# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **LESLIE GALLOWAY, III**, | ) | |
| *Petitioner*, | ) | |
| | ) | |
| v. | ) | No. 1:24-CV-121-CWR |
| | ) | |
| **BURL CAIN,** Commissioner, Mississippi | ) | **CAPITAL CASE** |
| Department of Corrections; MARC | ) | |
| MCCLURE, Superintendent, Mississippi | ) | |
| State Penitentiary at Parchman, | ) | |
| Mississippi; and LYNN FITCH, Attorney | ) | |
| General of the State of Mississippi, | ) | |
| *Respondents*. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF AMENDED PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

**Claudia Van Wyk**
(pro hac vice)
American Civil Liberties Union
Capital Punishment Project
201 W. Main Street, Suite 402
Durham, NC 27701
(267) 971-6991
cvanwyk@aclu.org

**Ayanna Hill**
Miss. Bar No. 106590
American Civil Liberties Union
101 S. Congress St
Jackson, Mississippi 39201
(601) 354-3408
ahill@aclu-ms.org

**Gerald W. King, Jr.**
Chief, Capital Habeas Unit
for the Fourth Circuit
Gerald_King@fd.org

**Elsa-Maria Ohman**
(pro hac vice)
Assistant Federal Public Defender
Capital Habeas Unit for the Fourth Circuit
Elsa_Ohman@fd.org

**G. Amber Pittman**
(pro hac vice)
Deputy Federal Public Defender
Capital Habeas Unit for the Fourth Circuit
G_Amber_Pittman@fd.org
Federal Public Defender
Western North Carolina
129 W. Trade Street, Suite 300
Charlotte, NC 28202
Telephone: (704) 374-0720
Fax: (704) 374-0722

Attorneys for Petitioner

December 10, 2025

# TABLE OF CONTENTS

A. Introduction – Summary of the Legal Arguments .................................................. 1

B. The Scope of This Court's Habeas Corus Review Under the Antiterrorism and
   Effective Death Penalty Act of 1996 (AEDPA) .................................................. 2

C. The Required Analysis of Galloway's Sixth Amendment Claims of Ineffective
   Assistance of Counsel .................................................................................... 8

D. The Required Analysis of Procedural Default ..................................................... 11

   1. The Default Rulings Were Not Independent of Federal Law ....................... 12

   2. The Procedural Rule On Which The State Court Relied was Inadequate
      to Bar Federal Review................................................................................ 13

   3. Even if the Petition Includes a small Minority of Defaulted Claims, No
      Default Bar Prevents the Court From Granting Relief for Their Cumulative
      Effect With the Claims Entitled to Merits Review ....................................... 14

E. Statement of the Facts ....................................................................................... 15

   1. Facts Presented During the Trial Proceedings............................................. 15

   2. Facts Presented During the Sentencing Proceedings .................................... 22

   Grounds for Relief............................................................................................. 26

   I.     The Trial Court, By Allowing The Admission of DNA Test Results
          Without Providing Mr. Galloway The Opportunity To Confront The DNA
          Analyst Who Did The Testing, Violated His Sixth Amendment Right
          To The Confrontation Of Witnesses And Other Constitutional
          Rights ................................................................................................ 26

   II.    Trial Counsel's Failure to Prevent, Impeach, or Attack the "Junk Science"
          Opinion Testimony of the State's Pathologist Deprived Mr. Galloway
          of the Effective Assistance of Counsel .................................................... 50

   III.   Trial Counsel Provided Unconstitutional Ineffective Assistance During
          Jury Selection ...................................................................................... 72

   IV.    Trial counsel's prejudicially deficient investigation into mitigating
          circumstances of Mr. Galloway's background and mental health deprived

him of right to the effective assistance of counsel as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution ............................................................................................ 108

V.    Counsel failed to investigate the carjacking aggravating circumstance used to obtain Mr. Galloway's death sentence and thus deprived Mr. Galloway of the effective assistance of counsel ..................................... 182

VI.    The State Violated Its Constitutional Duty in Suppressing Material Impeachment Evidence About Dr. McGarry's Misconduct, Depriving Mr. Galloway of Due Process Law ......................................................... 198

VII.    The Court's Failure to Require a Clear Jury Finding That Any Penetration was Non-Consensual, Either in Its Initial Instructions or in Response to a Jury Note, Deprived Mr. Galloway of His Rights to the Presumption of Innocence, Due Process, a Fair Trial, and a Reliable Sentencing Determination ........................................................................................ 208

VIII.    The Evidence was Insufficient to Sustain the Predicate Felony of Sexual Battery and thus Insufficient to Sustain Mr. Galloway's Capital Murder Conviction in Violation of The Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution ........................................................ 214

IX.    Mr. Galloway's Constitutional Rights Were Violated by Juror Misconduct ........................................................................................ 217

X.    The Statutory Petit Jury Oath Prevented Mr. Galloway From Vindicating His Constitutional Right To Determine Whether The Prospective Jurors In His Case Could be Fair And Impartial And Follow The Law .............................................................................................. 228

XI.    Mr. Galloway was Denied His Constitutional Rights By the Mississippi Statute Limiting the Jury Venire to Qualified Electors or Resident Freeholders For More Than One Year ..................................................... 232

XII.    Forcing Mr. Galloway to Wear a Stun Belt at Trial Deprived Him of his Right to the Presumption of Innocence, Due Process, a Fair Trial, a Reliable Sentencing Determination, and Effective Assistance of Counsel .............................................................................................. 237

XIII.    The Unwarranted Delay in Scheduling the Trial in this Case Violated Mr. Galloway's Constitutional Right to a Speedy Trial ................................ 250

XIV.    The Trial Court's Exclusion of Evidence of Ms. Anderson's Sexual Relationships with Third Parties Violated Mr. Galloway's Due Process and Sixth Amendment Rights, and Counsel's Failure to Object on State

Evidentiary and Constitutional Grounds Deprived Him of the Effective Assistance of Counsel .......................................................................... 259

XV.    The Trial Court Violated Mr. Galloway's Rights by Allowing Victim Impact Evidence in his Guilt Phase Trial Over Defense Objection........ 273

XVI.    Dixie Brimage's Highly Suggestive and Unreliable In-Court Identification of Mr. Galloway Violated His Constitutional Rights and Mandates Reversal ................................................................................................ 280

XVII.    The Trial Court's Overruling the Defense's Objection to Speculative and Constitutionally Unreliable Testimony on an Important Issue Violated Mr. Galloway's Rights to Due Process, a Fair Jury Trial, to Confront All Witnesses Against Him and to a Reliable Sentencing Determination as Guaranteed Him by the Sixth, Eighth, and Fourteenth Amendments .......................................................................................... 287

XVIII. The Trial Court Deprived Mr. Galloway of His Sixth Amendment Right to Confrontation by Allowing the Admission of Multiple Testimonial Hearsay Statements ............................................................................... 292

XIX.    The Prosecution's Misconduct Violated Mr. Galloway's Rights Under the Sixth, Eighth, and Fourteenth Amendments ......................................... 306

XX.    The Court's Requirement that Defense Counsel Share the General Nature of the Defense to be Offered and Counsel's Acquiescence at Trial Deprived Mr. Galloway of his Rights Against Self-Incrimination, to a Fair Trial, Due Process, a Fair and Reliable Verdict and the Assistance of Counsel .............................................................................. 317

XXI.    The Trial Court's Refusal to Give Proposed Sentencing Instructions and its Defective Charge to the Jury Violated Mr. Galloway's Rights and Necessitates Habeas Relief .................................................................... 322

XXII.    By Excluding Penalty Phase Evidence That Would Have Rebutted the Implication Raised by the State That Mr. Galloway Was a Future Danger, the Court Violated Mr. Galloway's Rights Under the Sixth, Eighth, and Fourteenth Amendments .......................................................................... 328

XXIII. The Court Violated Mr. Galloway's Rights Under the Sixth, Eighth, and Fourteenth Amendments by Excluding the Relevant Mitigating Evidence Regarding the Conditions at the Mississippi Department of Corrections Endured by Inmates Sentenced to Life Without Parole ......................... 333

XXIV. The Evidence that the State Introduced to Establish the Aggravating Factor of a Prior Conviction for a Crime of Violence was Constitutionally Insufficient .................................................................. 337

XXV. By Sustaining the Prosecution's Objection to Constitutionally Protected or Permissible Defense Arguments in Summation, the Trial Court Violated Mr. Galloway's Rights Under the Sixth, Eighth, and Fourteenth Amendments ........................................................................................ 342

XXVI. The "Especially Heinous, Atrocious, or Cruel" Aggravating Circumstance was Constitutionally Invalid in Violation of the Eighth and Fourteenth Amendments ........................................................................................ 399

XXVII. Mississippi's Capital Punishment Scheme is Unconstitutional on its Face and as Applied .................................................................................. 358

XXVIII. Prosecutors' Unfettered, Standardless, and Unreviewable Discretion Violates Equal Protection, Due Process, and the Eighth Amendment ........................................................................................ 370

XXIX.   The Numerous Instances of Ineffective Assistance of Counsel Cumulatively Require Relief ............................................................. 374

XXX. Cumulative Error Requires Relief from Both the Conviction and the Death Sentence ...................................................................................... 388

XXXI. The Supreme Court's Decision in *Loper Bright Enterprises v. Raimondo* Prohibits "Deference" to the State Court Decision Under 28 U.S.C. § 2254(d) ................................................................................................. 381

F.   Conclusion ............................................................................................... 395

Certificate of Service .................................................................................... 396

**Table of Citation Abbreviations**

| Abbreviation | Document |
|---|---|
| C. | Clerk's record |
| R. | Reporter's record |
| Supp. Tr. Jury Instructions | Portion of record supplemented with transcription of jury instructions on June 9, 2011 |
| R.E. Tab | Record excerpt tabs |
| S-# | Exhibits introduced by the State at the guilt phase of trial with page references corresponding to the chronological page number of the document in PDF form; |
| S PP-# | Exhibits introduced by the State at the penalty phase |
| MS SCt Petition (Ex. #) | Exhibits to Motion for Leave to Proceed in the Trial Court with a Petition for Post-Conviction Relief, October 3, 2014 |
| MS SCt Second Amended Petition (Ex. #) | Exhibits to Second Amended Motion for Post-Conviction Relief, Mississippi Supreme Court, November 21, 2021 |
| App. | Appendix to Petitioner's Petition for Writ of Habeas Corpus, Doc. 11-1, July 26, 2024 |
| Supp. App. | Supplemental Appendix to Petitioner's Memorandum of Law, December 10, 2025 |

Petitioner Leslie Galloway III, a death-sentenced inmate, filed his petition for writ of habeas corpus on July 26, 2024. Doc. 11. This Court directed Galloway to file this memorandum of law in support of the petition in the Court's Order Granting Motion for Appointment of Counsel, Doc. 3, and granted permission to file the memorandum no later than December 3, 2025.  Minute order, October 24, 2025.

## A. INTRODUCTION – Summary of the Legal Arguments.

Leslie "Bo" Galloway[1] presents this memorandum in support of his writ of habeas corpus, which raises thirty constitutional claims for relief, including the following.  The state presented constitutionally unreliable evidence, including unconfronted testimonial hearsay from a DNA analyst whom the State did not call as a witness, and junk science testimony from a disgraced pathologist who had recently lost his job in New Orleans for botched autopsies, without direct contradiction from Mr. Galloway's unprepared counsel. Trial counsel also allowed the state to select an all-white jury unchallenged. That all-white jury convicted and sentenced Mr. Galloway to death after a trial so riddled with constitutional error that the jurors could not conduct an informed weighing of the facts at either phase of trial.   Trial counsel, through pervasive ineffective assistance, left jurors uninformed about multiple facets of the truth, including experiences of abuse, neglect and impoverishment, his resulting PTSD and other mental illness, and the counter-narrative behind a conviction the State introduced as an aggravating factor.  Instead, they presented a paltry twenty-two pages of mitigation testimony and no mental health experts.  The all-white jury convicted and sentenced Mr. Galloway to death after a trial so riddled with

---

[1] This pleading refers to Mr. Galloway as "Bo" when describing his childhood or the statements of persons who knew him by that name.

1

constitutional error that the jurors could not conduct an informed weighing of the facts at either phase of trial.   For all the reasons below and in the petition, this Court should grant an evidentiary hearing and, ultimately, relief.

### B. The Scope of This Court's Habeas Corpus Review Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a federal court ordinarily may not grant a writ of habeas corpus unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). Exhaustion requires that a claim of constitutional error must first be raised "before the state courts in accordance with state procedures." *Shinn v. Ramirez*, 596 U.S. 366, 378 (2022), and that the "substance" of the claim, *Vasquez v. Hillery*, 474 U.S. 254, 258 (1986), must be "fairly presented" to the "highest" state court, *Brown v. Allen*, 344 U.S. 443, 447 (1953), either on direct appeal or in state post-conviction proceedings, *Castille v. Peoples*, 489 U.S. 346, 351 (1989); *see also Picard v. Connor*, 404 U.S. 270, 275, 277 (1971) (in order for the issue to be exhausted, the federal claim must be "fairly presented" to state court to give state "an opportunity to apply controlling legal principles to the facts bearing upon [the] constitutional claim"). Exhaustion also requires pursuit of all available discretionary review options that are a part of the ordinary appellate process. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999).

If the petitioner has failed to exhaust the claims, but it would be futile to return to state court to exhaust these claims, "the technical requirements for exhaustion" have been met because "there are no state remedies any longer 'available' to him." *Coleman v. Thompson*, 501 U.S. 722, 732 (1991). In this situation, the federal court must determine whether the failure to present this claim in accordance with state procedure – or, a

procedural default – can be "excused" due to "cause for the default and actual prejudice as a result of [an] alleged violation of federal law." *Id.* at 750.

If the claim has been exhausted in state court and there is no applicable procedural default, AEDPA places the following limitations on a federal court's ability to grant habeas corpus relief:[2]

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was not adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The federal court assesses the reasonableness of the "last state-court adjudication on the merits" of the claim. *Brown v. Davenport*, 596 U.S. 118, 141 (2022). A denial of discretionary review by an appellate court does not constitute an adjudication and instead is simply a decision "not to decide at all." *Id.* at 142.

Despite these limitations on the federal court's ability to grant relief, habeas review is neither a "meaningless ritual" nor a simple rubberstamp of the state court's judgment. *Evitts v. Lucey*, 469 U.S. 387, 393-94 (1985). Even under AEDPA, searching and meaningful federal court review remains available. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (deference under AEDPA "does not imply abandonment or abdication of judicial review" and "does not by definition preclude relief"); *see also Panetti v. Quarterman*, 551 U.S. 930, 953-54 (2007) (considering petitioner's claim under AEDPA "without deferring to the state court's finding"

---

[2] In Ground Thirty-One, Petitioner argues that these limitations are unconstitutional.

where "the factfinding procedures upon which the court relied were not adequate for reaching reasonably correct results").

First, § 2254(d)'s deference requirements do not apply to any issues upon which the state court did not rule on the merits or, under the plain language of the statute, "adjudicate the claim on the merits." If the petitioner has properly presented a claim to the state court but the state court has not adjudicated the claim or a required element of the claim on the merits, the federal court will apply a *de novo* standard of review. *See, e.g., Brumfield v. Cain*, 576 U.S. 305, 323 (2015) (Where "the state trial court never made any finding" on an element of the claim, "[t]here is . . . no determination on that point to which a federal court must defer in assessing" the claim).

With respect to the claims that the state court did address on the merits, the federal court must apply the limitations on relief of § 2254(d).  In doing so, "AEDPA does not require a federal habeas court to adopt any one methodology" in deciding whether relief is required.  *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). But a federal court that first conducts *de novo* review before making a "perfunctory statement" that the state court's analysis was unreasonable acts in "a manner fundamentally inconsistent with AEDPA."  *Shinn v. Kayer*, 592 U.S. 111, 119 (2020) (quoting *Sexton v. Beaudreaux*, 585 U.S. 961, 968 (2018)).

"[C]learly established Federal law" under § 2254(d)(1) refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision," *Williams (Terry) v. Taylor,* 529 U.S. 362, 412 (2000), and may consist of a "series of precedents" establishing "the governing legal principle or principles," *Lockyer*, 538 U.S. at 71. Federal courts may look to circuit precedent to ascertain whether the circuit court has already held that a particular point in issue is clearly established by Supreme Court precedent, but they may not canvass circuit decisions to determine whether a particular rule of law is so widely accepted among the federal

4

circuits that it would, if presented to the Supreme Court, be accepted as correct. *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013); *see also Andrew v. White*, 604 U.S. 86, 106 (2025) ("[d]efining clearly established law at an overly high level of generality makes it virtually impossible to find an unreasonable application warranting relief.").

If the Supreme Court's precedents have not addressed an issue, it cannot be said that the state courts had unreasonably applied clearly established Federal law under AEDPA. *Wright v. Van Patten*, 552 U.S. 120 (2008) (per curiam). In other words, "'if a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state-court decision.'" *White v. Woodall*, 572 U.S. 415, 426 (2014) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004)). "AEDPA permits relief only when a state court acts contrary to or unreasonably applies th[e Supreme] Court's preexisting and clearly established rules." *Brown v. Davenport*, 596 U.S. 118, 144 (2022) (a federal court may not "use an AEDPA case as an opportunity to pass on the wisdom of extending old precedents in new ways."). Additionally, Circuit precedent, state court decisions, treatises, and law review articles cannot amount to or inform "clearly established Federal law." *Kernan v. Cuero*, 583 U.S. 1, 9 (2017).

The Court must also consider "the specificity" of the clearly established law. *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004). "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* It is not unreasonable for "a state court to decline to apply a specific legal rule that has not been squarely established" by the Supreme Court. *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009). Nevertheless, a clearly established general principle qualifies as "clearly established federal law" under the statute. *Andrew*, 604 U.S. at 94 ("General legal principles can constitute clearly established law for purposes of AEDPA so

long as they are holdings of this Court."). There is a "presumption that state courts know and follow the law." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). Thus, state court decisions are given "the benefit of the doubt," *id.*, under AEDPA's "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997).

A state court decision will be "contrary to" established Supreme Court precedent if the state court either "applies a rule that contradicts the governing law set forth" by the Supreme Court or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [the Supreme Court] precedent." *Williams,* 529 U.S. at 405-06.

A state court decision will be an "unreasonable application of" the Supreme Court's clearly established precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case," *Williams*, 529 U.S. at 407-08, or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," *id.* at 407. "An unreasonable application of federal law is different from an incorrect application of federal law." *Id.* at 410. Even a "clear error" will not suffice. *Woodall*, 572 U.S. at 419. Rather, a state court decision is unreasonable if the decision is "objectively unreasonable," *Williams*, 529 U.S. at 409, which is established "if, and only if, . . . there could be no 'fairminded disagreement' on the question," *Woodall*, 572 U.S. at 427 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.")).

6

In deciding whether a state court's decision "involved" an unreasonable application of federal law or "was based on" an unreasonable determination of the facts, the federal habeas court is required "to 'train its attention on the particular reasons – both legal and factual – why state courts rejected a state prisoner's federal claims," and to give appropriate deference to that decision. *Wilson v. Sellers*, 584 U.S. 122, 125 (2018) (quoting *Hittson v. Chatman,* 576 U.S. 1028, 1028 (2015) (Ginsburg, J., concurring in denial of certiorari)).

> A federal court must carefully consider all the reasons and evidence supporting the state court's decision. After all, there is no way to hold that a decision was "lacking in justification" without identifying – let alone rebutting – all of the justifications.

*Mays v. Hines*, 592 U.S. 385, 391-92 (2021) (per curiam).

In applying the § 2254(d) analysis, when the last state court to reject a prisoner's claim issued only an unexplained order, the federal courts presume that "later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground" or basis. *Ylst v. Nunnemaker*, 501 U.S. at 797, 801 (2014). This presumption is made because "unexplained orders" typically reflect "agree[ment] . . . with the reasons given below." *Id* at 804.

In applying these standards, "whether a state court's decision was unreasonable must be assessed in light of the record the court had before it." *Holland v. Jackson*, 542 U.S. 649, 652 (2004) (per curiam). In other words, federal habeas review is limited to the record that was before the state court at the time the state court adjudicated the claim. *Ramirez*, 596 U.S. at 378; *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011).

The applicable rules for the federal court's consideration of state court findings of fact are found in § 2254(d)(2) and § 2254(e)(1), which provide that "a determination of a factual issue made by a State court shall be presumed to be correct," unless the petitioner rebuts "the presumption of correctness by clear and convincing evidence." The interplay of these sections is

as follows:

> Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding, § 2254(d)(2); see also *Williams*, 529 U.S. at 399, 120 S. Ct. 1495 (opinion of O'Connor, J).

> Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief. A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.

*Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). In short, a federal court need not "accept[] without question the state court's evaluation" of demeanor and credibility. *Id.* at 341.

## C. The Required Analysis of Galloway's Sixth Amendment Claims of Ineffective Assistance of Counsel.

The United States Supreme Court has repeatedly emphasized the fundamental role of counsel in ensuring a defendant a fair trial. *See, e.g., Gideon v. Wainwright*, 372 U.S. 335, 343-44 (1963). Counsel, the Court has stated, is the means through which all other rights of the person on trial are secured. *United States v. Cronic*, 466 U.S. 648, 653 (1984); *see also United States v. Ash*, 413 U.S. 300, 307 (1973) (counsel serves as a "guide through complex legal technicalities"). This core component of our adversary system is meaningless, however, if counsel performs incompetently. Thus, the Court has held that the right to counsel necessarily encompasses "the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

8

In determining whether trial counsel provided ineffective assistance of counsel, pursuant to the Sixth and Fourteenth Amendments, the courts must apply the standards set forth in *Strickland*. The *Strickland* standard is satisfied if a petitioner establishes both that his attorney's representation "fell below an objective standard of reasonableness," *id.* at 688, and that the petitioner was "prejudiced" by his attorney's substandard performance, meaning that there is a reasonable probability that, but for counsel's deficiency, the outcome would have been different. *Id.* at 692; *see also Andrus v. Texas*, 590 U.S. 806 (2020) (per curiam); *Buck v. Davis*, 580 U.S. 100 (2017); *Hinton v. Alabama*, 571 U.S. 263, 274 (2014) (per curiam); *Sears v. Upton*, 561 U.S. 945 (2010) (per curiam); *Porter v. McCollum*, 558 U.S. 30 (2009) (per curiam); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000).

In deciding an ineffective assistance claim, courts need not "address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. Specifically, the court can first address prejudice and, if none is found, the court need not address the question of whether counsel's conduct is deficient. *Id.* In assessing prejudice, a reviewing court considers the effects of more than one deficiency cumulatively. *See Strickland*, 466 U.S. at 694-95 (prejudice test assesses effect of "counsel's unprofessional errors"); *Dodson v. Stephens*, 611 F. App'x 168, 178-79 (5th Cir. 2015) (unpublished) (recognizing the 5th Circuit's previous application of a cumulative *Strickland* prejudice analysis "when confronted with a case in which there were multiple instances of deficient performance by counsel").

*Strickland* is clearly established law under AEDPA for all claims of ineffectiveness of trial counsel even though it requires a case-by-case examination of the facts. *Williams*, 529 U.S. at 391. *Williams* and *Wiggins* and the subsequent Supreme Court cases applying the *Strickland*

standard have "made no new law" and have simply applied the *Strickland* standard. *Wiggins* at 522 (quoting *Williams*, 529 U.S. at 396); *see also Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (per curiam) (The *Strickland* "standard is necessarily a general one.").

When AEDPA review is conducted under 28 U.S.C. § 2254, "[j]udicial review of a defense attorney's" conduct "is highly deferential – and doubly deferential when it is conducted through the lens of federal habeas," which requires a showing that the state court judgment is "not only erroneous, but objectively unreasonable." *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) (per curiam). The "doubly deferential" review means (1) there is a "highly deferential" look at counsel's performance; and (2) this must be done through the "deferential lens of § 2254(d)." *Pinholster*, 563 U.S. at 190; *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013) (The "'doubly deferential' standard of review . . . gives both the state court and the defense attorney the benefit of the doubt.")

> Federal courts may not disturb the judgments of state courts unless "each ground supporting the state court decision is examined and found to be unreasonable." *Wetzel v. Lambert*, 565 U.S. 520, 525, 132 S.Ct. 1195, 182 L.Ed.2d 35 (2012) (per curiam). Thus, if a fairminded jurist could agree with either [the state court's] deficiency or prejudice holding, the reasonableness of the other is "beside the point." *Id.*, at 524, 132 S.Ct. 1195.

*Shinn v. Kayer*, 592 U.S. 111, 120 (2020). Under AEDPA, "the only question that matters" is whether the state court's adjudication was "so obviously wrong as to be 'beyond any possibility for fairminded disagreement.'" *Id.* at 124 (quoting *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011)). In other words, an "unreasonable" adjudication refers only to "extreme malfunctions" in the state court adjudication. *Mays v. Hines*, 592 U.S. 385, 391 (2021) (per curiam) (quoting *Richter*, 562 U.S. at 102).

With respect to counsel's conduct, "*Strickland*'s first prong sets a high bar. A defense lawyer navigating a criminal proceeding faces any number of choices about how best to make a

client's case." *Buck v. Davis*, 580 U.S. 100, 118 (2017). At minimum, however, counsel has a duty to conduct an "independent examination of the facts, circumstances, pleadings and laws involved." *Strickland*, 466 U.S. at 693; *see also Hinton*, 571 U.S. at 274 ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*.").

In assessing prejudice at the penalty phase of a capital case, a reviewing court must decide if there is a reasonable probability that, but for counsel's deficient performance, at least one juror would have voted for life. *See Wiggins*, 539 U.S. at 537; *Escamilla v. Stephens*, 602 F. App'x 939, 941-42 (5th Cir. 2015); *Ruiz v. Stephens*, 728 F.3d 416, 424 (5th Cir. 2013).

The ensuing sections of this introduction describe the trial testimony, which included a thoroughly investigated and presented prosecution case and a scanty defense presentation. Ground Four *infra* includes a detailed account of defense counsel's deficient defense investigation and preparation, which yielded them inadequate evidence to present at trial.

### D. The Required Analysis of Procedural Default.

The State and/or the Mississippi Supreme Court have maintained that Mr. Galloway has defaulted Grounds Eleven, Sixteen, Eighteen, Nineteen, Twenty-Two, and Twenty-Three by failing to object contemporaneously at trial, and has defaulted Ground Three by failing to present them on direct appeal. State's Answer at 1-2. A procedural ruling in state court cannot bar federal review unless the ruling rests on an adequate and independent state ground. *See Brown v. Davenport*, 596 U.S. 118, 133 (2022) (citing *Wainwright v. Sykes*, 433 U.S. 72 (1977)). In this case, the grounds the state court relied on were neither independent nor adequate.

11

### 1.  The Default Rulings Were Not Independent of Federal Law.

Section 99-39-21(a) of the Mississippi Code provides in relevant part that:

> Failure by a prisoner to raise objections, defenses, claims, questions, issues or errors either in fact or law which were capable of determination at trial and/or on direct appeal, regardless of whether such are based on the laws and the Constitution of the state of Mississippi or of the United States, shall constitute a waiver thereof and shall be procedurally barred[.]

At the time of the alleged defaults, however—during Mr. Galloway's trial and direct appeal—Mississippi law provided that an error that violated a petitioner's "fundamental constitutional rights" surmounted the procedural bars in the Uniform Post-Conviction Collateral Relief Act ("UPCCRA"). *See Rowland v. State*, 42 So. 3d 503, 506 (Miss. 2010); *Bevill v. State*, 669 So. 2d 14, 17 (Miss. 1996). Under that doctrine, if a reviewing court concluded that a litigant had suffered the violation of a fundamental constitutional right, "no discretion is afforded when deciding whether to except a claim . . . from procedural bars." *Rowland*, 42 So. 3d at 507; *id*. at 508. The Mississippi Supreme Court had also held that it would relax procedural rules in capital cases when it would advance "the interests of justice." *Williams v. State*, 445 So. 2d 798, 810 (Miss. 1984).[3]

Under this scheme, no state court could issue a default ruling independently of federal law, because a conclusion that the litigant had defaulted the claim would of necessity entail the rejection of any argument that a violation of fundamental constitutional right or deprivation of the interests of justice had occurred.  Thus, in this case, the state court's rejection of each claim, far from relying "independently" on pure

---

[3] The Mississippi Supreme Court has recently overruled the flexible "fundamental constitutional rights" test.  *See Howell v. State*, 358 So. 3d 613 (Miss. 2023). But that decision post-dates the time of the defaults in this case by many years and cannot retrospectively provide an independent state ground for its rulings years ago.

state law, depended on a conclusion that no federal violation had occurred. Accordingly, the state court rulings lacked the "independence" needed to serve as a bar to this Court's federal habeas review.

### 2. The Procedural Rule on Which The State Court Relied Was Inadequate To Bar Federal Review.

A state procedural rule is adequate to bar federal habeas review only if it is "firmly established" and "regularly followed," at the time of the default. *See Johnson v. Lee*, 578 U.S. 605, 608 (2016) (state procedural default rule "firmly established" because state court announced it "decades before" Lee's default) (per curiam); *Walker v. Martin*, 562 U.S. 307, 316-17 (2011) (rule firmly established, although discretionary, because caselaw plainly framed timeliness requirement); *Ford v. Georgia*, 498 U.S. 411, 424–25 (1991) (rule not announced at time of default not firmly established); *see generally* Brian R. Means, *Postconviction Remedies* § 24:9 & nn. 1-6 (2024 ed.). Whether the state procedural ruling is adequate is a question of federal law. *See Beard v. Kindler*, 558 U.S. 53, 60 (2009).

A decision that makes an unanticipated change to a rule is inadequate. For example, in *Cruz v. Arizona*, 598 U.S. 17, 26-27 (2023), the Court reviewed the state court's decision under a rule that allowed successive or untimely petitions based on "a significant change in the law." The state court had held that a previous case in which it had overruled binding precedent did not constitute a significant change. *Id*. at 27. The Supreme Court characterized this holding as "novel," "unforeseeable," and lacking "fair or substantial support in prior state law." *Id*. at 31 (citations omitted). The Court invoked its "rule, reserved for the rarest of situations, that 'an unforeseeable and unsupported state-court decision on a question of state procedure does not constitute an adequate ground to

preclude this Court's review of a federal question.'" *Id.* at 26 (quoting *Bouie v. City of Columbia*, 378 U.S. 347, 354 (1964)); *see also*, *e.g.*, *Austin v. Davis*, 876 F.3d 757, 777 (5th Cir. 2017) (interpretation of filing deadline for state habeas petitions did not apply to petitioner where "the procedural rule had not been clearly announced nor regularly followed because the [state court] had never before interpreted the statute in such a way"); *Reed v. Scott*, 70 F.3d 844, 846–47 (5th Cir. 1995) (application of procedural rule in cases decided after petitioner's alleged default do "not support the conclusion that [the procedural rule] was firmly established at the time [petitioner's case] was decided").[4] Because *Howell* abolished the judicially created exceptions to MISS. CODE § 99-39-21(1) long after the alleged defaults occurred, the new rule it created is inadequate to bar this Court's review.

Finally, Mr. Galloway's memo of law will provide claim-specific explanations why none of these claims falls under a procedural bar.

### 3. Even if the Petition Includes a Small Minority of Defaulted Claims, No Default Bar Prevents the Court From Granting Relief For Their Cumulative Effect With the Claims Entitled to Merits Review.

The State acknowledges that Mr. Galloway has properly exhausted most of his claims and does not contend that he has defaulted most of them.[5]  It acknowledges,

---

[4] The Mississippi Supreme Court itself has acknowledged implicitly that its change of course will work unanticipated hardship on petitioners.  *See Howell*, 358 So.3d at 616-17 ("Because we announce the partial overruling of *Rowland*, as described above, for the first time, we also address the merits of the petition and hold that the trial court correctly denied relief to Howell on the merits.").

[5] *See* State's Answer at 15, 16, 18, 19, 19-20, 20, 21, 22, 23, 24, 25, 26, 29, 30, 32, 33, 34, 34-35 (addressing Habeas Petition Grounds One, Two, Four, Five, Six, Seven, Eight, Nine, Ten, Twelve, Thirteen, Fourteen, Fifteen, Twenty, Twenty-One, Twenty-Four, Twenty-Five, Twenty-Six, Twenty-Seven, Twenty-Eight).

moreover, that he has properly exhausted his claims of cumulative ineffective assistance and cumulative error.[6]

The Mississippi Supreme Court has held that cumulative errors can override any procedural bars that might apply to the individual errors alleged. In *Minor v. State*, 402 So.3d 1272 (Miss. Feb. 27, 2025), the court held:

> Given the combined gravity of these four errors, we align with Judge Lawrence's application of the cumulative error doctrine. *Minor*, 2024 Miss. App. LEXIS 83, 2024 WL 804539, at *10 (Lawrence, J., dissenting). Admittedly we, like the Court of Appeals, can identify applicable procedural bars sufficient to deny Minor relief from any of the individual errors. But a line must be drawn, a line to dispel the notion that endless errors can be rectified on procedural grounds. Under these facts, the cumulative effect of the errors is simply too detrimental to ignore.

*Id*. at 1280. In Mr. Galloway's case, the concededly undefaulted errors alone, which include a clearcut Confrontation Clause violation in the presentation of DNA evidence and multiple errors involving highly unreliable expert pathology evidence, along with multiple instances of ineffective assistance of counsel at both phases of trial, had enough "combined gravity" on their own to require relief. The allegedly defaulted claims only add further weight to the "detrimental" and cumulative effect of all the errors combined. This Court should, at a minimum, address the cumulative impact of the claimed constitutional violations even if it rules that it cannot reach the merits of some of them or any of them individually.

### E.  Statement of Facts.

#### 1.  Facts Presented During the Trial Proceedings.

Leslie "Bo" Galloway was convicted and sentenced to death on September 23-24, 2010, in

---

[6] *See* State's Answer at 35, 36 (addressing Habeas Petition Grounds Twenty-Nine, Thirty).

Harrison County, Mississippi, for the murder of Shakeylia "Kela" Anderson on or about December 6, 2008. C. 304-305; R.E. Tab 3.

Mr. Galloway's capital murder conviction rested on the predicate felony of sexual battery by anal[7] penetration, but the prosecution's only evidence of anal sexual battery was the unequivocal (but scientifically invalid) testimony of forensic pathologist Dr. Paul McGarry that Ms. Anderson had been anally penetrated by a penis without her consent. *See* Ground Two, *infra*. And despite Dr. McGarry's testimony, the jury sent the trial court a note asking whether murder automatically escalated sex to sexual battery – a question that the court refused to answer. The question established that at least some jurors had serious doubts about whether non-consensual sex had occurred. C. 275.

At trial, the State presented evidence that Ms. Anderson had had a consensual sexual relationship with Mr. Galloway before her death and ongoing relationships with at least one other man, James Futch, whose DNA profile matched a complete profile identified in a sample from the victim. R. 526, 649; State Ex. 16 at 5. Mr. Galloway and Ms. Anderson had communicated by phone many times in the previous months, including on December 5, 2008, and she left with him voluntarily sometime after 10 p.m. on December 5. R. 422-23; 432-33; 482-85.

According to the State's evidence, there was a small, ¾ inch tear inside Ms. Anderson's anus when her body was found. R. 676, 731. Although semen was found in her vaginal cavity, no foreign biological material was found in her anal cavity. R. 730-31. Dr. McGarry nevertheless testified that "the anus had the kind of injuries that occur with forceful penetration." R. 675. He stated: "My impression is that it was forceful penetration of the anus that caused injury to the –

---

[7] The trial court instructed the jury only on alleged anal sexual battery, based on the State's response to its pretrial order requiring disclosure of the State's theory of sexual battery. *See* R. 746-47.

what is called the sphincter or the muscle ring around the anus that ordinarily is less than a fourth

of an inch in diameter, stretched out to more than an inch in diameter by the penetration of the anal

canal. It's evidence of anal rape." R. 677. He claimed that the penetration would have "cause[d]

enough pain that it would be resisted. It would not be … something that a person would want to

have done to them." R. 683, 678. On cross-examination, Dr. McGarry reiterated that only sexual

penetration could have caused this injury. R. 683.

The defense presented the testimony of Dr. LeRoy Riddick, a retired state medical

examiner and coroner for Mobile County, Alabama. R. 727. Dr. Riddick testified that the small

tear could have occurred when Ms. Anderson's body was run over by a vehicle or even from

straining during a large bowel movement. R. 731. Defense counsel did not ask him to comment

on Dr. McGarry's theory that *only* nonconsensual sexual penetration by a human penis could have

caused it.

In rebuttal, to close out the culpability phase, the prosecution recalled Dr. McGarry, who

rejected Dr. Riddick's testimony and insisted again that the injury represented a "classic pattern[]

of penetration, forceful, resisted into the anus…. And this is exactly what she had. She had the

injury of forceful penetration by a penis of a sexual event, not a random injury of the area between

her legs." R. 739-40. According to Dr. McGarry, Ms. Anderson's injuries were not merely

consistent with forceful penetration, they were, unequivocally, the result of forceful sexual

penetration.

The prosecution relied heavily upon Dr. McGarry's testimony in closing argument. It

reminded the jury that Dr. McGarry had described how Ms. Anderson "was brutally anally raped,

unequivocal could come from nothing else." R. 763 (emphasis added). Defense counsel suggested

in closing that the contradiction between the two experts was "reasonable doubt alone" as to the

greater offense of capital murder, R. 775, but did not advocate for the theory of the defense expert, stating only that "they are both experts" and "what expert are you going to believe or are they both right." *See* Petition at 22-28, 30-31. The prosecution, however, returned to Dr. McGarry's unequivocal conclusions in closing rebuttal:

> Dr. McGarry told you that there was no question that what he viewed as a result of his autopsy came from forcible penile penetration to the anus. This was not scratches around the outside of the anus. This was a tear inside of the anus that could only come from forcible penile penetration. He was very clear about that. He said that the type of force that would be used in this would be resisted, and the tearing would create so much pain that the individual who received this injury would resist this type of penetration.

R. 783 (emphasis added). The prosecution added:

> Dr. McGarry came back on rebuttal. … He said that based upon the examination that he did that this injury occurred from forceful penetration. It did not occur from rolling over…. So again, he stood or he sat right there, and for the second time said there was no question what caused the injuries to Kela Anderson's anus, and that, ladies and gentlemen, was rape.

R. 784.

The jury began deliberations at 10:26 a.m. on September 23, 2010. R. 786. Sometime before 11:45, the jury sent the court a third note,[8] which asked:

Does murder escalate the sex automatically to sexual battery? Please define legal

---

[8] After 40 minutes, the court received the first note asking the following:

1.    What was Leslie's phone #
2.    The taped interview, was it stopped in the middle of the interview? Or was it the full interview.
3.    What was Keela's Phone #
4.    What was Cornelious phone #
5.    What is confirmed that in the mixture was blood, sweat, or just DNA?

R. 786; C. 276. The court responded to the jury, "You have all of the evidence before you that can be considered. Please continue your deliberations." *Id*.

Soon thereafter, the jury sent out a second note requesting a copy of the phone records on which they could write. R. 787; C. 277. The court instructed them to "use the writing materials provided and do not write on the exhibits." *Id*.

term of sexual battery
Rape

R. 790; C. 275.  Defense counsel asserted that the jury's question suggested that at least some jurors believed that sex alone, even if consensual, could become sexual battery when paired with murder, and requested that the court instruct the jury that murder does not automatically escalate sex to sexual battery:

> The fact that if he killed her and had sex with her, does that make it sex battery, seems to me what they're asking.  And the answer, of course, to that question is no, it does not.
> ...........................................................................................
> It seems to me we could at least make that part of it clear to them, tell them, no, it doesn't.  It doesn't.  That is not the case here.  Otherwise they might say well, you know, we believe he murdered her, since he murdered her it has to be sex battery, therefore it must be capital murder.

R. 790-91.  Although the court confessed its confusion as to the meaning of the jury's question, R.790, it complied with the State's request to give only the "standard response" and told the jury, "You have all of the instructions of law that apply to this case.  Please review those instructions and continue your deliberations."  C. 275; R. 790-91.

Less than an hour later, the jury returned a verdict finding Mr. Galloway guilty of capital murder.  R. 792-93; C. 278.

*** 

The prosecution's evidence connecting Mr. Galloway to Ms. Anderson's death consisted of circumstantial evidence that he picked her up on the night of December 5 in his mother's car and was the last person seen with her alive, and DNA evidence directly linking him and his mother's car to the murder.

A hunter discovered the 17-year-old's body in a rural wooded area in Harrison County on the night of December 6, 2008. R. 447. Law enforcement officers found tire tracks and a burn patch near the body, which was undressed and burned.  R. 464, 550.  They secured the area for a

search the next morning, which was conducted in the presence of Dr. McGarry.  R. 463; 669.The investigation led law enforcement four days later to Ms. Anderson's cousin, Dixie Brimage.  Ms. Brimage informed them that she last saw Ms. Anderson on the night of December 5, through the glass screen front door of her grandmother's house, meeting a "Bo" from Moss Point.  R. 431-32; R. 102.  She reported that Ms. Anderson and the man stood talking outside a white Taurus for about five minutes before Ms. Anderson got into the car and left with him.  R. 432.  Ms. Brimage did not believe anyone else was in the car, but admitted she could not see clearly into its back seat.  R. 442.

Ms. Brimage told the police – and the jury – that she was certain that the man who picked up Ms. Anderson had gold teeth.  R. 445.  Mr. Galloway does not have gold teeth.  R. 442-43. Ms. Brimage was unable to positively identify Mr. Galloway from a photo line-up before trial.  *Id*. Nearly two years later, at trial, she identified Mr. Galloway in court, with certainty, as the man who picked up Ms. Anderson on December 5, 2008.  R. 432.

On December 9, 2008, law enforcement staked out Mr. Galloway's mother's home in Moss Point for several hours and pulled over her white Taurus when it left the residence.  R. 537. Mr. Galloway was driving, and Cornelius Triplett was in the vehicle with him.  R. 518.  Mr. Galloway was immediately placed into custody and handcuffed.  R. 537, 540, 518, 541. Officers did not allow Mr. Triplett to drive the vehicle back to the residence.  R. 114, 518. Law enforcement towed the Taurus to Bob's Garage in Pascagoula and left it there unattended overnight. R. 538, 544.  The next day, law enforcement collected samples from the car to submit for DNA testing to the Jefferson Parish (Louisiana) Regional Laboratory.  R. 474-76, 500-509.

As described further in Ground One, the DNA analyst at the lab who received, stored, and tested the samples did not testify at trial.  R. 654, 659-60.  Rather, a surrogate who had reviewed

the DNA test data did. This surrogate concluded that DNA profiles obtained on the undercarriage and inside of the Taurus were consistent with Ms. Anderson's known reference DNA sample. R. 643-44. She reported that two samples inside the car contained mixtures consistent with a combination of Mr. Galloway's and Ms. Anderson's reference samples. R. 648-49. She also concluded that DNA samples found on a pair of shoes and a hat located at Mr. Galloway's mother's house produced profiles consistent with Ms. Anderson's known reference sample. R. 645-47. The shoes and hat were found in an area of the house which Mr. Galloway's mother purportedly identified as Mr. Galloway's. R. 486, 519-20.

A sperm sample from the vaginal swab contained a mixture from at least two individuals. R. 656. From the DNA profiles produced from the swab, the analyst concluded that a man named James Futch[9] was a major contributor to the sample. R. 650. Though many of Mr. Galloway's alleles were missing from the profile, the analyst claimed that she could not exclude him as a minor contributor. R. 650-51.

After taking Mr. Galloway into custody, the police interrogated him. He told them that he and Ms. Anderson had had sex on Thanksgiving, that they had talked on the phone all day on December 5, 2008,[10] and that he had picked her up that night from the neighborhood behind the

---

[9] Mr. Futch told the police that he was Ms. Anderson's boyfriend and insisted that the last time he had sex with her was during the week of Thanksgiving, more than a week before her autopsy. R. 607, 610. He described their relationship as exclusive. R. 610. The State's DNA analyst testified that sperm samples can only last in a vaginal tract up to 2-3 days. R. 651. Ground Two, *infra*, describes evidence that Mr. Futch's last sexual encounter with Ms. Anderson must have been more recent than he claimed in his testimony.

[10] Phone records indicated that Ms. Anderson contacted Mr. Galloway at 7:21 a.m. on Friday, December 5, 2008, the day she disappeared. State Ex. 6 at 21. They also spoke the night before. *Id*. They continued to communicate by phone into the evening. *Id*. at 3, 21-22. The last phone call from Mr. Galloway's phone to Ms. Anderson's phone occurred at 11:12 p.m. *Id*. at 22. However, Ms. Anderson's phone received three calls from the phone of a mutual friend, Cornelius Triplett (the man in the car with Mr. Galloway at his arrest), at 2:30 a.m. on December 6, 2008. R. 526-27.The State also introduced evidence that Mr. Galloway and Ms. Anderson had been calling or text messaging each other for weeks leading up to her disappearance. R. 482-85, 523; State Ex. 6 at 4-22. They first connected through Mr. Triplett, who resided with Mr. Galloway and his mother at her home in Moss Point. R. 519-21; State Ex. 16 at 4.

Raceway in Gulfport in his mother's white Taurus. R. 477; State Ex.16 at 3-6.

Based on all the evidence, including Dr. McGarry's testimony and the surrogate DNA testimony, the jury returned a guilty verdict. C. 278.

### 2.  Facts Presented During Sentencing Proceeding

At the sentencing phase, the prosecution's evidence raised the clear implication that Mr. Galloway would be dangerous in the future. The prosecution told the jury that Mr. Galloway was a recidivist: he had been previously convicted of carjacking, and was under a period of post-release supervision when the crime was committed. R. 814. In closing argument, the State commended Ms. Brimage for "bravely" identifying Mr. Galloway, suggesting to the jury that she had reason to fear him. R. 759.

Nevertheless, the State sought to limit the defense by preventing it from introducing evidence that would demonstrate Mr. Galloway's "ability to adapt to prison life in the future or his ability or his propensity or lack thereof to commit violent acts in the future," including the testimony of psychologist Beverly Smallwood, and various lay witnesses. R. 804. Despite defense counsel's objection, the court granted the State's motion, ruling that "I'm not going to prevent you from putting on any kind of testimony about his behavior while incarcerated in the past," but the defense witnesses "will be prohibited from speculating as to how he might behave in the future." R. 806-07.

The defense had wanted to call Dr. Donald Cabana at the sentencing phase to provide the jury with information regarding "the conditions at the Mississippi Department of Corrections endured by inmates sentenced to serve life without the benefit of parole or hope of early release."

---

During this time, Mr. Galloway's and Ms. Anderson's relationship went beyond talking on the phone: they had consensual sex at least once, on Thanksgiving Day, November 27, 2008. State Ex. 16 at 5; R. 526.

C. 309; *see also* R. 799-802. This testimony would have responded to the State's arguments that imposition of a life sentence would be insufficient punishment and would not hold Mr. Galloway accountable for the capital murder, and that defense counsel's closing argument requesting a life sentence was a plea for "sympathy." R. 860. Nevertheless, the trial court ruled the testimony inadmissible. R. 803-04. Instead, the defense presented evidence from two employees of the Harrison County Detention Center, who testified about Galloway's general demeanor in jail, and family members and friends who testified Mr. Galloway was a loving and caring father to his three children. R. 829, 831, 834, 837, 839.

The entirety of the defense's penalty phase evidence fills just twenty-two transcript pages.[11] R. 815-40. First, attorney Rishel called the two corrections officers from the Harrison County Adult Detention Center. Deborah Wittle, "the officer in charge of the Offender Services Department" at the Detention Center, testified that Mr. Galloway had been placed in protective custody for his own wellbeing. R. 816. She reported that Mr. Galloway had received one minor rule violation while in custody for "talking through the fire-exit door to an inmate on the other side" and "[f]ailure to follow an order from the staff member and being on the top tier without permission." R. 817. She described him as "quiet," and stated that he never said anything disrespectful to her. *Id.* On cross-examination, she conceded that she only had contact with Mr. Galloway once a month. R. 818. Similarly, Dawn Catchings testified she interacted with Mr. Galloway every day for a year while working on the block in the Detention Center, never had any problems with him, and never knew him to lose his temper or get in trouble. R. 819-20.

The defense next called J.G., Mr. Galloway's thirteen-year-old paternal half-sister. Mr. Rishel appeared unprepared to examine her; after J.G. stated her name, Mr. Rishel asked her how

---

[11] R. 815-40 (four of these pages involved housekeeping before and after an overnight recess).

to spell her first name, then how to pronounce it, and then, clearly still having difficulty with her name, he offered instead to "just call you Ms. Galloway." R. 826. Mr. Rishel asked J.G. only five substantive questions, in what would prove to be a rote script: 1) whether she was close to Mr. Galloway; 2) whether he would help her in a jam; 3) whether she loved him; 4) whether she would visit him in prison; and 5) whether that would be good for her. R. 826-27.

Trial counsel's next witness was Vincent Bishop--then boyfriend and current husband of Mr. Galloway's sister, LaShandra Taylor--who had known Mr. Galloway only as an adult and for just a brief time. R. 828-829; *see also* App. 623a.  Ms. Christensen asked Mr. Bishop only how often he would see Mr. Galloway prior to his arrest, whether he had helped Mr. Galloway, whether Mr. Galloway was a good father to his children, whether he had visited him in the jail, and whether he would visit him in prison. R. 828-29.

The defense returned to its refrain with Mr. Galloway's childhood friend, Angelo Ash, asking only if Mr. Galloway was a good father to his children and if he and would visit him in jail. R. 831-32.

The defense did not deviate from that script even when examining Mr. Galloway's parents and sister. The defense asked Mr. Galloway's father, Leslie Galloway Jr., only whether he loved his son, whether he would visit him in prison, and whether Mr. Galloway was a good father to his children. R. 833-34. Mr. Rishel's lack of preparation tripped him up when Mr. Galloway, Jr. admitted that he had not visited his son while he was incarcerated close by at the Harrison County jail. R. 833. Still, Mr. Rishel did not stray from his script: as with every other witness, he next asked Mr. Galloway, Jr. if he would visit his son at Parchman, more than a five-hour drive from the Gulf Coast, if he was sentenced to life. *Id*.

24

Defense counsel's questioning also revealed how little he knew about his own client and his family. Mr. Rishel asked Ms. Taylor if Mr. Galloway was her older or younger brother. Even after she answered "younger," Mr. Rishel responded, "How much older than you is he?" R. 835. When Ms. Taylor testified that she and Mr. Galloway are "like a year and a half apart," Mr. Rishel asked how old his own client was: "So he's about 29 maybe. He's about 30 years old?" R. 835. Ms. Taylor corrected him, "No, he's 27." R. 835. Although Ms. Taylor had already testified that Mr. Galloway was younger than she was, Mr. Rishel was surprised by her answer: "Oh, you're older than he is?" R. 835. After stumbling, Mr. Rishel brought back out the same tired script he had used with the witnesses before her: whether she was close to her brother, whether he loved his children, and whether she would visit him in prison. R. 837.

Mr. Galloway's mother, Ollie Varghese, followed her daughter. Again, counsel asked her nothing more than whether she loved her son, how Mr. Galloway was as a father, and whether she would visit him in prison. R. 839-40. After cross-examination, apparently unsatisfied that her testimony on behalf of her son's life was so incomplete, Ms. Varghese asked permission to "say something" before she left the stand, but her request was denied. R. 840. Counsel did nothing to follow up. *Id*.

Without soliciting any information at all about Mr. Galloway's childhood or behaviors from any witness, the defense rested. Mr. Rishel never presented the testimony of his mental health expert, Dr. Smallwood, whom he had promised the jury he would call in his opening statement, only the day before. R. 812. The jurors returned a death verdict. R. 872. They found that Mr. Galloway "actually killed Shakeylia Anderson" but did not make an intent finding. C. 303. The jurors requested that the court poll them by number rather than by name, establishing beyond tenable dispute that Mr. Galloway's future dangerousness was prominent in their minds. R. 870;

C. 280.  The trial court immediately imposed a sentence of death.  R. 873.

**GROUNDS FOR RELIEF:**

I.    **GROUND ONE - The Trial Court, By Allowing The Admission Of DNA Test Results Without Providing Mr. Galloway The Opportunity To Confront The DNA Analyst Who Did The Testing, Violated His Sixth Amendment Right To The Confrontation Of Witnesses And Other Constitutional Rights.**

    **A. Introduction**

The State never made the expert who analyzed the DNA evidence that it used against Mr. Galloway available for cross-examination. A surrogate expert who knew nothing about how the non-testifying expert actually did her work presented the latter's testimonial hearsay, for its truth, to the jury. Because the DNA evidence had a substantial and injurious effect on the outcome of trial, the testimony violated Mr. Galloway's right to confront the witnesses against him. U.S. CONST. AMEND. VI. The Mississippi Supreme Court's denial of relief on this ground flouted well-established Supreme Court precedents and deserves no deference from this Court. The Court should accordingly grant habeas relief on this ground.

    **B. The state shielded the expert who performed the analyses from cross-examination by presenting a surrogate expert at trial.**

Bonnie Dubourg, a forensic DNA analyst for the Jefferson Parish Sheriff's Office Regional DNA Laboratory, was the State's only witness from the lab. Another analyst named Julie Golden, not Ms. Dubourg, had performed the DNA testing procedures.  She was not Ms. Golden's supervisor; Connie Brown, who did not appear at trial, supervised them both.  R. 654. Ms. Dubourg did not communicate with law enforcement or make critical decisions regarding the reference samples.  R. 659.  She played no part in, and did

not even observe, the storage of or testing procedures performed on the evidence samples. R. 654-60. Ms. DuBourg performed only the limited role of analyzing Ms. Golden's DNA test results. As Ms. DuBourg herself described it, "the tests were performed by Miss Julie Golden, who was also a DNA analyst. She actually ran the samples, and I analyzed her data." R. 654.[12] Thus, the State admitted Ms. Golden's testimonial out-of-court statements, describing her testing and production of DNA profiles from the known and unknown samples, through Ms. Dubourg's testimony.

---

[12] Ms. Dubourg often signaled when she was relying on Ms. Golden's out-of-court statements by employing the pronoun "we," which she used repeatedly. *See* R. 631 ("That is the type test that we performed."); R. 633 (lab runs "positive negative buffer controls…. along with all of the evidence that we test"); R. 634 ("we did receive exhibits for this case"); R. 634 ("the facility we were in was a secure facility"); R. 640 ("Yes, we received shoes."); R. 641 ("We conduct what is called short tandem repeat."); R. 643 ("we did obtain a profile" with respect to State's Ex. 4; it was "consistent with the DNA profile obtained from the reference blood sample of Shakeylia Anderson"); R. 649-50 ("When we get a vaginal swab, what we do is we do what is called a differential extraction where we're trying to separate the female portion, the vaginal cells from the sperm cells. So we get what is called an epithelial cell fraction and a sperm cell fraction. We did get an epithelial cell fraction which was consistent with Shakeylia Anderson. And on the cell fraction, the DNA profile obtained from the sperm cell fraction of the vaginal swab 7512-12S was consistent with being a mixture of at least two individuals, one major contributor and one minor contributor…. Leslie Galloway … cannot be excluded as a minor contributor in this mixture. Approximately 99.99 percent of the entire population can be excluded as possible contributors of the DNA in this mixture"); R. 647-48 ("Yes, we did [receive samples]."); R. 650 ("We run our samples through what is called a genetic analyzer, and we look at peaks….").

At other times, she described Ms. Golden's work through the use of a passive voice (i.e., omitting any mention of who did the work). *See* R. 647 (partial DNA profile obtained from State's Ex. 19; it "was consistent with the DNA profile obtained from the reference sample of Shakeylia Anderson"); R. 648 (DNA profile extracted from State's Ex. 22 "was consistent with being a mixture from at least two individuals."); R. 649 ("DNA profile obtained from" State's Ex. 23 "was consistent with the DNA obtained from the reference blood sample from Leslie Galloway"); R. 643 (State's Ex. 4 was "consistent with the DNA profile obtained from the reference blood sample of Shakeylia Anderson"); R. 643 (same with respect to State's Ex. 11); R. 644 (same with respect to State's Ex. 12); R. 644 (same with respect to State's Ex. 13); R. 644-45 (same with respect to State's Ex. 14); R. at 645 (same with respect to State's Ex. 9); R. at 645-46 (same with respect to State's Ex. 8); R. at 646-47 (same with respect to State's Ex. 15); R. 653 (same with respect to State's Ex. 10).

In contrast, Ms. Dubourg took ownership of her own work by using the pronoun "I." *See, e.g.,* R. 654 ("I analyzed the data.")

Ms. Golden, not Ms. Dubourg, performed the critical tasks of initial presumptive DNA testing,[13] DNA extraction (including the differential extraction of the DNA on the vaginal swab),[14] DNA quantitation,[15] polymerase chain reaction (PCR),[16] the separation and detection of PCR-produced STR (short tandem repeat) alleles, and the production of electropherograms through electrophoresis.[17] *See generally* Ms. Dubourg's testimony (R. 625-62); Dr. Ronald Acton's testimony (R. 693-726); *see also* Butler, Forensic DNA

---

[13] The lab analyst's first task is to identify whether the collected item has biological fluid present on it at all. John M. Butler, FORENSIC DNA TYPING: BIOLOGY, TECHNOLOGY, AND GENETICS OF STR MARKERS 39 (2d ed. 2005) (hereinafter, Butler).

[14] "A biological sample obtained from a crime scene in the form of a blood or semen stain [for example] ... contains a number of substances besides DNA." Butler, *supra*, at 42. Before the DNA from the sample can be examined, the other cellular substances must be separated from the DNA. Id. "**The extraction process is probably where the DNA sample is more susceptible to contamination in the laboratory than at any other time in the forensic DNA analysis process.**" *Id.* at 42 (emphasis added). During the extraction process, it is paramount that the lab analyst "avoid further degradation of the DNA template" by preventing the sample's exposure to heat, humidity, and UV irradiation or by treating a blood sample with a preservative, like EDTA, and make attempts to remove inhibitors to the polymerase chain reaction (PCR), like hemoglobin." *Id.* at 43, 49-50.

[15] DNA quantitation is the process for determining how much DNA is in a particular sample. "Only after DNA in a sample has been isolated can its quantity and quality be reliably assessed. Determination of the amount of DNA in a sample is essential for most PCR-based assays because a narrow concentration range works best . . . . Too much DNA can result in split peaks or peaks that are off-scale for the measurement technique . . . . Too little DNA template may result in allele 'drop-out' because the PCR reaction fails to amplify the DNA properly." Butler, *supra*, at 50. "PCR amplification [discussed below] is dependent on the quantity of template DNA molecules added to the reaction. Based on the DNA quantitation results ... the extracted DNA for each sample is adjusted to a level that will work optimally in the PCR . . . ." *Id.* at 56.

[16] PCR can be thought of as a molecular copy-machine. Butler, *supra*, at 63. Using alternating temperature cycles, PCR produces copies of the particular portions of the DNA template identified for STR analysis. *Id.* "**The sensitivity of PCR necessitates constant vigilance on the part of the laboratory staff to ensure that contamination does not affect DNA typing results.**" *Id.* at 79 (emphasis added). The process is "so sensitive that **it's very easy to get DNA transferred from one object to another.**" R. 709 (emphasis added). **That is why known samples and unknown samples need to be processed separately to avoid contamination.** Butler, *supra*, at 80.

[17] Once PCR amplification is complete, the lab analyst needs to follow the lab's protocols to remove the PCR enzymes that would inhibit electrophoresis, the chemical process used to separate and detect the STR alleles. The PCR amplified sample is then ready for electrophoresis. Electrophoresis, using a viscous medium and an electric field, separates DNA fragments by size. Once separated, the fragments are visualized using a sequence of dyes. Finally, software is used to plot the results of the electrophoresis, producing a chart called an electropherogram. The electropherograms are used for DNA analysis.

Typing; *id*. at 6, Figure 1.2 (overview of biology, technology, and genetics of DNA typing using short tandem repeat (STR) markers).

The State never called Ms. Golden. Instead, it presented Ms. Dubourg to relate Ms. Golden's test results for DNA collected from the following sources: (1) locations on Mr. Galloway's mother's car; (2) a pair of shoes and a hat found at Mr. Galloway's mother's house; and (3) a vaginal swab from Ms. Anderson's body.  R. 633-654. The lab obtained reference samples from Ms. Anderson, Mr. Galloway, James Futch, and Garrid Worlds,[18] and Ms. Golden developed DNA profiles from the samples.  R. 640, 649-50.  Ms. Dubourg testified that some of the DNA profiles collected from the car were consistent with the DNA profile generated from Ms. Anderson's known reference sample, and that the DNA profiles generated from the samples from the trunk release and the interior left passenger door of the car were consistent with a mixture of Ms. Anderson's and Mr. Galloway's known samples.  R. 642-45, 647-49.  She testified that the probability that these samples belonged to a randomly-selected individual was one in over 100 billion. *Id*.  Ms. Dubourg also testified that the DNA profiles obtained from the shoes and hat were consistent with the DNA profile obtained from Ms. Anderson's reference sample. R. 645-47.  The probability that these samples belonged to a randomly-selected individual, she testified, was also one in over 100 billion. *Id*.  Last, Ms. Dubourg testified that the vaginal swab contained sperm cells from at least two people, that DNA profiles were generated, and that she could not exclude the DNA profile generated from James Futch's known sample as the major contributor and the DNA profile obtained from Mr.

---

[18] James Futch testified at trial that he had a dating relationship with Ms. Anderson. R. 607.  He testified that they had last had sex in the days following Thanksgiving break. R. 610, 613.  The significance of the sample from Garrid Worlds was never explained at trial.  *See* R. 768.

Galloway's known sample as a minor contributor.    R. 649-50.    She could, however, exclude 99.99% of the entire population as possible donors to the sperm sample.  R. 650-51.

The State presented this evidence through Ms. Dubourg even though there was no evidence that she had observed Ms. Golden perform the DNA test procedures or even that Ms. Dubourg had been in the laboratory when Ms. Golden performed them. Because the State did not produce Ms. Golden, defense counsel could not question her about her critical tasks of initial presumptive testing, DNA extraction (including the differential extraction of the DNA on a vaginal swab), DNA quantitation, polymerase chain reaction (PCR), the separation and detection of PCR-produced STR (short tandem repeat) alleles and the production of electropherograms through electrophoresis.  Similarly, only Ms. Golden could have testified about possible sample contamination and her vigilance in attempting to prevent it.  Ms. Dubourg admitted that although the lab did its best to control contamination, it was "not a bubble."  R. 655.  She did not have the personal knowledge she would have needed to describe with certainty what actions Ms. Golden actually took in this case to reduce the possibility of contamination, whether any problems developed, or how she dealt with them.

At trial, the State shielded Ms. Golden from cross-examination and thus shielded her actions, the circumstances under which the DNA testing occurred, the care she took in performing her work, her vigilance, her veracity, her interest, her biases, her prejudices, her proficiencies, her capabilities, and the substance of her conversations with Investigator Mechelle Carbine of the Harrison County Sheriff's Department. The following exchange between Ms. Dubourg and defense counsel about the vaginal swab

in the rape kit makes plain her inability to provide meaningful information about these

critical matters:

> Q:   You initially did this first testing on February 20th, 2009; is that correct, with the sperm fraction?
>
>       ***
>
> A:   **It looks like** the first day that she [Golden] started testing was March 4th,2009, on the protocol for the swab.
>
>       ***
>
> Q:   Did you have anybody else [besides Mr. Galloway's reference sample] to compare it to at that time?
>
> A:   At that time – **I think** we did not have Mr. Futch at that time.
>
> Q:   Okay.  So did you get in contact with the investigator?
>
> A:   **I think Miss Golden did.  I believe to the best of my knowledge Miss Golden did.**
>
> Q:   Did y'all receive some more items?
>
> A:   We received two additional reference samples.

R. 656-57 (emphasis added).

In addition, when defense counsel asked about the lab's decision not to test the

inside of the baseball hat and shoes collected at Mr. Galloway's mother's house to

compare any DNA profile generated to Mr. Galloway's or any other reference samples,[19]

Ms. Dubourg again betrayed her lack of personal knowledge:

> Q:   All right.  And what part of the hat did you test?
>
> A:   **They** tested the bill because it was – I guess it was soiled.

---

[19] The only evidence that the baseball hat and shoes belonged to Mr. Galloway was the hearsay statement of his mother, improperly introduced through Inv. Carbine's testimony.  R. 519-20.  *See* Ground Eighteen, *infra*.

       ***

Q:     Okay. But there is – I understand the bill of a baseball hat, but you have the top part and the under part, which part –

A:     It was done by Miss Golden, and she just – I have that it's a swab of the bill. **So I'm not the one who tested it, so I can't say definitely.** It just says she swabbed the bill of the cap.

Q:     Okay.  Was the inside of the cap swabbed?

A:     I do not see that it was swabbed.

Q:     Okay.  Could that have been done?

A:     It wasn't done.  I mean, it was screened by Miss Golden, and she had talked to the investigator.  So **I guess** she had decided that it was more important to swab the bill of the cap.

R. 659 (emphasis added).[20] *See also* R. 660 (defense inquiring about Ms. Golden's decisions to test only the top and tongue of the shoes).[21]

Only after Ms. Dubourg took the stand did defense counsel learn that she had not performed the DNA testing—and then only during cross-examination.  R. 654, 664. Following her testimony, counsel immediately requested a hearing outside the jury's presence and moved to exclude the DNA evidence "referred to by Ms. Dubourg" on the ground that the defense had been denied the right to confront Ms. Golden guaranteed under Supreme Court precedent, including *Melendez-Diaz*, 557 U.S. 305.  R. 663-64.  The court denied the motion, ruling that Ms. Dubourg "analyzed the test results," her "superior

---

[20] The record suggests at least one reason to be concerned with the lab's storage and control of the baseball hat and shoes.  Inv. Carbine, who had collected the shoes from Mr. Galloway's mother's house, testified that they were not in the same condition at trial as when she found and secured them: the shoelaces had been removed.  R. 494-95.  Mr. Galloway's counsel had no opportunity to confront Ms. Golden about the storage and control of the evidence and why the shoelaces were missing.

[21] Additionally, had the State called Ms. Golden, defense counsel could have explored why she no longer worked as a DNA analyst at the Jefferson Parish Lab.  *See* R. 654 (Ms. Golden "**was** a DNA analyst.") (emphasis added).

also reviewed the test results and approved them," and "under Mississippi law the actual lab technician who does the test is not required to come to court to testify." R. 665-66. After trial, the defense raised the error again in a Motion for New Trial and Acquittal Notwithstanding the Verdict, which the trial court also denied. R. 877-79, 892-93; C. 307-309; R.E. Tab 4.

### C. The testifying analyst primarily conveyed the hearsay statements of the non-testifying analyst.

In *Crawford v. Washington*, 541 U.S. 36, 59 (2004), the Supreme Court held that the Sixth Amendment's Confrontation Clause bars the admission of a testimonial out-of-court statement unless the witness is unavailable and the defendant had an earlier opportunity to cross-examine, regardless of whether a court deems the statement reliable. The Court later applied this principle to out-of-court documentation of laboratory analyses. In *Melendez-Diaz*, 557 U.S. at 308-09, the State presented "certificates of analysis" showing the results of a state laboratory's tests of suspected cocaine. The Supreme Court held that the admission of these certificates violated the Confrontation Clause because they fell within the "core class of testimonial statements": they were essentially affidavits of fact sworn to by an officer authorized to administer oaths. They were, moreover, made under circumstances that would lead an objective witness to believe they would be available for use at trial. This made the analysts "witnesses" whom the Confrontation Clause required the state to make available for cross-examination at trial. *Id*. at 310-11.

In *Bullcoming v. New Mexico*, 564 U.S. 647, 652 (2011), the Court held that the Confrontation Clause did not permit "the prosecution to introduce a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular

33

fact—through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification," unless the non-testifying analyst was unavailable at trial and the accused had had a pretrial opportunity to cross-examine that analyst.

In the wake of these decisions, some courts sought to condone the use of unconfronted evidence of lab results by focusing on the basis for the testifying analyst's knowledge. In *Williams v. Illinois*, 567 U.S. 50 (2012), the prosecution presented a DNA analyst who had not conducted the testing but relied on a non-testifying analyst's results as a "basis" for her own opinion. Four dissenting justices maintained that the testifying analyst had relied on the non-testifying analyst's results for their truth, triggering Confrontation Clause protection. Justice Thomas agreed that the lab results were hearsay but viewed them as non-testimonial. The other four members of the Court, in the opinion that prevailed because Justice Thomas provided the fifth vote for affirmance, concluded that the recitation of the non-testifying analyst's findings "served the nonhearsay purpose of illuminating the expert's thought process." 567 U.S. at 78, 106 n.1, 132.

*Smith v. Arizona*, 602 U.S. 779, 790-91 (2024), disavowed the *Williams* plurality's acceptance of "basis" testimony, characterizing the plurality's reasoning as a constitutionally invalid end-run around the clear holdings in *Melendez-Diaz* and *Bullcoming*. In *Smith*, the state presented an analyst who had not participated in the testing, but whose trial testimony "related what was in" the non-testifying analyst's report and notes, "item by item." *Id*. at 790-91. The majority concluded that the report and notes were hearsay, explaining:

> [T]ruth is everything when it comes to the kind of basis testimony presented here. If an expert for the prosecution conveys an out-of-court statement in

34

> support of his opinion, and the statement supports that opinion only if true, then the statement has been offered for the truth of what it asserts. . . the truth of the basis testimony is what makes it useful to the prosecutor; that is what supplies the predicate for—and thus gives value to—the state expert's opinion.

602 U.S. at 795. Allowing an analyst who had "not taken part in the lab work" to offer an "independent opinion" based on another analyst's work would "allow for easy evasion of the Confrontation Clause" because it would deprive the defendant of the right to cross-examine the testing analyst about "what she did and how she did it and whether her results should be trusted." *Id.* at 798. While a non-testing analyst might properly describe the lab's typical functioning or general forensic guidelines and techniques, or might answer hypothetical questions that assumed the truth of out-of-court statements, that would not eliminate the defendant's right to "confront the person who actually did the lab work, not a surrogate merely reading from her records." *Id.* at 799-800.

In a case similar to this one, *United States v. Seward*, 135 F.4th 161, 168 (4th Cir. 2025), a DNA expert testified that her "lab analyzed" each DNA sample but admitted that she herself was not "hands-on with the samples." She merely reviewed the non-testifying analyst's notes and work and then "independently" reviewed that analyst's conclusions. The Court of Appeals held that the government had offered the testimony for its truth, implicating the Confrontation Clause. "As in *Smith*, the testifying witness relied on the work produced by another analyst to reach her expert conclusions." *Id.* at 168. Although the expert in *Smith* "more overtly" put the other analyst's statements on the record, while the *Seward* expert only implied that the other analyst had followed standard procedures, that distinction did not avoid the Constitution's requirement. "[T]he government may not sidestep the Sixth Amendment problems created by having a witness testify to their

opinions that are founded on a non-testifying analyst's out-of-court statements by simply omitting any questions about the analyst's work."  As in *Smith*, that would reduce the Court's relevant precedents to a dead letter. *Id.*; *accord Swims v. State*, No. 2023-KA-01244-COA, 2025 WL 2218140, at *5-7 (Miss Ct. App. Aug. 5, 2025) (testifying expert could describe own conclusions from direct review of autopsy photos, but non-testifying expert's autopsy report, and testifying expert's repetition of report's conclusions, were inadmissible in wake of *Smith*); *contra Roalson v. Noble*, 116 F.4th 661, 668-69 (7th Cir. 2024) (allowing analyst to testify about comparing DNA profiles developed by non-testifying analyst who ran tests did not unreasonably apply *Melendez-Diaz* and *Bullcoming*); *Grim v. Fisher*, 816 F.3d 296, 298-99 (5th Cir. 2016) (same, pre-*Smith*).[22]

　　In Mr. Galloway's case, as in *Smith* and *Seward*, the prosecution sought to sidestep the Confrontation Clause by having the testifying analyst, Ms. Dubourg, relay the work of her colleague, Ms. Golden, to the jury through use of the passive voice or the pronoun "we."  *See* Petition at 10. All Ms. Dubourg's opinions relied on the assumption that Ms. Golden's test results were true, and she made clear that she could not provide any evidence about how Ms. Golden had conducted her tests. Petition at 13-14. Ms. Dubourg's testimony conveyed hearsay offered for its truth and implicated the Confrontation Clause.

---

[22] Multiple state courts have recognized in the wake of *Smith* that similar surrogate expert testimony is inadmissible, in some cases despite earlier state precedents discounting *Bullcoming* and *Melendez-Diaz*. *See State v. Clark*, 909 S.E.2d 566, 570 (2024) ("[testifying expert]'s failure to independently test substance and sole reliance upon [non-testifying expert]'s statements contained in her report—being hearsay and testimonial in nature—implicated Defendant's rights under Confrontation Clause"); *State v. Smiley*, No. 114178, 2025 WL 2171058 (Ohio App. 8th Dist. July 31, 2025) (substitute analyst's testimony and DNA lab report were testimonial hearsay under *Smith*); *State v. Hall-Haught*, 569 P.3d 315, 322-23 (*Smith* abrogated state precedent that "misconstrued" *Williams* and had unconstitutionally allowed supervisor's expert opinion to rely on nontestifying analyst's factual statement as basis for opinion).

**D. The non-testifying analyst's statements, made in the expectation that the prosecution would use them at trial, were testimonial.**

The Confrontation Clause protects against the prosecution's cross-examination—free use of *testimonial* hearsay—when statements are made for the "primary purpose" of serving as trial testimony. *See Smith*, 602 U.S. at 800-01 (the "primary purpose" test is a "separate" requirement). In *Melendez-Diaz*, the Court found this test satisfied by a statement made "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." 557 U.S. at 310; *see also Smith*, 602 U.S. at 802 (test is whether statement prepared with "'focus on court'"); *Seward*, 135 F.4th at 169 (test is whether out-of-court statements made with "an evidentiary purpose"); *State v. Hale*, No. C-230420, 2024 WL 4901601, at * 13 (Ohio App. Nov. 27, 2024) ("When a BCI analyst communicates the results of her tests and the details of her procedure to another expert, who will then author a report, the non-authoring analyst *must* know that the substance of her statement is likely to make its way into a future prosecution. Indeed, that is the primary reason her lab and her job exist."). Alternatively, Justice Gorsuch suggested in *Franklin v. New York*, 604 U.S. ___, 145 S. Ct. 831, 833-34 (2025) (Gorsuch, J., respecting denial of certiorari), that courts should ask only whether the prosecution seeks to use a witness's statement against the defendant instead of presenting live testimony. Mr. Galloway's case easily satisfies Justice Gorsuch's alternative test; the government used Ms. Golden's hearsay, conveyed through Ms. Douborg, in lieu of presenting Ms. Golden's live testimony.

In this case Ms. Dubourg conveyed testimonial statements to the jury. The laboratory performed the analyses at the request of the case investigator for the Harrison County Sheriff's Department, received the samples from that department, and returned

37

them after completing the analyses. R. 634-35, 657. Ms. Golden received the samples from the lead sheriff's investigator in this case, Michelle Carbine, communicated with Ms. Carbine during the testing, addressed the report to Ms. Carbine, and invited Ms. Carbine to contact her with any further questions. The primary purpose of her work was to analyze evidence for a murder prosecution. Neither Ms. Golden nor any other reasonable analyst could have thought that her descriptions of her analytical steps and results had any purpose but to develop evidence the prosecution could use in court. And the prosecution did convey her hearsay statements to the jury through Ms. Douborg's testimony.

Ms. Dubourg's extensive recounting of Ms. Golden's testimonial hearsay at Mr. Galloway's trial violated his Sixth Amendment right to confront the witnesses against him.

### E. The admission of testimonial hearsay had a substantial and injurious effect on the outcome of trial.

To order relief for constitutional error, a habeas court must conclude that it had a substantial and injurious effect upon the outcome of trial. *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993); *accord Brown v. Davenport*, 596 U.S. 118, 122 (2022); *Hodges v. Epps*, 648 F.3d 283, 290 (5th Cir. 2011) (ordering relief because Mississippi Supreme Court's harmless error ruling was unreasonable, and constitutional error had substantial and injurious effect on outcome); *Burbank v. Cain*, 535 F.3d 350, 357-58 (5th Cir. 2008) (granting relief because Confrontation Clause error had substantial and injurious effect); *Wilkerson v. Cain*, 233 F.3d 886, 892 (5th Cir. 2000) (Confrontation Clause error had substantial and injurious effect, requiring habeas relief). If the habeas court finds itself in "grave doubt" on that question, it must rule for the petitioner. *O'Neal v. McAninch*, 513

38

U.S. 432, 435 (1995); *Gongora v. Thaler*, 710 F.3d 267, 283 (5th Circ. 2013) (ordering relief because court in "grave doubt" about harmlessness of error); *Robertson v. Cain*, 324 F.3d 297, 309-10 (5th Cir. 2003) (same).

Whether the unconstitutional admission of surrogate testimony about laboratory results had a substantial and injurious effect depends on both the extent of the testifying analyst's reliance on the non-testifying analyst's testimonial hearsay and the importance of the evidence to the prosecution's case. In *Hisler v. Royce*, No. 1:21-CV-03676 (DC), 2025 WL 903847, at *13 (E.D.N.Y. Mar. 25, 2025), for example, notations in the reports and forms admitted into evidence indicated that several non-testifying analysts had performed some of the DNA testing. The court concluded, however, that the testifying analyst described only her own out-of-court assertions about her own testing of the samples, and that any error was harmless because the petitioner had conceded his presence at the victim's home. *Accord Swims*, 2025 WL at *7 (although trial court erroneously admitted non-testifying expert's autopsy report, error harmless because testifying expert reached same conclusions based on own review of underlying photos). Similarly, in *Seward*, the government had offered significant circumstantial and forensic evidence that Seward did not challenge, and the DNA evidence was "comparatively limited." 135 F.4th at 170.

In Mr. Galloway's case, in contrast to *Hisler*, Ms. Dubourg conducted no analyses of her own. She served merely as a conduit for Ms. Golden's statements about her analyses and could not have answered any questions about how Ms. Golden actually conducted them. She could not describe whether or how Ms. Golden complied with the

necessary steps of extraction, quantitation, PCR, separation, or electrophoresis, or whether or how Ms. Golden guarded against possible contamination.

The State relied heavily on the DNA evidence, not only to draw a general connection between Mr. Galloway and Ms. Anderson, but to establish the sexual battery that provided the sole ground for a conviction of capital murder. Cross-examining Ms. Golden could have changed the outcome of trial by rebutting the State's theory of the case. Concurrently with this memorandum, Mr. Galloway has moved this Court to expand the record to include the report of Alan Keel, a consultant in forensic biology and DNA analysis, and to allow Mr. Galloway to present Mr. Keel's testimony at an evidentiary hearing. Mr. Keel is prepared to testify that trial counsel could have asked the non-testifying analyst about (a) her failure to recognize the vaginal swab profile as an *indistinguishable mixture* and her inappropriate use of a statistic to calculate the combined probability of inclusion or exclusion of Mr. Galloway's partial profile, (b) her failure to note the likelihood that the semen of the major contributor, Mr. Futch, was deposited *closer in time* to the victim's death than the fraction attributed to Mr. Galloway; and (3) whether, because the non-testifying expert analyzed all the samples concurrently, the presence of sperm attributed to Mr. Galloway as the minor contributor could be explained by *inadvertent cross-contamination* during processing. Supp. App. A24-A25 (Keel affidavit).[23]

---

[23] Defense expert Ronald Acton, Ph.D., testified to some of these same themes. He disagreed with Ms. Dubourg's "interpretation" of the data identifying Mr. Galloway as a minor contributor to the vaginal sample, because in a mixture the attempt to "pick and choose" and "deduce what you think may be the profile associated with one subject versus another" is "very problematic." R. 705. For that reason, the National Research Councils had repeatedly warned about the "problem with mixtures." *Id.* Here, some of Mr. Galloway's alleles were "not found in the mixture," which provided a "basis for exclusion." In Dr. Acton's opinion, the analyst had two choices: either say that the test was "inconclusive" and not report it or say that he was excluded. R. 707.

Before trial, Dr. Acton visited the Jefferson Parish Crime Laboratory, where he met Ms. Dubourg and a Ms. Brown (apparently the DNA lab's "technical leader," Connie Brown, R. 654), but not the analyst who

If trial counsel had had the opportunity to cross-examine Ms. Golden, they could have asked her whether the evidence suggested that Mr. Futch was the victim's last sexual partner, whether her concurrent analysis of all the samples could have created cross-contamination, and whether the vaginal sample reflected an indistinguishable mixture that could not support a calculation of the probability of inclusion/exclusion. The cross-examination could have prevented the jurors from concluding that the DNA results pointed to Mr. Galloway beyond a reasonable doubt. Allowing the prosecution to evade these cross-examination topics by presenting Ms. Dubourg's surrogate testimony had a substantial and injurious effect upon the outcome of trial.

### F. The *Teague* retroactivity bar does not apply because *Smith* did not announce a new rule.

#### 1. Law-of-the-case doctrine does not prevent this Court from applying *Smith* to decide the merits of the habeas petition.

In 2024, this Court denied Mr. Galloway's motion for a stay and abeyance to allow him to seek relief under *Smith* in the Mississippi Supreme Court. *See* Doc. 23 (filed Jan. 3, 2025). The Court rested its ruling partly on its perception that Mr. Galloway had already exhausted this claim in state court on direct appeal and had no viable avenue for further relief there. *Id*. at 7. It also ruled, however, that "*Smith* [did] not apply retroactively" because it announced a "new rule of criminal procedure", and no exception applied. *Id*. at 8-9. The State cites this ruling in support of its opposition to the claim. Answer at 16 n.1.

---

performed the DNA testing, Ms. Golden. R. 698-99. They showed him their own proficiency test records but apparently not Ms. Golden's. R. 699. Dr. Acton questioned whether one could properly call Ms. Dubourg an "expert" because she did not hold a doctorate, which could impair her ability to interpret results and recognize problems in testing. R. 700-01.

The Court's earlier ruling on stay and abeyance does not prevent it from deciding now that *Smith* applied an old rule on which a habeas court can rely. The "law of the case" is a discretionary doctrine that does not limit courts' powers. *Messenger v. Anderson*, 225 U.S. 436, 444 (1912). The doctrine includes an exception for decisions that are "clearly erroneous and would work a manifest injustice."  *United States v. Pierre*, No. 23-30645, 2024 WL 4457460, at *2 (5th Cir. Oct. 10, 2024) (quoting *United States v. Agofsky*, 516 F.3d 280, 283 (5th Circ. 2008)).

As described in more detail in the next section, this Court's ruling that *Smith* announced a new rule that Mr. Galloway could not invoke retroactively in habeas review was clearly erroneous and would work a manifest injustice. Adhering to the ruling would allow the State to evade the Confrontation Clause principles that the Supreme Court had already established by the time of Mr. Galloway's direct appeal.

### 2.  *Smith* was dictated by precedent.

In *Teague v. Lane*, 489 U.S. 288, 316 (1989), the Supreme Court held that new constitutional rules of criminal procedure apply only to cases on direct review and that litigants whose convictions have already reached finality cannot rely on those rules unless one of two exceptions applies. Federal courts have repeatedly recognized that a decision applying an established rule does not announce a *Teague* "new rule," and that federal habeas courts may therefore rely on the new case to guide their decisions. The Court asks whether the new case "broke new ground," *see Stringer v. Black*, 503 U.S. 222, 228-29 (1992), or on the contrary was "dictated by precedent" that already existed before the case under review became final. *Id*. at 237.

For example, in *Stringer*, the Supreme Court held that its application in *Maynard v. Cartwright*, 486 U.S. 356 (1988) of its earlier decision in *Godfrey v. Georgia*, 446 U.S. 420 (1980), to invalidate a similar Oklahoma aggravating circumstance did not announce a new rule even though the two statutes "did indeed involve somewhat different language."  In the same opinion, the Court held that *Clemons v. Mississippi*, 494 U.S. 738 (1990), also did not announce a new rule because it rested on a "well-established general requirement" combined with a "more specific requirement" that was also well established. *Stringer*, 503 U.S. at 231; *see also Yates v. Aiken*, 484 U.S. 211, 216-17 (1988) (*Francis v. Franklin*, 471 U.S. 307 (1985), did not announce new rule because it was "merely an application of the principle that governed our decision in *Sandstrom v. Montana*, 442 U.S. 510 (1979).").

Applying similar reasoning in *Smith v. Dretke*, 422 F.3d 269, 278-79 (5th Cir. 2005), the Fifth Circuit granted a certificate of appealability on the basis of the then-recent decision in *Wiggins v. Smith*, 539 U.S. 510 (2003), even though the Supreme Court had decided *Wiggins* long after the petitioner's conviction had become final. The court rejected the possibility that *Wiggins* announced a new rule constrained by *Teague*. "The Court in *Wiggins* emphasized that its decision was not a new rule, rather it was squarely drawn from its previous decisions in *Strickland v. Washington* and *Williams v. Taylor*, therefore, no new law was created."  422 F.3d at 278 n.2; *see also Newland v. Hall*, 527 F.3d 1162, 1197 (11th Cir. 2008) ("In *Williams, Wiggins*, and *Rompilla*, the Court did nothing more than apply *Strickland*'s standard to a specific set of circumstances" and they "are not new law under *Teague*"); *Allen v. Massie,* 236 F.3d 1243, 1245 (10th Cir. 2001) ("There is simply nothing in the Supreme Court's decision in *Williams* that even remotely

resembles a new rule of constitutional law. Instead, the *Williams* Court merely reaffirmed that all claims of ineffective assistance of counsel should be resolved by reference to the well-established rubric set forth in *Strickland*."); *cf. Wiggins*, 539 U.S. at 522 ("we . . . made no new law in resolving" the ineffectiveness claim in *Williams v. Taylor*, which was "squarely governed by *Strickland*" for purposes of analysis under 28 U.S.C. § 2254(d)).

    *Smith* stands in the very same position respecting its clearly established precedent as the position *Williams* and *Wiggins* occupied respecting *Strickland*. *Smith* made no new law and broke no new ground but was dictated by the precedents that already governed: *Melendez-Diaz* and *Bullcoming*. Indeed, *Smith* explicitly stated as much:

> Approving that practice would make our decisions in *Melendez-Diaz* and *Bullcoming* a dead letter, and allow for easy evasion of the Confrontation Clause. As earlier described, those two decisions applied *Crawford* in "straightforward" fashion to forensic evidence. *Melendez-Diaz*, 557 U.S., at 312; see *Bullcoming*, 564 U.S., at 659–661; *supra*, at 1792 - 1793. The first prevented the introduction of a lab analyst's testimonial report sans lab analyst. The second refused to accede to the idea that any old analyst—*i.e.*, a substitute who had not taken part in the lab work—would do. Arizona offers only a slight variation. On its view, a surrogate analyst can testify to all the same substance—that is, someone else's substance—as long as he bases an "independent opinion" on that material. And that is true even if, as here, the proffered opinion merely replicates, rather than somehow builds on, the testing analyst's conclusions. So every testimonial lab report could come into evidence through any trained surrogate, however remote from the case. And no defendant would have a right to cross-examine the testing analyst about what she did and how she did it and whether her results should be trusted. In short, Arizona wants to end run all we have held the Confrontation Clause to require. It cannot.

*Id*. at 798–99 (citation modified).

    Despite this clear guidance, another court in this district has held in a non-precedential opinion that *Smith* did not apply retroactively to a Confrontation Clause challenge to surrogate expert testimony. *See Garcia v. Cain*, No. 1:24-CV-52-HSO, 2025

WL 1363109 (S.D. Miss. May 9, 2025). This ruling, however, rested on internally contradictory reasoning. On one hand, the *Garcia* court observed that the petitioner "admit[ted]" that *Smith* did not make a retroactive change in the law but "merely applied an existing rule of criminal procedure." 2025 WL 1363109 at *4. The court continued, however, to characterize *Smith* as a new rule that did not apply retroactively and therefore could not apply in habeas review under *Teague*. *Id*. at *5.

The *Garcia* opinion contradicted not only itself but also the holding in *Smith* that *Melendez-Diaz* and *Bullcoming* effectively dictated its result. This Court should therefore disregard *Garcia*'s non-precedential discussion. Because *Smith* did not announce a new rule, this Court may rely on its analysis in applying the precedents the Supreme Court had already announced before Mr. Galloway's conviction became final.

### 3. *Teague* cannot bar review of the Mississippi Supreme Court's 2025 ruling that the *Smith* claim had no merit.

Even if *Smith* did announce a new rule (and it did not), *Teague* would not bar review of this claim. After the Supreme Court decided *Smith*, Mr. Galloway moved in the Mississippi Supreme Court for permission to file a successive petition for post-conviction relief, arguing that, although *Smith* did not announce a "new rule" for federal habeas purposes, it did constitute a retroactively applicable "intervening decision" for state post-conviction purposes because it clarified the governing holdings of *Melendez-Diaz* and *Bullcoming*. *Galloway v. State*, MS SCt No. 2025-DR-00129-SCt, Motion for Leave to File Successive Petition for Post-Conviction Relief at 6-12. The state court denied the motion in reasoning that incorporated by implication the judgment that *Smith* was dictated by precedent. *Galloway v. State*, 418 So.3d 1237 (Miss. 2025). It held in relevant part:

45

> After a thorough review of Galloway's claim, we find that the intervening-decision exception affords Galloway no relief, as **_Smith_** is not an intervening case. Further, assuming arguendo, if **_Smith_** were an intervening case, we find that it would not apply retroactively. Because Galloway has failed to demonstrate an exception, his successive petition is barred by time, res judicata, and as a successive writ. See Miss. Code Ann. §§ 99-39-5(2)(b), -21(3), -21(9) (Rev. 2020). Notwithstanding the bars, the Court finds no merit to Galloway's claim.

*Id*. at 1238-39 (emphasis in original).

The court held that *Smith* was "not an intervening case," which meant by definition that, according to the court, it would *not* have changed the outcome of a case in which it had already reviewed the line of authority beginning with *Crawford*. *See* MISS. CODE ANN. § 99-39-23(6) (excepting from bar on successive petitions cases in which "there has been an intervening decision of the Supreme Court . . . which would have actually have adversely affected the outcome"). The court's insistence that *Smith* changed nothing entailed a conclusion that it was dictated by the precedents that came before it, *see Stringer*, 503 U.S. at 237, and a rejection on the merits of the argument based on that whole line of cases.

This ruling did not rest on an adequate or independent state ground. *See Coleman v. Thompson*, 501 U.S. 722 (1991). A federal court may review a decision that appears to rest primarily on federal law unless the state court makes a "plain statement that its decision rests upon adequate and independent state grounds." *Michigan v. Long*, 463 U.S. 1032, 1042 (1983); *see also Harris v. Reed*, 489 U.S. 255, 263 (1989) (on habeas review, state procedural ruling bars review only if state court "clearly and expressly" states judgment rests on state bar). Furthermore, "the state court must actually have relied on the procedural bar as an independent basis for its disposition of the case." *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985).

46

In this case, the state court's statement that "notwithstanding" the procedural bars it would reach the merits of the claim was far from a "plain statement," or a "clear or express" one, that the decision actually rested on state procedural rules. Rather, the court indicated that it would disregard its procedural rules and address the merits, and it rejected the claim on those merits.  Regardless of whether *Smith* applied retroactively to the Mississippi Supreme Court's 2013 merits decision on direct appeal—which it did—it applied to its merits decision in 2025.

*Teague* thus imposes no obstacle to this Court's review of the merits of Mr. Galloway's claim.

### G. AEPDA imposes no limitation on relief.

The State argues that 28 U.S.C. § 2254(d) limits this Court's ability to grant relief. That provision says that a federal habeas court may not grant relief from a state court's merits ruling unless it concludes that the ruling was "contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or that it rested on an "unreasonable determination of the facts." The provision poses no obstacle to relief in this case.

### 1. *Loper Bright* makes clear that 28 U.S.C. § 2254(d) unconstitutionally constrains federal courts' independent judgment.

As described in Ground Thirty-One, 28 U.S.C. § 2254, if construed to require federal court "deference" to state court interpretations of federal law, would violate the doctrine of constitutional avoidance, Article III, and the Supremacy Clause.  *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). This Court should accordingly review Mr. Galloway's constitutional claims independently.

47

**2. The State does not deny that the state court unreasonably applied clearly established federal law.**

The State denies that the state court decision was "contrary to" clearly established federal law or that it was an "unreasonable determination of the facts," but makes no opposition to Mr. Galloway's argument that the state court "unreasonably appl[ied]" federal law. This Court may deem that argument waived in this claim and in all subsequent claims in which the state does not deny unreasonable application, because the Supreme Court has not spoken clearly on the waivability of AEDPA's limitations on review. *Cf. Brumfield v. Cain*, 576 U.S. 305, 322-23 (2015) (state waived argument that trial court's decision should be reviewed under § 2254(e)(1) instead of § (d)(2) by not raising it in court below); *but see Miller-El v. Dretke*, 545 U.S. 231, 282 (2005) (Thomas, J., dissenting) (questioning whether § 2254(d)(2) is waivable; *Neal v. Vannoy*, 78 F.4th 775, 785 (5th Cir. 2023) (standards under § 2254(d) and (e)(1) may not be waived by government); *Langley v. Prince*, 926 F.3d 145, 162 & n.8 (5th Cir. 2019) (collecting cases holding AEDPA standard unwaivable).

In any event, Mr. Galloway explains below why he can satisfy § 2254(d)'s "unreasonable application" requirement.

**3. The State court unreasonably applied clearly established federal law.**

The Mississippi Supreme Court confronted and considered *Melendez-Diaz* and *Bullcoming* and then misapplied them. The court, relying on *Melendez-Diaz*, acknowledged that "[f]orensic laboratory reports created specifically to serve as evidence against the accused are among the 'core class of testimonial statements' governed by the Confrontation Clause.'" App. 112a; *Galloway v. State*, 122 So. 3d 614, 636 (Miss. 2013)

(quoting *Melendez-Diaz* and *Grim v. State*, 102 So. 3d 1073 (Miss. 2012)).[24]  The court

nevertheless rejected Mr. Galloway's argument that under *Bullcoming* a Confrontation

Clause violation had occurred because defense counsel could not question Ms. Golden

about "critical tasks" such as DNA extraction PCR, and electrophoresis, and that only

Golden could be cross-examined about possible contamination of the samples. *Id*. at 637.

The court held that Ms. Dubourg's general familiarity with the processes Ms. Golden had

followed satisfied the Constitution:

> Distinguishable from *Bullcoming,* the record here illustrates that Dubourg,
> as the technical reviewer assigned to the case, was familiar with each step
> of the complex testing process conducted by Golden, and Dubourg
> performed her own analysis of the data. *Cf. id.* at 672-73 (Sotomayor, J.,
> concurring) (specifying that an inadmissible report in the case had not been
> admitted through "a supervisor, reviewer, or someone else with a personal,
> albeit limited, connection to the scientific test at issue"). Dubourg
> personally analyzed the data generated by each test conducted by Golden
> and signed the report. Given Dubourg's knowledge about the underlying
> testing process and the report itself, any questions regarding the accuracy of
> the report due to possible contamination of the DNA samples could have
> been asked of Dubourg. *See, e.g., Williams v. Illinois,* 567 U.S. 50, 85
> (2012) (plurality opinion) ("knowledge that defects in a DNA profile may
> often be detected from the profile itself").

> Consistent with our holding in *Grim,*[25] we find that no Confrontation Clause
> violation occurred in this case. This issue is without merit.

*Id*. at 637-38 (citation modified).

The Mississippi Supreme Court unreasonably applied *Bullcoming* and *Melendez-*

*Diaz* in exactly the same way that the Arizona Supreme Court misapplied them in *Smith*.

---

[24] This distinguishes Mr. Galloway's case from *Stanfield v. Clement*, 775 F. Supp. 3d 1104, 1122 (D. Idaho 2025), which relied on the perceived absence of clearly established federal law on whether the statements at issue were testimonial.

[25] The state court relied in part on its then-recent opinion in *Grim v. State*, 102 So. 3d 1073 (Miss. 2012), which the Fifth Circuit later upheld without the benefit of *Smith*. *See Grim v. Fisher*, 816 F.3d 296 (5th Cir. 2016). Like the Mississippi Supreme Court opinion in Mr. Galloway's case, the Fifth Circuit decision in *Grim* cannot withstand scrutiny after *Smith*. It relied on the uncertainty about the reach of *Bullcoming* set forth in the opinions in that case and *Williams*. 816 F.3d at 307-10. *Smith* settles that uncertainty.

Testimony by an expert familiar with the "process," but with no personal knowledge of what the non-testifying analyst actually did, cannot satisfy the Confrontation Clause.

The State makes no effort to dispute that the Mississippi Supreme Court unreasonably applied clearly established federal law, and § 2254(d) cannot limit this Court's ability to grant relief. The Court should accordingly grant habeas relief on this ground, alone and in combination with the other claims in this petition.

## II.    GROUND TWO - Trial Counsel's Failure to Prevent, Impeach, or Attack the "Junk Science" Opinion Testimony of the State's Pathologist Deprived Mr. Galloway of the Effective Assistance of Counsel.

### A. Introduction

The State had only one available means of obtaining a conviction of capital murder: attempting to show "sexual battery" through the opinion of pathologist Paul McGarry that a human penis, and only a human penis, could have caused an anal tear found on autopsy, buttressed by the notion that the injury would have caused a degree of pain inconsistent with consent. Trial counsel knew that refuting Dr. McGarry's unscientific opinion was the key to avoiding a conviction of death-eligible murder and sought funds to retain pathologist LeRoy Riddick as a defense expert. Nevertheless, inexplicably, they never investigated the scientific validity of McGarry's conclusions—an inquiry that would have led them to unequivocal opinions from Riddick or other readily available experts that McGarry's conclusions fell far outside the bounds of science. Counsel never met with Riddick before trial or asked him to comment on McGarry's opinion, either before or during trial. They never conducted the background investigation that would have uncovered dramatic impeachment information, including McGarry's recent dismissal from his position with the Orleans Parish Coroner following several

botched autopsies. They never moved to preclude McGarry's testimony under Mississippi Rule of Evidence 702 and made no objection when McGarry testified far beyond the opinions the prosecution had disclosed pretrial. These deficiencies, alone and in combination, deprived Mr. Galloway of the effective assistance of counsel guaranteed by the Sixth Amendment.

**B. Trial counsel failed to conduct a reasonable investigation, preparation, and presentation of expert testimony that would have supported the defense.**

An attorney has a constitutional obligation to provide effective assistance, *see Strickland*, 466 U.S. at 687, a duty the Supreme Court has held especially imperative in capital cases. *See Andrus,* 590 U.S. at 814; *Rompilla*, 545 U.S. at 386; *Wiggins,* 539 U.S. at 524-25; *see also* U.S. CONST. AMENDS. VI; XIV. A client who challenges an attorney's performance must show that it was deficient, or unreasonable under prevailing professional norms, and that it was prejudicial, meaning that there is a reasonable probability that, but for the attorney's errors, the outcome would have been different. *Strickland*, 466 U.S. at 687.

An attorney's obligations extend to the reasonable investigation, preparation, and presentation of expert testimony that will support the defense. For example, in *Hinton*, 571 U.S. at 274, the Supreme Court held that trial counsel's failure to request additional funding to replace an expert he knew to be inadequate, because he mistakenly believed that he had received all he could get under Alabama law, constituted deficient performance. *Id*. at 274. Furthermore, merely retaining an expert and even presenting some expert testimony does not suffice. Effective counsel must adequately prepare expert witnesses and effectively present their testimony. *See Walbey v. Quarterman*, 309 F. App'x. 795, 803 (5th Cir. 2009) (counsel ineffective under clearly established federal law

51

when he failed adequately to prepare mental health expert to testify and failed to rehabilitate expert when State elicited aggravating diagnosis on cross-examination); *Richey v. Bradshaw*, 498 F.3d 344 (6th Cir. 2007) (state court unreasonably applied *Strickland* because, although counsel retained expert shortly before trial, counsel did not explore or test basis for expert's opinion, and thus failed to take requisite reasonable steps to present favorable expert testimony).

Trial counsel's investigation, preparation, and presentation of the defense response to Dr. McGarry's unreliable and substantially inadmissible testimony fell far short of these minimum standards.

### 1. Counsel were deficient in the preparation and presentation of their attack on the state expert's testimony and affirmative support for their own expert.

Courts applying the standards for ineffective assistance laid down by the Supreme Court have recognized that trial counsel's foundational duty of reasonably adequate investigation and preparation applies with special force to evidence from expert witnesses. For example, in *Dunn v. Jess*, 981 F.3d 582 (7th Cir. 2020), the petitioner had slapped the victim in a bar parking lot, causing him to fall to the ground, but witnesses observed him upright and apparently unharmed immediately afterwards. A bar patron found him dead hours later at a different location. *Id*. at 585. Trial counsel retained a pathologist who concluded, after reading the medical examiner's report, that the victim died immediately after the petitioner pushed him down. Trial counsel never investigated the findings of the co-defendant's experts, who supported a no-causation defense, and did not even realize until shortly before trial that the medical examiner herself expressed doubts about the cause of death. Even then, however, trial counsel did not call his own

expert. *Id*. at 585-86. Applying de novo review because the state court had not ruled on the *Strickland* performance prong, the Court of Appeals held that, even though trial counsel had consulted an expert, his various excuses for attempting to make his case through cross-examining the medical examiner, without calling or properly preparing his own expert, were unreasonable. *Id*. at 592-93.

In the same vein, in *Couch v. Booker*, 632 F.3d 241, 243 (6th Cir. 2011), the victim died after a group beating following a party at which he had been drinking and using cocaine and marijuana. The state's pathologist concluded that the cause of death was asphyxia from inhaled blood following blunt-force facial injury, and counsel consulted a medical expert, who agreed. *Id*. at 243. The Court of Appeals nevertheless found counsel deficient for not reviewing the incident report or talking to the medics, who would have described a victim who was conscious when they arrived, and whose mouth and nose were not flooded with blood. *Id*. at 247. With this information, a defense expert could have argued death resulted from an accidental cocaine overdose that led to "cardio respiratory failure." *Id*. at 248. "Hiring a medical expert to review an autopsy report does not amount to the outsourcing of all investigation into plausible causation theories, including a theory that may have nothing to do with the autopsy report." *Id*. at 247.[26]

---

[26] *Accord Dunn v. Neal*, 44 F.4th 696 (7th Cir. 2022) (trial counsel ineffective for failing to consult pathologist about cause of death in case where eyewitness accounts could have supported defense theory that victim died falling off staircase onto his head and not as a result of bludgeoning by defendant); *Liao v. Junious*, 817 F.3d 678 (9th Cir. 2016) (in attempted murder case in which defense advanced theory that petitioner was sleepwalking and did not have requisite intent when he hit the victim three times on the head with a hammer, counsel ineffective for failing to persist in seeking funding for medical examination and sleep study that his expert recommended); *Thomas v. Clements*, 789 F.3d 760 (7th Cir. 2015) (counsel ineffective in murder case for failing to consult with pathologist or other expert to support defense contention that he unintentionally caused partner's death during sexual horseplay, in light of state's expert's finding no external bruising or signs of struggle); *Gersten v. Senkowski*, 426 F.3d 588 (2d Cir. 2005) (counsel ineffective in failing to consult defense medical expert, to rebut state expert's opinion that victim had suffered penetrating trauma to the hymen and tearing of the anus, by testifying whether the physical evidence necessarily indicated that victim suffered sexual abuse); *Chester v. Vannoy*, No. 16-17754, 2018

Even applying the stringent test of 28 U.S.C. § 2254(d), the Court of Appeals affirmed the district court's grant of habeas relief. *Id*. at 244, 250.

In Mr. Galloway's case, as in *Dunn* and *Couch*, trial counsel retained a pathologist but failed to conduct an adequate investigation of the theory of capital murder that the state presented through Dr. McGarry, or to prepare and present evidence to counteract that theory through their own expert or others readily available. Counsel adopted a strategy of contesting Dr. McGarry's opinion and presenting evidence that the auto rollover caused the anal tear, but simultaneously left multiple obvious and necessary steps to implementing that strategy undone.

- They sent their expert, Dr. Riddick, the autopsy report and photos, but never provided the coroner's report or the prosecutor's letter describing Dr. McGarry's anticipated testimony.

- Counsel never met with Dr. Riddick before trial.

- They never consulted other readily available experts who also would have rejected Dr. McGarry's opinions as beyond the bounds of science and, like Dr. Riddick, would have contested Dr. McGarry's assertions that (1) the anal trauma denoted non-consent; and (2) a pathologist could determine the instrumentality of the wound on the basis of post-mortem examination.

- Counsel took no pretrial steps to limit or preclude Dr. McGarry's unscientific testimony under Mississippi Rule of Evidence 702.[27]

---

WL 2970912, at *40-45 (E.D. La. 2018) (counsel's failure to present blood spatter and DNA evidence was deficient).

[27] Counsel could have shown that Dr. McGarry's analysis could attract no demonstrated acceptance in peer-reviewed studies and had no demonstrated error rate and no standards of research. Indeed, the leading forensic pathologists whose reports were proffered in state court (and again in this court) unanimously

- Counsel never learned about the assistance an expert pathologist could have provided to the penalty phase defense by explaining the evidence that the otherwise torturous rollover and burning injuries occurred post-mortem. *See* Petition at 41; App. 1021a-22a.

At trial, counsel asked Dr. Riddick for his own opinion about the cause of the victim's anal injury but never asked him to comment on Dr. McGarry's insistence that only a human penis could have caused it. Ms. Christensen asked Dr. Riddick one question: whether he had formed an opinion about "whether there was penetration." R. 730. Dr. Riddick responded that the dilation observed on autopsy could have stemmed from "the process of dying," which causes sphincters to relax. *Id*. The anal tear could have originated in the crushing force of the rollover:

> And having been run over by a car, there were actually tire marks there. And in my opinion because she was run over and she was crushed, that the tear in the anus could be produced by the stretching of the buttocks, and you can make a small tear in that way."

R. 731. The tear could also have resulted from "having strained at the stool or having a very large difficult bowel movement." *Id*.

Trial counsel neither prepared nor presented testimony from Dr. Riddick attacking Dr. McGarry's opinion and never confronted Dr. McGarry about Dr. Riddick's opinion in cross-examination. Instead, counsel questioned him about a theory Dr. Riddick had never advocated. In summation, co-counsel did not even argue that the jurors should accept Dr. Riddick's opinion but half-heartedly told them that "they are both experts" and

---

concluded that no forensic pathologist could testify, consistent with the evidence in this case, that the injuries to the victim's anogenital area must have been caused by sexual activity, or that the victim did not consent to any anal sexual intercourse. These factors could have demonstrated that the testimony was inadmissible under Rule 702. *See Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 37, 42 (Miss. 2003) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)).

"what expert are you going to believe or are they both right." *See* Petition at 22-28, 30-31. Counsel thus left the jurors to weigh two contrasting expert opinions without giving them any hint of the non-existent scientific support for one of them, and without even advocating for the other, which would have supported an acquittal of capital murder. No reasonable attorneys would have implemented their own strategy in this negligent manner. Counsel's performance was deficient.

### 2. Counsel were deficient for not investigating and presenting readily available impeachment evidence.

Courts applying Supreme Court precedent have recognized that effective counsel's investigation duties include an inquiry for evidence that may impeach a prosecution expert. In *Rivas v. Fischer*, 780 F.3d 529, 531 (2d Cir. 2025), the medical examiner changed his estimate of the time of death, six years after the crime, to include a time when the defendant had no alibi. Instead of investigating the reasons for the change—which would have disclosed that the district attorney had the medical examiner under criminal investigation and had asked him to reconsider the time of death—or consulting an independent medical expert, trial counsel went forward with no expert and presented the defendant's alibi for a different time frame than the one the prosecution now alleged. *Id*. at 543-44. The Court of Appeals held that the state court's finding of trial strategy unreasonably applied *Strickland*. *Id*. at 549-50; *accord Brown v. Smith*, 551 F.3d 424, 432 (6th Cir. 2008) (counsel ineffective, in defense of charges that defendant sexually molested teenage daughter, for failing to obtain daughter's counseling records after learning daughter's counselor did not believe her; at a minimum, counsel could have used records to impeach daughter on cross-examination), *overruled on other grounds by Cullen v. Pinholster,* 563 U.S. 170 (2011).

In this case, minimal investigation would have yielded maximal results. Counsel knew or should have known that shortly before Mr. Galloway's trial the Orleans Parish Medical Examiner had terminated Dr. McGarry's employment for high-profile botched autopsies. Nevertheless, counsel made no effort to obtain his personnel files or otherwise document the termination, and never questioned Dr. McGarry about it on cross-examination. *See* Petition at 33-34. From Dr. Riddick, local practitioners, and media accounts, counsel could have obtained information about Dr. McGarry's propensity to advance scientifically invalid opinions. *See* Petition at 32, 34-38. They failed to investigate his workload and his exorbitant claims of its volume. *Id*. at 38. In post-conviction declarations, trial counsel claimed that they had a strategy of "get[tng] Dr. McGarry off the stand as quickly as possible" because of his years of experience, *see* Petition at 21-22, but no strategy could justify failing to impeach him when they were already presenting a defense pathologist to rebut him. And certainly no strategy could justify failing to look for impeachment evidence before deciding whether to use it. *See Brown*, 551 F.3d at 432 (failure to obtain complainant's counseling records not excused by counsel's anticipation that counselor would not have made credible witness). Trial counsel were equally deficient on this ground.

### 3. Counsel were deficient in failing to object to Dr. McGarry's testimony beyond his disclosed opinion.

Under the Sixth Amendment principles established by the Supreme Court, effective counsel must also make reasonable efforts to oppose any prosecution attempts to elicit inadmissible expert testimony that exceeds the scope of discovery, expertise, or rules of evidence. In *Gebaree v. Steele*, 792 F.3d 991, 993-94 (8th Cir. 2015), for example, the defendant's daughter and stepdaughter had given inconsistent statements about

whether he sexually abused them. Counsel made no objection to inadmissible testimony by a medical expert, whom the state had called to testify about marks of *physical* abuse, that their allegations of *sexual* abuse were "consistent" and "credible." The expert had never interviewed the girls about sexual abuse. Nor did counsel object to a psychologist's inadmissible testimony that the defendant held "parenting beliefs that contributed to abuse and neglect." *Id*. at 994. The Court of Appeals held that the state court unreasonably applied *Strickland* in concluding that counsel had a reasonable strategy for making no objection. *Id*. at 997-98; *accord Neal v. Vannoy*, 78 F. 4th 775 (5th Cir. 2023) (trial counsel who yelled at state's key witness and called him the killer, but did not review or investigate serology or shoeprint reports or review inconsistencies in witness's statement, and therefore failed to impeach him, performed deficiently); *see also Buford v. State*, 320 So.3d 502, 513-14 (Miss. 2021) ("any competent lawyer" would have moved to suppress defendant's confession, where record included "strong evidence" it was inadmissible).

In this case, the prosecutor disclosed pretrial only that Dr. McGarry would testify that the injuries observed on autopsy were "consistent with sexual battery." *See* Petition at 20. His testimony far exceeded that measured conclusion. Instead, he told the jurors that the automobile rollover could not have caused the anal tear and that only non-consensual penetration by a human penis could have caused it. See Petition at 23-25. Trial counsel made no objection, never argued surprise, and never asked for a chance to prepare a rebuttal.[28] Prevailing professional norms require an attorney to oppose the introduction of inadmissible evidence. Counsel's silence on the State's use of Dr. McGarry's

---

[28] Mississippi law provided procedures for situations, like this one, for handling mid-trial discovery violations. See *West v. State*, 553 So.2d 8, 18 (Miss. 1989) (reversing conviction because of undisclosed theory advanced by state's pathologist, and outlining proper procedure).

inadmissible conclusions on the key factual element of the prosecution case for capital murder was deficient.

### 4. Counsel's deficient performance prejudiced the defense.

Reasonably effective counsel could have demonstrated that the State's entire case for death-eligible murder rested on a laughably preposterous expert opinion. Instead, counsel presented the opinion of their own expert, Dr. Riddick, as merely a plausible alternative to Dr. McGarry's opinion, and otherwise left Dr. McGarry alone. *See* Petition at 27.

Courts have repeatedly found *Strickland* prejudice for similarly deficient performance respecting experts when effective counsel could have:

- Presented a more credible expert on a key issue. *See Hinton v. State*, 172 So.3d 355, 362 (Ala. Crim. App. 2013), *on return to third remand* (Ala. Crim. App. Nov. 21, 2014) (on remand from Supreme Court, reasonable probability that more qualified expert would have instilled reasonable doubt of guilt, requiring relief).

- Provided a contrasting account of how a victim received their injuries. *See Dunn v. Jess*, 981 F.3d at 594 (prejudice found because testimony of postconviction expert sufficiently contradicted that of medical examiner to raise reasonable probability); *Couch*, 632 F.3d at 247 (prejudice found because defense expert could have established different cause of death and non-causation defense); *Dunn v. Neal*, 44 F.4th at 709 (prejudice established because forensic pathologist, if called, could have supported exculpatory eyewitness accounts); *Thomas v. Clements*, 789 F.3d at 771

(prejudice found because defense expert's opinion about accidental death more consistent with timing of events).

- Given the defense expert materials needed to provide persuasive testimony. *See Liao*, 817 F.3d at 693-94 (prejudice found because counsel could have bolstered expert testimony with sleep studies and records to establish accuracy of opinion defendant was sleepwalking at time of crime).

- Presented persuasive impeachment. *See Rivas*, 780 F.3d at 550-51 (prejudice established where reasonable probability that, but for counsel's failure to investigate medical examiner's change of opinion after coming under criminal investigation, fact finder would have reasonable doubt of guilt); *Brown*, 551 F.3d at 435 (prejudice found where case turned entirely on witness's credibility and failure to investigate left important facts and inconsistencies undiscovered).

- Prevented inadmissible expert testimony. *See Gebaree*, 792 F.3d at 999-1000 (prejudice found where doctors' inadmissible testimony strengthened a weak prosecution case); *Neal v. Vannoy*, 603 F. Supp. 3d 310, 349-50 (E.D. La. 2022) (prejudice found where counsel failed to impeach key state's witness with evidence of his own implication in crime).

In Mr. Galloway's case, with minimally adequate preparation and advocacy, trial counsel could have demonstrated through Dr. Riddick (or other available experts) the array of reasons that Dr. McGarry's theory was scientifically ludicrous. First, with a reasonably adequate referral question and/or *any* pretrial consultation, Dr. Riddick could have highlighted weaknesses in the autopsy report and district attorney's discovery letter.

If asked about the discovery letter, he would have told counsel that Dr. McGarry's conclusion about the anal injuries (that they would have "caused a degree of pain that would not be tolerated or withstood during consensual sexual activities") "went beyond the bounds of science, was unreliable, and was unsupported by medical evidence." App. 1045a, ⊮ 31. No one from Mr. Galloway's defense ever asked Dr. Riddick to testify about Dr. McGarry's opinion on lack of consent. App. 1046a, ⊮ 35. Similarly, because a car had run over the victim and her body was in a damaged condition, Dr. Riddick would have disputed Dr. McGarry's autopsy opinion that certain superficial abrasions were "defensive" wounds. App. 1043a, ⊮ 24.

Dr. Riddick could have helped counsel prepare a motion to exclude, or at least helped prepare to rebut in court, the theory suggested by the district attorney's discovery letter, which stated that the victim's anal injuries were "consistent with" penetration by a penis. He could have explained that the evidence could not support that theory *to the exclusion of* the automobile rollover or another mechanism as the source of the injuries. If Ms. Christensen and her co-counsel had met with him before trial, they could have learned:

> [I]t is entirely likely that the crushing of the car produced stretching of the buttocks and caused the tear in the anus. Given that the victim was overrun by a motor vehicle, all of her anal and perianal findings may be explained by this mechanism of injury, with or without the additional post-mortem changes due to decomposition. The tear could also have been caused by a medical condition known as fissure in ano, or a fissure around the anus from straining at the stool or having a large, very difficult bowel movement.

App. 1046a, ⊮ 33; *see also* ⊮ 37. Trial counsel could also have obtained similar opinions from multiple additional experts.  *See* Petition at 30-32.

Furthermore, counsel could have impeached Dr. McGarry with the sordid details of his botched autopsies and dismissal for cause from the Coroner's Office of a major city. By filing a Rule 702 motion or objecting to a blatant discovery violation, they could have prevented him from straying beyond what he had said before trial—that his theory was merely "consistent" with the autopsy findings—or at least could have sought time to present rebuttal to his surprise opinion. There is a reasonable probability that if counsel had done one of these things, let alone all of them, as they should have done, the jurors would have found Mr. Galloway not guilty of capital murder by means of "sexual battery," or, at a minimum, at least one of them would have voted for life. Counsel's deficient performance accordingly prejudiced the defense, both alone and in combination with the other instances of ineffective assistance in this petition.

### C. This Court Can Address Mr. Galloway's Claim on the Merits Because the State Court Ruled on the Merits.

#### 1. A Petitioner Only Needs to Raise a Claim Once to Exhaust State Court Remedies.

The State properly acknowledges that Mr. Galloway exhausted this claim and makes no assertion that he defaulted it. *See* State's Answer at 16. The Mississippi Supreme Court upheld the general admissibility of Dr. McGarry's testimony and rejected the related ineffective assistance claim on direct review. 122 So.3d at 633, 638-39. It held in state postconviction review that Mr. Galloway's multi-pronged attack on counsel's assistance respecting Dr. McGarry was "barred" because the arguments, it thought, overlapped with those already rejected on direct appeal. App. 198a; 374 So.3d at 494.

The state procedural "bar" for repetitive postconviction claims does not operate as a bar to federal habeas review. Regardless of whether the Mississippi Supreme Court

correctly concluded that the postconviction claims repeated the claims on direct review (and they did not) the earlier claims received merits rulings and exhausted state remedies. *See Cone v. Bell*, 556 U.S. 449, 466-67 (2009) (even though state court incorrectly viewed pleading as procedurally inappropriate repetitive filing, claim exhausted and not defaulted for purposes of federal habeas review).

### 2. Section 2254(d) does not limit this court's review of this claim.

As described in Ground Thirty-One, the Supreme Court's 2024 opinion in *Loper Bright v. Raimondo*, 603 U.S. 369 (2024), held that federal court deference to reasonable agency decisions—the same type of deference that § 2254(d) imposes on federal habeas courts reviewing "reasonable" state court decisions—is unconstitutional. Employing § 2254(d) to limit habeas relief, therefore, would contravene the rule of constitutional avoidance, Article III, and the Supremacy Clause.

The State, moreover, does not deny that the state court ruling on the McGarry claims unreasonably applied clearly established federal law. *See* State's Answer at 17. As discussed below, the state court opinions, indeed, unreasonably applied that law.

### 3. The state court unreasonably applied clearly established federal law.

In multiple ways, the state court unreasonably applied the general *Strickland* principles that governed Mr. Galloway's ineffective assistance claims.

> General legal principles can constitute clearly established law for purposes of AEDPA so long as they are holdings of this Court. . . . moreover, "certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt."

*Andrew v. White*, 604 U.S. 86, 94-95 (2025) (citations omitted).

### a.  The direct appeal opinion rested on state law, not federal law.

On direct appeal, the Mississippi Supreme Court rejected Mr. Galloway's challenge to Dr. McGarry's unscientific testimony that the victim's "anal injury must have been caused by penile sexual penetration, to the exclusion of all other causes, and that the penetration was resisted, to the exclusion of consensual sex." *Galloway* (I), 122 So. 3d at 629. Because trial counsel had raised no objection to this testimony, the court reviewed the claim as plain error. *Id*. at 629-30. After summarizing Dr. McGarry's findings and testimony, Dr. Riddick's testimony, and McGarry's rebuttal, *id*. at 630-31, the court summarized state law governing the admissibility of expert testimony:

> "[I]n Mississippi, a forensic pathologist may testify as to what produced [a victim's] injuries ... and what trauma such an injury would produce." *McGowen v. State*, 859 So.2d 320, 335 (Miss.2003) (quoting *Holland v. State*, 705 So.2d 307, 341 (Miss.1997)). A forensic pathologist may also testify about "wounds, suffering, and the means of infliction of injury," since it falls within his or her area of expertise. *Holland*, 705 So.2d at 341. Furthermore, a forensic pathologist may testify as to whether a particular instrument or weapon in *evidence was consistent with particular injuries* to a victim. *McGowen*, 859 So.2d at 336.

*Id*. at 632 (citations modified) (emphasis added). The court did not discuss the fact that Dr. McGarry went well beyond what the law permitted, i.e., he went well beyond testifying that an injury was "consistent" with a particular instrument and claimed instead that only that instrument could have caused the injury. And, working only from the trial transcript, the state court said nothing about whether McGarry's out-of-bounds testimony was consistent with science.[29] As discussed above, trial counsel never asked Riddick that

---

[29] The court ignored an amicus brief submitted by a group of pathologists that included several of those whose affidavits Mr. Galloway proffered in state postconviction and again in this Court.

question. The court accordingly had nothing in the trial record that prompted or permitted it to assess the scientific admissibility of McGarry's conclusions.

The court noted that it had upheld Dr. McGarry's similar testimony in another case, and that McGarry had again given similar testimony in a third case in which the court ordered a new trial on other grounds. *Id*. at 632-33 (citing *Holland v. State*, 587 So.2d 848, 874-75 (Miss. 1991), and *Harrison v. State*, 635 So.2d 894, 898-99 (Miss. 1994)). In its one-paragraph discussion of the merits, the court gave three terse reasons for rejecting the claim: (1) Mr. Galloway, unlike the defendant in *Harrison*, had his own expert, and "we cannot say" that Dr. McGarry's opinion (2) went beyond the scope of his expertise or (3) improperly invaded the province of the jury. The court accordingly found no reversible error. *Id*. at 633. It made no rulings of federal law.

> **b. The state court unreasonably rejected the challenge to counsel's failure to investigate the scientific validity of Dr. McGarry's opinion.**

Elsewhere on direct appeal, the state court rejected a federal claim that counsel provided ineffective assistance "for failing to object to Dr. McGarry's highly prejudicial testimony (1) that the anal tear must have been caused by a human penis; (2) that the tear would have required such force as to be resisted; and (3) that stated a legal conclusion beyond his specialized knowledge." App. 26a,122 So.3d at 638. Observing that the court could address record-based ineffectiveness claims on direct review, and relying only on the trial record, the court "proceed[ed] directly to the prejudice prong." App. 27a, *Id*. at 639. It held that, because it had already found "no reversible error was present in Dr. McGarry's testimony," the ineffective assistance claim of necessity failed. *Id*. The court did not consider whether counsel could have established the scientific inadmissibility of

65

McGarry's testimony with the assistance of Dr. Riddick or other readily available experts. It drew its conclusion only from the absence of any evidence of inadmissibility in the appellate record.

In post-conviction review, where Mr. Galloway argued that trial counsel were ineffective for failing to bring a pretrial challenge, under Mississippi Rule of Evidence 702, to Dr. McGarry's unscientific conclusions, the Mississippi Supreme Court viewed the claim as identical to the one raised on direct appeal and rejected it as repetitive:

> The issue is procedurally barred by res judicata. Miss. Code Ann. § 99-39-21(3) (Rev. 2020). Galloway cannot relitigate this claim under the guise of ineffective assistance of counsel. *Wilcher*, 863 So. 2d at 805.

App. 212a; 374 So.3d at 499-500. This ruling rested on an unreasonable determination of the facts and unreasonably applied *Strickland*. *See* 28 U.S.C. §§ 2254(d)(1), (2). First, the claim was not identical to the one the court had rejected on direct appeal but supported by six declarations by Dr. Riddick and other pathologists, all of whom could have demonstrated how Dr. McGarry's opinion exceeded the bounds of science and could not have survived a pretrial Rule 702 challenge. *See* Petition at 29-32, 39-42. The court rejected the claim without giving any consideration to this evidence, leaving the appellate ruling based only on the trial record intact, and thus unreasonably determined the facts. *See Wiggins*, 539 U.S. at 528 (state court decision rested partly on erroneous fact-finding and thus represented unreasonable determination of the facts). Mr. Galloway should not suffer a penalty for raising the ineffective assistance claims available on the record and then, in post-conviction, raising additional claims supported by extra-record material. *See Turner v. State*, 366 So. 3d 855, 860 (Miss. 2023) ("Typically, ineffective-assistance claims are more appropriate for post-conviction petitions."); *Havard v. State*, 928 So.2d

66

771, 786 (Miss. 2006) ("The utilization of affidavits is better served in the post-conviction relief proceedings allowable by statute."); *Goodin v. State,* 856 So. 2d 267, 279 (Miss. 2003) (granting hearing on ineffective assistance claims raised in post-conviction proceedings even though petitioner's attorney on direct appeal did not represent him at trial); M.R.A.P. Rule 22(b) ("Issues which may be raised in post-conviction proceedings may also be raised on direct appeal *if such issues are based on facts fully apparent from the record*.") (emphasis added).

Moreover, the Court misapplied *Strickland* and its progeny in holding that Mr. Galloway could not "relitigate" counsel's failure to pursue a claim that would have been valid under state law as ineffective assistance. As the state court described, Mississippi law provided two potential forums for constitutional claims of ineffective assistance; as a matter of federal law those claims could include allegations that counsel were deficient for failure to seek remedies available under state law. The Supreme Court recognized as much in *Hinton*: "An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland.*" 571 U.S. at 274 (citing *Williams v. Taylor,* 529 U.S. 362, 395 (finding deficient performance where counsel "failed to conduct an investigation that would have uncovered extensive records [that could be used for death penalty mitigation purposes], not because of any strategic calculation but because they incorrectly thought that state law barred access to such records"); *Kimmelman v. Morrison,* 477 U.S. 365, 385 (finding deficient performance where counsel failed to conduct pretrial discovery and that failure "was not based on 'strategy,' but on counsel's mistaken belie[f] that the State was obliged to take the initiative and turn over

67

all of its inculpatory evidence to the defense")). In Mr. Galloway's case, that the constitutional claim incorporated the state law error did not make them identical. The state court misapplied *Strickland* and its progeny in denying the claim as mere "relitigate[ion]."

In sum, Mr. Galloway can satisfy both prongs of § 2254(d) on this ground.

### c. The state court unreasonably rejected the challenge to counsel's failure to prepare and present testimony from Dr. Riddick and otherwise prepare for trial.

On post-conviction review, the state court rejected a claim that counsel were ineffective for failing to meet with Dr. Riddick and prepare and present his testimony in a constitutionally adequate manner. The court acknowledged that "Galloway's case was a case in which an expert was arguably necessary." App. 203a; 374 So.3d at 495. Nevertheless, the court distinguished *Hinton* and state court precedents because counsel did timely request and retain an expert. From the letter Dr. Riddick wrote to counsel before trial, briefly stating his conclusions, "defense counsel received the answers to the questions they were seeking in order to achieve their strategy." Their decision not "expend further effort" interviewing him before trial, the court held, was not deficient. Furthermore, counsel made a "reasonably compelling case to rebut Dr. McGarry's testimony regarding anal sexual battery." *Id*. at 498-99.

The court also rejected as without merit the claim that counsel "necessarily failed in their duty" by not preparing or consulting Dr. Riddick "on anything but the narrow topic of sexual battery." *Id*. at 499. It ignored their most glaring omission: they never asked his opinion of Dr. McGarry's contentions or his help in planning a demonstration of their scientific invalidity, through direct testimony by Dr. Riddick and/or other experts,

and/or adequately planned cross-examination of McGarry. The court ignored the uninformed cross-examination counsel undertook instead, asking McGarry about a theory that contradicted both the evidence and Riddick's testimony. *See* Petition at 25.

The state court unreasonably applied *Strickland* and *Hinton* by analyzing the claim on the basis of the little that counsel did do without addressing what they did not do— prepare to attack Dr. McGarry's opinion by consulting Dr. Riddick, and/or other readily available experts, about its lack of scientific basis, and presenting that easily prepared attack to the jury. It was highly unreasonable for counsel to secure the services of a pathologist, ask him nothing before or during trial about the opinions of the corresponding expert for the state, and then on summation abstain even from advocating in favor of his own expert's opinion. Counsel compounded these unreasonable omissions by failing to seek expert opinion on cause of death, which could have mitigated the State's portrayal of the victim's suffering at the penalty phase. It was equally unreasonable for the state court to endorse counsel's deficient and prejudicial conduct. Mr. Galloway can show that the state court unreasonably applied *Strickland* on this ground as well.

> ### d. The state court unreasonably rejected the challenge to counsel's failure to uncover and/or present devastating evidence that Dr. McGarry had lost his job over botched autopsies, and other impeachment evidence.

Despite the narrow record-based grounds for the ruling on direct appeal, the state court inaccurately disparaged Mr. Galloway's claim that counsel failed to investigate Dr. McGarry's background, and thus failed to uncover dramatic impeachment material, as a repetitive "repackaged attack." App. 199a; 374 So.3d at 494. It went on to reject the claim on the merits because, in its view, counsel's strategy to "get [Dr. McGarry] off the stand as quickly as possible" was reasonable. Because "there was a strategy in dealing

with Dr. McGarry" and at least one of the attorneys knew the Orleans Parish Coroner had fired him, Mr. Galloway could not show that counsel were deficient. Id. at 494-95.

Under Supreme Court precedent, the fact that counsel has a strategy does not necessarily mean that the strategy is reasonable. "*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy." *Wiggins*, 539 U.S. at 527 (citing *Strickland*, 466 U.S. at 691). Here, getting McGarry quickly off the stand hardly even qualified as a strategy but more nearly as an excuse for the evasion of the duty to investigate beforehand, especially given the claim of one attorney that she knew he had lost his job in New Orleans. No reasonable attorney could fail to follow up on that damning information, or to conduct other obvious lines of investigation that would have yielded the large trove of available, conviction-threatening impeachment. No reasonable attorney would have failed to use this readily available impeachment at trial. The state court unreasonably applied *Strickland*'s fundamental principles in rejecting this ground for relief.

> **e. The state court unreasonably rejected the claim that counsel failed to object when Dr. McGarry offered testimony beyond the scope of his disclosed opinion.**

The state court rejected Mr. Galloway's claim that counsel were ineffective for failing to object to Dr. McGarry's testimony as exceeding the scope of discovery. Even though the court focused its analysis on the contents of a letter apparently not part of the record,[30] the court held that Mr. Galloway could have raised this claim on direct appeal

---

[30] The court mentions that the District Attorney filed an earlier letter, but not this one, with the clerk, and infers only circumstantially that counsel received the letter. App. 213a-214a & nn. 11 and 12; 374 So.3d at 501 & nn.11 and 12.

and therefore waived it. "Notwithstanding the procedural bar," the court rejected the claim on the merits. App. 213a; 374 So.3d at 500-01. It relied on a pretrial letter dated April 16, 2010, in which the prosecutor advised defense counsel that Dr. McGarry would testify that the anal injuries were "consistent with sexual battery" and would have caused "a degree of pain that would not be tolerated or withstood during consensual sexual activities." *Id*. at 501. The court held that Dr. McGarry's testimony was "covered" in the April 16 letter, which sufficed to prompt the defense to seek funds for Dr. Riddick. Finding no "discovery" violation, the court held that counsel were not deficient. *Id*.

As discussed above, the prosecution letter's speculation that the anal injuries could have resulted from sexual battery and that they would have caused a degree of pain inconsistent with consensual activity should have prompted reasonable investigation and a pretrial motion to preclude Dr. McGarry's speculations under Rule 702. Regardless of whether a Rule 702 motion could have prevailed, moreover, the difference between the pretrial disclosure and the trial testimony should have prompted counsel to object, emphatically. The opinion that the injuries were "consistent with" sexual battery, although not the rest of the April 16 letter, fell within the bounds of science; the insistence at trial that only a human penis and nothing else could have caused the injuries fell far outside those bounds. Given counsel's strategy of rebutting Dr. McGarry, their failure to object to his undisclosed opinion, like their failure to mount an attack on that opinion based in science, was blatantly unreasonable. The state court unreasonably applied *Strickland* in concluding otherwise, satisfying § 2254(d).

71

**f. Because the state court did not address the question of prejudice, this Court's review of that issue is de novo.**

The state court ruled against Mr. Galloway on *Strickland*'s performance prong and did not reach the prejudice prong. App. 214a-215a; 374 So.3d at 501-02. With no state court merits ruling on the question of prejudice, this Court must review the prejudice prong *de novo*. *See Wiggins*, 539 U.S. at 534; *Rompilla*, 545 U.S. at 390. In any event, having unreasonably rejected the multiple grounds of deficient performance, the state court's failure to reach the question of prejudice, along with any inference that there was no prejudice, were also unreasonable under § 2254(d).

There is a reasonable probability that, but for counsel's deficient performance, alone and in combination with the other instances of ineffective assistance set forth in this petition, the jury would have acquitted Mr. Galloway of capital murder or, at a minimum, at least one juror would have voted for a life sentence. Counsel's ineffective assistance, alone and in combination with the other constitutional errors set forth in this petition, had a substantial and injurious effect on the jurors' guilty verdict and death sentence. This Court must accordingly grant habeas relief on this ground.

**III.    GROUND THREE – Trial Counsel Provided Unconstitutional Ineffective Assistance During Jury Selection.**

**A. Introduction**

Despite their recognition that voir dire was "one of the most important parts of any criminal trial and especially capital trials," App. 304a, Mr. Galloway's attorneys failed to adequately protect his right to a fair trial by an impartial jury when counsel inexplicably failed:

1. To raise a *Baston*[31] objection even though the prosecution used 75 percent (3 of 4) of its strikes against qualified Black jurors who were similarly situated to the White jurors it accepted, resulting in an all-White jury;

2. To ask any meaningful questions about such crucial topics as the jurors' ability to consider mitigation; their ability to consider a life sentence in a case with sexual assault; and their areas of bias, including racial bias and views about sexual assault;

3. To seek any type of individual questioning, much less individual, sequestered voir dire, or a questionnaire to ask about sensitive topics.

4. To obtain a ruling on a pretrial motion seeking to question jurors about mitigation and setting forth the law and importance of such questions; and

5. To ask jurors about the bases of their death penalty views, even though trial counsel secured permission from the court to do so.

App. 304a. These failures undeniably prejudiced Mr. Galloway. As a result, an all-White jury with biased members convicted and sentenced Mr. Galloway, a mentally ill Black man, to death. Trial counsel's performance during jury selection deprived Mr. Galloway of the effective assistance of counsel. U.S. CONST. AMENDS. VI, XIV; *Strickland v. Washington*, 466 U.S. 668,693 (1984).

---

[31] *Batson v. Kentucky*, 476 U.S. 79 (1986).

**B. Counsel's deficient performance during voir dire denied Mr. Galloway his Sixth Amendment right to effective assistance of counsel.**

**1. Counsel's failure to object under *Batson* denied Mr. Galloway his Sixth Amendment right to effective assistance of counsel.**

**a. *Batson* and its progeny prohibit the exclusion of even a single potential juror on the basis of race.**

"In the eyes of the Constitution, one racially discriminatory peremptory strike is one too many." *Flowers v. Mississippi*, 588 U.S. 284, 298 (2019). *See also Snyder v. Louisiana*, 552 U.S. 472, 485-86 (2008). The Equal Protection Clause forbids a prosecutor to strike any potential juror on the basis of race. *Batson,* 476 U.S. at 100; *Swain v. Alabama,* 380 U.S. 202, 203-04 (1965); *Strauder v. West Virginia,* 100 U.S. 303, 312 (1879). This rule protects the rights of the defendant and jurors and the integrity of the courts. First, a defendant has "the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." *Batson,* 476 U.S. at 85-86. Potential jurors also have an equal protection right "to jury selection procedures that are free from state-sponsored group stereotypes rooted in, and reflective of, historical prejudice." *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 128 (1994). This right is enforceable by the defendant. *Id*. As the Supreme Court has explained:

> The very fact that [members of a particular race] are singled out and expressly denied... all right to participate in the administration of the law, as jurors, because of their color, though they are citizens, and may be in other respects fully qualified, is practically a brand upon them, affixed by the law, an assertion of their inferiority, and a stimulant to that race prejudice which is an impediment to securing to individuals of the race that equal justice which the law aims to secure to all others.

*Powers v. Ohio,* 499 U.S. 400, 408 (1991) (quoting *Strauder,* 100 U.S. at 308). Finally, "the very integrity of the courts is jeopardized when a prosecutor's discrimination invites cynicism respecting the jury's neutrality and undermines public confidence in adjudication." *Miller-El v. Dretke,* 545 U.S. 231, 238 (2005) *(Miller-El II)* (internal citations omitted).

74

*Batson* sets forth a three-part test for analyzing claims of discrimination in jury selection:

1. A defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race;

2. The prosecution must offer a race-neutral basis for striking the juror in question;

3. The court must determine whether the defendant has shown purposeful discrimination.

*Batson,* 476 U.S. at 96-97; *see also Miller-El v. Cockrell,* 537 U.S. 322, 328-29 (2003) *(Miller-El I); Reed v. Quarterman,* 555 F.3d 364, 368 (5th Cir. 2009).

Once a *Batson* challenge reaches the third step, "a defendant may rely on 'all relevant circumstances' to raise an inference of purposeful discrimination." *Batson,* 476 U.S. at 96-97; *see also Miller-El II,* 545 U.S. at 240-66 (providing a list of non-exhaustive yet illustrative factors useful in "ferreting out" the discriminatory pretext of peremptory strikes). One relevant factor is whether the prosecutor employed disparate questioning during the voir dire of minority and non-minority jurors. *See Miller-El II,* 545 U.S. at 255 ("The next body of evidence that the State was trying to avoid black jurors is the contrasting voir dire questions posed respectively to black and nonblack panel members."); *Rhoades v. Davis,* 852 F.3d 422, 435 (5th Cir. 2017) (finding a "substantial showing of constitutional violation" in connection with the striking of a black venire member based on, inter alia, evidence that the prosecutor "questioned her more extensively than the previous, White jurors"). Additionally, courts will consider "broader patterns of practice" that may confirm the inference of intentional discrimination. *Miller-El II,* 545 U.S. at 253. For example, courts often look to the proportion of qualified minority venire members peremptorily struck by the government in a given jury selection. *See, e.g., id.* at

75

240 (observing that "prosecutors used their peremptory strikes to exclude 91% of the eligible African-American venire members" and that "[h]appenstance is unlikely to produce this disparity"). If the defendant establishes that even a single juror was excluded on the basis of race, a new trial is warranted. *See Batson,* 476 U.S. at 100; *Snyder,* 552 U.S. at 478; *Reed,* 555 F.3d at 381 n.12.

> **b. Counsel ineffectively failed to object contemporaneously when the State used 75 percent (three out of four) of its peremptory strikes to eliminate Black jurors and struck Black jurors at more than eleven times the rate it struck White jurors.**

Here an all-White jury sentenced Mr. Galloway, a Black man, to death, in a courtroom where every other significant participant – the judge, the prosecutors, and the defense attorneys – was White. After hardship and cause challenges, there were 31 jurors left from whom to strike the jury.  R.160-401; App. 291a. Twenty-two of those jurors were White, and nine were people of color. *Id*. Of the people of color, eight were Black and one was Hispanic. *Id.*  The state used peremptory challenges to strike two Black jurors who could have deliberated in this case: Annie Marie Taylor, a 40-year-old-supervisor at a casino, and Lolisa Ruffin, a 46-year-old sales associate. R. 402-04.[32] With regard to the alternates, the State also used its only alternate peremptory strike to remove a Black man, Wilbert Ball, who was 69 years old and retired.  *Id.*[33] In total the State exercised four

___

[32] Defense counsel struck the only Black juror the State passed. R. 402, 404. Trial counsel provided his file to post-conviction counsel, App. 305a. and attested that he records the race and gender of venire members for all of his trials. App. 304a. His trial file notes contain his handwritten list of jurors in which he notes every prospective juror's race. App. 321-22a

[33] After the State used its only peremptory strike for alternates to remove Black venire member Wilbert Ball, the defense accepted the next venire member, a White woman, Shawn Sims, who became the first alternate.  R. 404. The defense then used its only peremptory for the alternates to strike a White woman, Melissa Rogers. *Id*. The court then selected the next venire member, Deborah Jordan, a Black woman, as the second alternate. R. 405. Both alternates were dismissed before the jury began deliberations. R. 870. All of the jurors who deliberated in this case were White.

peremptory strikes; three were against Black prospective jurors. It struck three of the four prospective Black jurors, while striking only one of the 15 White jurors. "Happenstance is unlikely to produce this disparity." *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005).

Trial counsel recorded the racial composition of the venire and the strikes and thus must have been aware of the prosecution's lopsided strike pattern. App. 304a, 321-22a. Nonetheless, trial counsel sat silent and did not object. R. 405. Trial counsel did not make a single objection based on *Batson* and failed even to make a record of the race of the struck jurors. R. 194-404. When a family member of Mr. Galloway's expressed concern, counsel only observed, "at least we have some women on there," but failed to make any objection. App. 373a.

In the face of the prosecution's discriminatory tactics, the appropriate response from any competent, experienced lawyer would have been to lodge objections under *Batson*. [34] But defense counsel's performance during jury selection fell far below that of competent counsel and failed to reflect even a cursory understanding of the law

---

[34] Courts have found similar disproportionate use of strikes to demonstrate a prima facie case of discrimination under the first prong of *Batson* in a number of cases. *See e.g. Foster v. Chatman*, 578 U.S. 488, 493-500 (2016) ("The State exercised nine of its ten allotted peremptory strikes, removing all four of the remaining black prospective …[B]oth parties agree that Foster has demonstrated a prima facie case, and that the prosecutors have offered race-neutral reasons for their strikes."); *Johnson v. California*, 545 U.S. 162, 173 (2005) (The prosecution used three out of twelve peremptory challenges to remove the remaining three black prospective jurors.); *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003) (The prosecution struck 9 out of 10 Black jurors);*Harris v. Kuhlmann*, 346 F.3d 330, 346 (2d Cir. 2003) ("The fact that the prosecutor in this case was initially willing to accept one black juror is not sufficient to exempt from scrutiny the prosecutor's later decisions to strike all four of the remaining black potential jurors.");*Heckman v. Gonzalez-Caballero*, 65 F.4th 222, 229 (5th Cir. 2023) ("The Parties agree that defense counsel used two peremptory strikes against the only two Black persons on the venire panel. The trial court concluded that these strikes made a *prima facie* case of discrimination."); *State v. Brown*, 314 Kan. 292, 299, 498 P.3d 167, 173 (2021) ("Finding a prima facie case of purposeful discrimination where the State used four of its eight peremptory strikes on African-American prospective jurors, leaving one African-American to serve as the alternate juror.").

surrounding *Batson* and its progeny.  Counsel should have known how to make a prima

facie *Batson* claim:

> a defendant may establish a prima facie case of purposeful discrimination
> in selection of the petit jury solely on evidence concerning the prosecutor's
> exercise of peremptory challenges at the defendant's trial. To establish such
> a case, the defendant first must show that he is a member of a cognizable
> racial group, and that the prosecutor has exercised peremptory challenges
> to remove from the venire members of the defendant's race. Second, the
> defendant is entitled to rely on the fact, as to which there can be no dispute,
> that peremptory challenges constitute a jury selection practice that permits
> "those to discriminate who are of a mind to discriminate." Finally, the
> defendant must show that these facts and any other relevant circumstances
> raise an inference that the prosecutor used that practice to exclude the
> veniremen from the petit jury on account of their race. This combination of
> factors in the empaneling of the petit jury, as in the selection of the venire,
> raises the necessary inference of purposeful discrimination.
>
> In deciding whether the defendant has made the requisite showing, the trial
> court should consider all relevant circumstances.
>
> For example, a "pattern" of strikes against black jurors included in the
> particular venire might give rise to an inference of discrimination. Similarly,
> the prosecutor's questions and statements during *voir dire* examination and
> in exercising his challenges may support or refute an inference of
> discriminatory purpose.

*Batson,* 476 U.S. at 96-97 (internal citations omitted). Counsel should also have

known that in the face of a prima facie case of discrimination, the burden would

then shift to the state. *Berry v. State*, 802 So. 2d 1033, 1037 (Miss. 2001).

Counsel should have been aware, too, of how to rebut any race-neutral reasons

proffered by the state to justify strikes. The United States Supreme Court has recognized

that "all of the circumstances that bear upon the issue of racial animosity must be

consulted." *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008).  These circumstances include

statistical evidence about the prosecutor's use of strikes against Black potential jurors

compared to those against White potential jurors. *Miller-El v. Cockrell*, 537 U.S. 322,

342 (2003). Another factor courts will consider are side-by-side comparisons of White jurors who were not struck to Black jurors who were struck. *Snyder*, 552 U.S. at 483. Courts should also consider relevant history of racial discrimination. *Miller-El*, 537 U.S. at 346, as well as the relevant history of the State's peremptory strikes in the past. *Swain v. Alabama*, 380 U.S. 202, 223 (1965), *overruled on other grnds by Batson*, 476 U.S. 79; *see also Flowers*, 588 U.S. at 302. In addition to a clear prima facie case for a *Batson* objection, more compelling support for a *Batson* challenge was available if counsel had objected.

### i.  Statistical evidence of disparities in strikes.

As described above, the state used 75 percent (three of four) of its strikes against Black venire members. App. 292a. The state also struck 75 percent (three of four) of the Black venire members while only striking 6.67 percent of the White venire members. *Id.*[35] With these strikes, the State ensured an all-White jury in a county where at least two Black jurors usually sat on criminal juries. *See* App 327a. ("Generally, we get pretty good juries in Harrison County compared to other parts of the State. There's a diverse group of people in the area…. An all-White jury is very rare in Harrison County. We usually have a least two black people on our criminal juries, if not more.").[36] While the State struck 75% of the Black jurors, it struck only one 1 of the 15 White jurors (6.67%). App.

---

[35] Defense counsel struck one Black juror, Willie Sims, a 43-year-old worker at DuPont.

[36] According to the 2010 census, Harrison County Mississippi was, at the time of the trial, roughly 67% white and 33% non-white, with 22% of the population identifying as Black or African American. *Mississippi: 2010, Summary Population and Housing Characteristics*, 2010 Census of Population and Housing (2012), chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www2.census.gov/prod2/cen2010/cph-1-26.pdf (last visited November 25, 2025.

292a. This lopsided ratio, where the prosecution struck Black jurors at more than 11 times the rate at which it struck White jurors, is statistically significant and unlikely due to chance. *Id*.

> ### ii. Side by side comparisons of the stricken Black jurors and accepted White jurors show they were distinguishable from the selected White jurors only on the basis of their race.

The White jurors who were accepted are largely indistinguishable from the stricken Black jurors. Ms. Taylor, Ms. Ruffin, and Mr. Ball were eminently qualified. Each was an elector or resident freeholder of one year or more (35, 3, and 53 years respectively), and otherwise literate and qualified under Mississippi Code Annotated § 13-5-1. *See also* R. 156-57. Except for Mr. Ball, who was 69 and retired, each of these willing and able prospective jurors was gainfully employed, like all of the White jurors selected.[37] C. 186-193, 195 (juror information cards for prospective jurors 1, 2, 3, 6, 8, 13, 17, 18, 20, 23, 28, 30). Each of these prospective Black jurors:

1) Had never been on a criminal jury, like ten of the White selected jurors, C. 186-96;

2) Had never been on a civil jury, like six of the White selected jurors, C. 186-96;

3) Had either a G.E.D. (Ruffin) or high school diploma (Taylor and Ball), like the three White jurors selected who had a high school diploma, C. 186-96;

4) Had never been charged with a felony, like *all twelve* of the White selected jurors, R. 369-71;

5) Had never been charged with a violent crime, like *all twelve* of the White selected jurors, R. 353.

---

[37] The all-White jury selected was comprised of (1) Judith Reyer, (2) Randi Bennett, (3) George Taylor, (6) Carmen Urbina, (8) Kathryn Gates, (17) Lauren Hughes, (18) Rachel Hebert, (20) Elise Deano, (23) Kathy Carlson, (28) Steven Ford, and (30) Tina Swanier. R. 405. The alternates were (32) Shawn Sims, who is White, and (35) Deborah Jordan, who is Black but was selected only after the State had exhausted its one peremptory for alternates. *Id.* None of the alternates ultimately served.

6) Had never been an accused, complainant, or witness in a criminal case, like eleven of the White selected jurors, C. 186-96;

7) Had never been a defendant, plaintiff, or witness in a civil case, like *all twelve* White jurors selected, C. 186-96;

8) Knew someone else in the jury pool, as did six of the White jurors selected, R. 377-79;[38]

9) Identified a religious preference that was Christian in faith, like eleven of the White jurors selected.[39]

In other words, the rejected Black prospective jurors looked remarkably similar, if not identical, to the selected White jurors on these important measures.

The three willing and able Black prospective jurors (Mr. Ball, Ms. Ruffin, and Ms. Taylor) were not themselves alike in every respect, but each was like some or all of the selected White jurors in the following important ways:

1) Like one of the selected White jurors (Ms. Reyer), Mr. Ball and Ms. Taylor had family members involved in law enforcement, and assured the Court, as did Ms. Reyer, that this would not cause them to lean towards the State. R. 357-58.

2) Like two of the selected White jurors (Mr. Ford and Ms. Reyer), Mr. Ball and Ms. Ruffin had family members who had been accused of crimes. R. 353, 369-71. And like the White selected jurors, Mr. Ball and Ms. Ruffin both affirmed that this experience would not interfere with their ability to be fair in this case. *Id.*

3) Like all twelve White jurors, Mr. Ball and Ms. Ruffin stated that neither they nor any of their family members had been victims of violent crime. R. 350. Ms. Taylor stated that her niece had been (R. 350), but she assured the Court she could remain fair and impartial, and of course this is the type of experience that, if anything, would favor the prosecution.

---

[38] This factor was presumably not of significance to the State in the exercise of its strikes, because it was defense counsel who asked this question. Counsel only followed through with some of the jurors who said they knew someone, R. 377-79, and the State never asked follow-up questions. The trial judge, however, did note that he had never seen a jury with so many people who knew one another. R. 380. He asked if anyone would be influenced by knowing someone else on the jury and like questions, but no prospective juror raised their hand to say yes. R. 380.

[39] This observation is further evidence that the Black and White jurors were alike but is certainly not meant to suggest that religious preference would be a legitimate reason to strike or not strike a juror.

81

In other words, with the exception of Ms. Taylor's niece having been a crime victim, each of the Black jurors was like one or more of the selected White jurors, even when they were different from one another.

Most significantly, on an exhaustive list of the 25 substantive, case-related, or process-related questions asked of the venirepersons, the qualified Black prospective jurors presented answers *no different* from the selected White jurors. This includes the following questions, to each of which *every member of both groups* answered "no" (with an exception noted below as to one White juror's answer to a single question):

1) "Do any of you have conscientious scruples against the infliction of the death penalty when the law authorizes it in the proper case and where the testimony and the evidence warrants it?" R. 180;

2) "Does anybody have conscientious scruples against awarding the death penalty?" R. 180;

3) "Could or would your attitude towards the death penalty prevent you or materially affect you in making the decision as to the defendant's guilt[?]" R. 180;

4) "Would you vote against the death penalty without regard to the evidence that is brought forth during the course of trial?" R. 181;

5) "Would you automatically vote for the imposition of the death penalty without regard for the evidence of aggravation or mitigation and only for the reason that you may find the accused guilty of the crime of capital murder?" R. 181;

6) "Is there anyone who hasn't already raised their hand that for religious, philosophical, or any other reason whatsoever, that you feel that your views of the death penalty would substantially impair your ability to serve as a juror in this case?" R. 184;

7) "How many of you would automatically vote for the death penalty when you were considering what punishment would be appropriate in that case?" R. 185;

8) "Under those circumstances how many of you would not consider the death penalty at all?" R. 186. None of the Black or White jurors raised their hands except Tina Swanier, a White woman. Ms. Swanier was selected after additional questioning in private. R. 330-32.

9) "Anybody here who thinks you just have to slug it out until you get something that is life or death?" R. 187-88;

10) "How many of you think that it doesn't really matter what decision you make in the penalty phase?" R. 189;

11) "Is there anyone who has read anything in the past or has obtained any information that would not let you follow that principle of law?" R. 336;

12) "Any of you related by blood or marriage to any of the persons just identified by Mr. Huffman . . . [or] either Mr. Cono Caranna [District Attorney] or any of the other assistant district attorneys just identified by Mr. Huffman?" R. 337;

13) "Are any of you related by blood or marriage to either the defendant or any of his attorneys . . . [or] personally acquainted with the defendant or any of his attorneys?" R. 341;

14) "Do any of you know any of the witnesses identified by Mr. Huffman?" R. 343-44;

15) "Is anybody related by blood or marriage to any of the witnesses identified by Mr. Rishel? Does anybody know of any of those witnesses?" R. 346;

16) "Is there anybody here who feels that just because a person is a policeman you would give more weight to that policeman's testimony than otherwise?" R. 346;

17) "Have any of you heard anything about the allegations in this case from any source whatsoever?" R. 346;

18) "Is there anyone who just simply cannot sit and listen to the facts of a crime of this nature?" R. 367;

19) "Can we all agree that any decisions you make as jurors should be based in fact and not sympathy?" R. 369;

20) "[I]s there anyone in here who would refuse to" draw "reasonable inference[s]?" R. 375-76;

21) "Is there anyone in here who can describe what a typical murderer looks like?" R. 376;

22) "Can we agree that stereotyping, particularly in a court of law, is just not right?" R. 376;

23) "Anyone here think that you are not entitled as a juror to have your own opinion about the facts and make your own decision as to what should be done as far as a murder case is concerned?" R. 380;

24) "Anyone think that you should give in to your fellow jurors?" R. 380;

25) "Is there something that is going to get in your way?" R. 384-86.

    The selected White jurors, and the rejected Black jurors, did not differ in their responses to *any* of these questions. All answered in a manner that would suggest that

83

they were both qualified and appropriate jurors for the case, but only the White jurors were permitted to serve because of the prosecutor's discriminatory use of strikes. Defense counsel's response to this troubling discrimination was total inaction.

The side-by-side comparative analysis of the prosecutions' treatment of Black and White jurors, as demanded in *Snyder*, *Flowers*, and *Miller-El*, shows that counsel would more than likely have prevailed on the *Batson* claim. Ms. Taylor and Ms. Ruffin, the Black jurors who would have served if not stricken, were just like the selected White jurors on all 25 of the questions propounded. And they were like several or more of the White jurors on 13 other factors or questions in this record. This is powerful and compelling evidence that the only reason Ms. Taylor and Ms. Ruffin were struck is that, like Mr. Galloway, they are Black. See *Miller-El*, 545 U.S. at 241.

### c. History and other relevant circumstances.

Leslie Galloway is an African-American male. His death sentence came in a courtroom in which every other significant participant – the judge, the prosecutors, and the defense attorneys – was White. Every elected District Attorney for Harrison County, Mississippi in the modern death penalty era has been a White man: Albert Necaise (1974 to 1986); Cono Caranna (1986 to 2012) Honorable Joel Smith (2012 to 2021); W. Crosby Parker (2021 to present). Mr. Galloway was tried during the Caranna era, when another capital case was tried that resulted in a remand for a *Batson* hearing. *See Thorson v. State*, 653 So. 2d 876, 895-96 (Miss. 1994) (remanding for *Batson* hearing where Harrison County prosecutors struck 7 of the 13 Black venire members). In *Walker v. State*, Harrison County prosecutors used 4 of their 7 peremptory strikes against Black jurors. 671 So. 2d 581, 627 (Miss. 1995) (en banc). More recently, in *State v. Ronk*, appellate counsel

asserted that in another 2010 capital trial, the prosecution also used peremptory strikes to secure an all-White jury. *Ronk v. State*, 267 So. 3d 1239, 1289-1290 (Miss. 2019).[40]

> ### d. Counsel sank well below any standard of reasonable competence by failing to raise a contemporaneous *Batson* objection even when the prosecutor struck the panel down to an all-White jury.

The above facts would have prompted any reasonably competent attorney representing a Black client to lodge a swift and compelling *Batson* challenge. Counsel's failure to do so constituted ineffective assistance of counsel.[41] Under the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, "counsel should consider … potential legal challenges to the procedures for selecting the jury that would be available in any criminal case (particularly those relating to bias on the basis of race or gender)…." ABA Guideline 10.10.2 (A). The commentary to this guideline states that raising valid *Batson* challenges is part and parcel of effective counsel's duties. Commentary to Guideline 10.10.2, *in* 31 Hofstra L. Rev. 913, 1055 & n.268 (2003).

Given the above analysis within the *Batson* framework of the strike pattern here*,* the teachings of *Strickland,* and the guideposts of the ABA Guidelines, counsel should have recognized their professional duty to raise a *Batson* challenge. When a prosecutor strikes Black jurors at more than ten times the rate at which he strikes White jurors,

---

[40] In post-conviction, the defendant in *Ronk* did not raise a *Batson* challenge but rather challenged trial counsel's failure to preserve the record of the race of the venire members, and this Court found the record preservation issue waived. *Id.* at 1290. Mr. Ronk was represented by Mr. Rishel's office, as was another Harrison County capital defendant tried in 2010, Jason Keller. *Id.*; *Keller v. State*, 138 So. 3d 817 (Miss. 2014). In Mr. Keller's case, defense counsel failed to timely object to the failure of the court reporter to record the jury strikes and selections. 138 So. 3d at 837.

[41] "An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland.*" *Id. Hinton v. Alabama*, 571 U.S. 263, 274 (2014). Trial counsel's failure to raise a *Batson* challenge was clearly an "inexcusable mistake of law." *Id.* at 275.

without any apparent valid justification, and the defendant himself is Black, no reasonably competent attorney could fail to raise a *Batson* challenge. Under the first prong of *Strickland*, then, counsel were deficient. 466 U.S. at 686.

The affidavit of Mr. Stewart shows that a *Batson* challenge would certainly have been expected under the facts above, and that there could be no conceivable strategic reason for counsel's failure to do so:

> *I most always raise Batson challenges when the prosecution strikes Black people.* I don't know why we would not have raised them in this case. It is hard to establish a pattern after the first strike of a Black person, so we usually don't raise them after the first one, but once there's a second strike, we do. All three attorneys would have had the responsibility to raise a *Batson* challenge during jury selection.

App. 378a. (emphasis added). Similarly, Mr. Rishel's notes show he was aware of the race of the jurors and therefore could not have avoided noticing the discriminatory pattern of strikes.  Mr. Rishel stated in his affidavit:

> the three defense attorneys keep notes regarding the sex and race of each juror as well as other factors an attorney might consider important. I do not recall making any *Batson* challenges. Some Black members of the jury panel were excused upon their own request and some were stricken for cause. However, White jurors were excused upon their own request and some were stricken for cause. Had a *Batson* challenge been appropriate, we would have made one.

App. 304a. This statement evidenced a profound lack of understanding regarding the law or flagrant disregard of the law. Mr. Rishel failed to note that the State exercised peremptory strikes to remove qualified Black jurors, much less that the State used three of four peremptory strikes to remove willing and able prospective Black jurors, resulting in the seating of an all-White jury.

Mr. Rishel either did not understand that *Batson* involves the use of *peremptory* strikes (not cause challenges) or had no memory of this jury-selection process. His

86

affidavit does not provide any strategic reason to forgo a constitutional challenge that could have shielded Mr. Galloway from a jury selected through obvious discrimination. *Id.* Trial counsels' affidavits only further compel the conclusion that counsel were deficient for failing to raise a *Batson* challenge, falling far below an objective standard of reasonableness.

Moreover, trial counsel knew, or should have known, the importance of a contemporaneous objection to a *Batson* error. Without one, a litigant procedurally defaults the claim under state law. *See Jones v. Johnson,* 171 F.3d 270, 278 (5th Cir. 1999); *Ronk v. State*, 267 So. 3d 1239, 1290 (Miss. 2019) (quoting *Thomas v. State*, 517 So.2d 1285, 1287 (Miss. 1987) ("A trial objection is required to preserve a *Batson* claim for appeal.")). Counsel also knew, or should have known, of Fifth Circuit precedent holding that a contemporaneous objection is a constitutionally required element. *See Andrews v. Collins,* 21 F.3d 612, 621 (5th Cir. 1994); *Wilkerson v. Collins,* 950 F.2d 1054, 1062-63 (5th Cir. 1992).

A *Batson* error is structural, providing "automatic relief to defendants who prevailed on claims alleging race or gender discrimination in" jury selection. *Weaver v. Massachusetts*, 582 U.S. 286, 288 (2017). Thus, an attorney's failure to make a *Batson* claim, when confronted with a prima facie case of discriminatory exercise of peremptory challenges, is deficient. *See Drain v. Woods,* 902 F. Supp. 2d 1006, 1025 (E.D. Mich. 2012) ("Counsel's passivity in light of an obvious pattern of strikes against minority prospective jurors fell below an objective standard of reasonableness and amounted to deficient performance."), *afl'd,* 595 F. App'x 558, 560 (6th Cir. 2014); *see also Mitcham v. Davis,* 103 F. Supp. 3d 1091, 1102-08 (N.D. Cal. 2015) (counsel deficient in

87

capital murder case for failing to object in 1984 trial to state's peremptory strikes of all black jurors on basis of state pre-*Batson* authority). As the Fifth Circuit has recognized, an attorney's failure to challenge a biased juror who then sits on the jury is prejudicial. *See Virgil v. Dretke,* 446 F.3d 598, 612-14 (5th Cir. 2006); *Biagas v. Valentine,* 265 F. App'x 166, 172 (5th Cir. 2008). The same principle applies to an attorney's failure to make a meritorious *Batson* challenge. *See Drain v. Woods,* 595 F. App'x 558, 583 (6th Cir. 2014) *(Batson* error structural; failure to make meritorious *Batson* challenge prejudicial). *See also Eagle v. Linahan*, 279 F.3d 926, 943 (11th Cir. 2001) ("If we conclude that the omitted [*Batson*] claim would have had a reasonable probability of success, then counsel's performance was necessarily prejudicial because it affected the outcome of the appeal."). *But see Scott v. Hubert,* 610 F. App'x 433,435 (5th Cir. 2015) (declining to hold that a structural error alone is sufficient warrant a presumption of prejudice).

### e. Counsel's ineffectiveness in failing to object to the Batson violation prejudiced Mr. Galloway.

Trial counsel's performance at jury selection fell below the standard of competent counsel required by the United States Constitution.  Because a *Batson* error is structural and renders a trial fundamentally unfair, counsel's deficient performance requires relief. The Supreme Court has held that counsel's failure to object to some kinds of structural errors, like courtroom closure in violation of the right to public trial, does not necessarily render the trial "fundamentally unfair" and thus does not require relief unless the defendant shows *Strickland* prejudice. *See Weaver v. Massachusetts*, 582 U.S. 286, 301 (2017).  The Court stressed, however, that this holding "[did] not address" an attorney's

deficient failure to object to *Batson* errors.  It acknowledged that those errors had always

required "automatic relief" on direct appeal. *Id*. at 301-02.

Elsewhere, the Supreme Court has repeatedly recognized that *Batson* does protect

trial fairness and equal justice.

> When the government's choice of jurors is tainted with racial bias, that
> "overt wrong ... casts doubt over the obligation of the parties, the jury, and
> indeed the court to adhere to the law throughout the trial ...." That is, the
> very integrity of the courts is jeopardized when a prosecutor's
> discrimination "invites cynicism respecting the jury's neutrality," *ibid.,* and
> undermines public confidence in adjudication. So, "[f]or more than a
> century, this Court consistently and repeatedly has reaffirmed that racial
> discrimination by the State in jury selection offends the Equal Protection
> Clause."

*Miller-El v. Dretke*, 545 U.S. 231, 238 (2005) (citations omitted); *see Powers v. Ohio*,

499 U.S. 400, 411 (1991) (defendant has "concrete interest" in challenging discriminatory

exercise of peremptory challenges against jurors of a different race because "racial

discrimination in the selection of jurors 'casts doubt on the integrity of the judicial

process,' and places the fairness of a criminal proceeding in doubt.") (quoting *Rose v.

Mitchell*, 443 U.S. 545, 556 (1979)); *see also Flowers v. Mississippi*. 588 U.S. 284, 301

(2019) ("Equal justice under law requires a criminal trial free of racial discrimination in

the jury selection process. . . . By taking steps to eradicate racial discrimination from the

jury selection process, *Batson* sought to protect the rights of defendants and jurors, and

to enhance public confidence in the fairness of the criminal justice system."); *Snyder v.

Louisiana*, 552 U.S. 472, 478 (2008) ("The Constitution forbids striking even a single

prospective juror for a discriminatory purpose."); *Batson*, 476 U.S. at 99  ("By requiring

trial courts to be sensitive to the racially discriminatory use of peremptory challenges, our

decision enforces the mandate of equal protection and furthers the ends of justice . . .

public respect for our criminal justice system and the rule of law will be strengthened if we ensure that no citizen is disqualified from jury service because of his race.").

Because the blatant *Batson* errors in this case would have required "automatic relief" at trial or on appeal if trial counsel had properly objected, counsel's deficient performance was presumptively prejudicial and requires this Court to grant habeas relief.

Furthermore, there is a reasonable probability that, but for counsel's failure to object to the discriminatory peremptory strikes that resulted in an all-White jury, the outcome of Mr. Galloway's trial would have been different. *Strickland*, 466 U.S. at 694. The scientific literature on the racial dynamics of juries, and the types of errors that made this particular jury especially susceptible to those dynamics, compel this conclusion.

Extensive social science research conducted over the last fifty years has shown that all-White juries engage in less deliberative decision making.[42] Research also shows that all-White juries are less receptive to mitigation presentations than diverse juries.[43]

---

[42] *See, e.g.*, Daniel Swett, *Cultural Bias in the American Legal System*, 4 Law & Society Rev. 79, 79-110 (1969) (explaining the role of culture and race in erroneous assumptions made by an all-White jury in a case where a Black defendant was convicted of murder); Samuel R. Sommers, *On Racial Diversity and Group Decision Making: Identifying Multiple Effects of Racial Composition on Jury Deliberations*, 90 J. Personality & Soc. Psychol. 597 (2006) (mock-trial experiments showed that racially diverse juries engaged in longer deliberations and were more accurate in their factual assessments than all White juries and that the diverse setting had a motivational influence on White jurors to more carefully scrutinize information); Valerie P. Hans & Neil Vidmar, *The Verdict on Juries*, 91 Judicature 226, 227 (2008) (empirical research of juries showed that a "representative, diverse jury promotes vigorous debate" and that "[h]eterogenous juries have an edge in fact finding, especially when the matters at issue incorporate social norms and judgments, as jury trials often do.").

[43] *See* Craig Haney, *Death by Design* 189-209 (Oxford University Press 2005) ("It could be argued that the courts have an affirmative duty in all death penalty cases – but certainly ones involving African American defendants – to proactively seek to overcome the effects of what I have termed an 'empathic divide' between capital jurors and defendants.  It is a divide that is widened in the case of African Americans who are on trial for their lives...."). *See also* M. Shanara Gilbert, *An Ounce of Prevention: A Constitutional Prescription for Choice of Venue in Racially Sensitive Criminal Cases*, 67 Tul. L. Rev. 1855, 1926 (1993) (arguing for greater acknowledgment of "[t]he difficulty White jurors face in extrapolating from the experiences of black people or others of color").  *See also Brown v. North Carolina*, 479 U.S. 940, 940 (1986) (O'Connor, J., concurring in denial of certiorari) ("We ought not delude ourselves that the deep faith that race should never be relevant has completely triumphed over the painful social reality that, sometimes, it may be.").The Capital Jury Project has found that capital decision making is strongly influenced by,

In a case with extremely weak evidence of sexual battery, *see infra*, the failure of defense counsel to ensure the seating of a diverse jury could well have made the difference with regard to the finding of a sexual assault, a predicate for death penalty eligibility. This more diverse jury would likely have scrutinized the evidence more closely and may well have rejected the junk science supporting Mr. Galloway's capital murder verdict. Also, this more diverse jury would likely have been more receptive to Mr. Galloway's mitigation presentation (even as weak as it was due to counsel's other unprofessional errors).

### f. The Mississippi Supreme Court unreasonably applied clearly established federal law and unreasonably determined the facts.

The Mississippi Supreme Court held that "notwithstanding the procedural bar," this claim was "without merit." App. 184, 374 So. 3d at 486. As described in Ground Thirty-One, 28 U.S.C. § 2254 if construed to require deference to state court rulings, would violated the doctrine of constitutional avoidance, Article III, and the Supremacy Clause.

The Mississippi Supreme Court's rejection of this claim was in fact an unreasonable application of clearly established federal law and an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1), (2). The Mississippi Supreme Court ignored the holdings of *Batson* and its progeny in determining that Mr. Galloway could not show that "his counsels' performance was deficient" and that there was no prejudice. App. 189a, 374 So. 3d 489. In ignoring or misapplying the law governing (1) the legal

---

among other factors, the race of the defendant, the race of the individual jurors, and the racial composition of the jury. *See generally* William J. Bowers et al., *Death Sentencing in Black and White*, 3 U. Pa. J. Const. L. 171, 259 (2001).

strength of the *Batson* claim, and (2) the facts establishing the validity of the *Batson* claim under *Flowers*, and by (3) finding that counsel had a strategic purpose where none was offered, the Mississippi Supreme Court failed to adequately analyze counsel's performance under *Strickland* and also failed to identify the prejudicial nature of the counsel's failures in jury selection.

### i. The court unreasonably determined the facts by finding a "strategy" in trial counsel's inaction.

Quoting at length from its own opinion in *Wilcher v. State*, 863 So. 2d 776 (Miss. 2003), the court suggested that the decision not to make a *Batson* challenge could have been strategic. It drew support for that notion from the evidence that trial counsel took notes on juror race or ethnicity and from counsel's self-serving statement that if he had thought a *Batson* claim was appropriate he would have filed one. App. 187a, 374 So.3d at 487-88. There is no evidence that counsel analyzed the prosecution's strikes in light of *Batson,* and trial counsel did not claim that the failure to object was in any way "strategic." Under well-settled state law procedure, the Mississippi Supreme Court was obligated to hold a hearing unless it was beyond doubt that Mr. Galloway would be unable to prove his claim. *See, e.g., Robertson v. State*, 669 So.2d 11 (Miss. 1996). Instead, the Mississippi Supreme Court unreasonably determined that counsel had a "strategy" to allow the *Batson* violation to go unchallenged. In this respect it unreasonably determined the facts. 28 U.S.C. § 2254(d)(2).

### ii. The court unreasonably applied *Strickland* respecting counsel's failure to make a *Batson* motion.

Under *Strickland*, counsel's performance must be evaluated relying "all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland,* 466 U.S. at 691. The Mississippi Supreme Court should have evaluated the

deficiency of counsel's performance based on the full circumstances outlined in Mr. Galloway's post-conviction petition, including:

- The availability of a meritorious objection based on a prima facie case of discriminatory purpose raised by the statistical evidence of a 75-percent strike rate of Black jurors compared to a 6.67-percent strike rate of White jurors and determination that the prosecution "struck black jurors at more than 11 times the rate they struck White jurors in this case," App. 289a-300a (Affidavit of Barbara O'Brien, a Professor of Law);

- Mr. Galloway's attorney's seeming ignorance of the potential claim by way of his comment to a family member when questioned about the all-White jury that "at least we have some women on there," App. 371a-373a;

- Trial counsel's access to expertise, training, and motions pertaining to *Batson* and outlining the resources available to counsel to prepare for voir dire, App. 249a-288a, 329a-331a.;

- Counsel's own notes indicating that they were aware of and keeping track of the race and gender of each juror, App 306a-323a (Excerpts from trial counsel's files).

The Mississippi Supreme Court utterly failed to "conduct an objective review of their performance, measured for reasonableness under prevailing professional norms." *Miller v. Dretke*, 420 F.3d 356, 363–64 (5th Cir. 2005) (internal citations omitted).

Instead, as described above, the Mississippi Supreme Court relied on a single statement of trial counsel that if "a *Batson* challenge [had] been appropriate, we would have made one" as evidence of a "decision to not raise such a claim." App.187a, 374 So.

3d 488. This was not a "strategic decision" but merely "their decision." *Id*. The state court's facile reliance on trial counsel's self-serving statement unreasonably applied *Strickland*.

### iii. The state court unreasonably relied on what it perceived as an absence of prejudice.

"Among the factors relevant to deciding whether particular strategic choices" is "*the potential for prejudice from taking an unpursued line of defense*." *Strickland*, 466 U.S. at 681 (emphasis added). The Mississippi Supreme Court, again relying on *Wilcher*, held that "the fact that an all-White jury was empaneled is not evidence of prejudice." App. 189a, 374 So.3d at 489. This conclusion unreasonably applied both *Batson* and *Strickland*. First, trial counsel could have won the *Batson* motion by making the obvious prima facie showing that the prosecution struck Black jurors at a significantly higher rate than White jurors. This would have necessitated an evaluation under the second and third prongs of *Batson* at the trial stage. Even if rejected by the trial court, that evidence could have been considered on direct appeal. The analysis and facts provided in post-conviction would have allowed Mr. Galloway to show under *Flowers* that the strikes in his case were racially motivated, which would have resulted in a different outcome.

Second, the state court unreasonably applied *Batson* by not recognizing, as described above, that it requires automatic relief, and by refusing to conduct a hearing at which post-conviction counsel could have demonstrated how the all-White jury indeed prejudiced Mr. Galloway's defense.

**g. The state court unreasonably applied *Strickland* by treating counsel's deficient performance in not raising the *Batson* claim as a wavier of the *Baston* claim.**

While identifying the correct federal precedent on the underlying issue, *Batson* and *Flowers*, the Mississippi Supreme Court found the analysis under *Flowers* to be inapplicable due to trial counsel's failure to raise a *Batson* challenge. The court noted that the prosecution was not given an opportunity to offer race-neutral reasons for their strikes and the trial judge was not granted the opportunity to access those reasons. App. 186a, 374 So. 3d at 487. The court's circular reasoning failed to give consideration to the strength of the claim that counsel failed to preserve—the very reason counsel's performance was deficient. Moreover, the state court could have easily remedied the problem by remanding to the trial court for an evidentiary hearing.

The court acknowledged that Mr. Galloway went to "great lengths" to establish "statistical evidence about the prosecutor's use of peremptory strikes against black prospective jurors as compared to White prospective jurors in the case;" "side-by-side comparisons of black prospective jurors who were struck and White prospective jurors who were not struck in the case;" "relevant history of the State's peremptory strikes in past cases;" and "other relevant circumstances that bear upon the issue of racial discrimination." App. 186a, 374 So. 3d at 487. To then choose to ignore that analysis as irrelevant, despite the fact that the strength of the *Batson* claim directly related to the prejudicial nature of the failure to raise it under *Strickland*, was an unreasonable application of the law and determination of the facts. *Id.*

95

## 2. Counsel failed to conduct constitutionally adequate voir dire.

Mr. Rishel stated that "one of the most important parts of any criminal trial and especially capital trials is voir dire. My goal in capital cases is to eliminate jurors who will automatically impose the death penalty and put as many jurors on the jury [as] possible who have scruples against the death penalty." App. 304a. While such a theory may be consistent on its face with an effective standard of practice, it must be executed to work.   Here, the defense team failed to execute this strategy.

### a. Trial counsel performed deficiently in failing to prepare for and question jurors in voir dire.

Defense counsels' failures to take meaningful steps to select an impartial capital jury began before voir dire started. Defense counsel neglected to seek a jury questionnaire or to move for individual, sequestered voir dire, basic tools routinely employed by competent capital defense attorneys in Harrison County and Mississippi to learn about prospective jurors. Long before Mr. Galloway's trial, it was the exceedingly rare capital case indeed where defense counsel did not seek to use a questionnaire and did not seek individual, sequestered voir dire for questioning about death penalty views and sensitive topics like sexual assault. *See* App. 256-57a (attorney trainer Richard Jaffe, in a training Mr. Galloway's trial counsel attended, stating he provided the training group with a sample jury questionnaire, and that individual sequestered voir dire is a critical tool; if denied, then individual (non-sequestered) questions must be asked); App. 259-88a (Making the Case for life Conference Materials); App. 244a (establishing defense counsel attended this training); App 250-51a (defense counsel in Harrison County are routinely afforded individual, sequestered voir dire in capital cases, a critical tool for uncovering disqualifying biases).   These tools are vital to counsel's full exploration of whether

96

prospective jurors are qualified to serve. Counsels' failures fell far below the standard of care among attorneys at the time.

On July 29, 2009, defense counsel filed an omnibus document entitled "Motions," which included a subpart for a "Motion to allow defense counsel to question the potential jurors about whether they deem any of the mitigating factors defendant intends to prove irrelevant to their sentencing decision." C. 21, 36-39. This indicates that defense counsel recognized the importance of questioning prospective jurors about their ability to consider mitigation. At the pretrial motions hearing, however, when the trial court invited defense counsel to take up any of the motions in the omnibus document, defense counsel neglected to take up the motion for voir dire. R. 10 ("I was just about to say that there are, looks like several motions to be heard. So I'll hear you, Mr. Rishel, in any order you with to bring them up."); R. 147 (Mr. Rishel erroneously asserted that defense motions have all been argued and ruled on). As a result, the trial court never ruled on the motion to conduct voir dire on mitigation. *See, e.g.*, C. 105-107.

During jury selection, defense counsel's incompetence continued. They asked only the barest questions – whether jurors would automatically vote for the death penalty or, mysteriously, whether they would automatically vote for life. R. 185-86. Defense counsel asked no questions about whether jurors could consider mitigation, despite their pretrial motion and despite the clear importance of such questioning for securing a fair trial. App. 255-56a; CR 36 (motion arguing defense entitled to explore whether mitigation would be irrelevant for jurors). As their own motion argued, Mississippi courts have permitted these lines of questions for years. *Id.*

Mr. Rishel asked and received permission from the court to reserve questions exploring jurors' death penalty views, but then inexcusably failed ever to ask those questions. R. 190-91 (Mr. Rishel receiving the right to later ask "some other questions about the death penalty but they are regarding the reason why you vote one or way or the other and not so much as to whether you automatically vote for or against the death penalty"). He never asked the jurors whether they could consider life in a case where the defendant was convicted of capital murder based on a finding of sexual battery. R. 194-404.

Although defense counsel later asked a handful of perfunctory questions about whether the venire members knew witnesses or police officers, they asked no questions about the prospective jurors' views of sexual assault, race, or the defense's mitigation themes, or about the bases for their death penalty views. R. 384. Indeed, trial counsel failed to ask about sexual assault even after one of the jurors sua sponte offered that it would be hard for her to serve on a sexual assault case. R. 376-77.  Because the voir dire panel questioning relied upon jurors to volunteer an answer by raising their hands, the vast majority of seated jurors in this case never individually responded to a single verbal question.  R. 157- 384.

### b.  Trial counsel performed deficiently in failing to challenge biased jurors.

 "No competent defense attorney would intentionally leave someone on the jury who indicated a strong preference for the death penalty and also stated that he would require the defense to convince him that death was not appropriate even though he was aware that the burden of proof remains with the state." *Anderson v. State*, 196 S.W.3d 28, 41 (Mo. 2006) (finding counsel ineffective for failing to move to strike such a juror for

cause). At least one juror who was unable to consider a life verdict sat on Mr. Galloway's jury. Juror Kathy Carlson believed there could be no verdict other than death if Mr. Galloway was convicted, that death was the "only sentence it could be." Supp. App. A051, Affidavit of Susanna Henry. Because counsel never asked Ms. Carlson a single individual question, they did not learn her views about the death penalty. R. 194-404. They did not know that she believed it was wrong for taxpayers to pay to incarcerate a defendant convicted of a terrible crime like Mr. Galloway's. *See* App. 1003. These strongly held views about the necessity of a death sentence after a rape-murder conviction would have been uncovered with adequate voir dire. App 255-56a.

Defense counsel also ineffectively failed to challenge potential juror Mr. McCoy for cause, though he had raised his hand when asked whether he would automatically impose the death penalty upon a conviction for capital murder. R. 315-16. He clarified on individual voir dire that he meant he would automatically impose the death penalty upon conviction for capital murder if the defendant had a prior felony conviction. R. 316-19. Mr. Galloway has a prior felony conviction. *See Uttecht v. Brown*, 551 U.S. 1, 21-22 (2007) (jurors must be fairly able to consider both life and death sentences under facts of case).

Defense counsel further ineffectively failed to challenge for cause potential juror Ms. Smith, who said that if the case involved sexual assault, which this case allegedly did, she would demand the death penalty. R. 376-77. *Anderson*, 196 S.W.3d at 41.

Trial counsel received training in 2008 on the "need for jurors to treat each other with respect and dignity." App. 256-57a; App. 259-88a. (Making the Case for life Conference Materials). Yet counsel also failed to secure pledges from each juror that

Case 1:24-cv-00121-CWR    Document 37    Filed 12/10/25    Page 106 of 403

they would respect the views of the others. R. 194-404. This also contributed to the coercion in the jury room. *See, e.g.*, App 255-57a. One juror wanted to vote for life, but at least two women bullied the holdout juror and threatened her. App. 1070a, 1072a. The holdout juror was so distraught that she was reduced to tears. App. 1072a; Ground Nine *infra*.

A capital defendant is entitled to an impartial jury in both the guilt and the penalty phase. *Morgan v. Illinois*, 504 U.S. 719, 728-29 (1992).    Defense counsel failed to provide Mr. Galloway with a constitutionally adequate voir dire necessary to protect this right. The defense team abandoned their own motion to ask questions about mitigation and abandoned their stated intent to ask questions probing jurors about their ability to consider a life verdict. R. 189-90. Mr. Galloway was charged with capital murder premised on the felony predicate of sexual battery, yet defense counsel asked no questions about whether the jurors could consider life for a person convicted of sexual battery and murder. Defense counsel failed to ask questions about the jurors' ability to consider the alleged aggravating factors and the alleged mitigating factors impartially. They inexplicably failed to use tools routinely available to defense counsel in Harrison County capital cases, like jury questionnaires and individual, sequestered voir dire. In all of these respects, counsels' performance was deficient.

### c. Counsel's ineffectiveness during voir dire prejudiced Mr. Galloway.

As a result of their deficient performance during voir dire, at least one juror was seated who should have been excluded for cause because of her inability to consider a life sentence in this case.  These failures also resulted in the seating of one juror who believed there could be no verdict other than death if Mr. Galloway were convicted; one of the

seated jurors held the view that persons convicted of the crimes Mr. Galloway was convicted of, capital murder and sexual battery, had to receive death sentences. And counsel failed to guarantee that all the jurors would be willing to consider mitigation and vote for life even in a case of sexual assault. It is reasonably probable that these omissions were outcome-determinative, because, as described in Ground Nine *infra*, members of this jury coerced a life holdout into changing her vote for death by telling her that she could be prosecuted for voting her conscience. App. 1003a, 1070a, 1073a. The bullying arguments to which the holdout yielded could not have been made by jurors who were properly qualified to consider mitigation and vote for a life sentence. But for the failures of counsel to adequately question jurors, it is reasonably probable that the trial would have produced a different result. Counsel's failures therefore deprived Mr. Galloway of the effective assistance of counsel. U.S. CONST. AMENDS. VI, XIV.

Trial counsel's other failures in voir dire may well have affected the death verdict at the penalty phase. Trial counsel failed to ask any meaningful questions about such crucial topics as the jurors' ability to consider mitigation; their ability to consider a life sentence in a case with sexual assault; and their areas of bias, including racial bias and views about sexual assault. They further failed to seek any type of individual questioning, much less individual, sequestered voir dire or a questionnaire to ask about sensitive topics. Defense counsel's failures are inexplicable given that counsel filed a pretrial motion seeking to question jurors about mitigation and setting forth the law and importance of such questions. Trial counsel failed to take up that motion, and the trial court never ruled on it. Similarly, although trial counsel secured permission from the court to ask jurors

101

about the bases of their death penalty views, they neglected to ask any such critical questions. Because of this, they failed learn the views of each juror.

> **d. The state court unreasonably applied *Strickland* by treating counsel's deficient performance in voir dire as strategic and adopting a higher standard of prejudice.**

In determining that counsel conducted a constitutionally adequate voir dire, the Mississippi Supreme court unreasonably applied *Strickland,* explaining that an "attorney's actions during voir dire are considered to be a matter of trial strategy and as such*, cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be 'so ill chosen that it permeates the entire trial with obvious unfairness*" and finding that there was no such showing and finding the issue to be without merit.  App. 194a, 374 So. 3d at 491 (emphasis added).  This standard does not comport with *Strickland*'s holdings that the "proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688, 694.  Nor does it comport with *Strickland*'s definition of  prejudice as a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been." *Id*. at 694.

Had the court applied the holding of *Strickland*, in light of the overwhelming evidence of both local and national professional norms for performance during voir dire in capital cases, it would have considered:

- The Affidavit of Richard Jaffe, outlining national expectations for capital voir dire and training materials provided in the 2008 Making the Case for Life training, App.  253a-258a;

- 2008 Making the Case for Life training materials, App. 259a-288a; and

- Affidavit of James Lloyd Davis, III indicating that trial counsel had access to his expertise and outlining the resources available to counsel to prepare for voir dire, App. 249a-252a;

The court did not address these materials in its opinion, relying instead on a presumption of trial strategy that could not be overcome absent a showing that trial counsels' actions were so ill chosen that they permeated "the entire trial with obvious unfairness." App. 194a, 374 So. 3d at 491. The determination that the issue was without merit was therefore based on an unreasonable application of *Strickland* and an unreasonable determination of the facts presented. 28 U.S.C. § 2254(d)(1), (2).

### C. No procedural bar prevents this Court's review.

The state maintains that this claim is procedurally defaulted because trial counsels' failure to make a contemporaneous *Batson* objection at trial was capable of being raised on direct appeal but was not. Answer at 17. The Mississippi Supreme Court stated that Mr. Galloway had "waived" the right to raise the *Batson* issue because trial counsel did not object at trial, then further determined that the ineffectiveness claim was record-based and thus could have been raised on direct appeal, but also found it to be meritless. App. 190a, 122 So.3d at 486.

First, ineffectiveness claims are not generally considered appropriate to raise on direct appeal:

> Because appellate courts are limited to the trial record on direct appeal, "generally, ineffective-assistance-of-counsel claims are more appropriately brought during post conviction proceedings."

> This Court addresses ineffective-assistance-of-counsel claims on direct appeal only where "[1] the record affirmatively shows ineffectiveness of constitutional dimensions, or [2] the

> parties stipulate that the record is adequate and the Court
> determines that findings of fact by a trial judge able to
> consider the demeanor of witnesses, etc.[,] are not needed."

*Bell v. State*, 202 So. 3d 1239, 1242 (Miss. 2016) (internal citations omitted). *See also*

*Osbourne v. State*, 275 So. 3d 1072, 1076 (Miss. 2019) (declining to consider

ineffectiveness claims which concern matters outside the record); *Hawkins v. State*, 255

So. 3d 1264, 1270 (Miss. 2018) ("Similarly, the issue before this Court in the case at hand

cannot be resolved either way without facts that are not fully apparent from the trial

record."); *Dartez v. State*, 177 So. 3d 420, 423 (Miss. 2015) (refusing to consider on direct

appeal an ineffectiveness claim where the full scope of the claim involves facts not fully

apparent from the record.).

    Also, under Mississippi law, a claim buttressed by extra-record facts is

appropriately raised in post-conviction proceedings. *See Turner v. State*, 366 So.3d 855,

860 (Miss. 2023) ("Typically, ineffective-assistance claims are more appropriate for post-

conviction petitions."); *Havard v. State*, 928 So.2d 771, 786 (Miss. 2006) ("The

utilization of affidavits is better served in the post-conviction relief proceedings allowable

by statute."); *Goodin v. State,* 856 So. 2d 267, 279 (Miss. 2003) (granting hearing on IAC

claims raised in PCR proceedings even though the petitioner's attorney on direct appeal

did not represent him at trial); M.R.A.P. Rule 22(b) ("Issues which may be raised in post-

conviction proceedings may also be raised on direct appeal *if such issues are based on*

*facts fully apparent from the record*.") (emphasis added).

    In light of these considerations, the Mississippi Supreme Court's novel and

unforeseeable interpretation of its own rules was not an adequate state ground. The

question of whether a state procedural rule is adequate is one of federal law. *Lee v. Kemna*,

534 U.S. 362, 375 (2002). Novel applications of state law procedural requirements "cannot be permitted to thwart" federal review. *Id*. at 423 (internal cites omitted).  Only "firmly established and regularly followed state practice may be interposed by a State to prevent subsequent review." *Id*. at 424 (internal cites omitted). When a rule is "not always clear or closely hewn to" it cannot constitute "the sort of firmly established and regularly followed state practice that can prevent implementation of federal constitutional rights." *James v. Kentucky*, 466 U.S. 341, 346-349 (1984).  Accordingly, the state court's "waiver" ruling is inadequate to serve as a procedural bar to this Court's merits review.

Reviewing the relevant Mississippi case law above and facts presented, it is apparent that the Mississippi Supreme Court's novel and unexpected determination that Mr. Galloway had waived his ineffectiveness claim under *Batson* because it was record-based and could have been raised on direct appeal was not only an inadequate procedural bar but also an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2). While some of the facts necessary to prosecute the ineffectiveness claim were contained within the record, many were not. In post-conviction, Mr. Galloway relied on investigation and numerous items of evidence which were not available on direct appeal, including but not limited to:

- Affidavit of Barbara O'Brien, a Professor of Law at Michigan State University College of Law with a Ph.D. in social psychology, who calculated the strike rate for the prosecution of White and Black jurors, finding at the prosecution "struck black jurors at more than 11 times the rate they struck White jurors in this case," App. 289a-300a;

- Affidavit of Dana Christensen, trial counsel, indicating that she had attended the 2008 Making the Case for Life training, App. 329a-331a.

- Affidavit of Richard Jaffe, outlining national expectations for capital voir dire and training materials provided in the 2008 Making the Case for Life training, App. 253a-258a;

- 2008 Making the Case for Life training materials, App. 259a-288a;

- Affidavit of James Lloyd Davis, III, indicating that trial counsel had access to expertise and motions pertaining to *Batson* and outlining the resources available to counsel to prepare for voir dire, App. 249a-252a;

- Affidavit of Glen Rishel, lead attorney at trial, App. 301a-305a;

- Excerpts from trial counsel's files, App 306a-323a;

- Affidavit of Charles Stewart, trial counsel, App. 324a-328a; and

- Affidavit of Kaffie Diane Taylor, indicating that Mr. Galloway's attorney's response to a family query on the all-White jury resulted in the "older White" male attorney stating that "at least we have some women on there," App. 371a-373a.

Post-conviction counsel relied on these items to develop and present the voir dire ineffectiveness issues raised in post-conviction.   Here, the record alone, without more, was insufficient to show ineffectiveness of constitutional dimensions and there was no stipulation on the record between the parties as to the adequacy of the record. *Bell v. State*, 202 So. 3d at 1242. Moreover, in rejecting this claim, the Mississippi Supreme Court relied upon the affidavit of Glen Rishel, thus indicating that the claim, as analyzed by the court, was not limited to the record. *Galloway*, 374 So. 3d at 487-488. Accordingly,

contrary to the holding of the Mississippi Supreme Court, this was not a "a record-based challenge" appropriately raised on direct appeal, because it required additional investigation and development of the record. *Galloway* 374 So. 3d at 486.

Also, as described at Section D.1 The Default Rulings Were Not Independent of Federal Law, *supra*, at the time of the default, that is at trial, the contemporaneous objection rule was not independent of federal law because judicially created exceptions required a reviewing court to determine whether a federal violation had occurred before deciding whether the exception applied. Furthermore, any unforeseeable application of newly stringent procedural bar decisions would be inadequate to bar federal habeas review because the rules they announced were not "firmly established" at the time of any defaults. Finally, no default bar prevents this Court from granting relief for the cumulative effect of any defaulted claims with those entitled to merits review.

Thus, the state court's "waiver" ruling on this claim imposes no procedural bar to this Court's review.

### D. Conclusion

The Mississippi Supreme Court held that "notwithstanding the procedural bar," this claim was "without merit." A. 190a, 374 So. 3d at 486. As described in Ground Thirty-One, 28 U.S.C. § 2254, if construed to require federal court "deference" to state court interpretations of federal law, would violate the doctrine of constitutional avoidance, Article III, and the Supremacy Clause. This Court's review of the Mississippi court's merits ruling should therefore be *de novo*.

The state court's unreasonable application of the clearly established standard and unreasonable determination of the facts, as described above, also requires this Court to

review the claim *de novo*. *See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (when "the requirement set forth in § 2254(d)(1) is satisfied[, a] federal court must then resolve the [constitutional] claim without the deference AEDPA otherwise requires."). Counsel's ineffectiveness impacted both the conviction and sentence of death. Either standing alone, or when considered cumulatively with counsel's numerous other errors, counsel's deficient failure to raise a *Batson* challenge and ensure a constitutionally adequate voir dire prejudiced Mr. Galloway because it deprived Mr. Galloway of his right to due process, equal protection, a fair trial, a fair and reliable determination of sentence and one jury free of racial discrimination.

Because the state court did not grant an evidentiary hearing on this matter, this court should, allowing full development of the facts.[44] The Court should grant habeas relief on this ground from Mr. Galloway's conviction and death sentence, both on this ground alone and cumulatively with the other grounds in this petition.

## IV.    GROUND FOUR - Trial counsel's prejudicially deficient investigation into the mitigating circumstances of Mr. Galloway's background and mental health deprived him of right to the effective assistance of counsel as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

### A. Introduction

The attorneys assigned to represent Mr. Galloway at his trial for life conducted almost no investigation into his personal and family history and did not bother to obtain readily available, voluminous documents that would have disclosed extreme poverty, trauma, and mental illness. Although counsel had little contact with Mr. Galloway or his mother, they relied primarily on them to lead them to the superficial anecdotal evidence they did compile from an extremely narrow set

---

[44] In separate motions, Mr. Galloway is seeking both discovery and a hearing on this matter.

of sources. They did not even follow up with most of the potential witnesses whom their client and his mother named. They had no social history to share with their retained mental health expert and ignored her firm recommendation that they compile one, even though readily available local resources would have enabled them to do so. When the time for trial inevitably arrived, counsel's lack of preparation repeatedly revealed itself and they peppered the record with other incompetent missteps, the worst of which was their baffling failure to call the mental health expert as a witness after promising the jurors in opening that they would hear from her. All they gave the jury was twenty-two transcript pages' worth of testimony by eight witnesses, whom counsel cycled on and off the stand to answer a handful of rote questions apiece. R. 815-840. As described below, constitutionally adequate investigation, preparation, and presentation could have provided the jury with a detailed account of Mr. Galloway's struggles to build a life in the face of poverty, violence, and mental illness, buttressed by explanatory opinions from, at a minimum, the mental health expert counsel had already retained, and other readily available experts. But for counsel's failures to uncover and tell this more complete story, there exists a reasonable probability that at least one juror would have voted to sentence Mr. Galloway to life rather than death. *See Strickland*, 466 U.S. at 694; *Wiggins*, 539 U.SS. at 537; *see also Porter*, 558 U.S. at 39 (citing *Williams*, 529 U.S. at 396); *Wiggins*, 539 U.S. at 524 (quoting ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Section 11.4.1 (1989))); *Rompilla*, 545 U.S. at 377.

The effective assistance of counsel would have played an instrumental role in securing to Mr. Galloway the constitutional protections available to defendants standing trial for life. "The qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." *California v. Ramos*, 463 U.S. 992, 998-99 (1983); *see also Burger v. Kemp*, 483 U.S.

776, 785 (1987) (the federal court's "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case"). The Supreme Court has also recognized that this "differen[ce] in kind" of the death penalty from any other punishment, *Gregg v. Georgia*, 428 U.S. 153, 188 (1976), also means that in capital cases "avoiding execution [may be] the best and only realistic result possible." *Florida v. Nixon*, 543 U.S. 175, 191 (2004).

Because of this difference, the jury must possess the fullest information possible concerning the defendant's life and characteristics in selecting the appropriate sentence. *See Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978). If the jury fails to consider "those compassionate or mitigating factors stemming from the diverse frailties of humankind," an unacceptable risk exists that the death penalty will be imposed in spite of factors that warrant a less severe penalty. *Woodson*, 428 U.S. at 304. Counsel's failure to perform their constitutionally required duty under the Sixth Amendment prevented the jury from performing its own constitutionally required duty under the Eighth and Fourteenth Amendments.

**B. Trial counsel failed to conduct a reasonable mitigation investigation, to present all relevant and mitigating facts, and to tell Mr. Galloway's compelling life story.**

Trial counsel failed to investigate and present compelling and abundant evidence in mitigation on Mr. Galloway's behalf, including his serious mental illnesses; the profound family dysfunction and chaos he endured as a child; parental neglect and abandonment; his father's alcoholism and domestic violence against his mother; his own physical abuse at the hands of his father, grandfather, and older brother; his exposure to violence and crime in the community; an impoverished childhood; and the history of

mental illness in his family. Trial counsel's performance was grossly deficient. Had counsel uncovered the wealth of available mitigation evidence, there is a reasonable probability that the result of his sentencing proceeding would have been different.

### 1. Counsel failed to investigate Mr. Galloway's background and prepare for the sentencing phase.

Harrison County Public Defender Glenn Rishel was lead counsel at Mr. Galloway's trial and had primary responsibility for the penalty phase. App. 302a, 325a, 330a. Trial counsel knew or should have known of his duty to conduct a thorough mitigation investigation, having attended "every capital seminar" in Mississippi since the creation of the Public Defender's Office in 2007, including two around the time of Mr. Galloway's arrest. App. 302a; *see also* App. 244a (members of the Harrison County Public Defender's Office attended a capital defense conference in January 2008); App. 270a-272a (Making the Case for Life – Biloxi Conference) (listing Mr. Rishel, Mr. Stewart, Ms. Christensen, and Mr. Reese as attendees at the September 2008 Making the Case for Life – Biloxi Conference ); MS SCt Second Amended Petition (Ex. 9, Aff. of R. Stetler, ¶ 8) (discussing his presentation at the 2008 NACDL conference in Biloxi). However, Mr. Rishel and the other defense counsel collectively failed to fulfill that duty.

### 2. Trial counsel's sentencing phase investigation and preparation were completely inadequate.

The penalty phase presentation was left to Mr. Rishel and Damon Reese, a fact investigator on staff with the Public Defender's Office, who "worked on the mitigation." App. 303a. Mr. Rishel and the trial team met with Mr. Galloway on only a handful of occasions. The meetings were short and unproductive. *See* App. 326a. Mr. Galloway would sit quietly, with his head down, with trial counsel inexplicably failing to explore

whether his demeanor could indicate mental health issues. App. 304a; App. 331a. He hardly said two sentences. App. 326a. No attorney ever attempted to meet with Mr. Galloway one-on-one. *Id.*; *see also id.* at 304a. Most meetings centered on trying to persuade Mr. Galloway to consider a plea to life imprisonment. *See* App. 303a; App. 331a; App. 326a.

Lead counsel's time entries from visits with Mr. Galloway illustrate how infrequently mitigation was discussed. On May 28, 2009, trial counsel "discussed case, procedures, and mitigation" with Mr. Galloway. App. 307a. Lead counsel next met with Mr. Galloway some five months later, on October 27, 2009, when they "discussed [the] case, his version of facts." *Id.* In November 2009, investigator Reese delivered a disc to Mr. Galloway. *Id.* On December 28, 2009,[45] Mr. Rishel and Mr. Stewart "reviewed cassette tapes" with Mr. Galloway, and on December 29, 2009, Mr. Rishel, Ms. Christensen, and Mr. Stewart "discussed motion hearings, possible plea, problems with discovery, and the events around his being stopped." *Id.* In the seven months that followed before Mr. Galloway's trial commenced, counsel met with Mr. Galloway only two more times, both for under an hour. App. 630a-31a. Investigator Damon Reese met with Mr. Galloway only an additional three times during this period, including a twenty-five-minute meeting at the jail a week before trial. *Id.* at 632a, 638a-39a. Counsel's efforts with Mr. Galloway's family were little better. Mr. Rishel and Mr. Reese met with Mr. Galloway's mother, Ms. Varghese, a number of times at the Public Defender's office. Mr. Reese also went to Ms. Varghese's home on a few occasions to speak with her and Mr.

---

[45] At this time, a motions hearing was set for January 14, 2010, and trial was set for February 8, 2010. C. 44. The trial was later continued to May 10, 2010, C. 57, and held on September 21, 2010.

Galloway's sister, Mary Taylor, who also lived there. App. 304a, 343a, 350a. Yet at these meetings, Mr. Rishel and Mr. Reese asked only the most cursory questions about Mr. Galloway's background and life history. App. 344a, 349a, 625a. Instead, Mr. Rishel focused on reviewing the prosecution's evidence against Mr. Galloway and asking the family to persuade Mr. Galloway to take a plea to life imprisonment. *Id.* at 343a, 624a. Mr. Rishel did not discuss any penalty phase testimony except to say that he would ask witnesses to beg for Mr. Galloway's life. *Id.* at 349a.

Trial counsel relied exclusively on Mr. Galloway and his mother to provide them names of potential mitigation witnesses and others with information about their client's life. App. 303a, 304a ("We relied on Mr. Galloway and his family to give us a history of Mr. Galloway's life. Based on what we were told, there were no other records" than "his school records from Greene County."). Trial counsel, however, failed to meet with many of the witnesses they identified. For instance, counsel never attempted to contact Mr. Galloway's older sister LaShandra Taylor – the sibling with whom he was the closest and who had practically raised him – even though her boyfriend accompanied Ms. Varghese to several meetings at the Public Defender's Office and traveled from Missouri to testify at Mr. Galloway's trial. App. 352a, 360a. This was despite Ms. Taylor's contacting Mr. Rishel by phone on January 12, 2009, and leaving the message that she "wants to talk about what will happen." App. 323.[46]

---

[46] As discussed *infra*, Ms. Taylor would have been able to speak, among other things, to the food insecurity, domestic violence, and mental illness Mr. Galloway experienced, as well as to the sexual abuse that took place in their childhood home. App. 352a-54a, 356a-58a.

Moreover, even a cursory review of the records provided by the State in discovery would have revealed the names of many other available mitigation witnesses. *See* MS SCt Second Amended Petition (Ex. 9, Aff. of R. Stetler at ¶ 21) ("Careful review of records often discloses the existence of collateral documentation, which in turn needs to be pursued."). For instance, the discovery contained Mr. Galloway's cell phone contact list, as well as his cell phone records dating back to November 1, 2008. App. 646a-50a. Those records showed that, in the month before his arrest, Mr. Galloway was frequently in touch with Porter Bell, Precious Brandon, Rufus Molden, Terrance Norman, and LaShandra Taylor -- all of whom would have been available and willing to testify on Mr. Galloway's behalf. *See id.* at 653a, 609a, 643a, 584a, 360a. As detailed below, these witnesses would have been able to speak, among other things, to the violence, abuse, and chaos Mr. Galloway experienced as a child and the devastating impact that his brother's mental illness and incarceration had on him. *See id.* at 652a, 607a, 642a-43a, 583a-84a, 352a-58a. Trial counsel made no effort to contact these friends and other family members, whose contact information was literally at their fingertips.

Similarly, trial counsel knew that Rufus Molden was one of Mr. Galloway's closest friends and had sent a letter notifying Assistant District Attorney Huffman nearly a year before trial that the defense intended to call Mr. Molden as a witness in mitigation. *See* App. 311a, 643a. Mr. Molden had even attended Mr. Galloway's preliminary hearing and one day of the trial. *Id.* at 643a. Still, trial counsel made no effort to contact him before trial, interview him, or call him as a witness in mitigation. *Id.*[47]

---

[47] Mr. Molden would have been able to speak, among other things, to the violence Mr. Galloway witnessed as a child. *Id.*

Other family members and friends also came to the courthouse to observe Mr. Galloway's trial. Despite their being literally at hand, trial counsel had little to no contact with them. Mr. Galloway's Aunt Kaffie came to the courthouse for some of the trial with her daughter, Nolanda Mitchell, but no one from the defense team attempted to interview her or ask her about testifying for her nephew. *Id*. at 373a. Kaffie Taylor's only contact with trial counsel occurred when she approached him about the lack of Black people on the jury. Counsel brushed off the question, responding, "Well, at least we have some women on there." *Id*.[48]

Sabriya Thomas, Mr. Galloway's former girlfriend and close friend, came to the trial every day. App. 343a, 349a. Even though Ms. Thomas would have been ready and willing to testify on Mr. Galloway's behalf, trial counsel made no effort to contact her, much less ask her about Mr. Galloway's background. *Id*. at 343a. This failure made Ms. Thomas permanently unavailable to the defense, as she tragically died in a car accident following Mr. Galloway's trial, forever depriving the courts of any mitigation evidence she might have offered.[49]

### 3. Counsel failed to compile readily available and abundant records.

The trial team ignored an abundance of readily available records on Mr. Galloway and his family members, including his educational, medical, Youth Court, and incarceration records. His trial team collected a single page of records on Mr. Galloway's educational and medical history – a transcript from Green County High School, from

---

[48] Ms. Taylor would have been able to provide information on the physical and sexual abuse Mr. Galloway's father forced on his children and the poverty Mr. Galloway experienced growing up. Discussed *supra*; App. 371a-72a.

[49] *Four Victims Identified in Deadly I-10 Accident*, WLOX, (Sept. 1, 2011 4:12 AM), https://www.wlox.com/story/15372817/four-victims-identified-in-deadly-i-10-accident/.

which he graduated. *See Rompilla*, 545 U.S. at 391-92 (counsel's failure to look at Rompilla's prior conviction file, which was readily available and would have provided additional mitigation evidence was ineffective assistance of counsel); *Wiggins*, 539 U.S. at 510 (counsel failed to investigate beyond a pre-sentence investigation report and the Department of Social Services records when those records pointed to further mitigation evidence). Had trial counsel obtained Mr. Galloway's records from the Moss Point school district – where he had attended all but one year of school – they would have been able to identify mitigation witnesses such as his fourth-grade teacher, Sandra Lewis, who was available and willing to testify about her impressions of Mr. Galloway and his family. *See* MS SCt Second Amended Petition (Ex. 49, L. Galloway – Moss Point High School Records Bates 5357)); App. 656a-57a.

Simple requests for Mr. Galloway's readily available criminal records would have led counsel to Mr. Galloway's friends and family members who had lived their entire lives in neighboring Jackson County. Even after the Jackson County Public Defender's Office offered its file to Mr. Rishel, noting that it contained potential mitigating evidence, he failed to follow through. App. 672a, 674a. The records would have given counsel the names of Marcus Jackson and Calvin McCorvey, childhood friends of Mr. Galloway who were both available and willing to testify on his behalf. *See* MS SCt Second Amended Petition (Ex. 53, Jackson Co. Public Defender File – carjacking); App. 603a, 596a.[50]

Obtaining publicly available criminal records on Mr. Galloway's father would have revealed a history of alcoholism, domestic violence, allegations of sexual abuse, and

---

[50] Among other information, Mr. Jackson and Mr. McCorvey would have been able to speak to Mr. Galloway's history of blackouts. App. 603a, 595a.

possession of marijuana, *supra*; App. 677a, 679a, 683a-91a, 694a, 697a-98a, 719a. Similarly, publicly available records on Mr. Galloway's mother would have shown her own brushes with the law and inability to pay the associated fines. App. 1076a-78a. Obtaining Mr. Galloway's available medical records would have revealed numerous visits to the Singing River Hospital Emergency Department for suspicious injuries suggesting child abuse.[51] Most critically, Mr. Galloway's youth court records would have alerted competent counsel to the relevant youth court history and records of both his older brother, Melvin Anderson, and his sister, Mary Taylor, *supra*, app. 727a-30a.

In particular, the voluminous youth court records of Mr. Anderson, who was violently mentally ill, would have documented the chaos and terror that he inflicted on Mr. Galloway and his family, as well as their parents' lack of supervision, *see supra,* App. 575a-80a. The youth court records also would have led counsel to Mr. Anderson's voluminous mental health records, which also documented Mr. Galloway's father's angry moods, violent behavior, and alcoholism, all witnessed by the children.[52]

Youth court records on Ms. Varghese, in connection with Melvin's proceedings, further documented the domestic violence in the home, *supra*, App. 365a ("She did apparently experience some physical abuse during her marriage to Leslie Galloway

---

[51] Mr. Galloway's medical records would have also alerted counsel to the possible mental health impairments delineated below.

[52] *See, e.g.*, App. 456a; *id.* at 459a ("[T]he patient's father has a history of violent behavior including hitting the patient's mother in front of the patient, and abusing the patient three years ago which included DHS involvement."); *id.* at 480a ("[H]is father had a history of violent behavior, and apparently his biological parents would get into physical fights from time to time. This also has occurred according to the patient between his mother and stepfather."); *id.* at 487a ("[B]io-father was court-ordered to attend anger management classes."); *id.* at 488a ("[B]io-father has drunk heavily in the past."); MS SCt Second Amended Petition (Ex. 32b, M. Anderson -- Sand Hill Memorial Hospital Records at 9908 ("[T]he father . . . is known to be violent at times.")).

[Jr.].”); *id.* at 366a (“Leslie Galloway [Jr.] has been violent in front of all of the children.”); *id.* at 368a (“[Leslie, Jr.] apparently has been physically abusive of Melvin and of the mother.”).

Similarly, the youth court records for Mr. Galloway’s sister Mary also documented their mother’s neglect, Mr. Anderson’s history of criminal charges and mental health problems and the violence the children dealt with in the community on a regular basis. App. 533a.

Trial counsel knew that Mr. Galloway had prior convictions, app. 304a-05a, but made no attempt to obtain his prior inmate classification records. *See Rompilla*, 545 U.S. at 389-90 (finding that counsel’s performance was deficient when they had failed to obtain prior conviction records that could have led to numerous leads on mitigation evidence). Mr. Galloway’s Mississippi Department of Corrections records would have revealed that he worked for years at Brass Hanger Cleaners, a work history also documented in the court records from his carjacking conviction. App. 621a, 790a, 876a-68a. Any inquiry to his former employer, Bruce Grimes, would have yielded mitigating evidence that Mr. Galloway was a good employee and hard worker. *See id.* at 876a.

**4. Counsel failed to marshal available resources that would have helped to investigate and discover mitigation evidence.**

Due process, equal protection, and the right to counsel all require that indigent defendants be provided with the tools reasonably necessary to mounting a defense. *Ake v. Oklahoma*, 470 U.S. 68, 76-77 (1985) (due process demands “access to the raw materials integral to the building of an effective defense”); *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) (the Eighth Amendment requires that capital defendants be afforded

"individualized consideration" at their penalty phase proceedings"). Trial counsel here neglected even to seek these basic tools to develop mitigating evidence for trial.

As explained below, counsel's failure to provide Dr. Smallwood with sufficient information to conduct a comprehensive analysis stemmed from their failure to conduct an adequate mitigation investigation or, if they were unable to do so because of a lack of time or expertise, retain a qualified mitigation investigator to do so. Dr. Smallwood wrote in her report that "conducting a full mitigation study is outside the scope of [her] forensic practice," and requested that counsel enlist the mitigation services of the "Office of Capital Defense in Jackson" or that another qualified expert in mitigation be appointed. MS SCt Second Amended Petition (Ex. 4, Dr. B Smallwood evaluation at 8114). Competent counsel would have followed these recommendations, seeking a qualified mitigation investigator, conducting the required social history investigation, and presenting Dr. Smallwood with those results. Trial counsel's inexplicable decision to forgo the necessary resources directly contributed to their failure to conduct an adequate investigation and presentation of the mitigating evidence.

The capital defense community has long recognized the importance of conducting a "mitigation investigation" in preparation for the penalty phase of a capital trial.[53] The

---

[53] Gary Goodpaster, *The Trial For Life: Effective Assistance of Counsel in Death Penalty Cases,* 58 N.Y.U. L. Rev. 299, 323-324 (1984) ("There must be inquiry into the client's childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychological and present feelings. The affirmative case for sparing a defendant's life will be composed in part of this investigation, and the care with which it is conducted cannot be overemphasized."); *see also,* Welsh S. White, *Effective Assistance of Counsel in Capital Cases: The Evolving Standard of Care,* 1993 U. Ill. L. Rev. 323, 377 (1993); Dennis N. Balske, *The Penalty-Phase Trial: A Practical Guide*, Champion, Mar. 1984, at 42; Kevin McNally, *Death is Different: Your Approach to a Capital Case Must Be Different, Too*, Champion, Mar. 1984, at 8. *See, e.g.*, Cessie Alfonso & Katharine Baur*, Enhancing Capital Defense: The Role of the Forensic Social Worker*, Champion, June 1986, at 26; James Hudson, Jane Core & Susan Schorr, *Using the Mitigation Specialist and the Team Approach*, Champion, June 1987, at 33; Kevin McNally, *supra*, at 12-13; Russell Stetler & Kathy Wayland, *Dimensions of Mitigation*, Champion, June 2004, at 31; Paul J. Bruno, *The Mitigation Specialist*, Champion, June 2010, at 26 ("The capital mitigation specialist is arguably the

core interdisciplinary team includes a mitigation specialist. ABA Guidelines (2003), Guideline 4.1(A)(1) ("The defense team should consist of no fewer than two attorneys qualified in accordance with Guideline 5.1, an investigator, and a mitigation specialist.").[54] Mitigation specialists are critical to the capital defense team because they possess the "time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf." ABA Guidelines (2003), Comment to Guideline 4.1—The Defense Team and Supporting Services, 31 Hofstra L. Rev. 913, 959 (2003).

In this case, trial counsel neither sought and obtained the assistance of a mitigation specialist, nor relied on any other team member or expert with similar experience and skills, nor conducted the necessary investigation themselves. Mr. Rishel defended his failure to hire this core team member with an unfounded and erroneous assertion that judges are reluctant to grant funding for mitigation specialists and that mitigation specialists are often hard to find. App. 303a. However, this was true neither before nor after Mr. Galloway's trial. Mr. Rishel had two distinct avenues for requesting mitigation

---

most important member of the capital defense team, especially when the client is facing a sentencing hearing in a death penalty case. This person, in effect, enables the capital defense team to develop and 'tell the story' of the client—the key to saving the client's life.").

[54] The various ABA standards are recognized by the U.S. Supreme Court as the "prevailing norms of practice," *Strickland v. Washington*, 466 U.S. 668, 688 (1984), including the 2003 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases. *See Wiggins*, 539 U.S. at 522; *Williams*, 529 U.S. at 396; *Rompilla*, 545 U.S. at 387.

investigation resources: he could have requested funds to appoint a mitigation investigator in this case or he could have requested the assistance of the statewide capital trial office.

At the time of Mr. Galloway's trial in September 2010, judges in Mississippi – and specifically judges along the Gulf Coast – had been authorizing funds for mitigation specialists for years, if not decades. *See, e.g.*, MS SCt Second Amended Petition (Ex. 91, *State v. Carr*, Pleadings, at Bates-006) (December 21, 2004 Order authorizing funding for social worker Kelly Bell to provide mitigation services); *see also* MS SCt Second Amended Petition (Ex. 11, Aff. of R. Simons, ¶¶ 9-10); App. 672a. Gulfport attorney James Davis, for instance, has "regularly sought funds to hire a mitigation specialist to conduct a mitigation investigation in any capital case that I expected to go to trial" and had been getting authorization for mitigation funding since the late 1990s. MS SCt Second Amended Petition (Ex. 12, Aff. of J. Davis, ¶¶ 6-7). And just a few months after Mr. Galloway's trial the Harrison County Public Defender's Office was successful in obtaining funding for a mitigation specialist in *State v. Smith*.[55] Then, just under two years after Mr. Galloway's trial, the Public Defender's Office sought and received initial funding of $5,000 for out-of-state mitigation specialist Janette Gagnon, from Judge Roger Clark, the same judge who presided over Mr. Galloway's trial. *See* MS SCt Second Amended Petition (Ex. 92, *State v. Radau*, Pleadings, at Bates-002, 004)). Several months later, the defense requested more time in order to conduct the mitigation investigation, and the court approved additional funds for the mitigation specialist, up to $10,000. MS SCt Second Amended Petition (Ex. 92, *State v. Radau*, Pleadings at Bates-027). The

---

[55] In *State v. Barbara Smith*, the court approved the public defender's office's request for $5,000 to hire mitigation specialist Stacey Ferraro. MS SCt Second Amended Petition (Ex. 93, *State v. Smith*, Pleadings, at 001). The case eventually settled. *Id*.

Office now hires mitigation specialists for all its capital cases. App. 330a. Mr. Rishel's decision to forgo the resources, or his ignorance of their availability, was an indefensible error and a grave misunderstanding of his constitutional obligation. *See Hinton,* 571 U.S. at 275 (counsel ineffective for "inexcusable mistake of law—the unreasonable failure to understand the resources that state law made available to him.").

Counsel's failure to fund and conduct a thorough mitigation investigation was especially inexcusable given that counsel's own expert informed them that the Office of Capital Defense Counsel in Jackson would be able to provide them with mitigation assistance. App. 244a; MS SCt Second Amended Petition (Ex. 4, Dr. B. Smallwood Evaluation, at 008114); MS SCt Second Amended Petition (Ex. 12, Aff. of J. Davis, ¶10)). And that expert, whom counsel never called to testify, made clear that her work evaluating Mr. Galloway's mental health could not be done properly without the foundation of an adequate social history investigation. Counsel's narrow request to Dr. Smallwood— limiting her inquiry to the questions of insanity, competency, and intellectual disability— was no substitute. *See* MS SCt Petition (Ex. 4, Dr. B. Smallwood Evaluation, Bates 8104, 8114).[56]

---

[56] *See, e.g., Rompilla*, 545 U.S. 374 (counsel deficient despite having expert evaluation to assess sanity at the time of the offense); *DeBruce v. Commissioner, Alabama Dept. Of Corrections*, 758 F.3d 1263 (11th Cir. 2014) (holding that "no lawyer could reasonably have made a strategic decision to forego the pursuit of mitigation evidence" based on a pretrial competence evaluation and report of competence to stand trial); *Blystone v. Horn*, 664 F.3d 397, 421 (3rd Cir. 2011) ("it is beyond cavil that the scope of an evaluation for purposes of mitigation at a capital sentencing proceeding is far broader than that for competency at trial"); *Williams v. Allen,* 542 F.3d 1326, 1339 (11th Cir. 2008) (counsel performed unreasonably by relying on a mental evaluation for competency instead of broadening the inquiry to include a search for mitigation evidence).

**5.  Counsel's failure to investigate was unreasonable and deficient.**

The duty to conduct a thorough investigation of the defendant's background and to present mitigating evidence on their behalf is well-established. *Porter,* 558 U.S. 30 (citing *Williams,* 529 U.S. at 396); *Wiggins*, 539 U.S. at 524 (quoting ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Section 11.4.1 (1989) (hereinafter "ABA Guidelines")); *Rompilla*, 545 U.S. 374; *see also* MS SCt Second Amended Petition (Ex. 9, Aff. of R. Stetler, ¶ 2); App. 243a-44a; MS SCt Second Amended Petition (Ex. 11, Aff. of Ross Simons, ¶¶ 9-11). This is because, in a capital sentencing context, a "reliable adversarial testing process generally requires that counsel present to the sentencing jury evidence of the character and record of the individual offender and the circumstances of the particular offense."  *Eddings v. Oklahoma*, 455 U.S. 104, 111-112 (1982).

 An attorney who fails to conduct an adequate investigation is not engaging in reasonable trial strategy, because reasonable trial strategy requires investigation and preparation. *See Wiggins*, 539 U.S. at 521-22 ("'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'"); *Sears*, 561 U.S. at 955-56 ("We certainly have never held that counsel's effort to present some mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant. …. A proper analysis of prejudice under *Strickland* would have taken into account the

newly uncovered evidence of Sears' 'significant' mental and psychological impairments, along with the mitigation evidence introduced during Sears' penalty phase trial, to assess whether there is a reasonable probability that Sears would have received a different sentence after a constitutionally sufficient mitigation investigation."); *Williams*, 529 U.S. at 396 (in finding Williams' ineffectiveness claim meritorious, Court applied *Strickland* and concluded that counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision to focus on Williams' voluntary confessions, because counsel had not "fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background.") (citing 1 ABA Standards for Criminal Justice, *Defense Function* §4-4.1, commentary, p. 4-55 (2d ed.1980)), as described in *Wiggins*, 539 U.S. at 523 (same); *see also Williams*, 529 U.S. at 415 (O'Connor, J., concurring) (noting counsel's duty to conduct the "requisite, diligent" investigation into client's background).

Counsel's unreasonable decisions to limit their investigation and not interview witnesses who have information about their client's life will amount to deficient performance. *Wiggins*, 539 U.S. at 524-25; *Foust v. Houk,* 655 F.3d 524, 534-35 (6th Cir. 2011); *Mason v. Mitchell*, 543 F.3d 766 (6th Cir. 2008). And counsel's duty to investigate and present evidence is all the more important in a case such as Mr. Galloway's where counsel anticipates a guilty verdict and expects the case to proceed to a penalty phase,[57] as counsel did here,[58] for then it should be obvious "that the sentencing phase was likely

---

[57] Mr. Rishel informed Mr. Galloway's family members that the State had substantial evidence against Mr. Galloway, and that their focus would be to save his life. *See also* App. 624a; App. 343a.

[58] As Ground Two explains, counsel's pessimism about prospects at the guilt phase stemmed partly from their ineffective preparation and presentation of evidence to rebut the State's star witness, Dr. Leo McGarry.

to be 'the stage of the proceedings where counsel can do his or her client the most good.'"
*Glenn v. Tate*, 71 F.3d 1204, 1207 (6th Cir. 1995) (quoting *Kubat v. Thieret*, 867 F.2d 351, 369 (7th Cir. 1989)).

The mitigation investigation must include conducting *meaningful* interviews with the client, family members, and other witnesses, as well as collecting life history records. *See Andrus*, 580 U.S. at 809, 818, 821 (counsel's investigation deficient although he presented Andrus's parents, a mental health expert, a prison counselor, and his client as witnesses); *Porter,* 558 U.S. at 39 (counsel failed to obtain the defendant's school, medical, or military records); *Rompilla*, 545 U.S. at 389-90 (counsel's performance was deficient when they failed to obtain the defendant's criminal records on prior convictions that would be used in aggravation by the State, which would have led to numerous leads on mitigation evidence). Following these precedents, many jurists of reason have held that similarly superficial investigations in capital cases were constitutionally inadequate, even though counsel presented some immediate family members and/or experts.[59]  *See also* MS SCt Second Amended Petition (Ex. 9, Aff. Of R. Stetler at  ¶¶ 16-17); MS SCt Second Amended Petition (Ex. 11, Aff. of R. Simons, ¶¶ 11-12).

Here, as in these cases, Mr. Galloway's counsel failed to interview family members, friends, employers, teachers, and other potential mitigation witnesses, and failed to collect the voluminous number of mitigating documents available. These

---

[59] *See Adams v. Quarterman*, 324 F. App'x 340, 2009 WL 1069330 (5th Cir. April 22, 2009); *Walbey v. Quarterman*, 309 F. App'x 795, 2009 WL 113778 (5th Cir. Jan. 19, 2009); *Lewis v. Dretke*, 355 F.3d 364, 367-68 (5th Cir. 2003); *see also DeBruce v Commissioner, Alabama Dept. of Corr.*, 758 F.3d 1263 (11th Cir. 2014); *Hooks v. Workman*, 689 F.3d 1148 (10th Cir. 2012); *Cooper v. Sec'y, DOC*, 646 F.3d 1328 (11th Cir. 2011); *Johnson v. Sec'y, DOC*, 643 F.3d 907 (11th Cir. 2011); *Ferrell v. Hall*, 640 F.3d 1199 (11th Cir. 2011); *Williams v. Allen*, 542 F.3d 1326, 1329-30 (11th Cir. 2008); *Gray v. Branker*, 529 F.3d 220, 225-26 (4th Cir. 2008).

witnesses and records would have provided a powerful mitigation case in favor of a sentence less than death. Rather than make a decision supported by reasonable professional judgment, they simply fell down on the basic job of investigating, including the job of exploring, preparing, and presenting necessary expert testimony. "[C]ounsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision . . . because counsel had not 'fulfilled their obligation to conduct a thorough investigation of the defendant's background.'" *Wiggins*, 539 U.S. at 522 (quoting *Williams*, 529 U.S. at 396); *see also United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989) ("[C]ounsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made."); *Loyd v. Whitley*, 977 F.2d 149,157 (5th Cir. 1992) (finding defense counsel's failure to pursue crucial line of investigation in a capital murder case was not professionally reasonable); *Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir. 1990) (explaining that tactical decisions must be made in the context of a reasonable amount of investigation, not in a vacuum). Trial counsel's failure to investigate was not "part of a calculated trial strategy," but was "likely the result of either indolence or incompetence." *Anderson v. Johnson*, 338 F.3d 383, 393 (5th Cir. 2003) (citation omitted).

Even assuming that Mr. Galloway was unhelpful in providing his own background information, as trial counsel claimed, "this does not excuse counsel's obligation to obtain mitigating evidence from other sources." *Douglas v. Woodford*, 316 F.3d 1079, 1088 (9th Cir. 2003); *see also Davis*, 87 So. 3d at 469, 474 (counsel's duty to conduct an "independent" investigation violated where counsel relied only on the witnesses the client

suggested); *see also Rompilla*, 545 U.S. 382-83 (finding counsel's mitigation investigation deficient even where "Rompilla's own contributions to any mitigation were minimal . . . ." and "his answers indicated [his childhood and schooling] has been normal . . ."); *see also Porter,* 558 U.S. at 40 (even though the defendant "may have been fatalistic or uncooperative, ... that does not obviate the need for defense counsel to conduct some sort of mitigation investigation").[60.]

Finally, Mr. Rishel's explanation for not hiring a mitigation specialist betrayed a dramatic ignorance of the specialist's role and the resources available under state law. *See Hinton*, 571 U.S. at 275 (counsel's "unreasonable failure to understand the resources that state law made available to him" deficient because it caused him to "employ an expert that he himself deemed inadequate"). Mr. Rishel said that:

> mitigation specialist [sic] are hard to find and judges are reluctant to pay them what they request. Mitigation specialist [sic] always need more time and more money. I am not sure exactly what a mitigation specialist is or how one becomes qualified to call yourself a mitigation specialist.

MS SCt (Ex 17, p. 2). As described in detail above, courts in Mississippi had been approving the appointment of mitigation specialists for years by the time of Mr. Galloway's trial, and Dr. Smallwood had called Mr. Rishel's attention to the availability

---

[60] *See also Blanco v. Singletary*, 943 F.2d 1477, 1502 (1991) ("a defendant's desires not to present mitigating evidence do not terminate counsels' responsibilities during the sentencing phase of a death penalty trial"); *Hamblin v. Mitchell*, 354 F.3d 482, 492 (6th Cir. 2003) (holding that the "ABA and judicial standards do not permit the court to excuse counsel's failure to investigate or prepare because the defendant so requested"); *Silva v. Woodford*, 279 F.3d 825, 847 (9th Cir. 2002) (holding that the ABA Guidelines "suggest that a lawyer's duty to investigate is virtually absolute, regardless of a client's expressed wishes"); *Marshall v. Hendricks*, 313 F. Supp. 2d 423, 450 (D.N.J. 2004) (holding that the defendant's failure to cooperate with the preparation of mitigation does nothing to relieve counsel "of his constitutional duty as an attorney"); *People v. Thompkins*, 732 N.E.2d 553, 572 (Ill. 2003) ("The mere fact that a client is uncooperative will not excuse a failure to investigate in a capital case"); *Commonwealth v. Moore*, 860 A.2d 88, 100 (Pa. 2004) (holding that, even though the defendant was an "uncooperative client," counsel was not "relieved of the duty to investigate potential mitigating evidence, particularly where counsel had no other penalty phase strategy").

of support from the Office of Capital Defense. His failure to take advantage of resources available for a constitutionally adequate mitigation investigation, or to conduct an adequate investigation by some other means, violated prevailing professional norms and was unreasonable.

### C. Trial counsel's failure to conduct a constitutionally adequate investigation prejudiced the defense.

#### 1. An adequate investigation would have uncovered a compelling story of a childhood marred by abuse, neglect and violence, extreme poverty, mental illness, and Mr. Galloway's struggle to overcome those obstacles.

Mr. Galloway's counsel failed to interview family members, friends, employers, teachers, and other potential mitigation witnesses, and failed to collect the voluminous number of mitigating documents available. Had trial counsel obtained this readily available evidence, they could have presented Mr. Galloway's jury with mitigating evidence that spanned every aspect of his life, including: 1) deep poverty; 2) domestic violence and dysfunction in his many childhood homes; 3) abandonment by his father and chronic neglect by his mother, 4) dangerous criminal activity in his community; 5) his struggle to survive his dangerous environment; 6) his mentally ill and violent older brother, who imposed a reign of terror upon the family; 7) his own serious mental illness, brain damage, and self-medication; 8) a turbulent relationship with the mother of one of his children; 9) his resilience and contributions, despite these many hardships; and 10) the effects of the difficult upbringing experienced by his parents, involving familial patterns later to be imprinted on him.[61] Because of trial counsel's abysmal performance, the jury did not hear

---

[61] The information contained herein is intended as a summary of the affiants' proffered testimony and the records collected in post-conviction. For a full recitation of the mitigating evidence available, please see MS SCt Second Amended Petition (Ex. 2-3, 5-8, 79 ), App. 332a-61a, 370a-73a, 424a-41a, 582a-613a,

a single sentence from any witness about any of these topics. In post-conviction review, Mr. Galloway's counsel proffered the available witnesses and records that trial counsel unreasonably failed to obtain, and which attest to the chaotic and dysfunctional childhood home life that shaped Mr. Galloway's development, and the trying trajectory his life took into young adulthood. These witnesses and records would have provided a powerful mitigation case in favor of a sentence less than death.

Had trial counsel performed their duties in accordance with accepted standards, by contacting the witnesses available and willing to testify on Mr. Galloway's behalf as well as obtaining readily available social history records on Mr. Galloway and his family members, the jury would have heard the following:

- *Difficult birth:* Ollie Taylor (later, Varghese) gave birth to Bo, after the medical staff determined he was in fetal distress. Bo had difficulties breathing at birth and had to be intubated, and he was later diagnosed with neonatal asphyxia. App. 334a; MS SCt Second Petition (Ex. 21, L. Galloway – SRHS Records, at 29, 37). Ollie was not allowed to see her son for several days while he was in the ICU as the staff was trying to control her skyrocketing blood pressure. App. 334a.

- *Violent home life:* Witnesses who had known Leslie "Bo" Galloway beginning in infancy could have offered vivid descriptions of his violent home life. For his first seven years, his father, Red, lived with the family. Red drank heavily, "beat the holy hell" out of Bo's mother Ollie, and regularly whipped Bo and two of his three siblings. The fourth, Bo's

---

622a-25a, 641a-44a, 651a-54a, 882a-907a, 952a-67a and pertinent selections of Mr. Galloway and his family members' social history records. MS SCt Second Amended Petition (Ex. 4, 21, 32-33, 49, 73, 81-82), App. 362a-69a, 374a-423a, 522a-81a, 614a-21a, 676a-874a, 877a-81a, 908a-52a.

eldest sister, escaped beatings but not her father's persistent sexual molestation. App 333a-60a, 371a-72a. After an occasion when Red beat Ollie bloody, one of the children called the police, and Red was arrested. After that, the marriage broke up. App. 353a.

- *Neglect:* Left on her own with four traumatized children, Ollie was emotionally erratic, unreliable, and neglectful, sometimes disappearing for days at a time or withdrawing to her room for hours, leaving the children unattended. App 333a-59a, 438a-39a, 539a. She punctuated the periods of neglect with unpredictable angry outbursts marked by screaming and threats of physical punishment. *Id.* at 335a. Ollie was ultimately diagnosed with major depressive affective disorder in 2008, *id.* at 928a, and with bipolar disorder in 2011. *Id.* at 920a.

- *Childhood poverty:* Bo and his siblings dressed in the discarded clothing of other children and ate with the aid of government food stamps. *Id.* at 335a. There "wasn't always food around Bo's house." App. 425a; *see also* App. 430a, 346a. At one point, Bo's family was homeless and had to move in with Ollie's sister Kaffie Taylor in Gautier. App. 337a.

- *Neighborhood violence*: When Bo was around eleven years old, Ollie moved her family to a two-bedroom house on Frederick Street in Moss Point in a dangerous neighborhood. App. 355a, 584a. Out in the street, drugs and fighting were rampant. *Id.* at 584a. Bo and his family would hear gunshots regularly. *Id.* at 643a, 348a, 885a. On one occasion, someone shot at the Frederick Street house, and the bullets came through the living room, narrowly missing Bo. *Id.* at 348a, 255a. No one called the police over the incident; it was just the way of life for their family. *Id.* at 355a; 890a ("[G]rowing up . . . Bo [Galloway] and I heard gunshots a lot. Shootings and drugs were very common.").

130

- *Caregiver abuse:* Sometimes the children would stay with Otis Taylor, whom they believed to be their grandfather. Otis would beat Bo. App. 373a. He was a mean man, and the children were terrified of him. They would huddle together under his house, wrapped in their deceased grandmother's blankets, hoping to stay out of his way and escape his violence. *Id.* at 357a. One time when Bo was eight years old, Otis hit Bo's arm with his cane so hard that Bo had to go to the emergency room for fear that it was broken (although it turned out not to be). *Id.* at 357a, MS SCt Second Petition (Ex. 21, L. Galloway III – SRHS Records at 147, 150) (describing an "accident" at the grandfather's home).

- *Abuse by sibling*: As Bo's older brother Melvin grew up, he, like his father before him, began to abuse the family. App. 333a-59a, 438a-39a. Eventually he was diagnosed with schizophrenia, and later he was sentenced to life in prison for murder.  App. 347a, 356a, 411a (schizophrenia diagnosis at age 18), 575-77a (schizophrenia diagnosis at age 17), MS SCt (Ex. 73, murder conviction). He subjected the family to years of terror. He threw his mother across the room and attacked her with a garden tool. App. 356a. He forced Bo and their sister Mary to fight one another and then beat up the loser. App. 347a, 356a. He set fire to Mary's mattress and closet. App. 334a, 347a, 356a. One morning, Mary awoke to find Melvin pointing a gun at her face. App. 347a.

- *Sibling impact on the family*: Readily available records, none of which counsel obtained, confirmed Bo's brother's many behavioral problems, showing that he was repeatedly in and out of mental institutions and juvenile detention centers. *See, e.g.*, MS SCt, Second Amended Petition (Ex. 33 (sealed), M. Anderson – Youth Court Records, at Bates-111137) (noting a one-year detention at Columbia Training School, a facility for juvenile offenders); *id.* at 111167 (noting a hospitalization at Sand Hill Hospital in Gulfport); *id.* at 111180

(noting a Singing River Hospital inpatient psychiatric admission); *id.* at 111181-83 (noting Melvin will be transported for admission to East Mississippi State Hospital); *id.* at 111223 (noting Melvin undergoing treatment at same); *id.* at 111191 (noting Melvin's stay at Oakwood Training School, a juvenile correctional facility); *id*. at 111213 (same); *id.* at 111196 (noting Melvin's commitment to Northshore Psychiatric Hospital); id. at 111218 (same); *id.* at 111207 (noting transport from Singing River Hospital back to youth court detention facility); *id.* at 111221 (noting transport from Northshore to Singing River for pre-screening for commitment to East Mississippi State Hospital); App 378a, 382a.

- *Physical impacts of abuse:* The violence Bo endured from Melvin and others in his dangerous world left physical reminders. He had numerous visits to the Singing River Hospital Emergency Department for suspicious injuries as well as several documented violent encounters in the community. *See, e.g.*, MS SCt Second Amended Petition (Ex. 21, L. Galloway III – SRHS Records at 65) (Bo arrived at the Emergency Department at 11 P.M., when he was four years old, for pain to his elbow; reportedly, his right arm was caught between the cushions of the couch and his brother tried to pull it out); *id.* at 101 (Bo, at four years old, was diagnosed with a "contusion/abrasion of head" after reportedly being knocked down by a cyclist; the doctor observed some frontal swelling, and he was given a neurological assessment); *id.* at 150 (after an "accident" at his grandfather's home, Bo was seen at the emergency department because he "hurt his left arm [and] woke up and could hardly move it this morning;" Bo was discharged with an arm sling); *id.* at 115-16 (at seven years old, Bo was taken to the hospital with a puncture wound to upper right leg done with a pencil); *id.* at 170-72 (at twelve years old, Bo was involved in an altercation, resulting in scratches to his face and neck; he was scratched with fingernails); *id.* at 195-

96 (at thirteen years old, Bo cut his left eyebrow after he reportedly "fell onto concrete" or "hit it on the side of a pool"); *id.* at 221 (at thirteen years old, Bo is seen for chest pain after a friend reportedly fell on his back while playing five days prior and may have kneed him in the back); *id.* at 245-53 (at fifteen years old, Bo is seen after getting punched in the ribs and possibly vomiting up blood); *id.* at 254-57 (at seventeen years old, Bo seen after being assaulted, complains of neck and back pain); *id.* at 300 (at seventeen years old, Bo seen for back pain after "running into a fence four days ago"); *id.* at 495 (at twenty- three years old, Bo seen for facial pain after being kicked in the jaw).

- *Emotional impact of trauma and signs of mental illness*: Ollie recalled that Bo began having panic attacks and hyperventilating by the time he was five or six years old. App. 335a. He was terrified that he would be taken away like his brother, and he would desperately cling to Ollie when she was home. App. 335a. Ollie rushed Bo to the hospital at eight years old because he was having an anxiety attack after an altercation with his siblings. MS SCt Second Amended Petition (Ex. 21, L. Galloway III – SRHS Records at 134). At fourteen years old, Bo appeared at the emergency department shaking in panic, with a heavy, elevated heartbeat. *Id.* at 231–40. Family members and friends also recalled that Bo had blackouts and periods when he isolated himself. App. 349a, 357a 426a, 595a, 601a. A friend described an occasion when he had to intervene when Bo locked himself in the bedroom and threatened to kill himself. App. 612a.

An adequate investigation would have yielded first-hand accounts of the trauma and poverty Mr. Galloway suffered growing up and of the symptoms of traumatic stress that began in his childhood. It would have uncovered voluminous background records

133

that trial counsel could have readily obtained. This evidence, in turn, could have led to informed expert opinion and testimony about his post-traumatic stress disorder ("PTSD") and other severe impairments.

In addition, counsel failed to uncover and present evidence of Mr. Galloway's resilience and efforts to be a good father. Even within this chaotic environment surrounded by violence, chaos, trauma, and poverty, He drew on a reservoir of inner strength, showed potential for growth, and even found happiness from time to time. Had trial counsel conducted a thorough investigation, a more complete picture of Mr. Galloway's resilience and dedication to his children would have been provided to the jury, including the following:

- *Bo found joy despite the chaos*: Bo, his friends, and his cousins would ride bikes around Moss Point and go swimming together. App. 583a, 598-99a. Bo and his friend Marcus loved to race bottle caps in the ditch after it rained, and they set up their own play area behind Bo's grandmother's house in the projects. App. 598a. Bo and his friends collected baseball cards. App. 583a. Bo and his cousin Terrance Norman would go fishing and sometimes would catch enough for his Aunt Barbara to fillet and cook the fish for dinner. App. 583a. Bo loved to play sports video games with his friends. App. 643a, 906a. They played basketball together every day. App. 599a, 643a. Bo also enjoyed sports and played football from elementary through high school. App. 642a, 906a, 957a. He was very talented at football, as well as at drawing and writing. App. 425a, 429-31a.

- *Teachers remembered him fondly*: Sandra Lewis, Bo's fourth grade teacher at East Park Elementary, remembered Bo as a quiet boy who never caused her any trouble. App. 656a. Bo's tenth grade English teacher Jansie Butler remembered that he was always respectful

to her and never caused her any problems. *Id.* at 960a. Moss Point High School football coach Jerry Alexander remembered Bo as hardworking and that he enjoyed playing football. Bo was quiet and never gave him any problems. *Id.* at 957a.

- *Graduation was a cause for celebration*: Ollie was so proud of her baby boy when he graduated from Green County High School – the only one of her children to do so. App. 337a. His graduation was a cause for a major celebration in the family. App. 440a. Ollie rented a limo for his family and friends and hung his diploma proudly on her bedroom wall. *Id*. Bo's family and friends remembered him as a fun-loving person who loved to joke around and make people laugh. *Id.* at 894a, 897a, 611a; *see also id.* at 613a ("Bo would give anybody the shirt off his back. Bo cared about people. Bo was helpful and trustworthy.").

- *Bo was a supportive brother and son*: Bo was the protector in his family and would do anything for them. *See* App. 584a, 440a, 593-94a. 425-26a, 893a-94a. For instance, when Mary was eight months pregnant at fifteen years old, her P.E. teacher still wanted her to run during gym class. Bo got upset with her teacher. *Id.* at 346a. Similarly, when the convenience store where Bo's mother was working was robbed, Bo watched the surveillance tape and found out who had done it. He fought the man responsible because of how he had endangered his mother. *Id.* at 601a.

- *Bo worked hard*: Bo's close friends and family members always knew him to be working or looking for work. *Id.* at 897a. And he worked hard. *Id.* at 876a; *see also id.* at 890a ("Bo worked very hard. Bo always had a job."). He worked for Brass Hangers Cleaners in Gautier for several years. *Id.* at 890a. At the cleaners, Bo kept quiet and to himself, reliably completing his work. *Id.* at 963a, MS SCt Second Amended Petition (Ex. 799, Aff. of Y.

135

Broadus, ¶¶ 4-5). Bo then started working at the Community Cleaners in Moss Point, where he burned his hand badly with the presser and had to go to the hospital. App. 907a, 876a; MS SCt Second Amended Petition, (Ex. 21, L. Galloway III – SRHS Records at 368-91). Later, he worked for a moving company and then Burger King. App. 643a, 606a, 907a.

- *Bo helped those around him*: Bo helped his family members and friends and respected the adults in his life. *Id*. at 436a, 372-73a, 438-39a, 607a, 903a, 598a, 876a. If his Aunt Kaffie told him to do something, he would do it. *Id.* at 371a. He would help her around the house. *Id*. Bo also helped Otis Taylor as he got older. *Id.* at 342a. Otis would sit in the living room and urinate in a bucket instead of getting up to go to the bathroom. *Id*. Bo would empty the bucket for him. *Id*. Bo would stop by Melvin Anderson's (his half-sister San's father) home to help him out around the house. *Id.* at 436a. Bo would cut his grass or clean up the yard. *Id*. Melvin would give him a little cash if he had any to spare, but Bo never expected it. *Id.*

- *Bo endeavored to be a good father*: Bo's three children meant the world to him. App. 348a. 339a, 607a, 643a, 907a, 358a, 439-40a, 596a. Sophia Loper remembered that even when they were dating in middle school, Bo "used to talk about how much he wanted to be a father someday" and that when he had his first daughter "he was so proud and happy to be a father." *Id.* at 431a. Bo did not want to repeat the mistakes of his father; he wanted to be a better father for his children. *Id.* at 607a. LaTerrance also recalled that "Bo loved his children more than anything. The happiest times for Bo were the birth of his daughter and his graduation from high school . . . Bo was very good with all children, not just his own." *Id.* at 612a; *see also id.* at 426a, 890a, 607a. Bo's nephew, S.R., the son of his sister, San, was also very close to his "Uncle BoBo." *Id.* at 893a. Bo was a

positive influence on S.R., mentored him, and encouraged him to stay out of trouble and follow his dreams. *Id*. Their relationship meant a lot to S.R. *Id*. at 894a.

Counsel also failed to uncover and present Mr. Galloway's parents' own difficult upbringings and the familial patterns imprinted on Mr. Galloway from generations past. At a minimum, defense counsel needed to investigate and uncover this background. *See* ABA Guidelines, *Guideline 10.7 - Investigation, Commentary*, 31 Hofstra L. Rev. 913, 1025 (Feb. 2003) ("A multigenerational investigation extending as far as possible vertically and horizontally frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment."); *id*. at 1061 ("[A]n understanding of the client's extended, multi-generational history is often needed for an understanding of his functioning."). Such an investigation could have provided potent mitigating evidence. A parent's upbringing and experiences inherently affect the manner and environment in which a parent rears a child. Understanding the backgrounds of Mr. Galloway's parents would have enabled the jury to understand him and the influences that shaped his life. Had counsel conducted a competent mitigation investigation, it would have revealed the following information about Mr. Galloway's parents and their background:

- *Leslie Galloway's Mother*: Bo's mother was born Ollie Taylor in Moss Point to Marie Dixon. App. 341a. Ollie Taylor grew up thinking that Otis Taylor was her father, but learned years later that her mother, Marie, had an affair with their neighbor Willie Holbrooks, and that he was likely her father. *Id*. Marie Dixon (Bo's maternal grandmother) was full Choctaw born on indigenous land near Philadelphia, Mississippi. Sarah Dixon and her children grew up in extreme poverty and in cultural isolation. *Id.* at 966a-67a.

137

Otis related to Marie, Ollie, and her sisters through violence. *Id.* at 342a, 898a-99a. Otis raged with a volatile temper. *Id.* at 898a-99a. Just as Red would later do, Otis beat Ollie. *Id.* at 342a. Once a neighbor had to call the police because she could hear Ollie screaming. *Id.*

Otis did not limit his abuse to beatings. At a very young age, Ollie witnessed Otis raping her sister Diane. *Id.* When Marie was in the hospital for a leg amputation, Otis also raped fifteen-year-old Ollie twice. *Id.* Ollie then ran away from home and would sleep at friends' houses or in her sister Barbara's car. *Id.* Ollie was sexually assaulted yet again by her sister's male friend when she was a teenager. *See* MS SCt Second Amended Petition (Ex. 81, O. Varghese- SRH Mental Health at p. 2).

- *Leslie Galloway's father Red*: As his children would later on, Bo's father, Leslie "Red" Galloway Jr., grew up in poverty. App. 336a. He struggled in school and had to repeat several grades, including the first, fourth, and seventh. MS SCt Second Amended Petition (Ex. 82, L. Galloway, Jr. – Moss Point HS Records at Bates-9299). He was an extremely quiet child and young man. The school system viewed his shyness as an "emotional symptom" of note through ninth grade, when he dropped out. *Id.* When he was around eighteen years old, he got into a fight with a man named Douglas Francis over a woman. App. 333a, 434a, 897a, 902a. Red beat Douglas up the first time, but by the second time they fought, Douglas was waiting for him and shot him multiple times in the head and shoulders. *Id.* at 897a, 902a. One of the bullets remained in Red's body near his spinal cord, leaving him physically disabled and causing periodic seizures. *Id.* at. 333a, 902a; MS SCt (Ex. 52, filed under seal, M. Anderson – Youth Court Records at Bates-111106).

138

## 2. Counsel's deficient performance was prejudicial.

Counsel's failure to investigate readily available mitigation witnesses and to obtain readily available records prejudiced Mr. Galloway. Beyond a showing of counsel's deficient performance, the law requires a showing of a reasonable[62] probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694. A reasonable probability is a probability that is sufficient to undermine confidence in the outcome. *Id*.

The Supreme Court has repeatedly explained how to apply this test in a capital case. "When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury," *id.*, because "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support," *id.* at 696; *accord Wiggins*, 539 U.S. at 534 ("In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.") (quoting *Williams*, 529 U.S. at 397-98); *see also Sears*, 561 U.S.

---

[62] "[T]he adjective is important." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.*; *see also Strickland*, 466 U.S. at 693 ("[A] defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case."); *Nix v. Whiteside*, 475 U.S. 157, 175 (1986) ("[A] defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice[.]"). A "reasonable probability of a different result" is thus less than a preponderance of the evidence. *Hull v. Kyler*, 190 F.3d 88, 110 (3d Cir. 1999) (*Strickland*'s prejudice standard "is not a stringent one. It is less demanding than the preponderance standard.").

at 956 (A proper prejudice analysis must consider "the newly uncovered evidence" and the mitigation evidence introduced during sentencing).

Furthermore, a capital defendant establishes prejudice if "there is a reasonable probability that *at least one juror* would have struck a different balance" but for counsel's errors in failing "to place petitioner's excruciating life history on the mitigating side of the scale." *Wiggins*, 539 U.S. at 537 (emphasis added); *see also Andrus*, 590 U.S. at 822 ("[B]ecause Andrus' death sentence required a unanimous jury recommendation, Tex. Code Crim. Proc. Ann., Art. 37.071, prejudice here requires only 'a reasonable probability that at least one juror would have struck a different balance' regarding Andrus' 'moral culpability.'") (quoting *Wiggins*, 539 U.S. at 537-38); *Buck*, 580 U.S. 119-20 ("[The question before the District Court was whether Buck had demonstrated a reasonable probability that, without [the expert's improper] testimony on race, at least one juror would have harbored a reasonable doubt about whether Buck was likely to be violent in the future."); *Lewis v. Dretke*, 355 F.3d 364, 369 (5th Cir. 2003) (had adequate mitigation been presented, "it is quite likely that it would have affected the sentencing decision of at least one juror"); *Emerson v. Gramley*, 91 F.3d 898, 907 (7th Cir. 1996) (noting that counsel had to convince only one of twelve jurors to refuse to go along with a death sentence).

In *Lockett v. Anderson*, the Fifth Circuit noted that under Mississippi law, a death sentence requires unanimity. 230 F.3d 695, 716 (5th Cir. 2000) (citing MISS. CODE ANN. § 99-19-103). Accordingly, a showing that could have changed the vote of at least one juror in Mississippi establishes prejudice.

140

Finally, undiscovered mitigating evidence may establish prejudice even if it does not directly rebut the prosecution's case in aggravation. In *Williams*, the Court stressed that while the evidence adduced at trial "may not have overcome" the prosecution's evidence of aggravating circumstances, "the graphic description of [the defendant's] childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability." 529 U.S. at 398. The Court concluded: "Mitigating evidence unrelated to [aggravating circumstances] may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." *Id*.; *see* 529 U.S. at 396; *see also Tennard v. Dretke*, 542 U.S. 274, 287 (2004) (rejecting assertion that mitigating evidence must have "nexus" to crime to be "constitutionally relevant").

Lower courts have applied these principles and granted relief in cases similar to Mr. Galloway's. *See Adams v. Quarterman*, 324 F. App'x 340, 2009 WL 1069330 (5th Cir. April 22, 2009)*; Walbey v. Quarterman*, 309 F. App'x 795, 2009 WL 113778 (5th Cir. Jan. 19, 2009); *Williams v. Allen*, 542 F.3d 1326, 1329-30 (11th Cir. 2008); *Gray v. Branker*, 529 F.3d 220, 225-26 (4th Cir. 2008). Applying clearly established federal law, these cases collectively hold that trial counsel in a capital case must make an "informed decision"[63] about mitigation strategy, and their failure to do so causes prejudice when

---

[63] *Adams*, 324 F. App'x at 349.

they fail to present "the details,"[64] "the full picture,"[65] the "entire,"[66] "cohesive,"[67] and "complete"[68] story, not a "scattered"[69] narrative that is "[in]accurate"[70] or "misleading,"[71] but "the strongest mitigation case possible."[72]

In *Walbey*, for example, trial counsel presented the petitioner's grandmother and two psychologists at trial, but failed to speak to a number of potential witnesses who had firsthand knowledge of his troubled childhood, failed to correct the grandmother's misleading testimony painting a too-rosy picture of Walbey's past, and failed to rehabilitate misleading cross-examination about whether Walbey fit the criteria for antisocial personality disorder. 309 F. App'x at 796-97. The Court of Appeals held that the state court unreasonably found no prejudice because the defense presentation was "substantially incomplete" compared with what counsel could have presented. *Id.* at 802-04.

Similarly, in *Adams*, trial counsel and his investigator spoke with the petitioner's mother and stepfather and one of his siblings but found none of them particularly

---

[64] *Walbey,* 309 F. App'x at 803.

[65] *Gray,* 529 F.3d at 238.

[66] *Id.* at 237.

[67] *Id.* at 235.

[68] *Walbey* 309 F. App'x at 802; *Williams*, 542 F.3d at 1340.

[69] *Gray*, 529 F.3d at 233 n.2.

[70] *Walbey* 309 F. App'x at 802.

[71] *Williams,* 542 F.3d at 1340.

[72] *Id.* at 1340.

informative or willing to help. The investigator testified that he did not make more active efforts to track down the petitioner's other family members or to investigate his social, medical, psychological, educational, abuse, and other histories because trial counsel did not ask him to do so. 342 F. App'x at 347-49. Trial counsel opted not to present mitigating evidence and instead adopted a punishment phase strategy of portraying the co-defendant as the instigator and the petitioner as only an accomplice to the murder and stressing the petitioner's cooperation with police. *Id.* at 343. On appeal from the district court's grant of penalty phase habeas relief, the Court of Appeals upheld the district court's ruling because trial counsel's "insufficient investigation prevented his discovery of substantial, readily available mitigating evidence of Adams's childhood abuse, neglect, and abandonment." *Id*. at 352; *accord Lewis*, 355 F.3d at 367-68 (accepting testimony of petitioner's sisters that trial counsel never interviewed them, and finding counsel ineffective in capital sentencing for failing to investigate and present evidence of petitioner's abusive childhood); *Moore v. Johnson*, 194 F.3d 586, 616-17 (5th Cir. 1999) (counsel deficient in penalty phase because, although he knew some of petitioner's background, he did not investigate or present mitigating evidence that would have shown abuse and abandonment by family).[73]

---

[73] *See also Williams*, 542 F.3d at 1329-30 (granting relief, although counsel presented the defendant's mother and consulted a mental health expert, because counsel's deficient investigation led to a misleading mitigation presentation that masked family dysfunction); *Gray*, 529 F.3d at 225-26 (granting relief, although counsel presented family testimony and was aware of psychiatrist's report, because adequate investigation would have uncovered many indicia of petitioner's mental health impairments); *Accord Haliym v. Mitchell*, 492 F.3d 680, 717-18 (6th Cir. 2007) (prejudice found despite fact that the petitioner was involved in the stabbing death of two people); *Mason v. Mitchell*, 543 F.3d 766, 769 (6th Cir. 2008) (prejudice found even though the petitioner raped a woman and beat her to death using "a blood-stained board with protruding nails").

As in these cases, Bo Galloway's trial counsel's deficient investigation prejudiced the defense because it deprived the jurors of a complete or detailed picture of Mr. Galloway's background and life circumstances, let alone an accurate one. *See Wiggins*, 539 U.S. at 524-25; *see also Rompilla*, 545 U.S. 374; *Williams,* 529 U.S. 362. Collecting and presenting rote testimony from a few immediate family members and two jail guards was a far cry from the presentation available through a constitutionally adequate presentation. There exists far more than a reasonable probability that the undiscovered and unpresented mitigating evidence, when weighed together with the evidence presented a trial and the state's evidence in aggravation, would have changed the outcome of the penalty phase of the trial, both alone and in combination with the other instances of ineffective assistance set forth in this petition. *See Strickland*, 466 U.S. at 694.

Counsel failed to elicit the compelling mitigating evidence from the witnesses counsel had already identified (through Mr. Galloway and his mother), from the records available but never collected by counsel, and from the community of people who knew, and in many cases loved Mr. Galloway, but were never once contacted pre-trial. In short, counsel left untold the stories that needed to be told to spare his life. The contrast between what counsel did and what any competent capital lawyer would have done could not be starker. The unexplained "good guy" whom counsel trotted out, without more, never stood a chance. But trial counsel could have discovered, and introduced to the jurors, the Bo Galloway who survived and endured intergenerational poverty, trauma, dysfunction and mental illness. Mr. Galloway was entitled to trial counsel who would undertake the investigation that could uncover that Bo Galloway and portray him to the jury. It is reasonably probable that if they had, at least one juror would have voted for life.

144

**3.  As a result of counsel's deficient investigation and preparation for trial, their presentation of evidence at the sentencing phase of the trial was constitutionally inadequate.**

The Supreme Court has repeatedly found deficient performance when counsel's limited, superficial penalty phase presentation failed to convey a complete or accurate picture of their client's character or background. *See Williams*, 529 U.S. at 396 ("the failure [of counsel] to introduce the comparatively voluminous amount of evidence that did speak to Williams' favor was not justified by a tactical decision to focus on Williams' voluntary confession."); *Sears*, 561 U.S. at 952 ("Unsurprisingly, the state postconviction trial court concluded that Sears had demonstrated his counsel's penalty phase investigation was constitutionally deficient" where the investigation was "limited to one day or less, talking to witnesses selected by [Sear's] mother…") (internal quotations omitted); *see also Walbey*, 309 F. App'x at 802 (finding counsel's mitigation presentation deficient where it conveyed an inaccurate picture because of the deficient investigation).

In this case, the defense presented eight witnesses at sentencing, spanning a mere twenty-two pages in the record on appeal. Two Sheriff's deputies from the Harrison County Adult Detention Center testified that Mr. Galloway had not caused them problems at the jail while he was awaiting trial, and five family members and one friend testified that Mr. Galloway ("Bo") was a good father to his children, that they cared about him, and that they would visit him in prison if he were sentenced to life. Not one of these witnesses was questioned regarding any aspect of Mr. Galloway's childhood or behaviors. Trial counsel failed to interview most of these witnesses before trial and failed to prepare a single family member or friend for their testimony. MS SCt Petition (Ex. 8, Aff. of J.G., ¶ 12, 13), (Ex. 9, Aff. A. Ash, ¶ 24, 25), (Ex. 11, Aff. of V. Bishop, ¶ 13),

(Ex. 12, Aff. of L. Galloway Jr., ¶ 18), (Ex. 26, Aff. of M. Stanton, ¶ 38), (Ex. 14, Aff. of O. Varghese, ¶ 68).

The first family witness to testify for the defense was J.G., Mr. Galloway's younger half-sister by his father. She spoke to trial counsel for the first time when he called her to the stand. MS SCt. Petition (Ex. 8, Aff. of J.G., ¶ 13), (Ex. 9, Aff. of A. Ash, ¶¶ 23-25).[74] Thirteen years old at the time of trial, J.G. came to the courthouse at the request of Ollie Varghese, Mr. Galloway's mother. Mr. Rishel's unpreparedness is flagrantly evident from the record. After J.G. stated her first name J, Mr. Rishel had to ask her how to spell it, and then how to pronounce it. Clearly still having difficulty with her name, he offered instead to "just call you Ms. G."  R. 826.

Mr. Rishel only asked J.G. five questions of any substance:  1) whether she was close to Mr. Galloway; 2) whether he would help her in a jam; 3) whether she loved him; 4) whether she would visit him in prison; and 5) whether that would be good for her. R. 826-27. Had she been asked, J.G. would have also been willing to testify that her big brother Bo would encourage and support her, that they would joke around, laugh, and have fun together, that he was a great father to his three children whom he adored, and that he would often help out their father who had a lot of physical problems. MS SCt Petition (Ex. 8, Aff. of J.G., ¶ 13).

Trial counsel's next witness was Vencin Bishop, boyfriend of Mr. Galloway's sister LaShandra Taylor, who had only known Mr. Galloway for a brief time as an adult.

---

[74] J.G. and another witness, Mr. Ash, may well have been called by counsel on the fly simply because they had shown up at the courthouse. The day before their testimony, counsel informed the court that he had only four family members and Dr. Smallwood remaining for the final day of testimony. R. 822. On the last day of trial, he had added two witnesses, bringing the total to five family members and one friend. R. 826-41.

MS SCt Petition (Ex. 11, Aff. of V. Bishop, ¶ 4). Attorney Christensen, who had not been involved in the preparations for the penalty phase prior to trial, presented Mr. Bishop's trial testimony.[75] *See* MS SCt Petition (Ex. 7, Aff. of D. Christensen, ¶ 5). Ms. Christensen asked Mr. Bishop only how often he would see Mr. Galloway prior to his arrest, whether he had helped Mr. Galloway, whether Mr. Galloway was a good father to his children, whether he had visited him in the jail, and whether he would visit him in prison. R. 828-29. Had he been asked, Mr. Bishop would have told the jury how much stress Bo's relationship with Shamekia Moore caused him, especially in the months leading up to his arrest for this crime. MS SCt Petition (Ex. 11, Aff. of V. Bishop, ¶ 8). He would have testified that Mr. Galloway was a Mama's boy and loved his mother, but his children were the most important thing in his life. He would have told the jury how hard it was on Mr. Galloway when Shamekia would keep the children away from him and how Mr. Bishop would try to counsel Mr. Galloway about their relationship. He would have told the jury how helpful Mr. Galloway was to him around the house working on odd jobs, to supplement the small income he was making at his own jobs.  He would have also testified that he saw Mr. Galloway in the days before he was arrested, he was not acting himself. Mr. Bishop could tell that something was wrong with him, as Mr. Galloway had gotten a ride home from him and wouldn't get out of the car. He had a blank stare on his face and was in a very serious mood. *Id.* This evidence could have been

---

[75] Of the family witnesses, only Vencin Bishop recalls that Mr. Rishel reviewed with him the questions he would be asking him beforehand – and then, only in the hallway of the courthouse just before his testified. MS SCt Petition (Ex. 11, Aff. of V. Bishop, ¶15). Then, Ms. Christensen, whom Mr. Bishop had never met before and who had no responsibility for the penalty phase, was the attorney to examine him on the stand. R. 828.

used to support evidence of Mr. Galloway's mental health impairments, as described more fully below.

Following Mr. Bishop, the defense called Mr. Galloway's childhood friend Angelo Ash. Like J.G., Mr. Ash did not meet trial counsel until he was called to the stand, with no preparation for the questions counsel would ask. MS SCt Petition (Ex. 9, Aff. of A. Ash, ¶ 24-25). Trial counsel asked Mr. Ash nothing that added to the witnesses before him, as the defense refrain continued: was Mr. Galloway a good father to his children, and would Mr. Ash visit him in jail. R. 831-32. Trial counsel never asked Mr. Ash about Mr. Galloway's childhood and what it was like growing up for them. Had he been asked, Mr. Ash could have told the jury how young Bo, their friend Rufus Molden, and he loved to play video games, and described how they would ride their bikes all over town. Mr. Ash would have shared with the jury how Mr. Galloway's mother wasn't around for them because she was working all the time and how his sister San would have to take care of Mr. Galloway and his sister Mary. He would have told the jury how Mr. Galloway's father was also never around for him, how Mr. Galloway worried about his mother, and how he had observed signs of his mother's depression, such as her crying alone in her room. MS SCt Petition (Ex. 9, Aff. of A. Ash, ¶ 14). He would have told the jury how Mr. Galloway wanted so badly to work things out with Shamekia Moore because he loved his children so much and how Mr. Galloway was a hard worker and always tried to have a job.

Mr. Galloway's father Leslie Galloway, Jr. testified next. He too did not know the questions trial counsel would ask him until he was on the stand. MS SCt Petition (Ex. 12, Aff. of L. Galloway, Jr., ¶ 19). As with the preceding witnesses, trial counsel asked him

only whether he loved his son, whether he would visit him in prison, and whether Mr. Galloway was a good father to his children. R. 833-34. Mr. Rishel's lack of preparation tripped him up when Mr. Galloway, Jr. admitted that he had not visited his son while he was incarcerated close by at the Harrison County jail. R. 833. Still, Mr. Rishel did not stray from script: as with every other witness, he asked Mr. Galloway, Jr. if he would visit his son at Parchman, more than a 5-hour drive from the Gulf Coast, if he was sentenced to life. *Id*.

Mr. Galloway's sister Mary Taylor followed their father. Again, the record exposes how completely unprepared trial counsel was for her testimony and reveals that he was asking her questions for the first time on the stand. His questioning also revealed how little he knew about his own client and his family. Mr. Rishel asked Ms. Taylor if Mr. Galloway was her older or younger brother. Even after she answered "younger," Mr. Rishel asks her, "How much older than you is he?" R. 835. When Ms. Taylor testified that she and Mr. Galloway are "like a year and a half apart," Mr. Rishel had to ask her how old his own client was: "So he's about 29 maybe. He's about 30 years old?" R. 835. Ms. Taylor corrected him, "No, he's 27." R. 835. Though Ms. Taylor had already testified that Mr. Galloway was younger than she was, Mr. Rishel was surprised by her answer: "Oh, you're older than he is?" R. 835. Even the most minimally prepared attorney for a capital sentencing phase would have a command of such basic facts about his client and siblings as their order of birth.

After stumbling, Mr. Rishel proceeded to ask Ms. Taylor the same questions as the witnesses before her: whether she was close to her brother, whether he loved his children, and whether she would visit him in prison. R. 837. Had counsel investigated Mr.

149

Galloway's life history, Ms. Taylor would have been able to provide overwhelming and powerful evidence in mitigation, including the dysfunction and chaos in the home, the neglect by their mother, the abandonment by their father, the domestic violence in their home and in their community, the physical abuse against her brother, their childhood poverty, and much more. App. 345a-350a.

Mr. Galloway's mother, Ollie Taylor Varghese, followed her daughter. Again, counsel asked her nothing more than whether she loved her son, how Mr. Galloway was as a father, and whether she would visit him in prison. R. 839-40. After cross-examination, apparently unsatisfied that her testimony on behalf of her son's life was so incomplete, Ms. Varghese asked for permission to "say something" before she left the stand. R. 840. Counsel did nothing to follow up. *Id*. Had counsel asked, Ms. Varghese, like her daughter, would have provided overwhelming and compelling evidence in mitigation. App 332a-344a.

Without eliciting any information at all about Mr. Galloway's childhood or behaviors from any witness, the defense rested. Mr. Rishel never presented the testimony of his mental health expert, Dr. Smallwood, whom he had promised to call in his opening statement. R. 812. Counsel's failure to call Dr. Smallwood as a witness after announcing the intention to do so was clearly deficient and prejudiced Mr. Galloway. *See Strickland*, 466 U.S. at 694; *Anderson v. Butler*, 858 F.2d 16, 18 (1st Cir. 1988) (Even "if it was . . . wise [not to call the witness] . . . it was inexcusable to have given the matter so little thought at the outset as to have made the opening promise."). Although Mr. Rishel claimed that Dr. Smallwood had told him before trial that her testimony would not help the defense, Dr. Smallwood did not describe any such conversation, and in any event Dr.

Smallwood had not received the fruits of a constitutionally adequate investigation. Moreover, she commented on the lack of such information. *See* App. 303a; MS SCt Second Amended Petition (Ex. 3, Aff. of Dr. Smallwood, ¶ 30), (Ex. 4, Dr. Smallwood Evaluation).

In his 10-minute closing argument, R. 868, Mr. Rishel mentioned only one detail about Mr. Galloway's background at all – his age – and could not even get that straight: "He's 27, 28 years old." R. 862. (Mr. Galloway was 27 at the time of the trial.) Rather than summarize what scant evidence the defense presented at the penalty phase, Mr. Rishel began to attack the jury's guilt phase findings, over the prosecution's objections. He reminded the very jury that had just found Mr. Galloway guilty beyond a reasonable doubt that "Leslie denies [doing] this. He denies this," without giving them any reason they should believe him and spare his life. R. 865. Mr. Rishel then tried to make an incomprehensible – and entirely unpersuasive – analogy comparing the death penalty to other injustices of Mississippi's past. R. 865. Finally, he made a general plea against the death penalty and asked the jury to spare Mr. Galloway's life to "end all of the killing." R. 866. In light of this scant and pitiful sentencing phase presentation, it is no wonder that several jurors thought they had no choice but to give Mr. Galloway the death penalty. *See* App. 1003a.

Trial counsel's cursory, truncated presentation of evidence was outside the standard of care required by the United States Constitution and supported by the ABA Guidelines. *See Rompilla*, 545 U.S. at 392 (finding counsel's performance deficient for failing to review Rompilla's prior conviction file, which would have led counsel to "a range of mitigation leads that no other source had opened up," including a picture of his

"childhood and mental health."); *Walbey,* 309 F. App'x at 801 (counsel's deficient mitigation investigation left extensive helpful evidence undiscovered and led to damaging presentation). The presentation in Mr. Galloway's case was deficient because it rested on almost non-existent pretrial investigation and preparation. With almost no evidence to present, counsel presented the jurors with almost nothing they could rely on as a reason to spare Mr. Galloway's life.

### D. Counsel conducted a constitutionally inadequate investigation and presentation of mental health evidence which prejudiced Mr. Galloway.

Trial counsel's failures to investigate, retain and present available expert testimony concerning Mr. Galloway's mental health are undeniable. Counsel has a duty to select appropriate experts and "present those experts with information relevant to the conclusion of the experts." *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1996). In addition to uncovering the mitigating background information discussed above, a reasonable investigation by trial counsel would have further shown the damage Mr. Galloway's traumatic history inflicted on his mental health, well-being, and functioning. Counsel retained but failed to use Dr. Beverly Smallwood. She and other available experts such as Dr. Frederic Sautter could have testified that Mr. Galloway suffers from Post-Traumatic Stress Disorder ("PTSD") and complex PTSD, consistent with his extensive documented trauma history. *See* MS SCt Second Amended Petition (Ex. 2, Aff. of Dr. Sautter, ¶ 11-29, 31). They both would have explained that Mr. Galloway has other serious mental illnesses, including Depressive Disorder and Psychotic Disorder. Counsel could have presented further evidence of abnormalities indicating brain damage. MS SCt Second Amended Petition (Ex. 6, Aff. of Dr. Gur, ¶ 11); *see also* MS SCt Second Amended Petition (Ex. 5, Aff. of Dr. Watson) ¶ 7), (Ex. 7, Affidavit of Dr. Agharkar, ¶ 5).

Competent trial counsel would have retained and prepared appropriate mental health experts who could have and would have testified about Mr. Galloway's mental functioning and mental health.

### 1. Dr. Smallwood

Counsel promised the jury but never actually offered the testimony of Dr. Beverly Smallwood, the clinical psychologist retained before trial. She spent, and billed for, two days waiting at the courthouse but never took the stand. *See* MS SCt Second Amended Petition (Ex. 131, Smallwood Invoices, Bates-008135).

Counsel failed from the start by providing Dr. Smallwood with none of the information she needed to assess the mitigation and mental health information that counsel could present to the jury. Counsel gave her only a single life-history record, itself a single page, Mr. Galloway's Greene County school record. MS SCt Second Amended Petition (Ex. 3, Aff. of Dr. Smallwood, ¶ 30).

 Dr. Smallwood wrote in her report that "conducting a full mitigation study is outside the scope of [her] forensic practice," and requested that counsel enlist the mitigation services of the "Office of Capital Defense in Jackson" or that another qualified expert in mitigation be appointed. MS SCt Second Amended Petition (Ex. 4, Dr. B. Smallwood Evaluation at Bates-8114). Competent counsel would have followed these recommendations, sought a qualified mitigation investigator or otherwise conducted the required social history investigation, and presented Dr. Smallwood with those results. However, defense counsel did not take the advice of the expert they had engaged.

Without the social history, Dr. Smallwood could do little more with a single interview and review of relevant police reports than scratch the surface of Mr. Galloway's

life history. She learned some of the basic outlines of Mr. Galloway's life, including that his father was often absent, his parents were separated, his father had been shot, and that he had young children. MS SCt Second Amended Petition (Ex. 4, Dr. B. Smallwood Evaluation at Bates-8106). Even without the critical social history available through investigation, Dr. Smallwood still documented a number of mental health symptoms, including reporting that Mr. Galloway had "trouble going to sleep," experienced trouble concentrating, had memory problems, was sometimes depressed, experienced auditory hallucinations, and had had suicidal thoughts in the past. *Id*. at 8107-108. Even her limited evaluation should have alerted competent counsel to the need for more investigation and expert assistance.

After reviewing the affidavits and social history records collected by post-conviction counsel, Dr. Smallwood found that they "painted a very different picture of Leslie's social history and . . . family dynamics" than she was aware of at the time of her evaluation of Mr. Galloway prior to trial. MS SCt Second Amended Petition (Ex. 3, Aff. of Dr. Smallwood, ¶ 11). The records provided "an invaluable amount of mitigating material," namely, a childhood marked by severe domestic and community violence, paternal abandonment, maternal neglect, early exposure to alcohol and substance abuse, and severe poverty; a multi-generational history of mental illness that predisposed Mr. Galloway to mental illness; a multi-generational history of sexual abuse, including sexual abuse within his childhood home; and the loss of Mr. Galloway's older brother to incarceration. *Id*. at ¶¶ 11, 13-15, 18-20, 22-25. Had Dr. Smallwood been given the records she was provided in post-conviction, including the evidence set out above, she would then have been able to tell the jury about Mr. Galloway's PTSD and Major

Depressive Disorder, and how his history of traumatic life experiences severely harmed his psychological and neurological development. *Id.* at ¶¶ 13-16, 21, 26-28).

Dr. Smallwood could have explained that the violence committed in Bo's childhood home by his father, maternal grandfather, and older brother "deprived him of the sense of safety and security that all children need to achieve good mental health as an adult." *Id.* at ¶ 14. Similarly, when his older brother, Melvin, physically attacked Bo and forced Bo to fight his siblings, he "trained [Bo] at an early age to fight for his survival." *Id.* Dr. Smallwood could also have explained that his mother's severe neglect had a "psychologically-crippling" effect on Bo. *Id.* at ¶ 19. Her neglect "is significant in terms of mitigation because it adds to the cumulative evidence that Leslie was raised without a sense of being nurtured or cared for by a parental figure," and Dr. Smallwood "would have testified at length about how Leslie was impacted by his mother's neglect had [she] known this valuable information. The literature on childhood abuse and neglect suggests that the adverse outcomes of neglect and the lack of psychological availability on the part of key caregivers can be equally or more damaging to children than actual abuse." *Id.*; *see also id.* at ¶ 25 ("The family's poverty paired with the instability in the home would have a devastating psychological impact on Leslie. Poverty and food insecurity are risk factors that are associated with internalizing and externalizing symptoms in children and can have negative effects on brain development.").

In addition to identifying numerous sources of trauma and triggers for mental illness in the information provided by post-conviction counsel, Dr. Smallwood also found that Bo began to display classic symptoms of PTSD from a very young age. Dr. Smallwood learned from Bo's social history and medical records that he began having

panic attacks when he was five or six years old, and found it "striking that [Bo] began to suffer from panic attacks at such an early age. . . The presence of this level of anxiety from such an early age is consistent with the high intensity of Leslie's exposure to violence and atmosphere of terror from early life." *Id.* at ¶ 15. Bo would also fight to defend himself or his family and would have trouble calming down after getting upset, which shows that Bo was "hypervigilant and hyperaroused – symptoms of PTSD." *Id.* at ¶ 16. To cope with and numb his traumatic memories, Bo "began to abuse marijuana at an early age and may have been abusing alcohol around the time of his arrest," and this substance abuse may have caused Bo "to become even more isolated, irritable, depressed, hypervigilant, and hyperaroused . . ." *Id.* at ¶ 24.

 Dr. Smallwood also cited evidence in Bo's social history that he experienced states of dissociation, a symptom "often seen in people with PTSD." *Id.* at ¶17. Dr. Smallwood would have told the jury about Bo's history of dissociation and the significance of this PTSD symptom had trial counsel provided her with the information contained in Bo's social history. *Id.* Ultimately, Dr. Smallwood would have diagnosed Bo with PTSD at the time of his trial if she had been provided with the available social history. *Id.* at ¶ 16.

The records also showed Dr. Smallwood that Bo had "more severe symptoms of depression before and leading up to his arrest." *Id.* at ¶ 26. Dr. Smallwood specifically cited Bo's isolating himself for days at a time, passing up food, and locking himself in a room with knives and threatening to take his own life. *Id.* Bo's records from the Harrison County Adult Detention Center showed that Bo had insomnia and suicidal thoughts at the time of Dr. Smallwood's initial evaluation. *Id.* at ¶¶ 26-27; *see also* MS SCt Second

Amended Petition (Ex. 128, L. Galloway III – HCSD Med Records). If Dr. Smallwood had been aware of these symptoms, she would have testified that he "met the criteria for Major Depressive Disorder, a serious psychological disorder that involves disturbance in mood, can result in significant social withdrawal, be expressed as severe irritability, and can affect cognitive functioning." MS SCt Second Amended Petition (Ex. 3, Aff. of Dr. Smallwood, ¶ 26).

However, Dr. Smallwood was unable to explain any of the mitigating aspects of Mr. Galloway's history and mental state at trial because of trial counsel's unreasonably deficient investigation, which left Dr. Smallwood with virtually no social history or relevant records for Mr. Galloway or his family. *Id.* at ¶¶ 4, 7, 30. Although Dr. Smallwood made it clear to trial counsel that she could not conduct a mitigation study and could only identify limited mitigating information from the scant information provided to her, trial counsel never initiated an adequate mitigation investigation and never provided Dr. Smallwood with any other information from Mr. Galloway's social history and records. *Id.* at ¶¶ 3, 4, 7, 30. Consequently, Dr. Smallwood could only conduct a "limited assessment" because she lacked sufficient information to conduct "a complete psychological evaluation." *Id.* at ¶ 30. Had she been provided with the information from Mr. Galloway's social history, Dr. Smallwood's "evaluation and conclusions would have been very different, and [she] would have had mitigating information to share to the jury at the penalty phase . . . [Her] testimony could have been woven into his penalty phase mitigation case in an effective manner." *Id.* at ¶ 32. However, lacking this, the jury heard nothing of Mr. Galloway's devastating traumatic history and severe mental illness.

157

## 2. Other Mental Health Experts

Other experts retained in post-conviction agree with the conclusions Dr. Smallwood reached once provided with an adequate social history, and they have developed additional evidence about the impact of trauma and brain injury on Mr. Galloway. These experts could have testified at Mr. Galloway's trial and supplemented and corroborated Dr. Smallwood's testimony.

Dr. Frederic J. Sautter, Ph.D., a clinical psychologist and Professor of Clinical Psychiatry in the Department of Psychiatry and Health Sciences at the Tulane University School of Medicine, conducted a comprehensive assessment of Mr. Galloway. He reviewed the extensive social history records and witness affidavits obtained by post-conviction counsel, performed two in-person assessments, administered several psychological assessment instruments,[76] and reviewed testing results from a separate neuropsychological evaluation conducted by Dr. Dale Watson. MS SCt Second Amended Petition (Ex. 2, Aff. of Dr. Sautter, ¶¶ 4-9, 27). Dr. Sautter determined that at the time of his capital murder trial Mr. Galloway met all then-current criteria for PTSD, and that "at the time of the offense Mr. Leslie Galloway's thinking and behavior were strongly influenced by his PTSD, complex posttraumatic stress, depression, and psychosis." *Id.* at ¶¶ 32. Significantly, virtually all of the traumatic life history on which Dr. Sautter based his findings is established by the affidavits of family and friends and medical and court records that post-conviction counsel had provided to him. *Id.* at ¶ 12. Dr. Sautter also

---

[76] Dr. Sautter also administered the "SIRS" to Mr. Galloway, which is considered the "Gold Standard" test of malingering in forensic populations. MS SCt Second Amended Petition Ex. 2, Aff. of Dr. Sautter, ¶ 8). Mr. Galloway's scores "on all seven scales fell within the 'Honest' range, indicating that he was honest in his responses to questions about psychiatric problems. The validity subscales of the Trauma Symptom Inventory also showed that Mr. Galloway was honest in his responses to questions about posttraumatic stress. These data all support the validity of the assessment findings." *Id.*

found that Mr. Galloway met the past criteria for Major Depressive Disorder, the current criteria for Depressive Disorder, the criteria for Psychotic Disorder "Not Otherwise Specified," and the past criteria for substance abuse disorder relating to his past abuse of alcohol and marijuana. *Id*. at ¶ 29; *see also* MS SCt Second Amended Petition (Ex. 5, Aff. of Dr. Watson, ¶ 7) ("Mr. Galloway is experiencing a severe degree of depression that appears to be sustained and long-standing.").

Dr. Sautter determined that Mr. Galloway had been exposed to a "large number" of traumatic events, including:

> (1) being exposed to regular physical assaults by his older brother Melvin . . . (2) witnessing Melvin's regular physical and emotional assaults of his mother, including watching an apparent attempt to take her life, in addition to other violence perpetrated by Melvin including his starting a potentially dangerous house fire and torture of cats; (3) Melvin forcing Leslie to fight other young males in the neighborhood thus involving Leslie in terrifying physical combat from approximately the age of eight years old through 13 years old, each posing a threat of serious physical injury; (4) being exposed to a drive by shooting when he was 10 years old and someone shot bullets into the Galloway home when Mr. Galloway was home; (5) being physically attacked by 'twelve guys in the neighborhood' when he was in his early teens; (6) being threatened by a man stealing Leslie's bicycle who pulled a knife on 14 year-old Leslie and threatened to hurt him, and (7) years of continuous emotional abuse as he was verbally assaulted and denigrated by his brother and father.

MS SCt Second Amended Petition (Ex. 2, Aff. of Dr. Sautter, ¶ 11).

Dr. Sautter also determined that Mr. Galloway was "exposed to high levels of early life adversity" that made him vulnerable to psychological problems in general, and PTSD in particular. *Id.* at ¶ 13. Dr. Sautter's assessment found that Mr. Galloway's early life adversity included:

> high levels of family stress and conflict; loss of a father figure who could provide support and nurturance when his father left the family; maternal neglect as his mother would work long hours, leaving her older daughter, Lashandra, who was a young child herself, to watch the younger children,

often for days on end; living in an impoverished family environment where all four children would share a bed, would often go hungry for lack of food, and where he was exposed to frequent violence and criminal behavior by his brother and other family members and family acquaintances, including apparent attempts by Melvin to take his sister Mary's life; living in a family environment in early childhood that accepted alcohol abuse, lack of family support for schooling and for developing intellectual skills and social behaviors that would provide the foundation to achieve competence and success later in life; a chaotic and unstable home environment, with frequent residential moves and school changes; growing up in a violent area that deprived him of developing the sense of safety and security that all children need to achieve good mental health as an adult; the endless cycle of abandonment by his brother, as he was in and out of juvenile detention and mental institutions; [and] living in a family environment where his sister Lashandra was sexually abused by his father.

*Id.* at ¶ 13.

From an early age, Mr. Galloway's prolonged exposure to traumatic events and life adversities triggered the signs and symptoms of PTSD and other psychiatric disorders. From the age of five or six, Mr. Galloway "would respond to [his mother's] threats of punishment against him by hyperventilating," and Mr. Galloway developed severe anxiety and panic attacks where he would have trouble breathing and complain that his chest was hurting, and his heart was beating heavy and fast. *Id.* at ¶ 20. Mr. Galloway also showed signs of "avoidance" and "numbing" – symptoms characteristic of PTSD – from an early age and continuing through the time of the offense. *Id.* at ¶¶ 16, 17. These included "withdrawing or shutting down," avoiding thoughts and feelings about past trauma, retreating to a corner, and isolating himself in a room for days at a time where he would pass up food and spend significant time playing video games alone. *Id.* at ¶¶ 16, 17. Mr. Galloway also displayed the PTSD symptoms of "increased hyperarousal" including "problems sleeping" and "trauma-related hypervigilance and an exaggerated startle response," as evidenced by his "fight[ing] to protect himself and his family,"

160

showing a quick temper, and having a difficult time calming down after becoming upset about something. *Id.* at ¶¶ 18, 19.

Dr. Sautter also found that Mr. Galloway demonstrated "complex PTSD symptoms" that occur when children and adults are exposed to "chronic interpersonal trauma" early in life. *Id.* at ¶ 23.[77] In Mr. Galloway's case, Dr. Sautter found that he had experienced symptoms of dissociation, which "is a defensive process in which an individual develops the capacity to separate himself or herself from the psychic or physical pain caused by the trauma." *Id.* at ¶ 24. Dr. Sautter noted that affidavits from friends and family showed that Mr. Galloway sometimes blacked out during fights and would have no memory of getting into them – all dissociative symptoms that began to emerge in Mr. Galloway's teens. *Id.* at ¶ 26. Mr. Galloway's severe PTSD with complex PTSD symptoms "would impair his social judgment, problem-solving and self-control, and would bias his perceptions of the world in the direction of overestimating threat. . . [H]e would likely experience a detached dissociative state that would interfere with his ability to process threat or other social information, impair his social judgment and likely cause him to overestimate threat and to potentially behave in an impulsive manner." *Id.* at ¶ 31.

Dr. Sautter concluded that at the time of the offense, "Mr. Leslie Galloway's thinking and behavior were strongly influenced by his PTSD, complex posttraumatic

---

[77] As he described: "Children and adults exposed to chronic interpersonal trauma early in their life cycle consistently demonstrate symptoms that are not included as diagnostic criteria for PTSD, but are also considered to represent posttraumatic stress syndromes that are especially damaging to a person's ability to regulate and control their own emotions and cope with interpersonal problems. These symptoms are called "complex PTSD symptoms" and they have been validated as a "disorder of extreme stress in a large number of clinical research studies and by the DSM-IV Field Trial for PTSD.4 They include emotion dysregulation, amnesia and dissociation, severe problems with trust and relationships, and damaged sense of self." MS SCt (Ex. 2, par. 23).

stress, depression, and psychosis." *Id*. at ¶ 32. Moreover, "the influence of complex trauma processes would decrease his ability to exercise conscious control over his own behavior and increase his perceptions of threat while rendering him less capable of controlling his trauma-related emotions and anger." *Id*.

Like Dr. Smallwood's testimony, Dr. Sautter's testimony would have constituted powerful and probative mitigation evidence that, it is reasonably probable, would have led one or more jurors to vote for life imprisonment without parole.

Trial counsel could also have consulted experts to assess Mr. Galloway's brain damage. For example, they could have consulted an expert like Shawn Agharkar, M.D., a forensic psychiatrist, who also "found substantial evidence of trauma," including "severe sleep disturbances," and "slow processing speed whenever he had to recall something from memory, indicating impaired verbal recall and fluency." MS SCt Second Amended Petition (Ex. 7, Affidavit of Dr. Agharkar, ¶ 5). As "these symptoms could indicate that Mr. Galloway suffers from serious mental health problems, including brain damage," he recommended a neuropsychological assessment. *Id*. at ¶¶ 5-6.

Such an assessment, performed by neuropsychologist Dale Watson, Ph.D., found "signs of a significant attentional disorder," possible "lateralized brain dysfunction," impairments in auditory processing, and short-term verbal recall in the "severely impaired range." MS SCt Second Amended Petition (Ex. 5, Aff. of Dr. Watson, ¶ 7). Dr. Watson also concluded that Mr. Galloway's "pattern of performance on the battery was most similar to that of individuals with mild traumatic brain injury." *Id*.

Counsel also could have consulted an expert like neuropsychologist Ruben Gur, Ph.D., who analyzed the results of Dr. Watson's neuropsychological testing and

completed a behavioral imaging analysis.[78] MS SCt Second Amended Petition (Ex. 6 Aff. of Dr. Gur, ¶ 3, 5). Dr. Gur found "abnormalities indicating brain damage . . . in regions that are very important for communication, emotional arousal and perception and interpretation of external environment." *Id*. at ¶ 14. He also found that "the abnormalities observed are consistent with several causes, including traumatic brain injury." *Id*. at ¶ 15.

### 3. Counsel's failure to properly develop and present expert testimony constituted deficient performance.

Trial counsel retained Dr. Smallwood but limited her referral questions to whether Mr. Galloway was insane, incompetent to assist counsel, or intellectually disabled. MS SCt Petition (Ex. 4, Dr. B. Smallwood Evaluation, Bates 8104, 8114). Counsel gave her no information other than a one-page school record from Greene County and a set of police reports. MS SCt Petition (Ex. 3, Aff. of Dr. Smallwood, ¶ 7), (Ex. 4, Dr. B. Smallwood Evaluation, Bates 8104-05). Counsel never asked Dr. Smallwood's advice about potential mitigating themes or opinions and ignored her urgent recommendation that he obtain a background investigation. Furthermore, because Dr. Smallwood remained in the dark about Mr. Galloway's background, she did not recommend the neuropsychological testing that she would have requested if she had known about Mr. Galloway's trauma exposure and other history. MS SCt Second Amended Petition (Ex. 3, Aff. of Dr. Smallwood, ¶ 31). Counsel never obtained any testing or other assessment of Mr. Galloway's neurocognitive functioning. Although Mr. Rishel stated that Dr. Smallwood told him she could give the defense no help, *see* App. 303, that does not

---

[78] A method developed by Dr. Gur in collaboration with colleagues across several universities that utilizes a "computerized algorithm with established reliability and validity" to conduct an "objective interpretation of standardized neuropsychological test results." MS SCt Second Amended Petition (Ex. 5, Aff. of Dr. Gur, ¶ 4).

explain why he would promise the jury they would hear from an expert who could not help, let alone why he would make that promise and then never call her as a witness.

Counsel's handling of the preparation and presentation of the mental health evidence was deficient. Counsel has a duty to select appropriate experts and "present those experts with information relevant to the conclusion of the experts." *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1996); *see also Wallace v. Stewart*, 184 F.3d 1112, 1116 (9th Cir. 1999) (counsel have an affirmative duty to provide mental health experts with information needed to develop an accurate profile of the defendant's mental health).

The Supreme Court has repeatedly found investigations deficient, and the deficiencies prejudicial, in part, because counsel failed to uncover or present mitigating mental health evidence. *See Rompilla*, 545 U.S. at 391 (counsel deficient even though they "arranged for Rompilla to be examined by three experienced mental health professionals" because adequate investigation would have disclosed evidence pointing to schizophrenia and other disorders); *Wiggins*, 539 U.S. at 535 (adequate investigation would have uncovered petitioner's "diminished mental capacities"); *Williams*, 529 U.S. at 396 (constitutionally adequate investigation would have disclosed that petitioner was "borderline mentally retarded"). The Court has reaffirmed these principles in its later opinions. *See Sears*, 561 U.S. at 956 (proper analysis of prejudice under *Strickland* would have taken into account newly uncovered evidence of Sears' "significant mental and psychological impairments," along with other evidence); *Porter*, 558 U.S. at 41 (deficient investigation prejudicial, in part, because it failed to uncover petitioner's "brain abnormality").

164

Similarly, in *Walbey*, the Fifth Circuit found trial counsel's performance deficient, in part, because they did not investigate evidence that their client was "borderline mentally retarded," and passed up available testimony from Walbey's treating professionals in favor of testimony from a doctor prepared only the week before trial, whose testimony turned out to be aggravating. 309 F. App'x at 801; *accord Miller v. Dretke*, 420 F.3d 356, 359, 362-63 (5th Cir. 2005) (counsel deficient because, while he elicited lay testimony about petitioner's traumatic brain injury, he decided against calling her treating physicians without first speaking to them).[79]

Counsel were also deficient for giving Dr. Smallwood limited referral questions that would not assist them in developing mitigating evidence. *See* MS SCt Second Amended Petition (Ex. 4, Dr. B. Smallwood Evaluation, Bates-8114); *see also Hardwick v. Crosby*, 320 F.3d 1127, 1163 (11th Cir. 2003) ("Regarding mental health mitigating evidence, our court has distinguished between its use during the guilt phase to establish competency to stand trial and presenting mental health mitigating evidence at the penalty phase"); *Combs v. Coyle*, 205 F.3d 269, 311 (6th Cir. 2000) (competency report cannot substitute for a full mitigation work-up of defendant's mental health); *Smith v. Stewart*, 189 F.3d 1004, 1009 (9th Cir. 1999) (same).

Compounding counsel's other deficiencies, their failure to call Dr. Smallwood as a witness after announcing their intention to do so was clearly deficient. *See Strickland*, 466 U.S. at 694; *Anderson v. Butler*, 858 F.2d 16, 18 (1st Cir. 1988) (Even "if it was . . .

---

[79] *See also Worthington v. Roper*, 619 F. Supp. 2d 661, 688-89 (E.D. Mo. 2009) ("[H]ad the trial judge heard testimony from properly prepared defense experts, there is a reasonable probability that petitioner would have received a different sentence."); *McNeill v. Branker*, *supra*, 601 F. Supp. 2d 694, 721 (E.D.N.C. 2009) (counsel ineffective for failing to investigate social history and develop mental health evidence).

wise [not to call the witness] . . . it was inexcusable to have given the matter so little thought at the outset as to have made the opening promise.").

In sum, counsel went through the motions of consulting a mental health expert without giving her the necessary information, asking the necessary questions, obtaining the necessary referrals, or, apparently, making any plans about whether to call her at trial. No reasonable strategy could excuse a course of inaction whose only motive seemed to be an aversion to taking trouble. Even giving due deference to counsel's professional judgment, counsel could not reasonably expect to exercise that judgment in an informational vacuum created by their own deficient non-performance.

### 4. Counsel's deficient performance was prejudicial.

The prejudice to Mr. Galloway from trial counsel's failure to prepare and present Dr. Smallwood, and/or any other experts who could have offered opinions on other aspects of Mr. Galloway's mental health, is overwhelming. Even setting aside trial counsel's failure to conduct the mitigation investigation that was constitutionally required, and that Dr. Smallwood had moreover requested, the report that Dr. Smallwood produced based on a single interview with Mr. Galloway contained significant mitigating evidence the jury should have heard—including Mr. Galloway's suicidal thoughts, depression, sleeplessness, and auditory hallucinations. MS SCt Second Amended Petition (Ex. 2, Aff. of Dr. Smallwood, ¶¶ 3, 11, 30, 32). There is a reasonable probability that that evidence alone could have changed the outcome.

Moreover, the prejudice to Mr. Galloway extends far beyond anything attributable solely to the evidence that counsel could have presented through Dr. Smallwood at trial. The evidence that counsel could not have presented at trial, because of their deficient

investigation and preparation, could have carried a clout many times greater by transforming the jurors' understanding of Mr. Galloway's functioning. They would have learned about the effects of trauma and neglect on his development, his panic attacks, his PTSD, and his depression. They would have learned about the brain damage that hampered his day-to-day life. *See Carter v. Bell*, 218 F.3d 581, 596-600 (6th Cir. 2000) (finding prejudice where counsel "presented no meaningful evidence by way of mitigation as a result of their failure to investigate and prepare, not as a result of trial strategy after thorough research"); *Hooks v. Workman*, 689 F.3d 1148, 1203-1207 (10th Cir. 2012) (counsel presented testimony of mental health expert, but was ineffective because the "mental-health evidence [presented] … was inadequate, unsympathetic, and even counterproductive at times" and because counsel failed to see "clear markers for organic brain damage"); *Ferrell v. Hall*, 640 F.3d 1199, 1227 (11th Cir. 2011) (although trial counsel hired mental health expert, they were ineffective because they did not ask expert to look for evidence of brain damage); *Kenley v. Armontrout*, 937 F.2d 1298, 1300, 1303, 1305, 1308 (8th Cir. 1991) (even though "counsel requested a psychiatric examination" counsel was ineffective for failing to further investigate "all available leads" and present mitigating evidence of client's "medical, psychological and psychiatric history.").

Without the benefit of either background information or expert testimony, the jury could not possibly make an informed, reasoned decision about the appropriate penalty in light of the traumatic and trying circumstances of Mr. Galloway's life and thus about his moral culpability. Had trial counsel investigated and presented the readily available mitigation through family and friends and also through Dr. Smallwood or other readily

167

available experts, "there is a reasonable probability that at least one juror would have struck a different balance" and voted for a life sentence. *See Wiggins*, 539 U.S. at 537.

**E. The claim is exhausted and not defaulted.**

As the State acknowledges, this claim is exhausted. Answer at 18. It was raised on direct appeal and in post-conviction review. *Galloway v. State*, MS SCt No. 2010-DP-01927, Brief of Appellant, Claim 23, at 103-105; *Galloway v. State*, MS SCt No. 2013-DR-01796-SCT, Motion for Leave To Proceed In the Trial Court With Amended Petition for Post-Conviction Relief, Claim I.A., at 30-118. The Mississippi Supreme Court held that it was not procedurally barred. App. 150a, 374 So. 3d at 69.

**F. AEDPA does not limit this Court's review.**

As described in Ground Thirty-One, 28 U.S.C. § 2254, if construed to require deference to state court rulings, would violate the doctrine of constitutional avoidance, Article III, and the Supremacy Clause.

The Mississippi Supreme Court's rejection of this claim was in fact an unreasonable application of clearly established federal law and an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1), (2). The court analyzed counsel's deficient background investigation and deficient mental health investigation and preparation separately. Although the court summarized Mr. Galloway's proffered evidence and controlling Supreme Court precedents, *see* App. 150a-169a, 374 So. 3d at 469-478, it proceeded to apply those precedents unreasonably and unreasonably determine the facts.

**1. The Mississippi Supreme Court unreasonably concluded that trial counsel effectively investigated Mr. Galloway's background.**

To reject the claim of deficient and prejudicial background investigation, the state court (1) applied a post-hoc "strategy" rationalization that had no support in the evidence and unreasonably applied *Strickland* and its progeny; (2) blamed Mr. Galloway and his mother for not volunteering the evidence that an adequate investigation would have uncovered, unreasonably applying *Rompilla*, and (3) found no prejudice because some of the evidence that counsel could have uncovered had negative potential and the aggravating factors were substantial, unreasonably applying *Wiggins* and its progeny.

**a. The state court, in relying on a hypothesized *post hoc* strategy to excuse counsel's failure to conduct reasonable investigation, unreasonably applied Supreme Court precedents and unreasonably determined the facts.**

The Mississippi Supreme Court held that counsel reasonably "made a strategic choice to humanize Galloway rather than risk harmful evidence being presented to the jury on cross-examination of mitigation witnesses," and it listed several types of evidence that, the court hypothesized, counsel sought to exclude: Mr. Galloway's carjacking conviction, another pending case, and his brother's murder conviction. App. 169a, 374 So. 3d at 478. None of Mr. Galloway's attorneys articulated the strategy the court attributed to them. *See* App. 304a-305a, 325a, 330a. Mr. Rishel indicated that the defense team wanted to prevent the jury from learning that Mr. Galloway's brother was serving a life sentence for murder, but he never advanced that as a reason for not conducting background investigation. App. 304a-305a. The "humanizing" concept came, not from anything Mr. Rishel or his co-counsel said, but from a phrase the state court drew from its own account of a lower court ruling in an unrelated case, *Walker v. State*, 303 So. 3d 720, 727-28 (Miss. 2020). *See* App. 167a-68a, 374 So. 3d at 477-78. The putative strategy, in any case,

169

could not reasonably explain the failure to investigate Mr. Galloway's background. Far from conflicting with the hypothetical goal of "humanizing" Mr. Galloway, investigating and presenting his story of trauma and its consequences could only have furthered it.

Instead of ordering an evidentiary hearing, the Mississippi Supreme Court relied on its own unsupported speculation about what counsel may have been trying to do, to the point of putting words into trial counsels' mouths. As in *Wiggins*, "the 'strategic decision' the state court[] . . . invoke[ed] to justify counsel's limited pursuit of mitigating evidence resembles more a post hoc rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing." 539 U.S. at 526–27; *see also Neal v. Vannoy*, 78 F.4th 775, 787-89 (trial counsel's affidavit, stating without elaboration that he did not review relevant forensic evidence, sufficient to rebut state court's unsupported factual finding that counsel's inaction based in "strategy"). The state court unreasonably determined the facts by relying on a "humanizing" strategy that had no record support instead of ordering a hearing. 28 U.S.C. § 2254(d)(2).

It also unreasonably applied controlling Supreme Court precedents. The Supreme Court has clearly established that counsel's failure to discharge the duty to investigate cannot be justified by *post hoc* rationalizations, because a reasonable strategic decision must rest on adequate investigation. Applying this concept in *Wiggins*, the Court rejected the State's attempt to rely on strategy to defend non-investigation. 539 U.S. at 534. Trial counsel in *Wiggins* failed to investigate "the sordid details" of the defendant's life beyond "a narrow set of sources," despite obvious red flags. *Id.* at 524, 536. The State argued that trial counsel made a "'tactical decision' to 'retry guilt'" instead of introducing mitigation in the sentencing phase. *Id.* at 518–519. The Court rejected that defense, holding that if a strategic choice is made "after less than complete investigation," it warrants deference

170

only insofar as it is supported by "the adequacy of the investigations" supporting it. *Id.* at 521. By "abandon[ing] their investigation at an unreasonable juncture," trial counsel had made "a fully informed decision with respect to sentencing strategy *impossible*." *Id.* at 527–528 (emphasis added). Counsel's alleged "strategic decision," therefore, "resemble[d] more a *post hoc* rationalization" than "an accurate description" of their pre-sentencing strategy. *Id.* at 526–527; *see also Williams*, 529 U.S. at 396 ("[T]he failure to introduce . . . [favorable] evidence . . . was not justified by a tactical decision to focus on [defendant's] voluntary confession."). This intolerance of *post hoc* rationalizations as a justification for insufficient investigation has been clearly established ever since. The Court explained in *Sears*, 561 U.S. 945, that trial counsel's cursory investigation cannot be "justified by a tactical decision" to "focus on one potentially reasonable trial strategy." *Id.* at 952–954. As the Court explained, "that a theory might be reasonable, in the abstract, does not obviate the need to analyze" whether counsel's inadequate investigation "before arriving at this particular theory" caused prejudice. *Id.* at 953; *see also Wiggins*, 539 U.S. at 521.

Most recently, in *Andrus*, 580 U.S. 806, the trial counsel called several witnesses and an expert, but the Court nevertheless held that counsel's failure to conduct a constitutionally adequate investigation of the defendant's life history or the State's case in aggravation "cannot 'be justified as a tactical decision.'" *Id.* at 816; *see also Neal*, 78 F.4th at 791–92 (rejecting the State's argument to justify counsel's failure to investigate serology and shoeprint analysis as "strategic");[80] *but see United States v. Scott*, 11 F.4th

---

[80] Accord *Noguera v. Davis*, 5 F.4th 1020, 1040 (9th Cir. 2021) (rejecting State's "attempt[] to justify counsel's limited investigation as a 'strategic choice' to pursue a 'positive light' defense strategy"; without further investigation, "counsel could not reasonably have evaluated the benefit—or possible detriment—

364, 372 (5th Cir. 2021) (excusing counsel's failure to investigate admissibility of evidence and pursue exclusion as part of her "defensive strategy to proceed with the plea process").

Here, counsel did not make a choice not to present the undiscovered mitigation evidence; they were simply unaware of it due to the failure to conduct an adequate investigation and adequate development of the available mitigation. The limitations counsel placed on the evaluation performed by Dr. Smallwood were unreasonable and did not constitute an adequate investigation of potentially mitigating mental health issues. They were not in a position to make an informed strategic decision to "humanize" Mr. Galloway rather than present the undiscovered evidence to the jury. *See Wiggins*, 539 U.S. at 527–28. The Mississippi Supreme Court's recitation of the threadbare "strategy" refrain as a post hoc excuse for counsel's failure to investigate before strategizing flouted longstanding Supreme Court precedent. It was thus contrary to, or at least unreasonably applied, clearly established federal law. 28 U.S.C. § 2254(d)(1).

---

of" further evidence, and thus could not have the failure to investigate "immunized from Sixth Amendment challenges simply by attaching to it the label of 'trial strategy.'"); *Abdul-Salaam v. Sec'y Pa. Dep't of Corrections*, 895 F.3d 254, 268 (3d Cir. 2018) ("Counsel can make a strategic decision to halt an avenue of investigation if he has completed a foundation of investigation to reach that decision, but decisions not to investigate certain types of evidence cannot be called 'strategic' when counsel 'fail[s] to seek rudimentary background information"; rejecting later-proffered explanation that counsel was worried about "warring experts or a relitigation of the trial."); *Pruitt v. Neal*, 788 F.3d 248, 272-73 (7th Cir. 2015) (rejecting state court's "surmise[] that trial counsel made a deliberate, strategic decision; even assuming *post hoc* rationalization was a "strategic" decision, "that choice was made after a less than thorough investigation, and as a result, the decision was not fully informed and was unreasonable."); *Marcrum v. Luebbers*, 509 F.3d 489, 503 (8th Cir. 2007) ("[T]he habeas court's commission is not to invent strategic reasons or accept any strategy counsel could have followed, without regard to what actually happened[.]")

**b. The state court misapplied *Rompilla* and unreasonably determined the facts in excusing counsel's deficient investigation because Mr. Galloway and his mother did not volunteer the undiscovered information.**

The state court's second reason for excusing trial counsel's scanty investigation was that counsel did speak to "some of the witnesses" whose detailed affidavits post-conviction counsel presented and even called some of those to testify. The court summarized Attorney Rishel's averments that he "relied on Mr. Galloway and his family to give us a history of Mr. Galloway's life," that Mr. Galloway "sat with his head down and was quiet during meetings," and that after having met with Mr. Galloway's mother they "were led to believe .. . . that Mr. Galloway had no remarkable history of any kind." App. 164a, 374 So. 3d at 479; App. 304a (affidavit of Glenn Rishel).

This analysis unreasonably applied *Rompilla*. Rompilla's lawyers reported that he was "uninterested in helping," told them his childhood and schooling had been "normal" except for quitting school in ninth grade, and at times "was even actively obstructive by sending counsel off on false leads." 545 U.S. at 381. The Supreme Court nevertheless found counsel's failure to investigate the court file of Rompilla's prior conviction deficient and prejudicial. *Id.* at 383, 393; *see also Porter*, 558 U.S. at 40 ("Porter may have been fatalistic or uncooperative, but that does not obviate the need for defense counsel to conduct *some* sort of mitigation investigation.") (emphasis in original) (citing *Rompilla*, 558 U.S. at 381-82)).[81]

___

[81] *See Andrews v. Davis*, 944 F.3d 1092, 1111-12 (9th Cir. 2019) ("To read *Strickland* as requiring a defendant to, first, know what mitigating evidence is, and, second, affirmatively volunteer theories of mitigation, is objectively unreasonable . . .The California Supreme Court's apparent assignment of that responsibility to Andrews was objectively unreasonable."); *Pruitt v. Harry*, No. 09-cv-1625, 2025 WL 2671547, at *42, *70 (E.D. Pa. Sept. 17, 2025) (granting habeas relief for counsel's deficient mitigation investigation; "The obligation to investigate mitigation exists regardless of the expressed desires of the client.").

The reasoning also rested on an unreasonable determination of the facts. While Mr. Rishel claimed in his affidavit that the defense team visited Mr. Galloway's mother seven or eight times and concluded that his background had nothing "that would shock the conscience of the jury in terms of mitigation," App. 304a,  the defense time sheets disclose that the discussions did not focus on developing background information but on encouraging Mr. Galloway to plead guilty.  *See* App. 303a; App. 331a; App. 326a. Indeed, Mr. Rishel himself described only a limited focus of his interest in the family: he wanted witnesses "who would testify that Mr. Galloway would have visitors," "would be a good prisoner," "his family loved him and would visit him," and he "could still have a positive impact on his family and his children." App. 304. . Furthermore, the few family members that trial counsel met, including his mother, said that counsel asked only cursory questions, and never met with many others the family suggested. App. 343a, 349a, 352a, 360a, 625a, 643a, 876a. Mr. Galloway's mother stated that counsel and the investigator enlisted her to urge her son to take a plea and asked her to beg for his life on the witness stand, but did not recall any questions about "my family or Bo's life growing up." App. 343a.  The state court could have ordered an evidentiary hearing to resolve the contested question of the extent of counsel's family inquiries, but it instead gave unquestioned credit to trial counsel's self-serving assertions. The court thus unreasonably determined the facts. 28 U.S.C. § 2254(d)(2).

> ### c. The state court unreasonably determined the facts and unreasonably found no prejudice because some of the undiscovered evidence might have created a negative impression and the State presented serious aggravating factors.

In assessing the prejudice that flowed from counsel's general failure to investigate, the Mississippi Supreme Court theorized that several items of "new evidence" "could

have damaged him," and dismissed the evidence that Mr. Galloway "loves his children" as "cumulative" to what counsel presented at trial. And while the court acknowledged that "sharing his difficult childhood dealing with violence, extreme poverty, as well as all of his life experiences are [sic] certainly mitigating circumstances," that evidence could have exposed the jurors to proof of prior drug convictions, pending charges, and his brother's murder conviction. App. 172a, 374 So. 3d at 480. The court also gave weight to the "circumstances surrounding the capital murder conviction" and the four aggravating factors the jurors found. *Id.*

This analysis unreasonably applied *Strickland*, *Wiggins*, and their progeny. First, the court cherry-picked a few items that could have created a negative impression, without assessing the large volume of "new evidence" in the aggregate in reweighing it against the aggravating evidence, as the precedents require. *Wiggins*, 539 U.S. at 534 ("In assessing prejudice, we reweigh the evidence in aggravation against the totality of the available mitigating evidence."); *Strickland*, 466 U.S. at 695 ("When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.") (emphasis added). As the *Walbey* court observed, the argument that "any unhelpful information renders otherwise potentially mitigating evidence useless[] is foreclosed by *Willliams*." 309 F. App'x at 804-805 (citing *Williams*, 529 U.S. at 396, "addressing double-edged evidence," but subsequently finding failure to introduce the mitigating evidence, including the double-edged evidence, prejudicial).

175

Second, neither the facts of the case nor the aggravating factors the jury found could obviate that reweighing. The Supreme Court has repeatedly found prejudice resulting from counsel's failure to investigate and introduce mitigating evidence even in highly aggravated cases. *See, e.g., Buck*, 580 U.S. at 123-124 (counsel's introduction of damaging racially charged evidence prejudiced defense although petitioner convicted of double homicide committed in front of children of one victim); *Porter*, 558 U.S. at 31, 42 (counsel's failure to investigate mitigation prejudiced defense although petitioner convicted of double murder of former girlfriend and her new boyfriend); *Rompilla*, 545 U.S. at 377, 390 (counsel's failure to investigate state's case in aggravation prejudiced defense although petitioner convicted of stabbing bar owner repeatedly and setting body on fire); *Wiggins*, 539 U.S. at 514, 524-25 (counsel's failure to investigate mitigation prejudiced defense although petitioner convicted of drowning 77-year-old victim in bathtub in ransacked apartment); *Williams*, 529 U.S. at 367-68, 370-71 (counsel's failure to investigate mitigation prejudiced defense although petitioner convicted of killing victim with a mattock).[82] Again, in *Walbey*, the Fifth Circuit, applying those clearly established precedents on habeas review, rejected a similar argument as a "non-starter." *See* 309 F. App'x at 804 (quoting *Gardner v. Johnson*, 247 F.3d 551, 563 (5th Cir. 2001) (rejecting argument that "brutality trumps" any mitigation)).[83]

---

[82] In addition, Williams had prior convictions for armed robbery and larceny; after the murder, he brutally assaulted an elderly woman, leaving her in a vegetative state. 529 U.S. at 368. Following this, he stole two cars, set fire to a home, stabbed someone during a robbery, set a fire in the jail, and confessed to having the urge to choke other inmates or break their jaws. *Id.* at 418 (Rehnquist, C.J., concurring in part and dissenting in part).

[83] *See also Lewis v. Dretke*, 355 F.3d 364, 369 (2003) (finding prejudice on habeas review despite brutal shooting and beating of robbery-murder victim); *Haliym v. Mitchell*, 492 F.3d 680 (6th Cir. 2007) (prejudice found despite fact that the petitioner was involved in the stabbing death of two people); *Mason v. Mitchell*, 543 F.3d 766, 769 (6th Cir. 2008) (prejudice found even though the petitioner raped a woman and beat her to death using "a blood-stained board with protruding nails.").

Finally, the Mississippi Supreme Court's overall conclusion unreasonably applied the whole body of clearly established federal law governing a capital defense attorney's constitutional duty to conduct a background investigation. Beyond "fairminded disagreement," *see Harrington v. Richter*, 562 U.S. 86, 103 (2011), no reviewing court could reasonably entertain: not even a reasonable probability that not even one of the jurors who had heard only counsel's skimpy, stilted, twenty-two page mitigation presentation would have voted for life instead of death upon encountering a robustly developed account of Mr. Galloway's life story. Even "doubly deferential" review, *id*. at 105, does not allow a federal habeas court to tolerate a devastating constitutional violation.

### 2. The Mississippi Supreme Court unreasonably upheld trial counsel's inadequate investigation, preparation, and non-presentation of mental health evidence.

The Mississippi Supreme Court began its discussion with an unreasonable determination of the facts: it said that "Galloway's defense counsel did contact Dr. Smallwood in an attempt to evaluate Galloway's mental health."  App. 174a, 374 So. 3d at 480. As described above, counsel did not ask Dr. Smallwood to make a general mental health assessment and ignored her urging that he obtain a mitigation investigation. Instead, he limited her inquiry to determining whether Mr. Galloway was insane, incompetent, or intellectually disabled. MS SCt (Ex. 4, p. 1).

The state court next summarized Attorney Rishel's claims about his interactions with Dr. Smallwood—that he gave her everything that she requested and that was in his possession, and that he was unaware of anything she needed in order to decide whether Mr. Galloway was insane under the *M'Naghten* test for an insanity defense. App. 160a,

374 So. 3d at 473 (citing *M'Naghten's Case* (1843) 8 Eng. Rep. 718, 10 Clark and F.

200). It included an extensive quotation from Dr. Smallwood's report and recounted Mr.

Rishel's claim that Dr. Smallwood told him "that putting her on the witness stand during

the penalty phase would not help Mr. Galloway."  App. 160a-63a, 374 So. 3d at 473-75.

When it turned to its analysis of this claim, the court repeated citations to places in

Dr. Smallwood's report where she reported Mr. Galloway's denials of "significant

medical history," abuse or trauma, treatment with medications, treatment for mental

health issues, or significant problems with depression. App. 174a, 374 So. 3d at 480-81.

It summarized Dr. Smallwood's account of her altered opinion after receiving the fruits

of a thorough social history investigation from post-conviction counsel, and also

described the opinions of Drs. Watson, Sautter, Agharkar, and Gur. App. 174a-78a, 374

So. 3d at 481-83.

It then returned to the same factually and legally unreasonable approach it had

taken to trial counsel's deficient background investigation: it endorsed a hypothesized

"alternative strategy":

> As with Galloway's other arguments, this argument turns on the proposition
> of an alternative strategy. In reaching his conclusion that defense counsel
> was ineffective, Galloway asserts that counsel should have presented Dr.
> Smallwood with a complete history of his life. As discussed above, defense
> counsel's decision to humanize Galloway in mitigation rather than delve
> into his "life story" and present mitigating evidence that would potentially
> expose damaging evidence the defense knew it did not want the jury to hear,
> was reasonable and strategic performance, not deficient performance.

App. 178a-79a, 374 So. 3d at 483.

As described above, counsel never claimed to have pursued an "alternative"

strategy. The court's assertion that counsel had one unreasonably determined the facts.

Furthermore, the court's creation of a putative, post hoc, strategic justification for a failure

178

to conduct the foundational investigation that should precede strategy, even if it had accurately reflected the facts, unreasonably applied clearly established Supreme Court precedents, including *Wiggins*. Its reasoning here took an extra illogical turn: the court asserted that the mitigating evidence Dr. Smallwood could have provided "would potentially expose damaging evidence"—although counsel could not possibly have known about any damaging information until after developing history-informed mental health evidence in consultation with experts, not before. Furthermore, implicitly blaming Mr. Galloway himself for not volunteering mitigating information in his interview with Dr. Smallwood unreasonably applied *Rompilla* and *Porter*. Dr. Smallwood would not have needed to rely solely on Mr. Galloway as her source for background investigation if counsel had given her the social history she requested.

The state court next defended counsel's conduct because, in contrast to a report Dr. Smallwood authored for the defense in *Ronk v. State*, 267 So. 3d 1239, 1261 (Miss. 2019), her report to Mr. Rishel did not signal an "incomplete medical diagnosis," and Mr. Rishel said he gave her "everything she requested from the defense team." App. 179a-80a, 374 So. 3d at 484. The court brushed aside the glaring contradiction to "everything requested"—counsel never developed a social history, through a mitigation specialist or otherwise, as Smallwood asked—because, in the court's view, the State was correct that "it is up to Galloway's attorneys to decide how to defend his case, not Dr. Smallwood." The court determined that counsel's decision to rely on the team's fact investigator, rather than a mitigation specialist, was a "tactical" decision. App. 182a, 374 So. 3d at 485. Furthermore, "the strategic decision to humanize Galloway in mitigation had been made." *Id*.

The court's factual assertion that counsel had already made a "strategic" decision to "humanize" Mr. Galloway at the time Dr. Smallwood recommended a mitigation investigation has no support anywhere in the record and was an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). And, as described above, even if counsel did in fact decide on an alternate strategy without first conducting a constitutionally adequate investigation, the Mississippi Supreme Court unreasonably applied *Williams*, *Wiggins*, and their progeny in endorsing that course of action. Moreover, Dr. Smallwood was not a "medical" doctor and counsel did not ask her to conduct a medical examination. That Mr. Galloway's case did not present an "incomplete medical diagnosis" had no reasonable bearing on whether counsel's preparation and presentation of mental health evidence was constitutionally adequate.

Finally, the court noted the absence of any explanation from Mr. Rishel for not calling Dr. Smallwood as a witness. It speculated that "perhaps" Mr. Rishel had Dr. Smallwood on call "as a backup in the event he felt the planned strategy of humanizing Galloway failed." But rather than order an evidentiary hearing, the court accepted an equally speculative remark from co-counsel Stewart—that he did not know why Mr. Rishel did not call Dr. Smallwood "except that she was going to say something hurtful"— as a demonstration that "it was a strategic decision not to call Dr. Smallwood in the end." App. 182a-83a, 374 So. 3d at 485. The court's adoption of a factual inference from a speculative comment, without the benefit of testimony at a hearing, was once again an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2).

In sum, the Mississippi Supreme Court's analysis of the performance prong of Mr. Galloway's claim that trial counsel provided ineffective assistance in the development

and non-presentation of mental health evidence was factually and legally unreasonable and deserves no deference from this Court.

The state court did not rule at all on the prejudice prong. This Court's review is accordingly de novo. As described above, but for counsel's deficient stewardship of the investigation and preparation of this case, Dr. Smallwood, at least, could have "painted a very different picture of [Mr. Galloway's] social history and the family dynamics than [Mr. Galloway] was able to describe to me." MS SCt Second Amended Petition (Ex. 3, Aff. of Dr. Smallwood, ¶ 11). This would have led to detailed and highly mitigating opinions, including diagnoses of PTSD and Major Depressive Disorder. *Id*., par. 21. As described at length in Ground Four, Section B.5.d *supra*, there is a reasonable probability that Dr. Smallwood's opinion alone, whether or not supplemented with the opinions of other experts, would have led at least one juror to appreciate the weight of "the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind," *see Woodson*, 428 U.S. at 304, and choose life over death. Trial counsel's deficient performance accordingly prejudiced Mr. Galloway's penalty phase defense.

## G. Conclusion

The state court's unreasonable application of clearly established federal law and unreasonable determination of the facts requires this Court to review the entire claim *de novo*. *See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (when "the requirement set forth in § 2254(d)(1) is satisfied[, a] federal court must then resolve the [constitutional] claim without the deference AEDPA otherwise requires."). The Court should grant habeas relief from Mr. Galloway's death sentence, both on this ground alone and cumulatively with the other grounds in this petition.

**V.      GROUND FIVE – Counsel failed to investigate the carjacking aggravating circumstance used to obtain Mr. Galloway's death sentence and thus deprived Mr. Galloway of the effective assistance of counsel.**

To paint Mr. Galloway as a repeatedly violent man at his capital trial, the prosecution submitted his previous unarmed carjacking conviction as an aggravating circumstance. It gave trial counsel ample notice of the intent to do so. But despite knowing this conviction would be a centerpiece of the State's case in aggravation, counsel made no effort to investigate it. They reviewed none of the underlying records, conducted no inquiry into the circumstances of the plea, and pursued no challenge to either the constitutional sufficiency of the aggravator (*see infra* Ground Twenty-Four) or its weight before the jury. This failure deprived Mr. Galloway of the effective assistance of counsel in two ways. First, had counsel conducted even the most cursory reading of the carjacking case file, they would have discovered a dire conflict of interest: Mr. Galloway's attorney, Wendy Martin, had previously prosecuted him *in that very same carjacking case*, and she conducted no investigation before walking Mr. Galloway through his guilty plea. Trial counsel's ignorance of this conflict effectively forfeited Mr. Galloway's opportunity to challenge the conviction and sentence: although counsel could have filed a timely challenge to the conflict at the time of trial, years later, when post-conviction counsel finally discovered it and challenged it, the court rejected the claim as time-barred. Second, trial counsel's failure to investigate left them unable to rebut the severity of his prior conduct, which, as explained below, was by no means aggravated. Counsel's failure here is the exact type of deficient performance that the Supreme Court condemned in *Rompilla*, 545 U.S. 374, and it violated Mr. Galloway's constitutional rights to the effective

assistance of counsel and freedom from cruel and unusual punishment. U.S. CONST. AMENDS. VI, VIII, XIV.

### A. Trial counsel's failure to investigate the carjacking aggravating factor depriving Mr. Galloway of effective assistance of counsel.

An attorney has a constitutional obligation to provide effective representation. *See Strickland*, 466 U.S. at 687; *see also supra* at Section C, The Required Analysis of Galloway's Sixth Amendment Claims of Ineffective Assistance of Counsel. To establish a claim under *Strickland*, a person must show that (1) their attorney's performance was deficient as measured against "objective standard of reasonableness" and "prevailing professional norms," *id.* at 688, and (2) counsel's deficiencies prejudiced their defense by creating a reasonable probability that the outcome of the proceeding would have been different. *Id.* at 694. Here, trial counsel's failure to investigate Mr. Galloway's prior carjacking conviction fails both prongs of *Strickland*'s test.

### 1. Counsel's failure to make reasonable efforts to investigate an aggravating circumstance—even after the State provided clear notice of its intent to use it—was squarely deficient under *Rompilla*.

A core requirement of effective representation is the independent duty to investigate and prepare for trial. *See Porter v. McCollum,* 558 U.S. 30 (2009) (citing *Williams v. Taylor*, 529 U.S. 362, 396 (2000)); *Wiggins*, 539 U.S. at 522-23 (quoting and incorporating the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Section 11.4.1 (1980)); *Rompilla,* 545 U.S. 374. While that duty includes the general obligation to uncover mitigating evidence in a capital case, *see*, *e.g.*, *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), capital counsel is specifically "bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of

aggravation at the trial's sentencing phase." *Rompilla*, 545 U.S. at 374; *see also* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Rev. Ed., Guideline 10.11(A) (2003) ("[C]ounsel at every stage of the case have a continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation."); *see also* Guideline 10.7(A).

In *Rompilla*, the Supreme Court found it "obvious" that counsel's performance was deficient when she did not investigate a prior conviction that the State told her it intended to use against her client at trial. *Id.* at 383. In a "plea letter" before trial, the prosecution informed counsel that it intended to introduce Mr. Rompilla's prior rape and assault conviction to establish the aggravating circumstance of a previous conviction involving the use or threat of violence. *Id.* The prosecution also stated that it would emphasize Mr. Rompilla's violent character by presenting the victim's testimony from the earlier case. *Id.* The court file for the prior conviction, which included the transcript and other relevant materials, was a public record that was "readily available for the asking at the very courthouse where [Mr.] Rompilla was to be tried." *Id.* at 384. Despite this advance notice and the ease with which counsel could have obtained the file, she did not review any part of it before the start of Mr. Rompilla's sentencing trial. And even then, counsel reviewed only the victim's testimony and none of the additional materials contained in the file. *Id.* The Supreme Court concluded that counsel's failure to investigate the prior conviction, despite knowing the prosecution would use it as an

191 of 403

aggravating circumstance and despite the file's ready availability, "fell below the line of reasonable practice." *Id.* at 390.[84]

In a near-identical situation, the performance of Mr. Galloway's attorneys fell even further below the line of reasonable practice. As in *Rompilla*, the State informed trial counsel that it intended to introduce Mr. Galloway's prior carjacking conviction to establish the aggravating circumstance of a previous conviction involving the use or threat of violence. CR 114. The court file was also readily and publicly available for counsel to access. But while counsel in *Rompilla* eventually reviewed one document within the file before trial, Mr. Galloway's counsel never opened it. Counsel affirmatively rejected the chance to review the Jackson County Public Defender Office's full file on Mr. Galloway, even after learning that the file was large and would contain mitigating information. App. 672a; App. 674a.  Counsel not only declined to investigate the aggravator that the State told them it planned to use, but they refused the opportunity to do so when it was directly presented to them.

"It flouts prudence to deny that a defense lawyer should try to look at a file he knows the prosecution will cull for aggravating evidence, let alone when the file is sitting in the trial courthouse, open for the asking." *Rompilla*, 545 U.S. at 389. Counsel's total failure to understand the nature of the aggravator, investigate the circumstances of the prior conviction, or review the readily accessible court and defender files mirrors, and in

---

[84] *See also Noguera v. Davis*, 5 F. 4th 1020 (9th Cir. 2021) (state court unreasonably rejected claim that counsel deficient for not investigating financial-gain special circumstance) (citing *White v. Ryan*, 895 F.3d 641 (9th Cir. 2018) (state court unreasonably rejected claim that counsel deficient for not investigating pecuniary gain aggravating factor)); *Daniel v. Commissioner, Alabama Department of Corrections*, 822 F.3d 1248, 1272-73, 1281-82 (11th Cir. 2016) (state court unreasonably rejected claim that counsel ineffective for failing to investigate client's prior conviction, which state introduced in aggravation, and petitioner entitled to hearing on merits of claim).

several respects exceeds, the deficiencies in *Rompilla*. No reasonable attorney could consider counsel's conduct consistent with prevailing professional norms. *Rompilla*, 545 U.S. at 390. Under *Strickland*, this conduct "fell below an objective standard of reasonableness," and therefore satisfies the first prong of the ineffective-assistance test. *Id.* at 688.

### 2. Counsel's failure prejudiced Mr. Galloway.

*Strickland's* second prong turns on "whether 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Rompilla*, 545 U.S. at 390 (quoting *Strickland*, 466 U.S. at 694). Counsel's failure to investigate the carjacking aggravator prejudiced Mr. Galloway in two independent ways. First, because counsel never examined the file, they remained unaware of (and thus never challenged) a glaring, undisclosed conflict of interest in Mr. Galloway's representation: his defense attorney in the carjacking case had previously served as the prosecutor in that very matter. Second, counsel's failure to investigate left them with no understanding of the underlying facts of the carjacking that they could have used to contest whether it qualified as an aggravating factor at all, or at least to diminish its weight.

> ### a. Counsel's failure to investigate left them unaware of Wendy Martin's conflict in representation and effectively waived Mr. Galloway's ability to challenge the aggravator or conviction on that basis.

Had trial counsel conducted even the most cursory of paper investigations, they would have learned that Mr. Galloway's prior carjacking conviction rested on a dire conflict of interest. By obtaining the records of the conviction, post-conviction counsel quickly learned that Wendy Martin, the lawyer who represented Mr. Galloway in his

carjacking plea, had previously prosecuted Mr. Galloway *in the very same case*. App. 746a; App. 842a.

Ms. Martin was the Assistant District Attorney in Jackson County initially assigned to prosecute Mr. Galloway for carjacking. She appeared against him on behalf of the State for at least three court appearances; she announced on the record that she was ready to try Mr. Galloway for the crime. She had evaluated the facts and strength of the case against him and offered him a plea. *See Galloway v. State*, MS. S.Ct. No. 2018-CA-01427-SCt, *Brief of the Appellant* at 3, 8-9, & cited exhibits. The case became inactive when Mr. Galloway did not appear for a court proceeding, and in between his non-appearance and rearrest Ms. Martin entered private practice. His family retained her to represent him. One day after her appointment, she asked the Public Defender's Office about the plea offer that her former office had made him. She made no efforts to investigate the case, and ultimately walked him through a plea to the charges just a day after receiving the indictment. MS SCt, Second Amended Petition (Ex. 83, Mot. to Vacate Carjacking Conviction, p. 7). As soon as post-conviction counsel discovered Ms. Martin's identity and realized the many failures in her representation, they filed a Motion to Vacate Conviction and Sentence on May 1, 2015, raising two claims: 1) that Ms. Martin's conflict of interest, neither disclosed to nor waived by Mr. Galloway, violated his constitutional rights to due process and the effective assistance of counsel; and 2) that Mr. Galloway was denied the effective assistance of counsel due to Ms. Martin's failure to investigate the case. *Id.* at p. 11, 25.[85]

---

[85] Mr. Galloway amended the motion on June 3, 2015, with additional supporting evidence. MS SCt, Second Amended Petition (Ex. 84, Amend. to Mot. to Vacate Carjacking Conviction). Mr. Galloway then amended the motion again to include a new claim, under *Brady v. Maryland*, 373 U.S. 83 (1963), after learning new,

The Jackson County post-conviction court ruled that his carjacking claims were time-barred under Mississippi's Uniform Post-Conviction Collateral Relief Act (UPCCRA), having been filed more than seven years after Mr. Galloway's conviction for carjacking, and also that they were without merit. App. 968a-98a. On appeal, the Mississippi Supreme Court agreed. *Galloway v. State*, 298 So. 3d 966, 968 (Miss. 2020). However, despite its decision to uphold the time bar and to affirm the lower court's merits ruling on the basis of its fact-finding, "which we are not permitted to second guess," the state court also noted "great consternation with the obvious lack of diligence on Martin's part in this case." *Id.* at 976.

The UPCCRA required that Mr. Galloway's carjacking conviction be challenged in post-conviction within three years of the entry of judgment on May 17, 2007. *See* App. 754a; MS Stat. § 99-39-5(2). His capital trial counsel's appointment in December 2008 fell easily within this timeframe. App. 302a. Therefore, had trial counsel investigated this conviction, they would have discovered the glaring conflict of interest and could have challenged the carjacking before the statute of limitations elapsed. *See Galloway v. Cain*, No. 1:20-CV-00271-HSO-RPM, ECF No. 12, 8 (S.D. Miss.) (July 26, 2021) ("Galloway's carjacking conviction had not yet expired at the time of his 2010 conviction and sentence for murder. Thus, he could have initiated habeas proceedings on the carjacking conviction prior to the expiration of his sentence and avoided the jurisdictional issue now confronting the Court.").

---

exculpatory information from the complainant that the State had not disclosed to trial counsel. MS SCt, Second Amended Petition (Ex. 85, Second Amend. to Mot. To Vacate Carjacking Conviction).

Trial counsel's failure to obtain the file, investigate, and timely raise this challenge undeniably was deficient performance. See *Rompilla*, 545 U.S. at 377 (2005) (counsel was ineffective in failing "to make reasonable efforts to obtain and review materials that counsel [knew] the prosecution [would] probably rely on as evidence of aggravation at the sentencing phase of the trial"); *see also Kimmelman v. Morrison*, 477 U.S. 365, 503 (1986) (counsel's performance was deficient when counsel failed to file a timely motion to suppress due not to strategy but to counsel's mistaken belief that the state would turn over incriminating evidence without the need to conduct discovery); *United States v. Gladden*, 394 F. Supp. 3d 465, 476 (S.D.N.Y. 2019) (trial counsel was ineffective for failing to file a timely motion to suppress); *United States v. Mercedes-De La Cruz*, 787 F.3d 61, 66 (1st Cir. 2015) (trial counsel's failure to file a timely motion to suppress was ineffective assistance).

Counsel's deficiency prejudiced the defense: there is a reasonable probability that, if trial counsel had timely challenged the carjacking conviction on the basis of Martin's conflict of interest, they could have secured its reversal and the State could not have used it in aggravation at Mr. Galloway's capital trial. *See Johnson v. Mississippi,* 486 U.S. 578 (1988). Mr. Galloway explains below why the Mississippi Supreme Court unreasonably concluded otherwise.

Because the State relied on the carjacking conviction to paint Mr. Galloway as a dangerous man, there is a reasonable probability that, without it, at least one juror would have voted for life.

**b. Counsel's failure to investigate the facts that mitigated the State's aggravating factor left Mr. Galloway incapable of challenging the factor at trial.**

Even if counsel could not have excluded the carjacking conviction, a reasonable investigation of the incident would have revealed not only the conflict of interest but also the circumstances surrounding the incident, which, if presented, could have decreased the weight the jury placed on the aggravating factor. Had counsel obtained the plea transcript, they would have learned of its extremely favorable description of the facts:

> Mr. Galloway was – just turned 18 when this carjacking happened. He was in high school. Basically, your Honor, what happened is that they had been drinking a little, they had gotten in the car with the girls. They had been riding around. The girls decided that they wanted them to get out. Mr. Galloway agreed to put $5 worth of gas in the car. They drove around a little more, and they got into an argument. He pulled the girl out of the car and drove home, because he didn't want to walk. This is what the argument started over, about him getting out of the car and walking. He was very young.

App. 866a-68a. Capital trial counsel also would have observed many red flags in the discovery that called into question the scenario alleged by the complainant, Monica Simmons. For instance, Ms. Simmons initially identified Marcus Jackson and a boy named Dewayne as the ones who took her car. MS SCt, Second Amended Petition (Ex. 83, Motion to Vacate Carjacking Conviction, Exhibit 3 - Jackson County Public Defender File, at Bates 10). Next, she identified Paul Martin to law enforcement, *id.* at Bates 6, 19, and to Paul Martin's sister, from a group photograph. App. 1000a. Ms. Simmons did not identify Mr. Galloway until Paul Martin's sister Kim Martin forced Mr. Galloway at gunpoint to go over to Ms. Simmons's house, in order to clear her brother's name. App. 602a-603a; App. 1001a.

190

Trial counsel never interviewed Mr. Jackson, Mr. McCorvey, and Mr. Martin, even though they all would have been available to testify on Mr. Galloway's behalf while his capital case was pending. App. 603a; App. 596a; App. 1001a. Such inaction on counsel's part amounted to deficient performance. "Failure to call a witness may be excused based on the belief that the testimony will not be helpful; such a belief in turn must be based on a genuine effort to locate or evaluate the witness, and not on a mistaken legal notion or plain inaction." *Davis v. State*, 743 So. 2d 326, 339 (Miss. 1999). The Fifth Circuit has long recognized "that, at a minimum, counsel has the duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case. This duty is reflected in the American Bar Association Standards for Criminal Justice, a proper guide for determining what is reasonable under the circumstances." *Nealy v. Cabana*, 764 F.2d 1173, 1177-78 (5th Cir 1985) (citing American Bar Association Standards for Criminal Justice 4-4.11 (2d ed. 1980) ("The Defense Function").

An investigation would have additionally revealed other suspicious facts: that Ms. Simmons and Ms. Fairley knew Mr. Galloway's friend Marcus Jackson and that they had been talking to him for weeks; that the girls were older than Mr. Jackson and Mr. Galloway, App. 602a; that they were among a group of girls who would often come to Moss Point to meet boys and party, and that they would take a lot of pills and do a lot of drugs. *Id*.; App. 595a-596a. Investigation would also have revealed that sometimes the Moss Point boys would drive the girls back home in the girls' cars because the girls did not know the way home. *Id*.

Basic investigation would further have revealed that Ms. Simmons and Ms. Fairley called Mr. Jackson and asked him to meet them at the L'il Super convenience store in

Moss Point so that they could all go to a party together at Paul Martin's house. App. 602a. And it would have revealed that Ms. Simmons was having problems with her boyfriend that night and that her boyfriend was following her car trying to get her to stop when she pulled off and took another route. *Id.*

Because trial counsel did not investigate and learn of these favorable facts, they could not determine whether to present them. Any decision about whether or not to present this evidence to mitigate the aggravating circumstance could not have been strategic when trial counsel did not even have the information in the first place. *See, e.g.*, *Wiggins*, 539 U.S. at 521-22; *Rompilla*, 545 U.S. at 390-93.

Years later, one of Mr. Galloway's trial counsel mused that "it might have been helpful to know how aggravated" the carjacking was—including whether it was a matter of only the car being taken or also involved threats to kill. App. 328a. This thought reveals just how blindly counsel went into Mr. Galloway's trial. His comment is particularly baffling given that at the time of Mr. Galloway's capital trial and earlier carjacking plea, unarmed carjacking was not a per se crime of violence in Mississippi. *See infra* Claim Twenty-Four (challenging the legal sufficiency of the aggravating factor because the State presented no evidence of force beyond fact of conviction, which did not necessarily require it). Inquiry into this would have informed whether counsel should have challenged the sufficiency of the aggravator at trial and how counsel could rebut the aggravated version of the carjacking that the State would present. Counsel made no effort to challenge the aggravator. His inaction left him unaware that he could.

Counsel's failure to investigate this prior conviction was thus deficient. Furthermore, counsel's inaction prejudiced Mr. Galloway because counsel could have

used the information to rebut the conviction, by eliciting the victim's shifting stories about who committed the carjacking and showing that the incident stemmed from an altercation among a group of young people who knew each other and had been out for the evening. This would have undermined the prosecutor's efforts to paint Mr. Galloway as a dangerous predator. There is a reasonable probability that at least one juror would have voted for a life sentence as a result.

In sum, counsel's deficient and prejudicial performance violated Mr. Galloway's federal and state constitutional rights to the effective assistance of counsel and freedom from cruel and unusual punishment. U.S. CONST. AMENDS. VI, VIII, XIV.

**B. AEDPA does not bar this Court from granting habeas relief.**

**1. *Loper Bright* makes clear that 28 U.S.C. § 2254(d) unconstitutionally constrains federal courts' independent judgment.**

As discussed in Ground Thirty-One, AEDPA cannot limit this Court's de novo review of Mr. Galloway's constitutional claim because, if it were to apply here, it would violate the rule of constitutional avoidance, Article III, and the Supremacy Clause. *See infra* Ground Thirty-One (citing *Loper Bright Enterprises*, 603 U.S. 369). Furthermore, the State does not deny that the state court unreasonably applied clearly established federal law. *See* State's Answer at 19. This Court should accordingly afford the Mississippi Supreme Court no deference and review Mr. Galloway's claim de novo.

**2. The state court ruling was contrary to and unreasonably applied clearly established federal law and unreasonably determined the facts.**

In any event, the state court did unreasonably determine the facts and unreasonably apply established federal law at every step of its denial of Mr. Galloway's *Strickland* claim.

### a. Counsel's failure to investigate and challenge the conflict of interest.

To decide the conflict of interest claim, the state court incorporated by reference its reasoning in Mr. Galloway's earlier post-conviction appeal in the carjacking case. Relying on its earlier reasoning, it held that Mr. Galloway's claim of prejudice from capital trial counsel's failure to investigate and discover the conflict was "unfounded," because any conflict challenge would have failed even if timely pursued: the earlier appeal rejected the claim on both timeliness and merits grounds. App. 158a, 374 So. 3d at 472 (citing 298 So. 3d at 968).

The earlier appeal analysis that the state court incorporated, however, unreasonably applied clearly established federal law. Although the court cited four "seminal" decisions of the United States Supreme Court, 298 So. 3d at 975, it did not apply them to resolve the case. Those cases, collectively, hold that the Sixth Amendment guarantee of effective assistance of counsel includes the right to counsel's undivided loyalty. *Wood v. Georgia*, 450 U.S. 261, 271-72 (1981). When conflicting interests burden an attorney's representation, "the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary." *Mickens v. Taylor*, 535 U.S. 162, 166 (2002). Therefore, to obtain relief on a conflict-of-interest claim, a defendant need not demonstrate prejudice if she shows that "an actual conflict of interest adversely affected [the] lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 349-50 (1980); *accord Mickens*, 535 U.S. at 168 (citing *Sullivan*); *see also Holloway v. Arkansas*, 435 U.S. 475 (1978) (improperly requiring joint representation over timely objection necessitates automatic reversal of conviction); *United States v. Infante*, 404 F.3d 376, 391 (5th Cir. 2005) (to prevail on conflict claim, a defendant must show an actual conflict that

194

adversely affected counsel's performance, but need not show outcome-determinative prejudice).

The state court accepted the post-conviction trial court's factual finding that Ms. Martin did not remember Mr. Galloway or the facts of the case. 298 So. 3d at 976. The court then dismissed the claim because, it held, the lower court's factual finding meant that counsel had not actually "made a choice between possible alternative courses of action" and thus the conflict remained "hypothetical." 298 So.3d at 975-76. This holding unreasonably ignored Mr. Galloway's extensive showing that counsel did make a choice to encourage him to plead guilty without conducting a minimally adequate investigation. *See* Ground Four, Section A.2.b, *supra*.[86] The balance of the court's discussion reviewed three approaches state courts have taken to conflict claims based on a prosecutor's switching sides in mid-case. Some states treated the situation as "a per se conflict of interest requiring automatic reversal," while others merely deplored the practice and still required a showing of prejudice. *Id*. at 976. The Wisconsin Supreme Court followed a third way of applying federal law, requiring reversal where the conflicted former prosecutor *either* (1) knowingly failed to disclose the conflict or (2) represented the defendant in a manner that adversely affected the defendant's interests. *Id*. at 977 (citing *State v. Love*, 594 N.W.2d 806, 816-17 (Wis. 1999)).

The Mississippi Supreme Court "declin[ed] to issue a specific rule," because it "could not conclude that Martin knowingly failed to disclose the conflict." It held that it

---

[86] This also highlights the prejudice from capital trial counsel's failure to challenge the carjacking conviction. Had capital counsel raised a timely challenge, there would have been a much greater likelihood that Ms. Martin would have recalled the case.

195

need not decide whether to adopt *Love*'s two-prong test because Mr. Galloway would fail the test in any case. But it unreasonably reached that conclusion after finding he could not satisfy the first prong, without considering whether Martin's conduct failed the second prong because the conflict adversely affected her performance. Under *Love*, a defendant who satisfies *either* prong must receive relief.

Therefore, while the Mississippi Supreme Court correctly identified the controlling Supreme Court precedents, it unreasonably applied them, *see* 28 U.S.C. § 2254(d), and this Court must review the conflict claim de novo.

### b. Counsel's failure to investigate the circumstances of the carjacking and present them in amelioration of the aggravating factor.

The Mississippi Supreme Court never made a specific ruling on this aspect of Mr. Galloway's claim. It summarized Mr. Galloway's arguments in some detail, App. 157a, 159a, 374 So. 3d at 472-73, and then veered into an extended, unrelated discussion of trial counsel's failure to investigate Mr. Galloway's background and mental health and a summary of the mitigation evidence counsel did present. App. 159a-171a, *id*. at 472–79. The court never engaged with *Rompilla*'s condemnation of conduct exactly like counsel's behavior here. *See* 545 U.S. at 390.

It mentioned the carjacking factual investigation claim only obliquely thereafter, in its discussion of the cumulative claim of ineffective assistance for overall deficient investigation. First, it held that counsel reasonably "made a strategic choice to humanize Galloway rather than risk harmful evidence being presented to the jury on cross-examination of mitigation witnesses." It listed the carjacking among the types of evidence that, the court hypothesized, counsel sought to exclude. App. 172a, 374 So. 3d at 478.

Next, in assessing the cumulative prejudice that flowed from counsel's general lack of investigation, the court again theorized that counsel could have sought to exclude damaging evidence.  Among other things, the facts of the carjacking "could have been damaging" by "open[ing] the door" to evidence that the victim was dragged from her car and suffered a black eye.  App. 172a, 374 So. 3d at 479. Not only could counsel have neutralized that rebuttal by showing that the victim named three different people as the responsible parties, including one she chose from a photo array, *see* MS SCt, Second Amended Petition (Ex. 83, Mot. to Vacate Carjacking Conviction, Exhibit 3 – Jackson County Public Defender File, at Bates 6, 10, 19), App. 1000a, but counsel in any event never made any such strategy claim. *See* App. 304a-305a, 325a, 330a. The state court's reasoning therefore rested on an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(2).

It also unreasonably applied clearly established federal law.  *See Wiggins*, 539 U.S. at 534 (rejecting State's attempt to rely on strategy to defend non-investigation) *see also Williams v. Taylor*, 529 U.S. at 396 (failure to investigate and present mitigating evidence not justified as tactical decision); *Sears v. Upton*, 561 U.S. 945 (2010) (court cannot endorse a theory that may be reasonable in abstract without analyzing whether preceding investigation was inadequate); *Andrus v. Texas*, 580 U.S. 806 (2020) (rejecting argument that counsel's deficient investigation was tactical decision).  Furthermore, the "strategy" credited by the Mississippi Supreme Court did not even make sense in the abstract. Counsel knew that the State intended to introduce the carjacking conviction. Investigating ways to exclude or mitigate that evidence was the only reasonable response, with or without a "humanizing" strategy. *See Walbey v. Quarterman*, 309 F. App'x 795, 806 (5th

197

Cir. 2009) (counsel found ineffective in habeas case for not attempting to rebut facts "already introduced [via] the aggravating 'edge' of [the State's evidence].").

Because trial counsel never investigated the facts of Mr. Galloway's carjacking conviction, they were in no position to make an informed strategic decision to "humanize" him rather than present those facts to the jury. *See Wiggins*, 539 U.S. at 527–528. The Mississippi Supreme Court's adoption of the "strategy" rationalization directly contradicted controlling precedents and therefore was contrary to, or at least unreasonably applied, clearly established federal law. 28 U.S.C. § 2254(d)(1).

For all these reasons, this Court should grant Mr. Galloway habeas relief from his death sentence on this ground, alone and in combination with the other grounds set forth in this motion and in the petition.

## VI.  GROUND SIX – The State Violated Its Constitutional Duty in Suppressing Material Impeachment Evidence About Dr. McGarry's Misconduct, Depriving Mr. Galloway of Due Process of Law.

### A. Introduction

The prosecution never disclosed to the defense any records or other information about Dr. McGarry's dismissal from his job at the Orleans Parish Coroner's Office shortly before Mr. Galloway's trial. Under all the circumstances apparent from the state court record, the prosecutor knew or should have known about the dismissal. Because Dr. McGarry's sensational string of botched autopsies and loss of his job would have impeached his credibility materially on the sole question that established death-eligibility, the suppression of the exculpatory impeachment material violated Mr. Galloway's right to due process of law. U.S. CONST. AMEND. XIV; *Brady v. Maryland,* 373 U.S. 83, 87

(1963); *see also Banks v. Dretke*, 540 U.S. 668 (2004); *Giglio v. United States*, 405 U.S. 150 (1972).

### B. The State Suppressed Material Impeachment Evidence About Dr. McGarry's Misconduct.

As recounted in Grounds Two and Six of the Petition, the state's key expert, Dr. Paul McGarry, lost his job at the Orleans Parish Coroner's office in about January 2010, a few months before Mr. Galloway's trial, after conducting multiple problematic autopsies.[87] *See* Petition at 32, 122; *see also* MS SCt, Second Amended Petition (Ex. 112, McGarry Testimony – *Williams,* Tr. 5:3–16) (McGarry testifying that office dismissed him following autopsy of Cayne Miceli); MS SCt, Second Amended Petition (Ex. 115, Aff. of M. Sherman, p. 4) (reflecting the coroner's office's last payment to McGarry in January 2010).   Dr. McGarry had committed repeated professional misconduct:

- In 2005, during his autopsy of Raymond Robair, Dr. McGarry neglected any examination of the lower body, delaying the investigation into police excessive force until the Department of Justice stepped in and indicted the involved officers. *See* MS SCt, Second Amended Petition (Ex. 103, NOLA.com - Robair Media Article).

-  In 2006, during his autopsy of Lee Demond Smith, Dr. McGarry identified a pulmonary blood clot as the cause of death without dissecting the lungs, only for a second autopsy to reveal that Mr. Smith had been strangled to death. *See* MS SCt, Second Amended Petition (Ex. 124, Sun Herald – Lee Demond Smith Article).

- Also in 2006, during his examination of Gerard Arthur, Dr. McGarry wrote down findings that suggested an accident, but a second autopsy uncovered additional injuries he had missed, including four broken ribs and

---

[87] After Mr. Galloway's trial, Dr. McGarry's profound malfeasance came to national attention. In 2011, national media sources ProPublica, PBS, Frontline, and NPR looked at 2,300 coroner's and medical examiner's offices nationwide and featured Dr. McGarry and his "series of errors and oversights" in its observation of a "deeply dysfunctional system that quite literally burie[d] its mistakes." MS SCt, Second Amended Petition (Ex. 126, ProPublica – McGarry Article). Mr. Galloway did not realize that he had a *Brady* claim until his post-conviction counsel discovered this coverage and raised the issue promptly in state post-conviction review.

hemorrhages in the neck that indicated strangling as the cause of death. *See* MS SCt, Second Amended Petition (Ex. 126, ProPublica – McGarry Article).

- Finally, in 2009, during his autopsy of Cayne Miceli, Dr. McGarry attributed her death to drug use, yet a toxicology screen showed that she had no alcohol or drugs in her blood. *Id*. A second autopsy determined that Ms. Miceli died from improper restraints during an asthma attack. This prompted her family to file a lawsuit. *Id*. After McGarry was fired, another Coroner filed an amended autopsy report. *Id*.; *see also* MS SCt, Second Amended Petition (Ex. 114, Amended Miceli Autopsy).

The prosecution never disclosed any evidence of this history to Mr. Galloway or his counsel before or during trial. App. 353a. Attorney Rishel, Mr. Galloway's lead trial counsel, did not know that "McGarry ha[d] been fired . . . or when or for what cause." App. 303a. Attorney Christensen, another trial counsel, stated that she did know about the termination at the time of trial, but it was unclear how long in advance she learned about it, or whether she knew anything about the details of its underlying cause or the problems with McGarry's autopsies, which his personnel file or other documents would have disclosed. App. 330-31a. Nothing in the record reveals any prosecution disclosure of documents or other background information about Dr. McGarry.

The prosecutors, on the other hand, knew or should have known about their own witness's employment history. They called Dr. McGarry as an "expert pathologist" in Mr. Galloway's trial, predicating the theory of death-eligibility on an anal sexual battery and relying solely on McGarry's testimony to support it. R. 783:19-784:24; 675:15–678:17; 691:3–8. The prosecutor's questioning to qualify Dr. McGarry as an expert showed that he must have known that McGarry had something to hide. The prosecutor elicited his testimony that he had "been licensed to practice" as a "forensic pathologist"

for "[f]ifty years." R. 667:11–19. But in contrast to his usual questioning of other experts, the prosecutor avoided questions about where McGarry was then practicing and how long he had been practicing in that position. *Id*. at 614:7–18 (asking Jimmy Purdue "where do you work?" and "how long have you worked [there]?"); *id*. at 625:16– 22 (asking Bonnie Dubourg the same). Instead, the direct examination went:

> Q. Are you presently engaged in the practice of pathology?
> A. Yes, sir.
> Q. And where did you receive your training?
> A. I have been a professor at LSU School of Medicine for over 25 years. I've been with the Coroner's Office of Orleans Parish as a forensic pathologist for that period of time, during which I have performed more than 13,000 autopsies.

*Id*. at 667:22–668:9. The prosecutor never corrected Dr. McGarry's misleading implication that he *still* worked at the Orleans Parish Coroner's Office.

Mr. Galloway had a due process right to records and information about Dr. McGarry's termination under the United States and Mississippi Constitutions. In reliance on Mr. Galloway's foundational right to discover exculpatory evidence, his counsel moved before trial for production of all evidence required by the Constitutions of Mississippi and the United States. C. 21. At the pretrial omnibus hearing, the prosecution represented that it had "disclosed all evidence in its possession favorable to the defendant on the issue of guilt." C. 158.

The prosecution's failure to disclose any employment records or information about Dr. McGarry's termination deprived Mr. Galloway of due process of law. "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87. The suppression

of material impeachment evidence also violates the Due Process Clause. *See Giglio*, 405 U.S. at 153-54; *see also Banks*, 540 U.S. 691 (trial witness's qualified informant status was favorable evidence for *Brady* purposes); *Strickler v. Greene,* 527 U.S. 263, 281–282 (1999) (undisclosed impeachment material qualified as favorable). Furthermore, the prosecutor's knowing creation of a false impression requires a new trial "if there is any reasonable likelihood that the false testimony could have affected the verdict." *Giglio*, 405 U.S. at 154; *see Napue v. Illinois*, 360 U.S. 264, 271 (1959) (same).

The prosecution's suppression of impeaching information about a key witness's employment status and records can require relief. *See Milke v. Ryan*, 711 F.3d 998, 1019 (9th Cir. 2013) (granting habeas relief where prosecution successfully opposed discovery of, and never disclosed contents of, detective's personnel file, which would have disclosed years of misconduct and dishonesty to superiors and courts); *United States v. McClellon*, 260 F. Supp. 3d 880, 888 (S.D. Mich. 2017) (granting new trial where prosecution suppressed fact that officer who was principal prosecution witness was suspended, the day after he testified against petitioner, and later criminally charged with making false reports; even if prosecutor did not know about suspension, officer himself clearly knew and his knowledge was imputed to prosecutor).

Suppression of impeaching information about an expert can also require *Brady* relief. In *Drake v. Portuondo*, 553 F.3d 230, 234 (2d Cir. 2009), for example, the state sought to prove a sexual motive for a shooting murder, relying initially on semen traces thought to derive from the petitioner on a slide from the female victim's rectal cavity. Later, after the prosecutor had learned that this evidence was inaccurate, he consulted a psychologist who eventually offered an opinion that the defendant suffered from

"picquerism," a syndrome in which a person obtains sexual satisfaction from penetration by sniper activity or bite wounds. *Id*. at 235. The prosecutor delayed notice until the day before the expert's testimony and never corrected the expert's false claim on the stand that he formed this opinion immediately when the prosecutor told him about the case. Nor did the prosecutor correct the expert's intentionally misleading testimony about his credentials. *Id*. at 236-37. Significantly, the prosecutor asked this expert only if he had "written" any papers but asked another expert if he had "written and published" any papers. *Id*. at 238. Because the false testimony impeached an opinion that went to the only issue in the case, intent, the Court of Appeals granted relief, citing *Napue*. *Id*. at 244-45, 247; *see also United States v. Banks*, 546 F.3d 507, 509-10, 513 (7th Cir. 2008) (prosecution's withholding of evidence that expert chemist misused her government credit card warranted granting new trial motion under *Brady*); *United States v. Mahoney*, 58 M.J. 346, 347-48, 349-50 (C.A.A.F. 2003) (government violated *Brady* by failing to provide defendant with letter from command staff judge criticizing prosecution's expert witness for his skepticism about lab processes that government used; prosecutor's ignorance of letter no excuse because discoverable by reasonable diligence); *People v. Garcia*, 17 Cal. App. 4th 1169, 1175, 1183-84 (Cal. App. 1993) (state habeas relief granted where state failed to disclose evidence that accident reconstruction expert had used faulty methodology and made errors in other cases).

In this case, as in *Drake*, the withheld evidence impeached an expert whose opinion was key to establishing a sexual element to the crime, and the prosecutor evasively questioned the expert about his credentials. As in *Mahoney*, even if the prosecutor did not know about Dr. McGarry's history of botched autopsies and dismissal—although the

way he questioned him suggested the prosecutor did know or suspect—reasonable diligence in preparing the witness would have disclosed the information. As the record amply shows, Dr. McGarry had testified for the prosecutor's office many times; even if the prosecutors who tried Mr. Galloway had never heard previously about his autopsy failures and recent employment setback (a claim the State has never made in opposition to this ground for relief), his change in employment status only months before Mr. Galloway's trial would inevitably have come up during preparation for his testimony.[88]

Because the prosecutor knew or should have known about the ample evidence that impeached Dr. McGarry's opinions and credibility, he violated *Brady* by withholding records and background information about his botched autopsies and loss of employment with the Orleans Parish Coroner.

### C. The suppressed evidence was material

Regardless of whether the defense requests the evidence, favorable evidence is material, and constitutional error results from its suppression, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.); *id.* at 685 (White, J., concurring in part and concurring in judgment). The "reasonable probability" standard does not require demonstration by a preponderance of the evidence, but does require reviewing courts to assess suppressed evidence collectively, not piece by piece. *Kyles v. Whitley*, 514 U.S. 419, 434-37 (1995).

---

[88] The state court denied discovery of Dr. McGarry's personnel records. Supp. App. A82-A84. with this memorandum, Mr. Galloway has filed a motion seeking to discover the records.

The history of botched autopsies and ultimate termination would have provided powerful impeachment. Dr. McGarry was a key State's witness, *Giglio*, 405 U.S. at 154–55, and the evidence was "known to" the prosecution, or should have been known. *Kyles*, 514 U.S. at 437. As in *Drake*, 553 F.3d at 244-45, 247, the expert testimony was the prosecution's only evidence on a key issue at trial—whether there had been a sexual battery and thus a death-eligible form of homicide. There is a reasonable probability that, had the prosecution disclosed that Dr. McGarry had been fired for conducting one botched, high-profile autopsy after another, along with the records documenting the particulars, the jurors would have had a reasonable doubt about guilt on the capital murder charge, or at least one juror would have voted for life at the penalty phase. Alone and in combination with the other errors set forth in this pleading and the petition, the error prejudiced Mr. Galloway's defense at both phases of trial.

### D. The Mississippi Supreme Court unreasonably applied clearly established federal law in excusing this *Brady* violation.

The Mississippi Supreme Court rejected Mr. Galloway's *Brady* claim and excused the State's failure to disclose because, it held, the defense could have discovered the evidence through "the exercise of reasonable diligence." App. 217a, 374 So. 3d at 502-03 (citing *Kutzner v. Cockrell*, 303 F. 3d 333, 336 (5th Cir. 2002), and *Rector v. Johnson*, 120 F.3d 551, 558 (5th Cir. 1997)). Moreover, according to the court, there was no *Brady* violation because one of Mr. Galloway's counsel said that she knew that Dr. McGarry "'had been terminated.'" App. 217a, 374 So.3d at 503. The court rejected the claim as without merit. App. 218a, 374 So.3d at 503.

As explained in Ground Thirty-One, 28 U.S.C. § 2254(d) cannot limit this Court's *de novo* review of Mr. Galloway's constitutional claim because, if it were to apply here,

it would violate the doctrine of constitutional avoidance, the separation of powers enshrined in Article III, and the Supremacy Clause. In addition, the State does not deny that the state court's ruling was an unreasonable application of clearly established federal law. Answer at 20.

In any event, the state court did unreasonably apply *Brady* and its progeny. Mr. Galloway did exercise due diligence: he filed a motion requesting the production of exculpatory information. As the Supreme Court explained in *Banks*, in the course of applying the clearly established line of cases beginning with *Brady* and continuing through *Strickler* and *Kyles*:

> The State here nevertheless urges, in effect, that "the prosecution can lie and conceal and the prisoner still has the burden to ... discover the evidence," so long as the "potential existence" of a prosecutorial misconduct claim might have been detected. A rule thus declaring "prosecutor may hide, defendant must seek," is not tenable in a system constitutionally bound to accord defendants due process. Ordinarily, we presume that public officials have properly discharged their official duties. . . . Prosecutors' dishonest conduct or unwarranted concealment should attract no judicial approbation.

540 U.S. at 696 (citations modified); *see also id*. at 690-92. *Banks* preceded Mr. Galloway's trial, long before his case became final with the conclusion of direct review. *See Greene v. Fisher*, 565 U.S. 34, 38 (2011) ("clearly established federal law" under § 2254(d)(1) is the law announced by the time of state court merits decision). The cases on which the state court relied, *Kutzner* and *Rector*, predated *Banks* and could not benefit from its holding or its explanation of how *Brady* applies.

Cases following *Banks* have demonstrated renewed recognition that defendants may rely on prosecutors' good faith compliance with their disclosure obligations and their representation that they have done so. *See In re Will*, 970 F.3d 536, 542-44 (5th Cir. 2020) (granting certificate of appealability where prosecutor represented that she would

produce all *Brady* materials before trial; "Trial counsel need not assume the prosecution may be withholding information in order to exercise diligence.") (citing *Banks*); *Floyd v. Vannoy*, 894 F.3d 143, 162-63 (5th Cir. 2018) ("The State does not demonstrate compliance with *Brady*'s disclosure requirement by asserting a possibility Floyd could deduce that, based on the general evidence provided to him, additional evidence likely existed . . . the prosecutor's *Brady* duty is not absolved through asserting various opportunities available for the defense to have uncovered the evidence.") (citing *Banks*).

Nor could one defense attorney's statement that she knew by the time of the trial about Dr. McGarry's dismissal excuse the state's non-disclosure of any and all documentary records and other information related to the dismissal. *See Floyd*, 894 F.3d at 165 (defense knowledge that one witness told detective he should interview a second witness did not absolve prosecution's non-disclosure of second witness's exculpatory statement). The prosecutor's questioning suggests he knew about Dr. McGarry's dismissal, and he certainly should have known. Any reasonable prosecutor armed with such knowledge about his own expert would have acquired his personnel file, or at least a portion of it, from Orleans Parish. Thus, both of the Mississippi Supreme Court's grounds for denying relief unreasonably applied *Brady* and its progeny, and the state court's determination also rests on an unreasonable determination of facts. As noted, during PCR proceedings, Mr. Galloway sought, but was denied, relevant discovery of documents related to Dr. McGarry. Mr. Galloway, therefore, was not in a position to develop additional relevant facts even though he acted with diligence to obtain them.

The state court's ruling on this claim was contrary to, or unreasonably applied, clearly established federal law and/or involved an unreasonable determination of the

<div align="center">207</div>

facts. See 28 U.S.C. § 2254(d) (1), (2). This Court should accordingly grant Mr. Galloway habeas relief from his conviction of capital murder, or, at least, his death sentence, on this ground, alone or in combination with the other claims in this petition.

**VII.    GROUND SEVEN – The Court's Failure to Require a Clear Jury Finding That Any Penetration was Non-Consensual, Either in Its Initial Instructions or in Response to a Jury Note, Deprived Mr. Galloway of His Rights to the Presumption of Innocence, Due Process, a Fair Trial, and a Reliable sentencing Determination.**

The trial court never clearly told the jury in its initial instructions that to convict Mr. Galloway of capital murder they must find beyond a reasonable doubt that any sexual penetration was non-consensual. During deliberations, the jury sent a note inquiring whether murder would "escalate the sex automatically to sexual battery," and asking the court to define sexual battery and rape. The court responded that it would provide no further instructions. Together, the instructions and non-response to the note created a risk that the jury convicted Mr. Galloway without actually finding him guilty of a death-eligible offense. The judge's refusal to ensure that the jury determined every element of the crime deprived Mr. Galloway of his rights to the presumption of innocence, due process, a fair jury trial, and a reliable sentencing determination. U.S. CONST. AMEND. VI, VIII, XIV.

Mississippi law defines sexual battery as "sexual penetration with another person without his or her consent," MISS. CODE § 97-3-95(1)(a), making a jury finding on non-consent a necessary element for conviction. *See Goodin v. State*, 977 So.2d 338, 340-41 (Miss. 2008) (reversing conviction for sexual battery because instructions had not required jury to find lack of consent). Anal sexual battery was the underlying crime that

elevated the offense to capital murder in this case. *See* Miss. Code § 97-3-19(2)(e); C.R. 10, 264.

The court instructed the jurors on the elements of murder and sexual battery without ever explaining that the jurors could not convict without determining that the penetration, rather than the homicide, must occur without consent:

> **Jury Instruction No. S-2A**
> \*\*\*
> 2. the defendant, LESLIE GALLOWAY, III, did willfully, unlawfully and feloniously and with or without design to effect death,
> 3. kill and murder Shakeylia Anderson, a human being, without authority of law,
> 4. while in the commission of the crime and felony of Sexual Battery, as defined by Section 97-3-95, Miss. Code of 1972, as amended, in that:
> 5. the said, LESLIE GALLOWAY, III, did willfully, purposely, unlawfully and feloniously engage in the act of sexual penetration,
> 6. without the consent of the said Shakeylia Anderson,
>
> \*\*\*
> **Jury Instruction No. S-3**
> The Court instructs the Jury that in order to sustain the crime of Sexual Battery some penetration must be proven beyond a reasonable doubt. However, it need not be full penetration. Even the slightest penetration is sufficient to prove the crime of Sexual Battery.
>
> **Jury Instruction, No. S-4A**
> The Court instructs the Jury that "sexual penetration" is any penetration of the anal openings of another person's body by any object or part of a person's body.

C. 262-63, 264; *see also* Supp. Tr. Jury Instructions 6-7.

During guilt phase deliberations, the jury sent a note (its third) to the judge:

> Does murder escalate the sex automatically to sexual battery?
> Please define legal term of sexual battery
> Rape

R. 790; C. 275.

Defense counsel told the court that the "first question troubles me a great deal. I don't know what it means." R. 790. The Court responded, "I don't either, but I just can't –." *Id*. Trial counsel then elaborated on his concern and proposed that the judge instruct the jurors that murder does not automatically escalate sexual conduct to sexual battery:

> The fact that if he killed her and had sex with her, does that make it sex battery, seems to me what they're asking. And the answer, of course, to that question is no, it does not . . . . *It seems to me we could at least make that part of it clear to them, tell them, no, it doesn't. It doesn't. That is not the case here.* Otherwise they might say well, you know, we believe he murdered her, since he murdered her it has to be sex battery, therefore it must be capital murder.

R. 790-91 (emphasis added). The prosecutor, ignoring the obvious indications that the jury did not understand that non-consensual penetration was a necessary element of capital murder, urged the court to give the "standard response," and the court agreed. R. 791. Without clarifying that murder does *not* automatically escalate sex to sexual battery, without defining the elements of sexual battery in a more precise way, or at a minimum, pointing the jury back to its instructions on sexual battery, and without even inquiring further about a question that it acknowledged it did not understand, the court told the jurors that they had all the instructions that applied to the case and that they should continue their deliberations. R. 790-91, C. 275. Less than an hour later, the jury returned a guilty verdict on capital murder. R. 793.

The court's original instructions failed to convey to the jurors that they must find non-consent to penetration in order to find the predicate crime of sexual battery. Instruction S-3 said only that "some penetration must be proven beyond a reasonable doubt." Instruction S-2A listed six elements, one of which was non-consent (element 6) but did not indicate that the non-consent must pertain to the battery and not the murder.

210

The jurors' question homed in on this very deficiency, asking, in effect, whether a murder automatically turned the sexual conduct into sexual battery. Because the judge refused to answer the question or even ask the jurors to clarify their confusion, there is no way to know whether their verdict represented a determination that Mr. Galloway was guilty of capital murder or of the lesser-included offense of non-capital murder.

Together, the judge's original instructions and his non-response to the jurors' note deprived Mr. Galloway of his due process and Sixth Amendment rights to a jury determination of guilt on every element of the crime. U.S. CONST. AMEND. VI, XIV; *see United States v. Gaudin*, 515 U.S. 506 (1995) (failure to submit "materiality" element of charged crime to jury violated due process and Sixth Amendment rights); *Sullivan v. Louisiana*, 508 U.S. 275, 277-78 (1993). Furthermore, the risk the instructions and non-instruction created of an unwarranted conviction of capital murder unconstitutionally diminished the reliability of the jury's determination of guilt or innocence and subjected Mr. Galloway to cruel and unusual punishment. U.S. CONST. AMEND. VIII, XIV. The jury's finding on sexual battery would differentiate capital from non-capital murder, and therefore that finding was constitutionally required. *See Schad v. Arizona*, 501 U.S. 624, 643-44 (1991) (upholding instructions that allowed capital murder verdict on alternative theories, but only because state law treated them as "moral[ly] equivalent" with same maximum sentence of death) (plurality opinion), *abrogated on other grnds*, *Ramos v. Louisiana*, 590 U.S. 83 (2020); *Beck v. Alabama*, 447 U.S. 625 (1980).

The failure of the court's jury instructions and non-instruction to ensure a jury verdict on a necessary element of capital murder was structural and requires relief without regard to any prejudice. *See Sullivan*, 508 U.S. at 277-78; *see also Weaver v.*

*Massachusetts*, 582 U.S. 286, 296 (2017) (citing *Sullivan* with approval). Even if harmless-error review applies, moreover, the error had a substantial and injurious effect on the jury's decision on guilt or innocence or, at least, on the penalty. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993); *Davis v. Guerrero*, No. 24-70008, 2025 WL 1766785 at *1, *6 (5th Cir. June 26, 2025) (grt'g certif. of appealability on challenge to death sentence and murder conviction for murder in course of aggravated sexual assault; "Just because Davis was allowed to present rebuttal testimony [to inflammatory evidence of Satanism] does not mean he effectively neutralized the potential prejudice."). Although Mr. Galloway's trial counsel ineffectively investigated, prepared, and presented evidence that would have rebutted the prosecution case for a non-consensual sexual battery, *see* Ground Two, *supra*, trial counsel did seek to sow doubt about non-consent in the jurors' minds. The jurors, as their note makes clear, likewise focused on consent, asking whether, in effect, the murder automatically elevated consensual sex to a sexual battery. The erroneous instructions alone accordingly had a substantial and injurious effect on the jurors' decision at the guilt-innocence phase or at least the penalty phase. This Court should at least find itself in equipoise on the question. *See O'Neal v. McAnanich*, 513 U.S. 432 (1995). The effect was all the more substantial and injurious, at both phases of trial, in combination with trial counsel's ineffective assistance in developing evidence to rebut the prosecution's non-consent theory, and all the other claims set forth in this pleading and the petition.

    The state court did not rule on the constitutional aspects of this claim, ruling instead on state law abuse-of-discretion grounds and concluding that "the trial court did not err."

App. 017a-021a, 122 So.3d 614, 633-35 (2013). Accordingly, this Court's review is *de novo*. *See Rompilla*, 545 U.S. at 390.

The State nevertheless maintains, citing 28 U.S.C. § 2254(d), that Mr. Galloway has failed to show that the state court ruling was "contrary to" clearly established federal law or unreasonably determined the facts. At the same time, the State does not deny that the state court unreasonably applied that federal law. Answer at 20. Moreover, as described in Ground Thirty-One, 28 U.S.C. § 2254, if construed to require federal court "deference" to state court interpretations of federal law, would violate the doctrine of constitutional avoidance, Article III, and the Supremacy Clause. This Court should review the claim *de novo* for that reason as well.

Even if § 2254(d) did limit this Court's review (but it does not), the state court unreasonably applied clearly established federal law. The trial court never made clear to the jurors their duty to reach a conclusion on the key element on which the prosecution and defense theories turned. As the Supreme Court wrote in *Gaudin*, "The Constitution gives a criminal defendant the right to demand that a jury find him guilty of all the elements of the crime with which he is charged[.]" 515 U.S. at 511. Mr. Galloway had the right to demand a jury finding on consent, but the trial court failed and then refused to instruct the jury to make that finding. Therefore, this Court should grant habeas relief on this ground from Mr. Galloway's conviction or at least his death sentence, alone and in combination with the other claims set forth in this pleading and the petition.

## VIII. GROUND EIGHT – The Evidence was Insufficient to Sustain the Predicate Felony of Sexual Battery and Thus Insufficient to Sustain Mr. Galloway's Capital Murder Conviction in Violation of the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

The State alleged that Mr. Galloway committed sexual battery by anal penetration on the night Ms. Anderson disappeared, during the commission of her murder. That predicate felony charge rendered Mr. Galloway eligible for capital murder. *See* MISS. CODE § 97-3-19(2)(e); C.R. 10 (indictment), 262-64 (jury instructions). The only evidence of sexual battery was Dr. McGarry's testimony describing injuries he observed to Ms. Anderson's anus. R. 675, 677, 678, 682, 739-40. His opinions that the injuries must have been caused by a penile penetration, to the exclusion of other means, and must have been nonconsensual, to the exclusion of consensual sexual activity, exceeded the bounds of science and should have been excluded. *See* Ground Two, *supra*. But even apart from the prejudicial inadmissibility of that evidence, the State failed to prove its case.

The Due Process Clause of the Fourteenth Amendment protects criminal defendants from conviction unless the prosecution proves every element of the crime. A habeas court reviewing a constitutional sufficiency claim asks "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *United States v. Vargas-Ocampo*, 747 F.3d 299, 300-01 (5th Cir. 2014) (following *Jackson* test). The prosecution failed to sustain its burden at Mr. Galloway's trial.

To prove capital murder, the State had to show that the homicide happened "while in the commission of the . . . felony of sexual battery."  MISS. CODE § 97-3-95. The State

214

could not do that, for two reasons. First, the evidence showed that (and the court unconstitutionally excluded additional evidence that, *see* Ground Fourteen) the victim had more than one ongoing sexual relationship. Dr. McGarry described the anal tear on which he based his conclusions only as "fresh," but otherwise gave no timeframe for it. R. 676. The State introduced evidence that Ms. Anderson had had a consensual sexual relationship with Mr. Galloway prior to her death, R. 526; State Ex. 16 at 5, and that she was sexually active with at least one other man. R. 607, 610. Given Ms. Anderson's history with Mr. Galloway and at least one other sexual partner, the State's evidence was insufficient to establish that the alleged penetration occurred during the commission of Ms. Anderson's murder, as required under MISS. CODE § 97-3-19(2)(e).

Moreover, the State failed to adduce constitutionally sufficient evidence that the alleged penetration was nonconsensual. According to the State's own evidence, Mr. Galloway and Ms. Anderson had not only had consensual sexual relations in the past but communicated by phone many times in the previous months, including on December 5, 2008. She left with him voluntarily on the night of December 5 at some time after 10 p.m. R. 422-23; 432-33; 480-82; R. 526; S-16 at 5. And, again, she had a sexual relationship with at least one other person. Thus the evidence was insufficient to establish that the anal tear occurred as a result of nonconsensual sexual activity.

Therefore, even if Dr. McGarry's testimony that the injuries must have been caused by penile penetration, to the exclusion of other means, and must have been nonconsensual, to the exclusion of consensual sexual activity, had not exceeded the bounds of science, *but see* Ground Two, the evidence would have been insufficient. Because the State failed to prove that the allegedly nonconsensual penetration occurred

during the murder and that Mr. Galloway rather than someone else was responsible, the state failed to prove his guilt of the predicate felony of anal sexual battery, and thus of capital murder, beyond a reasonable doubt. Therefore, Mr. Galloway's conviction violates the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution without regard to any showing of prejudice. S*ee Jackson*, 443 U.S. at 314-15, 324.

The State acknowledges that this claim is exhausted. Answer at 21, 32.[89] Furthermore, AEDPA places no limits on this Court's review. As explained in Ground Thirty-One, any construction of 28 U.S.C. § 2254(d) to require this Court's deference to state court determinations of federal law would violate the doctrine of constitutional avoidance, the separation of powers guaranteed under Article III of the Constitution, and the Supremacy Clause. This Court should accordingly review the claim *de novo*.

In any case, the Mississippi Supreme Court's rejection of this claim was an unreasonable application of clearly established federal law and/or an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1), (2). The court reasoned that Dr. McGarry's opinion "did not go beyond his scope of expertise" or invade the jury's province and that the evidence as a whole—the crime scene, the condition of the body, the defensive wounds, the fresh anal injury—was sufficient to sustain the jury verdict. App. 81a, 122 So.3d at 667. This unreasonably applied *Jackson*. With the prosecution's entire case for capital murder hanging on the conclusion that the anal tear occurred non-consensually and during the murder, no reasonable trier of fact could have accepted the

---

[89] Trial counsel raised the claim in a Motion for Judgment of Acquittal at the close of State's evidence and Motion for New Trial and for Acquittal Notwithstanding the Verdict. R. 686-89; C. 307-10. The State answers this claim in two places, Answer at 21 (labeled Point VIII) and 32 (labeled Point XXIV).

State's theory casting unequivocal responsibility for the tear and its timing on Mr. Galloway. *See Jackson*, 443 U.S. at 324.

This Court should grant habeas relief on this ground from Mr. Galloway's conviction and sentence of death, both on this ground alone and cumulatively with the other grounds in this pleading and the petition.

## IX.   GROUND NINE – Mr. Galloway's Constitutional Rights Were Violated by Juror Misconduct.

Mr. Galloway's constitutional rights to a fair and impartial jury, due process of the law, reliable determination of sentence, and confrontation of the witnesses against him were violated when jurors engaged in misconduct. *See* U.S. CONST. AMENDS. VI, VIII, XIV. First, contrary to the trial court's instructions, one juror watched the local news while sequestered. App. 1071a. Second, this same juror, who did not want to but ultimately did vote for execution, did so only after other jurors "pressured her" and "told her that she would get prosecuted for contempt or perjury if she didn't follow the oath she took." App. 1070a. Finally, another juror failed to disclose her prior jury service in response to a voir dire inquiry. The resulting conviction and death sentence violated the U.S. Constitution.

### A. Mr. Galloway's constitutional rights were violated when a juror violated the court's order not to watch local news and was exposed to improper extra-judicial evidence regarding the case and the victim.

The trial court sequestered the jurors at the Beau Rivage Casino Hotel in Biloxi, as required by Miss. Uniform Circuit and County Court rule 10.02 to insulate the jury from outside influence or evidence. C. 314-326 (hotel bills); R. 179, 409-411; App. 1004a. The court ordered the jurors not to watch the local news:

217

As I told you earlier, you will be housed at the Beau Rivage Hotel, and the bailiffs will be with you at all times. Each of you will have a separate room. You will have television in the room. I'm advised that they are unable to block out WLOX, the local channel. *I'm going to ask you and order you not to view WLOX during the course of this trial* because there may be some newscast regarding this case, and a lot of times the media has a tendency to say some things that are not admissible in court and can't be considered by the jury. So I'm going to ask you to watch any channel you want to other than the local channels.

R. 410-411 (emphasis added).

On the morning of the final day of trial, at the State's request, the trial court told the jury that he wanted to "make sure that everyone has abided" by his "admonitions not to watch any news media accounts of this trial or not read any news media accounts of this trial." R. 825. The court asked the jurors whether they had abided by its admonitions to avoid all news accounts of the trial. *Id.* No one admitted otherwise. *Id.* Juror Tina Swanier did not raise her hand. *Id.*

Juror Swanier failed to admit to the court that she had watched television news telecasts about the case. App. 1071a. Juror Swanier "had to see the victim" and by watching the news to do so, saw photographs not admitted at trial showing "how pretty she was." App. 1071a.

By disobeying the court's order, Ms. Swanier exposed herself to non-confronted, biased victim-impact information.[90] Ms. Swanier's intentional exposure to TV coverage undermined the trial court's attempts to limit the jurors' exposure to external influences—

---

[90] It is well-documented that news coverage tends to describe victims "in normalizing, endearing terms that connect them emotionally to the public. Perpetrators, on the other hand, are depicted in ways that emphasize their deviance and, in turn, distance them from the audience. The characterization of victims understandably elicits identification and empathy, whereas the characterization of perpetrators typically produces only alienation and anger." Craig Haney, *On Mitigation as Counter-Narrative: A Case Study of the Hidden Context of Prison Violence*, 77 UMKC L. REV. 911, 916 (2009) (reviewing norms of crime reporting). In other words, the media portrayal of victims almost certainly was highly prejudicial to Mr. Galloway.

including removing all telephones from the rooms and preventing the jurors from having access to newspapers. App. 1004a. Because the televisions could not be easily moved, jurors were on an "honor code" not to watch the local news stations about the case. *Id.*; R. 409-411.

The Sixth and Fourteenth Amendments guarantee "at the very least that the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Turner v. Louisiana*, 379 U.S. 466, 472-473 (1965) (citation modified). Those rights were denied here because the juror exposed herself to media depictions outside of court. App. 1071a. In a capital case, the jury should reach its verdict based solely on the evidence presented in court. *See Mattox v. United States*, 146 U.S. 140, 149-150 (1892), *called into doubt on other grounds by Peña-Rodriguez v. Colorado,* 580 U.S. 206, 209, (2017). The extra-judicial information that infected the juror's actions in this trial undermined the Eighth Amendment's heightened reliability requirement for capital cases.

Juror Swanier's actions also exposed her to unconstitutional and nonjudicially supervised admission of victim-impact evidence. Through her media exposure, Ms. Swainer observed "how pretty" the victim was. App. 1071a. When, if ever, victim impact evidence is admitted, it is strictly limited under the dictates of the United States Supreme Court. *See Payne v. Tennessee*, 501 U.S. 808, 823 (1991). These carefully calibrated constitutional standards were violated here when the juror was exposed to photos of the victim.

219

Ms. Swanier willingly exposed herself to the very media coverage from which the Court had tried to shield the jury in accordance with Miss. U.R.C.C.C. 10.02. R. 825. Ms. Swanier did not want to vote for death, though she eventually changed her mind. App. 1070a. While this was undoubtedly a difficult decision for Ms. Swanier, her exposure to the media's sympathetic portrayal of the pretty victim—i.e., unauthorized victim-impact evidence—ultimately placed a thumb on the scale in favor of execution. It directly bolstered the prosecution's themes in summation, which included the prosecution referring to the victim as a "little girl." R. 868-869. Furthermore, Ms. Swanier was a juror who did not want to vote for death. App. 1070a. It is more than reasonably possible that Ms. Swanier's willful exposure to victim impact evidence made the difference in her vote. Her misconduct had a substantial and injurious effect upon the outcome of Mr. Galloway's trial. *See Brecht v. Abrahamson*, 507 U.S. 619 (1993); *Smith v. Phillips*, 455 U.S. 209 (1982).

**B. Mr. Galloway's constitutional rights were violated when a death verdict was unconstitutionally coerced from a holdout juror.**

Mr. Galloway's jury only arrived at a death sentence after a group of jurors coerced a holdout for life to abandon her convictions and vote for death. Ms. Swanier, the same juror who violated the judge's order by watching local news, did not initially want to vote for execution, despite her exposure to prejudicial TV reporting, because as a mother she saw "loss from both sides." App. 1070a. But she ultimately voted for death after other jurors "pressured her" and "told her that she would get prosecuted for contempt or perjury if she didn't follow the oath she took." *Id.* The resulting death sentence violated the U.S. Constitution. *See* U.S. CONST. AMENDS. VI, VIII, XIV.

To the other jurors, it was a surprise that Ms. Swanier was selected as a juror. App. 1073a (declaration of juror Kathryn Ann Gates). She raised her hand during jury selection when asked if any prospective jurors opposed the death penalty. R. 186 (referring to Ms. Swanier, prospective juror No. 30); App. 1073a. During deliberations, Ms. Swanier's vote for life in this case became a problem for her fellow jurors. Jurors have admitted that in response to Ms. Swanier's refusal to vote for death, they reminded her of her oath, and that she, like each of them, had promised they could impose the death penalty. App. 1003a, 1073a. One of those jurors—the oldest on the jury—was undoubtedly influential and looked to as a leader in the process, for she had "served on many juries before, both civil and criminal[.]" *Id*. Ultimately, the atmosphere became so hostile in the jury room that Ms. Swanier started crying, and two of the jurors had become upset with her for "not wanting to vote for the death penalty." *Id*. Ms. Swanier's fellow jurors finally broke her when they "told her that she would get prosecuted for contempt or perjury if she didn't follow the oath she took." App. 1070a. She changed her vote from life to death.

Ms. Swanier's (pre-coercion) decision that the appropriate sentence here was one of life imprisonment without release, rather than execution, was a moral decision to which she was absolutely entitled. *McKoy v. North. Carolina*, 494 U.S. 433 (1990) (juror's decision about death penalty an individual one); *Mills v. Maryland*, 486 U.S. 367 (1988) (same); *see also Witherspoon v. Illinois*, 391 U.S. 510, 519 (1968) (reversing a death sentence where the State struck every prospective juror who expressed reservation about the death penalty because even "a man who opposes the death penalty, no less one who favors it, can make a discretionary judgement entrusted to him by the State and can thus obey the oath he takes as a juror."). Responsibility for sentencing a criminal defendant to

221

death rests firmly with each individual juror. *Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985). The jurors who coerced Ms. Swanier violated these fundamental constitutional rules when they forced her to abandon her constitutionally protected, individual moral decision to vote for life.

The Sixth Amendment provides those accused of a crime the right to a trial by an impartial jury. *Alleyne v. United States*, 570 U.S. 99 (2013). This right ensures a fair trial by unbiased jurors, and the "failure to accord an accused a fair hearing violates even the minimal standards of due process." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). "There may be cases of juror bias so extreme that, almost by definition, the jury trial right has been abridged." *Warger v. Shauers*, 574 U.S. 40, 51 n. 3 (2014).

Because of the qualitative difference between sentences of execution and imprisonment, "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson*, 428 U. S. 280, 305 (1976). Further, the Eighth Amendment protects against the arbitrary imposition of death. *Furman v. Georgia*, 408 U.S. 238, 274 (1972) (Brennan, J., concurring). A death sentence based on coercion, rather than the facts of the crime or the defendant's life, is the height of arbitrariness and is unreliable. *See Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988) ("Any criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body"). Further, the Eighth Amendment protects against the arbitrary imposition of death. *Furman*, 408 U.S. at 274) (Brennan, J., concurring).

Isolated, pressured, and threatened with prosecution for contempt or perjury, Ms. Swanier was forced to choose between abandoning her own moral conviction or adhering

to it and facing the prospect of prosecution.  Her fellow jurors coerced her into believing the law required her to surrender her moral convictions or face criminal prosecution. For a juror unfamiliar with the legal system, the combination of threats from other jurors and the knowledge that she had failed to follow the judge's instructions regarding media exposure would have felt extremely intimidating and coercive. It only makes sense that a fellow juror's threat, though a step removed from the judge, could be intimidating and coercive to a lay juror who does not know the law. Her own knowledge that she had violated the court's order would have made her even more susceptible to the pressure.

The death verdict, obtained under these circumstances, violated Mr. Galloway's constitutional rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution to a fair trial, to a fair and impartial jury, to due process of law, to equal protection under the laws, and to be free from cruel and unusual punishment, and had a substantial and injurious effect upon the outcome of Mr. Galloway's trial. *See Brecht,* 507 U.S. 619.

### C. Mr. Galloway's constitutional rights were violated by a juror's dishonest answer in voir dire.

Juror Kathryn Gates indicated on her juror information card that she had not served on a criminal jury before. C. 188. At the outset of voir dire, the court required the jurors to take the following oath:

> Do you, and each of you, solemnly swear or affirm you will true and correct answer make to questions that shall be propounded to you by the Court, touching your qualifications as jurors, so help you God?

R. 156. The jurors responded, "I do." *Id.* During voir dire, juror Kathryn Gates and other panelists were explicitly asked to raise their hands if they had "ever served on a criminal jury before, raise your card." R. 372. Ms. Gates did not raise her hand. *Id.* As Ms. Gates

223

has now admitted in her affidavit, she had "served on many juries before, both civil and criminal[.]" App. 1073a. Her lack of candor before the court denied Mr. Galloway a fair and impartial jury and reliable determination of sentence and had a substantial and injurious impact on the trial. *See* U.S. CONST. AMENDS. VI, VIII, XIV. *Brecht* 507 U.S. 619.

Here, the question was certainly relevant and unambiguous, prompting explicit answers from several of the panelists that they had served on prior juries. R. 372 ("Anyone here who has ever served on a criminal jury before, raise your card."); R. 372-74 (colloquies of jurors who answered yes). Further, Ms. Gates proved by her sworn affidavit that she had knowledge of her past jury service. App. 1073a. Mr. Galloway would absolutely have peremptorily struck this juror had she disclosed her prior service "on many juries, both civil and criminal." *Id*. The state did not pass any regular jurors to strike who admitted to having served on a prior jury but did have and pass on the opportunity to strike alternate, Shawn Sims, who admitted to having served only as an alternate in a single trial. R. 373. Mr. Galloway's clear preference was thus to strike any juror who had previously served on other juries. Moreover, Ms. Gate's failure to come forward with the information could suggest an unwillingness to be forthcoming, indicate untold bias.

Juror dishonesty on *voir dire* can deprive a defendant of the bedrock constitutional guarantee of an impartial jury. *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984). In *McDonough*, the Supreme Court held that a party may "obtain a new trial . . . [upon proof] that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a challenge for cause." *Id.* at 556. Moreover, a juror's silence regarding matters inquired about during

*voir dire* can "so infect[] the trial as to deny due process." *Williams v. Taylor*, 529 U.S. 420, 442 (2000) (finding evidence of juror bias where juror failed to give truthful responses on *voir dire* and where the juror's explanations for so doing were incredible); *see also Smith v. Phillips*, 455 U.S. 209, 217, 219-221 (1982).

### D. The Mississippi Supreme Court unreasonably applied clearly established federal law and unreasonably determined the relevant facts.

The Mississippi Supreme Court's ruling was contrary to, or an unreasonable application of, clearly established federal law and unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1)(2). "[T]he Supreme Court has clearly established a constitutional rule forbidding a jury from being exposed to an external influence." *Oliver v. Quarterman*, 541 F.3d 329, 336 (5th Cir. 2008) "Under *Mattox* and its progeny . . . evidence of "external" influence is admissible" including "publicity and information related specifically to the case the jurors are meant to decide," *Allen v. Vannoy*, 659 F. App'x 792, 801 (5th Cir. 2016). Because it "is vital in capital cases that the jury should pass upon the case free from *external causes* tending to disturb the exercise of deliberate and unbiased judgment," no "ground of suspicion that the administration of justice has been interfered with" can "be tolerated." *Mattox,* 146 U.S. at 149.  When faced with allegations of improper contact between a juror and an outside influence, courts should first ask whether the contact was "possibly prejudicial," meaning it had a "tendency" to be "injurious to the defendant." *Id.* at 150. Once deemed "presumptively prejudicial," the burden shifts to the government "to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." *Remmer v. United States*, 347 U.S. 227, 229 (1954).

Relying on Mississippi Rules of Evidence 802 and 606, the Mississippi Supreme Court denied the claim regarding Ms. Swainer as based on hearsay and that these claims constituted an attempt to impeach the verdict. App. 222a-25a, 374 So. 3d at 508-509. In doing so, it utterly failed to address the constitutional concerns raised and thus the claims should be reviewed de novo.

The Mississippi Supreme Court failed to identify or reasonably apply *Mattox* with regard to both claims involving Ms. Swainer. There was ample evidence presented of outside influence to trigger this analysis under *Mattox* and its progeny. The determination that the evidence should not be considered because the juror herself admitted to seeking out the outside influence is neither a reasonable application of the facts nor of the law. To the contrary, a juror's admission of her own misconduct is still evidence of "external influences" and the requirement that jurors must not be permitted exposure outside influence to preserve the right to a fair trial and impartial is invariably clear.[91] *Oliver*, 541 F.3d at 336. While sequestered, contrary to the trial court's instructions, Ms. Swainer watched the local news in violation of the instructions of the trial court. App. 1071a.

This same juror, who did not want to but ultimately did vote for execution, did so only after other jurors "pressured her" and "told her that she would get prosecuted for contempt or perjury if she didn't follow the oath she took" after she had already violated the trial court's instruction that she not watch the local news. App. 1070a. Discounting a

---

[91] To the extent that the Mississippi Supreme Court relied on Rule 802, the hearsay rule, to avoid considering this evidence, this was also unreasonable given that there was no hearing and no opportunity to call Ms. Swainer to testify. Moreover, under Rule 804, if Ms. Swainer were to refuse to testify a hearing, her statement against interest contained within the affidavit could be made admissible.

number of cases addressing the impact of coercion on a juror,[92] the court denied the coercion claim pertaining to Ms. Swainer because the coercion did not come directly from the judge and because the court viewed the argument as an attempt to impeach the verdict under Mississippi Rule of Evidence 606. App. 224a, 374 So. 3d at 5071. In doing so, the court unreasonably interpreted the facts when it failed to consider that Mrs. Swainer would likely have been more susceptible to coercion because she knew she had already violated the court's instructions. In failing to consider the totality of the circumstances, the Mississippi Supreme Court's ruling rested on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). At the very least they necessitate an evidentiary hearing and further inquiry. *Williams v. Taylor,* 529 U.S. 420, 442 (2000).

Because the Mississippi Supreme Court did "not make factual findings regarding the effect of an external influence" then this Court should "conduct a harmless error analysis using the *Brecht* standard without having to defer to any state court findings." *Oliver*, 541 F.3d at 343. Without question, Ms. Swainer's exposure to media and coercion had a substantial and injurious effect on the outcome of the trial. *See Brecht* 507 U.S. 619.

As to Juror Gates, the Mississippi Supreme Court denied relief on this issue, finding that Mr. Galloway failed to establish prejudice. *Galloway,* 122 So. 3d at 510. This Court's review is *de novo* because the Mississippi Supreme Court did not rule on the federal constitutional aspects of this claim, instead relying on *Odom v. State*, 355 So. 2d 1381, 1383 (Miss. 1978), a case based on Mississippi construction of Mississippi laws and jurisprudence. The court failed to identify the appropriate federal caselaw outlined

---

[92] See *Kelsey v. United States*, 47 F.2d 453, 454 (5th Cir. 1931); *Strickland v. State*, 348 So.2d 1105 (Ala. Crim. App. 1977); *People v. Dahl*, 160 P.3d 301, 304-306 (Colo. App. 2007) (collecting authorities); *State v. Fourchy*, 25 So. 109, 112 (La. 1899).

above and this Court's consideration should be *de novo*. Regardless, the ruling was contrary to, or an unreasonable application of, clearly established Federal law. 28 U.S.C. § 2254(d)(1). The Mississippi Supreme Court's findings are an unreasonable application of the settled Supreme Court precedent, as described above.

Moreover, the Supreme Court's decision in *Loper Bright Enterprises* establishes that the type of "deference" that section 2254 imposes on habeas courts violates the rule of constitutional avoidance and both Article III and the Supremacy Clause. 603 U.S. 369. This Court should accordingly review Mr. Galloway's constitutional claims independently without granting deference to the state court.

This Court should grant Mr. Galloway habeas relief from his conviction of capital murder and death sentence, or from his death sentence alone, based on this claim and cumulatively with the other claims in this petition.

## X.    GROUND TEN – The Statutory Petit Jury Oath Prevented Mr. Galloway From Vindicating His Constitutional Right To Determine Whether The Prospective Jurors In His Case Could Be Fair And Impartial And Follow The Law.

The central purpose of voir dire is to determine whether prospective jurors are able to render true verdicts in accordance with the law and evidence. The United States Supreme Court held that a "defendant on trial for his life must be permitted on voir dire to ascertain whether his prospective jurors" can fairly follow the law governing capital punishment, including the law requiring jurors to consider a life sentence. *Morgan v. Illinois*, 504 U.S. 719, 735-36 (1992). Mr. Galloway was denied that "part of the guarantee" by the court's actions in administering an oath that required prospective jurors to swear that they could follow the law before voir dire and before being informed of the law. *Id*. Administration of the petit juror oath and requiring jurors to commit to following

the law before voir dire created a constitutionally intolerable risk that Mr. Galloway, through his counsel, was unable to determine whether his prospective jurors could be fair and impartial and follow the dictates of the law, depriving him of his rights under the Sixth, Eighth and Fourteenth Amendments. The Court should grant habeas relief on this ground.

Prior to voir dire, the court administered the petit juror oath, MISS. CODE § 13-5-71, requiring the prospective jurors to swear that they "will well and truly try all issues and execute all writs of inquiry that may be submitted to you by the Court during the present week and true verdicts render according to the law and the evidence so help you God?"  R. 159-60.  Then, before general voir dire questioning by the parties, the judge asked the jurors to "commit to me now … even though you don't know what the law will be until I give it to you, do you commit to me that you will follow the law that I give you at the end of the case?"  R. 335-36.  He then asked whether there was anyone who could not "make that quantum leap at this time?"  R. 336.

The Supreme Court held in *Morgan* that the voir dire in the case before it created an unacceptable risk that the defendant was not able to determine whether the prospective jurors were able to fairly follow the law.  *Id*. at 739. *Morgan* rejected the idea that general fairness questions would be sufficient to uncover those who would automatically vote for the death penalty. *Id*. At 735.  In doing so, the Court explained that "part of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors." *Id*. at 729.  The *Morgan* Court recognized one might "swear to uphold the law" but be unable to do so due to one's beliefs about the death penalty. *Id*. At 735.  The Court

229

held that the voir dire in the case before it created such a risk and reversed. *Id*. at 739 (citing *Turner v. Murray*, 476 U.S. 28, 36 (1986) (plurality opinion)).

The Supreme Court has also held that "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment… is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 424 (1985) (internal quotation marks omitted). By giving the oath before voir dire, the trial court's actions made it impossible to ascertain whether or not a substantial impairment in the ability to perform duties as a juror in accordance with jury instructions existed because those jurors had already committed to following the law.

Having jurors swear that they will return "true verdicts render[ed] according to the law and the evidence" before they are questioned undermines the purpose of voir dire. R. 159-60. Jurors who have sworn that they will render such verdicts and have committed to doing so before they are questioned are locked into that prior oath and would be forced to break that oath to admit the truth of their closely held convictions. They will be far less willing to admit during voir dire that they are unable to follow the law (to admit that they are unable to do so would be to admit in effect that they had sworn falsely). Accordingly, the oath administered, and the commitment required of jurors to follow the law created a constitutionally intolerable risk that Mr. Galloway was denied his constitutional right constitutionally adequate voir dire and to a fair and impartial jury in violation of *Morgan*.

The Mississippi Supreme Court dismissed this argument outright, finding it to be "meritless." 122 So. 3d 614, 678. The Mississippi Supreme Court's rejection of this claim

was contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1).

While identifying the controlling caselaw of *Morgan*, the Mississippi Supreme misapplied its holding and unreasonably interpreted the relevant facts. *Galloway*, 122 So. 3d 677. The Mississippi Supreme Court focused not on the impact of the error in when the oath was administered and how it impacted the jury, but instead focused on the substantive actions taken by the trial court in instructing the jurors on the law, deciding that because some jurors admitted that they would automatically impose the death penalty, then the administration of the oath was harmless. *Galloway*, 122 So. 3d 677–78. This ignores *Morgan*'s determination "that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so" while also exaggerating the importance of the jurors who admitted they would automatically vote for death. *Morgan*, 504 U.S. at 735-736 (internal citations omitted). In doing so, the Mississippi Supreme Court discounted the "risk that such jurors may have been empaneled in this case and infected petitioner's capital sentencing [is] unacceptable in light of the ease with which that risk could have been minimized." *Id.* Therefore, the Mississippi Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law and constituted an unreasonable interpretation of the facts. 28 U.S.C. § 2254(d)(1)(2).

Moreover, the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), establishes that the "deference" that § 2254 imposes on habeas courts violates Article III, the Supremacy Clause, and the rule of constitutional avoidance.

This Court should accordingly review Mr. Galloway's constitutional claims independently.

This Court should grant habeas relief on this ground from Mr. Galloway's conviction and sentence of death, both on this ground alone and cumulatively with the other grounds in this petition.

XI.    **GROUND ELEVEN – Mr. Galloway was denied his constitutional rights by the Mississippi statute limiting the jury venire to qualified electors or "resident freeholders for more than one year."**

A. **The limitations on the jury venire service in MISS. CODE § 13-5-1 are unconstitutional.**

Pursuant to MISS. CODE § 13-5-1, the jury venire in this case was limited to qualified electors of Harrison County or resident freeholders for more than one year. *See* R. 156-57. Mississippi's limitation of jury venires to qualified electors or resident freeholders for more than one year is unconstitutional on multiple grounds:

1.    It violates potential jurors' right to be free from discrimination on the basis of property ownership, *Powers v. Ohio*, 499 U.S. 400 (1991);

2.    It is not rationally related to any legitimate governmental interest and is discriminatory, *Quinn v. Millsap*, 491 U.S. 95, 106-07 (1989);

3.    It violated a defendant's right to a fair and impartial jury drawn from a fair-cross-section of the community, *Taylor v. Louisiana*, 419 U.S. 522, 528-31 (1975); and

4.    The durational element applying to resident freeholders does not serve any compelling governmental interest, *Dunn v. Blumstein*, 405 U.S. 330, 338-39 (1972)

These limitations on jury service violated potential jurors' rights under the equal protection and due process clauses of the U.S. Constitution to be free of discrimination on the basis of[93] U.S. CONST. AMENDS. V, XIV. Because jury service is a fundamental right, Mississippi must show that its property ownership requirement is narrowly tailored to serve a compelling state interest.  *Powers*, 499 U.S. at 213-14 (implying that jury service is a fundamental right).  It clearly cannot do so and, therefore, the requirement is unconstitutional.

Even if strict scrutiny does not apply, Mississippi's property ownership requirement is unconstitutional because it is not rationally related to any legitimate governmental interest and amounts to invidious discrimination.  *See Quinn v. Millsap*, 491 U.S. 95, 106-07 (1989) (Missouri requirement that only owners of real property can serve on government boards violated equal protection clause because not rationally related to any legitimate governmental interest); *Turner v. Fouche*, 396 U.S. 346, 361-64 (1970) (similar).   Further, exclusion from jury service on the basis of financial status, which directly affects whether one can own property, is constitutionally impermissible. *See Carmical v. Craven*, 547 F.2d 1380, 1382 (9th Cir. 1977).

Moreover, Mr. Galloway had a constitutional right to a fair and impartial jury drawn from a fair-cross-section of the community, which was denied him by the State's limitations on the jury venire. *See* U.S. CONST. AMENDS. VI, XIV; *see also Taylor v. Louisiana*, 419 U.S. 522, 528-31 (1975). "To establish a prima facie violation of the fair cross section requirement: the defendant must show (1) that the group alleged to be

---

[93] A criminal defendant has standing to raise equal protection claims of third parties who were excluded from jury service. *Powers v. Ohio*, 499 U.S. 400, 410-11 (1991).

excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process." *United States v. Williams*, 264 F.3d 561, 568 (5th Cir. 2001) (citing *Duren v. Missouri*, 439 U.S. 357, 364 (1979)). Here, the excluded groups are distinctive groups in the community— new non-elector freeholders and all non-elector residents who do not own property.  In addition, the exclusion of these groups means that their representation in jury venires is not fair and reasonable in relation to the number of such persons in the community.  In Harrison County, 38% or approximately 27, 278, of all occupied housing units were not owner occupied at the time of the 2010 census. Thus many of the residents do not own property and therefore are not eligible for jury duty if not electors.[94]

Further, the statute's one-year residency requirement for non-elector freeholders makes it a durational residence law, and because the requirement does not further any compelling state interest it violates the fundamental rights to vote and to travel as guaranteed by the equal protection clause.  *See Dunn v. Blumstein*, 405 U.S. 330, 338-39 (1972) (holding that state laws requiring a would-be voter to have been a resident for a year in state and three months in county do not further any compelling state interest and

---

[94] *See Mississippi: 2010, Summary of Population and Housing* (2012), Mississippi: 2010  (last visited November 26, 2025).*See also*  HYPERLINK "https://fred.stlouisfed.org/series/HOWNRATEACS028047"Homeownership Rate (5-year estimate) for Harrison County, MS (HOWNRATEACS028047) | FRED | St. Louis Fed (stlouisfed.org), , HYPERLINK "https://fred.stlouisfed.org/series/HOWNRATEACS028047"https://fred.stlouisfed.org/series/HOWNRATEACS028047 (last visited November 26,2025).https://fred.stlouisfed.org/series/HOWNRATEACS028047 (last visited November 26,2025).November 26,2025).https://fred.stlouisfed.org/series/HOWNRATEACS028047 (last visited November 26,2025).

violate equal protection, and that requiring only 30 days of residence would be ample for the state to complete whatever administrative tasks may be needed).

**B.  No procedural bar prevents this Court's review.**

The state maintains that this claim is procedurally defaulted because trial counsel failed to make a contemporaneous objection. Answer at 23.  The Mississippi Supreme Court stated that the claim was procedurally barred because trial counsel did not object, and that it was also meritless.  App. 103a, 122 So.3d at 679.

As described at Section D.1 The Default Rulings Were Not Independent of Federal Law, *supra,* at the time of the default, that is at trial, the contemporaneous objection rule was not independent of federal law because judicially created exceptions required a reviewing court to determine whether a federal violation had occurred before deciding whether the exception applied.  Furthermore, any application of newly stringent procedural bar decisions would be inadequate to bar federal habeas review because the rules they announced were not "firmly established" at the time of any defaults. Finally, no default bar prevents this Court from granting relief for the cumulative effect of any defaulted claims with those entitled to merits review.

Accordingly, the state court's "waiver" ruling on this claim imposes no procedural bar to this Court's review.

**C.  The Mississippi Supreme Court unreasonably applied clearly established federal law and unreasonably determined the facts.**

As described in Ground Thirty-One, 28 U.S.C. § 2254, if construed to require federal court "deference" to state court interpretations of federal law, would violate the doctrine of constitutional avoidance, Article III, and the Supremacy Clause.  This Court's review should therefore be *de novo*.

The Mississippi Supreme Court's rejection of this claim was in fact an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1), (2). The Mississippi Supreme Court found this issue to be meritless, without identifying or applying the controlling federal constitutional cases, by relying on *Jordan v. State*.  App. 103a, 122 So. 3d 679.  *Jordan* does not address the any of the individual constitutional issues raised.  *Jordan v. State*, 786 So. 2d 987, 1023–24 (Miss. 2001).  Instead, it addresses only a claim that MISS. CODE § 13-5-1 is unconstitutional because it denied Mr. Jordan a fair cross section only on the basis of age and literacy, not property ownership. *Id*. The Mississippi Supreme Court held the claim to be "without merit as we have held that Mississippi's jury eligibility statute with regard to age and literacy is constitutional." *Jordan v. State*, 786 So. 2d 987, 1023–24 (Miss. 2001).  The cases relied upon in *Jordan*, likewise, do not address the constitutional issues raised in the direct appeal and presented here.

The state court's refusal to analyze multiple constitutional flaws in  Mississippi's statute under the clearly established standard therefore requires this Court to review the claim *de novo*. *See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (when "the requirement set forth in § 2254(d)(1) is satisfied[, a] federal court must then resolve the [constitutional] claim without the deference AEDPA otherwise requires."). The Court should grant habeas relief on this ground from Mr. Galloway's conviction and death sentence, both on this ground alone and cumulatively with the other grounds in this petition.

XII.    **GROUND TWELVE – Forcing Mr. Galloway to Wear a Stun Belt at Trial Deprived him of his Right to the Presumption of Innocence, Due Process, a Fair Trial, a Reliable Sentencing Determination, and Effective Assistance of Counsel.**

A. **Introduction**

Physical restraints are "an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold." *Illinois v. Allen*, 397 U.S. 337, 344 (1970); *see also United States v. Durham*, 287 F.3d 1297, 1306 (11th Cir. 2002) (holding that the use of a stun belt denied defendant the Sixth Amendment right to be present at trial). *Deck v. Missouri* prohibits the use of a physical restraint on a criminal defendant without an individualized finding of necessity. 544 U.S. 622, 631-635 (2005). Otherwise, these restraints are impermissible. *Id*. The State physically restrained Mr. Galloway with a stun belt throughout his trial, during both phases. The State never offered any security justification for the use of the stun belt, and the trial court never demanded one. His lawyers did not object to the use of the stun belt. The State's unjustified use of a stun belt, and counsel's failure to object to it, denied Mr. Galloway the rights to effective assistance of counsel, the presumption of innocence, due process, a fair trial and a reliable sentencing determination. *See Deck*, 544 U.S. at 626; *Strickland*, 466 U.S. at 691-692, 694; U.S. CONST. AMENDS. VI, VIII, XIV.

**B. The trial court and trial counsel violated Mr. Galloway's constitutional rights when officers were permitted, without justification, cause, or objection, to place a "stun belt" on Mr. Galloway.**

**1. Relevant Facts**

At his trial, the security officers placed a stun belt[95] and shackles on Mr. Galloway. The use of this restraint was completely unwarranted. The stun belt threatened, at any moment, to shock him with thousands of volts of electricity. No one—not the court, the State, defense counsel, or courtroom security—placed on the record that Mr. Galloway was being subjected to the unjustified use of a stun device. Neither the State nor the court offered any security justification. The trial court conducted no hearing on the matter and thus failed to weigh such security interests against Mr. Galloway's rights to be present, to counsel, and to a fair trial. His counsel did not object.

"Both Attorneys Stewart and Christensen were aware Galloway wore an electronic restraint during at least some stages of his trial."  App. 234a, 374 So. 3d at 510. Because Mr. Galloway's lawyers, who after learning of both the stun device and shackles,

---

[95] *The "Stunning" Truth: Stun Belts Debilitate, They Prejudice, and They May Even Kill,* 15 Cap. Def. J. 383, 385-386 (2003), describes how stun belts work:

> The belt that courts use most often is the Remote Electronically Activated Control Technology ("REACT") belt, which is manufactured by Stun-Tech, Inc. The belt is placed over the defendant's waist, and prongs that are connected to two nine-volt batteries are attached to the defendant over the left kidney area. The belt is designed to deliver a 45,000-50,000-volt shock for eight seconds when activated by a remote control that is within 300 feet of the belt. Once someone activates the belt, that person cannot stop the shock manually; the shock will last for the full eight seconds.

The force of the shock knocks most wearers to the ground. The victim may shake uncontrollably and could remain incapacitated for up to fifteen minutes. Some victims have suffered more severe or long-term effects, such as muscular weakness for thirty to forty-five minutes, immediate and uncontrolled defecation and urination, welts on the skin that require as long as six months to heal, heartbeat irregularities, and seizures.

ineffectively failed to object, these facts only came to light through post-trial interviews with defense counsel. App. 327a, 331a.

Though Galloway's attorney mentioned in a declaration that the shackles may have been covered by his pants, common sense renders a conclusion that the shackles were visible to the jury. App. 331a. Shackles, to prove effective, all have one common thread: a chain that links the cuffs from one body party to the next. It is, therefore, logically impossible for the chain linking one leg to the other to have been covered completely by his pants.

### 2. During the trial, Mr. Galloway was subjected to unwarranted restraints because the court failed to inquire whether physical restrains were necessary.

In *Deck*, the Supreme Court recognized that the federal constitution's prohibition against forcing defendants to wear visible physical restraints without justification has "deep roots in the common law." *Deck*, 544 U.S. at 626 (citing Blackstone and other early authorities). These constitutional concerns, in turn, are based upon "three fundamental legal principles":

(1) because the criminal process presumes that the defendant is innocent until proved guilty, shackling undermines the presumption of innocence and the related fairness of the factfinding process;

(2) the use of physical restraints diminishes the right to counsel because they can interfere with the accused's ability to communicate with counsel and participate in their own defense;

(3) restraints impair the ability of judges to maintain a judicial process that is dignified and reflects the importance of the matters at issue, including the

respectful treatment of defendants, to inspire confidence in the proceedings. *Id.* at 630-631.

These principles apply with even greater urgency to stun belts. *See Durham*, 287 F.3d at 1306 (stating that "[s]hackles are a minor threat to the dignity of the courtroom when compared with the discharge of a stun belt, which could cause the defendant to lose control of his limbs, collapse to the floor, and defecate on himself.").

Moreover, "certain practices pose such a threat to the fairness of the factfinding process that they must be subjected to close judicial scrutiny." *Holbrook v. Flynn*, 475 U.S. 560, 568 (1986). It is the responsibility of the court, not custodial law enforcement officials, to ensure "the safe, reasonable and orderly progress of [a] trial." *U.S. v. Theriault*, 531 F.2d 281, 284 (5th Cir. 1976).

While shock belt devices are not always visible to a jury, their use raises the same—and often greater—constitutional concerns than the Supreme Court has outlined in barring the routine use of visible shackles without security justification. As the United States Court of Appeals for the Eleventh Circuit observed in *Durham*, a "defendant is likely to concentrate on doing everything he can to prevent the belt from being activated, and is thus less likely to participate fully in his defense at trial." 287 F.3d at 1306. Fear can be a powerful force that interferes with the right to counsel. *See id.* at 1305 ("The fear of receiving a painful and humiliating shock for any gesture that could be perceived as threatening likely chills a defendant's inclination to make any movements during trial— including those movements necessary for effective communication with counsel."). Moreover, a "stun belt is far more likely to have an impact on a defendant's trial strategy than are shackles, as a belt may interfere with the defendant's ability to direct his own

240

defense." *Id.* at 1306. Beyond interference with the accused's constitutional rights to present a defense and rely on counsel, the belt also poses a much greater threat to the dignity and decorum of the court than shackles, in that it "could cause the defendant to lose control of his limbs, collapse to the floor, and defecate on himself." *Id.*

A trial court must therefore exercise extreme caution and careful discretion, permitting the use of a shock belt only after setting forth the justification for it on the record. *Durham*, 287 F.3d at 1304, 1308. Indeed, state and federal courts across the country have consistently required trial courts to make specific findings of fact justifying the use of shock belts as absolutely necessary.[96]

Here, courtroom security forced Mr. Galloway to wear a stun belt and leg shackles without any determination by the trial court that his behavior required them. The purpose of a stun belt, or electronic restraint, is to control the defendant's behavior. Before using restraints, *Deck* required the judge to weigh the totality of circumstances and determine that restraints were necessary as a matter of security specific to Mr. Galloway. 544 U.S. at 632. But the trial court failed to do so. No findings, or mention at all, regarding the use of physical restraints appear on the record. It is unclear from the record what role, if any, the trial court played in determining that Mr. Galloway should wear unwarranted

---

[96] *See also People v. James*, 40 P.3d 36, 42 (Colo. App. 2001) (citing *Lucero v. Lundquist*, 196 Colo. 95 (1978)); *People v. Allen*, 222 Ill. 2d 340, 347 (2006); *State v. Powell*, 274 Kan. 618, 637 (2002); *Hymon v. State*, 121 Nev. 200, 209 (2005); *People v. Buchanan*, 13 N.Y.3d 1, 3-4 (2009) (per curiam); *State v. Washington*, 355 Or. 612, 628 (2014); *People v. Mar*, 28 Cal. 4th 1201, 1220 (2002); *State v. Franklin*, 97 Ohio St. 3d 1, 19 (2002); *State v. Youngblood*, 217 W. Va. 535, 544 (2005), *vacated on other grounds*, *Youngblood v. W. Virginia*, 547 U.S. 867 (2006); *State v. Avidan*, 322 Wis. 2d 735, ¶ 4 (Wis. Ct. App. 2009); *Morris v. State*, 554 S.W.3d 98, 110 (Tex. App. 2018, pet. ref'd); *United States v. Miller*, 531 F.3d 340, 346 (6th Cir. 2008); *United States v. Wardell*, 591 F.3d 1279, 1293, 1298 (10th Cir. 2009).

restraints. The court certainly made no on-record determination that his behavior required them.

### 3.  The use of a shock belt was unjustified.

Had the trial court inquired, it would have found that Mr. Galloway posed absolutely no threat of danger or escape in the courtroom. Mr. Galloway did not have a history of aggressive or combative behavior while in custody or in court. His trial attorney referred to him as "calm." App. 327a. There was no indication that he was a flight risk. He had no history of escape or escape attempts. In fact, during the penalty phase two corrections officers testified on Mr. Galloway's behalf regarding his behavior in prison. Both officers recalled having no disciplinary problems with Mr. Galloway while he was incarcerated. R. 815-821.

The trial court either knowingly allowed Mr. Galloway to be tried in a stun belt without making the necessary findings or ran a courtroom where a stun belt could be used without the presiding judge's knowledge. The State, by and through courtroom security, used the stun belt without justification, possibly without notification to the trial court, and without the trial court making the necessary findings.

### 4.  Trial counsel's failure to object was deficient.

Defense counsel was ineffective for failing to object to the use of a stun belt and shackles on their non-dangerous client, without any security need being alleged or found. Mr. Galloway's lead counsel did not know why he was required to wear the stun belt. App. 327a. Mr. Galloway's second- and third-chair defense attorneys sat in silence as the State physically restrained Galloway without just cause. One of Mr. Galloway's trial attorneys has since stated that (1) Mr. Galloway was the first person in Harrison County

to have been forced to wear such a device and (2) that Mr. Galloway may have worn foot shackles (under his pants), App. 331a. There is no evidence that counsel took care to confirm what devices Mr. Galloway wore, or whether either the device itself or the remote control for the device may have been visible to the jury.

Mr. Galloway's attorneys knew or should reasonably have known that a trial court must exercise extreme caution and careful discretion before permitting the use of a shock belt or other restraints. *See Deck*, 544 U.S. at 628; *see also Rush v. State*, 301 So. 2d 297, 300 (Miss. 1974) ("It is a common-law right of a person being tried for the commission of a crime to be free from all manner of shackles or bonds, whether of hands or feet, when in court in the presence of the jury."). They also should have known that a trial court could only exercise this discretion after setting forth its justification.   At a minimum, counsel should have known and confirmed that neither the stun belt, its remote control, nor the shackles were visible to the jury at any point during the trial.

Defense counsel's failure to object was not strategic. Defense counsel's failure to object or even question the use of a stun belt indicates either a neglect of known law or a clearly erroneous understanding of the law regarding stun belts that constitutes deficient performance. *Hinton*, 571 U.S. at 274. Counsel's failure to object and demand a hearing was therefore inexcusable and deficient performance.

### 5. The use of the stun belt prejudiced Mr. Galloway.

The use of the stun belt was prejudicial because of its obvious effect on Mr. Galloway's ability to communicate with counsel during his trial for his life. *See Durham*, 287 F.3d at 1305 ("The fear of receiving a painful and humiliating shock for any gesture that could be perceived as threatening likely chills a defendant's inclination to make any

movements during trial-including those movements necessary for effective communication with counsel."); *see also Stephenson*, 865 F.3d at 958-959 (vacating Stephenson's death sentence due to the fact that "a stun belt can compromise a defendant's participation in a trial because it 'relies on the continuous fear of what might happen if the belt is activated for its effectiveness.'") (quoting *Wrinkles v. State*, 749 N.E.2d 1179, 1194-195 (Ind. 2001)); *cf. Riggins v. Nevada*, 504 U.S. 127, 142-145 (1992) (Kennedy, J., concurring) (describing the "serious prejudice" that would result from forced medication of an accused, though invisible to the jury, if the defendant's "capacity to react and respond to the proceedings and to demonstrate remorse or compassion" are inhibited, or if attorney-client relations are effected); *see also Hall v. Warden*, 686 F. App'x. 671, 680-681 (11th Cir. 2017) (concluding that interference with the accused's ability to communicate with counsel would make it "unconstitutional to administer antipsychotic medication to a defendant during trial").

Mr. Galloway's defense was prejudiced by the wearing of a stun belt. It was not confirmed whether or not the jury saw or learned of the use of the stun belt or shackles. Moreover, *Deck* recognizes that there exist "kinds of prejudice"—fear can be a powerful force that can prejudice a defendant's right to counsel, to be present, and to participate beyond that which is visible to the jury. 544 U.S. at 634.

Moreover, two factors particular to Mr. Galloway and his case only heighten the prejudice here. First, Mr. Galloway's fear and anxiety about being shocked were more likely to control his movements and to interfere with his ability to confer with counsel due to past trauma and ongoing mental health problems. Mr. Galloway has an extensive trauma history and mental health history, including post-traumatic stress disorder and

anxiety attacks that began at five or six years old. *See supra*, Ground Four. Whatever anxiety, trauma and stress a stun belt would cause for a mentally healthy person would only have been multiplied for Mr. Galloway. Second, the treatment Mr. Galloway had received from his lawyers pretrial made it even less likely that he would face the risk of shock to speak with counsel during trial. Before trial, as established above, counsel barely met with Mr. Galloway. *Id*. A poor attorney-client relationship makes a person particularly vulnerable to the client-quieting and paralyzing effects of a stun belt.[97]

In *Stephenson v. Neal*, the Court of Appeals for the Seventh Circuit vacated a death sentence finding ineffective assistance of counsel where trial counsel failed to object to the use of a shock belt at trial when there was "no evidence that the defendant was at all likely to act up at the penalty phase of his trial, or at any other phase." 865 F.3d 956 (7th Cir. 2017). In finding prejudice, the Court noted the brevity of the sentencing presentation acknowledging:

> . . . the jurors may have thought it evidence that Stephenson was violent and unpredictable—evidence confirming the jury's decision to convict and encouraging it to sentence such a person, already found to be a murderer, to death. It's also possible that wearing the stun belt affected Stephenson's demeanor and appearance throughout the trial—made him nervous and fearful, which jurors might interpret incorrectly as signs of guilt. . .

> The government argues that Stephenson can't have been prejudiced by the stun belt, because the most important factor in sentencing is the crime itself, which was a trio of murders that the jury found Stephenson guilty of. But weighing against this argument is the brevity of the penalty phase, which gave salience to the stun gun's potential negative effect on the jury's assessment of Stephenson's character and may thus have influenced the jury's voting to sentence him to death.

---

[97] Though there is no mention of it in the record, it is also reasonable to assume that the use of the stun belt would have also, on some unconscious level, impacted trial counsel's interactions with Mr. Galloway. Should they have been touching him when he was shocked, they too could have been injured.

*Id.*

As in *Stephenson*, it is also possible that wearing the stun belt impacted Mr. Galloway's demeanor making "him nervous and fearful, which jurors might interpret incorrectly as signs of guilt." *Stephenson*, 865 F.3d at 959. This could have had a "potential negative impact on the jury's assessment of" Mr. Galloway's "character and may thus have influenced the jury's voting to sentence him to death." *Id.*

The use of the stun belt therefore had a substantial and injurious effect on the outcome of Mr. Galloway's trial. *See Brecht,* 507 U.S. at 637. Had the trial court engaged in the appropriate inquiry under *Deck*, considering the totality of the circumstances, Mr. Galloway would not have been subjected to unwarranted restraint.

Likewise, under *Strickland*, there is a reasonably probability that if counsel had objected to the unwarranted restraints, and taken action to show that there was no justification to use them on Mr. Galloway, the devices would have been removed. Without them, the jury likely would have acquitted Mr. Galloway of capital murder or at least one juror would have voted for a life sentence. The evidence of both guilt and aggravation was weak. As such, counsel's failure to object requires relief because "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

The State's use of a stun belt and counsel's failure to object to it denied Mr. Galloway the rights to effective assistance of counsel, the presumption of innocence, due process, a fair trial, and a reliable sentencing determination. *See Deck*, 544 U.S. 629-632; *Strickland*, 466 U.S. 668; U.S. CONST. AMENDS. VI, VIII, XIV.

246

**C. The Mississippi Supreme Court unreasonably applied clearly established federal law and unreasonably determined the facts.**

If 28 U.S.C. section 2254 is construed to require federal court "deference" to state court interpretations of federal law, that would violate the doctrine of constitutional avoidance, Article III, and the Supremacy Clause. *See supra* Ground Thirty-One. This Court's review should therefore be *de novo*.

The Mississippi Supreme Court's rejection of this claim was an unreasonable application of clearly established federal law and an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1), (2). The Mississippi Supreme Court denied relief on this issue. App. 231a-236a, *Galloway,* 122 So. 3d at 510-514. First, after determining without a hearing that the stun belt was not visible, the court refused to address the constitutional issue and determined that *Deck* was inapplicable because the stun belt was not visible to the jury. Second, the court found that wearing a stun belt resulted in no prejudice to Mr. Galloway and denied relief. App. 236a, *Galloway,* 122 So. 3d at 514.

The state court found this issue to be meritless, without applying *Deck,* instead relying on *Clark v. State,* 233 So. 3d 832, 848 (Miss. Ct. App. 2017). App. 235a, *Galloway,* 122 So. 3d at 512. Quoting *Clark*, the court determined that a trial court may exercise "considerable discretion regarding the decision to restrain a defendant, based upon reasonable grounds for apprehension". *Clark*, 233 So. 3d at 848. *Clark* does not address the individual constitutional concerns raised in *Deck* and its progeny. Instead, *Clark* applies state law that grants considerable discretion to trial judges on the decision to restrain a defendant and addresses a fact specific claim raised by Mr. Clark in a *pro se* pleading that the use of the stun belt denied him his right to a fair trial. *Id*. The cases relied upon in *Clark*, likewise, do not address the constitutional issues raised here, including the

247

right to counsel, a presumption of innocence and to be present. None of these state law precedents require, as the federal constitutional precedents do, that the judge make specific on-record findings before allowing the use of stun devices or restraints.

The Mississippi Supreme Court's decision was contrary to clearly established law in *Deck* and *Strickland.* In the instant case, trial counsel admitted they did not know why Galloway was required to wear the stun belt. This omission betrays *"a startling ignorance of the law"* which constitutes deficient performance. *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (emphasis added).

Moreover, federal appellate courts have recognized that the use of electronic restraints, even when not visible, can impede a criminal defendant's trial participation. *Durham*, 287 F.3d at 1305-306; *Stephenson*, 865 F.3d at 958-959. By distinguishing *Deck* on the basis that the stun belt was not visible, the Mississippi Supreme Court misapplied federal law. The *Deck* court's constitutional concerns were not limited to visibility but included the restraint's interference with trial participation.

Galloway was also prejudiced by both counsel's performance and the trial court's failure to hold a hearing on the matter. Though the Mississippi Supreme Court found no prejudice because the belt was hidden and Galloway was never shocked, this finding was an unreasonable factual determination under 28 U.S.C. § 2254(d)(2). No shock was sent during the trial because Galloway "never acted up." *Stephenson*, 865 F.3d at 959. Moreover, the evidence in aggravation was weak. "The possibility that the defendant's having to wear the stun belt—for no reason, given that he had no history of acting up in a courtroom—contaminated the penalty phase of the trial" and this Court, like the court in *Stephenson*, should be persuaded to grant relief. *Id*. at 959.

248

Furthermore, the court unreasonably determined the facts by assuming that the stun belt was not visible to the jury, without considering whether the remote control was visible to the jury or whether the jury had somehow come to be aware of its use. Additionally, the facts in the record demonstrate that Galloway (1) had a history of trauma and mental health vulnerabilities and (2) was known by correctional officers to be nonviolence. These facts demonstrate prejudice. *Durham*, 287 F.3d at 1305-306; *Stephenson*, 865 F.3d at 958.

As such, the Mississippi Supreme Court's rejection of Galloway's stun belt claim was both contrary to, and unreasonably applied, clearly established federal law and based on an unreasonable determination of facts. Relief is warranted under 28 U.S.C. section 2254(d). The state court's refusal to analyze the government's use of the stun belt under federal law and counsel's failure to object under the clearly established standard therefore requires this Court to review the claim *de novo*. *See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (when "the requirement set forth in § 2254(d)(1) is satisfied[, a] federal court must then resolve the [constitutional] claim without the deference AEDPA otherwise requires."). The Court should grant habeas relief on this ground from Mr. Galloway's conviction and death sentence, both on this ground alone and cumulatively with the other grounds in this petition.[98]

---

[98] In a separate motion, Mr. Galloway requests an evidentiary hearing on this matter. An evidentiary hearing is required to determine whether jurors were aware of the stun belt or shackles, evaluate the effects of the stun belt, and assess the prejudice caused by counsel's failure to object.

XIII.  **GROUND THIRTEEN – The Unwarranted Delay in Scheduling the Trial in this Case Violated Mr. Galloway's Constitutional Right to a Speedy Trial.**

The 424-day delay in scheduling Mr. Galloway's trial violated his speedy trial rights under the Sixth and Fourteenth Amendments. U.S. CONST. AMENDS. VI, XIV; *Barker v. Wingo*, 407 U.S. 514, 53 (1972). As its own dissenting justice maintained, the Mississippi Supreme Court rejected this claim by unreasonably applying *Barker*'s four-pronged constitutional speedy trial test. This Court should give the state court's decision no deference because 28 U.S.C. § 2254(d) does not limit its plenary review. Therefore, this Court should grant Mr. Galloway habeas relief on this ground.

**A. All four *Barker* factors weigh in Mr. Galloway's favor.**

In *Barker*, the Supreme Court established a four-pronged test to determine whether pretrial delay violates a defendant's right to a speedy trial under the Sixth Amendment. 407 U.S. 514. Courts must weigh: (1) the length of delay, (2) the reason for delay, (3) whether the defendant asserted his speedy trial rights, and (4) the prejudice the delay caused the accused. *Id.* at 530. Here, all four weigh in Mr. Galloway's favor.

**Length of delay.** This Court must first determine whether the length of delay is "presumptively prejudicial" to the accused. *Id.* Only then is the remaining *Barker* analysis necessary, for this factor acts as a "triggering mechanism" for the rest of the inquiry. While "the length of delay that will provoke such an inquiry is necessarily dependent on the peculiar circumstances of the case," *id.*, the Supreme Court has suggested that delay becomes "presumptively prejudicial" under *Barker* when it approaches one year. *See Doggett v. U.S.*, 505 U.S. 647, 652 n.1 (1992). Here, Mr. Galloway was arrested on December 10, 2008. R. 82. The court set his first trial date 424 days later. R. 84; App.

250

48a, 122 So. 3d at 650. As the Mississippi Supreme Court acknowledged, "the 424 day period from [Mr.] Galloway's arrest until the first trial setting exceeded eight months and is presumptively prejudicial." App. 50a, 122 So. 3d at 650; *see Doggett*, 505 U.S. at 652, n.1. This factor weighs in Mr. Galloway's favor.

      **Assertion of speedy trial rights.** A person does not waive speedy trial protections by failing to demand a speedy trial. *Barker*, 407 U.S. at 531-32 (rejecting this prior rule). Nevertheless, whether a person asserts their rights, and how they do so, is "entitled to strong evidentiary weight in determining whether a defendant is being deprived of the right." *Barker*, 407 U.S. at 531-32. This is because when a person demands a speedy trial, it supports the inference that they are not to blame for the delay and the State's delay is prejudicing them. *See U.S. v. Villareal*, 612 F.3d 1344, 1353-54 (11th Cir. 2010) (citing *Barker*, 407 U.S. at 531) ("The strength of [a person's] efforts will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences[.]"). Here, Mr. Galloway demanded a speedy trial in writing twice, on July 10 and July 29, 2009. R. 8, 13-15, 20, 21-23. He expressly asserted his desire to be tried promptly. *Cf. U.S. v. Frye*, 489 U.S. 201, 211 (5th Cir. 2007). As the Mississippi State Court agreed, this factor weighs in his favor. App. 51a, 122 So. 3d at 650; *Barker*, 407 U.S. at 531-32.

      **Reason for delay.** Where the State causes delay, *Barker* instructs that courts should weigh this factor against the State differently for different reasons. *Id.* at 531. Deliberate delay heavily weighs against the State. *Vermont v. Brillon*, 446 U.S. 81, 90 (2009). "A more neutral reason such as negligence or overcrowded courts should be weighted less heavily" than deliberate delay but still should weigh against the State

because "the ultimate responsibility for such circumstances must rest with the government." *Barker*, 407 U.S. at 531. A valid reason for delay would weigh in the State's favor, though it carries the burden of establishing that it had a valid reason. *Id.*

The State's reason for delay in this case purportedly related to delay in scientific testing. R. 86, 88. But the State provided no documentation, and alleged no facts, of actual delay in obtaining testing results. *See Flora v. State*, 925 So. 2d 797, 817 (Miss. 2006) ("This Court should not be expected to simply accept at face value the claims of crowded dockets, backlogged laboratory testing, and other similar logistical problems, which undeniably exist."). In fact, the record suggests that the State provided the very documents it sought to test at Mr. Galloway's arraignment. The defense moved for a DNA expert to review the State's testing results in July of 2009, more than six months before the trial date. C. 42-43. The court's scheduling order of August 31, 2009, directed the defense to provide discovery to the State by November 20, 2009, but did not include a date for the State to provide discovery, suggesting that the State had already provided discovery. C. 44. The lack of an adequate explanation for the delay weighs against the State. *Flora,* 925 So. 2d at 817-18; *see also Barker*, 407 U.S. at 531 (even "neutral" explanations, like delay from crowded dockets, should weigh against the State).

**Prejudice.** The final *Barker* factor is whether the accused was prejudiced by the delay in bringing his case to trial. Prejudice is "not always readily identifiable"; the accused may not know the ways in which time has hindered his ability to present a defense. *Id.* at 531. *Barker* recognizes three interests that the right to a speedy trial protects: (1) prevent oppressive pretrial incarceration, (2) minimize anxiety and concern of the accused, and (3) limit the possibility that the defense will be impaired. *Id.* at 532.

The State's nearly 14-month delay implicated all three of these concerns. Mr. Galloway was detained on capital charges, the most serious and anxiety-producing, for several months before a trial date was set. Most critically, the delayed trial likely affected adversely the reliability of the memory of at least one state witness. *See* R. 432, 442-43. At trial, for the first time, Dixie Brimage identified Leslie Galloway as the man who picked up her cousin Shakeylia Anderson the night of December 5, 2008. R. 432. Four days after Ms. Anderson's disappearance, Ms. Brimage had described the man as having gold teeth, R. 445, but Mr. Galloway does not have gold teeth. R. 443. At that time, she was unable to positively identify him in a photo line-up. R. 442-43. But at trial, nearly two years later, she did not hesitate to identify him, while still insisting that the person had gold teeth. R. 442. As the only eyewitness in the case, Ms. Brimage's in-court identification of Mr. Galloway as the driver of the vehicle that the State's evidence suggested killed Ms. Anderson was extraordinarily prejudicial. Without it, the State would have been limited to her inconclusive photo identification and her previous description of a man with gold teeth who could not have been Mr. Galloway—which would have supported defense counsel's theory at trial that another person may have been in the car, and that that person may have been Cornelius Triplett. R. 439, 441-42, 765-67. R. 439-40, 765, 767.

As the Presiding Justice of the Mississippi Supreme Court, Justice Leslie King, wrote in his dissent, Mr. "Galloway demonstrated to the extent possible that he suffered prejudice due to an impact on Brimage's memory." App. 122a, 122 So. 3d at 689 (King, J. dissenting). "'Loss of memory. . . is not always reflected in the record because what has been forgotten can rarely be shown.'" *Id.* (quoting *Barker*, 407 U.S. at 532).

The combination of the impact on Ms. Brimage's memory, the hardship of lengthy pretrial incarceration, and the anxiety Mr. Galloway felt with the emotional and mental toll of facing capital charges without a trial requires that this factor weigh heavily in his favor.

All four of *Barker's* factors weigh in Mr. Galloway's favor. Thus, the State's 425-day delay deprived him of his constitutional right to a speedy trial.

### B. The claim is neither unexhausted nor procedurally barred.

As the State concedes, Mr. Galloway exhausted this claim. Answer at 24. Neither does the State allege that the claim is procedurally defaulted. *Id.*

### C. AEDPA does not limit this Court's review.

Title 28 U.S.C. § 2254(d) permits a federal court to set aside a state court's merits ruling if the ruling was "contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or relied upon an "unreasonable determination of the facts." The Mississippi Supreme Court's decision on this ground unreasonably applied *Barker*'s speedy trial analysis to the facts in his case.

### 1. *Loper-Bright Enterprises* makes clear that 28 U.S.C. § 2254(d) unconstitutionally constrains federal courts' independent judgment.

In *Loper Bright Enterprises*, the Supreme Court established that the forced "deference" that § 2254 imposes on habeas courts violates the rule of constitutional avoidance, Article III, and the Supremacy Clause. 603 U.S. 369; *see infra* Ground Thirty-One. This Court should accordingly afford the Mississippi Supreme Court no deference and review Mr. Galloway's claims *de novo*.

## 2.   The state court unreasonably applied clearly established federal law.

The Mississippi state court found that three of four *Barker* factors weighed in Mr. Galloway's favor, and yet there was no speedy trial violation because he did not establish actual prejudice. App. 57a, 122 So. 3d at 653. This application of *Barker* unreasonably applied clearly established federal law. By requiring Mr. Galloway to demonstrate actual prejudice to establish a federal speedy trial claim, the state court enshrined actual prejudice as a condition necessary to establish a speedy trial violation. The Supreme Court has explicitly said this is not so.

In *Moore v. Arizona*, 414 U.S. 25, 25-26 (1973), the Supreme Court expressly rejected the premise that *Barker* requires demonstrable "actual prejudice" to prove a speedy trial violation. In *Moore*, the Arizona Supreme Court rejected the petitioner's speedy trial claim because he did not establish actual prejudice. *Id*. at 25. The Supreme Court found the Arizona court "in fundamental error in its reading of *Barker*[] and in the standard applied in judging petitioner's speedy trial claim." *Id.* The Court relied on *Barker*, which "expressly rejected the notion that an affirmative demonstration of prejudice was necessary to prove a denial of the constitutional right to a speedy trial," *Id,* and quoted:

> 'We regard none of the four factors identified above (length of delay, reason for delay, defendant's assertion of his right, and prejudice to the defendant) as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process. But, because we are dealing with a fundamental right of the accused, this process must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution.'

*Id.* (quoting *Barker*, 407 U.S. at 533 (footnote omitted)). No factor, including prejudice, is a "necessary. . . condition" to prove a speedy trial violation. If the other three factors weigh in a defendant's favor, a court may still properly find a speedy trial violation under *Barker*.

And actual prejudice is not the only way to establish *Barker*'s prejudice factor: a court must carefully consider and weigh possible prejudice as well. *Moore*, 414 U.S. at 25. This includes both possible prejudice to a person's defense on the merits and the more abstract prejudice that often follows from lengthy pretrial incarceration—anxiety caused to the accused and his family, disruption of employment and financial resources, and so on. *Id.* (citing *Barker*, 407 U.S. at 532-33 and *Id.* at 537 (White, J. concurring)).

In cases where eyewitness identification is an issue, it is critical that courts recognize the possibility that delay prejudiced a defendant, even where he cannot actually show it. "Loss of memory. . . is not always reflected in the record because what has been forgotten can rarely be shown." *Id.* at 532; *see Gray v. King*, 724 F.2d 1199, 1202 (5th Cir. 1984) (acknowledging that even a relatively brief nine-month delay "may be excessive in a case relying on eyewitness identification" because of the possible prejudice to a witness's memory that delay could cause); App. 122a, 122 So. 3d at 689 (King, J. dissenting) (citing *Barker*, 407 U.S. at 532) (arguing that, just as *Barker* warned, "Brimage's certainty in her ability to identify Galloway changed in the time period between her pretrial identification and her identification at trial, which certainly evinces possible prejudice to Galloway.").

Here, the Mississippi Supreme Court found that three of four *Barker* factors weighed in Mr. Galloway's favor. He asserted his speedy trial rights; the State failed to

provide a record to analyze whether the delay was for a neutral reason; and the length of delay presumptively prejudiced Mr. Galloway. *Galloway*, 122 So. 3d at 650-51. But when analyzing the final factor, prejudice, the court refused to consider the emotional, social, or economic impact of incarceration as a form of prejudice. *Id.* at 651. And when evaluating the impact of time on Ms. Brimage's eyewitness testimony, it entirely dismissed the possibility and found that Mr. Galloway had established "no actual prejudice; thus, [it] weighed the prejudice factor against [Mr. Galloway]." *Id.*

The court's opinion unreasonably applied *Barker* and *Moore* in two ways. First, despite three factors weighing in Mr. Galloway's favor, the court found that he failed *Barker*'s test. This opinion "renders the prejudice factor dispositive and flies in the face of *Barker*." *Id.* at 688 (King, J. dissenting) (arguing that if *Barker*'s promise that no one factor is dispositive is to have any meaning, the majority's opinion should have found in Mr. Galloway's favor); *see Berryman v. Huffman*, No. 23-60627, 2025 WL 2936176 (5th Cir. Oct. 16, 2025) (acknowledging that neither prejudice nor any other single factor has "talismanic" weight, and clarifying that once court finds a violation it must dismiss entire indictment).

Second, by ignoring the impact of extensive pretrial incarceration as a form of prejudice, *id.* at 652, and finding that the prejudice factor weighs against Mr. Galloway because he "failed to show any actual prejudice due to the delay of his trial*," id.* at 653, the court refused to weigh possible prejudice as *Moore* and *Barker* require. The court refused to consider Mr. Galloway's argument that he experienced severe anxiety as a result of his lengthy incarceration with no trial date. It claimed that "Mississippi case law does not recognize the negative emotional, social, and economic impacts that accompany

incarceration as prejudice." App. 52a, 122 So. 3d at 651 (citing *Johnson v. State,* 68 So. 3d 1239, 1245 (Miss. 2011)).

This state rule diametrically opposes *Barker*. In *Barker*, the Supreme Court expressly directed courts to weigh the impact of incarceration as a form of prejudice. 407 U.S. at 531-32. Specifically, *Barker* requires courts to evaluate "the anxiety and concern of the accused"—a fundamental interest that speedy trial rights protect—as well as the "detrimental impact on the individual" that follows from "time spent in jail awaiting trial." *Id.* at 532. "It often means loss of a job; it disrupts family life; and it enforces idleness." *Id.* at 532-33. Because Mississippi "does not recognize the negative emotional, social, and economic impacts that accompany incarceration as prejudice," *Johnson*, 68 So. 3d at 1246, it does not recognize binding federal law.

Regarding Ms. Brimage's memory, the state court found that because Mr. Galloway did not demonstrate actual prejudice caused to her memory, *Barker*'s prejudice factor weighs against him. In doing so, it refused to give weight to the possibility of prejudice. The court speculated that prejudice was impossible. It dismissed the discrepancy between Ms. Brimage's insistence that the person she saw had gold teeth and the fact that Mr. Galloway does not, because gold teeth can be faked. *See* App. 57a, 122 So. 3d at 653 (citing *Thomas v. Dwyer,* 2007 WL 2137807 at *9 (E.D. Mo. July 23, 2007) (finding it was not improper for a prosecutor to pop on faux gold teeth during summation to establish that gold teeth can be faked)). Even if that is true, *Barker* required a court to weigh the possibility that the teeth were not fake, and the absence of any record evidence that they were or any reason fake teeth would have been used, in deciding whether the discrepancy was real and the result of prejudicial delay. The court also refused to

acknowledge that time had any impact on Ms. Brimage's testimony, speculating that "Brimage no doubt would have testified with the same effect had the trial been held a week after indictment." *Id.* Where there is the possibility of prejudice, the court must consider it, not summarily decide it does not exist. The court chose not to consider possible prejudice, directly contrary to *Moore* and *Barker.*

By treating actual prejudice as a prerequisite to relief, disregarding the recognized harms inherent in prolonged pretrial incarceration, and speculating away the possibility of prejudice to the defense, the court abandoned the "difficult and sensitive balancing" process that *Barker* demands. 407 U.S. at 533. The result is an unreasonable application of clearly established federal law under 28 U.S.C. § 2254(d).

### D.  Conclusion

The 424-day delay in scheduling Mr. Galloway's trial violated his speedy trial rights under the Sixth and Fourteenth Amendments. Given the direct failure of the state supreme court to conduct a reasonable application of federal law, this Court should give its denial of Mr. Galloway's speedy trial claim no deference. This court should grant Mr. Galloway habeas relief on this ground.

### XIV.  GROUND FOURTEEN – The Trial Court's Exclusion of Evidence of Ms. Anderson's Sexual Relationships with Third Parties Violated Mr. Galloway's Due Process and Sixth Amendment Rights, and Counsel's Failure to Object on State Evidentiary and Constitutional Grounds Deprived Him of the Effective Assistance of Counsel.

### A.  Introduction

The State successfully moved *in limine* to preclude the defense from introducing any evidence that Shakeylia Anderson had contemporaneous sexual relationships with at least one, and possibly more, persons around the time she disappeared. The trial court

adhered to its exclusionary ruling even when the State acknowledged the existence of just that type of evidence: the complete DNA profile of James Futch in the vaginal sample. The exclusion of the evidence of third-party guilt violated Mr. Galloway's due process right to present a defense and his Sixth Amendment rights to compulsory process and confrontation of witnesses. U.S. CONST. AMEND. VI, XIV.

Moreover, even though the state's case for capital murder hinged on proving that an anal tear occurred during a nonconsensual sexual battery by Mr. Galloway, and the defense hinged on showing that other persons or processes could have caused it, trial counsel made no objection to excluding any and all defense evidence of Ms. Anderson's sexual activities with other persons. For the reasons below, counsel's passive acquiescence in this devastating ban on relevant defense evidence deprived Mr. Galloway of the effective assistance of counsel. U.S. CONST. AMEND. VI.

**B. The Trial Court Unconstitutionally Excluded Third-Party Guilt Evidence.**

**1. The court granted the State's motion to exclude the evidence.**

The State moved *in limine* to exclude any evidence of Ms. Anderson's prior sexual behavior, arguing that it was irrelevant, prejudicial, and barred by Mississippi Rule of Evidence 412, as it would "only be used to paint her in a negative light." R. 92-93. Rule 412 provides that evidence of a victim's sexual behavior or predisposition, including reputation and opinion evidence, is generally inadmissible in a criminal case involving an alleged sexual offense. The rule makes an exception, however, for specific instances of the victim's past sexual behavior with a person other than the defendant, if offered to prove that someone else was the source of the semen, pregnancy, disease, or injury. Miss. R. Evid. 412.

In response to the State's motion, defense counsel Glenn Rishel objected solely to the exclusion of evidence related to Mr. Galloway's own sexual encounters with Ms. Anderson. R. 93. Even when the prosecutor acknowledged that he planned to introduce evidence that analysts had identified the full DNA profile of another person, James Futch, in the vaginal sample, and conceded the admissibility of that evidence, Mr. Rishel made no objection to the court's contradictory response. He merely responded, "Yes, sir," when the court announced that, while the DNA evidence could come in, "to the extent that you might bring some witnesses in to say, I had sex with her the night before, or two days before, a week before. That's not admissible." R. 96. The court excluded all testimony suggesting that Ms. Anderson had engaged in sexual activity with anyone other than Mr. Galloway, except for those DNA results, and specifically excluded sexually graphic letters from Ms. Anderson to Demetri Lamar Brown. R. 96-98.

### 2. The Supreme Court and Fifth Circuit have repeatedly recognized the constitutional right to show third-party guilt.

The court's blanket exclusion of Ms. Anderson's sexual history with third parties devastated the defense's third-party guilt strategy, violating Mr. Galloway's constitutional right to present a defense under United States Supreme Court and Fifth Circuit precedent. *See In re Oliver,* 333 U.S. 257, 273 (1948) (right to cross-examine adverse witnesses and present defense testimony are key ingredients of "opportunity to be heard" guaranteed by Due Process Clause).

In the seminal case on third-party evidence, *Chambers v. Mississippi*, 410 U.S. 284 (1973)*,* the State charged the defendant with a murder to which another individual had orally confessed. The trial court excluded on hearsay grounds any testimony from witnesses who heard the confession. Further, Mississippi's common-law voucher rule

prohibited the defendant from cross-examining the confessor. *Id*. at 291-94. The Supreme Court held that these rulings violated Mr. Chambers's due process rights under the Fourteenth Amendment: "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Id*. at 294 (citing *Oliver*, 333 U.S. at 273). Despite the importance of the rule against hearsay, because the excluded statements were critical to the defense and bore persuasive assurances of trustworthiness, the trial court had unconstitutionally excluded them. *Id*. at 302. The Court concluded, "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id*.; *see also see also Lilly v. Virginia,* 527 U.S. 116 (1999); *Green v. Georgia*, 442 U.S. 95, 97 (1979). Similarly, the voucher rule, by making it impossible for the defense to cross-examine the man who had confessed to the crime, "plainly interfered with Chambers' right to defend against the State's charges." *Chambers*, 410 U.S. at 297-98.

In *Holmes v. South Carolina*, 547 U.S. 319 (2006), the Supreme Court reaffirmed a defendant's constitutional right to present a complete defense in circumstances similar to those in this case. The defendant sought to introduce testimonial evidence of a third party's confession to the crime, which the trial court excluded under state precedent precluding a defendant from introducing evidence of third-party guilt if the prosecution has introduced strong evidence of the defendant's guilt. *Id*. at 328. The Supreme Court held that the rule was arbitrary because it shifted the focus from the probative value of the defense's evidence to the strength of the State's case. *Id*. at 329. This, the Court concluded, violated the defendant's right to a meaningful opportunity to present a

complete defense. *Id.* at 331. The Court clarified that constitutional limits constrain rule makers' latitude to exclude evidence; "whether rooted directly in the Due Process Clause of the Fourteenth Amendment or the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Id.* at 319. *Holmes* held that rules that infringe on a weighty interest of the accused, and are arbitrary or disproportionate to their intended purposes, abridge this constitutional right. *Id.* at 320; *see also Fry v. Pliler*, 551 U.S. 112, 121 (2007) (announcing appropriate harmless error test upon habeas review of Court of Appeals ruling that state trial court violated *Chambers* by excluding testimony that witness heard another individual confess to a murder resembling the one of which defendant was accused).

In other contexts, the Supreme Court has recognized a defendant's general constitutional right to present a complete defense. In *Washington v. Texas*, 388 U.S. 14, 19 (1967), for example, the state court had excluded testimony from a co-participant that the defendant was not at the scene of the crime, relying on a state exclusionary rule. The Court held that the constitutional right to compulsory process and due process prevailed over the state rule of evidence *Id.* at 19; *see also Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("the blanket exclusion of the proffered testimony about the circumstances of petitioner's confession deprived him of a fair trial," whether rooted in Due Process Clause or Compulsory Process or Confrontation Clauses of Sixth Amendment); *Webb v. Texas,* 409 U.S. 95 (1972) (trial court's threatening remarks, which drove defense witness off the stand, defendant's due process right to present a defense).

**3. The exclusion of the evidence under a state evidentiary rule deprived Mr. Galloway of his right to present evidence of third-party guilt as guaranteed in *Chambers* and *Holmes*.**

The trial court, by excluding any evidence of Ms. Anderson's sexual history with third parties, deprived Mr. Galloway of his due process rights under the Fourteenth Amendment, as well as his Sixth Amendment rights to present a complete defense and to compulsory process and confrontation. The alleged sexual battery was the underlying felony on which the State relied to establish capital murder. App. 1056a. In support of its theory of anal sexual assault, the State called Dr. Paul McGarry, who testified that Ms. Anderson had an anal tear and stretching injuries that demonstrated forceful anal penetration. R. 675-78. The DNA analyst found no semen or DNA in the anus, however, but only in the vaginal cavity. R. 660. The vaginal sample included complete profiles consistent with Ms. Anderson and James Futch, who testified that he had had sex with Ms. Anderson several days before her disappearance and death. R. 649-51. The analyst also identified an incomplete profile consistent with Mr. Galloway. R. 647-68.

Because part of the defense strategy was to allege third-party guilt by showing that persons other than Mr. Galloway had sexual contact with the victim, the excluded evidence was critical to the defense's case. But for the court's exclusionary ruling, the defense could have shown, for example, that Garrid Worlds had an ongoing relationship with her and had sex with her on the night she disappeared. MS SCt, Second Amended Petition (Ex. 132, Aff. Of G. Worlds, ¶ 14). The defense might have presented further evidence about Cornelius Triplett, who was the last person to speak by phone to Ms. Anderson on the night she disappeared, R. 772, or might have introduced the sexually explicit letter to Lamar Brown found in Ms. Anderson's school locker. All this evidence

264

would have supported the defense summation argument—with scant support, because of the exclusionary ruling—that others could have been responsible for Ms. Anderson's injuries and death. *See* R. 764, 767, 769.

The critical testimonial evidence that would have advanced the third-party theory bore persuasive assurances of trustworthiness. In *Chambers*, the Court regarded the evidence as trustworthy because it fell within a recognized exception to the rule against hearsay. 410 U.S. at 302. Here, too, the excluded evidence fell within an exception included in the very rule the court invoked in excluding it. Rule 412 does not treat evidence of "past sexual behavior" as generally unreliable, but only limits its admission to circumstances of particular relevance. The evidence here fell squarely within those circumstances: the defense could have offered it to prove "that someone else was the source of . . . injury." Miss. R. Evid. 412(b)(1)(A).

As in *Holmes,* the trial court's exclusion of this evidence infringed on a weighty interest of the accused and was disproportionate to Rule 412's intended purposes. Mississippi Rule of Evidence 412 derived from Federal Rule of Evidence 412. *See Hopkins v. State*, 639 So.2d 1247, 1250 (Miss. 1993) (Mississippi Rules of Evidence generally same as Federal Rules, and Mississippi courts generally cite federal caselaw in construing them); *Goodson v. State*, 566 So.2d 1142, 1167 (Miss. 1990) (in dissent) (Rule 412 "identical" to federal rule except for addition of two more exceptions). The federal rule "aims to safeguard the alleged victim against the invasion of privacy, potential embarrassment and sexual stereotyping that is associated with public disclosure of intimate sexual details and the infusion of sexual innuendo into the factfinding process." Fed. R. Evid. 412 (Advisory Committee's Note, 1994 Amendment). The drafters intended

to "encourage victims of sexual misconduct to institute and to participate in legal proceedings against alleged offenders." *Id.* As the commentary explains, however, specific instances of sexual behavior may be relevant and thus admissible: "where the prosecution has directly or indirectly asserted that the physical evidence originated with the accused, the defendant must be afforded an opportunity to prove that another person was responsible." *Id; see United States v. Begay*, 937 F.2d 515, 523 n. 10 (10th Cir. 1991) (rejecting state's argument that no "injury" exception to Rule 412 applied because state specifically relied on enlargement of victim's hymen as evidence of defendant's guilt).

In this case, the State maintained that Ms. Anderson's anal injuries could only have resulted from anal rape and sought to link Mr. Galloway to that act solely based on the presence of his partial DNA profile in her vaginal cavity. Testimonial evidence that a third party whose full profile was also found in her vaginal cavity, or one of three other third parties, could have caused her injuries would have directly undermined the State's theory of guilt.

The trial court excluded the evidence in reliance on Rule 412 despite its clear admissibility under the recognized exception. Under *Holmes*, when a rule's application fails to advance its intended function and infringes on a "weighty" interest of the accused, the exclusion violates the constitutional right to present a complete defense under the Fourteenth Amendment's Due Process Clause. 547 U.S. at 328. Accordingly, in applying Rule 412 in a manner that barred evidence essential to negating the State's theory by implicating an alternative source for the physical findings used to support conviction, the trial court violated Mr. Galloway's constitutional rights to due process, compulsory

process, confrontation, and to present a complete defense under the Sixth and Fourteenth Amendments.

### 4. The errors had a substantial and injurious effect on the outcome of the trial.

The State used sexual assault as the sole ground that made the crime death-eligible, arguing that Mr. Galloway had anally raped Ms. Anderson and relying on the evidence of an anal tear to support the argument. Even assuming that only penetration by a penis could have caused the tear, *but see* Ground Two, *supra*, evidence that Ms. Anderson had had other sexual partners during the time immediately preceding her disappearance could have provided an alternative explanation, thus preventing the State from proving beyond a reasonable doubt its only ground for establishing capital murder. In summation, the prosecutor insisted that Ms. Anderson had been "brutally and anally raped, unequivocal that it could come from nothing else." R. 675. Therefore, undercutting the argument that pinned responsibility for the tear on Mr. Galloway would also have undercut his conviction of capital murder. At the very least, by throwing doubt on the State's theory of the facts, the evidence could have caused at least one juror to vote for life. On its own, the error had a substantial and injurious effect on the outcome of the guilt-innocence phase and the penalty phase. *See Brecht,* 507 U.S. 638.

The error had even greater prejudicial impact in combination with others. The prosecution not only managed to exclude evidence that other sexual partners could have borne responsibility for the anal tear but presented Dr. McGarry's inadmissible opinion that only a human penis could have caused the injury. The defense ineffectively prepared, and failed to present, readily available evidence to rebut Dr. McGarry's opinion, and the prosecution failed to disclose devastating impeachment evidence that included McGarry's

recent dismissal from his job following botched autopsies. *See* Grounds Two and Six *supra*. Furthermore, the prosecution presented a surrogate DNA expert instead of making the expert who analyzed the DNA available for cross-examination, preventing the defense from cross-examining the testing analyst about, among other things, the evidence that one of Ms. Anderson's sexual partners, James Futch, had had sex with her much closer in time to her killing than he admitted on the stand. *See* Ground One, *supra*. Even if excluding evidence of other sexual partners caused insufficient prejudice on its own to require relief, all these errors combined, and the others in this petition, had a "substantial and injurious effect or influence in determining the jury's verdict" at both phases of trial. *Brecht*, 507 U.S. at 631.

### C. Trial counsel's failure to oppose the exclusion of the third-party evidence deprived Mr. Galloway of the effective assistance of counsel.

Although the evidence that the victim had relationships with several persons other than Mr. Galloway could have played a critical role in the defense, Mr. Rishel made no objection to its exclusion. *R.* 93. He ignored, or did not know about, the exception to Rule 412 that would have allowed the defense to introduce such evidence to support the theory that someone other than Mr. Galloway caused the victim's injuries. Nor did Mr. Rishel invoke Mr. Galloway's constitutional right to present a defense under the Sixth and Fourteenth Amendments. *See Chambers*, 410 U.S. at 294; *Holmes,* 547 U.S. at 324–25. His ignorance of, or at least his failure to invoke, the applicable law was deficient under prevailing norms of representation. *Strickland*, 466 U.S. at 688.

In similar circumstances, in *Hinton,* 571 U.S. 263, the Supreme Court found trial counsel ineffective for his ignorance of state law. Counsel had "failed to make even the cursory investigation of the state statute" and thus did not know about the funds available

268

for a competent expert *Id.* at 274; *see also*, *e.g.*, *Padilla v. Kentucky*, 559 U.S. 356, 359 (2010) (counsel deficient for inaccurately advising client about deportation consequences of guilty plea); *Lafler v. Cooper*, 566 U.S. 156, 162-63 (2012) (parties agree counsel deficient for inaccurately advising client that jury could not find him guilty under circumstances of case if he went to trial); *Williams*, 529 U.S. at 395 (finding deficient performance where counsel "failed to conduct an investigation that would have uncovered extensive records [that could be used for death penalty mitigation purposes], not because of any strategic calculation but because they incorrectly thought that state law barred access to such records"); *Anaya v. Lumpkin*, 976 F.3d 545, 553 (5th Cir. 2020) (counsel's failure to advise client on "central component of self-defense statute" was deficient). Similarly, in *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986), the Supreme Court found counsel deficient for his failing to file a timely suppression motion, not for a strategic reason, but because he mistakenly believed that the law imposed a duty on the State to turn over discovery without motion by the defense.

Counsel's failure to argue that both an exception to Rule 412 and basic constitutional principles made third-party evidence relevant and hence admissible fell below an objective standard of reasonable representation. Rule 412 alone could have provided ready support for the argument. The Mississippi Supreme Court has held that proof of the victim's sexual activity can be admitted where it tends to "show that another person might have been responsible for her condition." *Goodson*, 566 So. 2d at 1150, 1151 (majority opn.) (allowing admission of evidence of alternative explanations for victim's enlarged hymenal opening under exception to Rule 412); *see also Herrington v. State*, 690 So. 2d 1132, 1136-37 (Miss. 1997) (defendant need not produce direct proof

of sexual activity to show another source of injury); *Heflin v. State*, 643 So. 2d 512, 516 (Miss. 1994) (trial court erred in disallowing evidence victim had sexual intercourse with boyfriend the weekend before alleged rape, which could account for seminal fluid found in her bathing suit). The constitutional principles established in *Chambers* and *Holmes* would have provided further support.

There is a reasonable probability that, but for this constitutionally deficient performance, the outcome of the trial would have been different. The Supreme Court has recognized the outcome-determinative potential of an attorney's failure to comply with procedural rules that governed admissibility in similar circumstances. *See Nevada v. Jackson*, 569 U.S. 505 (2013) (Supreme Court held that Nevada Supreme Court reasonably applied federal law when it determined that petitioner was not denied right to present complete defense because evidence in question was excluded after trial counsel failed to file written notice); *Michigan v. Lucas,* 500 U.S. 145 (1991) (petitioner precluded from introducing evidence under rape-shield statute due to failure to comply with notice-and-hearing requirement). In the same way, here, Mr. Rishel's failure to oppose the court's adverse evidentiary ruling deprived Mr. Galloway of evidence crucial to his defense—that others could have been responsible for Ms. Anderson's anal injury or her death. But for Mr. Rishel's failure to advance an integral component of his third-party guilt strategy, by advocating for the right to introduce evidence that was admissible under the state rules of evidence and the Constitution, there is a reasonable probability that the jury would have acquitted Mr. Galloway of capital murder or, at a minimum, at least one juror would have voted for life. Counsel's deficient performance accordingly deprived Mr. Galloway of a fair trial with reliable results and the effective assistance of counsel.

*Strickland*, 466 U.S. at 696. Mr. Rishel's error was prejudicial alone and in combination with all other instances of error set forth in this petition. In particular, counsel's failure to investigate and present DNA evidence that could have undermined the reliability of the partial profile attributed to Mr. Galloway, and their failure to investigate and present the many lines of attack on Dr. McGarry's insistence that the anal tear could only have occurred in an inculpatory way, combined with Mr. Rishel's acquiescence in the exclusion of third-party guilt evidence to prejudice the defense at both phases of trial.

**D.  AEDPA places no limits on this Court's review of the state court's decision.**

Mr. Galloway argued on direct appeal that the trial court's exclusion of evidence of Ms. Anderson's sexual relationships was reversible error because the evidence was admissible under the Mississippi Rules of Evidence and the Mississippi and United States Constitutions. He challenged both the exclusion of third-party guilt evidence and the exclusion of evidence that the victim had a consensual relationship with Mr. Galloway. *Galloway v. State*, MS S.Ct. No. 2010-DP-0127, Brief of Appellant at 85. Mr. Galloway maintained that these exclusionary rulings denied his rights to due process, a fair trial, to present a defense, to compulsory process, to confrontation of witnesses, to remain silent, to the effective assistance of counsel, and to a reliable sentencing determination. *Id*. at 85-86 (citing *Holmes* and *Crane*). And he argued specifically that Mr. Rishel was ineffective for limiting his objection to the exclusion of evidence showing prior encounters between Mr. Galloway and Ms. Anderson, and for otherwise acquiescing in the prosecution's motion. *Id*. at 86 n.75.

The Mississippi Supreme Court never ruled on the challenge to the exclusion of third-party evidence or the challenge to counsel's failure to address that evidence. It held

only that the challenge to the exclusion of Ms. Anderson's relationship with Mr. Galloway was "without merit" because, despite the trial court's invitation to revisit the exclusionary ruling if counsel proffered additional evidence during trial, counsel never did so. *See* App. 84a, 122 So.3d 614 at 668.

Because the state court never ruled on the merits of the third-party exclusion or the ineffectiveness of counsel, 28 U.S.C. § 2254(d) places no limit on this Court's ability to grant relief. *See, e.g., Wiggins*, 539 U.S. at 534 (section 2254(d) applies only to state court merits rulings); *Rompilla*, 545 U.S. at 390 (same). Furthermore, as described in Ground Thirty-One, applying the deferential standard of review set forth in § 2254(d) would contravene the doctrine of constitutional avoidance, the separation of powers embodied in Article III, and the Supremacy Clause.

Even if § 2254(d) governs this Court's review, the Court can and should grant relief. The State's response to this claim does not differentiate between the two types of evidence covered by the motion in limine at trial. The State argues, generally, that Mr. Galloway "fails to identify United States Supreme Court precedent the state supreme court unreasonably applied," and that the state court's decision was not "contrary to" clearly established federal law or an unreasonable determination of the facts. Answer at 25. The State is mistaken; Mr. Galloway's habeas petition cited, among other cases, *Holmes* and *Crane* in support of the argument that the exclusionary ruling violated the rights to present a defense, to compulsory process, and to confrontation of witnesses. *See* Petition at 160. He argued as well that defense counsel's failure to preserve the claims deprived him of effective assistance of counsel. Petition at 161 (citing *Strickland*).

Even if the Mississippi Supreme Court had ruled on these claims before denying relief, it would have applied clearly established federal law unreasonably in doing so. The excluded evidence fell squarely under the principles laid down in *Chambers* and its progeny and would have provided weighty support to the defense strategy. Counsel, in declining to fight the exclusion, acted in ignorance of or indifference to those constitutional principles and the rules of evidence, with no valid strategic reason for inaction. This Court need not, however, hypothesize about how the Mississippi court would have ruled on these claims if it had reached their merits. It never ruled on the merits, and this Court owes the state court no deference.

For all the reasons above, alone and in combination with the other claims in this petition, this Court should grant habeas relief from Mr. Galloway's convictions and death sentence.

### XV.    GROUND FIFTEEN – The Trial Court Violated Mr. Galloway's Rights by Allowing Victim Impact Evidence in his Guilt Phase Trial Over Defense Objection.

The Fifth, Sixth, and Fourteenth Amendments of the United States Constitution guarantee a defendant the right to a fair trial by an impartial jury. In *Payne v. Tennessee*, the Supreme Court allowed victim impact evidence in "the sentencing phase" of trial. 501 U.S. 808, 825 (1991). Nothing in *Payne,* however, supports the use of victim impact evidence in the culpability phase of the trial. Over defense objection, the prosecution introduced improper and highly prejudicial victim impact evidence through its first witness, Alan Graham. This evidence bore no relevance to the contested issue of Mr. Galloway's guilt and served only to incite the passions of the jury. The Court must grant habeas relief on this ground.

**A. Facts relevant to this ground for relief.**

Alan Graham's statements on the record as the State's first witness constituted impermissible victim impact testimony. In his testimony, Mr. Graham presented a number of facts that described the victim's personal characteristics and failed to provide any relevant background of the victim or otherwise set the stage for presentation of relevant evidence. In fact, the prosecutor prompted this disclosure of personal characteristics. R. 421. After being asked what names the victim went by, Mr. Graham explained that "[w]e called her Kela" and "I used to call her Ching," because "when my sister brought her home from the hospital she looked like she was like Asian, like Chinese." *Id*. After eliciting this victim impact evidence, the prosecutor directly questioned Mr. Graham about what the victim looked like. *Id.* Mr. Graham described to the jury that "[s]he was beautiful, healthy, fun loving," "had dark eyebrows," and "was like what we might call light skinned with a tan." *Id*.

The prosecution continued to seek information about Ms. Anderson's relationships with her family and Mr. Graham. Mr. Graham told the jury that she called him "Uncle Al," was "the baby" of the family, and "was a senior in high school. . . all excited about graduating and joining the Air Force." R. 421, 423. Prosecution then asked whether any other family members were in the Air Force, to which Mr. Graham responded that "her older brother Jerry is still in the Air Force, and one of her sisters, Janice, was in the Air Force." R. 423. None of this evidence illustrated or provided a basis for Mr. Graham's core testimony—that he was with Ms. Anderson on the evening before her death, that he noticed someone named "Bo" was calling her phone repeatedly and the approximate time

274

Ms. Anderson left the home. R. 422-23. His testimony, instead, served only to inflame the passions of the jury.

**B.  The Mississippi Supreme Court's adjudication of this issue.**

On direct appeal, counsel asserted that "[t]he trial court violated Mr. Galloway's rights in allowing victim impact evidence in the guilt-innocence phase over defense objection." Appellant's Brief at 101. In the argument, counsel asserted error on the basis of the Fifth and Fourteenth Amendments, the Mississippi Constitution, and other applicable State and Federal law. *Id.* at 101-2. Citing cases from the United States Supreme Court and the Mississippi Supreme Court, counsel asserted that Mr. Galloway had been denied his "right to a fair trial, due process of the law, and a reliable sentencing determination." Appellant's Brief at 101-2.

The Mississippi Supreme Court denied relief on this issue. App. 88a-90a, 122 So. 3d at 671-72. Citing several Mississippi Supreme Court cases, the Court asserted that Mr. Graham "merely provided some background information concerning Anderson" and did not "state any emotional effect the crime had on him or his family, nor did her state an opinion of the defendant." App. 90a, 122 So. 3d at 672. On the issue of the trial court's admission of Mr. Graham's testimony about Ms. Anderson's siblings, the Court found that the trial court erred but determined that this error was not prejudicial. App. 90a, 122 So.3d at 673.

**C.  The Mississippi Supreme Court unreasonably applied clearly established federal law.**

In its decision, the Mississippi Supreme Court misapplied *Payne* to hold that Mr. Graham's testimony did not contain improper victim impact statements. App. 90a, 122 So. 3d at 673. This adjudication was an unreasonable application of clearly established

275

federal law, so this Court's ability to grant relief is not constrained. *See* 28 U.S.C. § 2254(d).

First, the court misstated the law as defined in *Payne. Compare Galloway,* App. 90a, 122 So. 3d at 673 *with Payne*, 501 U.S. at 823. The court correctly acknowledged that "the *Payne* Court noted that various pieces of evidence regarding the victim's background likely would have been presented during the guilt phase of trial." App. 89a, 122 So. 3d at 671. Further, it noted that "*Payne* suggests that limited victim-background evidence may be admitted—indeed, may have to be admitted—during the guilt phase of trial." *Id.* But this understanding of *Payne's* conclusion is incomplete. In *Payne*, the Court highlighted that such evidence may have been admitted in the culpability phase "because of its relevance." 501 U.S. at 823. Here, the Mississippi Supreme Court has already agreed that Mr. Graham's testimony was, in part, inadmissible due to lack of relevance. App. 90a, 122 So. 3d at 673.

Second, the Mississippi Supreme Court considered whether Mr. Graham's testimony constituted victim impact evidence only insofar as it relayed "any emotional effect the crime had" on the witness or his family or "an opinion of the defendant." App. 90a, 122 So. 3d at 673. The court found that the testimony admitted at trial did not fall into either category. However, as detailed in *Payne*, the definition of victim impact testimony expands beyond those two categories; it includes a description of the "victim's personal characteristics," that illustrate "*each* victim's uniqueness as an individual human being." *Payne,* 501 U.S. at 823 (citation modified). Rather than evaluate whether the "personal characteristics" that Mr. Graham testified to fell within *Payne*'s definition of victim impact testimony, the court reduced this testimony to "some background

information concerning Anderson" that fell into the separate category of so-called "victim-background" evidence. App. 90a, 122 So. 3d at 673. The court wholly failed to apply *Payne*'s definition of victim impact evidence, thus its finding—that Mr. Graham's testimony did not include impermissible victim impact evidence—involved an unreasonable application of established Federal law.

In simply attributing Mr. Graham's descriptions of Ms. Anderson, prompted by the prosecutor, to "victim-background information," the Mississippi Supreme Court's ruling was contrary to federal law. A victim's "personal characteristics" have been included within the definition of victim impact evidence for over thirty years. *Payne,* 501 U.S. 808. While Mr. Graham did provide relevant information, his testimony was filled with descriptions of Ms. Anderson's appearance, nicknames and descriptors, and family dynamics that lacked any relevant purpose. Mr. Graham's relevant testimony did not rely on this information for background or foundation. Instead, the comments, prompted by the prosecuting attorneys, painted an impermissible picture of Ms. Anderson's personal characteristics during the culpability phase when such evidence was inadmissible

**D. The admission of victim impact evidence at guilt phase was prejudicial.**

Victim impact evidence is not permissible at the guilt phase of trial, and the victim impact admitted in Mr. Galloway's trial caused actual prejudice. Capital murder convictions must be subjected to "heightened scrutiny," with "all doubts. . . resolved in favor of the accused." *Balfour,* 598 So.2d at 739; *Havard,* 928 So.2d at 779. In *Brecht,* 507 U.S. at 637, the Supreme Court provided that a federal court may grant habeas relief when it determines that the error had a "substantial and injurious effect or influence in determining the jury's verdict." And, "if our minds are in virtual equipoise as to the

harmlessness under the *Brecht* standard, of the error, then we must conclude that it was harmful." *Woods v. Johnson,* 75 F.3d 1017, 1026-27 (5th Cir. 1996) (quoting *O'Neal,* 513 U.S. at 435).

Here, it is clear that the admission of testimony regarding Ms. Anderson's personal characteristics was not harmless. At least one juror watched news coverage of the case while sequestered because "she had to see the victim," despite the judge's "admonitions not to watch any news media accounts of this trial or not read any news media accounts of this trial." R. 825. The jurors were on an "honor" system, ordered to not watch or otherwise expose themselves to the media coverage of the trial or victim, because televisions inside their rooms could not be easily removed. App. 1004a; R. 409-11.

This testimony was not just "some background information;" it helped the State shape its narrative in summation as sympathetically as could be. During his closing argument, the prosecutor exclaimed multiple times that Ms. Anderson was a "little girl" or "high school girl," R. 868, calling back to Mr. Graham's statements that Ms. Anderson was the "baby" of the family. R. 421. Further, he asked that jurors to remember Ms. Anderson's "last day on this earth. . . [r]emember her in there talking with her Uncle Al," R. 869, identifying Mr. Graham and how he had stated Ms. Anderson knew him, as "Uncle Al." R. 421. Mr. Graham's testimony during the guilt phase laid the foundation for the prosecutor's closing argument, far from merely presenting background on Ms. Anderson.

With evidence as to jurors' curiosity about Ms. Anderson, and with the extent that this testimony enabled the State to emotionally charge its summation, Mr. Graham's inflammatory testimony must be brought under careful scrutiny. If this Court finds that

Mr. Graham's testimony was harmful or if there is a question of whether the testimony was harmless, it must grant relief in Mr. Galloway's case. *See O'Neal*, 513 U.S. at 435.

### E. Conclusion

In considering the above grounds for relief, this Court is not required to adopt a deferential approach in its ruling, as the state court deference required by the U.S. Supreme Court's interpretation of AEDPA in *Williams v. Taylor,* 529 U.S. 362, has been overruled by *Loper Bright Enterprises v. Raimondo,* 603 U.S. 369. In his concurrence in *Loper Bright*, Justice Thomas explains that when "a judge must accept an agency's interpretation of an ambiguous law, even if he thinks another interpretation is correct," the judge is abdicating his Article III "judicial Power." *Loper Bright Enterprises*, 603 U.S. at 414. "[T]he judicial power, as originally understood, requires a court to exercise its independent judgment in interpreting and expounding upon the laws." Id. (quoting *Perez v. Mortgage Bankers Ass'n.,* 575 U.S. 92, 119 (2015) (J. Thomas concurring)).

While federal court deference to state courts is not completely analogous to court deference to agencies within the executive branch, this Court should rule that the Article III judicial power is the same in both contexts and requires it to exercise its independent judgment. This Court should, in the exercise of that independent judgment, grant relief on this ground.

Alternatively because the trial court's admission of victim impact evidence at the guilt phase violated Mr. Galloway's Fifth, Sixth and Fourteenth Amendment rights and because the Mississippi Supreme Court's decision upholding the trial court's ruling was "contrary to" or involved an "unreasonable application" of clearly established Federal law, as determined by the Supreme Court of the United States, and was based on an

unreasonable determination of the facts in light of the evidence before it, 28 U.S.C. § 2254(d)(1) & (2), Mr. Galloway has established a violation of the Constitution as required by 2254(a), and has further shown that this Court is authorized to grant relief under 2254(b).

## XVI.  GROUND SIXTEEN – Dixie Brimage's Highly Suggestive and Unreliable In-Court Identification of Mr. Galloway Violated His Constitutional Rights and Mandates Reversal.

At trial, for the first time, Dixie Brimage identified Leslie Galloway with certainty as the man who picked up her cousin Shakeylia Anderson on the night of December 5, 2008. R. 432. Four days after Ms. Anderson's disappearance Ms. Brimage described the man as having gold teeth, R. 438, 445, but Mr. Galloway does not have gold teeth. R. 443. At that time, she could not identify him in a photo line-up. R. 442-43.[99] But at trial, nearly two years later, she did not hesitate to identify him, while still insisting that the person had gold teeth. R. 442. The introduction of Ms. Brimage's extraordinarily suggestive and unreliable in-court identification violated Mr. Galloway's rights to a fair trial, to due process, to be free of self-incrimination, and to a reliable sentencing determination. U.S. CONST. AMENDS. V, VI, VIII, XIV; *Manson v. Brathwaite*, 432 U.S. 98, 113-14 (1977).

---

[99] The record description of this photo array is too limited to allow a judgment about its suggestiveness. The State did not disclose even the limited details until redirect examination; trial counsel apparently had the impression from discovery that police had shown Ms. Brimage a single photograph. R. 442. On redirect examination, she testified that the police showed her six photographs and she picked the one of Mr. Galloway, but she could not identify him with certainty. R. 443.

### A. The highly suggestive in-court identification, coupled with the witness's failure to make an identification at the pretrial procedure, gave rise to a substantial likelihood of misidentification.

Reviewing courts assess a challenged identification by asking first whether it was impermissibly suggestive and second whether it gave rise to a very substantial likelihood of misidentification. *Brathwaite,* 432 U.S. at 116. Ms. Brimage's in-court identification was impermissibly suggestive. "It is obviously suggestive to ask a witness to identify a perpetrator in the courtroom when it is clear who is the defendant." *United States v. Rogers,* 126 F.3d 655, 658 (5th Cir. 1997) (citing cases); *Moore v. Illinois*, 434 U.S. 220, 229 (1977) ("It is difficult to imagine a more suggestive manner [than an in-court identification].").

A reviewing court next considers whether the procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Brathwaite*, 432 U.S. at 105 n.8. In evaluating this second prong, the court should consider five factors: "1) the opportunity of the witness to observe the criminal at the time of the crime; 2) the witness' degree of attention; 3) the accuracy of the witness' prior description of the criminal; 4) the level of certainty demonstrated by the witness at the confrontation; and 5) the length of time between the crime and the [identification]." *Neil v. Biggers,* 409 U.S. 188, 199-200 (1972). The Court must then weigh these factors "against … the corrupting effect of the suggestive identification." *Brathwaite*, 432 U.S. at 114.

This second prong is easily met here as well. Ms. Brimage's opportunity to observe the man was poor. She testified that she viewed him for around five minutes through a glass door from a distance of 50-60 feet, at around 10:00 at night. R. 435-36. She could not see into the back seat of the car. R. 441-42. The man could not have seen her at the

door while he was standing by his car. R. 437-38. Ms. Brimage's degree of attention is unclear from the record, and at best should be considered a neutral factor. She had never met Mr. Galloway or seen him before the alleged sighting that night. R. 438. Further, Ms. Brimage's prior descriptions were seriously inconsistent with Mr. Galloway's appearance. Again, she insisted, both after the murder and at trial, that the man had gold teeth, R. 439, but Mr. Galloway does not have gold teeth. R. 443. Ms. Brimage was also unable to positively identify Mr. Galloway in a photo line-up shortly after the crime, which "inevitably heightens the risk that her in-court identification was induced by the suggestiveness of the setting in which it occurred." *Kennaugh v. Miller*, 289 F.3d 36, 46 (2d Cir. 2002); s*ee also Foster v. California*, 394 U.S. 440, 442-43 (1969) (reversing where witness was initially unsure but subsequent, suggestive lineups produced a definite identification).

It is no surprise that she was absolutely certain on the witness stand that Mr. Galloway, sitting behind the defendant's table on trial for the murder of her "best cousin," was the man who had picked up Ms. Anderson on the night she disappeared. The setting "made it all but inevitable" that she would identify Mr. Galloway. *Kennaugh*, 289 F.3d at 46 (*quoting Foster*, 394 U.S. at 443). There was a two-year gap between the crime and Ms. Brimage's in-court identification. These factors rendered the in-court procedure "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Brathwaite*, 432 U.S. at 105 n.8 (*quoting Simmons v. United States*, 390 U.S. 377, 384 (1968)). Ms. Brimage's in-court identification of Mr. Galloway, "given under undeniably suggestive conditions, in a context of failed earlier confrontations," should have "raise[d] serious doubts about the reliability of her testimony." *Kennaugh*,

289 F.3d at 46. Further, any accuracy the factors do suggest is outweighed by the "corrupting effect of the suggestive identification." *Brathwaite*, 432 U.S. at 114.

The identification should have been excluded. Because Ms. Brimage was the only eyewitness in the case, her in-court identification of Mr. Galloway as the driver of the car that the State suggested killed Ms. Anderson was extraordinarily prejudicial. Without it, the State had only her inconclusive photo identification and her previous description of a man with gold teeth who could not have been Mr. Galloway—which would have supported defense counsel's theory at trial that another person may have been in the car, and that that person may have been Cornelius Triplett. R. 439, 441-42, 765-67. R. 439-40, 765, 767. Her utterly unreliable and impermissibly suggestive in-court identification had a substantial and injurious effect on the outcome of both phases of trial. *See Brecht v. Abrahamson,* 507 U.S. 619, 623 (1993); *Raheem v. Kelly*, 757 F.3d 122, 141 (2d Cir. 2001) (admission of impermissibly suggestive identifications, unreasonably applying *Brathwaite*, was not harmless under *Brecht*).

**B.  No procedural bar prevents this Court's review.**

The state maintains that this claim is procedurally defaulted because trial counsel failed to make a contemporaneous objection to the suggestive in-court identification. Answer at 26-27. The Mississippi Supreme Court stated that Mr. Galloway had "waived" the claim because trial counsel did not object, and that it also failed under plain-error review. App. 74a, 122 So.3d at 663.

As described at Section D.1 The Default Rulings Were Not Independent of Federal Law, *supra*, at the time of the default, that is at trial, the contemporaneous objection rule was not independent of federal law because judicially created exceptions required a

283

reviewing court to determine whether a federal violation had occurred before deciding whether the exception applied. Furthermore, any application of Mississippi's newly stringent procedural bar standards would be inadequate to bar federal habeas review because the rules they announced were not "firmly established" at the time of any defaults. Finally, no default bar prevents this Court from granting relief for the cumulative effect of any defaulted claims with those entitled to merits review.

Accordingly, the state court's "waiver" ruling on this claim imposes no procedural bar to this Court's review.

### C. The Mississippi Supreme Court unreasonably applied clearly established federal law and unreasonably determined the facts.

As described in Ground Thirty-One, 28 U.S.C. § 2254, if construed to require federal court "deference" to state court interpretations of federal law, would violate the doctrine of constitutional avoidance, Article III, and the Supremacy Clause. This Court's review should therefore be *de novo*.

Even if § 2254 does limit this Court's review, the State does not deny that the state court unreasonably applied clearly established federal law. Answer at 27. And, in fact, the Mississippi Supreme Court's rejection of this claim was an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1), (2). The court held that Mr. Galloway's reliance on the five reliability factors enumerated in *Biggers* "misses the mark," because the Supreme Court, it said, had recognized only two situations that would require their application: an in-court identification based on a suggestive pretrial procedure or a suggestive out-of-court procedure. App. 74a, 122 So. 3d at 663. In the state court's view, the Supreme Court had "not decided whether *Biggers* applies to an in-court identification not preceded by an impermissibly suggestive pretrial identification." App.

284

75a, 122 So. 3d at 663 (citing *Byrd v. State*, 25 A.3d 761, 767 (Del. 2011); *State v. Lewis*, 609 S.E.2d 515, 518 (S.C. 2005) (availability of trial protections, including cross-examination, adequately protects a defendant against suggestiveness of in-court identification)).Accordingly, applying it here would amount to "expand[ing] the *Biggers* two-step inquiry." App 77a, *Galloway*, 122 So. 3d at 664.

This analysis unreasonably applied *Brathwaite* and *Biggers*. As the Supreme Court has held:

> General legal principles can constitute clearly established law for purposes of AEDPA so long as they are holdings of this Court. . . . . "certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt."

*Andrew v. White*, 604 U.S. 86, 94-95 (2025) (citations omitted). The general principle governing identification is clear: "reliability is the lynchpin," and a suggestive procedure coupled with a risk of misidentification, measured by the *Biggers* factors, violates due process. *Brathwaite*, 432 U.S. 98, 114 (1977). The Supreme Court has never announced an "in-court-identification" exception to the general rule. The Mississippi Supreme Court accordingly inverted the proper application of this principle; the question is not whether to "extend" *Biggers* to a new situation but whether to exclude from its ambit a highly suggestive identification procedure to which it clearly applies. The Supreme Court has given lower courts no reason to make that exclusion.

Multiple federal courts have applied the *Brathwaite-Biggers* test in situations like these. *See Kennaugh*, 289 F.3d at 46 (acknowledging that suggestive nature of in-court identification, coupled with witness's earlier failure to make any identification, implicates

*Brathwaite* "reliability" test, but finding any error harmless); *id.* at 46-47;[100] *see also*

*United States v. Lang*, No. 06-30124, 2007 WL 1725548, at *6 (5th Cir. 2007) (applying

*Brathwaite-Biggers* factors to in-court identification by witness who was unable to

identify defendant pretrial); *United States v. Emanuele,* 51 F.3d 1123, 1131 (3d Cir. 1995)

(in-court identification by witness who initially could not make identification from photo

array was unnecessarily suggestive and required new trial). Although the Mississippi

Supreme Court cited opinions from other courts that agreed with its interpretation of what

federal law requires,[101] those cases also misapplied the law. The availability of cross-

examination cannot substitute for the application of the factors the Supreme Court has

---

[100] Citing *United States v. Rogers,* 126 F.3d 655, 658 (5th Cir. 1997) (employing *Brathwaite-Biggers* test to conclude identification by witness recalled to the stand after first testifying without making an identification "should not have been admitted," but finding no plain error); *Unted States v. Matthews,* 20 F.3d 538, 547 (2d Cir. 1994) (applying *Biggers-Brathwaite* factors to identification by witness who failed to choose defendant from photo array);  *United States v. Murray,* 65 F.3d 1161, 1168-69 & n. 6 (4th Cir.1995) (assessing the likelihood of irreparable misidentification from an initial in-court identification by relying upon the *Biggers* factors); *United States v. Hill,* 967 F.2d 226, 232 (6th Cir.1992) ("[T]he *Biggers* analysis applies to ... in-court identifications for the same reasons that the analysis applies to impermissibly suggestive pre-trial identifications. The due process concerns are identical in both cases and any attempt to draw a line based on the time the allegedly suggestive identification technique takes place seems arbitrary. All the concerns that underlie the *Biggers* analysis, including the degree of suggestiveness, the chance of mistake, and the threat to due process are no less applicable when the identification takes place for the first time at trial."); *United States v. Rundell,* 858 F.2d 425, 426 (8th Cir.1988) (applying *Brathwaite-Biggers* factors to in-court identifications of two witnesses who had not made pretrial identifications).

[101] *See Ralston v. State,* 309 S.E.2d 135, 136 (1983)*; United States v. Bush*, 749 F.2d 1227, 1231 (7th Cir.1984) ("deference shown the jury in weighing the reliability of potentially suggestive out-of-court identification would seem even more appropriate for in-court identifications where the jury is present and able to see first-hand the circumstances which may influence a witness"); *People v. Medina*, 617 N.Y.S.2d 491, 492-93 (App. Div. 1994) ("where there has not been a pretrial identification and defendant is identified in court for first time, defendant is not deprived of fair trial because defendant is able to explore weaknesses and suggestiveness of identification in front of the jury"); *State v. Smith*, 512 A.2d 189, 193 (Conn. 1986) (defendant's protection against obvious suggestiveness in courtroom identification confrontation is his right to cross-examination); *People v. Rodriguez*, 480 N.E.2d 1147, 1151 (Ill. 1985)("Where a witness first identifies the defendant at trial, defense counsel may test perceptions, memory, and bias of the witness, contemporaneously exposing weaknesses and adding perspective to lessen hazards of undue weight or mistake.").

identified as relevant to the reliability of an identification. The Supreme Court has never suggested otherwise.

The state court's refusal to analyze the in-court identification under the clearly established standard therefore requires this Court to review the claim *de novo* and rule that the admission of Ms. Brimage's in-court identification violated due process. *See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (when "the requirement set forth in § 2254(d)(1) is satisfied[, a] federal court must then resolve the [constitutional] claim without the deference AEDPA otherwise requires."). The Court should grant habeas relief on this ground from Mr. Galloway's conviction and death sentence, both on this ground alone and cumulatively with the other grounds in this petition.

### XVII. GROUND SEVENTEEN – The Trial Court's Overruling the Defense's Objection to Speculative and Constitutionally Unreliable Testimony on an Important Issue Violated Mr. Galloway's Rights to Due Process, a Fair Jury Trial, to Confront All Witnesses Against Him and to a Reliable Sentencing Determination as Guaranteed Him by the Sixth, Eighth, and Fourteenth Amendments.

The trial court allowed a police officer to give speculative testimony that he knew no one touched the Ford Taurus that multiple DNA samples were taken from even though it was unattended in a garage for a full night. The court overruled defense counsel's objection to this testimony, which impacted the jury's reception of the DNA evidence that was one of the key types of evidence used against Mr. Galloway. This violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

### A. Facts relevant to this ground for relief.

After the police took possession of the Ford Taurus belonging to Mr. Galloway's mother, they had the car towed to Bob's Garage, where it was left unattended overnight.

287

R.538-45. The next day, law enforcement collected DNA samples that were matched to Mr. Galloway and the victim. R. 474-76, 648-49; *see* Ground One, *supra*.

When asked on cross-examination whether he could "say unequivocally that no one touched the garage or had anything to do with the garage" before the car was turned over to the Sheriff's Department, Lt. McClenic answered "No." R.545. On re-direct examination, in response to whether an alarm in the garage had gone off, Lt. McClenic stated, "The only other person who would have gone in the building is if [the owner] got any more wrecker calls that night." R.546. When defense counsel objected to this statement as "speculation," Lt. McClenic insisted that he "kn[e]w it to be a fact." *Id*. The trial court overruled the objection. *Id.* The State then relied upon the DNA evidence collected from the car in closing arguments, maintaining that the DNA was "sufficient to tie the defendant and the victim to the murder weapon, which is the automobile." *See* R.690.

### B. The trial court violated Mr. Galloway's due process rights in allowing speculative testimony on a key issue in the trial.

"Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness." *California v. Trombetta*, 467 U.S. 479, 485 (1984). Thus, while "state and federal statutes and rules ordinarily govern the admissibility of evidence," the constitutional caveat is that evidence may not be introduced when it is "so extremely unfair that its admission violates fundamental conceptions of justice." *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012). In such cases, a trial is rendered "fundamentally unfair" and "the Fourteenth Amendment's Due Process Clause provides a mechanism for relief." *Payne v. Tennessee*, 501 U.S. 808, 809 (1991).

288

Lt. McClenic's testimony that he knew "it to be a fact" that the Ford Taurus was not at all touched when it parked overnight in a civilian parking garage violated "fundamental conceptions of justice." Given that Lt. McClenic admitted not having personally stayed overnight in the garage, this testimony was misleading speculation at best and knowing perjury at worst. In either case, the testimony was demonstrably false and should not have been presented to the jury. *See, e.g., Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959) (observing that "a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction"). The court committed constitutional error in overruling defense counsel's objection on these grounds.

## C. The admission of constitutionally unreliable testimony was prejudicial.

The Supreme Court in *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), held that habeas relief can be provided by federal courts when the error had a "substantial and injurious effect or influence in determining the jury's verdict." And where this determination leads a court to "virtual equipoise as to the harmlessness, under the *Brecht* standard, of the error, then we must conclude that it was harmful." *Woods v. Johnson,* 75 F.3d 1017, 1026-27 (5th Cir. 1996) (quoting *O'Neal v. McAninch,* 513 U.S. 432, 435 (1995)).

The admission of Lt. McClenic's testimony had a prejudicial impact on the jury and created an injurious effect on the outcome of Mr. Galloway's trial. The DNA recovered from the vehicle represented one of the stronger pieces of evidence against Mr. Galloway. The DNA evidence from the car was therefore a central component of the State's case, and a recurring focus in its closing arguments. *See* R.690; R.761.

One of Mr. Galloway's defense theories as to this central piece of evidence was that the DNA found in the Taurus may have gotten on the vehicle when it was left

unattended overnight at Bob's Garage. However, this theory was severely undercut when Lt. McClenic testified, in his capacity as a police lieutenant, that this was not possible because he knew as a "fact" that no one touched the car all night. *See* App. 117a-18a, 122 So.3d at 687 (noting that "it is likely that [Lt. McClenic's] testimony swayed the jury significantly on the chain-of-custody defense regarding the DNA on the vehicle," especially given his "extremely certain" testimony and "official capacity") (King, J., dissenting).

The testimony of Lt. McClenic painted a picture of the chain of custody of the car for jurors. It was an essential piece of evidence connecting Mr. Galloway to the DNA present in the vehicle. Lt. McClenic was without direct knowledge of what occurred but stated his testimony with extreme certainty. This error had a substantial and injurious effect on the outcome at both phases of trial. Together with all other errors committed in the aggregate, this unreliable testimony contributed to a trial rampant with prejudice for Mr. Galloway.

**D. AEDPA places no limit on this Court's ability to review this claim.**

The Mississippi Supreme Court found the argument regarding this speculative testimony to be without merit. App. 46a, 122 So.3d at 648. The court acknowledged that Lt. McClenic "improperly insisted" that he "[knew] it to be a fact" that no one would have entered the garage overnight unless the owner had received other calls. App. 43a, 122 So. 3d at 646. It nevertheless ruled on state evidentiary grounds that the trial court did not abuse its discretion in overruling the defense objection. Lt. McClenic's testimony was acceptable because it was based upon his "past personal experience and personal observations with the operation of Bob's Wrecker Service," established through questions

asked by Mr. Galloway's defense attorney on cross-examination. The court also found that the jury was able to hear Lt. McClenic admit that he could not definitively confirm that no one else had touched the vehicle before it was turned over to the authorities. *Id.* at 648 (citing Mississippi Rule of Evidence 602).

This Court's review is *de novo* since the Mississippi Supreme Court did not rule on the constitutional aspects of this claim. Regardless, the ruling was contrary to, or an unreasonable application of, clearly established Federal law, or resulted in an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1), (2). The prejudicial nature of the testimony rendered Mr. Galloway's trial unfair and "clearly established law provide[s] that the Due Process Clause forbids the introduction of evidence so unduly prejudicial as to render a criminal trial fundamentally unfair." *Andrew*, 604 U.S. at 96; *see also Payne*, 501 U.S. at 831 ("If, in a particular case, a witness' testimony or a prosecutor's remark so infects the sentencing proceeding as to render it fundamentally unfair, the defendant may seek appropriate relief under the Due Process Clause of the Fourteenth Amendment.") (O'Connor, J., concurring).

Moreover, the Mississippi Supreme Court's decision relied on an unreasonable determination of facts because, contrary to the opinion's statement, "McClenic's past personal experience and personal observations of Bob's Wrecker Service" could not reasonably have allowed him to "know it to be a fact" whether anyone accessed the Ford Taurus for the night it was left completely unattended. App. 46a, *Galloway*, 122 So.3d at 648.

### E.  Conclusion

The trial court's overruling of the defense objection to speculative and constitutionally unreliable testimony violated Mr. Galloway's due process and Sixth Amendment rights to a fair jury trial. The admission of the testimony went to a key issue of Mr. Galloway's case which prejudicially impacted the jury. The Mississippi Supreme Court's finding is in direct contrast to settled Supreme Court precedent, meriting habeas relief at the guilt-innocence phase, or at a minimum the penalty phase, both alone and in combination with the other errors set forth in this petition.

### XVIII.    GROUND EIGHTEEN – The Trial Court Deprived Mr. Galloway of his Sixth Amendment Right to Confrontation by Allowing the Admission of Multiple Testimonial Hearsay Statements.

The trial court admitted prejudicial testimonial hearsay statements through three State witnesses: Investigator Carbine, Lieutenant Ken McClenic of the Jackson County Sheriff's Department, and DNA analyst Dubourg. The State used each out-of-court statement for the truth of the matter asserted. Moreover, because the Statements were testimonial in nature, the State did not establish that the out-of-court declarants were unavailable, and Mr. Galloway had no prior opportunity to cross-examine them, the court's admission of each statement violated Mr. Galloway's confrontation clause rights. *Crawford*, 541 U.S. 36, 59; U.S. CONST. AMENDS. VI, XIV. The Mississippi Supreme Court's rejection of this claim should receive no deference from this Court because 28 U.S.C. § 2254(d) does not limit its plenary review. Therefore, the Court should grant Mr. Galloway habeas relief.

### A. The admission of each out-of-court statement violated *Crawford's* bar on testimonial hearsay.

The Sixth Amendment's Confrontation Clause bars admission of testimonial hearsay statements in criminal cases unless the declarant is shown to be unavailable and the defendant had

a prior opportunity to cross-examine them. *Crawford*, 541 U.S. at 59. The statements here fall within *Crawford's* prohibition.

### 1. Each statement was offered for the truth of the matter asserted.

Out-of-court statements are hearsay, and generally inadmissible, when offered to prove the truth of the matter asserted. Fed. R. Evid. 801-02 (defining and prohibiting hearsay); *Anderson v. United States*, 417 U.S. 211 (1974). Yet during the testimony of three witnesses, the trial court admitted out-of-court statements that the State relied on as true.

***Investigator Carbine***. The court admitted two forms of hearsay from Investigator Carbine. First, on direct examination, Investigator Carbine testified that she found shoes, a hat, and a bottle of New Amsterdam Gin in a space she identified as Mr. Galloway's room in his mother's house. R. 486-88, 491, 492. On cross, she admitted that Mr. Galloway's mother had told her that the room was his; his mother had pointed out "his living space, the space he occupied while he was there," R. 520, and described the space as "a bathroom, with a majority—or all of Galloway's items belonged to him …." *Id.* The State then asked Investigator Carbine to clarify on re-direct and she testified that she knew the space belonged to Mr. Galloway because "[h]is mom pointed it out to [the police]." R. 533-34. Of course, Investigator Carbine had no personal knowledge that this space belonged to Mr. Galloway; she merely reiterated his mother's out-of-court statements.

The State used these statements for their truth: that these areas of the house were Mr. Galloway's, and all belongings within were his. DNA samples found on the shoes and hat produced profiles consistent with Ms. Anderson's known reference sample. R. 645-46. The bottle of gin was the same brand as that found at the crime scene. R. 497-98. The defense questioned Ms. Dubourg about her lab's failure to further test the hat and shoes to identify their owner, *see* R. 659-60, and suggested to the jury that the shoes and the hat could have belonged to Cornelius Triplett,

who also lived at the house and was in the car Mr. Galloway was driving at the time of his arrest. *See* R. 770, 771. The defense also questioned the decision not to test the gin bottle for fingerprints. R. 770, 771. To rebut this argument, the State used the statements of Mr. Galloway's mother for their truth:

> [Investigator Carbine] went to the house and she found the area where Bo stayed, that defendant …. Went to his room. What did she find. She found the shoes, the hat, the gin bottle, some personal belongings of the defendant in the room **where that defendant's momma said he occupied. Well, it's her house. She knows who lives there.** And those were the shoes, that was the hat that had Shakeylia's remains, her blood on them in his room, nobody else's.

R. 782 (emphasis added). The court overruled defense's hearsay objection. R. 534

**Lt. McClenic.** Lt. McClenic testified that Mr. Galloway drove his mother's white Taurus from her house on December 9, 2008, shortly before law enforcement arrested him. R. 537, 539. On cross-examination, he admitted he was only relaying what his deputies told him. R. 541–42. In doing so, he offered their statements for their truth: that Mr. Galloway drove the vehicle that night.

**Ms. Dubourg**. DNA Analyst Dubourg testified that her lab received and tested blood samples from within the Taurus for DNA. R. 640. *See also* R. 648 ("the swab with blood"), 649 (same). The record does not reveal whether anybody conducted such testing, or if the substance actually was blood. *Cf.* R. 635 (Ms. Dubourg describing the sample as a "possible blood *like* substance) (emphasis added). The Court admitted this testimony for its truth, as it did all other hearsay testimony in which Ms. Dubourg relayed the findings of testing DNA Analyst Ms. Golden, *see supra* Ground One. And in closing argument, the State used the relayed statements for their truth: they argued that the police found Mr. Galloway's and Ms. Anderson's blood in the Taurus. R. 782 ("You will see

the smear marks right by the trunk release, where if you want to hit the trunk release a mixture of that defendant's blood and Shakeylia Anderson's blood.").

Each of the statements that Det. Carbine, Lt. McClenic, and Ms. Dubourg relayed were made by an out-of-court declarant and admitted for its truth. Each is hearsay. Fed. R. Ev. 801.

### 2. Each hearsay statement was testimonial in nature.

Hearsay is testimonial when its "primary purpose" is to serve as trial evidence. *See Smith*, 602 U.S. at 800–01. As this Court recognized in *Melendez-Diaz*, and as discussed *supra* Ground One, the primary purpose test is satisfied when a declarant makes a statement "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." 557 U.S. at 310.

In *Davis v. Washington*, 547 U.S. 813, 814-15 (2006) (consolidated for opinion with *Hammon v. Indiana*, No. 05-5705), the Supreme Court held that statements made to police during the investigation of past criminal conduct—not during an active emergency—are testimonial. The Court distinguished between statements made to resolve an ongoing emergency and those elicited to establish or prove past events. In *Davis*, statements made during a victim's frantic 911 call were non-testimonial because the purpose was to obtain immediate help during an ongoing domestic incident. *Id.* at 826-27. By contrast, in *Hammon*, the victim's statements to police at the scene after the altercation ended were testimonial, because their primary purpose was to "establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 822. The statement was testimonial, even though it did not take place in a formal police interrogation as in *Crawford*. *Id.*

Here, the "primary purpose" of each challenged statement was to serve as trial evidence. When Mr. Galloway's mother identified the room as his when speaking with Investigator Carbine, she did so during the execution of a search warrant for evidence related to this crime. R. 591, 533. She was aware of the purpose of the police's search; when they entered the home, they "explained to Miss Galloway why [they] were there and that [they] needed to—[they] had a search warrant for the house, [they] needed to know what living space belonged to" her son. R. 519. There was no active emergency. *Cf.* Davis, 547 U.S. at 814-15. Any reasonable person would understand that statements made to law enforcement during the execution of a search warrant, identifying a suspect's living quarters, could be used as evidence at trial. *See Melendez-Diaz*, 557 U.S. at 310. Lieutenant McClenic's statement that Mr. Galloway "was the driver of the white Ford Taurus" on the night that Ms. Anderson died similarly relayed testimonial hearsay. He relayed the statements of two detectives, whose primary purpose in sharing the information with Lieutenant McClenic was to gather evidence that the State could later use in its prosecution.

Ms. Dubourg's statement that "blood" was found in the car relied on testimonial hearsay. The record does not indicate whether anybody recovered blood in that car, whether it was tested, or whether it was a "blood-like substance" as other mixtures were described in the record. But the testing of any substance like this, to the extent it was done, and the recorded results, is testimonial. *Smith*, 602 U.S. at 802 (finding records of test results in a lab report testimonial when its primary purpose is focused on producing evidence for a court proceeding); *see supra* Ground One.

### 3. Neither of the two conditions necessary for the admission of testimonial hearsay under *Crawford* exist here.

*Crawford* permits the admission of testimonial hearsay only when the declarant is unavailable and the defendant had a prior opportunity for cross-examination. 541 U.S. at 59. The record shows neither condition was met. Because those requirements were absent, admitting each hearsay statement violated Mr. Galloway's Sixth Amendment right to confront the witnesses against him.

### B. The admission of the statements prejudiced Mr. Galloway.

The constitutional error here had a "substantial and injurious effect" on the outcome of Mr. Galloway's trial. *Brecht*, 507 U.S. at 638; *accord Brown*, 596 U.S. at 122; *Hodges*, 648 F.3d at 290 (granting habeas relief for Confrontation Clause error); *Burbank*, 535 F.3d at 357-58 (same); *Wilkerson*, 233 F.3d at 892 (same). The habeas court must grant relief if it finds itself in "grave doubt" about whether the error had such effect. *O'Neal*, 513 U.S. at 435.

Investigator Carbine's hearsay testimony was the sole basis for linking Mr. Galloway to incriminating items found in his mother's home. In the bedroom, police discovered shoes and a hat bearing DNA consistent with Ms. Anderson's reference sample, R. 645-46, as well as a bottle of gin matching one found at the crime scene. R. 497-98. The defense argued that these items belonged to another resident of the home, Mr. Triplett. Rather than call Mr. Galloway's mother to testify that Mr. Galloway was the resident of the bedroom, the State relied on her out-of-court statements, asserting in summation that the room where Investigator Carbine found "the shoes, that hat, that gin bottle" was "the room where that defendant's momma said he occupied. . . it's her house. She knows who lives there." R. 782. Without his mother's hearsay, the State could not have linked the incriminating items to Mr. Galloway and undercut the defense's alternative-suspect argument.

297

DNA analyst Dubourg provided the jury with testimony that went well beyond her personal knowledge. *See also infra* Ground Two (arguing that the entirety of her testimony was testimonial hearsay under *Smith*, 602 U.S. 779, as she did not conduct any tests herself). She relayed hearsay from unidentified sources that the swabs tested from the Taurus contained "blood," even though she herself performed no serological testing and could not confirm that fact. *See* R. 645 (distinguishing "possible blood-like substance"). The State then exploited these statements in summation, arguing that the blood in the Taurus belonged both to Mr. Galloway and Ms. Anderson. R. 782. This was powerful and inflammatory evidence, striking at the heart of the defense theory that any number of other people, including Mr. Triplett, could have been alternate suspects.

The State also relied on Lt. McClenic to place Mr. Galloway in the white Taurus—the alleged murder weapon—on the night Ms. Anderson was killed. McClenic testified that Mr. Galloway was driving his mother's Taurus when it left her home on December 9, 2008, shortly before his arrest. R. 537, 539. Again, without this hearsay, the State had no other basis to argue that Mr. Galloway drove the vehicle on the night Ms. Anderson died.

Time and again, the State relied on out-of-court statements to tie incriminating evidence to Mr. Galloway. It was hearsay that placed the shoes and hat with Ms. Anderson's DNA in his possession; hearsay that suggested the gin at the scene matched the brand he drank; hearsay that put him behind the wheel of the Taurus that night; and hearsay that claimed her "blood" was in the car. At every turn, the State declined to call witnesses Mr. Galloway could confront and cross-examine. Instead, it sidestepped the Confrontation Clause and built its case on untested, unreliable statements. Because these errors had, at minimum, a "substantial and injurious effect or influence"

on the verdict, *Brecht*, 507 U.S. at 623, habeas relief is required. And even if the Court finds itself in equipoise about their effect, *O'Neal*, 513 U.S. at 435, mandates granting relief.

The admitted hearsay evidence was so prejudicial that, at minimum, it had a substantial and injurious effect on the penalty phase trial. The jury heard the State connect Mr. Galloway to the crime in ways it otherwise could not have. In their eyes, his culpability increased, and when it came time for the choice between life and death, he appeared more blameworthy. The hearsay also undercut the defense's alternative-suspect theories, making Mr. Galloway appear dishonest or unremorseful. Jurors could conclude that his lawyers had tried to mislead them, when in fact it was the State's untested statements that undermined the defense, with no opportunity for Mr. Galloway to challenge them. In a capital case, where the Constitution requires reliability before the State may take a life, *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976), the use of unreliable, unexamined statements to secure a death sentence cannot be harmless. His death sentence was attained with untested testimonial hearsay, and habeas relief is required.

### C. The claim is exhausted.

As the State concedes, Mr. Galloway exhausted this claim. Answer at 28.

### D. The claim is not procedurally defaulted, in whole or in part.

The State argues that Mr. Galloway has partially defaulted this claim by failing to contemporaneously object at trial to Ms. Dubourg's testimony about the "blood" in the Taurus. Answer at 28.[102] A procedural ruling in state court cannot bar federal review unless the ruling rests on an adequate and independent state ground. *See Brown v. Davenport*, 596 U.S. 118, 133 (2022) (citing *Wainwright v. Sykes*, 433 U.S. 72 (1977)).

---

[102] The State also argues that Mr. Galloway's confrontation claim respecting cell phone records was defaulted. Answer at 28. Mr. Galloway does not pursue that claim here.

The State court's ruling is inextricable from a federal ground, and thus, cannot bar this Court's review.

> Section 99-39-21(a) of the Mississippi Code provides in relevant part that:

> Failure by a prisoner to raise objections, defenses, claims, questions, issues or errors either in fact or law which were capable of determination at trial and/or on direct appeal, regardless of whether such are based on the laws and the Constitution of the state of Mississippi or of the United States, shall constitute a waiver thereof and shall be procedurally barred[.]

At the time of the alleged default—during Mr. Galloway's trial—Mississippi law provided that an error that violated a petitioner's "fundamental constitutional rights" surmounted the procedural bars in the Uniform Post-Conviction Collateral Relief Act ("UPCCRA"). *See Rowland v. State*, 42 So. 3d 503, 506 (Miss. 2010); *Bevill v. State*, 669 So. 2d 14, 17 (Miss. 1996). Under that doctrine, if a reviewing court concluded that a litigant had suffered the violation of a fundamental constitutional right, "no discretion is afforded when deciding whether to except a claim . . . from procedural bars." *Rowland*, 42 So. 3d at 507, 508. The Mississippi Supreme Court had also held that it would relax procedural rules in capital cases when it would advance "the interests of justice." *Williams v. State*, 445 So. 2d 798, 810 (Miss. 1984).

Under this scheme, the state court's rejection of Mr. Galloway's federal claim as procedurally defaulted is inextricably tied to federal law. The UPCCRA required the court to evaluate, and then grant or deny, his claims under the United States Constitution. In denying them, the court necessarily determined that no federal constitutional violation occurred. Because the state court's ruling rests on federal grounds, it cannot serve as an independent and adequate bar to this Court's review.

**E.  AEDPA does not bar this Court from granting habeas relief.**

Title 28 U.S.C. § 2254(d) permits a federal court to set aside a state court's merits ruling if the ruling was "contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or relied upon a "unreasonable determination of the facts." The Mississippi Supreme Court's decision on this ground unreasonably applied clearly established Confrontation Clause precedent under *Crawford*. The Court may grant habeas relief.

> **1.  *Loper-Bright* makes clear that 28 U.S.C. § 2254(d) unconstitutionally constrains federal courts' independent judgment.**

In *Loper Bright Enterprises*, the Supreme Court established that the forced "deference" that § 2254 imposes on habeas courts violates both Article III and the Supremacy Clause and the rule of constitutional avoidance. 603 U.S. 369; *see infra* Ground Thirty-One. This Court should accordingly afford the Mississippi Supreme Court no deference and review Mr. Galloway's claims de novo.

> **2.  The State does not deny that the state court unreasonably applied clearly established federal law.**

The Supreme Court has not decided whether the State can waive AEDPA's limitations on review. *Cf. Brumfield*, 576 U.S. 305 at 23 (finding that the State waived argument that trial court's decision should be reviewed under § 2254(e)(1) instead of § (d)(2) by not raising it in court below); *but see Miller-El*, 545 U.S. at 282 (Thomas, J., dissenting) (questioning whether § 2254(d)(2) is waivable); *Neal*, 78 F.4th at 785 (holding standards under § 2254(d) and (e)(1) may not be waived by government); *Langley*, 926 F.3d at 162 & n.8. Here, the State declined to oppose Mr. Galloway's argument that the state court unreasonably applied clearly established federal law. Answer at 28 (opposing

301

Mr. Galloway's argument that the state court decision was rooted in an unreasonable determination of the facts, but not that it unreasonably applied federal law). This Court may, and should, find that the State, by choosing not to oppose, concedes that AEDPA does not limit Mr. Galloway's relief on this basis.

### 3.  The state court unreasonably applied clearly established federal law.

The Mississippi Supreme Court rejected Mr. Galloway's claim that testimony from Investigator Carbine, Lieutenant McClenic, and analyst Dubourg constituted inadmissible, prejudicial testimonial hearsay. *Galloway*, 122 So.3d at 645-46. The court held that any challenge to Ms. Dubourg's testimony was not preserved because the defense failed to object. As to Investigator Carbine and Lieutenant McClenic, the court concluded the defense had "opened the door" to their testimony and therefore could not complain on appeal, citing state precedent and *United States v. Jimenez*, 509 F.3d 682, 691 (5th Cir. 2007).

To the extent that this door-opening ruling was procedural, it was intertwined with federal law. *See supra,* Ground Eighteen, Section D (arguing that under the UPCCRA and *Rowland*, 42 So. 3d at 507, the state court's denial of Mr. Galloway's confrontation claim here implicitly determined that no federal constitutional violation occurred). It was, moreover, an unreasonable application of clearly established federal law.

Moreover, the ruling was an unreasonable application of federal law. Clearly established federal law dictates that the defense cannot "open the door" to evidence otherwise barred by the Confrontation Clause. *Hemphill v. New York*, 595 U.S. 140, 152 (2022). The Confrontation Clause regulates out-of-court statements, not "the law of evidence of the time being" in any given state. *Crawford*, 541 U.S. at 51 (citation

302

modified) ("Leaving the regulation of out-of-court statements to the law of evidence would render the Confrontation Clause powerless to prevent even the most flagrant inquisitorial practices."). The text of the Sixth Amendment does not permit courts to develop "open-ended exceptions from the confrontation requirement." *Id*. at 54. While states may adopt procedural rules governing objections, *see*, *e.g.*, *Melendez-Diaz*, 577 U.S. at 327, and remove defendants from court notwithstanding their confrontation rights if they act in a manner so disorderly, disruptive, and disrespectful that trial cannot continue with him in the courtroom, *Illinois v. Alen*, 397 U.S. 337 (1970), no state may allow a rule of evidence to substantively limit the scope of Sixth Amendment confrontation rights. *Hemphill*, 595 U.S. at 152.

The local New York evidentiary rule at issue in *Hemphill* allowed for the admission of otherwise inadmissible testimonial hearsay if defendants "open[ed] the door" by introducing evidence that created a misleading impression of the contents of otherwise barred statements. 595 U.S. at 152-153 (abrogating *People v. Reid*, 19 N.Y.3d 382 (N.Y. 2012) and *People v. Massie*, 2 N.Y.3d 179 (N.Y. 2004)). New York had rooted this rule in a few federal circuit court decisions, despite the extant circuit split.[103]

In *Hemphill*, a stray 9mm bullet killed a child when two men, Darrell Hemphill and Nicholas Morris, fought in the Bronx. The police found ammunition for a 9mm cartridge and .357 caliber bullets in Morris's home. He later pled to possession of a .357 revolver, which was not the caliber weapon that had killed the child. *Id.* at 687. At

---

[103] *See*, *e.g.*, *United States v. Lopez-Medina*, 596 F.3d 716, 733 (10th Cir. 2010); *United States v. Holmes*, 620 F.3d 836, 843–44 (8th Cir. 2010); *United States v. Cruz-Diaz*, 550 F.3d 169, 178 (1st Cir. 2008); *United States v. Acosta*, 475 F.3d 677, 683-84 (5th Cir. 2007); *but see United States v. Cromer*, 389 F.3d 662, 679 (6th Cir. 2004) ("the mere fact that Cromer may have opened the door to the testimonial, out-of-court statement that violated his confrontation right is not sufficient to erase that violation.")

Hemphill's trial, the defense elicited evidence that the police had recovered a 9mm cartridge from Morris's home, arguing that he was the shooter of the 9mm bullet. *Id.* at 687-88. Because the court believed that this created a misleading impression of the facts for the jury, it permitted the prosecution to introduce the portion of Morris's plea allocution where he admitted only to owning the .357 revolver. The defense had "opened the door" to the otherwise inadmissible testimonial hearsay. *Id.* at 688.

The Supreme Court reversed. The Confrontation Clause demands that cross-examination tests the reliability and veracity of testimonial hearsay against a criminal defendant; it is not for the trial court to decide when it is necessary to admit testimonial hearsay under an evidentiary rule that sidesteps these processes. *Id.* at 693.

Here, the state court ignored *Crawford*'s demand and allowed a local state evidentiary rule to dictate whether Mr. Galloway had a right to confront his witnesses. *Crawford*, 541 U.S. at 51. As in *Hemphill*, the door-opening rule substantively altered the scope of Mr. Galloway's confrontation rights. The court misapplied longstanding, clear federal law.

### 4. *Teague*'s bar on retroactivity does not preclude this Court from applying *Hemphill*'s rule.

*Teague* bars the retroactive application of new constitutional rules of criminal procedure to the cases of litigants whose cases have reached finality. 489 U.S. at 316. Whether a rule of criminal procedure is new turns on whether it "broke new ground" or was "dictated by precedent." *See Stringer*, 503 U.S. at 228-29. *Teague* bars retroactive application of the former, but not the latter. Restatements or refinements of longstanding precedent do not trigger *Teague*'s bar, nor do rules that impose a more specific requirement that is rooted in a longstanding general rule. *Id.* at 231; *see Andrew*, 604 U.S.

at 94 ("General legal principles can constitute clearly established law for purposes of AEDPA so long as they are holdings of this Court."); *Smith*, 422 F.3d at 278-279 (finding that *Wiggins*, 539 U.S. at 510, did not create a new rule of criminal procedure because the *Wiggins* court firmly rooted its holding in longstanding *Strickland* precedent).

*Hemphill* expressly roots its holding in *Crawford* and centuries-old common law Confrontation Clause precedent. In addressing the "bedrock constitutional protections" that the State conceded, the Court framed *Crawford* as having "examined the history of the confrontation right at common law." *Hemphill v. New York*, 595 U.S. 140, 150 (2022). To explain why *Crawford* rejected the reliability-based approach of *Ohio v. Roberts*, 448 U.S. 56 (1980), the Court cited *Crawford*'s interpretation of the Framers' intent:

> '[T]he Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.' Because '[t]he text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts,' the requirement was 'most naturally read' to admit 'only those exceptions established at the time of the founding.'

*Id*. (quoting *Crawford*, 541 U.S. at 53-53) (citation modified). The Court goes on to rely on *Crawford* heavily throughout its opinion.

*Hemphill* did not create a new rule of criminal procedure; it applied the same logic underlying "*Crawford*'s emphatic rejection of the reliability-based approach of [*Roberts*]" to New York's door-opening doctrine. *Id*. at 151-53. The pre-*Crawford* rule in *Roberts* had permitted the admission of unavailable witness statements so long as they fell within a hearsay exception, that is, that they had some indicia of reliability that the Court could determine with an evidentiary rule. *Id*. As *Hemphill* explained, "[i]f *Crawford* stands for anything, it is that the history, text, and purpose of the

Confrontation Clause bar judges from substituting their own determinations of reliability for the method the Constitution guarantees." *Id.* at 152. *Hemphill* found New York's rule "antithetical to the Confrontation Clause" for this same reason. *Id.* at 153.

Rather than breaking new ground, *Stringer*, 503 U.S. at 228-29, *Hemphill* followed directly from *Crawford*'s core holding: only the crucible of cross-examination can test reliability, not an evidentiary rule or judicial opinion on reliability. *Hemphill* is as rooted in *Crawford*'s doctrine as *Wiggins* is in *Strickland's*. *Cf. Smith*, 422 F.3d at 278-279. While *Hemphill* was decided after the state court decision here, *Crawford* predates it. *Hemphill*'s rule is not a new rule of criminal procedure, and thus *Teague* does not bar its application.

### F.  Conclusion

Throughout Mr. Galloway's trial, the court admitted testimonial hearsay that allowed the State to inculpate him while denying him the opportunity to confront his accusers. The Mississippi Supreme Court affirmed these rulings in defiance of clear Supreme Court precedent safeguarding the very confrontation rights the trial court disregarded. This Court should grant Mr. Galloway habeas relief from his conviction or, at a minimum, his sentence on this ground, both alone and in combination with the other claims in this petition.

### XIX.  GROUND NINETEEN – The Prosecution's Misconduct Violated Mr. Galloway's Rights Under the Sixth, Eighth, and Fourteenth Amendments.

Over and again, by its conduct, the prosecution violated Mr. Galloway's right to have the jury trial characterized by the fairness and due process that the Constitution demands. Instead, the prosecution offered and relied upon scientifically unreliable evidence, misstated multiple times the testimony before the jury, mischaracterized the

306

law the jury was to apply, and miscommunicated the role of a capital jury. Any of these categories of error were enough to prejudice Mr. Galloway by themselves, and they certainly were in the aggregate, and merit relief as violations of his rights under the Sixth, Eight and Fourteenth Amendments.

### A. The prosecution repeatedly engaged in misconduct.

Because a prosecutor's role is not that "of an ordinary party" but rather a "servant of the law," a prosector must "refrain from improper methods" in securing a conviction. *Berger v. United States*, 295 U.S. 78, 88 (1935). Failure to do so by a prosecutor "implicates due process concerns." *Foy v. Donnelly*, 9529 F.2d 1307 (5th Cir. 1992). Thus, where a prosecutor engages in misconduct, and particularly when such misconduct is "pronounced and persistent," relief is warranted. *Berger*, 295 U.S. at 89.

### 1. The prosecution repeatedly misled the jury as to the law and the facts.

It is a basic tenet of a fair trial that a prosecutor may not "manipulate or misstate the evidence" against a defendant. *Darden v. Wainwright*, 477 U.S. 168, 182 (1986); *United States v. Blakey*, 14 F.3d 1557, 1560 (11th Cir. 1994) ("[A] prosecutor may not make suggestions, insinuations, and assertions calculated to mislead the jury."). Nevertheless, the prosecution in this case misled the jury multiple times, regarding matters scientific, factual, and legal.

To begin, the prosecution presented scientifically unreliable and misleading evidence through the testimony of Dr. McGarry about whether or not a sexual battery occurred—a matter central to Mr. Galloway's capital conviction—and then heavily leaned on this evidence for summation. R.675-78; 739-40; 783. *See* Ground Two, *supra*. The prosecution then misled the jury as to the testimony of other expert witnesses, Dr.

307

Acton and DNA analyst Bonnie Dubourg. As to Dr. Acton, the prosecution misrepresented that he had "agreed" with "all but two different exhibits" showing that Mr. Galloway was responsible for the victim's murder. R.762; 782-83. The prosecution also falsely told the jury that Bonnie Dubourg had testified that the victim's blood was on the recovered hat and shoes (R.782), when no one—Ms. Dubourg or otherwise—had in fact ever made this claim.

In addition to these factual misrepresentations, the prosecution engaged in misconduct when it "mischaracterize[d] the applicable law." *Beuke v. Houk*, 537 F.3d 618, 650 (6th Cir. 2008). In particular, the prosecution told the jury it should find the aggravating circumstance that the defendant had previously been convicted of a crime involving the use or threat of violence simply because Mr. Galloway had previously pled guilty to carjacking. R.859. According to the prosecution, carjacking itself was "clearly and by law [] a conviction involving the use of threat or violence to another person" such that it would automatically meet the requirements for this aggravating factor. *Id*. However, this mischaracterized the carjacking statute, which clearly states that it pertains to motor vehicles taken "by force *or* violence" that may even include "stealthy seizure or snatching." MISS. CODE § 97-3-117(1) (emphasis added). In other words, the evidence before the jury failed to illustrate whether Mr. Galloway had *actually* threatened or used violence—as opposed to stealth—as would be necessary for this aggravating factor to apply to him.

### 2. The prosecution wrongfully misled the jury as to their roles as a capital sentencing body.

The specialized role of a capital (as opposed to noncapital) jury "requires consideration of the character and record of the individual offender *and* the circumstances

of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976).  (emphasis added). However, the prosecution repeatedly obfuscated the jury's role by concentrating on only the latter part of this inquiry, repeatedly asking Mr. Galloway's mitigation witnesses whether they believed the punishment should "fit the crime" (R. 830, 832, 834, 838, 840). Over and again, the prosecutor made it seem as though the jury's legal obligation ended with this inquiry alone. Doing so failed to show the requisite "fundamental respect for humanity underlying the Eighth Amendment." *Woodson*, 428 U.S. at 304.

In addition, the prosecution violated the rule that "[a] prosecutor may not make an appeal to the jury that is directed to passion or prejudice rather than to an understanding of the facts and of the law." *United States v. Phillips*, 664 F.2d 971, 1030 (5th Cir. 1981) (internal quotation omitted). The prosecution did so in summation, telling the jury that witness Dixie Brimage had "bravely" testified that Mr. Galloway was the person she saw speaking with the victim. R. 759. This not only improperly targeted the jury's passions and prejudices, but also constituted improper vouching for the veracity of Dixie Brimage. *See United States v. Washington*, 44 F.3d 1271, 1278 (5th Cir. 1995) ("The law is clear that in closing argument a prosecutor may not personally vouch for the credibility of a government witness . . .").

**B.  The prosecution's misconduct prejudiced Mr. Galloway.**

In *Brecht,* 507 U.S. at 637, the Supreme Court provided that a federal court may grant habeas relief when it determines that the error had a "substantial and injurious effect or influence in determining the jury's verdict." Prosecutorial misconduct prejudices a

defendant any time it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 169 (1986). And where this determination leads a court to "virtual equipoise as to the harmlessness under the *Brecht* standard, of the error, then we must conclude that it was harmful." *Woods v. Johnson,* 75 F.3d 1017, 1026-27 (5th Cir. 1996) (quoting *O'Neal,* 513 U.S. at 435).

The prosecution's misconduct clearly had a prejudicial impact on the jury and infected Mr. Galloway's trial with unfairness. The scientifically unreliable testimony of Dr. McGarry, and the prosecution's reliance on it, prejudiced the trial as to the central point of whether a sexual battery had occurred such that Mr. Galloway could be charged capitally. *See* Ground Two, *infra*. This misconduct was only worsened by the mischaracterizations of DNA experts that misleadingly undermined evidence on Dr. Acton's behalf and wholly created blood evidence on the hat and shoes where there was none.

Similarly, the prosecution's mischaracterization of the law around carjacking also went to a key issue in the case: the existence of an aggravator regarding previous conviction of a crime involving the use or threat of violence. R.859. These errors, and the misstatements above, were then made all the more impactful by the prosecution's vouching for Dixie Brimage and repeated call that a punishment "fit the crime," as opposed to the fulsome consideration of multiple factors, including a person's character and background, that is constitutionally required per Supreme Court precedent.

Each of the above instances infected Mr. Galloway's trial with unfairness separately, and certainly in the aggregate. "[W]e have not here a case where the

310

misconduct of the prosecuting attorney was slight or confined to a single instance, but one where such misconduct was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential." *Berger*, 295 U.S. 78 at 89. This is particularly so where, as here, none of this misconduct was met with "stern rebuke [or] repressive measures" by the trial court. *Id.* at 632. The cumulative effect of the prosecutor's errors prejudiced Mr. Galloway's defense at both stages of trial.

**C. AEDPA does not limit this Court's ability to grant relief.**

As discussed in Claim Thirty-One, the Supreme Court established in *Loper Bright Enterprises* that the forced "deference" that § 2254 imposes on habeas courts violates both Article III, the Supremacy Clause, and the rule of constitutional avoidance. 603 U.S. 369; *see infra* Claim Thirty-One. This Court should accordingly afford the Mississippi Supreme Court no deference and review Mr. Galloway's claims independently. However, even this court finds that 28 U.S.C. § 2254(d) applies in this case, Mr. Galloway is still entitled to relief because, first, the State does not deny that the state court unreasonably applied clearly established federal law. Answer at 28. Moreover, as discussed below, the Mississippi Supreme Court's decision as to the prosecution's misconduct relied on an unreasonable determination of facts and unreasonably applied clearly established federal law.

**1. The Mississippi Supreme Court adjudicated Mr. Galloway's prosecutorial misconduct claims on the merits.**

Although the State argued on direct review that Mr. Galloway's claims regarding prosecutorial misconduct were not preserved for appeal, the Mississippi Supreme Court, after noting the State's argument, decided to "address the merits of this issue," "procedural bar notwithstanding." App. 35a, 122 So.3d at 643. On the merits, the state

311

court addressed what it grouped as four different categories of prosecutorial misconduct: reliance on scientifically unreliable testimony, misstating evidence, witness vouching and inflaming juror passions, and misstating law.

As to reliance on Dr. McGarry's unreliable testimony, the court held the testimony itself "presented no reversible error, and the State was permitted to rely on it during its summation of the evidence." *Id.* The court similarly saw no factual issue with the prosecution's portrayal of Dr. Acton's testimony. App. 36a, 122 So. 3d at 643. On the other hand, the court recognized the prosecution's misstatement regarding blood evidence as testified to by Bonnie Dubourg, but found "any error here was harmless, given the presence of the victim's DNA on the items." App. 37a, 122 So.3d at 644.

Regarding the prosecution's improper inflaming of juror passions, the court found that the prosecution's reference to Dixie Brimage as "bravely" implicating Mr. Galloway did not render the trial "fundamentally unfair." *Id.* And as for the prosecution's repeated asking of witnesses "whether punishment should fit the crime," the court stated that it "s[aw] no problem with such a question" which it felt "should have served to focus the jury on the appropriate punishment for Galloway's crime." App. 38a, 122 So. 3d at 644.

Finally, the court found that the prosecution did not misstate the law as to the complained-of aggravator because "the act of carjacking per se involves conduct that presents a serious potential risk of physical violence to another" and thus saw no problem with the prosecution's representation on the issue to the jury. App. 39a, 122 So. 3d at 644-45.

## 2. The prosecutorial misconduct claim is exhausted, and was not defaulted.

The State properly acknowledges that Mr. Galloway exhausted this claim. *See* State's Answer at 28.

Although the State now claims that the claim was procedurally defaulted (*id.*), this overlooks that the court explicitly stated that it would address the merits of Mr. Galloway's prosecutorial misconduct claim and then proceeded to do so. *See Coleman v. Thompson,* 501 U.S. 722, 743 (2012). And because the court did not make a "plain statement" "clearly and expressly" relying on an alternative procedural ground, the claim is not defaulted on federal habeas review. *See Harris v. Reed*, 489 US. 255, 261, 263 (1989). Moreover, this ignores that, under *Rowland v. State*, any ruling by the Mississippi Supreme Court as to default would have been intertwined with federal law, as the court had no discretion to except constitutional claims "from procedural bars" at the time, such that any ruling as to default would necessarily have entailed rejection of the underlying constitutional argument as well. 42 So. 3d 503, 507 (Miss. 2010).

## 3. The adjudication of the Mississippi Supreme Court involved an unreasonable application of clearly established law and relied on an unreasonable determination of facts.

The merit-based decision of the Mississippi Supreme Court regarding Mr. Galloway's prosecutorial misconduct claim was rife with unreasonable determination of facts and misapplication of settled federal law. These errors affected both the way the court looked at individual errors and the way the court evaluated their effect.

   a. **The Mississippi Supreme Court failed to consider the prosecutor's misconduct against the federal law describing the differentiated role of capital juries.**

Far from acknowledging the error in the prosecution's repeated questioning of whether a punishment should "fit the crime," the Mississippi Supreme Court found that this "repeated query should have served to focus the jury on the appropriate punishment for Galloway's crime." App. 38a, 122 So.3d at 646. This finding fundamentally misunderstands settled law as to the role of a capital jury.

The Supreme Court has long made clear the distinction between a non-capital and a capital jury, caused by the reality that "the penalty of death is qualitatively different from a sentence of imprisonment, however long." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). This difference means "the need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual is far more important than in noncapital cases." *Lockett v. Ohio*, 438 U.S. 586, 605 (1978).

Thus, although "justice generally requires consideration of more than the particular acts by which the crime was committed" for cases capital and noncapital alike, this consideration is not optional in a capital case. For capital juries, the duty of a jury is not simply to match crime to punishment, but also "*requires* consideration of the character and record of the individual offender." *Woodson*, at 304 (emphasis added). To suggest otherwise to a jury is to misapply decades of settled federal law as to this significant duty.

   b. **Improper rejection of claims regarding Dr. McGarry's testimony and the treatment of carjacking as a per se aggravator caused the court to unreasonably reject Mr. Galloway's prosecutorial misconduct claim.**

The Mississippi Supreme Court's finding that the prosecution was "permitted to rely" on Dr. McGarry's testimony was based on a misunderstanding of federal law

regarding the admissibility of that testimony and the court's failure to independently assess it. *See* Ground Two, *supra*. Similarly, in erroneously finding carjacking to be a "per se" crime of violence necessary to apply an aggravating factor, the court relieved the prosecution of its duty to prove aggravating factors beyond a reasonable doubt as required by *Apprendi v. New York*, 530 U.S. 466 (2000). *See* Ground Five, *supra*. In both cases, the court's unreasonable determination of facts and application of settled federal law taints its decision as to Mr. Galloway's prosecutorial misconduct claim.

### c. The Mississippi Supreme Court failed to consider the *cumulative* prejudice of prosecutorial misconduct.

Since 1935, the Supreme Court has held that where "misconduct was pronounced and persistent, with a probable cumulative effect upon the jury" this misconduct "cannot be disregarded as inconsequential" and "[a] new trial must be awarded." *Berger v. United States*, 295 U.S. 78, 89 (1935). In *Berger* itself, the Court analyzed multiple instances and types of prosecutorial misconduct. The actions by that prosecutor had included misstating facts and testimony, making improper suggestions as to knowledge outside the trial, "assuming prejudicial acts not in evidence" and generally conducting himself in an "improper manner." *Id*. 295 U.S. at 84-5. Rather than address each type of wrong separately, the court made it clear that the correct inquiry involved looking at the actions in the aggregate. *Id.* at 89; *see also, e.g.*, *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) ("The relevant question is whether the prosecutors' *comments* so infected the trial with unfairness as to make the resulting conviction a denial of due process.") (emphasis added) (internal quotations omitted); *United States v. Melendez*, 57 F.3d 238, 241 (2d Cir. 1995) ("[M]ost of the cases in which we have reversed convictions as a result of prosecutorial

315

misconduct have involved repeated improper statements whose aggregate effect was more likely to undermine the fairness of the trial.").

The Mississippi Supreme Court's decision contradicts this decades-long clearly established law, as it does not address the cumulative nature of the prosecution's misconduct, and instead parses the errors into four separate categories that are only analyzed on their own. The court did this not only for categories of misconduct that involved unreasonable determinations of fact or law, as discussed above, but also for the few types of misconduct the court did seemingly acknowledge. For instance, the court allowed that there was no blood on Mr. Galloway's shoes or hat, and expressed confusion about the prosecution's use of the word "bravely" as to Dixie Brimage's testimony, but essentially found both harmless on their own and without analyzing the prejudice of even these errors together.

### D. Conclusion

The prosecution repeatedly engaged in misconduct that would confuse the jury as to the facts, the law, and its role as sentencing body. These multiple instances of misconduct targeted key issues in the case, often going to the very heart of Mr. Galloway's eligibility to be capitally sentenced. The Mississippi Supreme Court's finding otherwise is in direct contrast to settled Supreme Court precedent, meriting habeas relief, both alone and in combination with the other errors set forth in this pleading and the petition.

## XX. GROUND TWENTY – The Court's Requirement that Defense Counsel Share the General Nature of the Defense to be Offere4d and Counsel's Acquiescence at Trial Deprived Mr. Galloway of his Rights Against Self-Incrimination, to a Fair Trial, Due Process, a Fair and Reliable Verdict and the Assistance of Counsel.

At a pretrial hearing, the trial court demanded the disclosure of the general nature of Mr. Galloway's defense. Trial counsel did not object and complied, undermining Mr. Galloway's rights to the assistance of counsel and a fair trial, as well as the adversarial process. The trial court's order and defense counsel's failure to object violated Mr. Galloway's rights under the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution. U.S. CONST. AMENDS. V, VI, VIII, XIV.

At the September 13, 2010, pretrial omnibus hearing, the trial court required defense counsel to disclose to the prosecution "the general nature of the defense." Counsel was compelled to state that Mr. Galloway's defense would be "lack of special intent" and "General denial. Put prosecution to proof." R. 149; C. 164. Mississippi URCCC Rule 9.04 (C) governs a criminal defendant's pretrial discovery obligations, but nothing in it can reasonably be construed as requiring a criminal defendant to disclose pretrial the "general nature of the defense." Although nothing in the rules permitted this query, counsel did not object.

### A. The court's ruling violated Mr. Galloway's constitutional rights.

Courts have long recognized that a defendant will likely need to "shield the theory of his defense from the prosecutor's scrutiny." *United States v. Meriwether*, 486 F.2d 498, 506 (5th Cir. 1973). A defendant has the right to prepare the defense confidentially in consultation with counsel, without undue interference. This right is grounded in three principles of constitutional law:

317

The Fourteenth Amendment guarantees fairness and due process. In *Wardius v. Oregon*, 412 U.S. 470 (1973), the Supreme Court held that the Due Process Clause forbids the enforcement of alibi rules (compelling pretrial disclosure to the prosecution of a defendant's alibi) unless the state affords reciprocal discovery rights to defendants. *See also Camp v. Neven*, 606 F. App'x 322, 326 (9th Cir. 2015) ("[A]llowing the State to present unnoticed expert rebuttal testimony when Camp was required to disclose his own expert testimony on the same issues was a violation of the Supreme Court's precedent in *Wardius*, and [] the state courts were unreasonable in denying Camp relief on this ground."); *Sears v. Warden GDCP*, 73 F.4th 1269, 1290-91 (11th Cir. 2023) (rule allowing the State greater right of discovery of defense expert reports than defendant possessed in preparing for trial violated due process).

In a related vein, in *McWilliams v. Dunn*, 582 U.S. 183, 198 (2017), the Supreme Court held that clearly established federal law entitled a defendant to the "assistance of a mental health expert who is sufficiently available to the defense and independent from the prosecution" to give effective assistance to the defense. *Id*. at 198. The Court relied on *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985), which recognized a capital defendant's due process right to the assistance of a mental health professional when the defendant's mental condition was in issue, or when the defense needed such assistance to rebut the State's case for death.

Here, the prosecution was allowed to proceed to trial without revealing more than a vague description of Dr. McGarry's anticipated testimony about the lynchpin of its case for death-eligibility, and never disclosed until Dr. McGarry was on the stand his opinion on the cause of the anal tear on which its case rested. *See* Ground Two, *supra*, Section

318

B.3. Nevertheless, the court required defense counsel to disclose the general nature of the defense. *See Maruicio v. Duckworth*, 840 F.2d 454 (7th Cir. 1988) ("Compliance with the trial court's discovery order is clearly not the same as a gratuitous disclosure by Mauricio of the identity of his alibi witnesses."). The lack of reciprocity and the compelled intrusion on the independent preparation of the defense violated Mr. Galloway's right to due process of law.

The Sixth Amendment guarantees the right to the effective assistance of counsel. A criminal defendant has a constitutional right to have unburdened confidential access to counsel to confer about strategy and avail themselves of counsel's advice. For example, in *Geders v. United States*, 425 U.S. 80, 91-92 (1976), the Court held that an order preventing the defendant from consulting with his attorney "about anything" during an overnight recess violated his right to the assistance of counsel guaranteed by the Sixth Amendment. *See also Villarreal v. Texas,* 145 S. Ct. 1897 (Apri. 7, 2025) (grt'g certiorari on question "Whether a trial court abridges the defendant's Sixth Amendment right to counsel by prohibiting the defendant and his counsel from discussing the defendant's testimony during an overnight recess.").

The court's order here disclosed before trial the fruits of counsel's strategic consultation with his client and burdened Mr. Galloway's right to the assistance of counsel.

The Fifth Amendment protects against self-incrimination. The Supreme Court has recognized the Fifth Amendment's protections against both the adverse consequences of unwarned statements before trial and adverse comments or other burdens on silence at trial. In *Estelle v. Smith*, 451 U.S. 454, 468-69 (1981), for example, the Court held that

the admission of a psychiatrist's testimony on the topic of future dangerousness, based on a defendant's unwarned pretrial statements, violated the Fifth Amendment. And in *Griffin v. California*, 380 U.S. 609, 614 (1965), the Court granted relief because the prosecutor urged the jurors in summation to draw adverse inferences from the defendant's failure to testify as substantive evidence of guilt.

In this case, forcing counsel to disclose the theory of defense before trial placed an unconstitutional burden on Mr. Galloway's right to remain silent.

### B. The ruling was not harmless.

The state court's ruling, because it deprived Mr. Galloway of his right to counsel, was structural and requires reversal without regard to prejudice. *See Weaver*, 582 U.S. at 296 (where indigent defendant is denied an attorney "the resulting trial is always a fundamentally unfair one"); *United States v. Gonzalez-Lopez*, 548 U.S. 140, 152 (2006) (erroneous denial of defendant's choice of counsel violated Sixth Amendment right to counsel and "this violation is not subject to harmless-error analysis"); *cf. McCoy v. Louisiana*, 584 U.S. 414, 427 (2018) (violation of defendant's "Sixth Amendment-secured autonomy" where attorney conceded guilt in opposition to client's objectives "ranks as error of the kind our decisions have called structural . . . [and] is not subject to harmless-error review.")

The state court's denial of relief, including not only the Sixth Amendment but also the due process and Fifth Amendment grounds, in any case, had a substantial and injurious effect on the outcome by giving the prosecution unwarranted advance notice of the nature of Mr. Galloway's defense.

320

**C. The state court's ruling should be reviewed de novo, and its ruling on the only constitutional claim it considered was contrary to, or unreasonably applied, clearly established federal law.**

This Court should review Mr. Galloway's constitutional claims independently and *de novo* because the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), establishes that applying the "deference" that § 2254 imposes on habeas courts would violate the rule of constitutional avoidance and both Article III and the Supremacy Clause. *See* Ground Thirty-One, *infra*.

Furthermore, the Mississippi Supreme Court addressed only one of the constitutional grounds advanced here, although Mr. Galloway maintained on direct appeal that the court's ruling on was unconstitutional under the Fifth, Sixth, and Fourteenth Amendments. *See State v. Galloway*, Miss. S. Ct. No. 2010-DP-01927, Appellant's Brief at 71 (filed Dec. 20, 2011). The Court described the provisions of the applicable state rules of criminal procedure and the Supreme Court's holding in *Williams v. Florida*, 399 U.S. 78 (1970), which held, three years before *Wardius*, that a rule requiring a defendant to provide notice of alibi did not violate the Constitution. The court mentioned two other states that required the defendant to make a pretrial disclosure of the nature of the defense, and then held that it found "no constitutional violation" and no plain error. App. 67a-69a, 122 So.3d at 659-60.

Because the state court never ruled on Mr. Galloway's Fifth and Sixth Amendment claims, this Court must review those claims *de novo*. *See Wiggins*, 539 U.S. at 534. And, because the court made cursory mention of *Williams* without considering whether there was any impairment of reciprocity as in *Wardius*, it unreasonably applied clearly

established federal law in rejecting the Fourteenth Amendment due process claim. See 28 U.S.C. § 2254(d)(1).

This Court should accordingly grant Mr. Galloway habeas relief from his conviction of capital murder and death sentence, or from his death sentence alone, on the basis of this claim and cumulatively with the other claims in this petition.

## XXI.  GROUND TWENTY-ONE – The Trial Court's Refusal to Give Proposed Sentencing Instructions and its Defective Charge to the Jury Violated Mr. Galloway's Rights and Necessitates Habeas Relief.

Mr. Galloway's trial court violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution by refusing to give proposed sentencing instructions and issuing a charge that impaired the jury's consideration of mitigating evidence, misled the jury as to the circumstances in which it could impose a sentence of less than death, and left it uninformed of the consequences of its sentencing verdict. The Supreme Court of Mississippi failed to rectify those errors on appeal. As these state court adjudications are contrary to or unreasonable applications of clearly established federal law, habeas relief should follow.

### A.  Facts in support of this claim.

The trial court denied defendant's proposed sentencing instructions 2A, 3AA and D4A, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

Defense proposed instruction 2A read:

> The Court instructs the jury that should you be unable to agree,
> then the Judge shall sentence the Defendant, Leslie Galloway,
> III, to life imprisonment without parole or hope of early release.

C. 295.

Defense proposed instruction D4A read:

322

> A mitigating circumstance is any fact relating to the Defendant's character or history, or any aspect of the crime itself, which may be considered extenuating or reducing the moral culpability of the killing or making the Defendant less deserving of the extreme punishment of death. In offering mitigating circumstances, the Defendant is not suggesting that the crime is justifiable or excusable. Mitigating circumstances are those circumstances that tend to justify the penalty of life imprisonment without parole or probation as opposed to death.

C296.

Defense proposed instruction 3AA read:

> Each individual juror must decide for themselves whether the death penalty or life imprisonment without parole or probation is an appropriate punishment for the defendant. Even if mitigating circumstances do not outweigh aggravating circumstances, the law permits you, the jury to impose a sentence of life imprisonment without the possibility of parole. Only if you, the jurors, unanimously agree beyond a reasonable doubt that death is the appropriate punishment may you impose a sentence of death.
> You should indicate your findings in the jury verdict form which you will have with you in the jury deliberation room.

C. 302.

## B. The trial court's refusal to give defendant's proposed sentencing instructions denied Mr. Galloway his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

First, proposed instruction D2A would have informed the jury that if it were "unable to agree unanimously on punishment," the Court would sentence Mr. Galloway "to life imprisonment without parole or hope of early release." C. 295; R. 845. D2A correctly stated black-letter Mississippi law dictating that precise outcome if the jury could not agree as to sentence. MISS. CODE § 99-19-103 ("If the jury cannot, within a reasonable time, agree as to punishment, the judge shall dismiss the jury and impose a sentence of imprisonment for life."). The trial court refused to give this instruction. In its charge, the court instead told the jury that it could enter a verdict stating that it was

"unable to agree unanimously on punishment," but provided no explanation of the consequences of that verdict. C. 284. Without that information, the jury simply could not have known that such a verdict would result in a sentence of life without parole; there is an unconstitutional risk that the jury believed that if it "hung" as to sentence, there would be another trial before another jury. *Cf. Simmons v. South Carolina*, 512 U.S. 154, 169-70 (1994) (where prosecutor placed future danger in issue, denial of instruction informing jurors that the alternative to death was life without parole denied defendant due process).

Second, proposed instruction D4A correctly defined mitigating circumstances.  C. 296; R. 848-49.  The trial court refused that instruction and provided no similar or otherwise adequate definition in its charge. This raises a constitutionally intolerable risk that the jurors did not understand even what a "mitigating circumstance" was—much less the full scope of what they were required to consider—and might have held the tendering of even the minimal mitigating evidence trial counsel presented against Mr. Galloway.

This is not an abstract concern.  According to the findings of the Capital Jury Project (CJP),[104] "[t]he very word 'mitigation' is foreign to most jurors – and indeed a number of the jurors who were interviewed obviously did not understand the term, at times actually confusing it with aggravation."  Ursula Bentele & William J. Bowers, *How Jurors Decide on Death: Guilt is Overwhelming; Aggravation Requires Death; and Mitigation is No Excuse*, 66 BROOK. L. REV. 1011, 1044 (2001).  "Even jurors who did seem to understand the term [mitigation] often dismissed evidence that clearly should be considered mitigating,

---

[104]The "Capital Jury Project … [is] a multidisciplinary study of capital jury decision making involving intensive interviews with hundreds of jurors from hundreds of capital trials from around the country." Steven Mulroy, *Avoiding "Death by Default": Does the Constitution Require a "Life without Parole" Alternative to the Death Penalty?*, 79 TUL. L. REV. 401, 431-32 (December 2004).

such as childhood abuse and mental impairment, as not 'excusing' the defendant's conduct or reducing responsibility." *Id.* at 1044.[105]

Similarly, proposed instruction D3AA included essential information about the jury's constitutional obligations and latitude when deciding whether to impose death. D3AA first instructed "*[e]ach* individual juror" that "they must decide *for themselves* whether the death penalty or life imprisonment without parole or probation is an appropriate punishment for the defendant." C. 302; R. 848 (emphases added). It instructed that "[e]ven if mitigating circumstances do not outweigh aggravating circumstances, the law permits you, the jury to impose a sentence of life imprisonment without the possibility of parole." *Id.* Finally, it instructed the jurors that they could impose death only if they "unanimously agree beyond a reasonable doubt that death is the appropriate punishment[.]" *Id.*

The trial court refused to give this instruction. In its charge, the trial court instead told the jury that, if it found one or more of the aggravating circumstances and that "the mitigating circumstance(s) do not outweigh or overcome the aggravating circumstance(s),

---

[105]*See also id.* at 1042 ("[e]ven when jurors do report a discussion of mitigating factors, their understanding of what the law defines as mitigation is extremely limited. In the relatively rare instance when mitigating evidence is mentioned, jurors either seem not to understand what they are to do with such evidence or they dismiss it out of hand as no excuse for the murder. The impression conveyed is that unless the evidence in mitigation either proves that the killing was not deliberate or furnishes an excuse for the killing, such as insanity or duress – factors that would invalidate the capital murder conviction – it does not provide adequate reason to impose a sentence other than death."); Peter Meijes Tiersma, *Dictionaries and Death: Do Capital Jurors Understand Mitigation?*, 1995 UTAH L. REV. 1, 2 (1995) ("[T]here are disturbing indications that jurors do not adequately understand instructions on mitigation in death penalty cases."); Craig Haney, *Taking Capital Jury Seriously*, 70 IND. L.J. 1223, 1224-1225, 1229 (1995) ("Jurors decide life-and-death questions laboring under numerous misconceptions about the utility and operation of capital punishment –  sometimes unclear about the fundamental import of certain kinds of evidence (including something as basic as whether the evidence is aggravating or mitigating), almost always confused over the meaning of the all-important capital instructions, in some instances wrong about the decision rules by which they are to reach a sentencing verdict … ."); Craig Haney & Mona Lynch, *Comprehending Life and Death Matters: A Preliminary Study of California's Capital Penalty Instructions*, 18 LAW & HUM. BEHAV. 411, 424 (1994) (mock jurors had difficulty defining aggravating and mitigating factors, particularly mitigating factors).

you may impose the death sentence." C. 282-83.  The charge did not inform the jury that it could impose a life sentence *even if* it found that the mitigating circumstances did not outweigh the aggravators.[106]

D3AA would not have nullified the weighing process; it would have clarified what legal options were available to the jury once it was done with weighing.  The sentencing statute itself, MISS. CODE § 99-19-101(2)(d), specifically permits the jurors to make the finding D3AA instructs them about, as do the United States and Mississippi Constitutions. *Graham v. Collins,* 506 U.S. 461, 468 (1993) (*relying on Woodson v. North Carolina*, 428 U.S. 280, 304-05 (1976)); *Lockett v. Ohio*, 438 U.S. 586, 605 (1978); *Pruett v. Thigpen*, 665 F. Supp. 1254, 1277-78 (N.D. Miss. 1986); *Manning v. State*, 726 So. 2d 1152 (Miss. 1998).  It was error to deny instruction D3AA.

Given these instructional errors, Mr. Galloway must receive habeas relief from his death sentence, conditioned on a new penalty hearing.  As the Supreme Court has held, the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978).  Accordingly, "the Eighth and Fourteenth Amendments require that the sentencer…not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  *Id*. at 604. "A process that accords no significance to relevant facets of the character and record of the individual

---

[106]In denying this instruction, the trial court relied upon inapposite authority from the Supreme Court of Mississippi. R. 846, 851 (citing *Manning v. State*, 726 So. 2d 1152 (Miss. 1998)). As argued on direct appeal, *Manning* actually underscores the trial court's error, as the jury was instructed that "the prosecution carries the burden of showing not only that aggravating circumstances exist but also that they are sufficient enough to warrant death," and that the jurors were "free to find [the aggravating circumstance] insufficient to warrant death and are not required to automatically impose death."  726 So. 2d at 1198.

326

offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976).

In this instance, the trial court's refusal to give the proposed instructions and its resulting charge prevented Mr. Galloway's jury from giving full consideration to mitigating evidence, misled them as to the reasons and circumstances under which they could impose death or a lesser sentence, and concealed the sentencing consequences of their inability to agree on a proper whether to impose death. Those aspects of the jury's deliberations are essential and well-established in federal law. Their absence here deprived Mr. Galloway of a reliable sentencing determination.

Furthermore, the instructions could have meant the difference between life and death. As described in Ground Nine, at least one juror initially favored a life sentence and voted for death only after enduring coercive bullying from her fellow jurors. Because more robust mitigation instructions could have enabled her to stand her ground, the court's unconstitutional instructions had a substantial and injurious effect on the outcome of the penalty phase. *See Brecht*, 507 U.S. 619.

### C. The Mississippi Supreme Court unreasonably applied clearly established federal law and unreasonably determined the facts.

This Court's review is *de novo* since the Mississippi Supreme Court did not rule on the constitutional aspects of this claim. *See Wiggins, supra*. Furthermore, as described in Ground Thirty-One, 28 U.S.C. § 2254, if construed to require federal court "deference" to state court interpretations of federal law, would violate the doctrine of constitutional

327

avoidance, Article III, and the Supremacy Clause. This Court's review should be *de novo* for this reason as well.

The Mississippi Supreme Court's rejection of this claim was in fact an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1), (2). The court found this issue to be without merit, ruling on state law grounds that the concepts presented in the requested charges were adequately covered by the Court's given charge. App. 34a, 122 So.3d at 654-56. However, in light of *Simmons* and *Lockett*, the charges given failed to adequately apprise the jury (1) that a hung jury would result in a sentence of life without parole and (2) of the jury's own broad authority in terms of what constitutes mitigating evidence. This constitutes an unreasonable application of established federal law.

Habeas relief should follow on this ground, alone and cumulatively with other grounds in this petition.

## XXII. GROUND TWENTY-TWO – By Excluding Penalty Phase Evidence That Would Have Rebutted the Implication Raised by the State That Mr. Galloway Was a Future Danger, the Court Violated Mr. Galloway's Rights Under the Sixth, Eighth, and Fourteenth Amendments.

A defendant has a due process right to introduce rebuttal evidence whenever his future dangerousness is "at issue." *Simmons v. South Carolina,* 512 U.S. 154, 164 (1994); *Kelly v. South Carolina*, 534 U.S. 246, 252-53 (2002). The State need not explicitly argue future dangerousness; it is enough that an implication of future dangerousness is raised by the evidence. *See Kelly*, 534 U.S. at 252-54 (recognizing that even evidence of the crime may raise a strong implication of future dangerousness that the defendant has a right to rebut). Furthermore, Mr. Galloway had a due process and compulsory process right to present a defense, *see Washington v. Texas*, 388 U.S. 14 (1967), and an Eighth

Amendment right to present relevant mitigating evidence, including evidence that could help rebut the State's case for death. *See Rompilla v. Beard*, 545 U.S. 374 (2005). The Supreme Court has also held that evidence of future adaptability is mitigating. *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986).

The trial court violated Mr. Galloway's due process and Sixth, Eighth, and Fourteenth Amendment rights by excluding penalty phase mitigation evidence that would have rebutted the implication raised by the State's evidence that he was a future danger.

### A. Facts relevant to this ground for relief.

At trial, the prosecution's evidence raised the clear implication that Mr. Galloway would be dangerous in the future. In the first phase of trial, the State argued that the capital murder involved pain "a million times worse than touching a hot flame," R. 674. In closing. the State commented that Ms. Dixie Brimage for "bravely" identifying Mr. Galloway, suggesting that she had reason to fear Mr. Galloway. R. 759.

At sentencing, the State presented evidence that Mr. Galloway had previously been convicted of carjacking and was under a period of post-release supervision when the crime was committed, R. 814.The State's four statutory aggravators also raised the implication that Mr. Galloway was dangerous: (1) the capital offense was committed by a person under sentence of imprisonment; (2) the defendant was previously convicted of a felony involving the use or threat of violence to another person; (3) the capital offense was especially heinous, atrocious, or cruel; and (4) the capital offense was committed when the defendant was engaged in the commission of sexual battery. C. 281-85, 304. Overall, the State's evidence created a clear implication of future danger.

At trial, the State filed a motion to preclude Mr. Galloway from introducing evidence "with regards to his ability to adapt to prison life in the future or his ability or his propensity or lack thereof to commit violent acts in the future," including through the testimony of Dr. Beverly Smallwood, a psychologist hired by the defense, and various lay witnesses.[107] R. 804; C. 225-27. Defense counsel opposed the motion, arguing that "I think certainly the jury has every right to consider his past and how he may act in the future because of that …." R. 806.

The trial court granted the State's motion, ruling that "I'm not going to prevent you from putting on any kind of testimony about his behavior while incarcerated in the past," but the defense's witnesses "will be prohibited from speculating as to how he might behave in the future." R. 806-07.

The trial court's ruling left the jury with the uncontradicted impression that Mr. Galloway was a future danger. Although it promised in opening statement to do so, the defense did not call Dr. Smallwood at sentencing and did not ask any of its mitigation witnesses how Mr. Galloway would conduct himself in prison if given a life sentence.  R. 812, 815-40.

Later, a jury note sent with the sentencing verdict requesting that the jurors be polled by number rather than by name demonstrated that Mr. Galloway's alleged future dangerousness weighed heavily on their minds. R. 870; C. 280.

---

[107]The defense did not call Dr. Smallwood despite promising in opening statement that it would and asked none of its mitigation witnesses about how Mr. Galloway would conduct himself in prison if given a life sentence.

**B. By granting the State's motion, the trial court denied Mr. Galloway's rights under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.**

Mr. Galloway had a constitutional right to present evidence regarding how he might behave in the future to rebut the impression created by the State's evidence. The trial court's exclusion of such evidence violated his rights under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. It is a fundament rule that a "sentencer may not refuse to consider or be precluded from considering any relevant mitigating evidence." *Skipper v. South Carolina*, 476 U.S. at 4. By presenting evidence on four alleged statutory aggravating circumstances and other evidence and argument that suggested Mr. Galloway would be a future danger, the State put Mr. Galloway's future dangerousness at issue. Mr. Galloway therefore should have been allowed to rebut this suggestion. The court's ruling allowed the State to leave the jury with the unchallenged impression that Mr. Galloway would be a danger in the future.

The exclusion of this evidence had a substantial and injurious effect upon the outcome of the penalty phase. *See Brecht*, 507 U.S. at 623. The jurors' note indicated that they were afraid of Mr. Galloway. This fear would have resulted from the unconfronted evidence of future danger and its injurious influence on the jury. The Supreme Court in *Brecht* held that habeas relief can be provided by federal courts when the error had a "substantial and injurious effect or influence in determining the jury's verdict." And where this determination leads a court to "virtual equipoise as to the harmlessness, under the *Brecht* standard, of the error, then we must conclude that it was harmful." *Woods v. Johnson,* 75 F.3d 1017, 1026-27 (5th Cir. 1996) (quoting *O'Neal v. McAninch,* 513 U.S. 432, 435 (1995)).

331

### C.  No procedural bar prevents this Court's review.

The state maintains that this claim is procedurally defaulted because trial counsel failed to make a contemporaneous objection. Answer at 30.  The Mississippi Supreme Court stated that the claim was procedurally barred because trial counsel did not object, and that it was also meritless.  App. 31a, 122 So.3d at 640-41.

As described at Section D.1 The Default Rulings Were Not Independent of Federal Law, *supra,* at the time of the default, that is at trial, the contemporaneous objection rule was not independent of federal law because judicially created exceptions required a reviewing court to determine whether a federal violation had occurred before deciding whether the exceptions applied.  Finally, no default bar prevents this Court from granting relief for the cumulative effect of any defaulted claims with those entitled to merits review.

Accordingly, the state court's default ruling on this claim imposes no procedural bar to this Court's review.

### D.  The Mississippi Supreme Court unreasonably applied clearly established federal law and unreasonably determined the facts.

As described in Ground Thirty-One, 28 U.S.C. § 2254, if construed to require federal court "deference" to state court interpretations of federal law, would violate the doctrine of constitutional avoidance, Article III, and the Supremacy Clause.  This Court's review should therefore be *de novo*.

The Mississippi Supreme Court's rejection of this claim was in fact an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1), (2). The court found this issue to be meritless, ruling on state law evidentiary grounds that

332

"the trial court properly excluded such testimony because it was irrelevant to Galloway's character, his record, or the circumstances of his crime." App. 34a, 122 So.3d at 642.

This Court's review is *de novo* because the Mississippi Supreme Court did not rule on the constitutional aspects of this claim. Regardless, the ruling was contrary to, or an unreasonable application of, clearly established Federal law, or resulted in an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1), (2). The Mississippi Supreme Court's finding is in direct contrast to settled Supreme Court precedent, as described above. This Court should grant habeas relief on this ground from Mr. Galloway's sentence of death, both on this ground alone and cumulatively with the other grounds in this petition.

XXIII.    **GROUND TWENTY-THREE – The Court Violated Mr. Galloway's Rights Under the Sixth, Eighth, and Fourteenth Amendments by Excluding the Relevant Mitigating Evidence Regarding the Conditions at the Mississippi Department of Corrections Endured by Inmates Sentenced to Life Without Parole.**

A. **The trial court prevented the defense from presenting relevant mitigating evidence that would have rebutted the state's case for death.**

At the penalty phase, the defense wanted to call Dr. Donald Cabana to provide the jury with relevant information regarding "the conditions at the Mississippi Department of Corrections endured by inmates sentenced to serve life without the benefit of parole or hope of early release." C. 309; *see also* R. 799-802. This testimony would have rebutted the State's argument that imposition of a life sentence would be insufficient punishment and would not hold Mr. Galloway accountable for the capital murder, and that defense counsel's closing argument requesting a life sentence was a plea for "sympathy."[108]

---

[108] *See, e.g.,* R. 857 ("And today is the day that I ask you to hold the defendant accountable for his actions because that's what this case is about."); R. 858 ("This case is about accountability for those actions and

333

Therefore, the due process right to rebut the state's case for death, the due process and compulsory process right to present a defense, and the right to present relevant mitigating evidence all mandated its admission. *Simmons v. South Carolina*, 512 U.S. 154, 164 (1994); *Rompilla*, 545 U.S. at 393; *Washington v. Texas*, 388 U.S. 14, 23 (1967). Nevertheless, the trial court excluded the testimony in violation of Mr. Galloway's constitutional rights under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. R. 803-04.

The due process violation was especially egregious because prosecutors in Mississippi have a right to argue and present evidence at a capital trial regarding the "manifold pleasures" of prison life (*see Edwards v. State*, 737 So. 2d 275 at 299-300 (Miss. 1999)) and, therefore, defendants must be given the right to argue and present evidence about the harshness of that life. *Cf. Wardius v. Oregon*, 412 U.S. 470, 475 (1973).

Further, despite the Mississippi Supreme Court's holding in *Wilcher v. State*, 697 So. 2d 1123, 1133 (Miss. 1997), Dr. Cabana's testimony met the legal definition of mitigation and, therefore, was admissible under the Eighth Amendment. *See McCleskey v. Kemp,* 481 U.S. 279, 306 (1987) (capital defendant is entitled to have his jury consider "any relevant circumstance that could cause it to decline to impose the [death] penalty."); *Tennard v. Dretke*, 542 U.S. 274, 284 (2004).

---

nothing else."); R. 868-69 ("Now, what the defense has been asking you to do for the last ten minutes or so is to have sympathy. It's been a passionate appeal for Leslie Galloway. Well, I want you to remember these facts when you're back there considering what the appropriate sentence is."); R. 869 ("And then I want you to ask, is that deserving of sympathy.").

Additionally, Dr. Cabana's testimony was admissible under the Eighth Amendment because it would have provided the jury with accurate sentencing information, and both the United States Supreme Court and this Court have recognized that "accurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die by a jury of people who may never before have made a sentencing decision." *Gregg v. Georgia*, 428 U.S. 153, 190 (1976). This is especially true when the defendant seeks to correct common misconceptions about the corrections system. *Simmons,* 512 U.S. at 169 ("It can hardly be questioned that most juries lack accurate information about the precise meaning of `life imprisonment' as defined by the States.").

The trial court's rulings thus impermissibly prevented the jury from considering relevant mitigating evidence in violation of the Sixth, Eighth, and Fourteenth Amendments. The ruling had a substantial and injurious effect upon the outcome of the penalty phase. *See Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). The prosecution argued to the jury repeatedly that a life sentence would be an act of sympathy, implying that life imprisonment was not an adequate punishment. Dr. Cabana's testimony would have rebutted this argument, indicating the punitive nature of a life without parole sentence and undercutting the prosecution's argument.  In the absence of this testimony, the prosecution's argument and inferences went unconfronted and the jury was denied the accurate sentencing information needed to make a reasoned moral determination of the appropriate sentence.

**B. No procedural bar prevents this Court's review.**

The state maintains that this claim is procedurally defaulted because trial counsel failed to make a contemporaneous objection. Answer at 31. The Mississippi Supreme Court stated that the claim was procedurally barred because trial counsel did not object at trial, but also reviewed the merits of the claim and determined it to be meritless. App. 31a, 122 So.3d at 640-41.

As described at Section D.1 The Default Rulings Were Not Independent of Federal Law, *supra,* at the time of the default, that is at trial, the contemporaneous objection rule was not independent of federal law because judicially created exceptions required a reviewing court to determine whether a federal violation had occurred before deciding whether the exception applied. Furthermore, no default bar prevents this Court from granting relief for the cumulative effect of any defaulted claims with those entitled to merits review.

Accordingly, the state court's default ruling on this claim imposes no procedural bar to this Court's review.

**C. The Mississippi Supreme Court unreasonably applied clearly established federal law and unreasonably determined the facts.**

As described in Ground Thirty-One, 28 U.S.C. § 2254, if construed to require federal court "deference" to state court interpretations of federal law, would violate the doctrine of constitutional avoidance, Article III, and the Supremacy Clause. This Court's review should be *de novo* on that ground alone. Furthermore, the State does not deny that the Mississippi Supreme Court's ruling unreasonably applied clearly established federal law. Answer at 31-32.

The Mississippi Supreme Court's rejection of this claim was in fact an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1), (2). The Mississippi Supreme Court found this issue to be meritless, relying on the same grounds it had relied on in rejecting the claim challenging the exclusion of evidence rebutting future danger.  App. 34a, 122 So.3d at 642.   As described in Ground Twenty-Two, that ruling, resting on state law evidentiary grounds, was contrary to, or unreasonably applied, clearly established federal law.

On this claim, this Court's review is *de novo* since the Mississippi Supreme Court did not rule on the constitutional aspects of the claim.  *See Wiggins*, 539 U.S. at 534. Regardless, the ruling was contrary to, or an unreasonable application of, clearly established Federal law, or resulted in an unreasonable determination of the facts, for the same reasons that apply to the ruling underlying Ground Twenty-Two. 28 U.S.C. § 2254(d)(1), (2).

This Court should grant habeas relief on this ground from Mr. Galloway's sentence of death, both on this ground alone and cumulatively with the other grounds in this petition.

### XXIV.    GROUND TWENTY-FOUR – The Evidence that the State Introduced to Establish the Aggravating Factor of a Prior Conviction for a Crime of Violence was Constitutionally Insufficient.

#### A. Introduction

To establish that Mr. Galloway had previously been convicted of a crime "involving the use or threat of violence to the person"—an aggravating circumstance under Mississippi Code section 99-19-101(5)(b)—the State introduced into evidence the Mississippi Department of Corrections "pen pack" reflecting his prior carjacking

conviction. R. 814; State Ex. 26. But at the time of Mr. Galloway's plea, neither the use nor the threat of violence was a necessary element of carjacking in Mississippi. *See Young v. State,* 86 So. 3d 261, 268 (Miss. Ct. App. Aug. 9, 2011); MISS. CODE. § 97-3-117(1). While the indictment within the pen pack alleged that Mr. Galloway's crime involved violence, the State introduced no evidence to establish that Mr. Galloway pled guilty to carjacking under that theory, as opposed a theory of nonviolence or recklessness as section 97-3-117(1) permitted at the time. The pen pack established only the fact of conviction but contained no evidence to support any rational factfinder in finding, beyond a reasonable doubt, that the prior conviction of carjacking was specifically under the theory of threatened or committed violence. And yet, when Mr. Galloway's jury made that unsupported finding, both the trial court and state supreme court upheld the finding and deprived Mr. Galloway of his constitutional rights. *See* U.S. CONST. AMENDS. VI, VIII, XIV; *Lewis v. Jeffers*, 497 U.S. 764 (1990); *see Jackson v. Virginia,* 443 U.S. 307, 324 (1979); § 99-19-105(3)(b). Because AEDPA does not limit this Court's plenary review, it should grant Mr. Galloway habeas relief on this ground.

### B. The State failed to adduce sufficient evidence to prove Mr. Galloway was previously convicted for a crime involving the threat or use of violence.

Before a jury can weigh an aggravating circumstance in a capital case, the State must prove its existence beyond a reasonable doubt. *See Ring v. Arizona*, 536 U.S. 584 (2002); *Lewis v. Jeffers*, 497 U.S. 746 (1990). A sentencing court violates the Sixth, Eighth, and Fourteenth Amendments when it relies on an aggravating factor that the State failed to prove at trial. *See Ring*, 536 U.S. at 609 (rooting the requirement that a jury must find proof beyond a reasonable doubt in Sixth Amendment jury trial rights); *see Lewis*, 497 U.S. 746 (applying *Jackson,* 443 U.S. 307 (1979), in the capital context to find that

338

convictions obtained using legally insufficient aggravating factors run afoul to the Eighth and Fourteenth amendments); U.S. CONST. AMENDS. VI, VIII, XIV. A habeas court reviewing the constitutional sufficiency of an aggravator considers "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." S*ee Jackson*, 443 U.S. at 319 (emphasis in the original); *Lewis*, 497 U.S. at 782-8 (following *Jackson*'s test to evaluate capital aggravators). The State failed to sustain its burden here.

The prosecution here sought to prove the aggravating circumstance set out in Mississippi Code section 99-19-101(5)(b), alleging that Mr. Galloway had a prior conviction for a crime involving "the use or threat of violence to the person." It alleged that Mr. Galloway's prior unarmed carjacking conviction under Mississippi Code section 97-3-117(1) involved the use or threat of violence.

Under controlling law at the time of Mr. Galloway's plea, his capital trial, and the state supreme court decision affirming his capital conviction, neither the threat nor the use of violence was a necessary element of the crime of unarmed carjacking in Mississippi. *See Young*, 86 So. 3d at 261, 268; MISS. CODE § 97-3-117(1). The text of section 97-3-117(1) provides:

> Whoever shall knowingly or recklessly by force or violence, whether against resistance or by sudden or stealthy seizure or snatching, or by putting in fear, or attempting to do so, or by any other means shall take a motor vehicle from another person's immediate actual possession shall be guilty of carjacking.

Under this language, a person can violate section 97-3-117(1) through both violent and nonviolent conduct. The prosecution can obtain an unarmed carjacking conviction where

a person acts either knowingly or recklessly, takes a car "by force," by "sudden or stealthy seizure or snatching," "by putting [a person] in fear," or acts "*by any other means*." MISS. CODE. § 97-3-117(1) (emphasis added). As the Mississippi Supreme Court recognized in *Young*, "an accused may properly be convicted of carjacking. . . without any requirement that the prosecution prove that the accused employed violence, force, or the threat of force." 86 So. 3d at 269. Only years after Mr. Galloway's trial did the legislature separately enact Mississippi Code section 97-3-2 and designate carjacking, as defined in section 97-3-117, as a per se crime of violence. MISS. CODE § 97-3-2(1)(m).

Section 97-3-117 also permits a carjacking conviction based on a mens rea of recklessness, which cannot lawfully serve as a sentencing enhancement. *Begay v. United States*, 553 U.S. 137, 145-46 (2008) (crime of violence must demonstrate defendant's propensity towards "purposeful, violent, and aggressive conduct"). Federal courts have repeatedly rejected prior convictions, even with a use of force or violence element, when the crime carries a recklessness mens rea. *See United States v. Ossana*, 638 F.3d 895, 903 (8th Cir. 2011) (rejecting state conviction for aggravated assault as a crime of violence for sentence enhancement when recklessness was possible mens rea); *United States v. McFalls*, 592 F.3d 707, 716 (6th Cir. 2010) (expressly rejecting the argument that a crime of violence may stem from a mens rea of recklessness).

Given the many forms of conduct that could sustain a section 97-3-117 carjacking conviction, *Jackson* and *Lewis* required the State to adduce specific evidence that Mr. Galloway's prior carjacking conviction was predicated on conduct involving the use or threat violence. S*ee Jackson*, 443 U.S. at 319; *Lewis*, 497 U.S. at 782-8. It failed to do so.

At trial, the prosecution introduced the Mississippi Department of Corrections "pen pack" regarding Mr. Galloway's prior carjacking conviction. R. 814; S PP-26. The pen pack contained his certification of records form, sentence computation record, social admission interview, release document, sentencing order, commitment papers, indictment, fingerprint card, and photograph. While the indictment alleged that Mr. Galloway committed carjacking through the use or threat of violence, no document in the pen pack established that he admitted to that specific conduct when entering his plea. The commitment and sentencing orders indicated only that he pled guilty to unarmed carjacking, S PP-26, and the State did not submit a transcript of his plea colloquy. While the State indicted Mr. Galloway on a theory of carjacking with violence, the State presented no evidence that those were the facts to which he ultimately pled guilty, as opposed to one of the many non-violent theories of unarmed robbery that section 97-3-2 permits.

No rational trier of fact could have found that Mr. Galloway was previously convicted for a crime that involved the act or threat of violence. As such, the State's use of this aggravator to sentence Mr. Galloway to death deprived him of his Sixth, Eighth, and Fourteenth Amendment rights. *See Jackson*, 443 U.S. at 314-14, 324. The State does not contest that this is a basis for habeas relief. *See* Answer (omitting to challenge Mr. Galloway's argument regarding this claim).

### C. AEDPA does not limit this court's review.

As discussed in Ground Thirty-One, AEDPA cannot limit this Court's *de novo* review of Mr. Galloway's constitutional claim because, if it were to apply here, it would violate the rule of constitutional avoidance, Article III, and the Supremacy Clause. *See*

341

*infra* Ground Thirty-One (citing *Loper Bright Enterprises*, 603 U.S. 369). Even if AEDPA does apply, the state court unreasonably applied clearly established federal law and based its sufficiency finding on an unreasonable determination of the facts at Mr. Galloway's trial. 28 U.S.C. § 2254(d)(1), (2).

The court concluded that the indictment included in the prosecution's pen pack "sufficiently established that Galloway had a prior felony conviction involving the use or threat of violence to the person." App. 94a-95a, 122 So. 3d at 674 (citing *Russell v. State*, 670 So. 2d 816, 831 (Miss. 1995); *Duplantis v. State*, 708 So. 2d 1327, 1346 (Miss. 1998)). That conclusion unreasonably applied *Jackson*. Because the State relied on a carjacking conviction under a statute that criminalizes a wide range of conduct—violent and nonviolent, intentional and reckless—*Jackson* required the Mississippi Supreme Court to focus on whether any rational factfinder could conclude, beyond a reasonable doubt, whether the conduct underlying his conviction involved the use or threat of violence. By failing to reckon with the State's lack of evidence, the court failed to conduct its *Jackson* inquiry and deprived Mr. Galloway of his constitutional rights.

This Court should accordingly grant Mr. Galloway habeas relief from his conviction of capital murder, or, at least, his death sentence, on this ground and in combination of all others in this petition.

## XXV. GROUND TWENTY-FIVE – By Sustaining the Prosecution's Objection to Constitutionally Protected or Permissible Defense Arguments in Summation, the Trial Court Violated Mr. Galloway's Rights Under the Sixth, Eighth, and Fourteenth Amendments.

A closing argument is an integral component of a constitutionally protected defense in a criminal trial. Any limitation of summation therefore becomes a limitation of the defense itself. In this case, the trial court limited the defense summation regarding

two topics of central significance: the lack of evidentiary support for a sexual battery and the ability of the jury to exercise mercy in sentencing. These limitations violated Mr. Galloway's right to the assistance of trial counsel, due process and compulsory process right to present a defense and freedom from cruel and unusual punishment. U.S. CONST. AMENDS. VI, VIII, XIV.

### A. The trial court committed constitutional error in sustaining the prosecution's objections to the defense sentencing summation.

"The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). This means that "there can be no restrictions upon the function of counsel in defending a criminal prosecution in accord with the traditions of the adversary factfinding process" which, for hundreds of years, has included "the right of the defense to make a closing summary of the evidence to the trier of the facts." *Herring v. New York*, 422 U.S. 853, 857, 860 (1975).

The trial court in this case abridged the right to a zealous and constitutionally protected defense in the penalty phase summation in two different respects. First, the trial court curtailed defense counsel's argument regarding the lack of evidence supporting a sexual battery. Second, the trial court sustained an objection to the defense argument pleading for mercy to "end all of the killing in this situation." Both limitations undercut key arguments and Mr. Galloway's ability to present a fulsome defense.

While delivering summation for the sentencing phase of Mr. Galloway's trial, defense counsel attempted to highlight for the jury the weakness of the prosecution's case supporting a claim of sexual battery. Defense counsel attempted to make this point by arguing that the evidence of an anal tear was not alone enough to make the "quantum leap

to sexual battery," especially given the lack of any other supportive evidence such as sperm or other injuries. R.863. However, when the prosecution objected on the grounds that the guilt phase had "already been established," the court sustained the objection, even though defense counsel had begun the argument with a proper acknowledgment that the jurors had found sexual battery at the guilt-innocence phase. R.864.

This violated Mr. Galloway's right to present a comprehensive defense on this topic. *See Herring*, 422 U.S. at 864 ("[T]he appellant, through counsel, had a right to be heard in summation of the evidence from the point of view most favorable to him."). The argument was allowable under state law, *see Holland v. State*, 705 So.2d 307, 326 (Miss. 1997) (recognizing that counsel may argue residual doubt to jury in capital case under state law), and trial counsel properly explained its relevance in response to the objection.

This limitation was particularly significant given the centrality of the claim of sexual battery to the case. This claim was not only relevant at the guilt phase as necessary for the prosecution to be able to seek the death penalty against Mr. Galloway in the first instance, but it was also quite relevant to the jury's life or death determination as a key "circumstance[] of the particular offense" the jury was mandated to review. *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976). By limiting this argument, the trial court violated the maxim that "the sentencer, in all but the rarest kind of capital case, not be precluded from considering . . . any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 587 (1978) (emphasis in original).

The issue of whether a sexual battery occurred also bore heavily on not one, but two, aggravating factors: that an offense was committed during sexual battery and that an

offense was especially heinous. Thus, defense counsel had the right—and responsibility—to argue evidence supporting the existence (or lack thereof) of a sexual battery for the jury's consideration at the sentencing stage. *See Herring,* 422 U.S. at 862 ("It can hardly be questioned that closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case.").

The trial court then impeded Mr. Galloway's defense once again by sustaining an objection after defense counsel argued for mercy by telling the jury that a life sentence would "end all of the killing in this situation." R.866. Doing so signaled to the jury not only that the defense did not have the authority to make such an argument, but also wrongfully conveyed that mercy could not be weighed as a valid consideration by the jury. *See Gregg v. Georgia*, 428 U.S. 153, 199 (1976) ("Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution.").

### B. The trial court's curtailing of the defense summation prejudiced Mr. Galloway.

In *Brecht,* 507 U.S. at 638, the Supreme Court provided that a federal court may grant habeas relief when it determines that the error, "in light of the record as a whole" had a "substantial and injurious effect or influence in determining the jury's verdict." This standard "does not require in order for the error to be held harmful that there be a 'reasonable probability' that absent the error the result would have been different." *Woods v. Johnson,* 75 F.3d 1017, 1026 (5th Cir. 1996). And where this determination leads a court to "virtual equipoise as to the harmlessness under the *Brecht* standard, of the error, then we must conclude that it was harmful." *Id.* (internal quotation omitted).

345

The court's limitation of counsel's ability to argue regarding the lack of evidence supporting a sexual battery alone prejudiced Mr. Galloway such that there was a likely "injurious" effect on his death sentence. In addition to being a centrally relevant aspect of the circumstances of the offense, the presence or absence of proof supporting as sexual battery would be directly applicable to the aggravating circumstances of whether the offense was "committed during sexual battery" and whether the jury found the offense "especially heinous."

Similarly prejudicial was the trial court's limitation of defense counsel's plea that the jury embrace its ability to "end all of the killing" in the case. The ability to engage in such considerations is a unique ability of the capital jury, and the court's signaling otherwise was surely injurious to the jury's understanding of its role and power.

### C. AEDPA does not limit this Court's ability to grant relief.

As discussed in Ground Thirty-One, the Supreme Court established in *Loper Bright Enterprises* that the forced "deference" that § 2254 imposes on habeas courts violates Article III, the Supremacy Clause, and the rule of constitutional avoidance. 603 U.S. 369; *see infra* Ground Thirty-One. This Court should accordingly afford the Mississippi Supreme Court no deference and review Mr. Galloway's claims independently. However, even if this court finds that 28 U.S.C. § 2254(d) applies in this case, Mr. Galloway is still entitled to relief. First, the State does not deny that the state court's decision unreasonably applied clearly established federal law. Opp. at 32. Second, because the Mississippi Supreme Court's decision as to the court's limitation of defense counsel's summation unreasonably applied clearly established federal law, Mr. Galloway can satisfy § 2254(d).

346

### 1. The Mississippi Supreme Court's adjudication of Mr. Galloway's claim on the merits.

While discussing the defense argument regarding the dearth of evidence supporting a sexual battery, the Mississippi Supreme Court acknowledged that a sentencer may not be precluded from "considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense." App. 61a; *Galloway v. State*, 122 So.3d 614, 657 (2013) (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982)). The court also acknowledged that a defendant is free to argue residual doubt "to a relevant extent." App. 65a; *Galloway*, 122 So.3d at 657-58 (quoting *Minnick v. State*, 551 So.2d 77, 95 (Miss. 1988).[109] However, the court found that defense counsel's argument was "properly admonished" as a "challenge [to] the jury with regard to its guilty verdict." App. 66a; *Id.* at 658.

On the other hand, it found the trial court did err when it sustained the prosector's objection to the defense counsel's entreaty that a life sentence would "end all of the killing in this situation." App. 66a-67a; *Id.* This is because, pursuant to MISS. CODE ANN. § 99-19-104(1), each side may argue its "respective position on the death penalty." *Id.* at 659. Nevertheless, "[t]hough the trial court erred by sustaining the State's objection," the court found "the error harmless" because "[t]he jury already had heard the remark, and the jurors had been instructed that counsels' arguments were not evidence." *Id.*

### 2. The claim is exhausted and was not defaulted.

The State properly acknowledges that Mr. Galloway exhausted this claim. *See* State's Answer at 33. This claim is not defaulted, nor does the State claim as much. *Id.*

---

[109] *Minnick* was reversed on other grounds in *Minnick v. Mississippi*, 498 U.S. 146 (1990).

### 3. The adjudication of the state supreme court involved an unreasonable application of clearly established law and relied on an unreasonable determination of the facts.

By limiting defense counsel's argument, the trial court infringed on what the Supreme Court has hailed as a "basic element of the adversary factfinding process in a criminal trial." *Herring v. New York*, 422 U.S. 853, 858 (1975). When counsel argued there as no "other evidence of sexual battery" save a small anal cut, this was not just an argument of "residual doubt," but rather an argument in rebuttal of two aggravating factors. Thus, when the trial court sustained an objection to this argument, it violated Mr. Galloway's "right to place before the sentencing jury all relevant evidence in mitigation of punishment." *Skipper v. South Carolina*, 476 U.S. 1 (1986). The Mississippi Supreme Court's opinion finding otherwise disregarded the importance of this right, as well as the more general, and long-held right to present a criminal defense.

In addition, the Mississippi Supreme Court made an unreasonable determination when it determined that the trial court erred in limiting defense counsel's argument calling for mercy, but that this error was harmless because "[t]he jury already had heard the remark." *Galloway*, 122 So.3d at 659. This wholly discounts the common-sense principle that a jury will likely not consider that which it was told to disregard by a trial court. *See, e.g.*, *Greer v. Miller*, 483 U.S. 756, 767 (1987) ("We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it.").

### D. Conclusion

Defense counsel was prevented from making key arguments in the closing argument as to whether Mr. Galloway should live or die. Where the court found this not to be error, it misapplied settled constitutional law regarding the significance and accepted

breadth of defense closing arguments. On the other hand, where the Mississippi Supreme Cout did acknowledge error in this regard, it unreasonably assessed the facts supporting the prejudicial nature of the error. In both cases, habeas relief is merited, both individually and cumulatively with the other claims set forth in this pleading and the petition.

XXVI.    GROUND TWENTY-SIX – The "Especially Heinous, Atrocious, or Cruel" Aggravating Circumstance was Constitutionally Invalid in Violation of the Eighth and Fourteenth Amendments.

Under the Eighth and Fourteenth Amendments, an aggravating factor worded like Mississippi's "especially heinous, atrocious, or cruel ("HAC")" factor must be applied in only a limited manner. *Maynard v. Cartwright*, 486 U.S. 356, 361-65 (1988); MISS. CODE § 99-19-101(5)(h). Mississippi's version of the HAC aggravator is unconstitutionally vague and standardless, and the aggravator has been applied in an arbitrary manner in Harrison County in violation of the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment. Its application in Mr. Galloway's case accordingly violated his constitutional rights. U.S. CONST. AMENDS. VIII, XIV.

A. Facts relevant to this ground for relief.

At the end of Mr. Galloway's sentencing trial, the trial court presented the jury with four aggravating factors to consider in their sentencing deliberations. App. 1a-2a, 173a, 122 So. 3d at 627, 654. These factors were: (1) whether the offense was "committed by a person under sentence of imprisonment"; (2) whether Mr. Galloway "was previously convicted of a felony involving the use or threat of violence to another person"; (3) whether the offense "was committed when the defendant was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit, a sexual

battery"; and (4) whether the offense "was especially heinous, atrocious or cruel." App. 173a, 122 So.3d at 654; MISS. CODE § 99-19-101(5)(a), (b), (d), (h).

In support of the HAC aggravator, the State relied heavily upon the testimony of Dr. Paul McGarry, the prosecution's forensic pathology expert in this case. App. 195a-196a, 122 So. 3d at 675. During his testimony, Dr. McGarry recounted arriving at the scene where Ms. Anderson's body had been found, and initially examining her body there. R. 669. He reported finding her "with parts of her body gouged out" and "pieces of bone and flesh ten feet from her body." R. 670. In his opinion, Ms. Anderson had "defensive wounds," burns that "would not be instantly fatal" and would instead cause pain "a million times worse than touching a hot flame with a part of the body," and what he described as conclusive evidence of "anal rape," even though no sperm was recovered from the anus. R. 673, 674, 677; App. 1022.

In closing argument during Mr. Galloway's guilt phase trial, the State chronicled Dr. McGarry's highly inflammatory testimony. The State noted "the defensive wounds that she had on her body" and how "she was cut multiple times to her neck." R. 763. Neither of the injuries would have been fatal, the prosecution asserted—they were "torture." *Id.* The State evoked Dr. McGarry's repeated assertions that his findings were "unequivocal," not simply one scientific explanation of the circumstances surrounding Ms. Anderson's death. *Id.*

After Mr. Galloway was convicted of Ms. Anderson's murder, the State again focused heavily on Dr. McGarry's testimony in the closing argument at sentencing. R. 857. When stating what "this case is about," the prosecutor listed the "brutal rape," "brutal beating," "all the cuts to her neck that were not fatal," "setting fire to another human

being," and "the conscious decision to run over her." *Id.* And in the final appeal to the

jury, during the State's rebuttal at closing, the prosecutor spoke extensively about solely

the HAC aggravator and asserted that "[e]verything about this case is set apart. . . [t]his

case is different." R. 868.

Before penalty phase deliberations, the trial court provided the following

instruction regarding the HAC aggravating circumstance to the jury:

> The court instructs the jury that in considering whether the offense
> was especially heinous, atrocious or cruel, heinous means extremely
> wicked or shockingly evil. Atrocious means outrageously wicked and
> vile. And cruel means designed to inflict a high degree of pain with
> indifference to or even enjoyment of the suffering of others.
> An especially heinous, atrocious or cruel capital offense is one
> accompanied by such additional acts as to set it apart from the norm of
> capital murders, the conscienceless or pitiless crime which is
> unnecessarily tortuous [sic] to the victim.
> If you find from the evidence beyond a reasonable doubt that the
> defendant utilized a method of killing which caused serious mutilation,
> that there was dismemberment of the body prior to death, that the
> defendant inflicted physical or mental pain before death, that there was
> mental torture and aggravation before death, or that a lingering or
> tortuous [sic] death was suffered by the victim, then you may find this
> aggravating circumstance.

R. 286.

Ultimately, the jury found all four aggravating factors to have been proven beyond

a reasonable doubt, including the HAC aggravator. App. 1a-2a,122 So. 3d at 627.

**B. The jury instruction violated Mr. Galloway's constitutional rights.**

The jury instruction and application of the HAC aggravating factor in Mr.

Galloway's case were unconstitutional because the aggravating factor was not properly

narrowed. *Gregg v. Georgia,* 428 U.S. 153, 196-97 (1976). A capital sentencing scheme

must "suitably direc[t] and limi[t] the sentencer's discretion so as to minimize the risk of

wholly arbitrary and capricious action." *Arave v. Creech,* 507 U.S. 463, 470 (1993)

351

(citation modified). The scheme must also "genuinely narrow the class of persons eligible for the death penalty." *Zant v. Stephens,* 462 U.S. 862, 877 (1983). "The penalty of death may not be imposed under sentencing procedures that create a substantial risk that punishment will be inflicted in an arbitrary and capricious manner." *Godfrey v. Georgia,* 446 U.S. 420, 427 (1980) (citing *Furman v. Georgia,* 408 U.S. 238 (1972)) (citation modified). If the parties involved in capital proceedings cannot meaningfully distinguish the facts under which the HAC aggravator applies, the aggravator can be employed in an arbitrary manner.

Federal law has consistently dictated that the application of the death penalty must accommodate "twin objectives," ensuring that the system is both "consistent and principled" as well as "humane and sensible to the uniqueness of the individual." *Eddings v. Oklahoma,* 455 U.S. 104, 110 (1982).

The United States Supreme Court declared the entire first paragraph of this instruction unconstitutionally vague and overbroad in *Shell v. Mississippi*, 498 U.S. 1 (1990) (per curiam); *id.* at 2 (Marshall, J., concurring). Clarifying *Shell* "for the benefit of lower courts," Justice Marshall wrote in his concurrence that the language defining HAC at issue in *Shell*—the very same paragraph as the one above—was unconstitutionally vague under *Maynard* because it "could be used by '[a] person of ordinary sensibility [to] fairly characterize almost *every* murder.'" *Shell*, 498 U.S. at 2 (Marshall, J. concurring) (quoting *Maynard*, 486 U.S. at 363). Although courts have upheld language similar to that in the second and third paragraphs, *see Crawford v. Epps*,

353 F. App'x 977, 985-87 (5th Cir. 2009); *Puckett v. Epps*, 615 F. Supp. 2d 494, 538 (S.D. Miss. 2009),[110] no binding precedential authority has done so.

The aggravating factor not only falls afoul of Eighth Amendment vagueness standards but also violates the Due Process Clause of the Fourteenth Amendment. The Supreme Court, construing the Fifth Amendment's corresponding clause as it applied to a federal prosecution, has held that "by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or *so standardless that it invites arbitrary enforcement*." *Johnson v. United States,* 576 U.S. 591, 595 (2015) (emphasis added). The Court found a violent felon statute both unconstitutionally vague and standardless for two reasons. *Id.* at 597. First, the Court held that the clause left "grave uncertainty about how to estimate the risk posed by a crime" because "it ties the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements." *Id.* (quoting and abrogating *James v. United States*, 550 U.S. 192, 211 (2007)). Second, the statute raised "uncertainty about how much risk it takes for a crime to qualify as a violent felony." *Id.* at 598.

The Court's concerns in *Johnson* apply with equal force here. The HAC aggravator asks prosecutors, judges, and juries to imagine an ordinary "heinous, atrocious or cruel" capital murder to determine that the incident facts outline an "*especially* heinous, atrocious or cruel" capital murder. R. 286 (emphasis added). The statute and jury instruction lack sufficient guidance for determining this starting point, and it remains

---

[110] *See also Simon v. Epps*, No. 2:04CV26-P, 2007 WL 4292498, at *43-44 (N.D. Miss. 2007); *Woodward v. Epps*, No. 2:03cv529-DCB, 2006 WL 8439560, at *18 (S.D. Miss. 2006); *Williams v. Puckett*, No. 1:97CV320LN, 2000 WL 35782463, at *15 (S.D. Miss. 2000).

unclear how the legislature could reasonably determine a standard to provide. As in *Johnson*, this standard is tied to imagination rather than "real-world facts or statutory elements," rendering it unconstitutionally vague. *Cf.* 576 U.S. at 597.

Just as the Supreme Court grappled with how to define the level of risk in an "ordinary" burglary, the HAC aggravating factor poses the question of how much suffering is required to find that a murder was "especially" heinous, atrocious or cruel. "By combining indeterminacy about how to measure the risk posed by a crime with indeterminacy about how much risk it takes for the crime to qualify as a violent felony, the residual clause produced more unpredictability and arbitrariness than the Due Process Clause tolerates." *Id.* at 598.

### C. The HAC aggravator is applied in an arbitrary and capricious manner.

Even with the limiting language in the second and third paragraphs of the instruction given at Mr. Galloway's trial, the aggravating factor has been applied so broadly that prosecutors relied on the factor in virtually every capital case for years.

In Harrison County, prosecutors have submitted the aggravator in every case resulting in a death sentence. *See* Brief of Appellant at 54, *Heard v. State,* 2024-DP-00802-SCT (Miss. S. Ct. Jul. 11, 2025) ("*Heard* Brief"); *Garcia v. State,* 356 So. 3d 101, 109 (Miss. 2023); *Ambrose v. State,* 254 So. 3d 77, 107 (Miss. 2018); *Ronk v. State,* 172 So. 3d 1112, 1124 (Miss. 2015); *Keller v. State,* 138 So. 3d 817, 863 (Miss. 2014); *Galloway,* 122 So. 3d at 654; *Thorson v. State,* 895 So. 2d 85, 101 (Miss. 2004); *Billiot v. State,* 454 So. 2d 445, 464 (Miss. 1984). This includes those which may very well fall within the realm of an "ordinary" murder. *Cf. Johnson*, 576 U.S. at 597.

354

For example, in the case of Jason Keller, the Harrison County prosecutor pursued the HAC aggravating factor based solely on the testimony of Dr. McGarry. *Keller,* 138 So. 3d at 831, 863. Mr. Keller was convicted of capital murder for shooting a victim four times, and killing him, during the course of a robbery at a Food Mart. *Id.* at 831. As the shots occurred in rapid succession, the only evidence supporting the HAC aggravator was Dr. McGarry's testimony that the victim would not have died immediately upon the first shot and would have suffered before receiving the fatal shot. *Id.* at 858. While Mr. Keller was sentenced to death, the jury did not find the HAC aggravator in his case. *Id.* at 867-68.

In contrast, prosecutors in other counties appear to exercise discretion and do not submit HAC aggravators to the jury, even where facts of a case are heinous. In DeSoto county, Martez Abram was convicted of shooting and killing his two former coworkers before setting the workplace on fire. Corrected Brief of the Appellee at 5-6, *Abram v. State*, No 2023-DP-00614-SCT (Miss. S. Ct. Jan. 30, 2023) ("*Abram* Brief"). Abram "ran and chased [the victim] before he wounded him with one shot," then "stood over [the victim] and shot him again." *Id.* at 6. The State did not submit the HAC aggravator to the jury. In Jackson County, Thong Le and another man "tied and gagged" a 15-year-old and her 11-year-old sister, waiting for their mother to return home. *Le v. State,* 913 So.2d 913, 920 (Miss. 2005). When their mother arrived, "she was overpowered and hogtied with electrical cord." *Id.* at 921. The victims were then "beaten and strangled until they died." *Id.* Mr. Le insisted he did not participate in the murders and did not know his co-conspirator planned to kill the girls and their mother. *Id.* Nonetheless, after his co-

355

conspirator's suicide before trial, Mr. Le was convicted of three counts of capital murder. *Id.* The State did not submit the HAC aggravator to the jury. *Id.* at 943.

Thus the HAC factor's application varies sharply between counties in Mississippi and there are "no principled means provided to distinguish those that received the penalty from those that did not." *Maynard,* 486 U.S. at 362. Even when the HAC aggravator is not the lone basis for any Mississippi death sentence, the application of an invalid or inapplicable aggravating factor, especially one as broad as the HAC aggravator, can sway a jury, tasked with balancing aggravating and mitigating factors, from a life sentence to a death sentence.

When prosecutors can apply the HAC aggravator to every capital murder case without a common standard, juries cannot be expected to produce a "consistent and principled" result. *Eddings,* 455 U.S. at 110. Thus, as the HAC aggravator is so vague and standardless as to result in arbitrary enforcement, the factor is constitutionally infirm.

### D. The application of the HAC aggravating factor had a substantial and injurious effect in Mr. Galloway's case.

The prosecution's use of the unconstitutionally vague HAC factor in Mr. Galloway's case was far from harmless. The prosecution focused heavily on the HAC aggravator in comparison to the other three factors submitted in this case, see R. 857-59, and, in a capital sentencing scheme where jurors must weigh aggravating factors against mitigating factors in determining the appropriate sentence, there is a strong possibility that the resulting sentence may have been a life sentence if this factor had not been erroneously submitted to the jury and discussed in at length throughout the trial. Because of the highly inflammatory nature of this factor and because the remaining aggravating circumstances do not outweigh the mitigating circumstances, the unconstitutional

submission of this aggravating factor to the jury had a substantial and injurious effect upon the outcome of the penalty phase. *See Brecht*, 507 U.S. at 623.d

### E. The Mississippi Supreme Court's decision was contrary to or an unreasonable application of clearly established federal law.

As described in Ground Thirty-One, 28 U.S.C. § 2254(d), if construed to require federal court "deference" to state court interpretations of federal law, would violate the doctrine of constitutional avoidance, Article III, and the Supremacy Clause. This Court's review should therefore be *de novo*.

Even if § 2254(d) applies, this Court should grant relief. The State does not deny that the state court unreasonably applied clearly established federal law. *See* Answer at 33-34. In any case, the Mississippi Supreme Court did unreasonably apply federal law. The court found no error in the application of the HAC aggravator in Mr. Galloway's case. App. 98a-99a, 122 So. 3d at 675. It rejected the argument that the HAC jury instruction was unconstitutionally vague, citing other cases in which it had previously found the instruction to be sufficient. App. 96a, *Id.* at 674. The Court found there to be "no merit on this issue." *Id.* But the court ignored *Shell*, decided over twenty-five years earlier than its decision in *Galloway*. The state court's decision thus was contrary to *Shell* or at least unreasonably applied it *sub silentio*.

For the reasons above, this Court should grant habeas relief from Mr. Galloway's sentence of death, both on this ground alone and cumulatively with the other grounds in this petition.

### XXVII.  GROUND TWENTY-SEVEN – Mississippi's Capital Punishment Scheme is Unconstitutional on its Face and as Applied.

Defense counsel filed a number of pretrial motions challenging the constitutionality of Mississippi's capital punishment statute. See C. 25-29, 30-33, 34-36, 39-40. In denying them, R. 11, 12, 13, R.E. Tab 5, the trial court violated Mr. Galloway's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

First, the Mississippi statute requires no jury finding, and the jury in Mr. Galloway's case made no finding, of specific intent. It is constitutionally impermissible to execute a defendant without a finding of specific intent to commit a crime. The Supreme Court has stated, "[i]t is fundamental that 'causing harm intentionally must be punished more severely than causing the same harm unintentionally.'" *Enmund v. Florida*, 458 U.S. 782, 798 (1982) (quoting H. Hart, PUNISHMENT AND RESPONSIBILITY 162 (1968)). "American criminal law has long considered a defendant's intention –and therefore his moral guilt – to be critical to 'the degree of [his] criminal culpability.'" *Enmund*, 782 U.S. at 800 (quoting *Mullaney v. Wilbur*, 421 U.S. 684, 698 (1975)).[111]

In its sentencing verdict, the jury found only that Mr. Galloway actually killed; it declined to find that he attempted to kill, intended that the killing take place, or contemplated that lethal force would be employed. C. 283-84. Further, in its guilty verdict, the jury found only that Mr. Galloway killed with or without design to effect death. C. 262. In addition, the jury found that the predicate felony was sexual battery as

---

[111] *See also Tison v. Arizona*, 481 U.S. 137, 156 (1987); *Kennedy v. Louisiana,* 554 U.S. 407, 437-38 (2008); Edward Coke, THE THIRD PART OF THE INSTITUTES OF THE LAWS OF ENGLAND 107 (London, Printed by M. Flesher for W. Lee & D. Pakeman 1644) ("Actus non facit reum, nisi mens sit rea" (a harmful act without a blameworthy mental state is not punishable)).

defined by Section 97-3-95, which is not a specific intent crime. *Jones v. State*, 936 So. 2d 993, 999 (Miss. Ct. App. 2006). Thus, Mr. Galloway cannot be executed consistent with the United States Constitution.

Second, by treating the nature of Mr. Galloway's mens rea as a threshold aggravating issue, see MISS. CODE § 99-19-101(5)(d), Mississippi's capital punishment statute put beyond the effective reach of the sentencing jury the mitigating fact that Mr. Galloway did not kill, attempt to kill, or intend that a killing take place, which violated the Eighth and Fourteenth Amendments to the United States Constitution. The United States Supreme Court has held that a capital sentencer must be able to consider as a mitigating circumstance the character of the defendant's mens rea.[112] It also has held that capital punishment statutes may not put mitigating evidence "beyond the effective reach of the sentencer." *Johnson v. Texas*, 509 U.S. 350, 362 (1993) (quoting *Graham v. Collins*, 506 U.S. 461, 475 (1993)).

Third, under Mississippi's capital punishment scheme, persons convicted of killing a human being with "deliberate design" or by committing "an act eminently dangerous to others and evincing a depraved heart" are guilty only of simple murder and are ineligible for the death penalty (see MISS. CODE § 97-3-19(1)) unless an aggravating factor applies in their cases. MISS. CODE § 97-3-19(2)(e) reads in pertinent part:

> (2) The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases: (e) When done with or without any design to effect death, by any person engaged in the commission of the crime of rape, burglary, kidnapping, arson, robbery, sexual battery, unnatural intercourse … with mankind, or in any attempt to commit such felonies; . . .

---

[112] *See Lockett v. Ohio*, 438 U.S. 586, 608 (1978) (vacating death sentence because Ohio statute did not permit the sentencing authority to take into account "[t]he absence of direct proof that the defendant intended to cause the death of the victim"); *see also id*. at 613, 615-616 (Blackmun, J., concurring).

However, persons such as Mr. Galloway convicted of felony murder simpliciter automatically are guilty of capital murder and are eligible for the death penalty (*see, e.g., Jones v. State*, 381 So. 2d 983, 989 (Miss. 1980)), if the predicate felony was, inter alia, sexual battery. *See* MISS. CODE § 97-3-19(2)(e). Furthermore, the predicate felony of sexual battery is a statutory aggravating circumstance that juries are instructed to weigh against mitigating circumstances in determining whether the defendant receives a death sentence, and the jury did so in this case. MISS. CODE § 99-19-101(5)(d) reads in pertinent part:

> (5) Aggravating circumstances shall be limited to the following:
> . . .
> (d) The capital offense was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any ... sexual battery….

See also C. 303. The scheme, therefore, violates the Eighth Amendment to the United States Constitution in the following two ways.

One, it does not furnish a principled means of distinguishing defendants eligible for the death penalty. The Supreme Court has held that the death penalty may be imposed constitutionally only if the sentencing body's "discretion [is] suitably directed and limited" so as to avoid arbitrary and capricious executions. *Gregg v. Georgia*, 428 U.S. 153, 189 (1976). In Mississippi, this limiting function is achieved through aggravating circumstances. As the Court has stated, "statutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty." *Zant v. Stephens*, 462 U.S. 862, 877 (1983) (aggravators must "reasonably justify the imposition of a more severe sentence on

360

the defendant compared to others found guilty of murder"); *see also Godfrey*, 446 U.S. at 427-29.

As applied to felony murderers, Mississippi's capital punishment statute does not satisfy these commands. It cannot be tenably denied that there is no rational or historical basis for treating simple felony murderers as more culpable than premeditated murderers for purposes of capital punishment.[113]

Two, Mississippi's capital punishment scheme, as applied to felony murderers, violates the Eighth and Fourteenth Amendments because it does not furnish a principled means of distinguishing defendants who receive the death penalty. Before a jury may consider imposing a death sentence under Mississippi law, the jury must determine that mitigating circumstances do not outweigh aggravating circumstances. MISS. CODE § 99-19-101(3). Again, one such aggravator is the predicate sexual battery. The United States Supreme Court has held that even the fact of intentional murder does not furnish a principled means of distinguishing murderers and has specifically held that a State may not treat "every unjustified, intentional taking of human life" as an aggravating circumstance. *Maynard v. Cartwright*, 486 U.S. 356, 364 (1988); *see also Godfrey*, 446 U.S. at 433. If that is so, clearly a finding of felony murder does not.

Fourth, the sexual battery in this case was used both to make the murder death-eligible and as a means of narrowing the class of murders. Such dual use violates the

---

[113] Those few states which treat simple felony murder and intentional murder as equivalent apparently justify their decision by inferring malice aforethought from the intentional commission of the felony. "The felony murder rule was an effort to create felony liability for accidental killings caused during the course of an attempted felony." *Enmund*, 458 U.S. at 816 n.28 (O'Connor, J., dissenting) (citing ALI, Model Penal Code § 210.2 Comment, n.74 (Off. Draft and Revised Comments 1980)). "Over time, malice aforethought came to be inferred from the mere act of killing in a variety of circumstances," including the commission of a felony. *Tison*, 481 U.S. at 156.

longstanding constitutional precept that a death penalty can be imposed constitutionally only if the sentencing body's "discretion [is] suitably directed and limited" so as to avoid arbitrary and capricious executions. *Gregg*, 428 U.S. at 187. Whereas in Mississippi, state law does not narrow the class of death eligible offenders sufficiently in its definition of capital murder, then under the Constitution no element of the offense may be used to perform the narrowing function, and, therefore, Mississippi cannot treat the predicate sexual battery as an aggravating circumstance. *See Lowenfield v. Phelps*, 484 U.S. 231, 246 (1988); *Poland v. Arizona*, 476 U.S. 147, 156 (1986); *Zant*, 462 U.S. at 878; *United States v. McVeigh*, 944 F. Supp. 1478, 1489-90 (D. Colo. 1996) (striking duplicative aggravators as they only serve to skew the weighing process in favor of death).

Because the jury in Mr. Galloway's case unconstitutionally weighed the sexual battery as an aggravating circumstance, see C. 303, his death sentence must be reversed under the harmless error test set forth by the Supreme Court in *Brown v. Sanders*, 546 U.S. 212, 220-21 (2006). According to *Brown*, the State is required to prove beyond a reasonable doubt that "one of the other sentencing factors enable[d] the sentencer to give aggravating weight to the same facts and circumstances" as the invalid aggravator. *Id*. at 220. Here, the State cannot prove beyond a reasonable doubt that another aggravating circumstance would have enabled the jury to give aggravating weight to the sexual battery.

Fifth, the death sentence in this case is wanton, freakish, excessive, and disproportionate and, therefore, violates the Eighth Amendment. The Eighth Amendment requires that the death penalty only be imposed on those "worst of the worst" offenders who commit "a narrow category of the most serious crimes" and whose extreme

362

culpability makes them "the most deserving of execution." *Roper v. Simmons*, 543 U.S. 551, 568 (2005) (quotation omitted). Here, the offense for which Mr. Galloway was convicted was, though tragic, simply not within that "narrow category of the most serious crimes" that the Eighth Amendment contemplates punishing with the ultimate penalty. And given that the jury in Mr. Galloway's case made no specific intent finding whatsoever, there is no way that he can be considered someone whose "extreme culpability" makes him "the most deserving of execution." *Id.*

Sixth, Mississippi's death penalty scheme is being applied in a discriminatory and irrational manner in violation of the Eighth Amendment and the due process and equal protection clauses of the Fourteenth Amendment. The Eighth Amendment bars unpredictability in punishment, including sentences arbitrarily or capriciously inflicted. The Supreme Court has therefore consistently required reliability in capital sentencing, striking down sentencing schemes that can or do lead to arbitrary decision-making. *See Furman v. Georgia*, 408 U.S. 238, 364 (1972) (Marshall, J., concurring) ("A look at the bare statistics regarding executions is enough to betray much of the discrimination. A total of 3,859 persons have been executed since 1930 . . . 2,066 were Negro."). In 2018 the Washington Supreme Court unanimously struck down the state's death penalty as unconstitutional on state-law grounds, finding that it was being imposed in an "arbitrary and racially biased manner." *State v. Gregory*, 427 P.3d 621, 632-33 (Wash. 2018). The court emphasized that the death penalty is "unequally applied," and predicted at best by arbitrary, impermissible, and even abhorrent factors such as "where the crime took place, or the county of residence, or the available budgetary resources …, [and, most troublingly,] race of the defendant." *Id.* at 5.

363

Mississippi does no better. Black men make up 66% of death row inmates, but only 37% of the Mississippi population. Current Death Row Facts, MDOC, https://www.mdoc.ms.gov/general-public/death-row/current-death-row-demographics (last visited Oct. 22, 2025); World Population Review, Demographics (Mississippi), https://worldpopulationreview.com/states/mississippi#demographics (last visited Oct. 23, 2025). Of 56 executions the state of Mississippi has conducted since 1955, thirty, or more than half, were executions of Black men. *See* Mississippi Department of Corrections, Executions in Mississippi, https://www.mdoc.ms.gov/general-public/death-row/executions-mississippi (last visited Oct. 23, 2025).

Mississippi's history of racial discrimination, deeply entrenched in a legacy of slavery, has regrettably paved the way for the racial disparities that exist within both the state's death penalty process and criminal justice system at large. Between 1882 and 1930, Mississippi was home to more lynchings of Black Americans and fewer legal executions than any other state, with already high numbers of lynchings rising dramatically in times of racial strife. Parker Yesko, Execution in Mississippi: Who lives and Who Dies, APM Reports (July 3, 2018), https://www.apmreports.org/story/2018/07/03/execution-in-mississippi-who-lives-and-who-dies. Between 1940 and 1955, Mississippi utilized a traveling electric chair to carry out executions, with state officials carrying it from town to town as though part of a macabre travelling fair. The state executed 73 people in its travelling chair; 57 were Black. *Id*. After decommissioning the electric chair, the state quickly built a gas chamber and used it to gas thirty-one people; 77% were Black men. *Id*.

The system for selecting who lives and who dies in Mississippi is equally riddled with racial discrimination that renders the imposition of the death penalty arbitrary. Capital cases in Mississippi have routinely been subject to prosecutorial decisions and tactics that disproportionately impact Black capital defendants, such as the unconstitutional striking of Black prospective jurors based on race and favoring execution in black-on-white homicide cases. *See Flowers*, 588 U.S. at 306-007. The United States Supreme Court has previously upheld the death penalty on the premise that it would not be imposed under sentencing procedures that "create a substantial risk that it would be inflicted in an arbitrary and capricious manner." *Gregg*, 428 U.S. at 188. Mississippi's scheme violates that assumption.

Seventh, driven by exonerations of innocent people sentenced to death, the standards of decency have evolved to the point where the death penalty is no longer acceptable. As the Supreme Court has explained, the "Eighth Amendment is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened . . . To enforce the Constitution's protection of human dignity, this Court looks to the evolving standards of decency that mark the progress of a maturing society." *Hall v. Florida*, 572 U.S. 701, 708 (2014) (citing *Weems v. United States*, 217 U.S. 349, 378 (1910)); *see also Atkins v. Virginia*, 536 U.S. 304, 311-12 (2002) (quoting *Trop v. Dulles*, 356 U.S. 86, 100 (1958)) (applying the evolving standards of decency test to bar execution of persons with intellectual disability). The Supreme Court has frequently applied this test to narrow the use of the death penalty, and to bar its applications with respect to particular crimes and particular offenders when such executions fall outside of the national consensus of what is acceptable. *See, e.g., Kennedy v. Louisiana*, 554 U.S. 407, 438 (2008) (barring the death

penalty for child rape); *Roper v. Simmons*, 543 U.S. 551, 578 (2005) (barring the death penalty for juveniles); *Coker v. Georgia*, 433 U.S. 584, 584, 592, 598 (1977) (barring the death penalty for rape of adult woman).

When considering the "evolving standards of decency," the Supreme Court has generally looked to the trends of state legislatures and the practices of the states to determine a national consensus regarding the challenged application. *See Kennedy*, 554 U.S. at 426 (finding national consensus against executions for non-homicide child rape because only six states in the country permit such executions). As shown by the abolition of the death penalty in states across the country, and by dramatic drops in both executions and new death sentences in Mississippi and across the country, executions have become an increasingly rejected option for punishment.

Even in states where the death penalty is still authorized, the imposition of new death sentences has steadily declined. In 2017, only 39 new death sentences were imposed nationwide. Only one was in Mississippi. Death Penalty Information Center (DPIC), The Death Penalty in 2017, DPIC (Dec. 14, 2017), https://deathpenaltyinfo.org/research/analysis/reports/year-end-reports/the-death-penalty-in-2017-year-end-report. In 2024, that number was substantially lower: only 26 new death sentences. Death Penalty Information Center (DPI), The Death Penalty in 2024 (Dec. 19, 2024), at 3, https://dpic-cdn.org/production/documents/DPI-2024-Year-End-Report.pdf?dm=1735847939. Again, only one was from Mississippi. *Id*. at 32.

Since 2012, non-support for executions has jumped from 32% to 44%. Gallup, Death Penalty, https://news.gallup.com/poll/1606/Death-Penalty.aspx (last visited November 29, 2025). As of December 16, 2024, only nine states had carried out

executions and only ten states sentenced people to death for the year. Death Penalty Information Center, The Death Penalty in 2024 (Dec. 19, 2024), at 3, 57.  A 2023 Gallup poll reported, for the first time, that more Americans believe the death penalty is administered unfairly than fairly. Gallup, Death Penalty, https://news.gallup.com/poll/1606/Death-Penalty.aspx (last visited November 29, 2025).

Among other factors, high-profile exonerations inform the public's shift in attitude away from the death penalty. Since 1995, twenty-three innocent prisoners convicted and incarcerated by Mississippi have been exonerated and released, thirteen alone since 2012 and seven from death row. *See* Nat'l Registry of Exonerations, https://exonerationregistry.org/ (last visited Nov. 29, 2025) (map view to Mississippi); Death Penalty Information Center Innocence Database (filter to Mississippi), https://deathpenaltyinfo.org/policy-issues/policy/innocence (last visited Nov. 29, 2025). Perhaps most famous among them is Curtis Flowers, an innocent Black man exonerated after spending 23 years incarcerated and on death row, standing trial six times, and having his most recent conviction and death sentence reversed because prosecutors intentionally discriminated against Black jurors during jury selection. *See Flowers v. Mississippi*, 588 U.S. 284, 306-08 (2019); Sixty Minutes, How Curtis Flowers, tried six times for the same crime, was saved from death row (July 25, 2021), https://www.cbsnews.com/news/curtis-flowers-in-the-dark-60-minutes-2021-01-03/ (last visited Nov. 29, 2025).

But even after Mr. Flowers was released, others were exonerated: Eddie Howard and Sherwood Brown in 2021 and Anthony Fox in 2024. *See* National Registry of Exonerations, supra (Mississippi cases); Innocence Project, Eddie Lee Howard is Exonerated after 26 Years on Mississippi Death Row (Jan. 11, 2021),

https://innocenceproject.org/news/eddie-lee-howard-is-exonerated-after-26-years-on-mississippi-death-row/ (last visited Nov. 29, 2025); Death Penalty Information Center, Sherwood Brown Exonerated in Mississippi, 186th Death-Row Exoneration Since 1973 (Sept. 30, 2021), https://deathpenaltyinfo.org/sherwood-brown-exonerated-in-mississippi-186th-death-row-exoneration-since-1973 (last visited Nov. 29, 2025). Having executed 25 persons during the modern era, and exonerated seven innocent death-sentenced prisoners, Mississippi has exonerated one condemned person for every 3.6 persons it has executed. *See* Death Penalty Information Center, Execution Database, (filter to MS), https://deathpenaltyinfo.org/facts-and-research/data/executions?state=Mississippi&federal=No (last visited October 23, 2025). Nationwide, since 1973, 201 innocent people sentenced to death have been exonerated. *See* Death Penalty Information Center, Innocence Database, https://deathpenaltyinfo.org/facts-and-research/data/innocence (last visited Oct. 23, 2025).

In 2008, before leaving the bench, and while Mr. Flowers and Mr. Fox still languished innocent and incarcerated, Mississippi Supreme Court Justice Oliver Diaz called out the abhorrent likelihood that Mississippi has executed an innocent person: "Just as a cockroach scurrying across a kitchen floor invariably proves the presence of thousands unseen . . . these cases leave little room for doubt that innocent men, at unknown and terrible moments in our history, have gone unexonerated and been sent baselessly to their deaths." *Doss v. Mississippi*, No. 2007-CA-00429-SCT, 2008 Miss. LEXIS 608 (Dec. 11, 2008) (Diaz, P.J., dissenting) (internal citations omitted).

On the rising tide of exonerations has arisen a culture-shift on death penalty views in even conservative circles.[114]   As the standards for decency have heightened due to realizations of the death penalty's many flaws, this punishment has become increasingly inconsistent with the Eighth Amendment. Because the death penalty is cruel, arbitrary, and rare, Mr. Galloway's death sentence violates his equal protection and due process rights.

The Mississippi Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law and/or an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1), (2). The court held that Mr. Galloway's argument was "a policy argument for the legislature to consider." App. 237a, 374 So.3d at 513.  Citing *Atkins v. Virginia*, 536 U.S. 304 (2002), and *Roper v. Simmons*, 543 U.S. 551 (2005), it reasoned that the Supreme Court had "categorically excluded mentally retarded individuals and juveniles from the death penalty" but had not "invalidated" the penalty itself.  *Id*. In those cases, however, the Court ruled on claims specific to the two categories of persons before it and did not address the arguments Mr.

---

[114] See, e.g., David Montgomery, Death Penalty Opponents Gain Unlikely Allies: Republicans, PEW (Mar. 20, 2019), https://www.pewtrusts.org/en/research-andanalysis/blogs/stateline/2019/03/20/death-penalty-opponents-gainunlikely-alliesrepublicans (statement by chairman of Texas House Committee on Judiciary and Civil Jurisprudence Representative Jeff Leach) ("It keeps me up at night when I realize that there could be innocent people in our prisons and on death row."); Mead Gruver, Conservatives in Some States Push Against the Death Penalty, Associated Press (Oct. 28, 2019), https://apnews.com/article/1c2a219eb31f42338d22e6e89d5d0600 (joint-statement signed by 250 conservatives against the death penalty) ("We have come to the conclusion that the death penalty does not work and can't be made to work, not in spite of our conservative principles, but because of them."); Natalie Baptiste, Trump Loves the Death Penalty. These Conservatives Don't, Mother Jones (Oct. 31, 2019), https://www.motherjones.com/crime-justice/2019/10/trump-loves-the-death-penalty-theseconservatives-dont/ (statement of Hannah Cox, national director of Conservatives Concerned About the Death Penalty) ("The death penalty is a failed big-government program . . .[t]he administration is out of step with where the country is going on criminal justice reform."); Olivia Kennah, Conservatives from Wyoming and Other States Work to Repeal the Death Penalty, Sweet Water Now (Oct. 29, 2019), https://www.sweetwaternow.com/conservatives-from-wyoming-andother-states-work-torepeal-the-death-penalty/ (statement of Wyoming Representative Jared Olsen) ("The death penalty puts us in categories with nations like North Korea where we just simply don't stand when it comes to our values.").

Galloway advances here. The Mississippi Supreme Court accordingly unreasonably applied *Atkins* and *Roper*, and the large body of constitutional precedents cited above, in rejecting this claim.

This Court should grant habeas relief on this ground from Mr. Galloway's sentence of death, both on this ground alone and cumulatively with the other grounds in this petition.

### XXVIII. GROUND TWENTY-EIGHT – Prosecutors' Unfettered, Standardless, and Unreviewable Discretion Violates Equal Protection,, Due Process, and the Eighth Amendment.

Mississippi lacks statewide standards governing the discretion of local prosecutors to seek or decline to seek the execution of death-eligible defendants. *See* Miss. Code §§ 97-3-19, 99-19-101, (pertinent portions of capital sentencing statute, none of which include such standards). As a result, the decision whether to seek the death penalty turns completely on the personal policies of the local prosecutor.[115] For this reason, Mr. Galloway's death sentence violates his constitutional rights to equal protection, due process, and to a reliable sentencing determination under the Fifth, Sixth, Eighth and Fourteenth Amendments.

**Equal protection**. "[U]niform" and "specific" vote-counting standards are required to prevent the arbitrary and disparate treatment of similarly situated people whose fundamental right to vote is at stake. *Bush v. Gore*, 531 U.S. 98,102, 106 (2000). Because Mississippi's death penalty system concerns a right more fundamental than the right to vote – the right to life, *see Furman v. Georgia*, 408 U.S. 238, 359 (1972)

---

[115] *See, e.g.*, Editorial, Hinds DA: Budget Shouldn't Dictate Law, CLARION-LEDGER (Jackson, MS), Oct. 27, 2009 (Hinds County District Attorney's decision to seek death penalty is based on "budget issues and other factors").

(Marshall, J., concurring) – its system must satisfy the equal protection principles enunciated in *Bush* and must value the lives of all citizens equally. Just as a "State may not, by [] arbitrary and disparate treatment, value one person's vote over that of another," *Bush*, 531 U.S. at 104-05, a state may not, by arbitrary and disparate treatment, value one person's life over that of another.[116]  As established above, Mississippi fails this test. Its law does not even provide an "abstract proposition" or a "starting principle," *Bush*, 531 U.S. at 106, determining how local prosecutors should make these life-and-death decisions, and it is clear that similarly situated defendants have not been treated equally across Mississippi.

**Due process.** In determining the scope of due process protections, three factors must be balanced: (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of such interest through procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the state's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976). The discretion granted to Mississippi prosecutors violates Mr. Galloway's right to due process under this test. The interest at stake – the right to life – is the most fundamental of all. The lack of standards increases the risk of an erroneous deprivation by failing to ensure that the death penalty is applied to those individuals "who act with the level of moral culpability that characterizes the most serious adult criminal

---

[116] Since *Bush*, commentators have recognized that its logic prohibits standardless prosecutorial discretion to seek death against statutorily eligible defendants. See, e.g., Laurence Benner, et. al, Criminal Justice in the Supreme Court: An Analysis of United States Supreme Court Criminal and Habeas Corpus Decisions (October 2, 2000 - September 30, 2001), 38 Cal. W. L. Rev. 87, 90-94 (Fall 2001).

conduct." *Atkins v. Virginia,* 536 U.S. 304, 306 (2002). Statewide standards would reduce the risk of arbitrary application and could be adopted with relative ease. Additionally, the state's interest in granting prosecutors this unbridled discretion is minimal at best. Therefore, the standardless prosecutorial discretion to seek the execution of death-eligible defendants in Mississippi violates due process.

**Cruel and unusual punishment.** Capital sentencers' decisions must be guided by standards to narrow and guide their discretion. *See, e.g., Gregg v. Georgia,* 428 U.S. 153, 195 (1976). However, because a prosecutor's "decision whether or not to seek capital punishment is no less important than the jury's, . . . [his or her] 'discretion must [also] be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.'" *DeGarmo v. Alabama*, 474 U.S. 973, 974-975 (1985) (Brennan, J., dissenting from denial of cert.) (emphasis added) (*quoting Gregg*, 428 U.S. at 189). In *Gregg,* Justice White stated that, "[a]bsent facts to the contrary," he would not assume that prosecutors would "exercise [their] power in a standardless fashion." *Id.,* 428 U.S. at 225 (White, J., concurring). Justice White asserted that "defendants will escape the death penalty through prosecutorial charging decisions only because the offense is not sufficiently serious; or because the proof is insufficiently strong." *Id.* However, it is clear that geography, more than the nature of the offense or the State's proof, is the most indicative factor that a prosecutor will seek the death penalty. *See* Richard Willing & Gary Fields, Geography of the Death Penalty, USA TODAY, Dec. 20, 1999, at A1 ("differences in murder rates or population do not explain all the county-by-county disparities. Instead, the willingness of the local prosecutor to seek the death penalty seems to play by far the most significant role in determining who will eventually be sentenced to death."). Because of the lack of

standards governing this use, the death penalty continues to be imposed in an arbitrary, freakish, and discriminatory manner in violation of the Eighth Amendment.

As described in Ground Thirty-One, 28 U.S.C. § 2254, if construed to require federal court "deference" to state court interpretations of federal law, would violate the doctrine of constitutional avoidance, Article III, and the Supremacy Clause. This Court's review should therefore be de novo.

Even if § 2254 applies, the State does not deny that the state court unreasonably applied clearly established federal law in rejecting this claim. Answer at 34-35. In any event, the Mississippi Supreme Court's rejection of this claim was contrary to, or an unreasonable application of clearly established federal law and/or an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1), (2). The state court relied on the Supreme Court's observations in *McCleskey v. Kemp,* 481 U.S. 279, 296–97 (1987), and *Gregg v. Georgia,* 428 U.S. 153, 199 (1976), that prosecutorial discretion is an important feature of the criminal justice system. App. 107a-08a, 122 So.3d at 681. Mr. Galloway's argument, however, does not attack prosecutorial discretion in general but discretion without standards. The Mississippi Supreme Court's rejection of this claim, therefore, unreasonably applied *McCleskey* and *Gregg*, and was contrary to the constitutional precedents and unreasonably determined the facts on which this argument relies.

This Court should grant habeas relief on this ground from Mr. Galloway's sentence of death, both on this ground alone and cumulatively with the other grounds in this petition.

## XXIX.    GROUND TWENTY-NINE – The Numerous Instances of Ineffective Assistance of Counsel Cumulatively Require Relief.

From the pretrial period through sentencing, counsel performed below an objective standard of reasonableness, and this deficient performance undermined the reliability of the proceedings at both phases of the trial.  Mr. Galloway was entitled to the effective assistance of trial counsel. U.S. CONST. AMENDS. VI, XIV; *Strickland*, 466 U.S. 668, 687 (1984).  Capital cases impose even more stringent obligations. *Rompilla*, 545 U.S. 374; *Wiggins*, 539 U.S. at 524-25. In determining whether deficient performance resulted in a reasonable probability of a different result at either guilt or sentencing, "a court hearing an ineffectiveness claim must consider *the totality of the evidence before the judge or jury.*" *Strickland* 466 U.S. at 695. Here, the "combined prejudicial effect" of trial counsel's errors undermined the reliability of the proceedings and demands relief.  *White v. Thaler*, 610 F.3d 890, 906 (5th Cir. 2010).

### A. Facts relevant to this ground for relief.

Here, the totality of counsel's errors, noted in the Grounds Two through Four, Seven, Fourteen and Twenty (incorporated here), were pervasive.  In summary, trial counsel's constitutionally inadequate performance permeated each stage in the trial.

Pretrial, counsel failed:

- To file a Rule 702 pretrial challenge to Dr. McGarry's unreliable and unscientific forensic testimony; and

- To obtain a ruling on a pretrial motion seeking to question jurors during voir dire about mitigation and setting forth the law and importance of such questions.

During voir dire, counsel failed:

374

- To raise a *Batson* objection during jury selection when the prosecution used 75 percent of its strikes to eliminate Black jurors, and struck Black jurors at eleven times the rate it struck white jurors, resulting in an all-white jury;

- To ask any meaningful questions about such crucial topics as the jurors' ability to consider mitigation; their ability to consider a life sentence in a case with sexual assault; and their areas of bias, including racial bias and views about sexual assault;

- To seek any type of individual questioning, much less individual, sequestered voir dire or a questionnaire to ask about sensitive topics;

- To ask jurors about the bases of their death penalty views, even though trial counsel had secured permission from the court to do so.

During the guilt phase of trial, counsel:

- Failed to prevent, impeach or attack the "junk science" presented by Dr. McGarry;

- Failed to investigate and impeach Dr. McGarry with readily available evidence of his dismissal from his job a few months before trial, a problematic record overall, and prior challenges to his unreliable testimony;

- Failed to object to the testimony of Dr. McGarry;

- Limited the review of their own expert, Dr. Leroy Riddick, and failed to meet with him before trial, let alone adequately consult with and prepare him; and

- Failed to object to the use of a stun belt and/or shackles on Mr. Galloway in the presence of the jury when he presented no security risk whatsoever.

375

At sentencing, trial counsel failed to adequately investigate and present mitigation of Mr. Galloway's life story, including evidence of;

- Mr. Galloway's history of trauma, poverty, family dysfunction and domestic violence;

- Family history of mental illness;

- Mr. Galloway's mental illness;

- Mr. Galloway's resilience and efforts to be a good father;

- Intergenerational trauma;

Counsel also failed to investigate and object to the carjacking aggravation evidence.

### B. Taking in the totality of the evidence, Mr. Galloway is entitled to relief under *Strickland*.

From the context of "the totality of the evidence before the judge or jury," it is evident that the outcome of the trial would have been different but for counsel's performance. *Strickland* 466 U.S. at 695. Voir dire would have been conducted differently. Had counsel raised a contemporaneous *Batson* challenge, the jury would have been composed differently, or, on direct appeal, Mr. Galloway would have won on his claim under *Batson*. Mr. Galloway would not have been subjected to the dehumanizing impacts of being forced to wear a stun device in the presence of the jury throughout the entire trial. The unscientific evidence from Dr. McGarry would have been prevented completely or, at the very least, thoroughly impeached, undermining the conviction for capital murder based on sexual battery.

At sentencing, instead of the twenty-two transcript pages of cursory testimony that trial counsel presented, *see* R. 815-40, the jury would have learned of "a unique individual

story" that would have allowed them "to have all the relevant information that they need to render their reasoned moral decision reliably." Russel Stetler, Maria McLaughlin, Susan Garvey, *Mitigation That Worked: Empirical Evidence of Why Jurors Rejected the Death Penalty In Some Highly Aggravated Cases*, 53 Hofstra L. Rev. 729, 820. They would have been offered evidence undermining the aggravating evidence offered by the state. They would have learned about the full narrative of Mr. Galloway's life and been told the story of his compelling story of mental illness and resilience in the face of significant trauma, abuse and poverty.

Taking all of this into consideration, there is a reasonable probability that but for trial counsels' errors Mr. Galloway would not have been convicted of murder based on sexual battery or that at least one juror would have rejected a death sentence. Trial counsels' deficient performance thus violated Mr. Galloway's right to the effective assistance of counsel and requires relief from the conviction or, at a minimum, from the death sentence, because "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

As described in Ground Thirty-One, 28 U.S.C. § 2254(d), if construed to require federal court "deference" to state court interpretations of federal law, would violate the doctrine of constitutional avoidance, Article III, and the Supremacy Clause. This Court's review should therefore be *de novo*.

The Mississippi Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law and/or an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1), (2). The court determined that "no

377

individual errors require reversal of Galloway's conviction or sentence, nor does an aggregation of errors mandate a reversal." App. 241a, *Galloway,* 374 So. 3d at 515. This indicates that the Mississippi Supreme Court failed to consider *Strickland*'s mandate that "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland* 466 U.S. at 695.  Because of the state court's refusal to analyze trial counsel's ineffectiveness under the clearly established standard, this Court must review the claim *de novo. See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (when "the requirement set forth in § 2254(d)(1) is satisfied[, a] federal court must then resolve the [constitutional] claim without the deference AEDPA otherwise requires."). This Court should grant habeas relief from Mr. Galloway's conviction and sentence of death, both on this ground alone and cumulatively with the other grounds in this petition.

## XXX. GROUND THIRTY – Cumulative Error Requires Relief From Both the Conviction and the Death Sentence.

Even if none of the errors set forth above and in the petition warrants relief individually, all of them (or all those this Court finds meritorious) do require relief cumulatively.[117] Mr. Galloway argued that cumulative error required relief on both direct

---

[117] *See supra* Grounds One (confrontation claim relating to DNA Analyst DuBourg), Two (ineffective assistance of counsel for failure to challenge "junk science" testimony of Dr. McGarry), Three (same, for deficient performance in jury selection"), Four (same, for failure to investigate mitigating circumstances), Five (same, for failure to investigate carjacking aggravating circumstance), Six (due process violation for suppressing Dr. McGarry impeachment evidence), Seven (guilt innocence grounds for relief for failure to require jury finding that penetration was nonconsensual); Eight (insufficiency of evidence to establish sexual battery, and thus, to sustain capital murder conviction), Nine (juror misconduct), Ten (statutory petit jury oath), Eleven (statutory limitations on venire), Twelve (stun belt), Fourteen (exclusion of prior sexual conduct), Fifteen (victim impact evidence), Sixteen (Dixie Brimage's in-court identification of Mr. Galloway), Seventeen (overruled defense objections), Eighteen (testimonial hearsay statements throughout trial), Nineteen (prosecutorial misconduct), Twenty (court requirement that defense disclose strategy to the State), Twenty-One (sentencing instructions), Twenty-Two (excluded penalty phase evidence that would have rebutted future dangerousness), Twenty-Three (excluding mitigation evidence relating to prison conditions for individuals serving life without parole sentences), Fourteen (insufficiency of evidence of prior conviction of crime of violence aggravator), Fifteen (sustained State objections to defense summation), Sixteen ("especially heinous, atrocious, and cruel" aggravator), Seventeen (constitutional

appeal and post-conviction review in state court. *See* Appellant's Brief at 124; Motion to File Amended Petition for Post-Conviction Relief at 235. The Mississippi Supreme Court rejected that argument each time. App. 109a, *Galloway,* 122 So. 3d at 682; App. 241a, *Galloway,* 374 So. 3d at 514-15.

A court must grant federal habeas relief for cumulative errors in the conduct of a state prosecution where "the individual errors involved matters of constitutional dimension rather than mere violations of state law," "the errors were not procedurally defaulted for habeas purposes," and "the errors so infected the entire trial that the resulting conviction violates due process." *Derden v. McNeel,* 978 F.2d 1453, 1454 (5th Cir. 1992). "Inquiry into the fundamental fairness of a trial can be made only after examining the entire proceedings." *Trice v. Ward,* 196 F.3d 1151, 1167 (10th Cir. 1999).

Examining "the entire proceedings" shows that Mr. Galloway's claims collectively satisfy the *Derden* due process test because one constitutional violation followed another from beginning to end—with origins before the beginning, in a wholly inadequate pretrial investigation. The prosecution shielded its DNA analyst from cross-examination about sample contamination and methodology errors by presenting a surrogate expert who had no personal knowledge of the testing. To prove the sexual battery necessary to establish death-eligibility, the prosecutors relied on the junk science opinion of a disgraced pathologist who had lost his job only months before trial because of multiple botched autopsies, and they concealed that impeachment information from the defense. Trial counsel allowed this prosecution expert to hoodwink the jury without proper preparation,

---

challenge to Mississippi death penalty), Twenty-Eight (unreviewable and unfettered State discretion), Twenty-Nine (cumulative error of counsel).

objection, or opposition. To make things worse, the judge excluded evidence that the victim had other sexual partners who could have been responsible for the small laceration on which the prosecution rested its entire case for capital murder. Counsel did not object.

Counsel's other repeated failures of advocacy undermined the trial's integrity still further. Counsel made no effort to prevent the prosecution from using peremptory challenges to obtain an all-white jury and failed to advocate for an impartial jury. Before trial, counsel failed to conduct a constitutionally adequate investigation of Mr. Galloway's background and mental health or any inquiry into the prior conviction that State introduced as an aggravating factor. As a result, the jurors decided whether Mr. Galloway would live or die without ever learning about his deeply impoverished, violent background or his resulting mental illness. They did not know that the lawyer who represented him on the prior carjacking case that the State used as an aggravating factor had begun that same case as his prosecutor, or that that conflicted lawyer never learned the exculpatory facts that could have led to an acquittal. Counsel's other repeated deficient performance reinforced the prejudice that flowed from counsel's major failings.

Cumulatively, these and all the constitutional errors set forth in this memorandum and the petition, as *Derden* requires, "so infected the entire trial that the resulting conviction violates due process." 978 F.2d at 1454.

The state court rejected Mr. Galloway's cumulative error claims on direct appeal and post-conviction review, stating each time that, because it found no individual errors, it had no errors to cumulate. App. 109a, *Galloway*, 122 So. 3d at 682; App. 241a *Galloway,* 374 So. 3d at 514-15. The claims above explain why each of the court's

individual rulings, at a minimum,[118] unreasonably applied clearly established federal law. It was, at a minimum, a doubly unreasonable application of federal law for the state court to discount the collective prejudicial impact of all the errors and deny relief. 28 U.S.C. § 2254(d).

For this reason, if this Court does not grant relief on even one of Mr. Galloway's claims above individually, it must grant relief because they cumulatively deprived him of due process.

## XXXI.    GROUND THIRTY-ONE – The Supreme Court's Decision In *Loper Bright Enterprises v. Raimondo* Prohibits "Deference" to the State Court Decision Under 28 U.S.C. § 2254(d).

After exhausting his constitutional claims in the state courts, Mr. Galloway sought federal judicial review of the constitutional violations that infected his trial by filing this petition for a writ of habeas corpus. In its Answer, the State heavily relies on 28 U.S.C. § 2254(d) in an attempt to insulate the state courts' decisions upholding Petitioner's convictions and sentences.[119] Answer at 11-15. The State's position, in effect, requires this Court to grant deference to the Mississippi Supreme Court's decisions on his claims. This reading of the statutory scheme makes the state court the final arbitrator of what the Constitution means and what constitutes a federal constitutional violation.

---

[118] As explained in Ground Thirty-One, in light of *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), the Court's review should in any event be de novo.

[119] Section 2254(d) of Title 28 provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In June 2024, the United States Supreme Court reviewed precedents requiring similar deference to executive branch agencies and declared that abdication of judicial responsibility to be intolerable in our federal system of government. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391-92 (2024). The Supreme Court's reasoning applies equally to this Court's (and other courts') interpretation and application of § 2254(d): if Congress cannot delegate to federal agencies the authority to "make sub-constitutional law by which federal judges may be bound," Congress surely cannot delegate to state judges the authority "to make *constitutional* law by which federal judges may be bound." *See* Anthony G. Amsterdam & James S. Liebman, *Loper Bright* and the Great Writ, 56 Colum. Hum. Rts. L. Rev. 54, 54 (2025) (emphasis in original), available at  https://hrlr.law.columbia.edu/hrlr/loper-bright-and-the-greatwrit/  (hereinafter "Amsterdam & Lieberman"). [120] "Federal agencies are creatures of Congress to which it may appropriately delegate some of its power to make the law that federal courts then are duty-bound to apply. [But by force of Article III of the Constitution, n]either Congress nor any other authority save the American people by amendment may delegate the making of constitutional law." *Id*.

When the Supreme Court interpreted § 2254(d) of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") in *Williams v. Taylor*, 529 U.S. 362 (2000), the justices differed significantly regarding its meaning. Justice O'Connor stated for the majority that § 2254(d)(1) "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims

---

[120] Pursuant to Federal Rule of Civil Procedure 5.1, Petitioner served a copy of the petition for writ of habeas corpus and Notice of Constitutional Question on the Attorney General of the United States on May 29, 2025.

adjudicated on the merits in state court." *Id*. at 412. This restriction prohibits a federal court from issuing "the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied [the Constitution] erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411. The Supreme Court has held that this interpretation erects a "highly deferential standard for evaluating state-court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333, n.7 (1997); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); *Renico v. Lett*, 559 U.S. 766, 773 (2010); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam).

Justice Stevens disagreed with the *Williams* majority, noting that Congress did not use the term "deference" and concluding that Congress did not impose a "requirement that federal courts actually defer to a state-court application of the federal law that is, in the independent judgment of the federal court, in error." 529 U.S. at 386-87 (Stevens, J., concurring). Instead, § 2254(d) requires federal courts "'to give state courts' opinions a respectful reading, and to listen carefully to their conclusions, but when the state court addresses a legal question, it is the law "as determined by the Supreme Court of the United States" that prevails.'" *Id*. at 387 (quoting *Lindh v. Murphy*, 96 F.3d 856, 869 (7th Cir. 1996) (*en banc*), *rev'd on other grounds*, 521 U.S. 320 (1997)). As Justice Stevens concluded, to apply § 2254(d) with any other interpretation would result in conflicting constitutional protections among the differing states:

> In sum, the statute directs federal courts to attend to every state-court judgment with utmost care, but it does not require them to defer to the opinion of every reasonable state-court judge on the content of federal law. If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody—or, as in this case, his sentence of death— violates the Constitution, that independent judgment should prevail. Otherwise the federal "law as determined by the Supreme Court of the United States" might be applied by the federal courts

one way in Virginia and another way in California. In light of the well-recognized interest in ensuring that federal courts interpret federal law in a uniform way, we are convinced that Congress did not intend the statute to produce such a result.

*Id.* at 389-90 (footnote omitted). Justices Stevens further criticized the majority's interpretation as importing the deference accorded to federal administrative decisions:

"Deference after the fashion of *Chevron U.S.A. Inc. v. Natural Resources Defense Council* … depends on delegation. … Congress did not delegate either interpretive or executive power to the state courts. They exercise powers under their domestic law, constrained by the Constitution of the United States. 'Deference' to the jurisdictions bound by those constraints is not sensible."

*Id.* at 387 n.13 (quoting *Lindh*, 96 F.3d at 868).[121]

The judicial responsibilities that Justice Stevens identified stem from the inherent power of the judiciary in our constitutional system. Article III requires that federal courts exercise "the judicial Power" independently in a case arising under the Constitution, U.S. CONST. ART. III, §§ 1, 2, and "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). This is "the very essence of judicial duty." *Id.* at 178; *see also Cooper v. Aaron*, 358 U.S. 1, 18 (1958) (affirming the "basic principle that the federal judiciary is supreme in the exposition of the law of the Constitution, and that principle has ever since been respected by this Court and the Country as a permanent and indispensable feature of our constitutional system"). Further, the Supremacy Clause contained in Article VI ensures that federal law, as interpreted by the federal courts, binds "the Judges in every State." U.S. CONST. ART. VI, ¶ 2; *see, e.g., Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824)

---

[121] In *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842- 45, 865-66 (1984), the Supreme Court held that a federal court must defer to an administrative agency's interpretation of a federal statute unless the agency has adopted an unreasonable or impermissible interpretation, or alternatively has violated another statutory obligation.

("the act of Congress, or the treaty, is supreme; and the law of the State, though enacted in the exercise of powers not controverted, must yield to it."). Notably, although the Supreme Court has applied "deferential" interpretation in habeas cases following the *Williams* decision, the Court has never addressed whether such deference to state court decisions violates Article III or the Supremacy Clause. Amsterdam & Liebman, supra, 56 Colum. Hum. Rts. L. Rev. at 61.

In June 2024, the Supreme Court addressed the constitutionality of mandated federal court deference to non-Article-III actors' legal determinations. In *Loper Bright Enterprises v. Raimondo*, it considered Article III challenges to the constitutionality of the "*Chevron* deference" that it had previously given to federal executive agencies' decisions "at least 70 times" without addressing its constitutionality. 603 U.S. at 472 (Kagan, J., dissenting). In *Loper Bright Enterprises*, the owners of Atlantic fisheries challenged federal courts' invocation of *Chevron* to deny relief from Commerce Department fees covering the cost of onboard government monitors without making an independent judgment whether the fees violated the statutes under which the Department claimed to act. *Id*. at 2256-57. In overruling *Chevron*, the Court first described "the responsibility and power" that Article III "assigns to the Federal Judiciary" to decide cases and controversies. *Id*. at 2257. The Framers insisted that the "final 'interpretation' even of "'obscure and equivocal'" laws was "'the proper and peculiar province of the courts.'" *Id*. (quoting The Federalist No. 78, at 525 (J. Cooke ed. 1961) (A. Hamilton), *Id*. No. 37, at 236 (J. Madison)). Only Article III courts are equipped to "exercise that judgment independent of influence from the political branches" and to "construe the law with '[c]lear heads . . . and honest hearts,' not with an eye to policy preferences that had

385

not made it into the [law]." *Id*. at 2257, 2268 (quoting The Federalist No. 78, at 522, and 1 Works of James Wilson 363 (J. Andrews ed. 1896)). As a result, "[s]ince the start of our Republic," federal "courts have 'decide[d] questions of law' and 'interpret[ed] constitutional and statutory provisions' by applying their own legal judgment." *Id*. at 2261 n.4 (quoting 5 U.S.C. § 706); *see also id*. at 2257 ("In the foundational decision of *Marbury v. Madison*, Chief Justice Marshall famously declared that '[i]t is emphatically the province and duty of the judicial department to say what the law is.'") (quoting *Marbury*, 5 U.S. (1 Cranch) at 177).

This "traditional conception of the judicial function" compelled the Court in *Loper Bright Enterprises* to overrule *Chevron*'s deference doctrine because it required judges to disregard their responsibility to interpret and apply the law. *Id*. at 2262, 2270 (noting that *Chevron* deference "required courts" to "yield[] to an agency the express responsibility, vested in 'the reviewing court,' to 'decide all relevant questions of law' and 'interpret ... statutory provisions'") (quoting 5 U.S.C. § 706) (emphasis in original). So, when the 1946 Administrative Procedure Act ("APA") directed federal courts reviewing agency action to "decide all relevant questions of law," those courts had to "exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Id*. at 2272-73.

Concurring, Justice Thomas wrote separately "to underscore a more fundamental problem: *Chevron* deference also violates our Constitution's separation of powers." *Id*. at 2274. "Because the judicial power requires judges to exercise their independent judgment, the deference that *Chevron* requires contravenes Article III's mandate." *Id*. Justice Gorsuch agreed, explaining that *Chevron* deference must be overturned because it

386

unconstitutionally "precludes courts from exercising the judicial power vested in them by Article III to say what the law is." *Id*. at 2285.

In *Loper Bright and the Great Writ*, Professors Amsterdam and Leibman detail the extensive historical justifications for Justice Stevens's interpretation of § 2254(d) and the basis for concluding that deference to state court decisions violates Article III and the Supremacy Clause. The Framers of the Constitution devised a national system of government "to contain 'the spirit of power and faction' and its influence on state judging, which gravely endangered the law's sovereignty, the nation's unity, and the people's liberty." 56 Colum. Hum. Rts. L. Rev. at 58 (quoting The Federalist No. 10, at 70 (J. Madison)). Two provisions of the Constitution were drafted to promote these goals. Article III requires a federal court with jurisdiction to exercise "'[t]he judicial Power' independently—to say what the Constitution means and how it bears on the facts of the case and to carry its judgment into effect subject only to appeal to a higher federal court." *Id*. (quoting U.S. CONST. ART. III, §§ 1-2) (emphasis in original). "When the case originates with state judges and reaches a federal court on review, Article VI additionally obliges the federal court to assure that 'the Judges in [the] State' were 'bound' in their decision by the 'Constitution' as the "supreme Law of the Land," "any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'" *Id*. (quoting U.S. Const. art. VI, ¶ 2). "From the Founding until 1996," federal courts reviewing habeas corpus petitions challenging state court criminal judgments "persistently exercised the power independently to obviate the influence of local faction and effectuate supreme law in the cardinal case of state custody imposed and upheld in violation of the Constitution." *Id*. at 94 (footnote omitted).

This extensive history, underscored and relied upon by the *Loper Bright Enterprises* decision, demonstrates that deference to state court decisions interpreting and applying federal law violates Article III and the Supremacy Clause.

First, "AEPDA deference instructs federal courts with jurisdiction over the constitutionality of a prisoner's custody and state judges' decisions approving it to forbear doing what *Marbury* says they must do: 'say what they law is'; 'declar[e] what shall be the Supreme law of the land'; 'obey' all 'parts of the Constitution; and apply their independent judgment of it without bowing to a non-Article-III authority's reasonable approximation of it." Amsterdam & Liebman, 56 Colum. Hum. Rts. L. Rev. at 98 (emphasis in original).

Second, "AEDPA deference, limiting independent federal habeas review to whether state judges rendered a decision that is "so obviously wrong as to be 'beyond any possibility for fairminded disagreement,'" *Shinn v. Kayer*, 592 U.S. 111, 124 (2020) (per curiam) (quoting *Richter*, 562 U.S. at 103), "demands exactly the kind of ineffectual review that the Framers [and the United States Supreme Court's decisions in *Martin v. Hunter's Lessee*, 14 U.S. 305 (1816), *Osborn v. Bank of the United States*, 22 U.S. 738 (1824), and *Norris v. Alabama*, 294 U.S. 587 (1935)] rejected as incompatible with the federal judicial power in Madison's cardinal faction- imperiled cases. Worse, because AEDPA demands 'deference … near its apex' whenever constitutional meaning 'turns on general, fact-driven standards'—on facts documenting mob influence, jury discrimination, coerced confessions, ineffective representation, materiality of evidence withheld or falsified by the state—it gives state courts the broadest license to evade the

Constitution in cases where the most fundamental human rights are at stake." Amsterdam & Liebman, 56 Colum. Hum. Rts. L. Rev. at 102-03 (footnotes omitted).

Third, "AEDPA deference brazenly withdraws federal courts' obligation independently to say what the Constitution means and to assay its whole meaning as elaborated by its application to the facts; to decide the whole case before them based on their best constitutional judgment; and to oppose that judgment to decisions by even the most 'biassed,' 'partial,' and 'interested' state judges if those judges' rulings are 'possibly' reasonable. *Id*. at 109 (emphasis in original) (footnote omitted).

Fourth, the AEDPA unconstitutionally precludes Article-III courts "from exercising what [Alexander] Hamilton called an 'effectual power . . . in the federal courts to overrule such [state actions] as might be in manifest contravention of the articles of the Union.'" *Id*. at 109 (quoting The Federalist No. 80, at 68 (A. Hamilton)). The Supreme Court has long recognized that Article III gives the federal courts power to correct violations of federal law. *See, e.g., Plaut v. Spendthrift Farm, Inc*., 514 U.S. 211, 218-19 (1995) ("The record of history shows that the Framers crafted this charter of the judicial department with an expressed understanding that it gives the Federal Judiciary the power, not merely to rule on cases, but to decide them, subject to review only by superior courts in the Article III hierarchy—with an understanding, in short, that 'a judgment conclusively resolves the case' because 'a "judicial Power" is one to render dispositive judgments.'") (quoting Frank H. Easterbrook, Presidential Review, 40 Case W. Res. L. Rev. 905, 926 (1990)); *Martin v. Hunter's Lessee*, 14 U.S. at 329 (holding that the Constitution authorizes the judicial branch "to expound and enforce" federal law and "to carry into effect . . . the express provisions of the constitution"). Indeed, "Article III could

389

neither serve its purpose in the system of checks and balances nor preserve the integrity of judicial decisionmaking if the other branches of the Federal Government could confer the Government's 'judicial Power' on entities outside Article III." *Stern v. Marshall*, 546 U.S. 462, 484 (2011).

Over two hundred years ago, in *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264 (1821), the Supreme Court categorically refused to countenance state-court encroachment upon the federal judicial power. In *Cohens*, the Commonwealth of Virginia argued that the United States Supreme Court lacked the "power to compel State tribunals to obey your decisions" and so the Court "could not take jurisdiction over the case for lack of a fundamental component of the judicial power—the ability to effectuate its ruling." *Id.* at 317 (arguments of counsel); *see also* Amsterdam & Liebman, 56 Colum. Hum. Rts. L. Rev. at 112-16. Chief Justice Marshall rejected Virginia's reasoning, ruling instead that the Congressional grant of jurisdiction to a federal court carries with it not only the power to decide for itself any relevant constitutional question, but the duty to do so. *Cohens*, 19 U.S. (6 Wheat.) at 405 (noting that federal court must decide a relevant constitutional issue and "cannot pass it by because it is doubtful."). Just as in *Cohen* Virginia suggested encroachments on judicial authority, "[b]y requiring federal courts to 'pass' on state-court constitutional violations that are 'doubtful,' 'difficult,' not 'extreme,' or that 'approach the confines' of the rights the Constitution assures, so AEDPA deference commands 'treason to the Constitution.'" Amsterdam & Liebman, 56 Colum. Hum. Rts. L. Rev. at 116.

Congress has the power to establish or to refrain from establishing federal courts other than the Supreme Court. It has the power to grant or to withdraw the federal courts'

jurisdiction to decide cases arising under the Constitution. But once Congress has created a federal court and given it jurisdiction to adjudicate cases that present constitutional issues, Congress may not restrict the Judicial Branch's power to interpret the Constitution independently and to maintain the Constitution's supremacy and unity by enforcing it. *See Loper Bright Enterprises*, 603 U.S. 392 & n.4; *City of Boerne v. Flores*, 521 U.S. 507, 536 (1997) (declaring that "[w]hen the Court has interpreted the Constitution, it has acted within the province of the Judicial Branch, which embraces the duty to say what the law is" and that any contrary expectations from the legislative branch "must be disappointed"). Just as Article-III courts cannot defer to Congress's interpretations of federal law, *see City of Boerne*, 521 U.S. at 535-36, or to executive agencies' interpretations of federal law, *Loper Bright Enterprises*, 603 U.S. at 406-07, they cannot defer to state courts' interpretations of federal law – including those interpretations that are wrought by applying legal doctrine to the facts of a particular case at bar. *See Norris v. Alabama*, 294 U.S. 587, 590 (1935) (stating that it is "incumbent" upon federal courts to review mixed questions of law and fact; "[o]therwise, review by this Court would fail of its purpose in safeguarding constitutional rights").

If anything, AEDPA deference is a far greater encroachment on these principles than *Chevron* deference was. "[A]s the *Loper* justices all acknowledged—*Chevron* did not forgo federal-court adherence to the will of the lawgiver (Congress) in favor of deference to agency decisions. Instead, *Chevron* deference aimed to implement Congress's assumed delegation to agencies of authority to fill gaps in laws they administered, binding courts to treat agencies' reasonable judgments as Congress' own." Amsterdam & Liebman, 56 Colum. Hum. Rts. L. Rev. at 64. Justice Stevens recognized

this in *Williams*, explaining that "[d]eference after the fashion of *Chevron*" depends on a congressional "delegation" to the agency of a lawmaking role. *Williams*, 539 U.S. at 387 n.13 (Stevens, J., concurring) (quoting *Lindh*, 96 F. 3d at 868). But Congress through § 2254(d) "'did not delegate either interpretive or executive power to the state courts'" to make federal law because Congress cannot do so consistently with the Constitution." Amsterdam & Liebman, 56 Colum. Hum. Rts. L. Rev. at 64; *see Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 83-84 (1982) (plurality opinion) (Congress may "create presumptions" and "prescribe remedies . . . incidental to [its] power to define the right that it has created," but "when the right being adjudicated is not of congressional creation" and arises under the Constitution, such rules are "unwarranted encroachments upon the judicial power of the United States, which our Constitution reserves for Art. III courts").

Moreover, as Professors Amsterdam and Liebman underscore, the pernicious effect of AEDPA deference is "far worse than *Chevron* deference was":

> Unlike AEDPA deference, *Chevron* never delegated the content, interpretation, and enforcement of the Constitution to non-Article-III actors. It never let those actors defend doubtful decisions by saying nothing or as little as possible about how those decisions accorded with the law. It never forced federal courts to invent reasons that non-Article-III actors did not offer or to defer without first going through a process where you "don't [just] say, 'oh, it's difficult'" and give up, but instead you "work hard to figure out" the law's meaning using "every tool you can." *Chevron* deference unified federal law around a single agency's interpretation—with some disruptions every four or eight years, perhaps—but never fragmented federal law into 30,000 pieces in the inconstant hands of the judges in every State. Yes, it put property and livelihood at risk, but never the most basic liberties of movement and daily self-rule. And life.

56 Colum. Hum. Rts. L. Rev. at 154.

The reasoning of the Court's decision in *Loper Bright Enterprises* and its recognition of Article III unmistakably vitiates the Court's interpretation of § 2254(d) in *Williams*.[122] As a result, this Court should either (1) construe and apply § 2254(d) in accordance with Justice Stevens's interpretation, or, in the alternative, (2) conclude that requiring deference to state court decisions violates Article III and the Supremacy Clause.

The first approach mirrors that taken by the Court in *Loper Bright Enterprises* and avoids deciding a constitutional question. *See, e.g., I.N.S. v. St. Cyr*, 533 U.S. 289, 299-300 (2001) ("if an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' … we are obligated to construe the statute to avoid such problems") (citation omitted); *Simpson v. United States*, 435 U.S. 6, 12 (1978) (applying the "practice of avoiding constitutional decisions where possible" in interpreting statute); *Crowell v. Benson*, 285 U.S. 22, 62 (1932) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided."). This approach, if taken, requires interpreting § 2254(d) consistently with Justice Steven's interpretation: "In sum, the statute directs federal courts to attend to every state-court judgment with utmost care, but it does not require them to defer to the opinion of every reasonable state-court judge on the content of federal law. If, after carefully weighing all the reasons for accepting a state court's

---

[122] *But see Bates v. Sec'y, Florida Dep't of Corr.*, No. 25-12588, 2025 WL 2305211 (11th Cir. Aug. 1, 2025) (denying certificate of appealability; district court correctly rejected *Loper Bright* claim); *Miles v. Floyd*, No. 24-1096 (6th Cir. Mar. 25, 2025) (declining to hold that *Loper Bright* impliedly overturned AEDPA deference. );  *Davis v. Guerrero,* No. 3:21-CV-2333-B-BN (N.D. Tex. Sept. 5, 2025); *Gay v. Payne*, No. 6:23-CV-06011 (W.D. Ark. Sept. 25, 2025); *Piper v. Jackley*, No. 5:20-cv-05074 (D.S.D. March 21, 2025).

judgment, a federal court is convinced that a prisoner's custody—or, as in this case, his sentence of death—violates the Constitution, that independent judgment should prevail." *Williams*, 539 U.S at 389-90 (Stevens, J., concurring).

Adopting Justice Stevens's interpretation of 2254(d) fully comports with the legislative history of the statute. *See* Statement on Signing the Antiterrorism and Effective Death Penalty Act of 1996, 32 Weekly Comp. Pres. Doc. 719 (Apr. 24, 1996) (rejecting the view that AEDPA would keep federal judges from "bring[ing] their own independent judgment to bear on questions of law and mixed questions of law and fact that come before them on habeas corpus" and expressing President Clinton's "confiden[ce] that the Federal courts will interpret [AEDPA] to preserve independent review of Federal legal claims and the bedrock constitutional principle of an independent judiciary"), available at https://www.govinfo.gov/content/pkg/PPP-1996- book1/html/PPP-1996-book1-doc-pg630.htm; 2 Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice And Procedure § 32.3, at 1890–91 n.8, 1897–99 n.19 (7th ed. 2023) (collecting § 2254(d)'s legislative history, which confirms the drafters' understanding that § 2254(d) did not require federal-court deference).

In addition, adopting Justice Stevens's interpretation comports with the Supreme Court's consideration of the reasoning undertaken and the power of the reasons given by the actor whose interpretation is under review articulated in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).  The *Loper Bright Enterprises* Court has reinstated *Skidmore*'s test as the appropriate standard of review for agencies' decisions. In *Skidmore*, the Supreme Court held that federal courts should respect but not be displaced by administrators' demonstrated experience, learning, and thoroughness of reasoning. *Id*. at 104 ("We

consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.").

In the alternative, this Court should hold that deference to state court decisions violates Article III and the Supremacy Clause:

> Articles III and VI command that [habeas corpus petitioners who file 2254 writs] have a supporter—the extended republic's law as independently interpreted, applied, and effectuated by nonpartisan, tenured judges given jurisdiction and thereby endowed with the judicial power to maintain the Constitution as the supreme law of the land notwithstanding anything in state law to the contrary. Congress' 'pig's ear' drafting and the Court's 'highly deferential' interpretation of AEDPA obstruct and distort that power at every turn.

Amsterdam & Liebman, 56 Colum. Hum. Rts. L. Rev. at 157.

Either approach requires this Court to reject the State's assertion that the Court should defer to the state court decisions in this case.

## F. CONCLUSION

WHEREFORE, for the foregoing reasons and for reasons set forth in prior pleadings, Petitioner requests this Court issue the writ of habeas corpus on his behalf, or, in the alternative, hold an evidentiary hearing to allow him to present evidence to prove his entitlement to relief.

Respectfully Submitted,

**Claudia Van Wyk**
(pro hac vice)
American Civil Liberties Union
Capital Punishment Project
201 W. Main Street, Suite 402
Durham, NC 27701
(267) 971-6991
cvanwyk@aclu.org

**Ayanna Hill**
Miss. Bar No. 106590
American Civil Liberties Union
101 S. Congress St
Jackson, Mississippi 39201
(601) 354-3408
ahill@aclu-ms.org

**Gerald W. King, Jr.**
Chief, Capital Habeas Unit
for the Fourth Circuit
Gerald_King@fd.org

**Elsa-Maria Ohman**
(pro hac vice)
Assistant Federal Public Defender
Capital Habeas Unit for the Fourth Circuit
Elsa_Ohman@fd.org

**Gabrielle Amber Pittman**
(pro hac vice)
Deputy Federal Public Defender
Capital Habeas Unit for the Fourth Circuit
G_Amber_Pittman@fd.org
Federal Public Defender
Western North Carolina
129 W. Trade Street, Suite 300
Charlotte, NC 28202
Telephone: (704) 374-0720
Fax: (704) 374-0722


s/Gabrielle Amber Pittman
Attorney for Petitioner



December 10, 2025

**CERTIFICATE OF SERVICE**

I certify that I have served a copy of the foregoing petition on the following via the Court's ECF system on December 10, 2025.

Parker Proctor
Assistant Attorney General
P. O. Box 220
Jackson, MS 39205-0220

____s/Gabrielle Amber Pittman____
GABRIELLE AMBER PITTMAN
State of Georgia Bar # 581044
Deputy Federal Public Defender
Capital Habeas Unit for the Fourth Circuit
G_Amber_Pittman@fd.org
Federal Public Defender
Western North Carolina
129 W. Trade Street, Suite 300
Charlotte, NC 28202
Telephone: (704) 374-0720
Fax: (704) 374-0722