UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

LESLIE GALLOWAY, III,               )
      *Petitioner,*                )
                                  )
  v.                                )    No. 1:24-CV-121-CWR
                                  )
**BURL CAIN,** Commissioner, Mississippi   )
Department of Corrections, MARC     )
MCCLURE, Superintendent, Mississippi )
State Penitentiary at Parchman,     )
Mississippi; and LYNN FITCH, Attorney )
General of the State of Mississippi,  )
      *Respondents.*              )

**APPENDIX TO MEMORANDUM OF LAW IN SUPPORT OF AMENDED PETITION
UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE
CUSTODY**

1.  Mississippi Supreme Court Motion for Leave to File Successive Petition for Post-Conviction Relief, Case No. 2025-DR-00129-SCT, dated February 6, 2025 ...............A001

2.  Mississippi Supreme Court Order Granting Motion to Dismiss Successive Motion for Leave to Proceed in Trial Court with Petition for Post-Conviction Relief, dated September 11, 2025 .....................................................................................................A020

3.  Affidavit of Alan Keel, dated March 6, 2025 .............................................................A022

4.  Curriculum Vita of Alan Keel ...................................................................................A045

5.  Affidavit of Susanna Henry, dated August 30, 2021 .................................................A051

6.  MS SCt Exhibit 126 – ProPublica -McGarry Article, dated February 1, 2011 .............A053

7.  Circuit Court of Harrison County Motion for Discovery and Access to Physical Evidence, Case No. B2401-09-468, dated May 23, 2014 ..............................................A068

8.  Circuit Court of Harrison County Discovery Order, Case No. B2401-09-468, dated September 22, 2014 .....................................................................................................A082

IN THE SUPREME COURT OF MISSISSIPPI
*Mississippi Supreme Court Case No. 2025-DR-00129-SCT*

Prior Case Numbers:
*Mississippi Supreme Court Case No. 2013-DR-01796-SCT*
*Harrison County Circuit Court Case No. B2401-09-468*

LESLIE GALLOWAY, III

*Petitioner*

v.

STATE OF MISSISSIPPI

*Respondent*

**FILED**

FEB 06 2025

OFFICE OF THE CLERK
SUPREME COURT
COURT OF APPEALS

## MOTION FOR LEAVE TO FILE SUCCESSIVE PETITION FOR POST-CONVICTION RELIEF

KRISSY C. NOBILE
MISS. OFFICE OF CAPITAL POST-
CONVICTION COUNSEL
239 North Lamar Street, Suite 404
Jackson, MS 39201
(601) 359-5733
knobile@pcc.state.ms.us

STACY FERRARO
Mississippi Bar #100263
3422 N. State Street
Unit 1
Jackson, MS 39216
(601) 624-2690
lifestoryms@gmail.com

CLAUDIA VAN WYK
Requested admission pro hac vice
ACLU CAPITAL PUNISHMENT PROJECT
201 W. Main Street, Suite 402
Durham, NC 27701
cvanwyk@aclu.org
(919) 433-8529 (direct)
(267) 971-6991 (cell)

*Counsel for Leslie Galloway, III*

**MOTION#**    2025. 398

TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

SUMMARY OF PRIOR PROCEEDINGS ................................................................ 2

STATEMENT OF FACTS ...................................................................................... 4

GROUNDS FOR RELIEF ...................................................................................... 7

A. Relief is Required Because *Smith* Abrogated the Precedent and Reasoning on Which this Court Relied When it Denied Mr. Galloway's Sixth Amendment claim. ............................................................................................................ 6

B. Mr. Galloway is Not Barred From Seeking Relief From This Court ............ 11

    1. The Intervening Decision in *Smith v. Arizona* Overcomes the Bar to Successive Petitions ................................................................................ 12

    2. The Intervening Decision in *Smith* Overcomes the Statute of Limitations .............................................................................................. 13

    3. *Res Judicata* Provisions are Inapplicable .......................................... 14

    4. *Howell* is Inapplicable Because Statutory Ground for Relief Exist and *Howell* Applies Only to Judicially-Crafted Rights ................................ 14

    5. *Teague* is Inapplicable as *Smith* did not Declare a New Rule of Criminal Procedure, but Rather Applied Establish Law .................................... 15

CONCLUSION ..................................................................................................... 16

A002

## MOTION FOR LEAVE TO FILE SUCCESSIVE
## PETITION FOR POST-CONVICTION RELIEF

### INTRODUCTION

At Leslie Galloway's trial, the State called a surrogate expert to testify about DNA analysis that another analyst had performed, violating his constitutional right to confront the witnesses against him. This Court rejected Mr. Galloway's Sixth Amendment claim on direct appeal, resting its ruling on two precedents: (1) a state law ruling, *Grim v. State*, 102 So. 3d 1073, 1081 (¶¶22, 23) (Miss. 2012), which permits reliance on surrogate expert testimony "as long as someone with adequate involvement with the testing process testifies," *Galloway v. State*, 122 So. 3d 614, 636-37 (¶43) (Miss. 2013) ("*Galloway* I"); and (2) a Supreme Court plurality decision, *Williams v. Illinois*, 567 U.S. 50, 85 (2012), treating cross-examination about "knowledge about the underlying testing process and the report itself" as constitutionally sufficient. *Galloway* I, 122 So. 3d at 637 (¶48). The Supreme Court has now rejected both rationales. *Smith v. Arizona*, 602 U.S. 779, 796-803 (2024) (explaining why admitting testimony on similar grounds violated long-standing Sixth Amendment precedents).

Mr. Galloway brings this successive motion for post-conviction relief under Miss. Code Ann. § 99-39-5(1)(a) (2023) to seek relief under *Smith*. *Id.* He can overcome any potential procedural bars to this Court's review. A petitioner can overcome both the bar to successive petitions and the statute of limitations when there is an intervening Supreme Court decision, which, had it been known at the time of trial or direct appeal, would have adversely affected the outcome of his trial (by requiring

1

A003

relief on appeal). Miss. Code Ann. §§ 99-39-23(6) and 99-39-5(2)(a)(i) (2023). *Smith* constitutes such a decision.  Moreover, no *res judicata* bar to successive petitions, §§ 99-39-21(3) and 99-39-23(6), can apply because the issue of law—whether surrogate expert testimony violates the Sixth Amendment despite *Williams*—was not known at the time of Mr. Galloway's direct appeal and so was not "capable of determination at trial and/or on direct appeal."  Miss. Code Ann. § 99-39-21(1). Moreover, the ruling in *Smith* did not trigger the general rule against retroactive application of new rules in collateral review. *See Manning v. State*, 929 So. 2d 885, 897 (¶33) (Miss. 2006) (citing *Teague v. Lane*, 489 U.S. 288, 311 (1989)). *Smith* did not establish a new rule of criminal procedure. "[A] case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Teague*, 489 U.S. at 301 (citation omitted) (emphasis in original). Here, the outcome in Mr. Galloway's direct appeal was dictated by precedent existing at the time, as the Supreme Court has now definitively established in *Smith,* and it is clear that this Court's prior disposition of this issue was inconsistent with *Smith*. This successive petition offers the Court an opportunity to align its decisions with *Smith*.

For the reasons below, this Court should allow Mr. Galloway to file his successive petition to receive a merits ruling on his *Smith*-based Confrontation Clause claim.

## SUMMARY OF PRIOR PROCEEDINGS

Leslie "Bo" Galloway was convicted and sentenced to death on September 23-24, 2010, in Harrison County, Mississippi, for the murder of Shakeylia "Kela"

2

Anderson on or about December 6, 2008. C. 304-305; R.E. Tab 3.[1] This Court affirmed the judgment below. *Galloway* I, 122 So. 3d at 614. Mr. Galloway's motion for rehearing was subsequently denied, and the United States Supreme Court denied his petition a writ of certiorari on May 27, 2014. *Galloway v. Mississippi*, 572 U.S. 1134 (2014). This Court denied Mr. Galloway's subsequent "Motion for Leave to Proceed in the Trial Court with a Petition for Post-Conviction Relief" and "Motion for Leave to Proceed in the Trial Court with Amended Petition for Post-Conviction Relief." *Galloway v. State*, 374 So. 3d 452. 464 (¶2) (Miss. 2023) ("*Galloway* II").

Mr. Galloway filed a petition for writ of habeas corpus in United States District Court for the Southern District of Mississippi on July 26, 2024, and filed a motion to stay and hold those proceedings in abeyance on July 29, 2024. *Galloway v. Cain*, No. 1:24cv121CWR, ECF Nos. 11 (July 26, 2024), 12 (July 29, 2024). The district court denied the motion for stay and abeyance on January 3, 2025, and set a new briefing schedule. *Id.*, ECF No. 23 (Jan. 3, 2025). After receiving a 30-day extension, the State currently has a due date of March 5, 2025, to file its answer to the petition. *Id.*, Text Order, Jan. 29, 2025.

The Circuit Court of Harrison County, First Judicial District, ruled on December 6, 2013, that Mr. Galloway was indigent and entitled to the appointment

---

[1] "C." refers to the Clerk's record; "R." refers to the Reporter's Record; "State Ex." refers to exhibits introduced by the State at trial, with page references corresponding to the chronological page number of the document in PDF form; "SR. Jury Charge" refers to the portion of the record supplemented with the transcription of the jury instructions on June 9, 2011; "SR." refers to the supplemental record filed on July 29, 2011. "SR2." refers to the supplemental record filed on August 8, 2011. "R.E. Tab" refers to the Record Excerpt tabs.

of counsel for post-conviction review. Order, *Galloway v. State*, No. B2401-09-268, 468 (Harrison Co. Circuit Ct., 1st Dist., Dec. 6, 2013).

## STATEMENT OF RELEVANT FACTS

At trial, the prosecution introduced DNA evidence as a forensic link between Mr. Galloway and the victim. It did not, however, call Julie Golden, a forensic DNA analyst for the Jefferson Parish (Louisiana) Sheriff's Department, who conducted DNA testing on the blood and tissue samples obtained by case investigators. Instead, the prosecution called another technician, Bonnie Dubourg, to read from Ms. Golden's written materials and provide her own "analysis" of the results. Ms. Dubourg had no personal knowledge of Ms. Golden's testing of the samples. All her testimony relied on the assumed reliability of Ms. Golden's methods and the assumed truth of her results. Ms. Golden performed her analyses and prepared her results with the intention that they be used at trial.

Mr. Galloway moved to exclude Ms. Dubourg's testimony as a Confrontation Clause violation, arguing that it was Ms. Golden who conducted the DNA testing procedures. R. 663-64. The trial court denied the motion. R. 665-66.

When Mr. Galloway challenged Ms. Dubourg's testimony on confrontation grounds on direct appeal, this Court acknowledged that the Sixth Amendment bars the admission of testimonial hearsay at trial unless the declarant is unavailable, and the defendant had a prior opportunity to cross-examine. *Galloway* I, 122 So. 3d at 636 (¶42) (citing *Crawford v. Washington*, 541 U.S. 36, 59 (2004)). The Court also acknowledged that "[f]orensic laboratory reports created specifically to serve as

4

**A006**

evidence . . . at trial are among the 'core class of testimonial statements' governed by the [Sixth Amendment's confrontation guarantee]." *Galloway* I, 122 So. 3d at 636 (quoting *Grim*, 102 So. 3d at 1078) (citing *Melendez-Diaz v. Mass.*, 557 U.S. 305, 310 (2009)).

However, this Court rejected Mr. Galloway's claim, citing to Mississippi precedent allowing the prosecution to rely on a testifying expert "who participated in the analysis in some capacity, such as performing procedural checks[.]" *Galloway* I, 122 So. 3d at 636 (¶44) (italics omitted) (citing *Grim*, 102 So. 3d at 1079). The Court rejected Mr. Galloway's reliance on *Bullcoming v. New Mexico*, 564 U.S. 647 (2011) (rejecting surrogate lab expert testimony), because, it explained, in contrast to the analyst there, Ms. Dubourg was "familiar with each step of the complex testing process" and "performed her own analysis of the data." *Galloway* I, 122 So. 3d at 637 (¶48). The Court also drew support from the United State Supreme Court's divided opinion in *Williams*:

> Given Dubourg's knowledge about the underlying testing process and the report itself, any questions regarding the accuracy of the report due to possible contamination of the DNA samples could have been asked of Dubourg. *See, e.g.*, *Williams v. Illinois*, [567] U.S. [50], 132 S. Ct. 2221, 2244, 183 L.Ed.2d 89 (2012) (plurality opinion) ("knowledge that defects in a DNA profile may often be detected from the profile itself").

*Galloway* I, 122 So. 3d at 637-38 (¶48).

This Court thus rested its ruling on two grounds: one derived from *Grim*, allowing reliance on a surrogate expert who "participated in some capacity" that could include "procedural checks," and one derived from *Williams*, treating cross-

A007

examination about defects apparent from "the profile itself" as constitutionally sufficient. As discussed below, the Supreme Court has now rejected both rationales.

## CLAIM FOR RELIEF

**THE STATE'S USE OF A SURROGATE DNA EXPERT, WHOSE TESTIMONY ASSUMED THE TRUTH OF THE HEARSAY STATEMENTS OF A NONTESTIFYING EXPERT WHO HAD ANALYZED THE EVIDENCE, VIOLATED MR. GALLOWAY'S SIXTH AMENDMENT RIGHT TO CONFRONT THE WITNESSES AGAINST HIM.**

**A.    *Smith* Abrogated the Precedent and Reasoning on Which This Court Relied When It Denied Mr. Galloway's Sixth Amendment Claim.**

In *Smith*, the Supreme Court rejected Arizona's reliance on the testimony of a surrogate expert who, like Ms. Dubourg, had used an absent analyst's work as a "basis" for her calculations but had no personal knowledge about that work. Arizona offered the evidence provided by the surrogate witness so the jury would believe it— in other words, for its truth. If, on remand, the out-of-court statements were also found to be testimonial, the Court made clear that their introduction at trial would be a violation of the Confrontation Clause. Smith had a right to confront the person who actually did the lab work, not a surrogate merely reading from her records. *Smith*, 602 U.S. at 799.

The Court explained how its existing Confrontation Clause precedents required reversal. After reviewing *Crawford* and *Melendez-Diaz*, *id.* at 783-86 (citing *Crawford*, 541 U.S. at 61, and *Melendez-Diaz*, 557 U.S. at 310-20), the Court described *Bullcoming*. There, the Court had rejected "surrogate testimony" of an analyst from the same lab as the one who had tested the blood-alcohol level in a drunk

6

driving case. The testimony could not convey what the certifying analyst knew, expose lapses or lies, or provide information about the reasons for the analyst's leave without pay. Once the state introduced the analyst's certification, its author, not a substitute, became the witness whom the defendant had a right to confront. *Smith*, 602 U.S. at 786 (citing *Bullcoming*, 564 U.S. at 661-63).

The *Smith* majority also described the "confusion" "sown" by the 4-1-4 opinion in *Williams*, where the prosecution had presented a DNA analyst who had not conducted the testing but relied on a non-testifying analyst's results as a "basis" for her own opinion. *Smith*, 602 U.S. at 786-88. Four dissenting justices in that case maintained that the testifying analyst had relied on the non-testifying analyst's results for their truth. Justice Thomas agreed, but viewed the lab results as non-testimonial and therefore voted to deny relief. The other four members of the Court, in the opinion that prevailed because Justice Thomas provided the fifth vote for affirmance, concluded that the recitation of the non-testifying analyst's findings "served the ... nonhearsay purpose of illuminating the expert's thought process." *Smith*, 602 U.S. at 788 (citing *Williams*, 567 U.S. at 78, 106 n.1, 132).

In *Smith*, a majority disavowed the *Williams* plurality's acceptance of "basis" testimony:

> [T]ruth is everything when it comes to the kind of basis testimony presented here. If an expert for the prosecution conveys an out-of-court statement in support of his opinion, and the statement supports that opinion only if true, then the statement has been offered for the truth of what it asserts. . . [T]he truth of the basis testimony is what makes it useful to the prosecutor; that is what supplies the predicate for—and thus gives value to—the state expert's opinion.

A009

*Smith,* 602 U.S. at 795. Allowing an analyst who had "not taken part in the lab work" to offer an "independent opinion" based on another analyst's work would "allow for easy evasion of the Confrontation Clause" because it would deprive the defendant of the right to cross-examine the testing analyst about "what she did and how she did it and whether her results should be trusted." *Id.* at 799.

While a non-testing analyst might properly describe the lab's typical functioning or general forensic guidelines and techniques or might answer hypothetical questions that assumed the truth of out-of-court statements, that would not eliminate the defendant's right to "confront the person who actually did the lab work, not a surrogate merely reading from her records." *Smith,* 602 U.S. at 800.

The Court specifically rejected reasoning by the Arizona Supreme Court that was functionally indistinguishable from the reasoning this Court used on Mr. Galloway's direct appeal, explaining that "[w]hen an expert conveys an absent analyst's statements in support of the expert's opinion, and the statements provide that support only if true, then the statements come into evidence for their truth[,]" and moreover, this "will generally be the case when an expert relays an absent lab analyst's statements as part of offering his opinion." *Smith*, 602 U.S. at 783. Such statements, if offered for the truth of the matter asserted and testimonial, are barred under the Confrontation Clause of the United States Constitution. *Id.*

The Court declined to rule on whether the absent analyst's statements were testimonial in the case before it, noting that whether the statements were testimonial is "best considered by the state court in the first instance." *Smith*, 602 U.S. at 799-

8

801. In Mr. Galloway's case, however, Mississippi law already holds that a surrogate witness's statements are testimonial in circumstances like these. In *Grim*, this Court ruled that "[f]orensic laboratory reports created specifically to serve as evidence against the accused at trial are among the 'core class of testimonial statements' governed by the Confrontation Clause." *Grim*, 102 So. 3d at1078 (quoting *Melendez–Diaz*, 557 U.S. at 310); *Galloway* I, 122 So. 3d at 636.

*Smith*, accordingly, undermined the foundations of this Court's opinion in Mr. Galloway's case. It does not matter whether the testifying analyst "participated in procedural checks," because she based any such checks only on written test results. It did not matter that she could explain any factors apparent "from the [testing] profile itself." *See Galloway* I, 122 So. 3d at 637-38 (¶48) (quoting *Williams*, 567 U.S. at 85). The analyst could not respond from personal knowledge to cross-examination about the testing actually performed. Ms. Dubourg's testimony thus relied on hearsay introduced for its truth and no substitute for the absent testimony of the analyst who actually performed the work, Ms. Golden.[2]

---

[2] The Supreme Court and state appellate courts have ordered lower courts to revisit similar reasoning in the wake of *Smith*. *See Gordon v. Massachusetts*, No. 23-7150, ___ U.S. ___, 2024 WL 4259799 (Oct. 21, 2024) (granting, vacating, and remanding ("GVR") in light of *Smith*; state court had rejected confrontation claim because "The defendant cross-examined the substitute drug analyst regarding the basis on which she formed her opinion, her reliance on data generated by the non-testifying analyst, and the fact that she did not personally test the evidence.") (quote from *Commonwealth v. Gordon*, No. 22-P-825, 2023 WL 7383154, at *3 (Mass. App. Ct. Nov. 8, 2023)); *Seavey v. Texas*, No. 24-5118, ___ U.S. ___, 2024 WL 4486345 (Oct. 15, 2024) (GVR in light of *Smith*; state court had rejected confrontation claim, reasoning that the "substitute medical examiner's testimony, premised upon his independent review of the autopsy file, did not violate the Confrontation Clause.") (quote from *Seavey v. State*, No. 14-22-00513-CR, 2023 WL 8588054, at *3 (Tex. Crim. App. Dec.

The erroneous admission of Ms. Dubourg's testimony in lieu of testimony from Ms. Golden severely prejudiced the defense. The unconfronted out-of-court statements concerning this DNA analysis constituted the only direct evidence (1) connecting Mr. Galloway to the crime and (2) suggesting that his mother's car was the murder weapon. No other evidence supplied these critical links. The prosecution made clear throughout the guilt-innocence phase the importance of the DNA evidence to its case. The prosecutor referred to the evidence in his opening statement. R. 417. It was the only evidence of murder the prosecutor mentioned in defending against defense counsel's motion for a directed verdict. *See* R. 690 ("There is DNA evidence in

---

12, 2023)); *State v. West*, __ So. 3d ___, No. 2024-K-0033, 2025 WL 313976 (La. Jan. 28, 2025) (remanding to reconsider confrontation claim in light of *Smith*; lower court had held, in reliance partly on *Williams*, that autopsy reports are not testimonial and therefore not subject to confrontation requirements); *People v. Peterson*, No. 364313, 2024 WL 3548797, at *5 (Mich. Ct. App. July 25, 2024) (holding that "prosecution did not 'escape the Confrontation Clause' just because the raw DNA data from Sorenson [Forensics] came in to explain the basis of several expert witnesses' opinions"; remanding for determination whether statements were testimonial).

Other state courts have held that *Smith* required new trials. *See State v. Clark*, 909 S.E.2d 566, 569-71 (N.C. Ct. App. 2024) (granting new trial because statements by non-testifying lab analyst, relied on by testifying analyst, were prejudicial hearsay as in *Smith*); *State v. Hale*, No. C-230420, 2024 WL 4901601 (Ohio Ct. App. Nov. 27, 2024) (remanding for new trial because, in light of *Smith,* Hale had right to confront the non-testifying analysts whose statements were "embedded" in the testifying expert's testimony); *People v. Vigil*, 557 P.3d 805, 809, 811-13 (Colo. App. 2024) (reversing and remanding for new trial in wake of *Smith* because DNA and fingerprint experts "authenticated the analyzed items through inadmissible hearsay testimony").

this case sufficient to tie the defendant and the victim to the murder weapon, which is the automobile."). It was a central focus of the State's closing arguments.[3]

Because of the central role of the DNA evidence, the State cannot show that it is "clear beyond a reasonable doubt that the error did not contribute to the verdict." *See Pittman v. State*, 385 So. 3d 1205, 1208 (Miss. 2024) (quoting *Chapman v. California*, 386 U.S. 18, 22 (1967), and *Young v. State*, 99 So. 3d 159, 165 (Miss. 2012)). Instead, the error adversely affected Mr. Galloway's substantial rights and prejudiced his defense. *Id.* (quoting *Young*).

## B. No Procedural Bars Prevent Mr. Galloway From Seeking Relief.

Under the Mississippi Uniform Post-Conviction Collateral Relief Act (Miss. Code Ann. §§ 99-39-1 to 29 (2023)), an individual may file a motion to vacate, set aside or correct their judgment or sentence if "the conviction or the sentence was imposed

---

[3] *See* R. 761 (arguing that Ms. Anderson's and Mr. Galloway's blood was found in the car); R. 762 (arguing that Ms. Anderson's blood was found on Mr. Galloway's hat and shoes); *id.* ("And we heard from Bonnie Dubourg and she told us this number, this incredible number 100 billion to one. She told us that was a conservative number. The defense expert says those numbers aren't good enough for me, but they are good enough for the FBI. 100 billion to one were the odds this was Kela's blood on this hat, on these shoes, underneath the defendant's car, and in his car. She told us that the swabs from her vaginal area came back to have sperm on it, the sperm that was 99.9 percent match to two people, James Futch, who you heard from . . . And who was the other person, 99.9 percent match, Leslie Galloway,"); R. 782 ("you heard from the DNA expert, ladies and gentlemen, Bonnie Dubourg. She tells you that Shakeylia Anderson's remains were all – or everything that was collected underneath the vehicle she tested – that was tested at her lab and was confirmed by the defense's expert was Shakeylia Anderson's remains under the defendant's car. In that car were smear marks. You will see the smear marks right by the trunk release, where if you want to hit the trunk release a mixture of that defendant's blood and and Shakeylia Anderson's blood. Told you one in 100 billion. It's a big number, ladies and gentlemen.").

in violation of the Constitution of the United States or the Constitution or laws of Mississippi[.]" Miss. Code Ann. § 99-39-5(1)(a). Under § 99-39-21(6), "[t]he burden is upon the prisoner to allege in his motion such facts as are necessary to demonstrate that his claims are not procedurally barred under this section." *See, e.g., Jackson v. State*, 860 So. 2d 653, 661 (Miss. 2003). The claim raised in this petition is not statutorily or otherwise procedurally barred.

### 1. The Intervening Decision in *Smith* Overcomes the Bar on Successive Petitions.

The bar to successive petitions does not apply when there is an intervening Supreme Court decision, which, had it been known at the time of trial or direct appeal, would have adversely affected the outcome of the trial. Miss. Code Ann. § 99-39-23(6). *See also Howard v. State*, 300 So. 3d 1011, 1016, 1120 (Miss. 2020); *Bass v. State,* 4 So. 3d 353, 357-58 (Miss. Ct. App. 2008). Here, *Smith* is such an intervening Supreme Court decision.

As explained above, the decision in *Smith* directly addresses the type of analysis used to reject Mr. Galloway's previously raised Confrontation Clause claim against a key witness in his trial. The course of the trial would have been adversely affected had *Smith* been applied by the trial judge, or by this Court on direct appeal, because it would have precluded Ms. Dubourg's surrogate testimony, which the prosecution used to maintain that the DNA analysis conducted by Ms. Golden connected Mr. Galloway, and his mother's car, to the crime. This is because Ms. Dubourg had no personal knowledge of how the actual lab technician (Ms. Golden) tested the DNA samples. Only Ms. Golden had that information. The prosecution did

not produce her, and so Mr. Galloway had no opportunity to cross-examine her about "what she did and how she did it and whether her results should be trusted." *Smith*, 602 U.S. at 799. Moreover, the jury had no opportunity to gauge the reliability of Ms. Golden's work, upon which the prosecution heavily rested its case. It is impossible to say whether Ms. Golden would have impressed the jury with her ability and confidence in her work, or cast doubt on her findings, perhaps as the result of sloppy or inaccurate analysis exposed under cross examination. As explained above, the prosecution relied heavily on Ms. Golden's analysis and so cannot argue that the decision in *Smith* would have had no impact on the outcome of Mr. Galloway's case.

## 2. The Intervening Decision in *Smith* Overcomes the Statute of Limitations.

Under § 99-39-5(2), "[a] motion for relief under this article shall be made within three (3) years after the time in which the petitioner's direct appeal is ruled upon by the Supreme Court of Mississippi[.]" Exceptions include cases in which "there has been an intervening decision of the Supreme Court of either the State of Mississippi or the United States which would have actually adversely affected the outcome of his conviction or sentence[.]" Miss. Code Ann. § 99-39-5(2)(a)(i); *see, e.g., Chase v. State*, 873 So. 2d 1013, 1016 (Miss. 2003) (applying new decision barring the execution of the intellectually disabled). *Smith* satisfies the "intervening decision" exception to the statute of limitations for the same reasons it satisfies the identically worded exception to the bar on successive petitions. Mr. Galloway's petition is therefore not barred as untimely.

A015

### 3. Res Judicata Provisions Do Not Apply.

Successive applications are also generally barred under the *res judicata* provisions found in Miss. Code Ann. §§ 99-39-21(3), 99-39-23(6)), and 99-39-27(9) ("The doctrine of res judicata shall apply to all issues, both factual and legal, decided at trial and on direct appeal.") However, the *res judicata* bar also has an intervening decision exception. Miss. Code Ann. § 99-39-23(6) and § 99-39-27(9) (exempting "cases in which . . . there has been an intervening decision of the Supreme Court of either the State of Mississippi or the United States that would have actually adversely affected the outcome of his conviction or sentence"). Additionally, the *res judicata* bar is not subject to the cause and actual prejudice test under Miss. Code Ann. § 99-39-21(1). *See Walker v. State*, 863 So. 2d 1, 27 (Miss. 2003); *Foster v. State*, 687 So. 2d 1124, 1137 (Miss. 1996); *Gilliard v. State*, 614 So. 2d 370, 375 (Miss. 1992).

Here, the intervening Supreme Court decision in *Smith* overcomes any *res judicata* bar.

### 4. *Howell* is Inapplicable Because Statutory Grounds for Relief Exist and *Howell* Applies Only to Judicially Crafted Rights.

Additionally, while this motion is based on a violation of the Sixth Amendment to the United States Constitution, the holding in *Howell v. State*, 358 So. 3d 613, 615 (Miss. 2023) (overruling cases in which "the Mississippi Supreme Court has held that the courts of Mississippi can apply the judicially crafted fundamental-rights exception to constitutional, substantive enactments of the Legislature . . . applicable to petitions for post-conviction relief") presents no obstacle to merits review because it applies in cases in which petitioners had no other way to overcome procedural

14

default but the fundamental rights exception. Here, as explained above, the various potential procedural bars do not apply and Mr. Galloway does not rely on the fundamental rights exception.

### 5. *Teague* Does Not Apply, as *Smith* Did Not Announce a New Rule of Criminal Procedure, but Rather Applied Establish Law.

In addition, the bar on retroactive application of new rules of criminal procedure does not impede this claim. Although Mississippi looks for guidance to the federal test set forth in *Teague*, *see Manning v. State*, No. 2023-DR-01076-SCT, 2024 WL 4235459, at *4 (Miss. Sept. 16, 2024), *Smith* did not announce a new rule of criminal procedure. "[A] case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Teague*, 489 U.S. at 301 (emphasis in original). Here, the outcome was dictated by precedent existing at the time of Mr. Galloway's direct appeal, and the pre-existence of that precedent has now been clarified by the Supreme Court in *Smith*. *Smith* applied rules established in *Crawford*, 541 U.S. at 36, *Melendez-Diaz*, 557 U.S. at 305, and *Bullcoming*, 564 U.S. at 647. The Supreme Court announced all these decisions before the end of Mr. Galloway's direct review, and indeed Mr. Galloway's direct appeal brief and this Court's direct appeal decision cited them. The S*mith* majority opinion itself states that it is not announcing a new rule but applying old precedents. *Smith*, 602 U.S. at 798 ("Approving that practice would make our decisions in *Melendez-Diaz* and *Bullcoming* a dead letter, and allow for easy evasion of the Confrontation Clause."), *id.* at 799 ("In short, Arizona wants to end run all we have held the Confrontation

Clause to require. It cannot."). Therefore, *Teague* doctrine does not bar application of *Smith* to Mr. Galloway's claim.

## CONCLUSION

For the foregoing reasons, Mr. Galloway respectfully requests that this Court vacate his conviction and sentence and order a new trial, or in the alternative, remand this cause to the trial court for further proceedings.

Respectfully submitted, this the 6th day of February 2025.

Stacy Ferraro

KRISSY C. NOBILE
MISS. OFFICE OF CAPITAL POST-
CONVICTION COUNSEL
239 North Lamar Street, Suite 404
Jackson, MS 39201
(601) 359-5733
knobile@pcc.state.ms.us

STACY FERRARO
Mississippi Bar #100263
3422 N. State Street
Unit 1
Jackson, MS 39216
(601) 624-2690
lifestoryms@gmail.com

*Counsel for Leslie Galloway, III*

CLAUDIA VAN WYK
Requested admission pro hac vice
ACLU CAPITAL PUNISHMENT PROJECT
201 W. Main Street, Suite 402
Durham, NC 27701
919-433-8529 (direct)
267-971-6991 (cell)
cvanwyk@aclu.org

16

A018

**CERTIFICATE OF SERVICE**

I, the undersigned attorney, do hereby certify that I have on mailed by United

States Post Office notice to all counsel of record, including:

Lynn Fitch
Attorney General
Ashley Sulser
Chief, Criminal Appeals
Parker Proctor, Jr.
Special Assistant Attorney General
Mississippi State Attorney General's Office
Post Office Box 220
Jackson, MS 39205

Dated: February 6, 2025

Stacy Ferraro
MS Bar #100263

*Counsel for Petitioner Leslie Galloway, III*

2025 WL 2675771
Only the Westlaw citation is currently available.
Supreme Court of Mississippi.

Leslie GALLOWAY, III a/k/a Leslie Galloway
a/k/a Leslie "BO" Galloway, III, Petitioner
v.
STATE of Mississippi, Respondent

No. 2025-DR-00129-SCT
|
September 11, 2025

**Synopsis**
**Background:** Petitioner sought leave to file successive motion for post-conviction relief following affirmance of conviction for capital murder, 122 So.3d 614. State moved to dismiss.

**Holdings:** The Supreme Court, Sullivan, J., held that:

res judicata prohibited petitioner from raising claims, and

United States Supreme Court's *Smith,* 144 S.Ct. 1785, decision on confrontation clause was not retroactive.

Motion granted.

**Procedural Posture(s):** Post-Conviction Review.

### EN BANC ORDER

DAVID P. SULLIVAN, JUSTICE

**\*1** Before the Court, en banc, is the Motion for Leave to File Successive Petition for Post-Conviction Collateral Relief, filed by counsel for Leslie Galloway, III. The State subsequently filed a motion to dismiss Galloway's successive post-conviction filing, to which Galloway filed a response.

In 2010, Galloway was convicted and sentenced to death by lethal injection by a Harrison County jury of his peers for the capital murder of Shakeylia Anderson. *Galloway v. State,* 122 So. 3d 614, 625 (Miss. 2013). The Court affirmed Galloway's conviction and sentence on direct appeal. *Id.* at 682. Galloway's first petition for post-conviction collateral

relief was denied by the Court in *Galloway v. State,* 374 So. 3d 452 (Miss. 2023).

Now before the Court is Galloway's second petition for post-conviction collateral relief. Leave to proceed will be granted only if Galloway's petition, exhibits, and the prior record show that his claims are not procedurally barred and that they "present a substantial showing of the denial of a state or federal right[.]" Miss. Code Ann. § 99-27(5) (Rev. 2020); *see also Ronk v. State,* 267 So. 3d 1239, 1247 (Miss. 2019). "Direct appeal [is] the principal means of reviewing all criminal convictions and sentences ...." Miss. Code Ann. § 99-39-3(2) (Rev. 2020). Review at this stage, with certain exceptions, is limited to issues that could not or should not have been reviewed at trial and in the direct appeal. *Id.*; *Moffett v. State,* 351 So. 3d 936, 942 (Miss. 2022); *Brown v. State,* 798 So. 2d 481, 491 (Miss. 2001).

Galloway must overcome several procedural or substantive bars. First, the mandate in Galloway's direct appeal issued on October 13, 2013. Galloway's successive petition was filed on February 6, 2025. This filing is subject to the one-year time bar. Miss. Code Ann. § 99-39-5(2)(b) (Rev. 2020); *see also Brown v. State,* 306 So. 3d 719, 729 (Miss. 2020); *Jordan v. State,* 213 So. 3d 40, 42 (Miss. 2016); *Havard v. State,* 86 So. 3d 896, 899 (Miss. 2012). Unless Galloway can show that his claims are excepted, the petition is barred as untimely.

Second, as mentioned above, Galloway has filed a previous petition for post-conviction collateral relief. The claims raised in that petition were ultimately denied or dismissed. The petition now before the Court is subject to the successive-writ bar set out in Mississippi Code Section 99-27(9) (Rev. 2020). "Absent an applicable exception, a successive motion for post-conviction relief is procedurally barred." *Brown,* 306 So. 3d at 729. Unless Galloway meets an exception to the successive-writ bar, his claims are precluded at this point.

Third, Galloway is prohibited from reraising claims that have been addressed in prior proceedings. "The doctrine of res judicata shall apply to all issues, both factual and legal, decided at trial and on direct appeal." Miss. Code Ann. § 99-39-21(3) (Rev. 2020). "Res judicata also extends to those claims that could have been raised in prior proceedings but were not." *Ambrose v. State,* 323 So. 3d 482, 493 (Miss. 2021) (internal quotation marks omitted) (quoting *Brown,* 306 So. 3d at 730).

**\*2** One of the exceptions to the time bar and the successive-writ bar are those cases in which a petitioner can demonstrate "that there has been an intervening decision of the Supreme Court of either the State of Mississippi or the United States that would have actually adversely affected the outcome of his conviction or sentence ...." Miss. Code Ann. §§ 99-39-5(2)(a)(i), -27(9) (Rev. 2020). Galloway seeks to revisit the issue regarding the Sixth Amendment Confrontation Clause he raised on direct appeal. He asserts that the United States Supreme Court opinion in *Smith v. Arizona,* 602 U.S. 779, 144 S. Ct. 1785, 219 L. Ed. 2d 420 (2024), is an intervening case. [1] After a thorough review of Galloway's claim, we find that the intervening-decision exception affords Galloway no relief, as *Smith* is not an intervening case. Further, assuming *arguendo,* if *Smith* were an intervening case, we find that it would not apply retroactively. Because Galloway has failed to demonstrate an exception, his successive petition is barred by time, res judicata, and as a successive writ. *See* Miss. Code Ann. §§ 99-39-5(2)(b), -21(3), -27(9) (Rev. 2020). Notwithstanding the bars, the Court finds no merit to Galloway's claim. Accordingly, we find that the State's motion to dismiss the successive petition should be granted.

[1]    At the time Galloway filed his successive post-conviction petition, his federal habeas corpus petition was pending in the United States District Court for the Southern District of Mississippi,

Southern Division, case number 1:24-cv-121-CWR. The federal district court denied Galloway's request to stay his federal habeas corpus proceedings, specifically finding that *Smith* does not apply retroactively. Memorandum Opinion and Order, *Galloway v. Cain,* No. 1:24-cv-121-CWR (S.D. Miss. Jan. 29, 2025) ("[I]f the Court assumes *that Smith* announced a new rule of criminal procedure and that a retroactive change in the law applicable to one of a petitioner's claims can provide good cause for a *Rhines* [*v. Weber,* 544 U.S. 269, 125 S. Ct. 1528, 161 L. Ed. 2d 440 (2005)] stay, ... a stay is still unavailable here because *Smith* does not apply retroactively.").

IT IS, THEREFORE, ORDERED that the Motion to Dismiss Galloway's Succesive Motion for Leave to Proceed in the Trial Court with Petition for Post-Conviction Relief is granted.

SO ORDERED, this the 11th day of September, 2025.

TO GRANT: ALL JUSTICES.

**All Citations**

--- So.3d ----, 2025 WL 2675771

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.



Re: MS v. Leslie Galloway, III

**Affidavit of Alan Keel**

I, Alan Keel, pursuant to 28USC Section 1746, under penalty of perjury, declare that the following is true and correct:

1) My name is Alan Keel. I am over the age of 18 and otherwise fully competent to give this statement.

2) I am currently self-employed as a consultant in Forensic Biology and DNA Analysis. My primary services include advising defense attorneys in the pre-trial arena, both prosecutors and defense attorneys in the post-conviction arena, and civil litigants. From July 2011 through December 2021 I was the Forensic Biology/DNA Analysis Unit Supervisor and DNA Technical Lead Analyst for Forensic Analytical Crime Laboratory, Inc. (FACL) in Hayward, California. The FACL Forensic Biology/DNA Analysis Unit adheres to the FBI Quality Assurance Standards for DNA testing laboratories pursuant to the 1994 DNA Identification Act and is fully accredited by ANAB, the longest established provider of ISO/IEC 17025 accreditations to forensic testing agencies in the United States. FACL has provided DNA analysis and consulting services to law enforcement agencies and prosecutors, defense attorneys, and civil litigants since 1995. Approximately 40% of my private lab DNA testing caseload was for law enforcement investigation of criminal cases.

3) I earned my B.S. from Texas A & M University. I am certified by the American Board of Criminalistics in Molecular Biology. I am also a member of the American Academy of Forensic Sciences and California Association of Criminalists. I have over 41 years of professional experience, 38 of which involved forensic laboratory serological examination and DNA analysis of physical evidence. I have been involved with and have personally conducted PCR-based DNA analysis casework since 1991. For almost 15 years of my career, I worked as a criminalist in state and police crime laboratories, including the North Louisiana Crime Laboratory in Shreveport, Louisiana, the Oakland, California Police Department Crime Laboratory, the Tulsa, Oklahoma Police Crime Laboratory, and the San Francisco, California Police Department Crime Laboratory. Beginning in 1999, I have been in private practice, initially as a forensic DNA analyst with Dr. Edward Blake, who pioneered PCR-based DNA testing, at Forensic Science Associates (FSA), a private laboratory. FSA merged with FACL in 2011, where I was employed through December 2021. My resume is attached as Exhibit #1.

4) Over the course of my 38 years of firsthand experience, I have conducted DNA testing in hundreds of cases on thousands of samples from across the country. This testing has been on behalf of prosecutors and defendants in both pre-trial and post-conviction investigations dating back to 1972 – from 36 states including cases from Mississippi. I have testified in

state courts in 24 states and in federal courts in Texas, North Dakota, Alabama, Pennsylvania, Louisiana, Florida, Illinois, New Jersey, and Washington, DC.

5) I have personally conducted DNA testing in over 150 post-conviction investigations and though the small majority of those investigations inculpated the convicted defendant, almost half led to the exoneration of the convicted defendant.[1] I am intimately familiar with and personally experienced in the use and capabilities of state-of-the-art DNA testing to obtain new and relevant information from previously tested evidence, even when that evidence material is years and even decades old, degraded, marginal (previously sampled/contact level), or otherwise potentially compromised. I have reviewed the work product of numerous law enforcement analysts and laboratories from across the county in several hundred pre-trial, post-conviction, and civil litigations. In many post-conviction reviews my work has led to the outright exoneration or more testing that led to the exoneration of many convicted defendants.

6) I have personal knowledge and experience with the operational and DNA profile submission procedures of the Combined DNA Index System (CODIS), our national criminal law enforcement DNA databank. I have submitted numerous forensic profiles from cases from various law enforcement agencies for search in CODIS, many of which resulted in the identification of the source of the DNA.

7) In preparing this Affidavit, I have discussed the facts of this case with Claudia van Wyk, Esq. of the ACLU, G. Amber Pittman, Esq. of the Federal Defender Office, and others, counsel for defendant Leslie Galloway. I have also reviewed the following material provided by defense counsel:

   a) the December 7, 2008 Shakeylia Anderson autopsy report of Paul McGarry, M.D.
   b) the February 17, 2009 case Investigator Notes of Harrison County Sheriff's Department (HCSD) Investigator Y.M. Carbine;
   c) the June 8, 2009 Jefferson Parish Regional DNA Laboratory (JP Lab) Report No. MS-1270 of Bonnie DuBourg and supporting hard-copy benchnotes, analytical worksheets, electropherograms, and statistical calculations;
   d) the September 2010 trial transcripts of the testimony of Bonnie DuBourg, Dr. Ronald Acton, and James Futch;
   e) the 2011 JP Lab DNA Protocols Table of Contents, dated 12-8-11;[2]
   f) the undated JP Lab In-House Validation of STR Fragment Analysis using the Identifiler Kit summary (30 pages);

---

[1] Some cases out of Mississippi in which I conducted expert peer review and/or personally examined and conducted DNA testing include Andrew Harris, *Kennedy Brewer*, *Lavon Brooks*, *Sherwood Brown*, Edward Ward, and Curtis Clark. [Italics indicates the convicted defendant was ultimately exonerated.] Additionally, I have worked closely with the Jefferson Parish, LA Sheriff's and District Attorney's Offices in the pretrial investigation of the 1999 Angola Five murder of Capt. David Knapps in which I examined and tested numerous garments and weapons believed to be associated with the defendants and testified in their trials, and the 2012 post-conviction testing of numerous specimens in the 1996 rape/murder of Crystal Champagne, which resulted in the exoneration of death-row inmate Damon Thibodeaux.

[2] Only the Table of Contents (four pages) and none of the protocols themselves were provided. This 2011 Table of Contents applies to procedures in effect after the investigation of this case. However, some of the 2009 standard operating procedures in effect during the JSP Lab work in this case that were incorporated as contemporaneous worksheets into the case file were provided.

g) JP Lab DNA703: AmpF*l*STR Series Interpretation Guidelines, revised 3-12-10;[3]

h) the August 15, 2009 Analysis Threshold Validation Revision, the September 10, 2009 JP Lab Mixture Study Validation Revision, and the December 1, 2009 Sensitivity Revision Summaries and associated ABI 3130 Avant Relocation Performance Checks;[4]

8) My understanding of the overall facts in this case is as follows: Shakeylia Anderson was last seen alive on the late evening of December 5, 2008. Her body was found on an unpaved rural road on December 6, 2008. The body appeared to have been run over by a vehicle and burned. Only portions of burned clothing were recovered at the scene. Semen was recovered from her vagina at autopsy; no semen was detected on rectal swabs. The medical examiner opined sexual assault associated with her death. Leslie Galloway became a suspect, and several pieces of apparent tissue and bloodstains were recovered from a white Ford Taurus sedan he was known to drive. Blood was found on a cap and shoes that were recovered from Mr. Galloway's residence. The JP Lab was contracted by the State of Mississippi to assist in the investigation of many of the items of biological evidence that were recovered in this case. JP Lab Analyst Julie Golden examined, sampled, and conducted DNA testing on biological material recovered from physical evidence. The results of that Ms. Golden's work were described in the June 8, 2009 JP Lab report of Bonnie DuBourg. In particular, this report states that no foreign biology/DNA was detected from tests of the victim's fingernail evidence and that a mixture of semen compatible with Mr. James Futch as the major source and Mr. Galloway as a minor source was recovered from the victim's vaginal swabs.

9) It is also my understanding that the State's theory in the prosecution of Mr. Galloway was that he sexually assaulted and killed the victim sometime between the last time she was seen alive in the late evening of December 5, 2008 and when she was found in the late evening of December 6, 2008, for a window of opportunity of about 24 hours.

10) I was asked by counsel to Mr. Galloway:

a) to review the provided JP Lab DNA test results and supporting documentation, and expert trial testimony, for accuracy and reliability, in particular to assess the interpretation and weight given to those results;

b) to review the provided JP Lab DNA test results and supporting documentation, and expert trial testimony, to determine whether physical and/or genetic facts captured in the current results support or undermine the State's implied theory of the persistence (i.e., chronological deposition) of semen by Mr. Futch and Mr. Galloway in the victim's vagina; and

c) to identify areas in which Ms. Golden, a non-testifying expert, could have been cross-examined at trial.

---

[3] The JP Lab 2010 Interpretation Guidelines, while informative and somewhat helpful, reflect revisions put in place approximately one year after the work in this case.
[4] Similar to the 2010 JP Lab Interpretation Guidelines, these August, September, and December 2009 validation revisions and associated performance checks, again informative and somewhat helpful, bear upon *future* work, not the March 2009 work documented in the June 8, 2009 DuBourg report.

Alan Keel, Consultant in Forensic Biology and DNA Analysis
6 Captain Drive #245, Emeryville, CA 94608 | Telephone: 510/685-7787 | www.alankeelforensicdna.com

Page 3 of 23
A024

## Summary

11) Based on my education, training, and experience, and my review of the provided materials:

   a) the autosomal STR[5] profile produced from the #12s vaginal swab sperm cell fraction DNA is an indistinguishable mixture. No CPI/CPE statistic should have been calculated for this mixture profile, and no testimony as to the frequency of potential contributors in the general population to that mixture profile should have been offered at trial by a State expert.

   b) the findings of the State's expert from DNA testing of the victim's vaginal swabs that Mr. Futch could not be eliminated as "the major" semen donor and that Mr. Galloway could not be eliminated as "a minor" semen donor do not comport with the testimony of Mr. Futch as to when he last had consensual sexual intercourse with the victim or with the alleged time interval during which Mr. Galloway's semen was deposited in the victim's vagina. Rather, these findings indicate that Mr. Futch's semen was deposited in the victim's vagina more recently (closer to her time of death) than that of Mr. Galloway. Both the State's expert and the defense expert should have recognized this irreconcilability with the State's theory of this crime pretrial and conducted further investigation to attempt to rectify it.

   c) the non-testifying analyst could have been cross-examined about critical steps in the examination, sampling, and testing process that have profound impact on the test results; whether she acknowledged that #12s vaginal swab sperm cell fraction mixture profile was a low level indistinguishable mixture incapable of being interpreted with the CPI/CPE statistics; and that the evidence indicated that Mr. Futch was the more recent contributor of semen that was recovered from the victim.

## A. Accuracy and Reliability of the JP Lab Testing Results

The Anderson Vaginal Swabs (#12)

12) In March 2009 JP Lab Forensic Analyst Julie Golden tested one of two vaginal swabs collected from the victim at autopsy. Ms. Golden documented the detection of p30[6], or prostate specific antigen, from an aqueous extract of the vaginal swab with a "+" mark in her contemporaneous bench notes. She also noted the presence of "a few sperm" (which confirms the presence of semen) among the cellular/particulate debris recovered from this vaginal swab. Ms. Golden then processed the vaginal swab with a *differential digestion* procedure that generally isolates non-sperm DNA from sperm DNA.[7] Ms. Golden recovered

---

[5] STR, or short tandem repeat, refers to repeated sequences of nucleotides (the building blocks of DNA) in defined locations on human chromosomes. These locations behave similarly to genes in the way they are inherited but do not make protein or have other known metabolic function. There are hundreds of such repeated sequences, and forensic science has focused on 20+ of these STRs that are highly polymorphic (have many different "types") to assist in the discrimination of possible sources of human biology recovered in criminal cases. STRs form the basis of our national CODIS DNA profile databank regulated by the FBI for the generation of investigative leads.

[6] p30, or prostate specific antigen (PSA) is an enzyme present in high levels in semen and very low levels in other human (including female) body fluids, and as such is used as a sensitive assay for the presumptive presence of semen in a sample.

[7] Differential digestion is a procedure designed to isolate DNA from sperm that are commingled with female epithelial cells. In this instance, the differential digestion process generates two DNA samples: one "epithelial cell, or non-sperm DNA fraction" rich with female DNA from vaginal epithelial cells and another fraction, the "sperm

Alan Keel, Consultant in Forensic Biology and DNA Analysis
6 Captain Drive #245, Emeryville, CA 94608 | Telephone: 510/685-7787 | www.alankeelforensicdna.com

Page 4 of 23
A025

approximately 2,156ng of human (mostly female) DNA in the #12e vaginal swab epithelial cell fraction. She used approximately 1.5ng of the #12e vaginal swab epithelial cell fraction DNA for an Identifiler STR[8] amplification. Ms. Golden recovered approximately 2.65ng of human DNA in the #12s vaginal swab sperm cell fraction and used 0.53ng of this DNA in an Identifiler assay.[9]

13) From the #12e vaginal swab epithelial cell fraction amplification, a complete and robust Identifiler profile reflecting a single DNA contributor compatible with the victim was produced. This result is not unexpected, given the amount of DNA recovered, reflecting a huge ratio of female DNA from vaginal epithelial cells relative to the number of sperm observed. Any male DNA lost into the epithelial cell fraction would be overwhelmed during this autosomal amplification and go undetected.

14) From the #12s vaginal swab sperm cell fraction amplification, a low level Identifiler profile reflecting a mixture of DNA was produced. In her June 8, 2009 report Bonnie DuBourg described this profile as "[c]onsistent with being a mixture of DNA from at least two individuals: **one major** contributor and **one minor** contributor. James Vernon Futch cannot be excluded as **the** major contributor in this mixture. Leslie Galloway III cannot be excluded as **a** minor contributor in this mixture." While this "one major/one minor contributor" characterization holds based on the number of alleles[10] detected at each location it cannot account for all of the alleles in the profile. Hence, the #12s vaginal swab sperm cell fraction profile must be comprised of DNA from at least three people.

15) Assuming only three contributors, the 0.53ng (or 530pg) of DNA in the amplification is split at least three ways. This means that drop-out[11] of alleles, based solely on quantitative or stochastic considerations, particularly from the "minor" contributors, is likely at any or all locations in this profile. The autosomal alleles detected in the #12s vaginal swab sperm cell fraction mixture profile (as analyzed by Ms. DuBourg with an analytical threshold of 50rfu) range from a low of 53 to a high of 260rfu.[12] Seven of the 41 alleles detected exceed 200rfu,

---

DNA fraction," enriched with male DNA from sperm cells (when sperm are present). This DNA isolation procedure which exploits the natural hardiness of the sperm cell membrane is not 100% efficient. Some male DNA from semen (male epithelial and white blood cells, some sperm) is lost into the epithelial cell fraction and some amount of female epithelial cell DNA usually "carries over" into the sperm cell fraction. "Sperm fraction" is a term of art; one can create a sperm fraction in the absence of sperm.

[8] Identifiler is a commercial DNA test kit that incorporates 15 autosomal STR locations and the gender-indicating amelogenin marker into a single amplification.

[9] Typically, approximately 1 to 1.5ng of DNA is utilized for an Identifiler assay. Over 2ng of #12s vaginal swab sperm fraction DNA was available. However, Golden made no attempt to concentrate the #12s vaginal swab sperm fraction DNA; hence, she was limited to using only 0.53ng due to assay volume constraints.

[10] An allele is one of the two forms of an STR location inherited from one's parents. Inheriting the same allele from each parent at an STR produces a homozygous genotype; different alleles at the same STR produces a heterozygous genotype. In the DuBourg analysis of the #12s vaginal swab sperm fraction profile, no more than four alleles are detected/labeled at an analytical threshold (AT) of 50rfu, which is compatible with a two-person mixture if one ignores other data in the profile. However, under the assumption that Mr. Futch is a contributor, the profile requires DNA contribution from at least 3 persons – one of whom is compatible with the victim, which is not unexpected.

[11] Drop-out refers to the loss of one of a pair of alleles at an STR location during amplification that can create confusion or confound the ability to determine whether a contributor in a mixture is homo- or heterozygous at that location. Drop-out of both alleles at an STR location can occur.

[12] rfu, or relative fluorescence unit, refers to the quantitative intensity of fluorescence during capillary electrophoretic sizing of an amplified allele. This quantification is represented as the height of a signal peak.

the large majority (34, or 89%) fall between 50 and 200rfu. <u>There is evidence of alleles below 50rfu at eight locations</u>.

16) Ms. DuBourg calculated the Combined Probability of Inclusion/Exclusion (CPI/CPE) statistic[13] for the #12s vaginal swab sperm cell fraction mixture profile. These complementary statistics reflect the number/percentage of people in a given ethnic population that would be included/excluded as potential contributors to the mixture profile by chance by calculating the sum of all possible genotype combination frequencies at each "eligible" location. And although the number of contributors in a mixture is not a factor in the actual CPI/CPE calculation, that assessment is necessary to determine which locations in the mixture to include in the calculation. This statistic was commonly used in forensic DNA labs, prior to the advent/adoption of probabilistic genotyping, to assign weight to an evidentiary mixture that could not be sorted into individual contributor genotypes.

<u>Appropriate Use of CPI/CPE for DNA Mixtures</u>

17) The cardinal rule in determining which STR locations are eligible for inclusion in the CPI/CPE calculation is **any location for which allelic drop-out is <u>possible</u> cannot be included** in the CPI/CPE calculation. The primary objective parameters for determining which locations might be susceptible to drop-out are analytical threshold (AT) and stochastic threshold (ST). AT and ST are fundamental concepts in PCR-based STR profile interpretation, specifically addressed in the first iteration (2000) of SWGDAM Guidelines.[14] Both of these fixed values are determined from in-house experiments with ground-truth reference standard DNA and mock casework samples. <u>AT is defined as the minimum peak height (rfu) value above which detected signal can reliably be deemed to be DNA; ST is defined as the peak height (rfu) value above which drop-out of sister STR alleles at a location would not be expected</u>. However, with mixtures, there can be "stacking" of alleles that are possessed by more than one contributor, so a peak height above ST in a mixture does not guarantee drop-out of a sister allele has not occurred. In January 2010 SWGDAM promulgated Autosomal STR Typing Interpretation Guidelines that specifically addressed this issue and provided detailed instruction on statistical evaluation of DNA mixtures. Guideline 4.6.3 states "<u>When using CPE/CPI (with no assumptions of number of contributors) to calculate the probability that a randomly selected person would be excluded/included as a contributor to the mixture, loci with alleles below the ST may not be used for statistical purposes to support an inclusion</u>." This rule boils down to, for the purposes of CPI/CPE calculation, the elimination of any and all STR locations in mixture profiles with alleles below ST and above AT.[15] <u>Even further, according to Bieber, *et al*, any location that may appear to qualify but may have unseen (dropped-out) or undetected (below AT) alleles must be disqualified</u>.[16] With the exception of certain intimate sample profiles,

---

[13] CPI is the probability that an individual randomly selected from a population would not be excluded as a contributor to a DNA mixture. CPE is the probability that an individual randomly selected from a population would be excluded as a contributor to a DNA mixture. CPE = 1 - CPI. Both statistics express the same concept.

[14] <u>SWGDAM</u>, the Scientific Working Group on DNA Analysis Methods, is a group of experts convened by the FBI pursuant to the 1994 DNA Identification Act to monitor and recommend best practices for forensic DNA testing.

[15] One exception to this rule is the "restricted" CPI/CPE, for multiple major contributors, which is not a consideration in this case.

[16] Bieber, Buckleton, Budowle, Butler, and Coble. Evaluation of forensic DNA mixture evidence: protocol for evaluation, interpretation, and statistical calculations using the Combined Probability of Inclusion. *BMC Genetics*

Alan Keel, Consultant in Forensic Biology and DNA Analysis
6 Captain Drive #245, Emeryville, CA 94608 | Telephone: 510/685-7787 | www.alankeelforensicdna.com

Page 6 of 23
**A027**

this mixture profile evaluation should be performed blindly with regard to persons of interest (POIs) as potential contributors.

18) Once the mixture profile has been fully vetted the CPI/CPE statistic can be calculated and/or the STR alleles at remaining locations may be compared to POIs to determine inclusion or exclusion. The CPI/CPE statistic is calculated by summing all of the possible genotype frequencies at each remaining STR location then multiplying the sums together. Only one statistic results, whether there are two, three, four, or an indeterminant number of contributors. In order to be included as a possible contributor "All of the alleles of a POI should have a corresponding allelic or potentially allelic peak in the qualifying loci." (*Bieber, supra* at p. 10). This means that for the remaining/qualifying STR locations a POI must possess one of the *possible* genotypes at each location; if not, that person is eliminated as a contributor. The calculated statistic puts a frequency/weight to that **group of people** in the population who are not eliminated. Whether a person is deemed a major or minor DNA contributor is not a component of the probability statistic.

19) Ms. DuBourg's calculation of the CPI/CPE statistic for the #12s vaginal swab sperm cell fraction mixture profile included every allele above AT at every STR location regardless of peak height. Even though this approach includes multiple possible genotypes at each STR location, the resultant CPI is quite discriminating: $1.044 \times 10^{-9}$, or less than one person in 957 million people would qualify by chance as a contributor to the #12s vaginal swab sperm cell fraction DNA mixture. JP Lab/Ms. DuBourg chose to use the complementary CPE statistic to express the percentage of the population, 99.99% not including Futch and Galloway, who can be excluded as potential contributors. As stated in ¶16 above, these statistics express the same concept. Either way, as detailed in ¶¶17-18 above, Ms. DuBourg's calculation of a CPI/CPE statistic for the #12s vaginal swab sperm cell fraction DNA mixture profile was inappropriate. This is because JP Lab had no peak height-based ST from which to determine which, if any, locations were eligible for the calculation. In fact, because of the quantitative manifestation of alleles at each and every of the STR locations in this mixture profile, **all of the STR locations are disqualified for inclusion in a CPI/CPE calculation**. Even the application of an arbitrary but conservative peak height ST of 200rfu cannot salvage any of the locations in this mixture profile, and none of the alleles at any location can be isolated as a distinct "major cluster". The #12s vaginal swab sperm cell fraction DNA profile must be classified as an indistinguishable mixture. The electropherogram produced by Ms. Golden and Ms. DuBourg, annotated to illustrate this assessment is attached as Exhibit 2. While this profile must include DNA from at least three contributors, this classification would be true even if there were only two contributors.

Peak height or mass based Stochastic Threshold

20) Determining which alleles and which locations pass muster for use of the CPI/CPE statistic *requires* the use of a peak height based ST. A ST is typically four to five times or more the rfu value of the AT empirically determined from the same instrument as the ST.[17] JP Lab did

---

(2016) 17:125. Available as Open Access: https://bmcgenomdata.biomedcentral.com/articles/10.1186/s12863-016-0429-7

[17] Based on my experience in determining ATs at the San Francisco, CA Police Department Crime Lab, and Forensic Analytical Crime Lab and from my reviews of the work in numerous other government crime labs a reasonable peak height based ST at JP Lab would likely have fallen between 200 and 300rfu.

Alan Keel, Consultant in Forensic Biology and DNA Analysis
6 Captain Drive #245, Emeryville, CA 94608 | Telephone: 510/685-7787 | www.alankeelforensicdna.com

Page 7 of 23
A028

not determine a rfu peak height ST during internal validation of STR genotyping using the Identifiler kit and capillary electrophoresis. Instead, in 2009 JP Lab defined ST "in terms of mass of template DNA amplified rather than peak height." JP Lab determined that drop-out of heterozygote sister alleles in <u>single source</u> samples would not be expected during amplification of at least 70pg of template DNA. This 70pg input DNA ST was applied to mixtures, as well. This means that at JP Lab there was no minimum allele peak height requirement above AT for test results from Identifiler amplifications of at least 70pg of template DNA to qualify locations in <u>mixture</u> profiles for CPI/CPE calculation. This ST approach effectively precludes application of the peak height based cardinal rule detailed in ¶17 above for determining which STR locations are eligible for inclusion in the CPI/CPE calculation. Apparently, JP Lab considered all alleles detected above AT in amplifications of at least 70pg eligible for inclusion in a CPI/CPE calculation.

21) The JP Lab quantitative DNA template ST approach does not address the complications encountered with <u>mixtures</u> of DNA, and in particular, low level DNA mixtures such as the #12s vaginal swab sperm cell fraction DNA profile. While PCR is proportional, and most amplifications reflect the starting proportions, it is also a very dynamic chemical process subject to stochastic effects. Hence, the need for a peak height based ST that mitigates if not compensates for these unpredictable proportional variations – particularly allelic drop-out.[18]

22) Use of the CPI/CPE statistic was widespread in US crime labs upon the introduction in the early 2000s of multiplex STR amplification such as the 15 STR locus Identifiler kit used in this case. In 2015 the Austin Texas Police Department laboratory (APD Lab) routinely employed CPI/CPE to assess STR mixture profiles. After an updating of allele frequency databases, routine review of a few cases including recalculation of CPI statistics produced unexpected and highly discrepant differences including highly weighted inclusions changing to inconclusive and even eliminations. This revelation created quite a tempest in the Travis County District Attorney's Office, and the Texas Forensic Science Commission (TFSC) launched an investigation to determine the cause and extent of these discrepant findings. The APD Lab used the state-of-the-art Identifiler STR kit, like many other labs (including mine) across the country, which was not the cause. It was determined that, prior to the promulgation of the 2010 SWGDAM Guidelines, the APD Lab had used a quantitative (mass template DNA) ST approach (like JP Lab), but at some point prior to 2015 had switched to a peak height ST and revised their mixture interpretation protocol to comply with those Guidelines. Unfortunately, when the APD Lab made these updates to comply with the 2010 SWGDAM Guidelines no attempt was made to apply the new approach retroactively. The TFSC stepped in to provide a mechanism for review of any suspect case and to ensure going forward that mixture interpretation and statistical calculation was standardized statewide.[19]

23) Based on this case, it is apparent that JP Lab conducted no review of previous cases in light of 2010 SWGDAM Guidelines. Although each new iteration of SWGDAM Guidelines includes a disclaimer that the guidelines "are not intended to be applied retroactively" labs are encouraged "to update their procedures as needed." Indeed, as the State of Texas

---

[18] It is likely that JP Lab updated their ST approach and mixture interpretation protocols to comply with the 2010 SWGDAM Guidelines.
[19] See TFSC Final Audit Report for Austin Police Department, Forensic Services Division, DNA Section, July 8, 2016.

Alan Keel, Consultant in Forensic Biology and DNA Analysis
6 Captain Drive #245, Emeryville, CA 94608 | Telephone: 510/685-7787 | www.alankeelforensicdna.com

Page 8 of 23
A029

discovered with regard to the City of Austin Police Department DNA lab, a systematic review of all cases in which JP Lab experts provided testimony in regard to a CPI/CPE mixture profile statistic that was not based on a peak height based ST may be warranted.[20]

24) The failure to recognize the #12s vaginal swab sperm cell fraction DNA mixture profile as an indistinguishable mixture and the inappropriate use of the CPI/CPE statistic could have been addressed by Ms. Golden, had she been made available for testimony.

**B. Persistence of Semen in the Human Vagina**

25) The persistence of semen, including components of seminal fluid and sperm cells, in the vagina as to its potential relevance in terms of suspected sexual assault has been studied extensively. This was true decades ago just with mere detection of semen and became more important once we became able to reliably extract genetic information from it in the 1970's. The average human male ejaculate contains 2-5 milliliters of semen. Human semen contains 20-100 million sperm cells per milliliter, or about 40-500 million sperm per ejaculate. There is no dispute within the forensic arena that, since the advent of PCR based testing, although the amount drops precipitously within a few hours, numbers of sperm sufficient to produce a meaningful DNA profile can persist in and be recovered from the living vagina for several days. Around the end of the 20th century, that time frame was about three (3) days.[21] Because of the increases in the sensitivity of today's DNA analysis technology, it is now generally recommended, regardless of any intervening personal hygiene (including douching) that "Guided by the victim history, sexual assault specimens should be collected from any victim seeking care as soon as possible and up to (5) five days or longer post-assault."[22] There is also no dispute that at death the normal metabolic clearance of sperm cells in the vagina ceases and the status quo is maintained until catabolic processes/degradation ensues. The victim was found at about 11:00PM on December 6, 2008 and was last seen alive late in the evening of December 5, 2008. Generally speaking, this indicates the semen recovered from her at autopsy was likely deposited on or after December 1, 2008.

26) Mr. Futch testified on direct that he had sex with the victim during "the last week before she died." [TT p. 608, 16-25] This testimony was elicited to account for the presence of his semen on the post-mortem vaginal swab, as was claimed by Ms. DuBourg in her report and testimony. On cross-examination Mr. Futch testified that he last had sex with the victim "Like maybe a couple of days after Thanksgiving" which he clarified as being Saturday or Sunday after Thanksgiving, November 27, 2008 [TT p. 610, 5-20]. The Sunday after Thanksgiving 2008 was November 30. He later testified that he did not see her on December 1, 2008 because he was back at school. [TT p. 611, 20-29] Based on this testimony, semen from Mr. Futch's was last deposited in the victim's vagina on or before Sunday November 30, 2008. The findings and testimony of Ms. DuBourg together with the testimony of Mr. Futch established a minimum five day and potentially six day window during which Mr. Futch's semen would have to persist in the victim's vagina prior to her death.

---

[20] This trial was in September 2010; the 2010 SWGDAM Guidelines were published in January 2010.
[21] See California Office of Criminal Justice Planning, Medical Protocol for Examination of Sexual Assault and Child Sexual Abuse Victims, Collection of Evidence: Time Frame Guidelines, 2001, p. 29-30.
[22] National Best Practices for Sexual Assault Kits: A Multidisciplinary Approach, US DOJ, p.17.

27) In her bench notes, in addition to observing "a few" sperm, Ms. Golden documents detecting p30 from one of two vaginal swabs collected from the victim at autopsy. P30 is an enzyme, not a cell. It is detected immunologically. The ability to detect a protein like p30 depends on its concentration and its native condition as a complex molecule with tertiary structure. In this way p30 is even more susceptible to clearance/loss of conformation by dilution, denaturation, degradation, and digestion by microbes than cells, much faster than sperm cells. The scientific literature indicates that p30 can be detected from a post-coital vaginal swab from living persons from 13 to 47 hours (Graves, *et al*., 1985), from 10.5-24 hours (Kamenev, *et al*, 1989) and from 14-47 hours (Hochmeister, *et al*, 1997).

28) Again, in her report Ms. Dubourg described the #12s vaginal swab sperm cell fraction DNA profile as "[c]onsistent with being a mixture of DNA from at least two individuals: **one major** contributor and **one minor** contributor. James Vernon Futch cannot be excluded as **the major** contributor in this mixture. Leslie Galloway III cannot be excluded as **a minor** contributor in this mixture." These findings were the essence of her trial testimony as well. As the major source of sperm DNA, this means more sperm from Mr. Futch than Mr. Galloway must be present on the victim's vaginal swab. This also means that more sperm from Mr. Futch, allegedly deposited at least five days prior to the last time the victim was seen alive, persisted, and were recovered from the victim's vagina than a number of sperm from Mr. Galloway, allegedly deposited within 24 hours of her death.

29) <u>Based on the well-documented persistence windows of p30 (seminal fluid) and sperm in the living vagina and the average number of sperm in an average human ejaculate, the JP Lab findings from the victim's vaginal swab indicate that Mr. Futch's semen was likely deposited more recent to her death than was Mr. Galloway's semen.</u>

### C. Evidence that could have been developed
### through cross-examination of Ms. Golden

30) As is described in ¶¶8-9 above, all of the actual bench work – the evidence examination, sampling, and DNA testing of evidence in this case was done by JP Lab analyst Julie Golden, who did not testify to her work or findings. Ms. DuBourg reviewed Ms. Golden's bench notes and testified to Ms. Golden's work, couching her testimony in terms of "we" rather than "I". However, Ms. DuBourg did not collaborate with or even witness the work conducted by Ms. Golden. Ms. Golden was the analyst/expert with personal knowledge about critical steps in the examination, sampling, and testing process that have profound impact on the test results. Had Ms. Golden testified, the jury could have learned:

   a) the significance of her personal observations of only "a few sperm" commingled with "+4" nucleated epithelial cells;[23] what that meant in terms of time and order of semen deposition in the victim's vagina, as described above in ¶¶25-28;

   b) the *quantitative* indication of her p30 "+" finding (sample intensity relative to the internal standard) in terms of time of deposition/persistence of semen from two different males, as described above in ¶¶25-29;

---

[23] JP Lab used the now universally adopted cell density scoring scale introduced by Stuart S. Kind in 1964 (in Curry (Ed.) Methods of Forensic Science), and later described by Anne Davies in 1997 (J For Sci Soc, 17:127) in which +4 means "too many to count in each microscopical field down to +/- meaning cells are present but few and far between fields.

Alan Keel, Consultant in Forensic Biology and DNA Analysis
6 Captain Drive #245, Emeryville, CA 94608 | Telephone: 510/685-7787 | www.alankeelforensicdna.com

Page 10 of 23
A031

c) the implications of sampling, digestion, extraction, quantification, and amplification of all of the samples[24] in this case concurrently. For example, all sample DNA quantification was conducted the same day in the same test plate (3-6-09). Samples from the victim, crime scene, and suspect were tested simultaneously, and often immediately adjacent each other. This included highly concentrated DNA samples immediately adjacent very low concentration samples:

| Sample | Concentration, ng/ul | Total DNA, ng | Location in Quant Plate, Row/Column | Ratio; Equiv. Amt. |
|---|---|---|---|---|
| 7521 tissue from undercarriage | 133.55 | 6,677.5 | B4 | 150:1 |
| 7529A Nike right shoe stain | 0.887 | 44.35 | B5 | 0.33ul |
| 7522 tissue from vehicle | 16.07 | 803.5 | C4 | 50:1 |
| 7529B Nike right shoe stain | 0.321 | 16.05 | C5 | 1ul |
| 7530A Nike left shoe stain | 0.585 | 29.25 | D5 | 143:1 |
| 7512-14 victim reference blood | 83.50 | 4,175.0 | D6 | 0.35ul |
| 7518 vehicle dashboard stain | 1.63 | 81.5 | G3 | 60:1 0.82ul |
| 7526 tissue from left rear tire | 98.87 | 4,943.5 | G4 | |
| 7532 left rear pass seat stain | 0.083 | 4.15 | G5 | 1,191:1 0.04ul |

What the above table demonstrates, for example, is that only one-third of a microliter[25] of the DNA extract produced from the portion of the tissue recovered from the vehicle undercarriage #7521, which is compatible with the victim, can account for all of the DNA recovered from a stain of the right Nike shoe #7529A; and, much worse, only four one-hundredths of a microliter of the DNA extract produced from the portion of the tissue recovered from the vehicle left rear tire #7526, which is compatible with the victim, can account for all of the DNA recovered from the vehicle rear passenger seat stain #7532. Even the highly concentrated victim reference blood sample was placed immediately adjacent to a sample from a suspect's left shoe.

Most forensic crime labs process multiple samples and often samples from more than one case as a "batch." This is standard operating procedure and steps are taken to minimize cross-contamination. This batching requires, however, that all specimens from the milieu of the victim be processed completely separately, both in terms of time and space, from specimens from the milieu of a suspect; and all samples expected to yield large amounts of DNA should be processed separately from those expected to yield low levels of DNA.

---

[24] The only exception is that the victim's reference and defendant's reference DNA extracts were amplified on the same day, but separately from evidence samples.

[25] A microliter is a droplet about the size of the head of a straight pin.

Alan Keel, Consultant in Forensic Biology and DNA Analysis
6 Captain Drive #245, Emeryville, CA 94608 | Telephone: 510/685-7787 | www.alankeelforensicdna.com

Page 11 of 23
A032

The implications of the failure by Ms. Golden to take these necessary precautions with concurrent sample processing are clear. For example, consider that the blood recovered from the vehicle dashboard #7518 was entirely that of Mr. Galloway (as was the blood recovered from the interior rear passenger door #7519). However, the DNA profile from the dashboard swab specimen revealed a mixture compatible with Mr. Galloway and the victim. Such a result could be readily explained by cross-contamination of the entire dashboard extract with less than one-half of a microliter of the DNA extract produced from the small sample of the tissue recovered from the vehicle left rear tire #7526 – which was processed at the same time and was immediately adjacent to the dashboard sample for quantification. Given the huge concentration differences, not to mention the implications of inadvertent cross-contamination of a minute volume of DNA extract, Ms. Golden's approach to this evidence demonstrated poor judgment and practice, of which the jury could have been apprised through cross-examination.[26] Under these circumstances, all of the sperm DNA in the #12s vaginal swab sperm cell fraction DNA extract could arise from the "major" contributor compatible with Mr. Futch and the presence of a "minor" amount of DNA compatible with Mr. Galloway could be explained by inadvertent cross-contamination during processing.

d)  whether Ms. Golden was aware in 2009 that a mass based ST was inappropriate to assess the suitability of mixture DNA profiles for CPI/CPE calculation; and was she aware that JP Lab did not conduct mixture validation experiments in 2009 to test its mass based ST approach for calculating CPI/CPE on mixture profiles; whether she aware of the 2010 SWGDAM Guidelines published in January 2010; whether she was aware that the 2010 SWGDAM Guidelines specified the peak height approach to applying CPI/CPE on mixture profiles; whether JP Lab discussed implementing a peak height approach during the interim between the January publication of the SWGDAM Guidelines and the September 2010 trial in this case; whether the lab discussed the impact of the 2010 SWGDAM Guidelines on this and other past and present cases;

e)  whether Ms. Golden considered, or was approached by Ms. DuBourg or Ms. Brown about repeating any testing, particularly the #12s vaginal swab sperm cell fraction amplification with more DNA; whether she understood that the #12s vaginal swab sperm cell fraction DNA mixture profile did not comport with the State's claim that Mr. Futch's semen was deposited in the victim's vagina over five days prior to her death, and that Mr. Galloway's semen was deposited in the victim's vagina at or near the time of her death.

---

[26] It is difficult to conceptualize the minute liquid volume amounts in play here – how easily an aerosol can be created simply by opening the DNA extract tubes for transfers – and how such a small volume can contain such large amounts of DNA. For example, the four one-hundredths of a microliter of the #7526 tissue DNA extract that would contain the equivalent amount of DNA as the entire 50 microliter extract produced from the #7532 vehicle seat stain sample (over 4ng, or enough for four full target amplifications) would not be visible as a droplet, nor do forensic laboratory hand tools or automated machines have the capability to manipulate such tiny volumes.

I declare under penalty of perjury that the foregoing is true and correct. Further, Affiant sayeth naught.

Dated: _3/6/25_



Alan Keel

Sworn to before me this _6TH_ day of _MARCH_ , 2025.

_____
Notary Public

> AMANDIP SINGH HIRA
> COMM. #2417279
> NOTARY PUBLIC • CALIFORNIA
> ALAMEDA COUNTY
> MY COMM. EXP. SEPTEMBER 20, 2026

Alan Keel, Consultant in Forensic Biology and DNA Analysis
6 Captain Drive #245, Emeryville, CA 94608 | Telephone: 510/685-7787 | www.alankeelforensicdna.com

Page 13 of 23
A034

Exhibit 1

Resume of Alan Keel

Alan Keel, Consultant in Forensic Biology and DNA Analysis
6 Captain Drive #245, Emeryville, CA 94608 | Telephone: 510/685-7787 | www.alankeelforensicdna.com

Page 14 of 23
A035



ALAN KEEL
CONSULTANT
Forensic Biology & DNA Analysis

## BACKGROUND

Mr. Keel conducted traditional serological and DNA analysis investigations and consultation in criminal and civil forensic cases from 1982 through 2021 from 36 US States and has provided expert testimony in 21 state and federal courts. The first 15 years of Mr. Keel's 40+ year career were spent in law enforcement laboratories. For the last 23 years of his laboratory career he served as a DNA Technical Lead Analyst. Mr. Keel has particular and extensive knowledge in crime scene processing, evidence examination, human body fluid and cellular material identification, DNA purification, polymerase chain reaction (PCR) based amplification of short tandem repeat (STR) genes, single source and mixture autosomal and Y chromosome DNA profiles, classical population statistics, probabilistic genotyping, and genetic genealogy.

Mr. Keel has personally conducted testing in hundreds of pre-trial and over 150 post-conviction forensic biology case investigations. As a private consultant since 2022, he now assists prosecutors, Conviction Integrity Units, defense attorneys, Innocence Projects, and private clients with expert peer review of forensic evidence in pre-trial, post-conviction, and civil litigation, and with recommendations for additional investigation, direct and cross-examination, effective assistance, and client management strategy.

## PROFESSIONAL AFFILIATIONS

- American Academy of Forensic Sciences, current.
- California Association of Criminalists, current.
- The American Board of Criminalistics: Certifications:
  - Diplomate, General Criminalistics, 1991-2012.
  - Fellow, Molecular Biology, 1995-2012; November 2015, current.
- DNA Technical Leader/Manager, pursuant to the 1994 Identification Act and DNA Advisory Board Standard 5.2.1.1, advanced degree waiver conferred 1999.

- Licensed by the Texas Forensic Science Commission in Forensic Biology/DNA, December 2018-2022.

## EDUCATION

- Bachelor of Science (Zoology), Texas A & M University, College Station, 1978

- Graduate Course Work, Texas A & M University, College Station, 1978-80 in Human Physiology

- Graduate Course Work, University of California, Berkeley, 1993 in Nucleic Acid Biochemistry

## PROFESSIONAL EXPERIENCE

- 2011 – 2021 Forensic Analytical Crime Lab, Hayward, CA
    Forensic Biology/DNA Analysis Unit
    DNA Technical Leader/Supervisor/Analyst

- 1999 – 2011 Forensic Science Associates, Richmond, CA
    Criminalist/Consultant in Forensic Biology/DNA Analysis

- 1996 – 1999 San Francisco, CA Police Department
    Forensic Biology/DNA Analysis Unit
    DNA Technical Leader/Supervisor/Analyst

- 1996   Tulsa, OK Police Department
    Forensic Biology/DNA Analysis Unit
    DNA Technical Leader/Supervisor/Analyst

- 1995 – 1996 Consultant in Forensic Science, Shreveport, LA

- 1994 – 1996 Caddo Parish, LA Coroner's Office, Shreveport, Louisiana
    Death Investigator

- 1984 – 1993 Oakland, CA Police Department
    Criminalist III, specialized in Forensic Serology and DNA Analysis

- 1982 – 1984 North Louisiana Crime Lab, Shreveport, Louisiana
    Forensic Serologist

Alan Keel, Consultant in Forensic Biology and DNA Analysis
6 Captain Drive #245, Emeryville, CA 94608 | Telephone: 510/685-7787 | www.alankeelforensicdna.com

Page 6 of 22

A037

## SPECIALIZED TRAINING

- Recombinant DNA Technology, University of California Extension, Berkeley, CA 1986

- Forensic DNA Analysis, University of California Extension, Berkeley, 1989

- The Application of DNA Technology to Forensics, University of California Extension, Riverside, 1990

- PCR/DQA1 Typing Methods, CETUS/California Department of Justice, Berkeley, 1991

- Bloodstain Pattern Interpretation, California Criminalistics Institute, Sacramento, California, 1991

- Advanced PCR Analysis Methods: PM, D1S80, and Quantiblot, Roche Molecular Systems, Alameda, California, 1993

- Advanced Crime Scene Reconstruction, California Criminalistics Institute, Sacramento, CA 1996

- Instrumental DNA Typing and Analysis
    - Capillary electrophoresis 310 instrumentation and GeneScan data collection/Multiplex STR analysis/GenoTyper data analysis, Perkin-Elmer/Applied Biosystems, Foster City, CA 1996
    - Profiler Plus/Cofiler Multiplex STR analysis internal validation SFPD, 1998
    - Identifiler Multiplex STR analysis internal validation FSA, 2001
    - Yfiler Multiplex STR analysis internal validation FSA, 2005
    - Minifiler Multiplex STR analysis internal validation FACL, August 2014
    - ABI Genetic Analyzer CE 3500/Genemapper ID-*X* Multiplex STR analysis: internal vendor training/internal validation FACL, October 2016
    - Investigator 24Plex QS Multiplex STR analysis internal vendor training/internal validation FACL, April 2017
    - STRmix Probabilistic Genotyping: vendor workshop Prague, Czech Republic April 5, 2017; internal validation FACL, January 2018
    - Genetic Genealogy/Next Generation Sequencing, Promega Webinar Series: Part 1: An Inside Look at the Facts and Fiction Surrounding GG, April 13, 2022; Part 2: Closing the Genealogy Gap, from Extraction to Prosecution, May 4, 2022; Part 3: Decoding Laboratory Options for GG, May 25, 2022

Alan Keel, Consultant in Forensic Biology and DNA Analysis
6 Captain Drive #245, Emeryville, CA 94608 | Telephone: 510/685-7787 | www.alankeelforensicdna.com

Page A038

- o Genetic Genealogy: Part 1: The Use of GG in Forensic Investigations, October 11, 2023; Part 2: GG 2011-2023 Expectations vs Realities; JFS/AAFS/Wiley Virtual Seminars
- o Probabilistic Genotyping: DNA Interpretation Given Activity Level Propositions. AAFS 76th Annual Scientific Conference Workshop, February 20, 2024, Denver, CO.
- o Investigative Genetic Genealogy: Case Studies, Regional Coordination, and DNA Analysts' Roles in Support. California Association of Criminalists, February 27, 2024

- Technical Writing for Criminalists, California Criminalistics Institute, May 2021

- FBI Quality Assurance Standards Auditor Training, June 2012

## PROFESSIONAL PRESENTATIONS

- *A Collaborative Study of DQA1 Typing by PCR* presented to the California Association of Criminalists, 1991 Spring Seminar, Berkeley

- *A Collaborative Study of DQA1 Typing by PCR* presented to the American Academy of Forensic Sciences, 1992 Annual Seminar, New Orleans

- *Penile Swab Evidence in the Investigation of Rape* presented at the 1993 International Forensic DNA Analysis Symposium, Quantico, Virginia

- *Sampling Approach and DNA Analysis of Fingernail Evidence Specimens* presented at the Third Joint International Seminar of the Forensic Science Society [United Kingdom] and the California Association of Criminalists, May 2000, Napa, California

- *Finding the Roscetti Stone: a review of the Lori Roscetti homicide investigation and trial transcripts* presented to the California Association of Criminalists, 2005 Spring Seminar, Oakland

- *The Essential Elements of a Forensic DNA Analysis Laboratory Report*; *The Essential Elements of Expert Peer Review of a Forensic Laboratory DNA Investigation*; *The Utility of and Access to CODIS*; and *Some Potential Adverse Consequences of Regulation and Accreditation on Applied Forensic DNA Analysis* presented to the California Public Defender's Association, May 2014, Hayward

Alan Keel, Consultant in Forensic Biology and DNA Analysis
6 Captain Drive #245, Emeryville, CA 94608 | Telephone: 510/685-7787 | www.alankeelforensicdna.com

Page 4 of 6
A039

- *Adverse Effects of Blanket Quality Assurance Criteria on Sample-to-Sample and Lab-to-Lab Variable Genetic Data*, presented to the Joint California Association of Criminalists/Northwest Association of Forensic Scientists Seminar, October 2014, Rohnert Park, CA.

- *Demystifying "Touch DNA,"* presented to the 2015 National Innocence Network Conference, May 2, 2015, Orlando, FL.

- *The Difference between Low-Level DNA Analysis and Low-Copy Number (LCN) DNA Analysis and Why It Matters to You,* presented to the 2015 National Innocence Network Conference, May 2, 2015, Orlando, FL.

- *The Fundamentals of Forensic DNA Analysis*, presented as training to the Federal Habeas Corpus Resource Center, September 2015, San Francisco, CA

- *A Benchmark for Meaningful Forensic DNA Analysis:  Field (Beta) Testing of the Qiagen Investigator Quantiplex Pro qPCR Assay*, presented at the 6th Annual Qiagen Investigator Forum, Prague, Czech Republic, April 5, 2017.

- *The Twenty-six Year Investigation of the Kidnapping, Rape, and Murder of Dana Ireland*, presented at the California Association of Criminalists Seminar, May 2017, San Francisco, CA.

## SPECIAL RECOGNITION

2008 Innocence Network Conference, Santa Clara, CA: **Freedom and Justice Award** presented by the Northeast Council of the Wrongly Convicted "In recognition of your relentless pursuit of truth through science."

2021 Based in part upon recommendation by the Innocence Project (NY), Mr. Keel was selected as the expert for Special Counsel appointed by California Governor Gavin Newsom to review the 1983-1984 conventional serological testing and the 2002-2004/2019-2020 forensic DNA testing of evidence in light of the actual innocence claims and clemency request of California death row inmate Kevin Cooper.

## REFERENCES

Prosecution
Rockne Harmon, Esq., Alameda County, CA District Attorney Office, retired.
Cynthia Garza, Esq., Chief, Conviction Integrity Unit, Dallas County, TX District Attorney Office.
Emily Maw, Esq, Chief, Conviction Integrity Unit, Orleans Parish, LA District Attorney Office (former Director of Innocence Project New Orleans).

Alan Keel, Consultant in Forensic Biology and DNA Analysis
6 Captain Drive #245, Emeryville, CA 94608 | Telephone: 510/685-7787 | www.alankeelforensicdna.com

Page 5 of 6
A040

Kurt Mechals, Esq., DDA, San Diego County, CA District Attorney Office.
Kelly Manderino, Esq., DDA, San Luis Obispo County, CA District Attorney Office.
Sean Gallagher, Esq., DDA, San Mateo County, CA District Attorney Office.
Philip Kearney, Esq., Murphy Pearson Bradley & Feeney, San Francisco, CA, former
        San Francisco County, CA Deputy District Attorney.
Hon. Braden Woods, San Francisco Superior Court Judge, former San Francisco
        County, CA Deputy District Attorney.

Defense
Hon. Christopher Plourd, Imperial County, CA Superior Court Judge, former defense
        counsel.
Hon. Nina Morrison, US District Judge, Eastern District of New York, former Senior
        Litigation Counsel, Innocence Project, NY.
Innocence Project, New York, NY:
        Barry Scheck, Esq., Founder and Special Counsel.
        Peter Neufeld, Esq., Founder and Special Counsel.
        Vanessa Potkin, Esq., Director of Special Litigation.
        Jane Pucher, Esq. and Susan Friedman, Esq., Sr. Staff Attorneys.
Jee Park, Esq., Executive Director, Innocence Project New Orleans, LA.
Richard Davis, Esq., Legal Director, Innocence Project New Orleans, LA.
Victor Abreu, Esq., Supervisory Asst. Federal Public Defender/Capital Trial Unit,
        Eastern District of Pennsylvania.
George Kendall, Esq., Of Counsel, Squire Patton Boggs LLC, New York, NY.
Paul Casteleiro, Esq., Legal Director, Centurion, Princeton, NJ.
Thaddeus Betz, Esq., Criminal Defense Attorney, Bend, OR.

Forensic Serology/DNA Analysis Scientists
Gary Harmor, Laboratory Director and Chief Forensic DNA Analyst, Serological
        Research Institute, Richmond, CA.
Karen Lawless, Forensic Edge, Consultant, Portland, OR.
Dave Hansen, DNA Technical Lead Analyst, Forensic Analytical Crime Lab, Hayward,
        CA.
Dr. Edward Blake, Forensic Analytical Crime Lab/Forensic Science Associates, retired.

Alan Keel, Consultant in Forensic Biology and DNA Analysis
6 Captain Drive #245, Emeryville, CA 94608 | Telephone: 510/685-7787 | www.alankeelforensicdna.com

Page 6 of 6
A041

Exhibit 2

The #12s vaginal swab sperm cell fraction DNA profile as produced by JP Lab, annotated to highlight allelic peaks between 50 and 200rfu

Alan Keel, Consultant in Forensic Biology and DNA Analysis
6 Captain Drive #245, Emeryville, CA 94608 | Telephone: 510/685-7787 | www.alankeelforensicdna.com

Page 21 of 23
A042

MS-1270-2

**Applied Biosystems**
GeneMapper ID v3.2.1

7512-12S Anderson vaginal swabs, sperm DNA fraction





JP Lab electropherogram of the #12s vaginal swab sperm fraction DNA mixture profile, showing disqualification of locations with alleles between AT and ST



**AB Applied Biosystems**
GeneMapper ID v3.2.1

MS-1270-2

7512-12S Anderson vaginal swabs, sperm DNA fraction





JP Lab electropherogram of the #12s vaginal swab sperm fraction DNA mixture profile, showing disqualification of locations with alleles between AT and ST





---

## BACKGROUND

Mr. Keel conducted traditional serological and DNA analysis investigations and consultation in criminal and civil forensic cases from 1982 through 2021 from 36 US States and has provided expert testimony in 21 state and federal courts. The first 15 years of Mr. Keel's 40+ year career were spent in law enforcement laboratories. For the last 23 years of his laboratory career he served as a DNA Technical Lead Analyst. Mr. Keel has particular and extensive knowledge in crime scene processing, evidence examination, human body fluid and cellular material identification, DNA purification, polymerase chain reaction (PCR) based amplification of short tandem repeat (STR) genes, single source and mixture autosomal and Y chromosome DNA profiles, classical population statistics, probabilistic genotyping, and genetic genealogy.

Mr. Keel has personally conducted testing in hundreds of pre-trial and over 150 post-conviction forensic biology case investigations. As a private consultant since 2022, he now assists prosecutors, Conviction Integrity Units, defense attorneys, Innocence Projects, and private clients with expert peer review of forensic evidence in pre-trial, post-conviction, and civil litigation, and with recommendations for additional investigation, direct and cross-examination, effective assistance, and client management strategy.

## PROFESSIONAL AFFILIATIONS

- American Academy of Forensic Sciences, current.
- California Association of Criminalists, current.
- The American Board of Criminalistics: Certifications:
  - Diplomate, General Criminalistics, 1991-2012.
  - Fellow, Molecular Biology, 1995-2012; November 2015, current.
- DNA Technical Leader/Manager, pursuant to the 1994 Identification Act and DNA Advisory Board Standard 5.2.1.1, advanced degree waiver conferred 1999.

- Licensed by the Texas Forensic Science Commission in Forensic Biology/DNA, December 2018-2022.

## EDUCATION

- Bachelor of Science (Zoology), Texas A & M University, College Station, 1978

- Graduate Course Work, Texas A & M University, College Station, 1978-80 in Human Physiology

- Graduate Course Work, University of California, Berkeley, 1993 in Nucleic Acid Biochemistry

## PROFESSIONAL EXPERIENCE

- 2011 – 2021 Forensic Analytical Crime Lab, Hayward, CA
  Forensic Biology/DNA Analysis Unit
  DNA Technical Leader/Supervisor/Analyst

- 1999 – 2011 Forensic Science Associates, Richmond, CA
  Criminalist/Consultant in Forensic Biology/DNA Analysis

- 1996 – 1999 San Francisco, CA Police Department
  Forensic Biology/DNA Analysis Unit
  DNA Technical Leader/Supervisor/Analyst

- 1996   Tulsa, OK Police Department
  Forensic Biology/DNA Analysis Unit
  DNA Technical Leader/Supervisor/Analyst

- 1995 – 1996 Consultant in Forensic Science, Shreveport, LA

- 1994 – 1996 Caddo Parish, LA Coroner's Office, Shreveport, Louisiana
  Death Investigator

- 1984 – 1993 Oakland, CA Police Department
  Criminalist III, specialized in Forensic Serology and DNA Analysis

- 1982 – 1984 North Louisiana Crime Lab, Shreveport, Louisiana
  Forensic Serologist

Alan Keel, Consultant in Forensic Biology and DNA Analysis
6 Captain Drive #245, Emeryville, CA 94608 | Telephone: 510/685-7787 | www.alankeelforensicdna.com

A046

## SPECIALIZED TRAINING

- Recombinant DNA Technology, University of California Extension, Berkeley, CA 1986

- Forensic DNA Analysis, University of California Extension, Berkeley, 1989

- The Application of DNA Technology to Forensics, University of California Extension, Riverside, 1990

- PCR/DQA1 Typing Methods, CETUS/California Department of Justice, Berkeley, 1991

- Bloodstain Pattern Interpretation, California Criminalistics Institute, Sacramento, California, 1991

- Advanced PCR Analysis Methods: PM, D1S80, and Quantiblot, Roche Molecular Systems, Alameda, California, 1993

- Advanced Crime Scene Reconstruction, California Criminalistics Institute, Sacramento, CA 1996

- Instrumental DNA Typing and Analysis
  - Capillary electrophoresis 310 instrumentation and GeneScan data collection/Multiplex STR analysis/GenoTyper data analysis, Perkin-Elmer/Applied Biosystems, Foster City, CA 1996
  - Profiler Plus/Cofiler Multiplex STR analysis internal validation SFPD, 1998
  - Identifiler Multiplex STR analysis internal validation FSA, 2001
  - Yfiler Multiplex STR analysis internal validation FSA, 2005
  - Minifiler Multiplex STR analysis internal validation FACL, August 2014
  - ABI Genetic Analyzer CE 3500/Genemapper ID-X Multiplex STR analysis: internal vendor training/internal validation FACL, October 2016
  - Investigator 24Plex QS Multiplex STR analysis internal vendor training/internal validation FACL, April 2017
  - STRmix Probabilistic Genotyping: vendor workshop Prague, Czech Republic April 5, 2017; internal validation FACL, January 2018
  - Genetic Genealogy/Next Generation Sequencing, Promega Webinar Series: Part 1: An Inside Look at the Facts and Fiction Surrounding GG, April 13, 2022; Part 2: Closing the Genealogy Gap, from Extraction to Prosecution, May 4, 2022; Part 3: Decoding Laboratory Options for GG, May 25, 2022

Alan Keel, Consultant in Forensic Biology and DNA Analysis
6 Captain Drive #245, Emeryville, CA 94608 | Telephone: 510/685-7787 | www.alankeelforensicdna.com

A047

- o Genetic Genealogy: Part 1: The Use of GG in Forensic Investigations, October 11, 2023; Part 2: GG 2011-2023 Expectations vs Realities; JFS/AAFS/Wiley Virtual Seminars
- o Probabilistic Genotyping: DNA Interpretation Given Activity Level Propositions. AAFS 76th Annual Scientific Conference Workshop, February 20, 2024, Denver, CO.
- o Investigative Genetic Genealogy: Case Studies, Regional Coordination, and DNA Analysts' Roles in Support. California Association of Criminalists, February 27, 2024

- Technical Writing for Criminalists, California Criminalistics Institute, May 2021

- FBI Quality Assurance Standards Auditor Training, June 2012

## PROFESSIONAL PRESENTATIONS

- *A Collaborative Study of DQA1 Typing by PCR* presented to the California Association of Criminalists, 1991 Spring Seminar, Berkeley

- *A Collaborative Study of DQA1 Typing by PCR* presented to the American Academy of Forensic Sciences, 1992 Annual Seminar, New Orleans

- *Penile Swab Evidence in the Investigation of Rape* presented at the 1993 International Forensic DNA Analysis Symposium, Quantico, Virginia

- *Sampling Approach and DNA Analysis of Fingernail Evidence Specimens* presented at the Third Joint International Seminar of the Forensic Science Society [United Kingdom] and the California Association of Criminalists, May 2000, Napa, California

- *Finding the Roscetti Stone:  a review of the Lori Roscetti homicide investigation and trial transcripts* presented to the California Association of Criminalists, 2005 Spring Seminar, Oakland

- *The Essential Elements of a Forensic DNA Analysis Laboratory Report*; *The Essential Elements of Expert Peer Review of a Forensic Laboratory DNA Investigation*; *The Utility of and Access to CODIS*; and *Some Potential Adverse Consequences of Regulation and Accreditation on Applied Forensic DNA Analysis* presented to the California Public Defender's Association, May 2014, Hayward

Alan Keel, Consultant in Forensic Biology and DNA Analysis
6 Captain Drive #245, Emeryville, CA 94608 | Telephone: 510/685-7787 | www.alankeelforensicdna.com

A048

- *Adverse Effects of Blanket Quality Assurance Criteria on Sample-to-Sample and Lab-to-Lab Variable Genetic Data*, presented to the Joint California Association of Criminalists/Northwest Association of Forensic Scientists Seminar, October 2014, Rohnert Park, CA.

- *Demystifying "Touch DNA,"* presented to the 2015 National Innocence Network Conference, May 2, 2015, Orlando, FL.

- *The Difference between Low-Level DNA Analysis and Low-Copy Number (LCN) DNA Analysis and Why It Matters to You,* presented to the 2015 National Innocence Network Conference, May 2, 2015, Orlando, FL.

- *The Fundamentals of Forensic DNA Analysis*, presented as training to the Federal Habeas Corpus Resource Center, September 2015, San Francisco, CA

- *A Benchmark for Meaningful Forensic DNA Analysis: Field (Beta) Testing of the Qiagen Investigator Quantiplex Pro qPCR Assay*, presented at the 6th Annual Qiagen Investigator Forum, Prague, Czech Republic, April 5, 2017.

- *The Twenty-six Year Investigation of the Kidnapping, Rape, and Murder of Dana Ireland*, presented at the California Association of Criminalists Seminar, May 2017, San Francisco, CA.

## SPECIAL RECOGNITION

2008 Innocence Network Conference, Santa Clara, CA: **Freedom and Justice Award** presented by the Northeast Council of the Wrongly Convicted "In recognition of your relentless pursuit of truth through science."

2021 Based in part upon recommendation by the Innocence Project (NY), Mr. Keel was selected as the expert for Special Counsel appointed by California Governor Gavin Newsom to review the 1983-1984 conventional serological testing and the 2002-2004/2019-2020 forensic DNA testing of evidence in light of the actual innocence claims and clemency request of California death row inmate Kevin Cooper.

## REFERENCES

Prosecution
Rockne Harmon, Esq., Alameda County, CA District Attorney Office, retired.
Cynthia Garza, Esq., Chief, Conviction Integrity Unit, Dallas County, TX District Attorney Office.
Melissa Montle, Esq., Conviction Review Manager, CRD, Orleans Parish District Attorney's Office.

Alan Keel, Consultant in Forensic Biology and DNA Analysis
6 Captain Drive #245, Emeryville, CA 94608 | Telephone: 510/685-7787 | www.alankeelforensicdna.com

**A049**

Kurt Mechals, Esq., DDA, San Diego County, CA District Attorney Office.
Kelly Manderino, Esq., DDA, San Luis Obispo County, CA District Attorney Office.
Sean Gallagher, Esq., DDA, San Mateo County, CA District Attorney Office.
Philip Kearney, Esq., Murphy Pearson Bradley & Feeney, San Francisco, CA, former
        San Francisco County, CA Deputy District Attorney.
Hon. Braden Woods, San Francisco Superior Court Judge, former San Francisco
        County, CA Deputy District Attorney.

<u>Defense</u>
Hon. Christopher Plourd, Imperial County, CA Superior Court Judge, former defense
        counsel.
Hon. Nina Morrison, US District Judge, Eastern District of New York, former Senior
        Litigation Counsel, Innocence Project, NY.
Innocence Project, New York, NY:
        Barry Scheck, Esq., Founder and Special Counsel.
        Peter Neufeld, Esq., Founder and Special Counsel.
        Vanessa Potkin, Esq., Director of Special Litigation.
        Jane Pucher, Esq. and Susan Friedman, Esq., Sr. Staff Attorneys.
Jee Park, Esq., Executive Director, Innocence Project New Orleans, LA.
Richard Davis, Esq., Legal Director, Innocence Project New Orleans, LA.
Victor Abreu, Esq., Supervisory Asst. Federal Public Defender/Capital Trial Unit,
        Eastern District of Pennsylvania.
George Kendall, Esq., Of Counsel, Squire Patton Boggs LLC, New York, NY.
Paul Casteleiro, Esq., Legal Director, Centurion, Princeton, NJ.
Thaddeus Betz, Esq., Criminal Defense Attorney, Bend, OR.

<u>Forensic Serology/DNA Analysis Scientists</u>
Gary Harmor, Laboratory Director and Chief Forensic DNA Analyst, Serological
        Research Institute, Richmond, CA.
Karen Lawless, Forensic Edge, Consultant, Portland, OR.
Dave Hansen, DNA Technical Lead Analyst, Forensic Analytical Crime Lab, Hayward,
        CA.
Dr. Edward Blake, Forensic Analytical Crime Lab/Forensic Science Associates, retired.

Alan Keel, Consultant in Forensic Biology and DNA Analysis
6 Captain Drive #245, Emeryville, CA 94608 | Telephone: 510/685-7787 | www.alankeelforensicdna.com

A050

# EXHIBIT 90

[Affidavit of S. Henry]

A051

AFFIDAVIT OF SUSANNA HENRY

STATE OF NORTH CAROLINA

COUNTY OF DURHAM

I, Susanna Henry, after being duly sworn, depose and state the following:

1. I am over the age of 21 and competent to give this affidavit. I am currently an attorney in the Office of the Federal Public Defender of the Eastern District of North Carolina in Raleigh, North Carolina.

2. During the summer of 2014 I was a law clerk with the ACLU Capital Punishment Project. I conducted field investigation in Mr. Leslie Galloway's case during that summer, alongside counsel and/or other team members.

3. On July 26, 2014, I interviewed Kathy Carlson, one of the jurors who deliberated in Mr. Galloway's capital trial. I interviewed Ms. Carlson along with Alec Kassoff, one of the attorneys for Mr. Galloway.

4. We interviewed Ms. Carlson at her home in Gulfport, Mississippi. Mr. Kassoff and I explained that we represented Mr. Galloway and were investigating his case. Mr. Kassoff gave Ms. Carlson a copy of his card. At the request of Ms. Carlson, Mr. Kassoff also showed Ms. Carlson a copy of his license to show that it matched his business card.

5. Ms. Carlson said that after hearing from the medical examiner, Mr. Galloway's guilt was "a no-brainer." She said the evidence of Mr. Galloway's guilt was very strong, "beyond the shadow of a doubt."

6. Based on the evidence of Mr. Galloway's guilt, Ms. Carlson said there was no option in the case other than death. She said it was the "only sentence it could be."

7. Ms. Carlson told us that it would not be right for taxpayers to pay for an individual to be incarcerated indefinitely when someone had committed such a horrible crime.

Further affiant sayeth not.

Susanna Henry

Signed and subscribed before me on this 30ᵗʰ day of August, 2021.

Notary Public

My commission expires on (date)
7/4/24

CRISTINA M BECKER ELLIS
NOTARY
MY COMMISSION EXPIRES
7/4/24
PUBLIC
DURHAM COUNTY NC

**A052**

# EXHIBIT 126

[ProPublica – McGarry Article]

A053

Westlaw.    NewsRoom

2/1/11 ProPublica (Pg. Unavail. Online)
2011 WLNR 27944423
Loaded Date: 04/17/2013

ProPublica
Copyright 2011 Pro Publica, Inc.

February 1, 2011

The Real 'CSI': **How America's Patchwork** System of Death Investigations Puts the Living at Risk
An investigation by ProPublica, PBS "Frontline" and NPR looks at the nation's 2,300 coroner and medical examiner offices and finds a troubled system...

A.C. Thompson, Mosi Secret, Lowell Bergman and Sandra Bartlett

An investigation by ProPublica, PBS "Frontline" and NPR looks at the nation's 2,300 coroner and medical examiner offices and finds a troubled system that literally buries its mistakes.

WatchFrontline's documentaryproduced in conjunction with this story.And listen to NPR'sAll Things Consideredfor moreon this story.

In detective novels and television crime dramas like "CSI," the nation's morgues are staffed by highly trained medical professionals equipped with the most sophisticated tools of 21st-century science.Operating at the nexus of medicine and criminal justice, these death detectives thoroughly investigate each and every suspicious fatality.

The reality, though, is far different.In a joint reporting effort, ProPublica, PBS "Frontline" and NPR spent a year looking at the nation's 2,300 coroner and medical examiner offices and found a deeply dysfunctional system that quite literally buries its mistakes.

Blunders by doctors in **America's** morgues have put innocent people in prison cells, allowed the guilty to go free, and left some cases so muddled that prosecutors could do nothing.

In Mississippi, a physician'serrors in two autopsieshelped convict a pair of innocent men, sending them to prison for more than a decade.

The Massachusetts medical examiner's office has cremated a corpse before police could determine if the person had been murdered; misplaced bones; and lost track of at least five bodies.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Late last year, a doctor in a suburb of Detroit autopsied the body of a bank executive pulled from a lake -- and managed to miss the bullet hole in his neck and the bullet lodged in his jaw.

"I thought it was a superficial autopsy," said David Balash, a forensic science consultant and former Michigan state trooper hired by the Macomb County Sheriff's Department to evaluate the case. "You see a lot of these kinds of things, unfortunately."

More than 1 in 5 physicians working in the country's busiest morgues -- including the chief medical examiner of Washington, D.C. -- are not board certified in forensic pathology, the branch of medicine focused on the mechanics of death, our investigation found.Experts say such certification ensures that doctors have at least a basic understanding of the science, and it should be required for practitioners employed by coroner and medical examiner offices.

Yet, because of an extreme shortage of forensic pathologists -- the country has fewer than half the specialists it needs, a 2009 report by the National Academy of Sciences concluded -- even physicians who flunk their board exams find jobs in the field.Uncertified doctors who have failed the exam are employed by county offices in Florida, Michigan, Pennsylvania and California, officials in those states acknowledged.Two of the six doctors in Arkansas' state medical examiner's office have failed the test, according to the agency's top doctor.

In many places, the person tasked with making the official ruling on how people die isn't a doctor at all.In nearly 1,600 counties across the country, elected or appointed coroners who may have no qualifications beyond a high-school degree have the final say on whether fatalities are homicides, suicides, accidents or the result of natural or undetermined causes.

For 26 years, Tim Brown, a construction manager, has served as the coroner of rural Marlboro County in South Carolina, a $14,000-per-year part-time post. "It's been kind of on-the-job training, assisted by the sheriffs," he said.

Long before the current economic crisis began shrinking state and county government budgets, many coroner and medical examiner offices suffered from underfunding and neglect.Because of financial constraints, Massachusetts has slashed the number of autopsies it performs by almost one quarter since 2006.Oklahoma has gone further still, declining to autopsy apparent suicides and most people age 40 and over who die without an obvious cause.

Some death investigation units do a commendable job.While many coroners and medical examiners don't even have X-ray machines, New Mexico has a new facility equipped with a full-body CT scanner to help detect hidden injuries.Virginia has an efficient, thorough system, staffed by more than a dozen highly trained doctors.The autopsy suite in its Richmond headquarters is as sophisticated and sanitary as a top hospital.

Still, the National Academy of Sciences' study found far-reaching and acute problems.Across the country, the academy said, coroners and medical examiner offices are struggling with inadequate resources, poor scientific

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.                                               **A055**

training and substandard facilities and technology.

Their limitations can have devastating consequences.

"You call a death an accident or miss a homicide altogether, a murderer goes free," said Dr. Marcella Fierro, Virginia's former chief medical examiner and one of the report's authors. "Lots of very bad things happen if death investigation isn't carried out competently."

A Series of Errors and Oversights

After Cayne Miceli died in January 2009, her body was brought to the New Orleans morgue, a dingy, makeshift facility in a converted funeral home, for Dr. Paul McGarry to autopsy.

An autopsy, the dissection and evaluation of a corpse, generally begins with a physician scrutinizing the body, noting visible injuries.With a scalpel, a doctor then slices a long, Y-shaped incision in the torso and studies the innards, removing and weighing each organ, and using a small rotary saw to remove the top the skull.An autopsy can trace the path of a bullet through a body, or reveal microscopic damage to blood vessels in the brain, or identify a lethal clog in an artery.

By the time Miceli's body was laid on the stainless-steel examination table, McGarry had performed such work for three decades in Louisiana and Mississippi.In New Orleans, he was one of several forensic pathologists over-seen by the parish coroner, Frank Minyard, a trumpet-playing local legend who has held his elected office for more than 35 years.

Miceli, 43, had died after being held in a cell in the parish jail, bound to a metal bed by five-point leather re-straints.During the autopsy, McGarry observed "multiple fresh and recent injection sites" on Miceli's fore-arms.He determined that drugs -- he didn't specify the variety -- had killed her, according to his report.

But doctors who had treated Miceli the day she died encouraged her father, Mike Miceli, to look more closely into his daughter's death.He had her body flown to Montgomery, Ala., for a second autopsy by Dr. James Laur-idson, the retired chief medical examiner for the Alabama Department of Forensic Sciences.

Lauridson concluded that McGarry had misconstrued the needle marks on Miceli's arms. "In fact, all of the needle puncture marks were therapeutic -- drawing blood, IV's, that sort of thing," Lauridson said.

McGarry's finding also was contradicted by a central piece of evidence: a screen for drugs and alcohol didn't turn up either in Miceli's blood.McGarry had reached his conclusion days before he got the test results, records show.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Lauridson soon pinpointed the real reason for Miceli's demise.On the day of her death, Miceli had gone to the hospital to be treated for an asthma attack.She was arrested after an altercation with hospital staffers; Miceli thought they were trying to discharge her too soon, court records show.Peering at Miceli's lung tissue under a microscope, Lauridson was certain that severe asthma, combined with the way she was restrained at the jail, had caused her death.

"As I examined her lungs, it was very clear right away that her lungs and all of the airways were completely filled with mucous," he said. "To put an asthmatic flat and then tie them down during an acute asthma attack is nearly the same as giving them a death sentence."

McGarry had been wrong, and not for the first time.In fact, a review of medical records, court documents and legal transcripts shows McGarry has made errors and oversights in autopsy after autopsy.

In three instances since 2005, his findings in cases in which people died in the custody of police officers have been challenged by doctors brought in to perform second autopsies.In each case, McGarry's findings cleared officers of wrongdoing.The other specialists concluded the deaths were homicides.

Contacted by phone, mail and in person, McGarry repeatedly declined to comment for this article or related radio and television stories.

Some in the field champion McGarry, praising his track record. "I have the utmost respect for Dr. McGarry and he taught me much when I was in a forensic fellowship program," said Dr. James Traylor in an e-mail.Traylor was trained by McGarry and worked alongside him in the New Orleans morgue. "I am unaware of any 'mistakes' that he may have made."

Second autopsies are a rarity in most jurisdictions, but New Orleans civil rights attorney Mary Howell said she often taps forensic pathologists to perform follow-ups when she knows McGarry has handled a case.The degree to which their findings have differed from McGarry's is "shocking," Howell said.In some cases, they discovered, McGarry's work was so incomplete that bodies were "half-autopsied."

Gerald Arthur, a 45-year-old construction worker with a history of drug arrests, died after a struggle with police on a New Orleans street in 2006.Based onMcGarry's findings, coroner Minyard ruled the death an accident, but a forensic pathologist with the Georgia Bureau of Investigation brought in by Arthur's family to perform a second autopsy found four broken ribs that McGarry had not noted.Inhis report, the GBI pathologist also stated that McGarry "failed to dissect" key neck muscles, causing him to miss hemorrhages that, in his view, suggested Arthur had been strangled.

In a deposition, McGarry disputed that assertion, saying he had dissected the neck muscles but had come to a different conclusion. "I don't have any evidence that this man had a death due to neck strangulation," he said.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

A057

No criminal charges have been brought in connection to Arthur's death.His family settled a lawsuit against the police department last year for $50,000.

Also in 2006, McGarry autopsied Lee Demond Smith, a 21-year-old man who died in jail in Gulfport, Miss.McGarry decidedthat Smith had been killed by a pulmonary embolism, a blood clot in the lungs, based on evidence of internal bleeding.Again, another specialist brought in to do asecond autopsyfound injuries that Mc-Garry had not: abrasions on Smith's forehead and chest, as well as a half-dozen bruises on his legs and hands.The doctor concluded that Smith, like Arthur, had been strangled.

No criminal charges have been filed in Smith's death either.

Raymond Robair, a 48-year-old handyman who died shortly after an encounter with police, was autopsied by McGarry in 2005.Based on McGarry's examination, coroner Minyard declared Robair's death an accident.

But McGarry had not noted the wounds covering Robair's legs and arms.A second forensic pathologist hired by Robair's family documented 23 separate bruises, including a thigh contusion more than a foot long.The fatal injury was a severe laceration of Robair's spleen that caused extensive internal bleeding, according to the second autopsy, which was performed by another GBI doctor, Kris Sperry.Robair "was the victim of a beating," his autopsy report states.

Robair's sister, Pearl LeFlore, said her sibling's battered body was communicating a message: "This is what happened to me. ...I died brutally.I was beaten."McGarry's autopsy was "a lie altogether," she said.

Based on McGarry's autopsy, records show, the district attorney's office decided not to prosecute any police officers in connection with Robair's death. "The officers were effectively exonerated by the initial autopsy performed by the Orleans Parish Coroner's Office," wrote an assistant district attorney in a 2008 letter sent to the police department.

Ultimately, in 2010, after conducting an extensive investigation, the U.S. Department of Justice indicted New Orleans Police officer Melvin Williams for allegedly beating Robair to death and charged another officer with allegedly helping to cover it up.The officers have pleaded not guilty.

Cayne Miceli's father is still seeking justice.Mike Miceli has sued McGarry in Orleans Parish court, saying his actions were "extreme and outrageous," and has filed a separate suit against the Orleans Parish Sheriff's Department for wrongful death.Both cases are pending.

"There's no reason for a family to have to go through this," Mike Miceli said.After the lawsuits were filed, Minyard amended the autopsy report, changing Miceli's cause of death from a drug overdose to asthma and labeling it a natural death.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 1:24-cv-00121-CWR     Document 37-1     Filed 12/10/25     Page 60 of 85

Minyard declined to discuss the Miceli autopsy or other cases in which McGarry's findings have been challenged.He defended McGarry's work more generally. "I'm not aware of any impropriety," the coroner said. "I'm not aware of any mistakes."

Last year, McGarry stopped doing autopsies for Orleans Parish, but he is still working for three Mississippi counties. "He lives in Mississippi, and he's helping them over there," Minyard said. "The travel back and forth was too much."

The Debate Over Coroners

Some experts see coroners like Minyard as throwbacks to an earlier, less scientific era.

The qualifications of those who oversee death investigations vary widely from state to state -- and, in some areas, from county to county.But the main divide is between medical examiner systems, run by doctors specially trained in forensic pathology, and coroner systems, run by elected or appointed officials who often do not have to be doctors.

While Minyard happens to be a physician -- he worked as an obstetrician-gynecologist before becoming coroner -- he isn't a forensic pathologist and never actually puts scalpel to flesh.In the end, though, it is Minyard who decides what words will be typed on the death certificate.

The 2009 report by the National Academy of Sciences, a comprehensive overview of defects in the nation's death investigation system authored by more than 50 luminaries in the field, recommended phasing out coroners and replacing them with medical examiners.(For a detailed, state-by-state breakdown,see our app.)

For Fierro, the Virginia forensic pathologist, the coroner-versus-medical-examiner debate is fundamentally about competence.In her view, only trained specialists should oversee death investigations. "I'm not anti-coroner," said Fierro, one of the authors of the academy's report. "I'm pro-competency."

But another concern raised by the academy is that coroners often are closely aligned with law enforcement agencies.In 48 California counties, the local sheriff serves as coroner.In Nebraska, county prosecutors perform the coroner's duties. "Sensitive cases, such as police shootings and police encounter deaths ... require an unbiased death investigation that is clearly independent of law enforcement," the NAS report stated.

Minyard's close ties to law enforcement have provoked controversy throughout his long career, and his decisions in certain cases, particularly that of Adolph Archie, illustrate just how much power a coroner can wield.

Archie died in 1990, soon after grabbing a revolver from a Superdome security guard and shooting a police officer to death.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

When officers captured Archie, the chatter on the police radio turned sinister. "Somebody kill him," demanded one cop, according to a transcript of the radio traffic. "Hang the bitch by his balls," urged another.

By the time Archie reached Charity Hospital, he'd suffered a host of injuries, including broken facial bones and skull fractures, leading hospital staffers to conclude he had been kicked repeatedly, medical records show.

McGarry did the autopsy, noting many of Archie's injuries.Minyard initially told the media he was baffled and didn't know whether to rule the death a homicide.He speculated that Archie might have fallen backward and hit his head on the floor when he struggled with officers, or that officers might have struck him in self-defense.

"When a perpetrator grabs a gun, a policeman has a right to defend himself," Minyard told the local newspaper.

Media reports later revealed that one of the officers who arrested Archie was a friend of Minyard's who rented an apartment from the coroner.

A second autopsy conducted by Sperry, the Georgia doctor, uncovered additional injuries overlooked by Mc-Garry, including more skull fractures, crushing damage to Archie's larynx and bruising of his testicle.After public protests calling for the coroner's resignation, Minyard changed his determination, calling Archie's death a homicide.

Then he shifted his stance again, deciding that Archie had died of an allergic reaction to medication he received in the hospital.To this day, Minyard insists Archie wasn't killed by a police beating. "His trauma never caused his death," said the coroner, adding that "my position was that Adolph Archie died from an allergic reaction to iodine that he was given on the X-ray table."

Prosecutors never indicted anyone in connection with Archie's death.

"I don't think there's anybody in town who doesn't believe that he was beat to death by the police," said Mary Howell, the civil rights attorney who represented Archie's children in a wrongful-death suit.The city of New Orleans paid $330,000 to settle the case.From Howell's perspective, the Archie story -- and Minyard's role in it -- sent an "extremely damaging message."

"That was kind of a watershed incident in this city," she said.

Minyard believes criticism of coroners is "malarkey" -- in fact, he doesn't believe coroners even need a high-school diploma to do the job.

"Being a good coroner involves a lot more than finding out a cause of death," he said, adding that the key skills are the ability to speak to grieving families and to the media. "It has nothing to do with education.It has to do

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

with you as an individual and the love that you have for your fellow man.And so that's why I say having a coroner who has no education sometimes is better than a medical examiner who has all of the education in the world."

Several of the country's most esteemed death-investigation units are overseen by coroners, including the coroner's office in Clark County, Nev., which was the model for the TV show "CSI."

P. Michael Murphy, a former police chief, is the coroner there.He thinks the national academy report took an "off with their head" approach to his profession, even though coroners generally do "a really good job with what they have."

Murphy also made it clear that coroner systems come in many different forms, including those that insulate coroners from political pressure and the influence of law enforcement.In Clark County, for example, the coroner is appointed by the seven-member county commission, a process that mirrors the way many counties select their chief medical examiners.

In his view, laypeople are entirely capable of running a medical operation, noting that many hospitals are helmed by chief administrators who are more knowledgeable about finance than anatomy. "That model works well in hospitals all over the United States," he said.

Massachusetts: An Office In Turmoil

Hobbled by mismanagement and chronic underfunding, the state's Office of the Chief Medical Examiner has spent much of the last decade mired in disarray, its woes detailed in a succession ofauditsandreports.

At times, Massachusetts' forensic pathologists have toiled in disturbingly decrepit conditions.The National Association of Medical Examiners, a nonprofit body that inspects and accredits morgues, issued ablistering inspection reportin 2000 identifying more than 50 significant problems at the agency's facilities.At one morgue, since shuttered, doctors were collecting blood, bile and other bodily fluids in 5-gallon buckets and pumping them back into corpses because a septic system had collapsed, making it impossible to wash the fluids down the drain.

"It was a terrible facility -- the worst I've ever seen," remembered the inspector, Dr. John E. Pless, an Indiana forensic pathologist, who said the practice posed "an obvious health risk."

Pless also concluded the office would need $10 million annually in additional funds to do its job properly.

The budget has nearly tripled in the past decade, but even today, it is $3 million below the threshold set by Pless 10 years ago.The agency has never regained its NAME accreditation.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 1:24-cv-00121-CWR    Document 37-1    Filed 12/10/25    Page 63 of 85

The office has struggled with the most basic of tasks.In 2003, itmixed up the bodiesof two women severely burned in a Gloucester house fire.The blaze killed Ann Goyette and injured her friend, Susan Anderson.But when Goyette's body was delivered to the morgue, a doctor mistakenly wrote the name Susan Anderson on the death certificate.In fact, Anderson, comatose, swathed in bandages and surrounded by an oxygen tent, was lying in a bed in Massachusetts General Hospital.

By the time the mistake was uncovered, the agency had cremated Goyette's body, further upsetting her already distraught family. "How could the ball be dropped so many times?" asked Goyette's brother, Scott Arnold, who unsuccessfully sued the state over the snafu.

A comparison of data from the nation's 17 statewide medical examiner systems – including Washington, D.C. -- shows that Massachusetts' autopsy rate has fluctuated wildly in recent years.In 2004, it had the second-lowest autopsy rate among statewide systems, doing just three autopsies for every 100 deaths.Washington, D.C., the system with the highest rate, performed about 20 autopsies for every 100 deaths that year.

By 2006, under the direction of an ambitious new chief, the medical examiner's office was taking on far more cases and had brought its autopsy rate up to the average level for statewide systems -- to about six per 100.But the agency didn't have the personnel or facilities to handle the increase.Unrefrigerated bodies began piling up in the hallways, and blunders mounted.

John Grossman, who oversees the medical examiner's operations as the state's Undersecretary for Forensic Science and Technology, said the agency has made improvements since then.It has hired new medical staffers and developed safeguards against errors.

"I know we've made great strides in the last three years, putting systems in place so that the office is not on the verge of collapse, creating a culture where the doctors feel supported," Grossman said.

But the state also has scaled back its operations since 2007, slashing the number of autopsies its physicians perform by almost 25 percent to about 2,700 per year.

"In a world of unlimited resources, we'd like to do more autopsies, but we don't live in a world of unlimited resources," Grossman said.

A Lack of Qualifications

Despite the ubiquity of forensic pathologists in pop culture, the field has little appeal to most medical school graduates.

To become certified by theAmerican Board of Pathology, doctors must receive an extra year of training in autopsies at a coroner's or medical examiner's office and pass a one-day exam.In addition, forensic pathologists

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 1:24-cv-00121-CWR    Document 37-1    Filed 12/10/25    Page 64 of 85

are typically paid less than doctors in other specialties.

By most estimates the United States has only 400 to 500 full-time forensic pathologists.It's a tiny cadre of professionals for a country where roughly 2.5 million people die every year.

Partially because of the shortage of qualified practitioners, many of the nation's busiest coroner and medical examiner offices employ physicians who are not certified.

A survey of more than 60 of the nation's largest medical examiner and coroner offices by ProPublica, PBS "Frontline" and NPR found 105 doctors who have not passed the exam -- or more than 1 in 5 doctors on their full-time and part-time staffs.

Some have recently completed their training and have not had a chance to take the test, which is offered once a year.Others are long-time practitioners who have no plans to become certified.

But in numerous cases, the doctors are not certified because they have failed their exams.

The Arkansas State Medical Examiner's Office employs two forensic pathologists who have flunked their exams multiple times, according to Chief Medical Examiner Dr. Charles Kokes.He described certification as a "personal goal" and said the doctors had no plans to take the test again.

In Kentucky, Chief Medical Examiner Dr. Tracey Corey acknowledged that the state employs a doctor who is not even eligible to take the forensic pathology test because she failed the anatomic pathology exam, which is a prerequisite. "I'm comfortable having her work because I know her competence," Corey said.

The sheriff-coroner in Orange County, Calif., contracts with Juguilon Medical Corporation to provide autopsies.One of the company's doctors has failed the certification exam at least five times, acknowledged Dr. Anthony Juguilon, the company's chief, in an e-mail.

Some experts put little weight on board certification, but many leaders in the field say it's a critical element -- that you can't raise the overall quality of death investigation unless the people who do autopsy work are subject to consistent professional standards.

"What does it mean?It means that they have not demonstrated they have minimum knowledge of the field," said Dr. Vincent Di Maio, the former chief medical examiner for Bexar County, Texas. "And these people get hired."

'I Think We Miss Murders'

Lack of resourceshas forced Oklahoma to engage in a risky brand of triage.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

The state's Office of the Chief Medical Examiner has been without its top doctor for nearly a year.Three of its nine slots for forensic pathologists are empty.

Its remaining six doctors handle overwhelming caseloads.Most did between 300 and 400 autopsies last year, said Timothy Dwyer, the state's chief investigator.One did more than 500 -- double the maximum number recommended by the National Association of Medical Examiners.

Because of the grueling pace, the state has had to impose limits on the types of cases it investigates: Oklahoma typically does not autopsy possible suicides or alleged murder-suicides.In most instances, it does not autopsy people age 40 or older who die of unexplained causes.

"If we did an autopsy on every suicide, it would be all consuming, as with drug overdoses," said Cherokee Ballard, the office's chief administrator. "With suicides, we don't autopsy most them because it's an obvious cause of death."

But experts called Oklahoma's practices alarming.A savvy criminal can make a murder look like a suicide, said Dr. Robert Bux, a forensic pathologist who serves as coroner for El Paso County, Colo.

"The only way you're going to be able to sort it out, from my standpoint, is to do a complete autopsy," Bux said.

"I've had a lot of suicide cases they didn't autopsy," added Kyle Eastridge, a former homicide detective with the Oklahoma City Police Department and the Oklahoma State Police. "I don't think that every suicide is a murder, but I think we miss murders."

In the absence of forensic findings, families sometimes are left to forage obsessively for clues about what became of their loved ones.

When a bullet shattered the face of 17-year-old Carissa Holliday and left her dead in a trailer outside of Tulsa, no doctor ever autopsied her body.

Instead, a forensic pathologist looked at her wound and filled vials with blood and fluid from her eyeballs, screening them for drugs and alcohol.Two days after her death, before the lab tests had even come back, the doctor ruled her death a suicide, records show.

Holliday's mother, Andrea, didn't believe the ruling -- Carissa left no suicide note, and the pathologist's report did not address potential clues such as whether there was gunshot residue on her hands.

"For a year and a half, I dug and investigated and got clues and witnesses to prove that she didn't kill herself," said Andrea Holliday, who wrote a self-published account of her daughter's final hours titled Never Forgotten.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

The medical examiner has not reopened Carissa Holliday's case, and the official ruling on her death remains unchanged.

In 2009, NAME yanked Oklahoma's accreditation, in part because of its failure to autopsy suspected suicide and homicide cases.

Fierro, the Virginia forensic pathologist, called Oklahoma's decision not to look carefully into unexplained deaths of residents over 40 a mistake.Forensic pathologists have been critical in a range of investigations stretching beyond criminal justice, from identifying defective cribs to tracking the spread of infectious diseases.They play a crucial role in mapping public health trends, she said.

"If you want to improve the quality of people's lives, then we need to know what it is that causes them to be ill, sick or injured so that they can prolong their life," Fierro said.

Even at some of the nation's more robust death investigation units, staffers worry that they do too few autopsies to fulfill their watchdog role.

The Los Angeles County Department of Coroner looks into a comparatively large portion of deaths, roughly one in three each year, said Craig Harvey, the chief death investigator.Yet he would like to do more.

"I would love to have the staff to respond to every nursing home death.They're fraught with potential misses," Harvey said. "But if anything was to go wrong in those facilities, unless somebody says something, there's a good chance the case will pass through the system without ever being seen by the coroner."

The Price of Reform

The National Academy of Sciences has mapped out a plan to improve troubled coroner and medical examiner operations.

In its 2009 report, the academy called for the creation of uniform federal standards for death investigation and recommended making certification mandatory for doctors working in the field of forensic pathology.

So far, however, those suggestions have made little headway in Washington.

Sen. Patrick Leahy, D-Vt., recently introduced legislation aimed at upgrading the quality of forensic evidence, but his bill would impose no new requirements on the doctors at the center of death investigations.Instead, it would establish a committee to examine how to ensure that qualified practitioners are doing autopsy work.

Many of the academy's proposals would take money -- money to educate doctors, to hire more of them and to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

construct up-to-date facilities.

It's not an overwhelming amount.DiMaio, the former Bexar County medical examiner, estimated that the price of a good medical examiner's office is about $2.50 per person per year, "which is probably less than what you pay for a Coca-Cola in a movie theater."

So far, however, even that is a price many communities have been unwilling to pay.Oklahoma, for example, spends about one-third less each year on its medical examiner than DiMaio's formula suggests it should.

Dr. Victor Weedn, the Maryland assistant medical examiner, said basic misunderstandings about the significance of death investigation have made it a hard sell.

"It's difficult for people to spend money on medical examiner systems," Weedn said. "They see it often as wasting money on the dead, without realizing that everything that is done in a medical examiner office, or a coroner office, is truly done for the living.We try to protect society.We look for deaths that are premature, or that should not have happened, so that we can go forth and correct those errors in society."

ProPublica Deputy Editor of News Applications Krista Kjellman-Schmidt, Director of Computer-Assisted Reporting Jennifer LaFleur, Director of Research Lisa Schwartz and reporter Ryan Gabrielson of the Investigative Reporting Program at UC Berkeley contributed to this report.

Additional research was provided by Liz Day, Sydney Lupkin, Kitty Bennett, Sheelagh McNeill and Ryan Knutson of ProPublica, Jackie Bennion of PBS "Frontline," and Barbara Van Woerkom of NPR.

lier version of this story incorrectly identified David Balash as a doctor.Due to a data collection error, that earlier version cited Utah as the jurisdiction with the highest 2004 autopsy rate in our analysis.In fact, Washington, D.C., has the highest rate.

---- INDEX REFERENCES ---

COMPANY: MAGELLAN HEALTH SERVICES INC; COCA COLA CO (THE)

NEWS SUBJECT: (Social Issues (1SO05); Crime (1CR87); Death Penalty (1DE04); Police (1PO98); Violent Crime (1VI27); Legal (1LE33); Criminal Law (1CR79))

INDUSTRY: (Healthcare Service Providers (1HE78); Healthcare Services (1HE13); Hospital Administration (1HO60); Healthcare (1HE06); Hospital (1HO39))

REGION: (U.S. New England Region (1NE37); District of Columbia (1DI60); U.S. West Region (1WE46); Alabama (1AL90); Louisiana (1LO72); Mississippi (1MI74); Arkansas (1AR83); Michigan (1MI45); Oklahoma (1OK58); U.S. Southwest Region (1SO89); Massachusetts (1MA15); North America (1NO39); U.S. Mid-Atlantic Region (1MI18); Nevada (1NE81); California (1CA98); USA (1US73); Americas (1AM92); Texas (1TE14); U.S. Midwest Region (1MI19); U.S. Southeast Region (1SO88))

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Language: EN

OTHER INDEXING: (NEWS APPLICATIONS) (Cherokee Ballard; Melvin Williams; Kyle Eastridge; Krista Kjellman-Schmidt; Robert Bux; James Traylor; Sheelagh McNeill; Raymond Robair; Andrea Holliday; Scott Arnold; John Pless; Adolph Archie; Kris Sperry; Patrick Leahy; Kitty Bennett; Timothy Dwyer; Charles Kokes; Susan Anderson; Mike Miceli; Paul McGarry; P. Michael Murphy; Jennifer LaFleur; Victor Weedn; David Balash; Barbara Van Woerkom; Craig Harvey; Vincent Di Maio; Ann Goyette; Tracey Corey; Cayne Miceli; Lee Demond Smith; Frank Minyard; Mary Howell; Gerald Arthur; Anthony Juguilon; Marcella Fierro; Lisa Schwartz; Ryan Knutson; Carissa Holliday; Pearl LeFlore; John Grossman; Tim Brown; James Lauridson; Sydney Lupkin; Jackie Bennion; Liz Day; Ryan Gabrielson)

Word Count: 5169
2/1/11 PROPUBLICA (No Page)
END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI**
**Mississippi Supreme Court Case No. 2013-DR-01796-SCT**
**Harrison Circuit Court No. B2401-09-468**

**LESLIE GALLOWAY, III, Petitioner**

v.

**STATE OF MISSISSIPPI, Respondent**



MAY 2 3 2014

GAYLE PARKER
CIRCUIT CLERK
By _____ D.C.

## MOTION FOR DISCOVERY AND ACCESS TO PHYSICAL EVIDENCE

COMES NOW LESLIE GALLOWAY III, by and through counsel, and respectfully

moves this Court to order that he is entitled to the discovery of various records as outlined in

detail below, as well as access to inspect the physical evidence in the possession, custody, or

control of various state agencies and the Harrison County Circuit Clerk's office. Petitioner makes

this motion pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States

Constitution, Article 3, Sections 14, 23, 24, 25, 26, and 28 of the Mississippi Constitution,

Mississippi Code Sections 99-39-101 *et seq.*, Mississippi Rule of Appellate Procedure 22, and

other applicable state and federal law. In support of the motion, Petitioner shows as follows:

1.      Mr. Galloway was convicted of capital murder and sentenced to death in this

Court in September 2010. The Mississippi Supreme Court affirmed his conviction and sentence

on direct appeal on June 6, 2013, and it denied rehearing on September 26, 2013. The mandate

issued on October 3, 2013. Mr. Galloway has filed a petition for writ of certiorari in the United

States Court, which remains pending.

2.      On October 28, 2013, the Mississippi Supreme Court appointed the Mississippi

Office of Capital Post-Conviction Counsel ("the Office") to provide post-conviction

1

**A068**

representation. On December 6, 2013, the Circuit Court of Harrison County, Mississippi, First

Judicial Circuit, determined Petitioner to be indigent, and the Office was appointed to represent

him in his state post-conviction proceedings.

3.     Petitioner's counsel has reviewed the files provided thus far by the Harrison

County District Attorney's Office and the Harrison County Sheriff's Office. After reviewing the

information provided and conducting a preliminary investigation, Petitioner has determined that

additional discovery is necessary to investigate and develop all meritorious claims.

## **Specific Discovery Requests**

Petitioner specifically requests the following records:

1.     Harrison County Coroner's Office. The complete personnel file of Dr. Paul

McGarry maintained by the Harrison County Coroner's Office, including but not limited to:

   a. any employment contract

   b. any document discussing his terms of employment (as a contract worker or in any
      other capacity)

   c. any internal or external audits or review of his work

   d. all documents relating to license(s), awards, courses, education, and certifications
      received

   e. any complaints against Dr. McGarry and any responses to complaints

   f. any disciplinary action taken against Dr. McGarry

   g. any documents related to any internal investigation

   h. any civil or criminal lawsuits against the Harrison County Coroner's Office in
      relation to Dr. McGarry

   i. any civil or criminal lawsuits against Dr. McGarry, and any responses to the same

2

**A069**

     j.   the number of autopsies completed by Dr. McGarry for the Harrison County
Coroner's Office, broken down by year.

2.    Dr. McGarry's testimony was the prosecution's only evidence in support of the
underlying felony of sexual battery on the capital murder charge against Petitioner. Without Dr.
McGarry's testimony, Mr. Galloway would not have been eligible for a death sentence.

3.    Upon information and belief, Dr. McGarry was terminated from the Orleans
Parish Coroner's Office before Mr. Galloway's trial.

4.    Dr. McGarry testified in this case that he had performed more than 13,000
autopsies. R. 668. Even assuming a 35-year career, that would amount to more than 371
autopsies each year, or more than one per day. To ensure quality control, the National
Association of Medical Examiners (NAME) recommends that a forensic pathologist perform no
more than 250 autopsies per year, and instructs that pathologists "*shall not* perform more than
325 autopsies in a year." NAME, Forensic Autopsy Performance Standards, (Oct. 17, 2005)
(emphasis added).

5.    Jefferson Parish Regional DNA Lab. From the Jefferson Parish Regional DNA
Lab, Petitioner seeks discovery of the following documents:

     a.  The complete case file, including but not limited to handwritten bench notes;
extraction, quantitation, PCR, hybridization, capillary electrophoresis, and results
worksheets; statistical calculations worksheets; hardcopies of chromatographic
data (electrograms); communication logs;

     b.  copies of all computer data files used and created in the course of performing the
DNA testing and subsequent analysis of the data in this case, including but not
limited to all collection files; all Genescan files, including sample files and project

3

**A070**

files; all Genotyper files, including templates/macros; any category lists; stationary pad documents; unedited step lists, data utility programs, or electrophoresis history files generated in the course of this testing;

c. all testing documentation relied upon, including but not limited to, standard operating protocols (SOP) governing the performance of DNA testing by the laboratory; quality control and assurance SOPs; the identification of the types and manufactures of all kits and reagents utilized; all protocols and manuals accompanying any instrumentation and/or software utilized; and any documentation or certificates of analysis from the manufactures of the test kits, instrumentation, and/or reagents utilized;

d. copies of the most recent curriculum vita and job description for the individuals responsible for the performance and review of the DNA testing in this case, including but not limited to Bonnie Dubourg, Julie Golden, and Connie Brown;

e. all materials from any DNA databases used or relied upon for the statistical analyses performed in connection with this case, including but not limited to: complete databases stored in electronic form on computer disc or in hardcopy form and copies of all documents or literature citations related to the source and/or origins of samples in any such databases, including the methods by which samples were collected; the background and/or characteristics of the individuals who were the source of the samples; the choice of populations and sub-populations which were sampled; the nature of the sampling procedure which were used to collect the samples; and copies of any allelic frequency tables relied upon;

4

A071

f.  all chain of custody documents for each item of evidence subjected to DNA testing including descriptions of where and how evidentiary materials were collected; where and how the materials were stored (temperature and type of container); the amount of evidentiary material consumed during testing and the amount of material remaining; where and how the remaining evidence is stored (temperature and type of container);

g.  software and macro items, including a list of all commercial software programs used in connection with the testing performed; copies of any programs and/or macros written by the testing laboratory and used in the analysis of the data generated in this case;

h.  laboratory records or other materials that document any troubleshooting, repairs, modifications or changes that were made to the instrumentation three months before and after the testing in this case, including but not limited to all documentation and certification related to the recalibration of any instrumentation with the intent of modifying the equipment for the performance purposes; any routine diagnostic checks and/or logs of the laboratory's thermal cycler and any other instrumentation, including refrigeration devices, employed in the testing; any notes, or records of communications, relating to troubleshooting which had to be performed on any instrument, including calls to technical support lines and visits by field technicians to repair the instrument; records of changes that were made to any of the instruments in the course of the testing, including replacement of any parts; records of all computer resets or "reboots" which had to be executed

5

during the testing; records of all incidents in which manual controls or overrides were employed;

i.  developmental validation studies pertaining to the specific type of DNA test performed in this case;

j.  all internal validation studies pertaining to the specific type of DNA test performed in this case;

k.  all internal and external proficiency tests executed by the technician(s) responsible for the performance of the testing in this case and by laboratory personnel, including the complete proficiency test file; computer data files; test results, evaluations, and/or reports issued by any testing agency; records maintained pursuant to TWGDAM Guideline 9.3 and DAB Standard 13.1.1 reflecting an account of any errors note in the proficiency tests requested; and an indication whether the testing was performed in open or blind fashion;

l.  all licenses or other certificates of accreditation held by the Lab from December 2008 through present;

m.  all documentation of corrective actions maintained by the Lab;

n.  the DNA profiles of all technicians in the Lab involved in casework analysis from December 2008 through September 2010;

o.  the error rates associated with the type of DNA testing performed in this case, including rates (Laboratory, State, and National) calculated from errors detected and documented in conjunction with administered proficiency tests and rates (Laboratory, State, and National) calculated from errors detected and documented in previous casework;

6

p. a list of all reagents and materials utilized in the testing performed in this case, indicating the manufacturer's certified acceptable use policy for each item (e.g., "For Research Use Only", "For Diagnostic Use," etc.);

q. all documentation associated with any audits conducted to demonstrate compliance with the Federal DNA Identification Act of 1994; and

r. complete personnel files of Bonnie Dubourg, Julie Golden, and Connie Brown, including, but not limited to, any internal or external audits or review of their work, all documents relating to license(s), awards, courses, education, certifications received, complaints against, any responses to complaints, any disciplinary action taken, any documents related to any internal investigations, and/or any civil or criminal lawsuits against the department with relation to Dubourg, Golden, or Brown, or against Dubourg, Golden, or Brown, and any responses to the same.

6.    Upon information and belief, DNA Analysts Dubourg and Golden are no longer employed with the Jefferson Parish Regional DNA Lab; Ms. Golden may not have been employed with the Jefferson Parish Regional DNA Lab at the time of Petitioner's trial.

7.    The DNA evidence was crucial to the prosecution's case against Petitioner. It purported to link him to the victim Shakeylia Anderson, to his mother's Ford Taurus (which the prosecution alleged to be the murder weapon), and to personal items found at his mother's home. The prosecution called only Ms. Dubourg to testify at trial, though she did not perform the DNA testing herself. The prosecution did not call Ms. Golden, the analyst who did conduct the testing, or Ms. Brown, her supervisor.

7

8.    Harrison County Sheriff's Office. The complete personnel files of Mechelle

Carbine, Carl Rhodes, and Nancy Kurowski in the custody or possession of the Harrison County

Sheriff's Office, including, but not limited to:

- a. any internal or external audits or review of their work
- b. all documents relating to license(s), awards, courses, education, certifications

  received
- c. complaints against and any responses to complaints
- d. any disciplinary action taken
- e. any documents related to any internal investigations
- f. any civil or criminal lawsuits against the department in relation to Carbine,

  Rhodes, or Kurowski
- g. any civil or criminal lawsuits against Carbine, Rhodes, or Kurowski, and any

  responses to the same.

9.    Officers Carbine and Rhodes led the investigation of this case. Both testified at

Mr. Galloway's trial, and their testimony was critical to Mr. Galloway's conviction and death

sentence.

10.    Upon information and belief, Officer Carbine no longer works for the Harrison

County Sheriff's Department because she was either fired or asked to resign.

11.    Jackson County Sheriff's Office. The complete personnel file of former

Lieutenant Ken McClenic, including, but not limited to:

- a. any internal or external audits or review of his work
- b. all documents relating to license(s), awards, courses, education, certifications

  received

8

**A075**

    c.  complaints against and any responses to complaints

    d.  any disciplinary action taken

    e.  any documents related to any internal investigations

    f.  any civil or criminal lawsuits against the department in relation to McClenic

    g.  any civil or criminal lawsuits against McClenic, and any responses to the same.

12.    On December 20, 2013, Lt. McClenic was indicted in Jackson County for perjury; the charge is still pending against him. *See* Indictment, *State v. McClenic*, No. 2013-10,792, Jackson County Circuit Court (Dec. 20, 2013). He was immediately terminated following the indictment. The indictment alleges that Lt. McClenic gave false testimony under oath before the Jackson County Circuit Court – testimony that conflicted with his prior testimony before the Jackson County Grand Jury.

13.    McClenic's former boss, former Jackson County Sheriff Mike Byrd, has already been convicted of felonies in federal and state court. *See* Margaret Baker, *Byrd's resignation letter says it's effective Dec. 31*, Sun-Herald (Biloxi-Gulfport, Miss.), Dec. 11, 2013. The charges against Sheriff Byrd included, among other things, that Byrd "attempt[ed] to induce Detective Ken McClenic to under false pretenses withhold testimony from Judge Sharon Sigalis in order for McClenic to obtain from the judge an arrest warrant and affidavit for an arrest in a murder case"; and "ordering Detective McClenic to sign an affidavit an obtain an arrest warrant" in a murder case, "though McClenic told Byrd at the time he did not feel [the suspect] had committed the crime." Margaret *Baker, Fraud, perjury, extortion among the many charges Mike Byrd is facing*, Sun-Herald (Biloxi-Gulfport, Miss.), Aug. 30, 2013.

14.    Ken McClenic's testimony was central to the prosecution's case at trial. Dissenting from the opinion affirming Mr. Galloway's conviction and death sentence on direct

9

appeal, Justice King, joined by Justices Dickinson and Kitchens, noted that Lieutenant McClenic gave "extremely certain" testimony, "interrupt[ing] an exchange between an attorney and the judge to (unresponsively) state the factual nature of his assertion." *Galloway v. State*, 122 So. 3d 614, 686 (2014). Justice King also found that "it is likely that his testimony swayed the jury significantly . . . ." *Id.* at 687.

15.    Attorney Wendy Martin's Complete Case File on Prior Conviction. Attorney Wendy Martin represented Mr. Galloway on a carjacking conviction (Case No. 2002-10,271, Jackson County Circuit Court), which was used as an aggravating factor against him in the sentencing phase of his capital trial. It appears that Ms. Martin had also represented the State in prior proceedings on the same charge, before she left the Jackson County District Attorney's Office. Mr. Galloway's post-conviction team has made efforts to obtain the file from Ms. Martin, without success.

16.    Former ADA George Huffman's Files. Petitioner requests that the Harrison County District Attorney's Office disclose whether the office has identified any exculpatory or impeachment evidence that should have been turned over to defense counsel in the files of former Assistant District Attorney George Huffman in any case, as well as any internal investigations regarding same.

## Access to Physical Evidence and Trial Exhibits

17.    Petitioner also requests access to the physical evidence in the possession, custody, or control of all agencies involved in the investigation and prosecution of this case, including the Mississippi Crime Lab, the Harrison County District Attorney's Office, the Harrison County Sheriff's Office, the Jackson County Sheriff's Office, the Jefferson Parish Regional DNA Lab, the Harrison County Coroner's Office, as well as the physical evidence and exhibits introduced

10

at trial now in the possession of the Harrison County Circuit Clerk. Petitioner specifically requests access to any pathology slides, charts, diagrams, or X-rays used in conducting the autopsy in this case, in the possession of the Harrison County Coroner's Office and/or Dr. Paul McGarry.

18. For evidence that cannot be reproduced, Petitioner requests an order from this Court for permission to photograph or video-record the evidence.

19. Upon viewing the evidence at the respective agencies, Petitioner may wish to attempt to retest the physical evidence in this case, and will seek leave from the Court for an order allowing the evidence to be removed temporarily from the possession of the agent who currently possesses it.

**Legal Support**

20. The Mississippi Supreme Court recognizes that given the procedural requirements facing a petitioner, pre-petition discovery should be liberally allowed (albeit upon the threshold showing of the need for discovery). *See, e.g., Russell v. State*, 819 So. 2d 1177 (Miss. 2001). M.R.A.P. 22(c)(4)(ii) also provides that a petitioner may obtain additional discovery, provided that petitioner indicates "the purpose of such discovery and that such discovery is not frivolous and is likely to be helpful in the investigation, preparation, or presentation of specific issues which the petitioner in good faith believes to be in question and proper for post-conviction relief." *See also Russell v. State*, 819 So. 2d 1177, 1179 (Miss. 2001); *Howard v. State*, 758 So. 2d 463, 465 (Miss. 2000).

21. The Mississippi Supreme Court requires a petitioner to "at least state a 'claim, prima facie,'" with respect to the grounds for relief alleged in the post-conviction petition. *Cole v. State*, 666 So. 2d 767, 775 (Miss. 1995). To make out a prima facie case, a petitioner must

allege "with specificity and detail" facts supporting his claim. *Id.* As the Mississippi Supreme Court explained in *Russell*, the Uniform Post-Conviction Collateral Relief Act, Miss. Code § 99-39-1 *et seq.*, requires a petitioner to include in a motion "specific statements of facts not within his personal knowledge and submit affidavits of witnesses who will testify with copies of documents and records that will be offered." 810 So. 2d at 1178. The failure to comply with these requirements or to demonstrate a "substantial showing of the denial of a state or federal right," will result in the summary dismissal of the petition. *Id.*

22.    In many instances, the most efficient or most practical method of obtaining the necessary information for use in a petition is through the discovery mechanisms set forth in the Rules of Civil Procedure. In some instances, the discovery mechanisms may be the only vehicle for obtaining necessary information, in particular if a witness is adverse and is unwilling to sign an affidavit or even talk to petitioner's counsel. Thus, without access to discovery, Petitioner will not be able to satisfy the procedural requirements for obtaining post-conviction relief and thus will be denied a full and fair opportunity to develop claims for post-conviction relief. In the alternative, discovery may show that what appeared to be a promising ground for relief is in fact meritless. Pre-petition discovery, therefore, may in the long run provide for a more efficient use of resources. *Cf. Blackledge v. Allison*, 431 U.S. 63, 80 (1977) (in federal habeas corpus cases, discovery may show that an evidentiary hearing is unnecessary).

23.    Petitioner is also entitled to discovery based on *Brady v. Maryland*, 373 U.S. 83 (1963). Pursuant to the Due Process Clause of the Fourteenth Amendment, the prosecution must disclose "evidence favorable to an accused upon request . . . where the evidence is material to either guilt or to punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The mandate of *Brady* and its progeny includes impeachment material because it is "evidence favorable to the

12

**A079**

accused." *United States v. Bagley*, 473 U.S. 667, 675 (1985) (citing *Brady*, 373 U.S. at 87); *see also Kyles,* 514 U.S. at 435; *Giglio v. United States*, 405 U.S. 150, 154-55 (1972); *Strickler v. Greene*, 527 U.S. 263, 282 n.21 (1999), *Hughes v. State*, 735 So. 2d 238, 253 (Miss. 1999), *Malone v. State*, 486 So. 2d 367, 368 (Miss. 1986).

24.    This obligation extends to law enforcement and others assisting in the prosecution. Accordingly, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). Where there is uncertainty as to whether a particular item is favorable to the accused, "[t]he prudent prosecutor will resolve doubtful questions in favor of disclosure.'" *Id.* at 439 (quoting *United States v. Agurs*, 427 U.S. 97, 108 (1976)). The *Brady* rule applies with full force in post-conviction proceedings. *See, e.g.*, *Thomas v. Goldsmith*, 979 F.2d 746 (9th Cir. 1992).

## Conclusion

WHEREFORE PREMISES CONSIDERED, Petitioner requests that this honorable Court find that Petitioner is entitled to the relief requested herein.

Respectfully submitted,
LESLIE GALLOWAY III, Petitioner

BY: _____

Louwlynn Vanzetta Williams, MSB #99712
Alexander Kassoff, MSB #103581
Attorneys for the Petitioner
Mississippi Office of Capital
Post-Conviction Counsel
239 North Lamar Street, Suite 404
Jackson, Mississippi 39201
TEL: (601) 359-5733
FAX: (601) 359-5050

13                                                    **A080**

## CERTIFICATE OF SERVICE

I, the undersigned attorney for the Petitioner, do hereby certify that I have on this day

sent via first-class mail, postage fully prepaid, a true and correct copy of the foregoing Motion

for Discovery to the following:

Honorable Roger T. Clark
Circuit Court Judge
Post Office Box 1461
Gulfport, MS 339502

Honorable Cameron L. Benton
Special Assistant Attorney General
Post Office Box 220
Jackson, MS 39205

This the 22nd day of May, 2014.

Alexander Kassoff, MSB #103581
Certifying Attorney

14



## IN THE CIRCUIT OF COURT OF HARRISON COUNTY
### FIRST JUDICIAL DISTRICT

**STATE OF MISSISSIPPI**

**v.**                                                    **B2401-09-468**

**LESLIE GALLOWAY, III A/K/A LESLIE**
**GALLOWAY A/K/A LESLIE "BO"**
**GALLOWAY, III**

### ORDER

CAME before the Court, the several motions of Leslie Galloway, III, pursuant to Rule 22 of the Mississippi Rules of Appellate Procedure for discovery, to compel and a request to file an "ex parte" motion under seal in his criminal cause number. The Court, having considered the written arguments of the parties, having heard the oral arguments, and having considered the premises, finds the motions should be granted in part and denied in part. It is therefore,

ORDERED that in the Motion for Discovery and Access filed in May 23, 2014, the rulings are as follows:

1. The State has represented that the Harrison County Coroner's office does not have a personnel file on Dr. Paul McGarry. The request is denied.

2. The Jefferson Parish Regional DNA Lab shall produce the complete case file regarding Leslie Galloway, as described in ¶ 5.a. of the motion to the extent this Court has authority to order such production. The remainder of the request is denied.

3. The request for the personnel files of former employees of the Harrison County Sheriff's Department, Michelle Carbine, Carl Rhodes, and Nancy Kurowski is denied. (See ¶8)

A082

4. The State shall produce "in camera" the Jackson County Sheriff's Department's personnel file of former Lieutenant Ken McClenic.

5. The State shall produce the case file of Leslie Galloway III as maintained by Wendy Martin in Case No. 2002-10,271, if a file still exists.

6. The request regarding former Assistant District Attorney, George Huffman set out in ¶16 is denied. However, all prosecutorial and investigative files of the Harrison County District Attorney, including any exculpatory or impeachment evidence contained therein, shall be produced.

7. The requests for access to physical evidence and trial exhibits is granted as to the material described in ¶17 which is within the custody and control of the District Attorney's Office, Mississippi Crime Lab, Harrison County Sheriff's Office, Jackson County Sheriff's Office, and the Harrison County Coroner's Office. (Motion for Discovery and Access to Physical Evidence - filed May 23, 2014)

8. Counsel for Leslie Galloway are to be allowed to examine, copy and/or photograph the record and exhibits in the custody of the Harrison County Circuit Clerk. The State of Mississippi shall be given reasonable notice of the examination, which is to be conducted at a reasonable time, and is allowed to have a representative present during the examination. (Motion for Discovery and Access to Physical Evidence - filed May 23, 2014). Should Petitioner desire to re-test any physical evidence, he shall petition the Court for permission to do so.

The request of the Defendant, Leslie Galloway III to file an "ex parte" motion **under seal** is granted. Defendant is to give notice to the State of Mississippi by notice

2

A083

to the Office of the Attorney General. The response of the Attorney General is due by Wednesday, September 24, 2014, at end of business day. "Ex parte presentation should be available in proceedings for expenses and discovery, but only after a determination that disclosure to the State is incompatible with a meaningful opportunity to prepare the defendant's case. This necessarily entails service on the Attorney General of pleadings and notice of hearings." *Russell v. State*, 819 So.2d 1177 (Miss. 2001)

The Motion to Compel dated July 28, 2014, is granted.

The Motion to Compel dated September 19, 2014, is granted.

SO ORDERED AND ADJUDGED, this the ___22___ day of September, 2014.

_____
ROGER T. CLARK
CIRCUIT COURT JUDGE

3

FILED
SEP 23 2014
GAYLE PARKER, CIRCUIT CLERK
By B D_____ DC

A084

SCANNED BD